1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

FREDRICK and ANNALESA THOMAS; and
JO-HANNA READ, as Guardian ad Litem of
E.T., a minor

              Plaintiffs,

        v.

JASON CANNON; BRIAN MARKERT;
RYAN MICENKO; MICHAEL WILEY;
MICHEAL ZARO; CITY OF FIFE; CITY OF
LAKEWOOD; and PIERCE COUNTY
METRO SWAT TEAM

              Defendants.

No._____

COMPLAINT FOR DAMAGES UNDER 42
U.S.C. § 1983;  AND UNDER
WASHINGTON'S PUBLIC RECORDS
ACT, RCW 42.56 *et seq.*

COME NOW the Plaintiffs, and allege as follows:

## I.  INTRODUCTION

In the early morning of May 24, 2013, a Lakewood police sniper deployed with the

Pierce County Metro SWAT Team shot and killed Leonard Thomas in front of his four year old

son, at their home in Fife, Washington.  The shooting was the deadly culmination of a response

by Metro SWAT, Fife police and others to a minor dispute between Leonard and his mother,

Plaintiff Annalesa Thomas, who had come to pick up Leonard's son, Plaintiff E.T., after learning

that Leonard was despondent about the death of a friend.  Leonard didn't want her to take the

boy, they argued, and Annalesa called police.

Over the next hours, Metro SWAT surrounded the house and ordered Leonard to give up

his child.  Leonard repeatedly told police that his child was in no danger and that he did not want

COMPLAINT FOR DAMAGES - 1

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

1  the police to take him.  Leonard also told police several times that they should get off his

2  property, and that he was unarmed.   Leonard made no threats to harm the child, the police, or

3  himself.

4  During the on-going incident, Leonard's father, Plaintiff Fredrick Thomas, arrived to see

5  if he could talk to his son.  Worried that the police officers would kill Leonard, Fredrick tried to

6  approach the house (which he owned).  When he did, SWAT officers arrested him and took him

7  to the police station, without letting him talk to Leonard.

8  After continued talks with a negotiator, Leonard agreed to let Annalesa take the child.

9  Defendant SWAT Commander Michael Zaro, who had supervising the situation for more than

10  two hours, knew Leonard was not armed and had not threatened the child.  Despite lack of any

11  concrete threat, Commander Zaro gave the following order to his subordinate officers, including

12  the sniper Brian Markert: "Do not let that kid back in the house.  If we are able to separate the

13  kid from the dad, do not let him back in the house."  Commander Zaro knew or should have

14  known that his subordinate officers would use any means necessary (including deadly force) to

15  keep Leonard from re-entering the house with the child.

16  In same time frame that Commander Zaro gave this order, he also authorized SWAT

17  team members at the back of Leonard's house to force entry with the aid of an explosive device.

18  As Leonard was releasing the child, the other SWAT team detonated the explosive device at the

19  back door.  When Leonard reacted, Officer Markert shot him.  Leonard fell to the ground inside

20  the foyer of the house.  SWAT officers in the front of the house rushed toward the porch.

21  Officers Nathan Vance and Team Leader Mike Wiley shot and killed Leonard's dog.  Leonard

22  died at the scene.  Fredrick Thomas was detained at the police station and learned about his son's

23  death later when interviewed by detectives.

24                                        **II. PARTIES**

25        2.1        Plaintiffs Fredrick and Annalesa Thomas are a married couple, residents of Pierce

26  County, Washington, the parents of decedent Leonard Thomas, and the paternal grandparents of

27

COMPLAINT FOR DAMAGES - 2

1    E.T.  They also were and are the owners of the house and property at 218 – 55th Avenue East in

2    Fife, Washington, where the unconstitutional actions alleged herein occurred.

3         2.2      Plaintiff E.T. is the minor child of Leonard Thomas.  He is brings this action

4    through his Guardian ad Litem, Jo-Hanna Read.

5         2.3      Defendant Jason Cannon is a police officer employed by the City of Lakewood

6    and a member of Metro SWAT.  Defendant Cannon was working under color of law and within

7    the course and scope of his employment at all relevant times herein.

8         2.4      Defendant Brian Markert is a police officer employed by the City of Lakewood

9    and a member of Metro SWAT.  Defendant Markert was working under color of law and within

10   the course and scope of his employment at all relevant times herein.

11        2.5      Defendant Ryan Micenko is a police officer employed by the City of Fife and a

12   member of Metro SWAT.  Defendant Micenko was working under color of law and within the

13   course and scope of his employment at all relevant times herein.

14        2.6      Defendant Michael Wiley is a police officer employed by the City of Lakewood

15   and was, at all material times, the Team Leader of Metro SWAT.  Defendant Wiley was working

16   under color of law and within the course and scope of his employment at all relevant times

17   herein.

18        2.7      Defendant Michael Zaro is a police officer employed by the City of Lakewood

19   and, at all relevant times, the Commander of Metro SWAT.  Defendant Zaro was working under

20   color of law and within the course and scope of his employment at all relevant times herein.

21        2.8      Defendant City of Fife is a municipality within the State of Washington and

22   employed some police officers who responded to the May 24, 2013 incident involving Leonard

23   Thomas.  Fife maintains a Police Department that is a municipal agency that compiled records

24   related to the May 24, 2013 officer-involved shooting of Leonard Thomas.

25        2.9      Defendant City of Lakewood is a municipality within the State of Washington and

26   employed some police officers who responded to the May 24, 2013 incident involving Leonard

27

COMPLAINT FOR DAMAGES - 3

10633.1 ie221402

1    Thomas.  The civil rights violations delineated herein were proximately caused by its customs,

2    policies and usages.

3          2.10      Pierce County Metro SWAT is a "special weapons and tactics" team and an

4    entity composed of police officers from several municipalities within Pierce County and created

5    by interlocal agreement making it a jural entity.  Metro SWAT selects its members, creates

6    policies and procedures, trains its own members, compiled and/or maintained its own records,

7    and is a separate entity from the participating municipalities that provide officers.   Metro SWAT

8    agents, including Defendants Cannon, Markert, Micenko, Wiley and Zaro, responded to the May

9    24, 2013 incident involving Leonard Thomas.  The civil rights violations delineated herein were

10   proximately caused by its customs, policies and usages.

11                          **III.   JURISDICTION**

12         3.1      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

13         3.2      Venue is appropriate in the Western District of Washington pursuant to 28 U.S.C.

14   § 1391 because at least some of the Defendants reside in this judicial district and because the

15   events and omissions giving rise to the claims alleged here occurred within the Western District

16   of Washington.

17                          **IV.     FACTUAL ALLEGATIONS**

18         4.1      In the evening of May 23, 2013, Annalesa Thomas received a call from her son,

19   Leonard Thomas.  Leonard was upset because of the recent death of a friend and wanted her to

20   pick up Leonard's four-year old child, E.T.  Annalesa went to the home where Leonard and E.T.

21   lived, and which she owned along with her husband, Fredrick Thomas, located at 218 – 55th

22   Avenue East in Fife, Washington.

23         4.2      When Annalesa arrived, Leonard was outside with Kimberly Thomas, Leonard's

24   wife (from whom he was separated) and E.T.'s mother.

25         4.3      Annalesa was concerned about Leonard because he was upset and had been

26   drinking, after a year of sobriety.  She asked him to come with her and E.T.  Grief-stricken,

27

COMPLAINT FOR DAMAGES - 4

10633.1 ie221402

1    Leonard would not or could not come, and, as Annalesa later described to police, he collapsed on

2    the stairs to the house and started to cry.

3        4.4    Annalesa tried to remove E.T. from Leonard, to take the child home with her for

4    the night.  Leonard mistook this as an attempt to remove the child from his custody and grew

5    reluctant and upset.  Annalesa slapped Leonard to try and calm him down.

6        4.5    Annalesa decided to call 911 for assistance, at approximately 10:18 p.m.  When

7    she did, Leonard "grabbed [her] wrist and took [her] phone," according to a transcript of an

8    interview Annalesa later gave investigators.

9        4.6    During the 911 call, Leonard took the phone and told the dispatcher that Annalesa

10   had hit him.  Leonard went into the house with E.T.

11       4.7    In response to the 911 call, several Fife police officers arrived at Leonard's home

12   between 10:23 p.m. and 10:31 p.m.

13       4.8    Fife Police Officer A. Quinto encountered Annalesa and Kimberly and inquired

14   about the situation.  He asked Annalesa if Leonard was suicidal and Annalesa said she didn't

15   think so.  Annalesa explained how Leonard had taken her phone and, according to the report, that

16   she had "slapped Leonard in the face with an open hand."

17       4.9    Officer Quinto advised Fife Lt. Scott Green that there "was probable cause to

18   arrest Leonard Thomas for Assault 4 DV and Interfering with the reporting of DV."

19       4.10   At 10:28 p.m., Lt. Green spoke with Leonard at length.  Lt. Green reported that

20   Leonard explained he had been assaulted by his mother, he was upset about the recent loss of his

21   friend, he did not want to come out, and he would not allow the officers in the house.  Lt. Green

22   also reported that Leonard "advised he was with his 4 year old son and that we were scaring his

23   son" and "demanded" that the police leave.

24       4.11   Officer reports noted that Leonard moved around the two-story home and

25   repeatedly told them to leave and get off his property.

26       4.12   Among other officers, Sergeant Nils Luckman of Milton arrived.  Sgt. Luckman

27   was a hostage negotiator and took over communications with Leonard.  Shortly after 11:00 p.m.,

COMPLAINT FOR DAMAGES - 5

MacDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

1   Sgt. Luckman called Leonard at his request.  Sgt. Luckman described Leonard as "up and down"

2   during the conversation, also relating that Leonard allegedly said he "was off his meds" and

3   "bipolar."  No recording was made of the communications between Sgt. Luckman and Leonard.

4       4.13    In response to Leonard's repeated requests that the police leave, Sgt. Luckman

5   said "we can't leave until we physically speak to you."  Leonard then said, per Sgt. Luckman,

6   "Well, I'm right here.  I'm in the window."  Sgt. Luckman said he could hear Leonard yelling at

7   the officers: "I'm right here.  You can see me. . . . You guys can leave."

8       4.14    After these exchanges, Sgt. Luckman said, "Well, is your son okay?" Leonard

9   purportedly responded, "Yeah, my son's okay. Here, I'll show you he's okay."  Leonard then

10  brought E.T. to the window so the officers could see him.

11      4.15    During this conversation, Sgt. Luckman asked Leonard repeatedly, "Do you have

12  any weapons?" to which Leonard responded, "No, I'm unarmed."  Sgt. Luckman said Leonard

13  "used the word 'I'm unarmed' probably four or five times in the conversation."

14      4.16    Sgt. Luckman asked Annalesa whether Leonard had any weapons, and she said

15  "No."

16      4.17    During his conversation with Sgt. Luckman, Leonard purportedly told him that he

17  did not trust Fife police, especially Chief Brad Blackburn, due to past conflicts and

18  misunderstandings.  Leonard purportedly told Sgt. Luckman that he wanted the police off his

19  property and that he had posted no-trespassing signs.  Leonard never made any threats to the

20  officers.

21      4.18    During his conversation with Sgt. Luckman, Leonard never threatened his son,

22  E.T.  Sgt. Luckman also noted that E.T. was not crying, and that he "never heard the kid

23  screaming, yelling, or anything like that on the phone."

24      4.19    At approximately 11:21 p.m., Metro SWAT was activated and its members began

25  responding to the scene.  Commanded by Defendant Michael Zaro, the SWAT presence

26  consisted of over a dozen officers, a "bear cat" vehicle, an "armed transport" vehicle, and

27

COMPLAINT FOR DAMAGES - 6

1   eventually two snipers.  The team set up surveillance around the house perimeter and prepared

2   front and rear entry teams with armed explosive devices.

3        4.20    SWAT Sgt. T.J. Rodriguez was part of the "emergency assault team" and was

4   positioned near enough to the house that Sgt. Rodriguez could communicate directly with

5   Leonard.  Leonard told Sgt. Rodriguez he had not committed a crime but he did not trust the Fife

6   Police Department.

7        4.21    When Sgt. Rodriguez tried to have Leonard release his son, Leonard purportedly

8   said: "Nope, my son's staying with me.  He doesn't have to leave."  According to Sgt.

9   Rodriguez, Leonard said he didn't want to let his son go "until Grandma [Annalesa] shows up."

10  Sgt. Rodriguez asked Leonard "to go ahead and prove that his son was okay."  Leonard initially

11  was reluctant because E.T. was asleep.  Sgt. Rodriguez then reported that "eventually he went

12  and got his son," and the "son came to the window."

13       4.22    Sgt. Rodriguez said that Leonard did not threaten his son, the police, or anyone

14  else.

15       4.23    SWAT Sgt. Mark Eakes, a trained negotiator, arrived at approximately 11:50

16  a.m., replaced Sgt. Luckman, and communicated directly with Leonard instead of Sgt.

17  Rodriguez.  Sgt. Eakes was assisted by two other SWAT team members.

18       4.24    Sgt. Eakes received information from Sgt. Luckman and others that Leonard

19  didn't like Fife police and Chief Blackburn, that he had "a 4-year-old son in the house that he

20  wasn't letting out," that he "wasn't cooperating and he wanted the police to leave basically."

21       4.25    Sgt. Eakes learned from Sgt. Luckman that Leonard did not threaten himself, the

22  police or the child.  Sgt. Eakes asked Leonard if he had any weapons and Leonard said no.  Sgt.

23  Eakes reported later that Leonard made "no direct threats like if you [police] don't leave I'm

24  going to hurt my kid."

25       4.26    Leonard also told Sgt. Eakes that he didn't like the Fife Police Department and

26  "wanted them out of there."  Leonard told Sgt. Eakes "he hadn't done anything, he just had a

27  disagreement with his mom."

COMPLAINT FOR DAMAGES - 7

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

4.27    While Sgt. Luckman, and then Sgt. Eakes, spoke with Leonard intermittently on the phone, two snipers positioned themselves on the perimeter of the house:  Zach Kenyon was the first sniper on the scene and he set up under a carport to the side of the residence.  Defendant Brian Markert, the "sniper team leader," arrived at approximately 12:21 a.m.  He identified a location directly across the street from the front of the Thomas house, and set up there with his rifle and magnification scope.

4.28    From his position, Officer Markert could see Leonard moving around the house and speaking on the phone with the negotiator.  Officer Markert received periodic updates from the negotiator, Commander Zaro, SWAT Team Leader Wiley, and others.

4.29    While Officer Markert monitored the situation, he did not hear that Leonard had ever threatened his child.  Leonard did, according to Officer Markert, warn the officers that if they came into the house, "using your stun gun, tear gas, or blowing off my door," that his child could get hurt.  Officer Markert also said he saw Leonard yell from the window in reference to his child, "Hey, here he is! Can I put him back to bed now so you all can just leave?!?"

4.30    Officer Kenyon could observe Leonard interact with his child and said it looked like the child "was laughing with his dad."

4.31    With SWAT in position, Sgt. Eakes attempted to effect the release of the child through negotiation.  At the same time, Commander Zaro and Team Leader Wiley developed "contingency" plans to make a forced entry, including using an explosive device to blow off the rear door of Leonard's home.  While these plans were developed, Commander Zaro confirmed that he and his officers did not observe "anything . . . indicating weapons or threats to the child."

4.32    During this time, Fredrick Thomas arrived, at approximately 1:08 a.m., and saw Annalesa in the back of a patrol car.  Fredrick believed Annalesa had been arrested because of the domestic incident with Leonard.  Fredrick decided to try and talk to Leonard and walked toward the house.  Annalesa saw Fredrick and told the officers what he was doing.

4.33    As Fredrick went into his back yard, SWAT officers interceded.  Fredrick tried to explain to the officers that he was the property owner and he could talk to his son.  Defendant

COMPLAINT FOR DAMAGES - 8

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

1   SWAT Officer Jason Cannon reported that Fredrick said, "I can talk them out." Defendant

2   SWAT Officer Ryan Micenko reported that Fredrick said, "he wanted to help his son get out of

3   the house and was worried he would be killed."

4       4.34    The officers did not allow Fredrick to talk to his son.  Instead Officer Cannon and

5   Officer Micenko grabbed Fredrick, threw him to the ground, immediately zipped tied his hands

6   tightly behind his back, and arrested him without probable cause to believe he had committed a

7   crime.

8       4.35    Officer Micenko took Fredrick to Lt. Green who told another officer to drive

9   Fredrick to the Fife station house.  Fredrick was kept restrained in zip-ties during the ride.  He

10  was held in a cell at the station while, back at his son's house, negotiations continued until

11  Officer Markert ultimately shot Leonard.  Fredrick was not released for several hours, until the

12  next morning after officers interviewed him.

13      4.36    Through Sgt. Eakes, the officers attempted to convince Leonard to release his

14  child.  Leonard came out onto the porch, with his son, but did not want to hand him over to the

15  police.  According to Commander Zaro, Leonard told Sgt. Eakes: "I don't trust the police, I'm

16  not sending my kid to no cops, you said that . . . my mother [Annalesa] could come and get him."

17      4.37    When Leonard did not see Annalesa from the porch, he went back inside the

18  house with his child.

19      4.38    Commander Zaro noted Leonard did not like seeing the police there.  Leonard did

20  not release the child, but, according to Commander Zaro, did not re-enter the house.

21      4.39    SWAT officers, following instructions from Team Leader Wiley and Commander

22  Zaro, prepared to set an explosive on the back door, while other officers talked to Leonard on the

23  front porch.

24      4.40    Commander Zaro decided that Leonard was not going to release the child.

25  Commander Zaro communicated to the officers:  "Do not let that kid back in the house.  If we

26  are able to separate the kid from the dad, do not let him back in the house."  In the post-incident

27  interview, Commander Zaro clarified that the officers could use "[a]ny means necessary to get

COMPLAINT FOR DAMAGES - 9

1    that kid out of there."  Commander Zaro knew this was an order to use lethal force and that his

2    officers would understand it as such.

3        4.41    He also knew the plan to have the SWAT officers behind the house had set the

4    explosive device and his understanding of the planned breach: "If the hostage was outside the

5    front door to the home, the intent was for the explosive breach to be enough of a distraction to

6    the suspect [Leonard] that the officers from the Bearcat would be able to snatch the hostage off

7    the front stoop before the suspect had a chance to react."

8        4.42    Leonard returned to front door porch with the child, and with a phone in hand on

9    which he was speaking to Sgt. Eakes.  Commander Zaro reported Leonard was yelling that "he

10   wants his mother to walk up to the porch, take the kid and go back."

11       4.43    Despite Leonard's cooperation with arrangements to have his mother take E.T.,

12   Commander Zaro ordered the rear-entry team to breach:  "Launch, entry team launch into the

13   back, breach on command."

14       4.44    As the officers planned for the breach, Annalesa could see the front of the house.

15   She saw Leonard push his son from the front door toward the officers.

16       4.45    Team Leader Wiley "radioed that all units needed to prepare for the imminent

17   execution of the deliberate rescue plan," gave the countdown, and the rear-entry team detonated

18   the device, causing what the officers described as a loud boom.

19       4.46    From his vantage point, Officer Markert reported:  "A second after I heard the

20   loud roar of the explosive breach, the suspect suddenly lunged out of the doorway towards the

21   hostage."  According to Officer Markert, Leonard grabbed his son and moved to go back into the

22   house.  Officer Markert wrote: "I discharged one round from my rifle to incapacitate the suspect

23   before he was able to retreat inside the residence with the son."

24       4.47    Officer Markert's bullet nearly hit E.T. and struck Leonard in his lower abdomen

25   and exited his buttock area.  After Officer Markert shot Leonard, Team Leader Wiley announced

26   "Jackpot!" over the radio, signifying "suspect down" according to Commander Zaro.

27

COMPLAINT FOR DAMAGES - 10

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

4.48    Sgt. Eakes, who was on the phone with Leonard when the device detonated, said: "I heard the big flash bang. I heard him screaming for his son and – to get over here, come here to daddy." Sgt. Eakes' report continued, "then I hear a couple other shots right after the flash bang."

4.49    SWAT Officer Nathan Vance and Team Leader Wiley came through the front yard and encountered Leonard's dog that had been coming in and out of the house during the incident. When the officers saw the dog, they fired several shots killing it.

4.50    SWAT Officer John Derig belonged to the team assigned to enter the backdoor. Officer Derig came through the house toward the front of the house. Officer Derig said he expected to see Leonard with a gun and "was getting ready to probably mow some legs down to stop him."

4.51    When Officer Derig got to Leonard, Leonard had fallen to the ground in a sitting position. Officer Derig was looking for Leonard to have a gun, but there was none, only the phone. Officer Derig said he "reared [Leonard's] head back and started punching him in the face."

4.52    Commander Zaro and Team Leader Wiley unreasonably, unnecessarily, negligently, recklessly and with deliberate indifference to Plaintiffs' rights ordered the explosive breach of the rear door knowing it would likely cause Leonard to react and shots to be fired.

4.53    Commander Zaro issued the order to use lethal force, as described above, despite knowing that Leonard Thomas had not threatened his child, the police, or himself; despite knowing Leonard and Annalesa had told the officers he did not have a gun or other weapon; and despite knowing that no officer had seen Leonard with a gun. Any purported "risks" or "threats" to the child or anyone else were unfounded, speculative, and/or fabricated so as to justify the fatal shooting. Commander Zaro's order to kill Leonard Thomas in front of his child if he tried to re-enter his house was unreasonable.

4.54    Officer Markert fatally shot Leonard Thomas despite knowing that Leonard had not threatened his child, the police, or himself; despite knowing Leonard and Annalesa had told

MacDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

1   the officers he did not have a gun or other weapon; and despite never having seen Leonard with a

2   gun and knowing that no other officer had seen Leonard with a gun.  Any purported "risks" or

3   "threats" to the child or anyone else were unfounded, speculative, and/or fabricated so as to

4   justify the fatal shooting.  Officer Markert's decision to kill Leonard in front of his child was

5   negligent, reckless, unreasonable and deliberately indifferent to the Plaintiffs' rights.

6         4.55    Defendant Officers' actions as described herein were negligent, reckless,

7   outrageous and deliberately indifferent to Plaintiffs' rights.  They entered and searched E.T.'s

8   home and Fredrick and Annalesa Thomas' property in an unreasonable manner; they seized

9   E.T.'s person in an unreasonable manner; and they interfered with and destroyed the Plaintiffs'

10   liberty interest in a familial relationship with their son and father, Leonard Thomas.

11         4.56    Defendants' wrongful acts and omissions, as described herein, caused the death of

12   Leonard Thomas and the destruction of the Plaintiffs' familial relationships with him.

13         4.57    As a proximate result of Defendants' wrongful actions, Plaintiff E.T. lost liberty,

14   lost his father, and suffered fear, anxiety, depression, trauma, and great emotional distress by

15   witnessing his father's death by shooting.

16         4.58    Plaintiff Annalesa Thomas has suffered outrage, fear, anxiety, depression, trauma,

17   emotional distress, damage to property and destruction of her relationship with her son Leonard

18   as a result of Defendants' wrongful acts and omissions as described herein.

19         4.59    Plaintiff Fredrick Thomas has suffered fear, anxiety, depression, trauma,

20   emotional distress, loss of liberty and damage to property, and destruction of his relationship

21   with his son Leonard, as a result of Defendants' wrongful acts and omissions as described herein.

22         4.60    In the aftermath of the shooting, on or about May 29, 2013, and again on or about

23   July 24, 2013, Plaintiffs Annalesa and Fredrick Thomas made public records requests under

24   Washington's Public Records Act ("PRA"), RCW 52.46 *et seq.*, to several municipalities which

25   were known or believed to have provided officers to Metro SWAT or sent officers independently

26   to respond to the incident.  These included Bonney Lake, Fife, Lakewood, Milton, Puyallup, and

27   Tacoma in addition to the Pierce County Sheriff's Office.  The requests asked for police reports,

COMPLAINT FOR DAMAGES - 12

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

1  audio and video recordings of the incident, witness statements, written communications between

2  the respective law enforcement agencies that responded to the incident, among other documents.

3       4.61    With exception of Milton, these municipal entities responded that the requested

4  were exempt under RCW 42.56.240(1) because the documents related to an "open and active

5  investigation" that would go to the Pierce County Prosecutors' Office for review.

6       4.62    On or about September 10, 2013, Plaintiffs Annalesa and Fredrick Thomas

7  renewed their PRA requests to Fife.  On October 2, 2013, Plaintiffs renewed their PRA requests

8  to Lakewood.  These requests asked for the following documents, among others

9       &bull;   "all video or audio recordings made by Lakewood [and Fife] Police officers from

10           10:00 p.m. on May 23, 2013 to 11:00 a.m. on May 24, 2013 related to the shooting of

11           Leonard Thomas on May 24, 2013 in Fife, Washington by Multi-Jurisdictional

12           SWAT Team and other responding officers";

13       &bull;   "any statements by or interviews or conversations any other witness to the shooting of

14           Leonard Thomas on May 24, 2013 in Fife, Washington by Multi-Jurisdictional

15           SWAT Team and other responding officers, the events that led up to it, or the

16           investigation of it."

17       4.63    On September 19, 2013, Fife estimated that a first installment would be ready by

18  October 10, 2013.  On that date, Fife wrote to Plaintiffs that the first installment would not be

19  ready until November 7, 2013.

20       4.64    Between October 17, 2013 and January 21, 2014, Lakewood responded by

21  producing in successive installments many of the requested documents.  Missing were the audio

22  and video recordings themselves, including the audio recordings of dozens of post-incident

23  interviews with officers and civilian witnesses.

24       4.65    November 12, 2013, Fife responded by producing a first installment of

25  documents.  On December 5, 2013, Fife produced a second installment of documents.  Missing

26  from these productions were audio and video recordings of the event and witness interviews,

27  among others.

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    4.66    Over a year passed while Defendant City of Fife took with no action in processing

2    Plaintiff's public records request, without contact or explanation.  In December 2014, City of

3    Fife notified that Plaintiffs should pay for records previously produced, and Plaintiffs paid.

4    Thereafter, the City resumed producing records.

5    4.67    The City of Fife last communicated with Plaintiffs on May 21, 2015, alerting

6    them that a next install of records would be produced by June 5, 2015.

7    4.68    The City of Fife still has not fully responded to Plaintiffs' public records request,

8    after 21 months.  This unreasonable delay, coupled with the year of no action on processing the

9    records requests, effectively denied Plaintiffs the right to inspect public records in violation of

10   the PRA.

11                                              **V.  CLAIMS**

12                                      **FIRST CAUSE OF ACTION**
                            **(Federal Civil Rights Violation Under 42 U.S.C. § 1983)**

13

14   5.1    By virtue of the facts set forth above, all the Defendants except the City of Fife

15   are liable for compensatory and punitive damages for deprivation of civil rights of Plaintiff E.T.

16   guaranteed by the Fourth Amendment to  the Constitution of the United States and 42 U.S.C. §

17   1983, to be free from  unreasonable searches and entries into his home.

18   5.2    By virtue of the facts set forth above, all the Defendants are liable for

19   compensatory and punitive damages for deprivation of the civil rights of  Plaintiff  E.T.,

20   guaranteed by the Fourth Amendment to the Constitution of the United States and 42 U.S.C. §

21   1983, to be free from unreasonable seizures of his person.

22

23   5.3    By virtue of the facts set forth above, all the Defendants (except the City of Fife)

24   are liable for compensatory and punitive damages for deprivation of the civil rights of Plaintiff

25   E.T.  guaranteed by the  Fourteenth Amendment to the Constitution of the United States and 42

26   U.S.C. § 1983, to be free from the deprivation of his liberty interest in a family relationship with

27   his father without due process of law.

COMPLAINT FOR DAMAGES - 14

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

5.4     By virtue of the facts set forth above, all the Defendants except the City of Fife are liable for compensatory and punitive damages for deprivation of civil rights of Plaintiffs Fredrick and Annalesa Thomas guaranteed by the Fourth Amendment to the Constitution of the United States and 42 U.S.C. § 1983, to be free from unreasonable searches and entries into their house and property.

5.5     By virtue of the facts set forth above, all the Defendants (except the City of Fife) are liable for compensatory and punitive damages for deprivation of the civil rights of Plaintiffs Fredrick and Annalesa Thomas, guaranteed by the Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983, to be free from the deprivation of their liberty interest in a familial relationship with their son Leonard without due process of law.

5.6     By virtue of the facts set forth above, Defendants Cannon and Micenko and the City of Fife are liable for compensatory and punitive damages for deprivation of the civil rights of Plaintiff Fredrick Thomas guaranteed by the Fourth Amendments to the Constitution of the United States and 42 U.S.C. § 1983, to be free from unreasonable seizures of his person.

## SECOND CAUSE OF ACTION
### (State Law Claim)

**5**.7     By virtue of the facts set forth above, the City of Lakewood, the City of Fife, and the Pierce County Metro SWAT team, are liable to Plaintiffs Frederick Thomas, Annalesa Thomas and E.T. for compensatory damages for the tort of outrage.

## THIRD CAUSE OF ACTION
### (State Law Claim)

5.8     By virtue of the facts set forth above, the City of Lakewood, the City of Fife, and the Pierce County Metro SWAT team, are liable to Plaintiff Fredrick Thomas for compensatory damages for false arrest.

COMPLAINT FOR DAMAGES - 15

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

1

2

## FOURTH CAUSE OF ACTION
### (State Law Claim)

3

4        5.9     By virtue of the facts set forth above, the City of Lakewood, the City of Fife, and

the Pierce County Metro SWAT team, are liable to all Plaintiffs for compensatory damages for

5

negligence.

6

7

## FIFTH CAUSE OF ACTION
### (Violations of Washington's Public Records Act, RCW 42.56 *et seq.*)

8

9        5.10    Due to the acts and omissions described above, Defendants City of Fife failed to

10

meet their burden in promptly producing all public records requested, in violation of RCW 42.56

11

*et seq.*

12

## VI.    PRAYER FOR RELIEF

13

WHEREFORE, Plaintiffs request relief as follows:

14

6.1     Compensatory damages;

15

6.2     Punitive damages from the individual Defendants on Plaintiffs' claims under 42

16

17

U.S.C. § 1983;

18

6.3     Costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and to the

19

extent otherwise permitted by law;

20

6.4     Disclosure and production of all non-exempt documents and information

21

requested in Plaintiffs' public records requests that have not been produced;

22

6.5.    Penalties awarded to Plaintiffs Annalesa and Fredrick Thomas under RCW

23

42.56.550(4);

24

25

6.6     Reasonable attorneys' fees and costs under RCW 42.56.550(4) and to the extent

26

otherwise permitted by law;

27

6.7     Such other relief as may be just and equitable.

COMPLAINT FOR DAMAGES - 16

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402

1    DATED this 22nd day of May, 2015.

2                                    MacDONALD HOAGUE & BAYLESS

3

4                                    By: /s/ Timothy K. Ford
                                         Timothy K. Ford, WSBA #5986
5                                        timf@mhb.com

6                                    By: /s/ David J. Whedbee
                                         David J. Whedbee, WSBA # 35977
7                                        davidw@mhb.com

8                                    Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

COMPLAINT FOR DAMAGES - 17

MacDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10633.1 ie221402