1

Honorable Barbara J. Rothstein

2

3

4

5

6

7              UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON AT TACOMA

8

9   FREDRICK and ANNALESA THOMAS; and
    JO-HANNA READ, as Guardian ad Litem of
    E.T., a minor,

10
                                                    Nos. 3:15-cv-05346 BJR
                                                          3:16-cv-05392
                        Plaintiffs,                  CONSOLIDATED CASES

11

        v.

12

13  JASON CANNON; BRIAN MARKERT; RYAN          **DECLARATION OF MEAGHAN M.**
    MICENKO; MICHAEL WILEY; MICHAEL           **DRISCOLL IN OPPOSITION TO**
    ZARO; CITY OF FIFE; CITY OF LAKEWOOD;     **DEFENDANTS' MOTION FOR**
14  and PIERCE COUNTY METRO SWAT TEAM,        **SUMMARY JUDGMENT**

15                      Defendants.

16  FREDRICK THOMAS and ANNALESA
    THOMAS, as Co-Administrators of the Estate of
17  Leonard Thomas, and its statutory beneficiaries,

18  Plaintiffs,

19  v.

20  BRIAN MARKERT; MICHAEL WILEY;
    NATHAN VANCE; MICHAEL ZARO; SCOTT
21  GREEN; JEFF RACKLEY; CITY OF FIFE;
    CITY OF LAKEWOOD; PIERCE COUNTY
22  METRO SWAT TEAM; and JOHN DOES 1
    through 10,

23

24  Defendants.

25

26

27

**CONNELLY LAW OFFICES, PLLC**
2301 North 30th Street
Tacoma, WA 98403
(253) 593-5100 Phone - (253) 593-0380 Fax

1

2

Meaghan M. Driscoll declares as follows:

3

I am an attorney of record for the Plaintiff, The Estate of Leonard Thomas. I make this

4

declaration in support of Plaintiff's Response in Opposition to Defendants' Motion for Summary

5

Judgment. I am above the age of eighteen and am competent to testify to the matters described

6

herein and do so based on my own personal knowledge.

7

1.      Attached as Exhibit 1 are true and accurate excerpts of the deposition of Annalesa

8

Thomas.

9

10

2.      Attached as Exhibit 2 are true and accurate excerpts of the deposition of Kimberly

11

Thomas.

12

3.      Attached as Exhibit 3 are true and accurate excerpts of the deposition of Brad

13

Blackburn.

14

4.      Attached as Exhibit 4 are true and accurate excerpts of the deposition of Michael

15

Zaro.

16

17

5.      Attached as Exhibit 5 is a true and accurate copy of the May 23-24, 2013 scene

personnel log.

18

19

6.      Attached as Exhibit 6 are true and accurate excerpts of the deposition of Ryan

20

Micenko.

21

7.      Attached as Exhibit 7 are true and accurate excerpts of the deposition of Brian

22

Markert.

23

8.      Attached as Exhibit 8 are true and accurate excerpts of the deposition of Michael

24

Wiley.

25

26

9.      Attached as Exhibit 9 are true and accurate excerpts of the deposition of Zachary

27

Kenyon.

**CONNELLY LAW OFFICES, PLLC**
2301 North 30th Street
Tacoma, WA 98403
(253) 593-5100 Phone - (253) 593-0380 Fax

10.     Attached as Exhibit 10 are true and accurate excerpts of the deposition of Mark Eakes.

11.     Attached as Exhibit 11 are true and accurate excerpts of the written statement of Officer Brian Markert.

12.     Attached as Exhibit 12 are true and accurate excerpts of Metro Crime Response Unit's interview of Michael Wiley, taken on May 24, 2013.

13.     Attached as Exhibit 13 are true and accurate excerpts of the deposition of Nils Luckman.

14.     Attached as Exhibit 14 are true and accurate excerpts of the Metro Crime Response Unit's interview of Mark Eakes, taken on May 24, 2013.

15.     Attached as Exhibit 15 are true and accurate excerpts of the Metro Crime Response Unit's interview of Zachary Kenyon, taken on May 24, 2013.

16.     Attached as Exhibit 16 are true and accurate excerpts of the deposition of Charles Porche.

17.     Attached as Exhibit 17 are true and accurate excerpts of the deposition of Tom Thompson.

18.     Attached as Exhibit 18 are true and accurate excerpts of the SWAT 2 Transcript.

19.     Attached as Exhibit 19 are true and accurate excerpts of the transcribed audio interview of Brian Markert, taken June 4, 2013.

20.     Attached as Exhibit 20 are true and accurate excerpts of the Metro Crime Response Unit's interview of Mike Malave, taken on May 24, 2013.

21.     Attached as Exhibit 21 are true and accurate excerpts of the Metro Crime Response Unit's interview of Mike Zaro taken on May 24, 2013.

DECLARATION OF MEAGHAN M. DRISCOLL - 3of 5
(Cause Nos. 3:15-cv-05346 BJR; 3:16-cv-05392 BJR)

CONNELLY LAW OFFICES, PLLC
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

22.     Attached as Exhibit 22 is a true and accurate excerpt of the deposition of John Derig.

23.     Attached as Exhibit 23 is a true and accurate excerpt of the deposition of Matthew Watson.

24.     Attached as Exhibit 24 is a true and accurate excerpt of the deposition of Micah Wilson.

25.     Attached as Exhibit 25 is a true and accurate excerpt of the Metro Crime Response Unit's interview of Nils Luckman, taken on May 24, 2013.

26.     Attached as Exhibit 26 is a true and accurate copy of the City of Lakewood Policy 41.2.7 "Responding to Persons with Mental Illness".

27.     Attached as Exhibit 27 are true and accurate copies of policies and procedures from the City of Fife, City of Buckley, and City of Sumner regarding interactions with individuals with mental illness.

28.     Attached as Exhibit 28 is a true and accurate copy of the Professional Standards Shooting Review Board decision letter and supporting documentation regarding Brian Markert's shooting of Leonard Thomas.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and accurate to the best of my knowledge and belief.

DATED this 21st day of February, 2017 at Tacoma, Washington.


By:     _____*/s/ Meaghan M. Driscoll*_____
        Meaghan M. Driscoll, WSBA No. 49863

DECLARATION OF MEAGHAN M. DRISCOLL - 4of 5
(Cause Nos. 3:15-cv-05346 BJR; 3:16-cv-05392 BJR)

**CONNELLY LAW OFFICES, PLLC**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 21st day of February, 2017, I electronically filed the forgoing

with the Clerk of the U.S. District Court for the Western District of Washington using the

CM/ECF system, which will send notification of such filing to all counsel of record:

| | |
|---|---|
| KEATING BUCKLIN McCormack<br>Richard B. Jolley<br>Jeremy W. Culumber<br>rjolley@kbmlawyers.com<br>jculumber@kbmlawyers.com<br>800 Fifth Ave., Ste. 4141<br>Seattle, WA 98104<br>**Attorneys for Defendant** | MacDonald Hoague & Bayless<br>Timothy K. Ford<br>David J. Whedbee<br>Tiffany M. Cartwright<br>705 2nd Avenue, Suite 1500<br>Seattle, WA 98104<br>timf@mhb.com<br>davidw@mhb.com<br>tiffanyc@mhb.com<br>**Attorneys for Plaintiffs** |

DATED this 21st day of February, 2017.

CONNELLY LAW OFFICES, PLLC

By _____

Brooke E. Marvin, Paralegal

DECLARATION OF MEAGHAN M. DRISCOLL - 5of 5
(Cause Nos. 3:15-cv-05346 BJR; 3:16-cv-05392 BJR)

**CONNELLY LAW OFFICES, PLLC**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax



EXHIBIT 1

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3
    FREDERICK and ANNALESA THOMAS;  )
 4  and JO-HANNA READ, as Guardian  )
    ad Litem of E.T., a minor,      )
 5                                  )
             Plaintiff(s),  ) 3:15-cv-05346 BJR
 6                                  )
         vs.                        )
 7                                  )
    JASON CANNON; BRIAN MARKERT;    )
 8  RYAN MICENKO; MICHAEL WILEY;    )
    MICHAEL ZARO; CITY OF FIFE;     )
 9  CITY OF LAKEWOOD; and PIERCE    )
    COUNTY METRO SWAT TEAM,         )
10                                  )
             Defendant(s).   )
11
12    VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
13                  ANNALESA THOMAS
14
15
16              9:30 A.M.
17           AUGUST 8, 2016
18          2301 N. 30TH STREET
19          TACOMA, WASHINGTON
20
21
22
23
24
25  REPORTED BY: PATSY D. JACOY, CCR 2348
```

Page 2

```
 1            A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
 4    TIMOTHY K. FORD
      MacDonald Hoague & Bayless
 5    705 Second Avenue, Suite 1500
      Seattle, WA 98104
 6    206.622.1604
      timf@mhb.com
 7
 8  FOR THE PLAINTIFF ESTATE OF LEONARD THOMAS:
 9    MEAGHAN M. DRISCOLL
      Connelly Law Offices
10    2301 North 30th Street
      Tacoma, WA 98403
11    253.593.5100
      mdriscoll@connelly-law.com
12
13  FOR THE DEFENDANTS:
14    RICHARD B. JOLLEY
      JEREMY W. CULUMBER
15    Keating, Bucklin & McCormack, Inc., P.S.
      800 Fifth Avenue, Suite 4141
16    Seattle, WA 98104-3175
      206.623.8861
17    rjolley@kbmlawyers.com
      jculumber@kbmlawyers.com
18
19  ALSO PRESENT: Lori Talbott, Legal Videographer, CLVS
             YOM Full Service Court Reporting
20
21
22
23
24
25
```

Page 3

```
 1                 I N D E X
 2
 3  EXAMINATION BY:                  PAGE(S)
 4    MR. JOLLEY                       6
 5    MR. FORD                       129
 6
 7
 8
 9
10
11
12  EXHIBITS FOR IDENTIFICATION        PAGE
13  Exhibit 1  Charging Documents in Cause    19
14      No. 00 1 01410 6
15  Exhibit 2  Declaration for Determination of   23
16      Probable Cause
17  Exhibit 3  Tacoma Police Department Arrest    40
18      Report
19  Exhibit 4  Petition for Order for Protection   43
20  Exhibit 5  Fife Police Department Case        46
21      Supplemental Information
22  Exhibit 6  Fife Police Department Case        49
23      Supplemental Information
24  Exhibit 7  Photograph            54
25  Exhibit 8  Photograph            57
```

Page 4

```
 1  EXHIBITS FOR IDENTIFICATION        PAGE
 2  Exhibit 9  Photograph            59
 3  Exhibit 10  Photograph           63
 4  Exhibit 11  Fife Police Department Incident   71
 5      Detail Report
 6  Exhibit 12  CD of 911 call         89
 7  Exhibit 13  Transcript of interview of       110
 8      Annalesa Thomas
 9  Exhibit 14  Defendants' First Interrogatories 118
10      and Requests for Production to
11      Jo-Hanna Read as Guardian Ad Litem
12      of E.T., a Minor and Answers
13      Thereto
14  Exhibit 15  Hand-drawn diagram         130
15
16
17
18
19
20
21
22
23
24
25
```

1 don't know the details of it at all.

2    Q. Did it concern you for Elijah to be in an

3 environment where there was conflict between Leonard

4 and his girlfriend that resulted in him being stabbed?

5    A. She left immediately after -- after that

6 incident, they -- they no longer lived together.

7    Q. Were you aware that someone had set Leonard's

8 car on fire?

9    A. I was not aware of that incident at all.  I --

10 I've been told, but I -- I'm -- I don't -- I'm not

11 aware of that incident.

12    Q. Did you ever have a concern that Elijah was

13 exposed to violence there at the house on 55th Avenue

14 in Fife?

15    A. No.

16    Q. Leonard didn't have a driver's license,

17 correct?

18    A. Correct.

19    Q. How long had it been since Leonard had

20 actually been able to drive?

21    A. I don't recall.

22    Q. How did Leonard get around with Elijah to run

23 errands and do things with Elijah?

24    A. Myself or my mother would pick him up for

25 particular appointments and things like that.

1    Q. And where does your mother live?

2    A. She lives in Tacoma as well.

3    Q. Do you know who Mark Patterson is?

4    A. I believe he had a trailer at the house for a

5 period of time.

6    Q. When you say he had a trailer at the house,

7 what do you mean?  Like where was the trailer located?

8    A. In the back.  There are -- there are two

9 driveways at our residence and he had parked one at the

10 very back of our property.

11    Q. And how did you know Mark Patterson?

12    A. I didn't.

13    Q. What was your understanding of the

14 relationship between Leonard and Mark Patterson?

15    A. They were friends.

16       MR. JOLLEY: Let's mark this --

17    A. Acquaintances -- no, they weren't friends,

18 they were acquaintances.  He -- he was someone that

19 someone else knew and introduced Leonard.  They weren't

20 close, what I would consider close friends.

21    Q. (BY MR. JOLLEY)  Did you know that Mark

22 Patterson was a sex offender?

23    A. I did not.

24    Q. Would that have concerned you to know that a

25 sex offender was living on your property while Elijah

1 was living there?

2       MR. FORD: Objection, assumes a fact not

3 in evidence.

4       MR. JOLLEY: We'll mark this one as --

5 are we at 10, 11?

6       (Deposition Exhibit 11 was

7           marked for identification.)

8    Q. (BY MR. JOLLEY)  Take a look at Exhibit 11,

9 Mrs. Thomas.

10    A. (Witness reading document.)

11    Q. At some point Mark Patterson was living on

12 your property, correct?

13    A. Yes.

14    Q. And Mark Patterson was a sex offender,

15 correct?

16    A. Not that I was aware of.

17    Q. Had you known that, would you have been

18 concerned about him living there, given that Elijah was

19 living in the house?

20    A. Had --

21       MR. FORD: Objection, assumes a fact not

22 in evidence.  Go ahead.

23       MR. JOLLEY: Which fact is not in

24 evidence?

25       MR. FORD: That he is in fact a sex

1 offender.  You haven't proven that.

2    Q. (BY MR. JOLLEY)  Go ahead.

3    A. If he had indeed been a sex offender, had I

4 been aware that he was a sex offender, he would not

5 have been on the property.

6    Q. You would agree that knowingly exposing

7 your -- a four-year-old to a sex offender is

8 unacceptable?

9    A. Extremely unacceptable.

10    Q. How did you wind up at the house in Fife on

11 the day of the incident when Leonard was shot?

12    A. He called me.

13    Q. And when he called you, what did he say?

14    A. He said that he was upset over the death of

15 his friend and just maybe if I could come pick up

16 Elijah for the night.

17    Q. And so when you were talking to him first over

18 the phone, did you think he had been drinking?

19    A. I did.

20    Q. And did that concern you?

21    A. Certainly.

22    Q. How come?

23    A. Because he hadn't drank in such a long time.

24    Q. And when you talked to him over the phone did

25 he seem to be emotionally distraught?

1     A. Emotional.
2     Q. And why did you think he was emotional?
3     A. Because he just lost his best friend the week
4 before.
5     Q. It was actually his best friend's brother,
6 right?
7     A. Yeah, they were all best friends, him and
8 Davey, they were all -- they all grew up together, all
9 three of them, and they played together, so I won't --
10 distinction -- he was closer to Davey than he was to
11 Adam, but they were all close.
12     Q. Describe what happened when you first got to
13 the house.
14     A. I walked up and I believe Kim and Leonard were
15 sitting in Kim's car and I asked them where Elijah was
16 and they said he was in the house and I went after him.
17     Q. And was -- was it your understanding that you
18 were going over to pick up Elijah that evening?
19     A. It was.
20     Q. What happened when you went into the house?
21     A. I called for Elijah, I believe he was sitting
22 down putting on his shoes, and we finished putting on
23 his shoes and came back outside.
24     Q. And when you came back outside, where was
25 Leonard?

1     A. I believe him and Kim were standing at the
2 bottom of -- of the steps to the kitchen door.
3     Q. At some point that evening was -- was there a
4 period where Leonard is actually lying on the porch or
5 lying on the floor in the living room crying?
6     A. No. On the porch, I -- he sat down on the
7 porch at -- steps at one point, but we never reentered
8 the house.
9     Q. Was he actually lying down on the porch
10 crying?
11     A. No, he was sitting on the porch crying.
12     Q. When he was on the porch crying, were you
13 concerned about Elijah seeing that?
14     A. I was concerned for Leonard. I was concerned
15 for Leonard, he was -- he was very sad and -- and
16 probably concerned for Elijah, too, to see his dad cry
17 because I'm sure that upset him, but I was more
18 concerned for Leonard at that point because I knew he
19 was really sad.
20     Q. So you don't have any recollection of Leonard
21 actually lying down on the porch or on the floor in the
22 living room crying?
23     A. I -- as I said, we did not go in the house.
24     Q. Was there ever a discussion between you and
25 Leonard that night where you told him, You have to get

1 up, you're a grown man, words to that effect?
2     A. No, sir. I -- I said to Leonard, You need to
3 come with me because I have to work tomorrow. And my
4 thought was that I would have him and Elijah spend the
5 night at our home and he -- you know, get some sleep
6 and then my husband works a night shift and he could
7 take them home in the morning.
8     Q. And when you said to Leonard, Will you come
9 with me or you need to come with me, what was his
10 response?
11     A. I believe he said, I can't.
12     Q. And did you hear Kim tell Leonard words to the
13 effect of, You're a grown man, you need to get up?
14     A. I don't.
15     Q. At some juncture do you recall Leonard saying
16 to you, quote, I can't take it anymore?
17     A. I do.
18     Q. When did that happen?
19     A. In that when we were at this -- at the porch
20 and -- and while we were standing at the porch, in that
21 vicinity I believe.
22     Q. When he said, I can't take it anymore, how did
23 you interpret that?
24     A. Again, that he was very distraught over the
25 loss of this friend, it had been very sudden, and he

1 had also found out like the -- this is told me the
2 night before, that a dog that he had raised from a
3 puppy, he actually fed this dog a bottle, had a very
4 large tumor, so he was very concerned about that. So
5 he had some things he was worried and concerned over
6 and upset about.
7     Q. How did he know that -- and the dog's name was
8 Baxter, correct?
9     A. It was, yes.
10     Q. How did he know that Baxter had a tumor?
11     A. Because it was very large.
12     Q. So this was something that -- that Leonard
13 could actually see on Baxter's leg?
14     A. I -- I'm assuming so, yes.
15     Q. And how old was Baxter at the time?
16     A. Ten maybe.
17     Q. And was it Leonard's belief that -- that
18 Baxter was going to die from this tumor?
19     A. I'm sure he was very concerned, he -- he was
20 extremely attached to Baxter.
21     Q. And his friend that had passed away, didn't he
22 have some sort of like terminal illness, like a
23 disease?
24     A. I don't know. I don't know. I know that his
25 death was fairly sudden and he was pretty young.

1    Q.  When Leonard said, I can't take it anymore,
2  did you think that that meant that he was suicidal?
3    A.  No.
4    Q.  Right at that moment when Leonard is saying, I
5  can't take it anymore, was he crying as well?
6    A.  Yes, I believe so.
7    Q.  At that point, did you believe that Elijah
8  needed to be removed from that environment?
9    A.  No, my concern was that I wanted them both to
10  come with me.
11   Q.  At some point did you put Elijah in your car?
12   A.  I don't recall putting Elijah in my car.
13   Q.  At some point were you holding Elijah?
14   A.  Yeah, I believe I was holding Elijah when we
15  came down, you know, or holding his hand, I don't know
16  that I was carrying him, but I think I was holding his
17  hand.
18   Q.  Was there any time that night where Leonard
19  actually took Elijah from you?
20   A.  I don't recall.
21   Q.  Walk me through what happens from the time
22  Leonard says, I can't take it anymore, until you call
23  911.
24   A.  Okay.  At some point we moved down the
25  driveway toward the street, I don't know if that -- I

1  don't recall if that was because we were going to load
2  Elijah in my car, I -- I don't remember.  And I kept
3  trying to encourage Leonard to come with me because
4  that was what I wanted, was Leonard to come with me.
5         And at some point he did pick Elijah up and I
6  know both myself and Kim were saying, Come on, just
7  give him to us, you know, give him so I can take him
8  home, you know, it's getting late, you know.  I -- I
9  had to work the next day.  Kim actually works -- at
10  that time I believe worked a very early, early, early
11  morning shift, I think she had to be like to work at
12  4:00, so.
13   Q.  And was Leonard resistant to you taking
14  Elijah?
15   A.  He was.
16   Q.  Describe for me what he was doing.
17   A.  He had Elijah in his arms at one point, and
18  again, I'm kind of vague on how all that -- how did he
19  get him in his arms and how we transpired with each
20  other, I don't -- I don't recall all those details.
21  But at some point he was just kind of holding him in
22  front of him kind of dodging back and forth and I was
23  kind of pulling on him and saying, Just -- just give
24  Elijah to us.
25   Q.  Was there an actual sort of tug of war, not

1  where you're trying to pull Elijah in two, but where
2  you're tugging on Elijah and Leonard is holding him?
3    A.  I would say that's fair.
4    Q.  Did Leonard think that you were taking Elijah
5  away permanently?
6    A.  I don't know what Leonard was thinking for
7  sure, but in retrospect, as I think back on it, I think
8  because I had made statements to him that after he had
9  gone through treatment that I wanted him to stay clean
10  and sober and if he didn't, I might take Elijah from
11  him.  So I had made that statement to him, so perhaps
12  that's what he was thinking.
13   Q.  And was there any discussion where you said,
14  I'm just taking him for the night, or anything like
15  that?
16   A.  No, I just said -- I -- I got exasperated, I
17  did.  I -- I was tired, I wanted to go home, I wanted
18  him to come with me, he wasn't cooperating with us and
19  I just said, All right, just -- I'm going to just take
20  him.  And I think that's when we proceeded from the
21  steps down the driveway, but I don't recall exactly the
22  sequences.
23   Q.  Would you describe Leonard's frame of mind
24  that night as being rational?
25   A.  Certainly not, he'd been drinking.

1    Q.  But there was no discussion between the two of
2  you such as you telling him, I'm just taking him for
3  the night, or Leonard asking, Are -- do you -- are you
4  trying to custody of him, anything like that?
5    A.  No, no.
6    Q.  Why did you call 911?
7    A.  Because we were scuffling at the end of the
8  driveway and -- and I was trying to get Elijah and I
9  became -- I became angry, I -- I got angry and I said,
10  If you don't stop this, I'm going to call the police.
11   Q.  And why did you believe at that moment that
12  calling the police would be some sort of option that
13  you'd want to exercise?
14   A.  It's something I really regret, but at that
15  point I thought my -- my whole concern in this whole
16  thing was that if I left Elijah there, because Leonard
17  had not drank in a very long time, that Leonard might
18  fall asleep and then Elijah would be left unattended.
19  I never ever conceived that or thought that he would
20  harm Elijah in any way, my only concern was that he
21  might fall asleep.
22   Q.  And when you said words to the effect of, I'm
23  going to call 911 or call the police, what was
24  Leonard's response?
25   A.  He said, Go ahead.

Page 81

1    Q.  And what did you do then?
2    A.  I stepped over in the neighbor's yard and
3  called 911.
4    Q.  And when you say you stepped over in the
5  neighbor's yard, would this be the yard that is
6  adjacent to your house as you're going back towards the
7  Outpost, in that direction?
8    A.  Okay.  The best way I can describe it is if
9  I'm facing the house, the yard is on my right-hand
10  side.
11    Q.  If you're facing the house from where the
12  motor home is and the red barn?
13    A.  Uh-huh.
14    Q.  Then the yard would be to your right?
15    A.  Correct.
16    Q.  Okay.
17        MR. JOLLEY:  We're going to play the 911
18  tape now and I've got a copy for you guys, I'm just --
19  what I'm going to do is just play this one and then
20  leave it for the court reporter.
21        MR. FORD:  Okay.
22        MR. JOLLEY:  Let's see, Meaghan, I think
23  I might have two.  If not, I can certainly make one
24  later, however you guys want to handle it.
25        (Discussion off the record.)

Page 82

1    Q.  (BY MR. JOLLEY)  So Ms. Thomas, what I --
2  Mrs. Thomas, what I'm going to do is I'm going to play
3  a little portion of it and stop and ask you some
4  questions, okay?
5    A.  Yes.
6        (Audiotape playing.)
7    Q.  (BY MR. JOLLEY)  First off, can you hear it
8  okay?
9    A.  No, sir, I can't.
10    Q.  Okay, let's turn it up and we'll start over.
11        (Audiotape playing.)
12    Q.  (BY MR. JOLLEY)  Can you hear your voice right
13  there?
14    A.  Uh-huh.
15    Q.  And you are saying, Get away from me, correct?
16    A.  I believe so.  That sounds like it.
17    Q.  And so right at that moment what is going on
18  when you're saying, Get away from me?
19    A.  I don't -- I don't recall exactly, I don't
20  recall, but I -- at some point -- point I know Leonard
21  did come across the lawn in my direction.
22    Q.  And so you don't recall what's going on at the
23  moment that you say, Get away from me?
24    A.  No.
25        (Audiotape playing.)

Page 83

1    Q.  (BY MR. JOLLEY)  And is that your voice
2  saying, I need the police?
3    A.  Yeah.
4    Q.  And at that point as you're actually on the
5  phone, why did you think you needed the police?
6    A.  I just wanted -- I just wanted to have the
7  police come, have them, you know, go up to the door,
8  knock on the door, tell him, Hey, Elijah -- or Hey,
9  Leonard, you've had a couple things to drink, how about
10  we give the grandson to the grandma for the night and
11  you sleep it off.
12    Q.  Prior to -- oh, actually I'll ask you that
13  down the road.
14        At that point when you are on the 911 tape
15  saying, I need the police, it's because you actually
16  wanted the police to take Elijah or give Elijah to you
17  for the evening, correct?
18    A.  Correct.
19    Q.  How would you describe your tone of voice
20  right there on the 911 tape?
21    A.  I sound scared.
22        (Audiotape playing.)
23    Q.  (BY MR. JOLLEY)  Let's stop it there.  That's
24  Leonard's voice on the 911 tape?
25    A.  It is.

Page 84

1    Q.  How did Leonard get the phone after you were
2  on the 911 call originally?
3    A.  He took it.
4    Q.  And how did he take it?
5    A.  He -- I -- I'm left-handed, I had the phone
6  like this (indicating) and I believe he took my hand
7  and then removed the phone.
8    Q.  And did you have some -- first off, what kind
9  of phone was it?
10    A.  I don't -- I -- I think it might -- yeah, it
11  was my iPhone, it was my first iPhone, so it was a -- a
12  square kind of.
13    Q.  And did your iPhone have a case on it?
14    A.  Yeah, it did.
15    Q.  At some point did the case get broken?
16    A.  Earlier, earlier I had ahold of the phone
17  and -- and -- I don't know how, but the case fell off
18  and it -- it fell on the ground and was broken.
19    Q.  Was the case broken while you and Leonard were
20  sort of going back and forth with Elijah?
21    A.  I believe so, some -- at some point I'm -- but
22  I don't even know -- I don't even know why I was
23  holding the phone or whatever, but I do recall that the
24  case fell off and it -- as soon as it hit the pavement
25  it broke.

1    Q.  At some point before the phone broke did you
2  have it out to call 911?
3    A.  No.
4    Q.  Okay.  I'm just going to rewind it just a
5  touch and then let it play through a little bit
6  further.
7         (Audiotape playing.)
8    Q.  (BY MR. JOLLEY)  Did you punch Leonard in the
9  face?
10    A.  I did not punch him like with a fist.  I -- I
11  believe I hit him a couple times in the face open --
12  open handed like that (indicating), but I don't believe
13  I punched him.
14    Q.  So when Leonard indicated to 911 that you were
15  punching him in the face, that was an exaggeration,
16  correct?
17    A.  Correct.
18    Q.  And when you hit him, you were hitting him
19  with an open hand?
20    A.  To my recollection I was hitting him with an
21  open hand, but I don't recall if I actually hit him,
22  I just don't remember.  I do remember slapping him,
23  though.
24    Q.  And Leonard was 6'9"?
25    A.  6'8".

1    Q.  6'8"?
2    A.  Uh-huh.
3    Q.  And how tall are you?
4    A.  I'm about 5'5", I believe.
5    Q.  And is it -- would it have been a reach for
6  you to actually slap Leonard in the face?
7    A.  I wouldn't say a -- a reach necessarily.  I
8  mean, I wasn't on my tiptoes like this (indicating) or
9  anything like that, but yeah, I would have had to
10  stretch my hand.
11    Q.  Did you -- when you were -- is it fair to say
12  you were slapping at him?
13    A.  I was, yeah.
14    Q.  When you were slapping at him, were you
15  slapping him in the face?
16    A.  I remember hitting him twice in the face, at
17  least twice.
18    Q.  And can you say where at on his face?
19    A.  Cheek area and I -- I seem to recall that I
20  must have scratched his nose because I -- he was
21  bleeding a little bit, so.
22    Q.  When you say he was bleeding a little bit,
23  this is before the police came?
24    A.  Yes.
25    Q.  And did you see like blood going down onto his

1  shirt?
2    A.  No, no, it was just like a -- a finger scratch
3  that had a little bit of blood in it.
4    Q.  Nothing particularly gruesome or?
5    A.  No, no, no, I'm -- no, nothing I would have
6  even said, Okay, here's a rag, let's press it on and
7  stop the bleeding, nothing like that.
8    Q.  Okay.  And why were you slapping at Leonard?
9    A.  I was just frustrated.  I wanted to get him
10  and to get Elijah to get in my car and go home.
11    Q.  Was it sort of the idea of like this is, Hey,
12  wake up, leave me alone, what -- describe to me what's
13  going on.
14    A.  It was just, Come on, Leonard, let's just go,
15  we need to go, it's late, I need to go to bed, I have
16  to work tomorrow, Kim has to work in a couple hours,
17  you know, let's just stop this, come on, you can come
18  with me and we'll -- you can just go to the house and
19  sleep, you know, sleep downstairs and everything is
20  going to be fine, let's just go.
21    Q.  And when you slapped at him, is this before or
22  after he had taken the phone from you?
23    A.  That was before.
24    Q.  I'm just going to back this up just a little
25  bit, my apologies.  See if I can.

1         (Audiotape playing.)
2    Q.  (BY MR. JOLLEY)  Do you recall that Leonard
3  telling the 911 operator that his son was in danger?
4    A.  I did not hear that conversation.  He -- he
5  took the phone from me and ran down the driveway.  I'm
6  still in the neighbor's yard, standing in the
7  neighbor's yard, and he ran down the driveway toward
8  the house.
9    Q.  And where was Elijah when he ran down the
10  driveway?
11    A.  I don't remember.
12    Q.  And so --
13    A.  I -- I --
14    Q.  Oh, I'm sorry.
15    A.  I'm sorry.  At some point he picked Elijah up
16  and had him down at the end of the house, I recall
17  seeing them together, but when exactly he got Elijah,
18  picked him up and took him, I don't remember.
19    Q.  I think we're just about at the end of the
20  tape, but let's just listen a little bit longer.
21         (Audiotape playing.)
22    Q.  (BY MR. JOLLEY)  Let me stop it there.  What
23  was going on when Leonard is telling the 911 operator
24  that, She won't let me talk to you guys?
25    A.  I don't -- I don't know, I didn't -- I -- I



EXHIBIT 2

EXHIBIT 2

## Page 1

UNITED STATES DISTRICT COURT
WESTERN OF WASHINGTON
AT SEATTLE

_____

FREDERICK and ANNALESA THOMAS;   )
and JO-HANNA READ, as Guardian ad  )
Litem of E.T., a minor,            )
                                   )
     Plaintiffs,          )
                                   )
     v.                   )  No. 3:15-cv-05346-BJR
                                   )
JASON CANNON; BRIAN MARKERT; RYAN  )
MICENKO; MICHAEL WILEY; MICHAEL   )
ZARO; CITY OF FIFE; CITY OF        )
LAKEWOOD; and PIERCE COUNTY        )
METRO SWAT TEAM,                   )
                                   )
     Defendants.          )
                                   )

_____


DEPOSITION UPON ORAL EXAMINATION OF
KIMBERLY THOMAS

_____


Friday, August 12, 2016
Tacoma, Washington


VERB8M REPORTING, INC.
800 Fifth Avenue, #101-122
Seattle Washington 98104
Tel:  206/467/0800
Email:  Info@verb8m.net

## Page 2

```
 1
 2
                  APPEARANCES:
 3
 4   For the Plaintiffs:  MR. TIMOTHY K. FORD
                          Attorney at Law
 5                        MACDONALD HOAGUE & BAYLESS
                          705 2nd Avenue, Suite 1500
 6                        Seattle, Washington 98104
                          timf@mhb.com
 7
 8                        MS. MEAGHAN M. DRISCOLL
                          Attorney at Law
 9                        CONNELLY LAW OFFICE
                          2301 North 30th Street
10                        Tacoma, Washington 98403
                          mdriscoll@connelly-law.com
11
12   For the Defendants:  MR. JEREMY W. CULUMBER
                          Attorney at Law
13                        KEATING, BUCKLIN & MCCORMACK
                          800 fifth Avenue, Suite 4141
14                        Seattle, Washington 98104-3175
                          jculumber@kbmlawyers.com
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2
              EXAMINATION INDEX
 3
     EXAMINATION BY:              PAGE NO.
 4
     MR. CULUMBER                    4
 5   MR. FORD                      176
 6
 7
 8
 9
                EXHIBIT INDEX
10
     NO. DESCRIPTION              PAGE NO.
11
12   1  10-page Petition for Dissolution of    40
        Marriage.
13      (Remarked on page 41)
14   2  1-page color photo of trailer.         86
15   3  15 pages Petition for Order of Protection.    92
16   4  13 pages Petition for Order of Protection.    97
17   5  11 pages color pictures.              108
18
19
20
21
22
23
24
25
```

## Page 4

```
 1          BE IT REMEMBERED that on Friday,
 2   August 12, 2016, at 9:00 a.m., at 2301 North 30th
 3   Street, Tacoma, Washington 98403, before JONI NOVAK,
 4   CCR, in and for the State of Washington, appeared
 5   KIMBERLY THOMAS, the witness herein;
 6          WHEREUPON, the following proceedings
 7   were had, to wit:
 8
 9   KIMBERLY THOMAS,      having been first duly sworn
10                by the Court Reporter,
11                testified as follows:
12
13                EXAMINATION
14   BY MR. CULUMBER:
15   Q  Good morning, Ms. Thomas.
16   A  Good morning.
17   Q  My name is Jeremy.  We met a few minutes ago, but I
18      represent the defendants in this case, the cities and
19      the police officers.
20          Do you still go by Thomas?
21   A  Yes.
22   Q  What is your maiden name?
23   A  Jakosalem.
24   Q  J-a-k-o-s-a-l-e-n?
25   A  M.
```

Page 149

```
 1     they first started arriving, did they talk to Leonard
 2     through the windows or anything?
 3   A  I don't recall.
 4   Q  So there was a negotiator who was talking to Leonard on
 5     the phone and out loud?
 6   A  Correct.
 7   Q  What did he look like?  You don't remember his name, I
 8     see?
 9   A  I don't remember his name.
10   Q  What did he look like?
11   A  Light brown hair, brown eyes.  I want to say he looked
12     Hispanic sort of, but it was dark.
13   Q  What was he saying?  What was the conversation like that
14     you could hear?
15   A  It's like can we talk to you.  We just want to talk.
16     Just want to know what's going on.  Here to help.  And
17     then Leonard replied, get off my property.  I don't want
18     to talk to you, and kept proceeding that way.  I know
19     another officer came up and talked to us.  I don't know
20     who it was.  But we told him that there's a dog in
21     there, and -- with Elijah and Leonard.  So if you hear
22     barking, there's a dog.  But there's another dog too,
23     but she's in the back yard.  But Bachelor's in the
24     house.  And he was like, okay.
25         He wrote it on his pad, his little note pad.  But I
```

Page 150

```
 1     don't know who it was.  There was so many of 'em.  So
 2     trying to remember faces or names, it just -- it, it
 3     draws a blank.
 4   Q  So generally you heard police officers saying they want
 5     to talk to Leonard, and Leonard saying, I don't want to
 6     talk to you, get off my property?
 7   A  Yes.
 8   Q  You said before that he had an issue with Fife cops in
 9     particular?
10   A  Yes.
11   Q  And that was because of what you heard up at the house.
12   A  Mmm.
13   Q  Tell me about that.
14   A  He told me about the Fife cops are harassing him because
15     of Mary.
16   Q  He told you this before?
17   A  Yes.
18   Q  When?
19   A  The day of telling me about Mary kicking in the door.
20   Q  So a couple weeks before --
21   A  Yeah.
22   Q  -- he got shot, he told you that the Fife cops were
23     harassing him?
24   A  Yeah.
25   Q  And prior to that, had he ever said anything about Fife
```

Page 151

```
 1     police in particular?
 2   A  No.
 3   Q  So was there anything about what you heard between the
 4     police and Leonard that night that made you believe he
 5     didn't like the Fife police?
 6   A  Can you rephrase that question?
 7   Q  Yes.  You believed he didn't like the Fife police
 8     because he had talked to you about being harassed a
 9     couple weeks before?
10   A  Correct.
11   Q  Anything he said that night?  I mean, did you hear him
12     say, hey, if you're Fife police, get off my property, or
13     I don't like the Fife police, anything that night that
14     he expressed?
15   A  I just know, he says, I don't want to speak to Fife
16     police.
17   Q  You heard him say that when he was --
18   A  Mm-hmm.
19   Q  -- inside the house?
20   A  Mm-hmm.
21   Q  And he was saying that to police officers who were --
22   A  Yeah.
23   Q  -- trying to talk to him?
24   A  Yes.
25   Q  Was it just the one time you heard him say that?
```

Page 152

```
 1   A  Yes.
 2   Q  Anything else that you remember that sticks out in your
 3     mind about interaction between Leonard and the police
 4     before you got moved down to the Outpost?
 5   A  I remember glass breaking.
 6   Q  Okay.
 7   A  I don't know what the conversation was about between
 8     Leonard and the police, but I remember hearing glass
 9     breaking.
10   Q  Did you ever hear later what that was?
11   A  No.
12   Q  Anything else?
13   A  I remember Leonard and Elijah at the window, top window,
14     the bedroom window, and Elijah peeking out and looking
15     'cause he sees a lot of cops and saying boo, you know,
16     like peak-a-boo.
17   Q  Yes.
18   A  Boo, I see you.  I hear him saying boo, you know, and
19     Leonard saying boo, too, so.  I think he was just
20     playing, so I didn't think nothing of it.
21   Q  When you were standing there at the house and police
22     were trying to talk to Leonard, were you hoping that
23     Leonard would just let Elijah go?
24   A  Yeah, I was hoping.
25   Q  Anything else you remember about being there at the
```



EXHIBIT 3

Page 1

1      UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2

3      _____

       FREDRICK and ANNALESA THOMAS;)
4      and JO-HANNA READ, as          )
       Guardian ad Litem of E.T., a )
5      minor,                )
                             )
6              Plaintiffs,  )
                             )
7      vs.          )  3:15-cv-05346 BJR
                             )
8      JASON CANNON; BRIAN MARKERT; )
       RYAN MICENKO; MICHAEL WILEY; )
9      MICHAEL ZARO; CITY OF FIFE;  )
       CITY OF LAKEWOOD; and PIERCE )
10     COUNTY METRO SWAT TEAM,    )
                             )
11             Defendants.  )
12     _____
13     VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
                     BRAD BLACKBURN
14
                       VOLUME I
15
16     _____
17              9:08 A.M.
18           JULY 19, 2016
19       801 FIFTH AVENUE, SUITE 4141
20          SEATTLE, WASHINGTON
21
22
23
24     REPORTED BY:  CINDI ULLMAN, CCR 2687
25

Page 2

1          A P P E A R A N C E S
2
3      FOR THE PLAINTIFFS THOMAS:
4          DAVID J. WHEDBEE
           TIMOTHY K. FORD
5          MacDonald Hoague & Bayless
           705 Second Avenue, Suite 1500
6          Seattle, WA 98104
           206.622.1604
7          davidw@mhb.com
           timf@mhb.com
8
9
10     FOR THE DEFENDANTS:
11         JEREMY W. CULUMBER
           Keating, Bucklin & McCormack, Inc., P.S.
12         800 Fifth Avenue, Suite 4141
           Seattle, WA 98104
13         206.623.8861
           jculumber@kbmlawyers.com
14
15
16     ALSO PRESENT:
17         MEAGHAN M. DRISCOLL, Connelly Law Offices
18         ALBERT MAIMON, Legal Videographer, CLVS
           Maimon Legal Video
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
3      EXAMINATION BY:              PAGE(S)
4      MR. WHEDBEE                    5
5
6
7
8
9
10
11
12     EXHIBITS FOR IDENTIFICATION          PAGE
13     Exhibit 31   05/15/13 Email dated Re:    28
14          Citizen Phone call (D-RFP 000258)
15     Exhibit 32   Detailed Report of Responses    41
16     Exhibit 33   Co-Op Cities Metro Crime Response   42
17          Unit: Interview transcript
18          (Draft)
19     Exhibit 34   Positron Response Summary;    77
20          Incident Detail Reports; Case
21          Supplemental Information
22     Exhibit 35   Audio recording          --
23          (Retained by plaintiffs' counsel.)
24
25

Page 4

1      SEATTLE, WASHINGTON; JULY 19, 2016
2              9:08 A.M.
3              --oOo--
4
5          THE VIDEOGRAPHER:  Good morning.  We're
6      now on the record.
7          Today's date is July 19th, 2016.  The time on
8      the video monitor is 9:08 a.m.  My name is Albert
9      Maimon, Certified Legal Videographer, from Maimon Legal
10     Videography, here with Cindi Ullman, your court
11     reporter, representing Yamaguchi Obien Mangio with
12     offices in Seattle.
13         This is a video-recorded deposition of Brad
14     Blackburn, in the matter of Fredrick and Annalesa
15     Thomas, et al., vs. Jason Cannon, et al., filed in the
16     United States District Court Western District of
17     Washington at Seattle, Cause Number 3:15-cv-05346 BJR.
18     This deposition is -- deposition is noticed by counsel
19     for the plaintiff.  Our location today is 800 Fifth
20     Avenue, Suite 4141, Seattle, Washington 98104.
21         Will counsel please identify yourselves,
22     stating whom you represent, after which the court
23     reporter will swear in the witness and we will proceed.
24         MR. WHEDBEE:  David Whedbee, on behalf
25     of plaintiffs Fred, Annalesa, and Elijah Thomas.

1 internally?

2    A. I don't recall that part.  I recall

3 specifically seeing it on the memo board in dispatch.

4    Q. But again, after the shooting.

5    A. Correct.  No, that's not correct.  I saw it

6 before the shooting, but I didn't put the two and two

7 together till after the shooting.

8    Q. When did -- how do you know that you saw it

9 before the shooting?

10    A. Because after the shooting I was able to put

11 two and two together.

12    Q. Were you the person that authorized the SWAT

13 response?

14    A. Authorized?  Yeah.  The chief of police is the

15 only one that can activate the SWAT team.

16    Q. Was part of your SWAT authorization the fact

17 that there had been this officer safety alert regarding

18 the purported ability of Mr. Thomas to pull Taser

19 probes out of his body?

20    A. No.

21    Q. When you brought up that issue about the Taser

22 probe, I had been asking you whether Mr. Thomas had

23 mentioned any weapons or made any threats in the two

24 phone conversations that you had.  Did anything about

25 the Taser probes come up --

1    A. No.

2    Q. -- in those phone conversations?

3    A. No.

4    Q. Did you put two and two together about the

5 Taser probes because of conversations you had with

6 Lieutenant Thompson?

7    A. I could have.  After the scenario and after

8 the shooting, he may have brought that up as they were

9 speaking, and then I would -- then I would say, Okay.

10 That's the guy I read about in dispatch.

11    Q. Describe for me the process by which an

12 officer enters an officer safety alert in the Positron

13 system.  Is that the internal one?

14    A. The City of Fife one?

15    Q. Yeah.

16    A. Mm-hm.

17    Q. Describe for me that process.

18    A. The officer or the dispatcher would take

19 information.  They would attach it to the subject,

20 whether -- they could be a victim; they could be a -- a

21 subject; they could be just for information.  And they

22 could enter him into the system and they would flag him

23 with different codes, like a -- they would -- an

24 example would be dispatch gets a new registered sex

25 offender in the city.  They would get that information.

1 They would enter it into the system for information --

2 the case number, the court they're from -- and then

3 they would flag them as a sex offender.

4    It's changed over the years, but there's a --

5 there's a code they'd put in for that.  So when you run

6 that person's name, that would pop up and tell you that

7 you had a sex offender, a registered sex offender that

8 you were speaking with.

9    Q. Okay.  And with respect to the -- is that

10 different than officer safety alerts, or...?

11    A. It's the same system.

12    Q. Okay.  And I'm talking about off- -- officer

13 safety alerts now.

14    A. It's the same system.  It's the same thing.

15 So it could be -- say, a subject was arrested with

16 guns.  They would go in and they could flag him "A" for

17 armed.  You'd bring them up.  This little cue comes up.

18 It's a red flashing light.  They'd click on it, and it

19 tells you what the flag is.  So it could be safety.  We

20 used to -- I mean, pre-HIPAA, needles were a big

21 concern.

22    We also have it in there -- the system was set

23 up so if the power went out at this house and you type

24 in the person's name, if we had a medical situation

25 like with no power, they needed a generator for a key

1 to house this machine, then that would come up and then

2 they could get resources to them.  So it's a general

3 program.

4    Q. With respect to officer safety, what are the

5 different codes that you had in 2013?

6    A. I can remember a few of them, but not all of

7 them.

8    Q. What --

9    A. You could get a printout from this system.

10 It'll give it to you.

11    Q. What -- what could you remember?

12    A. We had armed, D for drug user.  It was Z for

13 sex offender.  Uncooperative was U.  There was R for

14 resists arrest.  There's a couple other ones in there.

15 T for theft.

16    Q. Okay.

17    A. I don't remember the specific wordings, but

18 those are the -- the general categories.

19    Q. So A for armed, U for uncooperative?

20    A. Uh-huh.  R would be like for resists arrest.

21    Q. There's a drop-down box, and there was --

22 there's a list of preset words in there.

23    MR. WHEDBEE:  Just see if we can get

24 somewhere with this.

25    Mark this as Exhibit 33 or -4 maybe.

Page 109

1    MR. WHEDBEE:  Why don't we take a short
2 lunch break right now.
3    THE WITNESS:  Okay.
4    MR. WHEDBEE:  And then maybe resume
5 at -- you know, the sooner, the better.
6    THE VIDEOGRAPHER:  The time is 12:02
7 p.m.  We're off the record.
8    (Deposition was recessed at 12:02 p.m.,
9    to be reconvened at 12:30 p.m.)
10
11
12    AFTERNOON SESSION
13    --oOo--
14    12:49 P.M.
15
16    THE VIDEOGRAPHER:  The time is 12:49
17 p.m.  We're on the record.
18
19    EXAMINATION RESUMED
20 BY MR. WHEDBEE:
21    Q.  Chief Blackburn, can you tell me how you first
22 heard about an incident unfolding at the home of
23 Leonard Thomas?
24    A.  Yeah.  I was off-duty.  I was at home, and
25 Scott Green called me to advise me.

Page 110

1    Q.  And what -- what -- what did -- and Scott
2 Green, he's a lieutenant?
3    A.  Correct -- he was at the time.
4    Q.  Okay.  And what did -- what did Lieutenant
5 Green say?
6    A.  He had a brie- -- gave a brief recap of the
7 situation and that he needed a SWAT team.
8    Q.  What -- what did he say in his recap?
9    A.  If I remember correctly, he needed -- he was
10 at a DV call and he had a barricaded subject or a
11 situation.
12    Q.  Did he mention anything else?
13    A.  There was a child involved.  That's all I
14 remember.
15    Q.  Did he -- did he describe any interactions
16 between the barricaded subject and the child?
17    A.  No.
18    Q.  Did -- in the DV call, what did he say about
19 that?
20    A.  You know, I just remember him saying that
21 there's a DV call, he had a barricaded subject and he
22 had a child with him.
23    Q.  Any other information?
24    A.  Not that I recall.
25    Q.  And did he affirmatively request that you

Page 111

1 authorize SWAT, or was he -- was it an open-ended
2 request?
3    A.  What does that mean?
4    Q.  Do you believe that Lieutenant Green -- well,
5 scratch that.
6    How -- how did Lieutenant Green -- Green
7 phrase his request for SWAT?
8    A.  Based on what I remember, what I just said.
9    Q.  Well, did he call and say, This is the
10 situation we got going on out here; what should we do?
11 Or did he say, This is a situation going on out here.
12 I would like to call in SWAT; will you authorize it?
13    A.  Partially, yeah.
14    Q.  So how did he -- can you tell me --
15    A.  So he told me the situation and that he needed
16 SWAT.
17    Q.  So he said he needed SWAT.
18    A.  SWAT to be called.
19    Q.  Okay.  And how -- how long was that
20 conversation?
21    A.  Pretty short.
22    Q.  Okay.
23    A.  From what I remember.
24    Q.  And so what you've told me here -- barricaded
25 subject, child involved, DV incident -- is there any

Page 112

1 other information that Lieutenant Green conveyed to you
2 before you authorized SWAT to respond?
3    A.  Not that I recall offhand.
4    Q.  Then what did you do?
5    A.  Then I -- I called Zaro -- he is the team
6 commander -- and briefly told him what -- what
7 situation we had.
8    Q.  And what did you say to Zaro?
9    A.  Pretty much the same information, yeah, what I
10 had.
11    Q.  And what did Commander Zaro say back to you?
12    A.  That he was going to activate the team and
13 that he wanted to know a location for a rally point, or
14 a meeting point.
15    Q.  Did anyone mention who the DV victim was when
16 SWAT was activated?
17    A.  I don't recall specifically.  It could be in
18 that statement there (indicating).
19    (Mr. Ford entered the room.)
20    Q.  (BY MR. WHEDBEE)  Well, here you say on page
21 7, line 33 (as read):  "He told me, let me see if I
22 have a phone flyer.  He, ah, he had told me
23 specifically they had a DV call with a barricaded
24 subject and he needed a SWAT team."
25    What -- what is a phone flyer?



EXHIBIT 4

Page 1

1          UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2

3  _____

   FREDRICK and ANNALESA THOMAS;)
4  and JO-HANNA READ, as         )
   Guardian ad Litem of E.T., a )
5  minor,                        )
                                 )
6              Plaintiffs,       )
                                 )
7      vs.                       )  3:15-cv-05346 BJR
                                 )
8  JASON CANNON; BRIAN MARKERT;  )
   RYAN MICENKO; MICHAEL WILEY;  )
9  MICHAEL ZARO; CITY OF FIFE;   )
   CITY OF LAKEWOOD; and PIERCE  )
10 COUNTY METRO SWAT TEAM,       )
                                 )
11             Defendants.       )

12 _____

13     VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

14                  MICHAEL A. ZARO

15                     VOLUME I
   _____
16

17                    9:11 A.M.

18                  JUNE 30, 2016

19          9401 LAKEWOOD DRIVE SOUTHWEST

20              LAKEWOOD, WASHINGTON

21

22

23

24 REPORTED BY:  CINDI ULLMAN, CCR 2687

25

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Page 106

```
1        Q.  (BY MR. FORD)  Do you know one Officer Zach
2   Kenyon?
3        A.  Yes.
4        Q.  And what --
5        A.  He was --
6        Q.  -- department does he work for?
7        A.  Right now?  I think he's -- I think he just
8   got hired by Puyallup from Bonney Lake, but he went
9   from Milton to Bonney Lake.  And at one time he was a
10  sniper for the team -- oh, in fact, I guess, yeah, he
11  was with Markert over on the -- on the 1 position,
12  so...  So he had to have still been with Milton because
13  when he went to Bonney Lake he was no longer on the
14  team.
15                  (Mr. Ford and Mr. Whedbee confer.)
16              MR. FORD:  Oh, sorry.  Okay, thanks.
17       Q.  (BY MR. FORD)  To your knowledge, did anybody
18  ever tell Leonard Thomas he was under arrest?
19       A.  I don't remember if those exact words were
20  used.
21       Q.  Okay.  Let's take a look at your Exhibit 27,
22  please?
23       A.  Okay.
24       Q.  So you -- you received a call from Chief
25  Blackburn at the beginning of this incident; is that
```

Page 107

```
1   right?
2        A.  Yes.
3        Q.  And there's some mention in here -- I'm not
4   sure where it is -- of whether there are -- the
5   incident met the criteria for a SWAT callout.  Where
6   are the criteria that are used to determine whether a
7   SWAT callout is appropriate?
8        A.  Did you say where or what?
9        Q.  Where would one find one, or find those?  Are
10  they written down somewhere?
11       A.  They might be in the MOS, I'm not sure.  But
12  generally what we look at is:  Is the suspect armed?
13  Is he barricaded?  Is there a PC for arrest?  Is there
14  a hostage?  Maybe the capabilities of the agency that's
15  calling to ask.  Those are all factors.  The -- the
16  suspect's criminal history.  I think I said whether or
17  not he's armed.  If there's other -- you know, other
18  suspects around?  What the environment's like, if it's,
19  you know, a -- a compound where it's hard to get into
20  safely, that -- those are all factors that would be
21  taken into consideration.
22       Q.  Did you have any information during the course
23  of the evening as to whether Leonard Thomas was the
24  natural parent of Elijah Thomas, the boy that was with
25  him?
```

Page 108

```
1        A.  I don't remember if that came up or not.
2        Q.  Do you know if he was the custodial parent?
3        A.  No.
4        Q.  You don't know?
5        A.  No.  I don't remember.
6        Q.  Where were you when you received the call from
7   Chief Blackburn?
8        A.  At home.
9        Q.  Which -- what part of the area is that?
10       A.  Puyallup.
11       Q.  When you arrived, had -- was the command
12  center already present?
13       A.  I don't remember if it was or not.
14       Q.  There's -- were two vehicles brought there,
15  one of which has been referred to as the "AT" and the
16  other one has been referred to as the "BearCat."  Do
17  you remember that?
18       A.  They were brought.  I don't remember when.
19       Q.  Who decides to bring -- whose decision would
20  it be to bring those vehicles?
21       A.  It's -- if the team gets called out, they get
22  brought.
23       Q.  Do you remember ever having any conversation
24  with anybody about whether one of those vehicles would
25  be driven into the backyard of the house that Leonard
```

Page 109

```
1   Thomas was in?
2        A.  I don't.
3        Q.  Did you know that that was Leonard Thomas's
4   residence?
5        A.  Yes.
6        Q.  Did you know that it was his son's residence
7   as well?
8        A.  I don't remember if -- again, you asked the
9   question about if I knew about the custodial status of
10  the son, and I don't remember.
11       Q.  Was that not a factor in your determination of
12  whether it was appropriate to use SWAT tactics to bring
13  the son out of the house away from the father?
14       A.  No.
15       Q.  Why not?
16       A.  Because the father had already hung the son
17  out the window with -- you know, endangering the child
18  and essentially assaulting the child, and we wanted --
19  need to make sure the child was safe.  Whether the --
20  it's the custodial parent or a complete stranger, if
21  they're threatening the -- safety and life of that
22  child, we need to make sure that child's safe.
23       Q.  Did Leonard Thomas ever threaten the safety or
24  life of his child while you were present?
25       A.  While I was present?  Well, when I was on
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

Page 37

1 I don't -- I think that there's a difference between
2 placing the charge and setting the charge, which is
3 essentially arming it.
4     Q. So setting it would be arming it?
5     A. You would need to ask one of the explosive
6 breachers on that.
7     Q. Well, in overhearing this, though, do you --
8 when you hear the charge being set, does that mean it's
9 going to go off now unless somebody does something --
10     A. No, no, no --
11     Q. -- to stop it?
12     A. -- nope.
13     Q. It's just ready to be --
14     A. No, it's just ready.
15     Q. Okay.
16         [Audio recording played.]
17     Q. (BY MR. FORD) Could you tell what he said
18 there? A door's open. The -- what is coming out
19 again?
20     A. I couldn't hear.
21     Q. Could -- could you tell whose voice that was?
22     A. No.
23         [Audio recording played.]
24     Q. (BY MR. FORD) Was that Wiley or was that
25 Markert that said, Door's open. It looks like he's

Page 38

1 moving some kind of pole or something behind the door?
2     A. I couldn't tell.
3     Q. Okay.
4         [Audio recording played.]
5     Q. (BY MR. FORD) That was you.
6     A. Yes.
7     Q. And you wanted to have somebody have grandma
8 call to Elijah?
9     A. Right.
10         [Audio recording played.]
11     Q. (BY MR. FORD) And that was you, Command to
12 Wiley, launch on the back door -- at your command? Is
13 that what that said?
14     A. It's what I heard.
15     Q. And "launch" means set off the explosion?
16     A. Yes.
17     Q. So you were aware at that time that Elijah
18 Thomas was sitting on the porch; is that right?
19     A. Right.
20     Q. And that Leonard Thomas was in the doorway in
21 some respect; is that right?
22     A. Right.
23     Q. And that the grandmother was speaking to
24 Elijah; is that right?
25     A. Yes.

Page 39

1     Q. And at that time you gave a command to explode
2 the back door and enter with the Go team from back
3 there; is that right?
4     A. To breach the back door, yes.
5         [Audio recording played.]
6     Q. (BY MR. FORD) Were you able to hear that when
7 it occurred?
8     A. Yes.
9     Q. Did you hear the shots?
10     A. Yes.
11     Q. Did you hear the sniper shot?
12     A. Yes.
13     Q. Can you distinguish between a sniper shot and
14 -- and other forms of munition?
15     A. Well, I can distinguish the -- the difference
16 between a 308 rifle and a 223, yes.
17     Q. Was the door to the command vehicle open?
18     A. I don't -- at that time, I don't remember.
19     Q. But you could hear -- could you hear the
20 explosion?
21     A. Oh, yes.
22     Q. Is there any soundproofing in that command
23 vehicle?
24     A. No. It's no different than an RV.
25     Q. So did something happen after you had the

Page 40

1 grandma call to Elijah that caused you to give a
2 command to launch on the back door on Wiley's command?
3     A. What do you mean, "did something happen"?
4     Q. Yes. Did something happen that caused you to
5 make the decision to give the command to launch?
6     A. We had the opportunity. We had the separation
7 and the -- the... What didn't happen was that the
8 child was not going to grandma and that we were not
9 able to recover him and we had more separation than
10 we'd had before from Elijah and Leonard Thomas.
11     Q. How did you know that the -- that Elijah was
12 not going to grandma?
13     A. Because I was not given that -- because they
14 would have said that the child was going to grandma.
15     Q. So you didn't have any source of information
16 about what was going on at the time you gave the
17 command to launch on the back door at Wiley's command
18 other than what was coming in over this radio; is that
19 right?
20     A. Correct.
21     Q. And do you remember if Leonard Thomas was
22 still speaking with the negotiator while this was
23 occurring?
24     A. I don't remember.
25     Q. Did Leonard Thomas ever make any statement



EXHIBIT 5

| IN | Name | Department | out |
|---|---|---|---|
| 6484 | B. Johns | Lakewo 2 | 1021 |
| 0434 | Hall | Lakewood | 0506 |
| 0434 | 253 | Fife PD | 0450 |
| 0434 | 250 | fife PD | 0507 |
| 0438 | Theuerkauf | Puyellup PD | 1010 |
| 0451 | (M.E.) BARR | ME 14 - MED EX. | |
| 0500 | MALAVE | FIFE P.D. | 0508 |
| 0511 | GOW | FIFE P.D. | 1026 |
| 0536 | MALAVE | FIFE P.D. | 1010 |
| 0543 | RACKLEY | FIFE P.D. | 1027 |
| 0651 | MELZO | PUYALLUP P.D. | 0958 |
| 0651 | OBERMILLER | PUYALLUP P.D. | 0958 |
| 0752 | STRINGFELLOW | FIFE P.D. | 1022 |
| 0803 | BOB THOMPSON | PUYALLUP P.D. | 0958 |
| 0810 | BLACKBURN | FIFE P.D. | 0814 |
| 0810 | MEARS | FIFE P.D. | 0813 |
| 0820 | T. THOMPSON | FIFE P.D. | 1010 |
| 0835 | BLACKBURN | FIFE P.D. | 0905 |
| 0855 | W. SMITH | SUMNER ANIMAL CONTROL | 0920 |
| 0922 | S. SCOTT | BONNEY LK P.D. | 0930 |
| 0953 | B. ROCHER | BONNEY LK P.D. | 1021 |
| 0952 | T. NICOLAUE | SUMNER P.D. | 1021 |
| 0948 | K. BARNES | P.C. PROS. INVES. | 0958 |

D-DISCL 001918

| 218 55TH Ave East | | | 3/24/2013 |

| IN | NAME | PD | OUT |
|---|---|---|---|
| 306 | Rackley #244 | Fife PD | 310 |
| 308 | Wiley | Lakewood PD | 339 |
| 308 | Zaro | Lakewood PD | 317 |
| 311 | Rackley #244 | ~~Lakewood PD~~ Fife PD (116) | 315 |
| 313 | Bruin Johnson | Lakewood PD | 325 |
| 317 | Porche | Lakewood PD | 328 |
| 317 | Rodriguez | Steilacoom | 317 |
| | Malave #259 | Fife PD | 318 |
| | Thompson #253 | Fife PD | 318 |
| 319 | Thompson #353 | Fife PD | 325 |
| 320 | Rackley #244 | Fife PD | 351 |
| 320 | Gow #280 | Fife PD | 354 |
| 320 | Rodriguez | Steilacoom PD | 337 |
| 321 | Malave #259 | Fife PD | 325 |
| 324 | Gow #250 | Fife PD | 350 |
| | Watson | Summer PD | 328 |
| | Waller | Lakewood PD | 328 |
| | ~~Riber~~ Reiber | Puyallup PD | 328 |
| | Wilson | Puyallup PD | 329 |
| 330 | Malave #259 | Fife PD | 343 |
| 330 | Thompson #253 | Fife PD | 0421 |
| | Vance | Bonney lake PD | 333 |
| | Massey | Puyallup PD | 333 |
| | Sivankeo | Lakewood PD | 333 |
| | Cannon | Lakewood PD | 337 |
| | William | Central Pierce Fire | 337 |

| T.N | Name | PD | |
|---|---|---|---|
| | AC Faleno | Bonney Lake PD | |
| | Temple | Puyallup PD | 3 |
| | Micenko (k-10) | Fife PD | 5 |
| 338 | Brian Johnson | Lakewood PD | 3 |
| | Devige | Steilacoom PD | 3 |
| | Kenyon #740 | Milton PD | 3 |
| | Maker | Lakewood PD | 3 |
| 355 | Rackley # 244 | Fife PD | 4/ |
| 400 | Eakes | Lakewood PD | 401 |
| 0444 | Thompson # 253 | Fife PD | 0421 |
| 0425 | Stringfellow #229 | Fife PD | 0421 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

D-DISCL 001920



EXHIBIT 6

EXHIBIT 6

Page 1

```
1        UNITED STATES DISTRICT COURT
2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE
3
4   _____
                                   )
5   FREDRICK and ANNALESA THOMAS;  )
    and JO-HANNA READ, as Guardian )
6   ad Litem of E.T., a minor,     )
                                   )
7        Plaintiffs,               )
                                   )
8   vs.             )   3:15-cv-05346 BJR
                                   )
9   JASON CANNON; BRIAN MARKERT;   )
    RYAN MICENKO; MICHAEL WILEY;   )
10  MICHAEL ZARO; CITY OF FIFE;    )
    CITY OF LAKEWOOD; and PIERCE   )
11  COUNTY METRO SWAT TEAM,        )
                                   )
12       Defendants.      )
13  _____
14       DEPOSITION UPON ORAL EXAMINATION OF
15                  RYAN MICENKO
16  _____
17
18              10:11 A.M.
19            MARCH 29, 2016
20        3737 PACIFIC HIGHWAY EAST
21            FIFE, WASHINGTON
22
23
24
25  REPORTED BY:  SHARI L. WHEELER, CCR NO. 2396
```

Page 2

```
1          A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS:
4      DAVID J. WHEDBEE
       TIMOTHY K. FORD
5      MacDonald Hoague & Bayless
       705 Second Avenue, Suite 1500
6      Seattle, Washington 98104
       206.622.1604
7      davidw@mhb.com
       timf@mhb.com
8
9   FOR THE DEPONENT:
10     JEREMY W. CULUMBER
       Keating, Bucklin & McCormack, Inc. P.S.
11     800 Fifth Avenue, Suite 4141
       Seattle, Washington 98104
12     206.623.8861
       jculumber@kbmlawyers.com
13
14  FOR DEFENDANT CITY OF FIFE:
15     F. HUNTER MACDONALD
       VSI Law Group, PLLC
16     225 Tacoma Avenue South
       Tacoma, Washington 98402
17     253.922.5464
       hunter@vsilawgroup.com
18
19
20
21
22
23
24
25
```

Page 3

```
1             I N D E X
2
3   EXAMINATION BY:                 PAGE
4      MR. WHEDBEE                    4
5
6
7   EXHIBITS FOR IDENTIFICATION            PAGE
8   (Exhibits 1 through 5 were previously marked.)
9   Exhibit 6  Hand-drawn map            45
10  Exhibit 7  Google Earth aerial photo     47
11  Exhibit 8  Picture of armored vehicle    75
12  Exhibit 9  Picture showing the backside of    76
13         the house and armored vehicle
14
15  EXHIBITS PREVIOUSLY MARKED AND REFERRED TO
16  Exhibit 2  Metro SWAT Channel radio traffic,     73
17         date of 5-29-2013
18  Exhibit 3  Fife Police Department Incident    56, 63
19         Reports and Case Supplemental
20         Information
21
22
23
24
25
```

Page 4

```
1        FIFE, WASHINGTON; MARCH 29, 2016
2              10:11 A.M.
3              --oOo--
4
5            RYAN MICENKO,
6   sworn as a witness by the Certified Court Reporter,
7           testified as follows:
8
9            EXAMINATION
10  BY MR. WHEDBEE:
11     Q.  Officer Micenko, thank you for coming this
12  morning.  My name is David Whedbee.  We met before.  I
13  represent Fred and Annalesa Thomas in this matter.
14     Your counsel, Mr. Culumber, may have gone over
15  some ground rules to the deposition.  But I would just
16  like to go over those, also.  And then if you have any
17  questions, you can ask me.
18     As you can imagine, I'm going to ask you a
19  series of questions.  If you can let me finish each
20  question that I ask before you answer, that would be
21  helpful to preserve a clear record.  And likewise, when
22  you're responding, I'll try not to interrupt you with
23  follow-up questions before you've had a chance to fully
24  respond.
25     Defense counsel may object during the course of
```

Page 65

1 on the phone, and he was continuing to refuse to exit
2 the house or allow his child to come out of the house.
3        Did you hear about any other -- did you hear
4 about specific plans to have the child come out of the
5 house --
6        A. No.
7        Q. -- among this information?
8        A. No.
9        Q. Okay.  Then skip down a couple of paragraphs.
10 It says:  I waited at the west side of the house on
11 containment until relieved by SWAT team members.
12        Do you see that?
13        A. Yes, sir.
14        Q. Tell me about the transition from you acting as
15 a Fife patrol officer to acting as a Pierce Metro SWAT
16 officer.
17        A. So I was moved away from the northwest corner
18 because they wanted us to kind of back off.  So I went
19 back to Sergeant Green.  Sergeant Green and I had a
20 quick discussion about the areas of the house that
21 still needed containment and --
22        Q. Can I stop you?
23        A. Yes, please.
24        Q. When you talked to Sergeant -- Lieutenant
25 Green --

Page 66

1        A. Sorry.  Lieutenant.
2        Q. Yeah, whatever.  Did you convey to him any
3 information that you had gathered while on containment?
4        A. Not that I remember.
5        Q. Okay.  Carry on, please.
6        A. So then I was moved to the west side of the
7 house.  I was still in patrol uniform at this point.
8 But SWAT members were beginning to arrive.  A couple of
9 them came up.  We had a brief conversation about what
10 they needed me to do, and they relieved me on the
11 containment.  I go back to my car, which is where all
12 of our SWAT equipment is stored, and basically changed
13 into the SWAT uniform.
14        Q. Which particular SWAT officers did you speak
15 with?
16        A. You know, they were behind me because I was
17 watching the house.  I believe it was Wiley and Cannon.
18        Q. Matt Cannon or Jason Cannon?
19        A. Jason Cannon.  There shouldn't be a Matt
20 Cannon.  Maybe you're thinking of Matt Watson.  There's
21 a couple of Matts.
22        Q. Sorry.
23        A. No, that's okay.
24        Q. So I can cross Matt Cannon off my list.
25        A. There you go.  One less deposition.

Page 67

1        Q. So Cannon and Wiley, did you give them any
2 intel, for lack of a better word, about what you had
3 gathered?
4        A. No.  Not that I remember.  Because they
5 would've gotten it all from the sergeant on scene or
6 Lieutenant Green at the time.  They would have gotten
7 it all from the on-scene commander.  We might have had
8 a brief conversation verifying that they had what I
9 had, but nothing that I recall directly.
10        Q. Okay.  You're transitioning to SWAT.  How were
11 you dressed when you had gone out as a patrol officer?
12        A. In our standard patrol uniform.  It's
13 essentially a jumpsuit with patches on it with standard
14 duty equipment.
15        Q. We had one of your colleagues here yesterday
16 who had a tie on and things like that.  It was not
17 that?
18        A. That was probably our Class A uniform.  It's
19 very similar, but not that formal of a uniform.
20        Q. Okay.  Did you have a helmet on?
21        A. As patrol?
22        Q. Yes.
23        A. No.
24        Q. How are the markings on the jumpsuit?
25        A. On the jumpsuit, you have, essentially, a -- I

Page 68

1 wear a cloth badge.  Some guys wear metal badges.  You
2 have a badge.  You have a name tag.  You have two
3 shoulder patches.  And then we all have pack panels
4 that say Fife Police or Police.
5        Q. Did you have a Kevlar vest on or anything like
6 that?
7        A. I have a concealed vest on underneath.
8        Q. Underneath?
9        A. Yes.
10        Q. All right.  Then when you switch out to SWAT,
11 what do you put on?
12        A. In this case, I'm going to leave my patrol
13 uniform -- we have green SWAT uniforms that look very
14 similar.  But in this case, I'm not going to strip down
15 to unders and put that on.  So I just, essentially -- I
16 strip off my concealed vest.  I take off my patrol duty
17 belt, and my SWAT belt goes on, which is very similar
18 in nature.  It just doesn't have the same types of
19 equipment.  And then I wear a vest on the outside that
20 has, essentially, additional ballistic protection.  We
21 wear a headset to wire into our radio and a helmet.
22        Q. What's on your belt?
23        A. A handgun, magazines, a gas mask.  There's,
24 like, a -- we call it a "dump pouch."  It's,
25 essentially, like a pouch that you can put whatever you

Page 69

1 want in there.  And I carry my medical kit on my pouch.
2     Q. Administratively, is there a change?  Are you
3 being paid at a higher rate when you do that?
4     A. If you are a member of Metro SWAT, I receive
5 2 percent specialty pay for the entire month,
6 essentially.  So I get a 2 percent raise while assigned
7 to the team.  There's nothing for when I go -- it's
8 just my normal wage.  If it's overtime, it's overtime.
9 If it's regular time, it's regular time.
10     Q. So it's not like there's an increase in your
11 hourly rate or something like that as soon as you put
12 the SWAT uniform on?
13     A. No.  It's associated with my membership to the
14 team for the pay period.
15     Q. So who did you start taking orders from at this
16 point, after you became -- when you were in your SWAT
17 gear?
18     A. I went back to the west side of the house.  And
19 I believe Cannon was the team leader on that side of
20 the house -- Jason Cannon.
21     Q. And were there team leaders assigned to each
22 side of the house?
23     A. Yes.  Usually it's -- it's not necessarily
24 dictated by the side of the house.  But whatever your
25 assignment is, there's separate teams doing separate

Page 70

1 things.  There's an assistant team leader assigned to
2 each of those.
3     Q. And thinking back to that night, what was the
4 chain of command for you?
5     A. As SWAT?
6     Q. Yeah.  Sort of going up the chain, who were the
7 people that you --
8     A. It would've been Jason Cannon in the back; Mike
9 Wiley, who is the team leader; and then it goes up
10 to -- that night, I believe Mike Zaro was the SWAT
11 admin commander.
12     Q. Is there an incident commander, too?
13     A. That would've been Zaro or whoever the Fife rep
14 was there.  I think it was Brad Blackburn, I believe.
15     Q. Is that the chief of police?
16     A. Yes.
17     Q. Or was at the time?
18     A. Yeah, was at the time.
19     Q. When did Chief Blackburn come on the scene?
20     A. I have no clue.  That would be in these
21 records.  We can look.
22     Q. So from your perspective, who was the highest
23 authority on scene?
24     A. It would've been Chief Blackburn.  The person
25 with the highest authority that I have direct

Page 71

1 communication with, if I want, would've been Mike Zaro.
2     Q. Okay.  And you go up the chain as far as you
3 need to?  First, you go to Cannon.  Then you go to
4 Wiley, if you need to?
5     A. Yes.  It's rare that I have any conversation
6 above the -- as the individual operator, it's rare that
7 you're going to have any conversation above you and
8 your assistant team leader.  Occasionally, I'll
9 communicate with Wiley.
10     Q. When you were still a Fife patrol officer that
11 night, you had the radio here on your shoulder?
12     A. I wear it right at the center of my chest, but
13 yes.
14     Q. When you switched into your SWAT gear, did you
15 start using different coms?
16     A. Yes.  We use the same radio.  We change
17 channels.  And the radio goes -- we have ear
18 protection, and it wires into the ear protection.  It
19 looks like a pilot's headset, I guess.
20     Q. And which channel were you on?  Was there more
21 than one channel that you were on, or just one?
22     A. I, as the individual operator, would usually
23 switch to whatever the internal team frequency is going
24 to be.  I don't remember what it was that night.  But
25 it was probably Metro SWAT 2.  We use different ones

Page 72

1 depending on where we're at.
2     Q. Was there another channel that was open that
3 night -- or not open, but being used that night?
4     A. Most of the guys -- most of the -- essentially,
5 when I go to -- when I was there as patrol, we were
6 using the Fife primary channel, which is still open for
7 all the other operations that are going on.  When we go
8 to the team stuff, I'm going to switch to an internal
9 channel that only the guys on the team are going to be
10 using, so that we can communicate without disturbing
11 the rest of the stuff that's going on around the scene.
12     Q. Okay.  And then when you went to SWAT, was
13 there a second channel?
14     A. They will occasionally use a second channel.  I
15 don't know if they did that night or not.  But it's not
16 uncommon for, like, Wiley to want to talk to command
17 directly and not jam up our channel for our use.  So he
18 might go to a different channel, talk to command, and
19 then come back.
20     Q. Could you hear Wiley talking to command that
21 night?
22     A. I could.  Minus if he went to the sidebar.  I
23 wouldn't follow him to the sidebar because it doesn't
24 mean anything to me.  I'm going to stay on the team
25 internal that we're using amongst ourselves.

Page 85

1    A. Yes, sir.
2    Q. What was that prior contact?
3    A. I remember being at the house with him over
4 some sort of -- I knew he was the owner of the house.
5 And it was some sort of, I think, landlord-tenant
6 disagreement. It was either somebody renting the
7 garage or him and Leonard. I had dealt with him a
8 couple of times before. I don't think I ever arrested
9 him. I think it was -- I'm 90 percent sure it was,
10 like, some sort of landlord-tenant, civil-type
11 disagreement.
12    Q. Did you ever have any contact with Annalesa
13 Thomas before this particular evening?
14    A. Not one I remember. I mean, she could've been
15 at any one of those calls. There was a lot of people
16 coming and going from there, so --
17    Q. Did you have any prior contacts with Kim
18 Thomas?
19    A. That's one of his -- Leonard's former
20 girlfriends, correct? Or wives?
21    Q. Uh-huh.
22    A. I probably had spoken to her. I don't remember
23 which is -- because he had two, I believe. I don't
24 remember which one is which really well. But I know I
25 had spoken to ex-wives or ex-girlfriends in the course

Page 86

1 of some of those investigations.
2    Q. Two? Or more than two?
3    A. I remember that there were two of them that I
4 ended up dealing with. One, I believe, was a
5 girlfriend and the mother of the child. And I think
6 the other one was married to him at some point. I
7 don't remember exactly, though.
8    Q. In your report, you mention -- this is, again,
9 relating to Fred as he approached. You say: Fred
10 seemed frantic and made several mentions that he wanted
11 to help get his son out of the house and was worried he
12 would be killed.
13        When he said that he wanted to help get his son
14 out of the house, did he tell you any particular ideas
15 for that?
16    A. No. Not that I remember.
17    Q. Did you ask him?
18    A. No.
19    Q. Did any other officer, that you heard, ask him,
20 What do you think? How do you think we might be able
21 to get Leonard out of the house?
22    A. Not that I remember. Not in that circle there
23 of what was going on.
24    Q. Did you ever hear that anybody asked Fred
25 Thomas how he might help get his son out of the house?

Page 87

1    A. No.
2    Q. So once you handed Fred Thomas off to
3 Lieutenant Green, that's the end of your contact with
4 Fred?
5    A. Yes.
6    Q. Okay. I know that meanwhile, there were plans
7 being developed to try to get Leonard out of the house
8 or the child out of the house. Could you describe for
9 me the specific plans you learned about to do that?
10    A. I know that they had set some breaches on the
11 door, so there were some emergency plans put in place,
12 which is standard for us on hostage calls. But I know
13 it was just, like, an ongoing investigation.
14    Q. Set up breaches? Is that an explosive breach?
15    A. It is.
16    Q. And is that standard on hostage calls?
17    A. If it is feasible to use, yes.
18    Q. Why an explosive breach?
19    A. I'm not an explosive brief expert. So the
20 science of it -- I mean, those guys go to a lot of
21 school to learn how to do it, but --
22    Q. And I'm not asking about how you technically do
23 it. I'm asking about the philosophy behind using an
24 explosive breach.
25    A. Because it's -- it can be done away from the

Page 88

1 door, and it's a far more sure thing than using some
2 sort of mechanical breach.
3    Q. Like a ram, you mean?
4    A. Yes. Or a Halligan or a sledgehammer or
5 whatever other method. It's a far more sure thing.
6    Q. Could you analogize what the nature of the
7 explosion is?
8    A. Are you talking, like, how loud it is?
9    Q. Well, let's start -- yeah, I was interested in
10 that.
11    A. It's pretty loud. It's like a small charge. I
12 mean, I don't know. It's hard for me to --
13    Q. Is it louder than an M80?
14    A. Yes.
15    Q. Much louder?
16    A. Yes. It's loud. I would say it's equally loud
17 as a -- like a sound flash diversionary device.
18    Q. Like a flashbang?
19    A. That would be, like, a slang term for it, I
20 guess.
21    Q. Is it louder than a flashbang?
22    A. No. I don't know. I would say it's pretty
23 equal to. It's loud enough to ring your ears. I'll
24 tell you that. It's going to ring your ears. It's
25 loud.

1      MR. CULUMBER:  He's got to say what's going
2  on, for the record, so we can talk about it.
3      THE WITNESS:  Okay.
4      MR. WHEDBEE:  If we can discuss these
5  subjects, then Plaintiff reserves the right to recall
6  Officer Micenko to discuss these issues.
7      Q. (BY MR. WHEDBEE)  So tell me what happened in
8  the debrief.
9      A. We gave, basically, an overview of the call.
10  There was discussions made about equipment needs.
11  There was discussions about stuff that we could've done
12  better, you know, the overall -- what the overall plan
13  was, and the future -- we always identify any training
14  gaps and equipment gaps and stuff like that in these
15  debriefs.
16     Q. Collectively, what was raised as to what the
17  group might have done better?
18     A. You know, I don't remember.  I remember a
19  couple of equipment ones because they were kind of
20  off-the-wall things.  But I don't remember.  I remember
21  there was some disagreement over how command
22  communicated.  But I was really new to the team, and
23  this was a lot for me.  Imagine, like, this being your
24  first trial.  You know, there was a lot going on.  And
25  me taking it all in was a little overwhelming.  So a

1  lot of it -- I don't remember a lot of it.
2      Q. What was the specific disagreement about how
3  command communicated?
4      A. I think there was discussion over, you know,
5  whether -- what we were going to do once we got the
6  kid.  You know, there was discussion over -- you know,
7  it's really rare for us, as SWAT, to be involved in a
8  misdemeanor assault.  So there was discussion over that
9  being kind of a rare call for us.
10     Q. Who was discussing that issue?
11     A. The majority of the team members.
12     Q. So a majority of the team made note of the fact
13  that this was a misdemeanor assault and SWAT had been
14  engaged.  And they were wondering about that; is that
15  fair?
16     A. Yes.  I said very little at the debrief, just
17  because, like I said, I was brand-new.  There was very
18  little that I had to offer that was of substance,
19  because it was -- like I said, for me, being new, there
20  was a lot of stuff going on that was just over my head
21  at that time.
22     Q. Do you recall certain officers being more
23  outspoken than others?
24     A. No.  Not directly.
25     Q. Aside from that issue about the misdemeanor

1  offense and SWAT's engagement, what else was raised as
2  far as things that the team might have done better?
3      A. We discussed, I remember -- kind of funny -- we
4  discussed some sort of -- trying to find some sort
5  of -- as opposed to tying off the door, some sort of
6  less lethal device.  Specifically, Taser makes a device
7  that we discussed could be potentially useful.  I
8  remember that, just because it was kind of an odd -- it
9  was something that I had never heard of.
10     Q. Did anybody have any criticism of Chief Zaro's
11  order not to let Leonard back in with the kid?
12     A. I think there were some questions about -- I
13  mean, I didn't have any questions about it.  I would
14  say that.  I think you're better off asking those guys.
15     Q. Well, I want to know what you heard in the
16  discussion.
17     A. I heard them discussing it.
18     Q. And what did they say?
19     A. Just what exactly it meant and what was going
20  on that led up to it.  Because a lot of guys, at that
21  point, wanted to know what was going on that led up to
22  him saying that at that point.
23     Q. What did Chief Zaro say was going on up to that
24  point?
25     A. He mentioned that negotiations weren't going

1  anywhere; that he seemed to be becoming more and more
2  spun up, I guess; and that he felt, at that point, it
3  was our best opportunity; and that if the kid went back
4  in, then we would be in a worse situation than we were.
5      Q. Did Chief Zaro articulate any specific risks
6  that he anticipated, if Leonard had been able to go
7  back in the house with his son?
8      A. I don't remember him saying, like,
9  specifically, This was said, so I knew this, if that's
10  what you're asking.
11     I know he was concerned about it.  To him, it
12  was a decisive call that he felt was right to make.  I
13  remember that.
14     Q. What did he think was going to happen?
15     A. That the kid would get hurt, I'm assuming.
16  You'd have to ask him.  I'm sorry.
17     Q. Well, again, I'm asking you what you heard,
18  inasmuch as Chief Zaro responded to the questions from
19  the group about wanting to know what had happened
20  before.  So my question to you is, did Chief Zaro
21  articulate any specific concern he had about what
22  Leonard was going to do with the kid or to the kid if
23  he had managed to get back in the house with him?
24     A. I don't remember him saying, specifically,
25  anything, like, direct, like, He's going to shoot him,

Page 109

1 or something like that.
2      But he was concerned about the kid, for the
3 kid's safety if he went back in, enough that he felt
4 the right decision was for us to go, at that point, and
5 try to recover the kid -- Elijah.  I'm sorry.
6      Q. I've been saying it, too.
7      I may have asked you this before.  In your
8 training, inside or outside of SWAT, dealing with
9 hostage rescue, which scenarios have you gone through,
10 if any, involving an adult, a parent of a child?
11     A. I don't recall any scenarios in training,
12 specifically parent-child, as a hostage.  Not to say
13 that there hasn't been one, but not one that I can
14 remember specifically.
15     Q. Have you seen any training films about the
16 subject?
17     A. No.
18     Q. I may have asked you this before.  But did you
19 hear directly or hear about Leonard threatening anybody
20 during this entire episode?
21     A. Speaking within the same parameters we set
22 earlier defining "threat," correct?
23     Q. Well, define it again for me, just so I'm --
24     A. Like, some sort of physical action or verbal --
25 like, actually waving some sort of weapon or saying

Page 110

1 specific --
2      Q. Correct.
3      A. No, I did not.
4      Q. And from your vantage point, did Leonard do
5 anything to prevent the officers from entering the
6 house?
7      A. You mean, like, locking doors or barricading
8 them, or --
9      Q. Anything?
10     A. Aside from denying us entry verbally, no.
11     Q. Okay.  Got it.  Did Leonard ever hide in any
12 way, that you saw?
13     A. No.  I never saw him intentionally hiding.
14     Q. Did Leonard ever say, You can't come in my
15 house, or words to that effect?
16     A. I just remember him telling me to leave the
17 property, that I was trespassing.  So I would take that
18 as I'm not allowed in the house.
19     Q. Okay.  Did you ever hear anything about Fred
20 Thomas, that night or before, aside from your own
21 interactions with him, about who he was or anything to
22 be worried about or anything like that?
23     A. Aside from my prior experience with him,
24 knowing he was the owner of the property, no.  No
25 safety flags on him or anything of that nature.

Page 111

1      Q. Was arresting Fred Thomas that night standard
2 SWAT procedure under these circumstances?
3      A. I'm sorry.  So you're saying -- can you -- are
4 you saying that we -- is it standard that we arrest
5 people on barricades?  Yes.  That's usually true, if
6 they're present.
7      But I know the ultimate goal of that night was
8 to get the kid out of there, not necessarily arrest
9 Leonard Thomas, which is part of what we do.  If we
10 were to leave and Leonard wasn't going to be arrested,
11 I don't think anybody was going to be heartbroken over
12 it.  I think we just wanted the kid away from him.
13     Q. So the plan wasn't to -- if the kid had been
14 released, then as far as you know, you might have just
15 let Leonard be?
16     A. That would've been a command decision, but
17 potentially.
18     Q. What about Fred Thomas?  Was it standard to
19 arrest him in these circumstances?
20     A. Yes.  I mean, we can't let him in there.
21     Q. I understand that you can't let him in there.
22 But to arrest him for obstruction?
23     A. Well, yes.  I mean, if the charges are -- if we
24 decide later to -- or if the prosecutor decides to not
25 file them or whatever, I have no heartburn over that.

Page 112

1 In fact, I think in this circumstance, I think that's
2 exactly what happened.  But if we're going to stop
3 somebody, we're going to drag them off, handcuff them,
4 and they committed the crime, then that's for them to
5 decide.  So, yes, I would generally arrest in that.
6      Q. You mentioned that you were driving the AT.
7 Did you drive over the fence on accident or on purpose?
8      A. On purpose.
9      Q. By what authority did you do that?
10     A. We needed to put the vehicle back there.  That
11 was the position I was told to put it in, so we drove
12 over the fence.
13     Q. Who gave you that order?
14     A. That probably would've been Jason Cannon.
15     Q. The AT and the Bearcat, are they used only by
16 SWAT or also be any of the participant municipalities?
17     A. They're used almost exclusively by SWAT.
18     Q. You say, "almost exclusively."  So let's say,
19 you know, I'm sitting here in Fife.  And for whatever
20 reason, I could really use the Bearcat.  Do I call you
21 guys up and say, Can I borrow it?  Or do I call you
22 guys up -- call SWAT up and say, I need it.  And then
23 SWAT comes and operates it?
24     A. That one.
25     Q. The latter?



EXHIBIT 7

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 3   _____
 4   FREDRICK and ANNALESA        )
     THOMAS, and JO-HANNA READ,   )
 5   as Guardian ad Litem of      )
     E.T., a minor,               )
 6                                )
            Plaintiffs,           )
 7                                )
        vs.                       ) 3:15-CV-05346 BJR
 8                                )
     JASON CANNON; BRIAN MARKERT; )
 9   RYAN MICENKO; MICHAEL WILEY; )
     MICHAEL ZARO; CITY OF FIFE,  )
10   CITY OF LAKEWOOD; and PIERCE )
     COUNTY METRO SWAT TEAM,      )
11                                )
            Defendants.           )
12   _____
13
14        DEPOSITION UPON ORAL EXAMINATION
15                     OF
16               BRIAN MARKERT
17   _____
18
19               9:00 A.M.
20             June 29, 2016
21          6000 Main Street Southwest
22            Lakewood, Washington
23
24
25   Reported by:  CONNIE FARANDA, RPR, CCR 2204
```

Page 2

```
 1          A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4      TIMOTHY K. FORD
 5      DAVID J. WHEDBEE
 6      MacDonald Hoague & Bayless
 7      705 Second Avenue, Suite 1500
 8      Seattle, Washington 98104
 9      206.622.1604
10      timf@mhb.com
11      davidw@mhb.com
12
13
14   FOR DEFENDANTS CANNON, MARKERT, MICENKO, WILEY, ZARO,
15   CITY OF LAKEWOOD, PIERCE COUNTY METRO SWAT TEAM:
16      RICHARD B. JOLLEY
17      Keating, Bucklin & McCormack, Inc., P.S.
18      800 Fifth Avenue, Suite 4141
19      Seattle, Washington 98104-3175
20      206-623-8861
21      rjolley@kbmlawyers.com
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3   EXAMINATION BY:                    PAGE
 4      Mr. Ford                 4
 5
 6
 7
 8
 9
10   EXHIBITS FOR IDENTIFICATION        PAGE
11   Exhibit 23   Color photocopies of     74
12                photographs
13   Exhibit 24   Metro SWAT policy manual    94
14   Exhibit 25   Statement of Officer      144
15                Markert
16   Exhibit 26   Transcribed audio         144
17                recorded interview of
18                Brian Markert
19
20
21              <<<<<< >>>>>>
22
23
24
25
```

Page 4

```
 1        Lakewood, Washington; June 29, 2016
 2                 9:00 A.M.
 3                 --oOo--
 4
 5             BRIAN MARKERT,
 6   sworn as a witness by the Certified Court Reporter,
 7             testified as follows:
 8
 9              EXAMINATION
10   BY MR. FORD:
11      Q.  Will you state your name and spell it for the
12   record, please.
13      A.  My name is Brian, last Markert, M-a-r-k-e-r-t.
14      Q.  And where do you work, sir?
15      A.  City of Lakewood Police Department.
16      Q.  What's your position there?
17      A.  I'm a patrol supervisor now.
18      Q.  And what's your rank there?
19      A.  Sergeant.
20      Q.  How long have you held that rank?
21      A.  Since January.
22      Q.  Of this year?
23      A.  Correct.
24      Q.  Prior to that, what rank did you hold?
25      A.  Patrol -- or police officer.
```

1    Q. Had you ever been a sergeant before?
2    A. Not as a police officer, no.
3    Q. Were you a sergeant in the military?
4    A. In the National Guard I was a sergeant for a
5  while.
6    Q. When did you have National Guard service?
7    A. It was during college. It was called the
8  simultaneous membership program. So I was -- I went to
9  a military college. So while I was going to military
10  college, I was also a member of the National Guard.
11   Q. What was the college you went to?
12   A. Virginia Military Institute.
13   Q. And did you continue your National Guard
14  service after graduation?
15   A. No. I was commissioned as a lieutenant in the
16  Army.
17   Q. And how long did you serve in the Army?
18   A. Four years. A couple of days over, but four
19  years.
20   Q. What was your duty -- what kind of unit did
21  you serve in?
22   A. I was an infantry officer.
23   Q. Did you see combat?
24   A. No.
25   Q. What were the years of the service?

1    A. '91 to '95.
2    Q. Did you graduate from VMI?
3    A. I did.
4    Q. What was your degree there?
5    A. I got a bachelor of arts degree in history and
6  with a minor in international studies.
7    Q. Do you hold a rank still in the National Guard
8  as a reserve or anything?
9    A. No. I'm completely out of the military.
10   Q. What police departments have you worked for
11  other than Lakewood?
12   A. I worked for Pierce County Sheriff's
13  Department in the corrections bureau for about one
14  year. And then I worked for the City of Redmond Police
15  Department from about '97 to 2004.
16   Q. On May 23rd-24th of 2013, you were a City of
17  Lakewood officer; is that right?
18   A. Correct.
19   Q. And did you fire the shot that killed Leonard
20  Thomas?
21   A. Yes.
22   Q. Have you shot anybody before Leonard Thomas?
23   A. Another person?
24   Q. Yes.
25   A. Yes, I have.

1    Q. Who? When?
2    A. It was back in 2011. I was involved in
3  another deadly force incident. This one was in the
4  city of Lakewood.
5    Q. Is that the only time?
6    A. Correct.
7    Q. Is that the only time you fired your weapon at
8  another person, in your life?
9    A. Yes.
10   Q. Is that the only time you've discharged your
11  weapon in the line of duty other than training?
12   A. No. I've had to destroy aggressive and
13  injured animals over my career. But other than --
14  involving people, that was the only other time.
15   Q. Have you ever had a deposition taken before?
16   A. I have.
17   Q. When was that?
18   A. Two-thousand-and -- I don't know. Maybe '6 or
19  so. It was for a criminal trial. It was a fairly
20  short deposition.
21   Q. A couple of rules. So far we're doing fine.
22  She has to write things down that we say --
23   A. Yeah.
24   Q. -- so we have to talk separately.
25   A. Uh-huh.

1    Q. And sometimes I'm not clear in what my
2  questions are. So please ask me to clarify if it's not
3  clear so we're talking about the same thing.
4    A. Okay.
5    Q. You have attended a couple of the depositions
6  in this case; is that right?
7    A. I have, yes.
8    Q. Which ones?
9    A. Officer Cannon, Officer Wiley, and Officer
10  Waller.
11   Q. Was there a particular reason you chose to
12  attend those?
13       MR. JOLLEY: I'm going to object to the
14  form. It calls for attorney-client privilege. And
15  he's a party. And I'm going to instruct him not to
16  answer.
17   Q. (By Mr. Ford) Were you paid for your time in
18  attending those depositions by the City of Lakewood?
19   A. Yes.
20   Q. And you're a member of the Pierce County Metro
21  SWAT. Are you still?
22   A. No.
23   Q. When did you stop being a member of that?
24   A. Earlier this month is when I officially
25  resigned.

Page 29

1    Q.  And the same question with regard to whether
2  you listened in on any channels other than SWAT 2.
3    A.  The only time I listened that I can recollect
4  listening to a side channel, SWAT 1, was when I spoke
5  to Officer Cannon.  And we actually did that twice in
6  very close proximity.  We spoke, and then he left
7  SWAT 1, and I had to pull him back there to talk to him
8  some more.  I don't remember any other occasion during
9  that event when I was on a side channel.
10    Q.  Tell me about your conversation with Officer
11 Cannon regarding whether there should be a sniper on
12 the back side of the house.
13    A.  Basically his -- he was responsible for -- or
14 he was talking on the radio regarding coverage of what
15 we call the 3 side of the house, the rear of the house.
16 And he had described some of Mr. Thomas's movements,
17 that he could see him through a window on the rear of
18 the house.
19      So I basically said -- I talked to him about,
20 you know, whether or not it would be more valuable for
21 us to have the snipers split up and cover two different
22 sides, or whether it would be more valuable for us to
23 be in basically a mutually supportive position covering
24 the front of the house.
25    Q.  Okay.  And could you give me any more details

Page 30

1  about -- let's take that apart and talk about first
2  what Officer Cannon described to you regarding
3  Mr. Thomas's movements.  Anything else you can tell me
4  about what he said about that subject?
5    A.  I don't recall us discussing, per se, his
6  particular movements.  During the conversation, I had
7  listened to Officer Cannon describe his movements
8  previously on the radio, that he was visible in this
9  window or that window.  Other than that, no.
10    Q.  Okay.  And let me just broaden the question,
11 now that you've clarified, with regard to anything else
12 Officer Cannon said about Mr. Thomas's movements in the
13 back of the house.  Anything else you remember about
14 his description of those movements or statements about
15 Mr. Thomas?
16    A.  At various points, he described where he was.
17 I think at one point, he described him kind of dancing
18 around or something to that effect, visible in the
19 window.  And this would have been throughout the
20 callouts where he was visible through the -- from the
21 3 side of the house.
22    Q.  Did Officer Cannon ever say anything about the
23 location of the child, Elijah Thomas.
24    A.  I don't recall any broadcast by him regarding
25 Elijah.

Page 31

1    Q.  Any broadcasts by him that indicated that
2  Mr. Thomas, Leonard Thomas, had made any threats
3  against anyone?
4    A.  I don't recall him making any transmissions of
5  that effect.
6    Q.  Any transmissions about whether Leonard Thomas
7  had a weapon?
8    A.  I don't recall him making any transmissions
9  about Mr. Thomas having a weapon.
10    Q.  So let's talk about your discussion with
11 Officer Cannon about the need for a sniper in the back
12 versus two in the front.  What more can you tell me
13 about that discussion?
14    A.  You know, in the end, I basically said, Hey,
15 it doesn't sound like you have a whole lot going on
16 back there.  So I'm going to stay out front.
17    Q.  When you were having that conversation and
18 making that decision about what you were going to do,
19 was that something you would be doing because you're
20 the team leader of the snipers, or would any sniper
21 who's not a team leader be free to make a decision
22 about where to locate?
23    A.  If I'm there, then, you know, I generally try
24 to coordinate things.  That's one of my roles.  But if
25 I was not there, then the snipers would basically have

Page 32

1  the authority to make those decisions independently and
2  notify command.
3    Q.  When you had this communication with Officer
4  Cannon, was that when you were basically in the same
5  location as Officer Cannon, or was that after you moved
6  to the location from which you finally took the shot?
7    A.  I believe it was while I was under the carport
8  with Officer Kenyon.
9    Q.  Let me show you what's been marked as Exhibit
10 Number 18, it looks like, and ask you if you can tell
11 me where it was that you were with Officer Kenyon in
12 the carport that you just described.  Whereabouts was
13 that in relation to the house?
14    A.  Basically it was directly across the street.
15    Q.  So it was the carport of another house?
16    A.  Yes.  It was a neighbor's house across the
17 street.  And there was a covered carport area.  And we
18 were in the carport together.  Separated from one
19 another slightly, but we were both in the carport area.
20    Q.  Did you ever --
21    A.  So on the map where it say Kenyon, that is
22 where Officer Kenyon and I were for a portion of the
23 callout together.
24    Q.  And then it looks like that somebody's also
25 marked an area where it says "Markert."

Page 77

1    Q.   More than two?
2    A.   Don't know.
3    Q.   Are there protocols for that in terms of in
4  that kind of a situation, how many officers are
5  supposed to speak or not speak to an individual?
6    A.   I didn't hear officers speaking over one
7  another.  By that, I mean I didn't hear officers
8  basically trying to speak to one another where they
9  were basically giving conflicting guidance or anything
10  like that.  But at times I heard different voices.
11       I distinctly remember -- I believe it was
12  Officer Rodriguez speaking to Leonard Thomas kind of
13  early in things.  That's -- you know, I -- at this
14  point, that's all I can remember.
15    Q.   Do you remember anything of the things that
16  Officer Rodriguez said to Leonard?
17    A.   No, not specifically.  Just generally, you
18  know, "Come on out," "Give yourself up," kind of that
19  general thing but nothing specific.
20    Q.   Do you remember any of Leonard Thomas's
21  responses?
22    A.   They were in the negative.  That was when he
23  was cursing at us and telling us to get off his
24  property and we needed to leave.
25    Q.   Were Leonard Thomas's responses responsive in

Page 78

1  the sense that, even if they were rude and impolite or
2  whatever they were, they were actually responding to
3  what the officers were saying rather than just randomly
4  saying things?
5    A.   I don't -- I can't really say at this point.
6  I don't really remember exactly whether he was
7  responding to a direct comment from an officer or not.
8    Q.   Did you have any impression from what you
9  heard as to whether he was mentally competent and had
10  his -- knew what was going on around him?
11    A.   He seemed -- I mean, honestly he seemed
12  agitated.  I got the impression that his voice sounded
13  slurred like maybe he was intoxicated or something like
14  that.  He was very -- you know, a lot of animated hand
15  gestures, and he was yelling, moving his head around.
16  So I got the impression that he was agitated.
17       You know, we had been -- we had received
18  broadcasts that he might be bipolar and off his
19  medication.  So, you know, I drew the connection that
20  it might be possible that he was having some sort of
21  mental health crisis.  But I don't -- I don't know what
22  his -- you know, I'm not there to diagnose his -- you
23  know, what specific condition he may or may not have.
24    Q.   Did he ever make any statements that made you
25  think that he was perceiving things that weren't the

Page 79

1  case, other than the fact that -- apart from the fact
2  that the police -- you know, his perception of the
3  police?  Was he seeing things that weren't there or
4  describing things that were not happening?
5    A.   He did say get off my property.  And at that
6  point, I don't believe there were any officers -- as he
7  was screaming out the front window, he was telling us
8  to get off his property, and there were no officers on
9  his property at that point.
10    Q.   Do you remember at any time the AT vehicle
11  driving in the backyard of the house?
12    A.   I could not see the backyard.  Or I couldn't
13  see where the AT was.  I was told it was in the yard
14  back there, or at some point, you know, that came up
15  over the radio or was discussed within earshot of me
16  that the AT was in the rear yard or back -- 3 side.  It
17  was covering the 3 side, you know.
18    Q.   Did you hear any orders or discussion that led
19  up to the decision to take the AT into the back of the
20  house?
21    A.   I don't remember anything specific.
22    Q.   Were there any protocols on that as to whether
23  or not you'd drive the vehicle through the fence of a
24  house and into the yard when you do that?
25    A.   If it's necessary to provide coverage for an

Page 80

1  area, then we do that at times, yes.
2    Q.   Do you have any idea of whether it was
3  necessary to provide coverage for an area for the AT to
4  be driven in the back of the Thomas house?
5    A.   I wasn't on the 3 side of the house.
6    Q.   So you wouldn't be able to speak to that
7  question?
8    A.   No.
9    Q.   Okay.  Let's go back to 23.
10    A.   All right.
11    Q.   The next page is number 31.  And that's the
12  Bearcat again.
13    A.   Yes.
14    Q.   And can you tell who that police officer is?
15    A.   Not from this photo.  I -- not from that
16  photo.
17    Q.   Okay.  Do you think it's a member of the SWAT
18  team?
19    A.   I don't think so.  Because he's not dressed in
20  his -- you know, a callout uniform.
21    Q.   Okay.  Can you go on to 32, please?
22       Do you recognize either of those officers?
23    A.   I have a -- not 100 percent, no.
24    Q.   What about any guesses as to who they might be
25  or who they are?

Page 121

1 done full explosive breaches on doors and windows where
2 the snipers have been on observation.  We're not going
3 to fire a bullet because -- well, there's cows on the
4 other side, and so we don't want to hurt the cows.
5      But we've done training with integration of
6 the entire team with explosive breaching.  And then
7 we've also done -- I've been on operations where we've
8 used live operational breaches on warrants, this
9 particular mission, and other callouts where I've been
10 serving as a sniper while there was a live breach that
11 was -- explosive breach that was conducted.
12      Q.  When you say you do integrated trainings, do
13 you do trainings along with the negotiators as well as
14 the other members of the SWAT team?
15      A.  Yes.
16      Q.  Are those regular, or are those special
17 training?
18      A.  They don't -- so Metro SWAT trains two days a
19 month.  And by that, I mean the entry element
20 basically.  Or we focus on sort of entry-related
21 tactics.  And when I'm not a -- when they don't need me
22 as a sniper, I'm an entry officer.  And I'm also sort
23 of -- I'm an assistant team leader on the team in that
24 regard.  Although I don't normally do assistant team
25 leader duties as an entry officer because they don't

Page 122

1 want me to get wrapped up in stuff but they might need
2 me to do sniper stuff.
3      So the team trains two days a month, and then
4 the snipers train one additional day a month just as an
5 additional element.  And then negotiators, they conduct
6 training -- I don't know.  They have training sessions
7 of their own but not monthly.  I believe it's
8 quarterly.  And then normally once a year, we do a
9 large-scale, full exercise that involves entry -- I
10 mean, the entire tactical side of the element.  So
11 entry snipers, all that stuff.
12      We'll have patrol officers serving as
13 perimeter or traffic control as role players, or they
14 might be first responders.  Negotiators will be there
15 to do their piece of the event.  And then command will
16 be on-site to basically provide incident and command
17 leadership during the event.
18      Q.  So back to the earlier question.  When the
19 explosive breach goes off --
20      A.  Yes.
21      Q.  -- Elijah's sitting on a step or the porch.
22      A.  Uh-huh.
23      Q.  Leonard is inside behind a door that's only
24 opened up a small distance --
25      A.  Right.  It's propped open by the --

Page 123

1      Q.  -- crouched down.
2      A.  Right.
3      Q.  And so the explosive breach goes off.  What
4 does Elijah do?
5      A.  He just sits there.
6      Q.  You're able to still see him?
7      A.  Yes.
8      Q.  Your field of view includes him?
9      A.  Yes.
10      Q.  His whole body?
11      A.  I don't remember exactly.
12      Q.  What does Leonard do?
13      A.  He basically kind of launches himself out of
14 the door.  The door comes open.  He comes very quickly
15 outside and, as I described earlier, wraps his arms
16 around Elijah's neck, pulls him fully off of his feet
17 so high that basically his -- Elijah's head was
18 basically in front of Mr. Thomas's head.  And basically
19 his body was almost fully superimposed over his
20 father's body.  And then he starts to retreat back into
21 the house with Elijah.
22      Q.  And so -- you indicated with both arms,
23 Leonard grabbed him with both arms.
24      A.  As I described earlier, he did put both of his
25 arms around his son's neck, yes.

Page 124

1      Q.  So you could see both of his arms.
2      A.  Well, I mean, I could see his -- his -- I
3 can't see, like, both his arms from the shoulder down.
4 But I can see that he has both of his arms around his
5 son's neck.
6      Q.  And you can see both of his hands?
7      A.  Once again, I can see he has both of his arms
8 around his neck.  I don't remember if I could see both
9 hands because, if I -- if I wrap both of my arms around
10 something, it is possible that my one hand is not
11 visible, depending on your vantage point.
12      Q.  But as he wrapped his hands around Elijah, you
13 could see his hands.
14      A.  Yes.
15      Q.  You could see him come out the door and --
16      A.  Yep.
17      Q.  -- pick up Elijah.
18      A.  Correct.
19      Q.  Both hands.
20      A.  Correct.
21      Q.  No weapons in hands.
22      A.  I did not see any weapons in his hand.
23      Q.  Nothing in his hands.
24      A.  I do not -- I didn't see anything in his
25 hands.

Page 141

1  going to take additional actions that could harm his
2  son, other than picking him up in the manner that you
3  described and taking him back in the house, at the time
4  you took the shot?
5      A.  Yes.  I was afraid that, if he got back in the
6  house, I would be unable to prevent any future harm to
7  Elijah.  Mr. Thomas had told officers that he was armed
8  with a pistol.  And as I said earlier, when he was at
9  the front door, it seemed to me that he made a
10  purposeful attempt to hide his left side of his body
11  and especially his left hand throughout that last
12  exposure time frame at the front door.  He had the
13  2-by-4 right there.  And then he's got a house full of
14  I don't know what.  Houses are full of things that can
15  be used to inflict serious bodily injury or death,
16  especially to a child.
17      Q.  Okay.  But officers were coming into that
18  house from the back, weren't they?
19      A.  Right.  But they were delayed by the breach.
20  They can't be right in front of the door when the
21  breach occurs because all the energy from an explosive
22  breach basically is redirected out.  Very minimal
23  energy is directed inside the structure.  That's a
24  function of and one of the benefits of that method of
25  breaching.

Page 142

1          They have to make their way through the house.
2  I don't know if the -- I don't even know if the back
3  door is going to get opened by the explosive breach.
4          I basically -- one of my jobs is to protect.
5  That's one of my big functions on the team, is I
6  protect the team.  I protect innocents.  I protect the
7  public.
8          And I can't protect Elijah if I let Leonard
9  get back in the house with him.  He's being -- a felony
10  assault is occurring right in front of my eyes.  He's
11  choking his son, and he's retreating into a house where
12  he knows that an explosive breach has occurred on the
13  back door.  I know that officers are going in there.
14  There's going to be some sort of a confrontation and I
15  cannot protect Elijah if I let him get back inside with
16  him.
17      Q.  So --
18      A.  He will continue his assault on his son.  And
19  he has access to a pistol potentially and whatever
20  other weapons are inside that household.
21      Q.  He will, based on...?  What is that, that --
22      A.  I'm sorry?
23      Q.  What is that you're basing that on when you
24  say he will do?  That's what you're concerned that he
25  might do?

Page 143

1      A.  Yeah.  I mean, he's actively -- he's
2  committing a felony assault of his son right now.  I
3  don't think it's going to get any better if he gets
4  inside the house with his son.  Conditions aren't going
5  to improve.  He is not going to -- I have no indication
6  that he's going to stop assaulting his son when he gets
7  inside the house.  And the potential is that he will
8  continue to assault his son when he gets inside the
9  house.  If he gets inside the house and the front door
10  closes, there's nothing I can do to help Elijah at that
11  point.
12      Q.  So if he had simply picked Elijah up under the
13  arms and taken him back in the house, all those dangers
14  would have existed also, would they not?
15      A.  Potentially, yes.
16      Q.  So would you have shot him?
17      A.  I -- I don't know.
18      Q.  You might have.
19      A.  I might have, yes.
20      Q.  You'd been given an order not to let him go
21  back into the house with the child.
22      A.  There was a previous order given, yes.
23      Q.  And that is part of why you were thinking that
24  all these things could happen if he got back in the
25  house with the child, isn't it?

Page 144

1      A.  That was one of the factors I considered
2  throughout my threat analysis.
3      Q.  And you were assuming that, and given that
4  command that Commander Zaro gave, things that maybe you
5  didn't know that could have justified a concern about
6  the threat to Elijah.  Isn't that right?
7      A.  It is possible, yes.
8          MR. FORD:  Why don't we take lunch.
9          (Deposition recessed from
10          12:25 P.M. to 1:30 P.M.)
11
12          <<<<<< >>>>>>
13
14          (Deposition Exhibits 25-26 were
15          marked for identification.)
16
17          EXAMINATION
18  BY MR. FORD:
19      Q.  So can you take a look at Exhibit 24 again,
20  the manual, please.
21      A.  Yes.
22      Q.  And take a look again at, using the right
23  corner numbers, page 99.
24      A.  Chapter 23?
25      Q.  Right.  Where it says, down at the bottom:

Page 153

1   A.  Something that basically develops as the plan
2   is unfolding.
3       Q.  Was Leonard a target of opportunity when you
4   shot him?
5       A.  I shot him because he was choking his son and
6   he had his arms around his son's neck in a chokehold.
7           I didn't shoot him when he was in the doorway
8   prior to the breach.  I didn't shoot him when he was
9   coming out of the doorway immediately after the breach.
10  I shot him after he wrapped his arms around his son's
11  neck in a chokehold and then tried to take his son back
12  inside the house.
13      Q.  I'm just asking, does that --
14      A.  Right.
15      Q.  -- constitute a target of opportunity?  I'm
16  not sure what that phrase means.
17      A.  Potentially, I guess.  I don't -- you know, we
18  don't have a definition here in the manual that I'm
19  aware of that defines exactly what that means.
20          Like a designated target would be, as part of
21  the tactical plan, let's say you have three hostage
22  takers -- or let's say we have three terrorists who
23  have bomb vests on.  Your job is to shoot terrorist
24  number 1, and your job is to shoot terrorist number 2.
25  And you're responsible for shooting any terrorist that

Page 154

1   tries to run out the front door and shoot himself, or
2   blow himself up.
3           The guy coming out the front door, that would
4   be a target of opportunity.  The other two guys would
5   be designated targets.
6       Q.  Okay.  And that would be dictated by the
7   assault plan.
8       A.  Correct.
9       Q.  Was there an assault plan here?
10      A.  There was a rescue plan basically that was put
11  out over the radio about who would do what when we
12  decided that it was necessary to initiate a rescue of
13  Elijah.
14      Q.  And isn't that the same as an assault plan?
15      A.  Yeah.  Yeah.
16      Q.  And was part of that, that Leonard was not
17  allowed to -- not to be allowed to go back in the house
18  with Elijah?
19      A.  That wasn't specifically stated.  When the
20  plan was given out over the air, it didn't specifically
21  state that anybody or any particular element would --
22  must prevent him from going back inside the house with
23  Elijah.
24          It was basically that, when the plan was
25  offered out over the radio, it described the actions

Page 155

1   that officers would take once basically it had started,
2   which basically starts with the breach.  That's when
3   things kind of -- well, that's not true.  It starts
4   with the countdown.  The countdown is when the plan
5   basically is initiated.  When that starts, then the
6   plan initiates.  Because there's certain things that
7   may happen during the countdown that are part of the
8   plan that are active in nature.  So the breach doesn't
9   start the plan.  It's part of the plan.
10      Q.  Okay.  And so what was the plan that was put
11  out over the radio?
12      A.  Basically that there would be an explosive
13  breach conducted on the back door.  And this was kind
14  of the -- I guess we'll call it the final plan, because
15  we had discussed various options throughout the event,
16  like the use of less lethal if we could while
17  Mr. Thomas was out and Elijah was out, or possibly
18  going in through windows with ladders.
19          But the final plan, the plan that was
20  basically initiated, if that's -- is your question
21  regarding the plan that was initiated --
22      Q.  Yes.
23      A.  -- that led -- okay.
24          Basically, then, an explosive breach would be
25  effected on the rear of the residence, 3 side; that the

Page 156

1   officers staged off to the side of the house would go
2   in through the 3 side and basically prevent Mr. Thomas
3   from coming back in the house, or basically deal with
4   him if he was able to get inside the house.
5           And then the officers by the Bearcat would
6   approach the front of the house, the 1 side, and enter
7   through the front door.  And their job was also to --
8   if Elijah was on the front stoop, they were to rescue
9   him and remove him from the scene.
10      Q.  And was all that stated in a comprehensive
11  way?  I mean, just more or less as you said it, over
12  the radio?
13      A.  In a shorter way.  I mean, I do believe it was
14  Officer Wiley who basically got on the air and said
15  this is the plan.
16      Q.  Does Wiley always swear a lot?
17      A.  Yes.  Yes, he does.  Honestly.
18          Well, not always.  I mean, not when he's
19  talking to -- I don't know.  I don't know.
20      Q.  So going back onto this page 100, the last
21  sentence of that paragraph says:  "The use of deadly
22  force can be based on collective knowledge, as passed
23  on from other team members or command element."
24          Is that your understanding?
25      A.  I'm sorry; where are we reading --

Page 189

1  with SWAT experience, and then a couple of patrol
2  officers.  And we forced entry into the apartment.  And
3  then we got between him and her.
4       And he was holding a knife to his own throat
5  at the time, and then we took him into custody.  I
6  would call that a -- as I refer to it, a patrol hostage
7  rescue.  That's the term I refer to it as.
8       Q.  And was there something preventing him from
9  harming her during the time you were forcing entry?
10     A.  No, not that I'm aware of.  He was at the
11 window talking to -- yelling at somebody, an officer
12 through the window.  Or through the blinds.
13     Q.  Your report says you and Officer Kenyon were
14 designated as Sierra-1.
15     A.  Correct.
16     Q.  What does -- does that have some significance?
17     A.  It means that we are a sniper element, and we
18 are covering the 1 side, the designated 1 side of a
19 structure.
20     Q.  I see.
21     A.  So it's just -- so I don't have to get on the
22 air and say Markert or Kenyon all the time.  It's
23 basically -- they know, when we get on the air, it's
24 the snipers who were covering the front of the house,
25 in this case.

Page 190

1      Q.  You heard Leonard Thomas say that he'd done
2  nothing wrong?
3      A.  Yeah, that's what he said.
4      Q.  Did you ever hear him say that he had, in
5  fact, himself been assaulted?
6      A.  No, I never heard him say that.
7      Q.  Did you hear anybody -- did anybody ever tell
8  you that he had said that during the night?
9      A.  During that night?
10     Q.  Yeah.
11     A.  No.
12     Q.  Did you hear that later?
13     A.  Yes.  I've heard it during the depositions.
14     Q.  Other than that?
15     A.  I don't believe so.
16     Q.  Did you ever hear his mother say anything that
17 night about whether she had assaulted Leonard?
18     A.  I did not speak to his mother.
19     Q.  Nobody told you, though, that she had said
20 that that night?
21     A.  Not that I recall.
22     Q.  You indicate in your report that at one point
23 Commander Zaro --
24     A.  Which page are we referring to?
25     Q.  I'm sorry.  I'm on page 6.

Page 191

1      A.  Okay.
2      Q.  -- radioed the team, asking that they
3  not communicate directly -- I guess it says Commander
4  Zaro or the negotiators radioed the team, asking that
5  they not communicate directly with the suspect as
6  negotiators were trying to get him to answer the phone.
7      A.  Uh-huh.
8      Q.  Was that a request that they stop altogether,
9  or just for that moment that they were trying to get
10 him on the phone?  Or was it, "Stop talking to this
11 guy, let the negotiators handle it" for the whole time?
12 Do you remember?
13     A.  It wasn't -- basically the intent is, Hey,
14 stop talking to him so we can get him on the phone.
15 But there are situations where officers may -- what we
16 call direct negotiations, where you're basically
17 talking to them, not maybe face-to-face close
18 proximity, but you're talking to them not through a
19 phone or whatever else.  You're basically having a
20 conversation with them.
21     So there might be situations where direct
22 negotiations would be appropriate.  Like if he's -- if
23 someone is on the outside of a building with no phone,
24 they're not on the phone with negotiators, and you want
25 to maybe, you know, give them directions.  And that

Page 192

1  would be, you know, something that might be
2  appropriate.
3      Q.  Just right below that line -- and this is
4  still on page 6 of your report if you want to look --
5  it says:  Over the next several hours the suspect
6  appeared at the upstairs window intermittently, waving
7  his arms and gesturing wildly..."
8      When he did that, was there a clear shot from,
9  say, Officer Kenyon's vantage point?
10     A.  I'm sorry; I didn't hear your question
11 exactly.
12     Q.  When Mr. Thomas did that, was there a shot
13 that could have been taken from Officer Kenyon's
14 vantage point?
15     A.  If he had determined that deadly force was
16 necessary, it would have been possible for him to --
17 I'm not exactly sure about elevation or whatnot.  But
18 when I was under the -- yeah, it's possible that he
19 would have had a clear view.
20     Q.  And was Mr. Thomas doing anything to shield
21 himself from such a shot at that time?
22     A.  Not when he wasn't -- when he didn't have
23 Elijah with him, he was by himself or with the dog.
24     Q.  Going down, you say in the next line, he was
25 yelling about his hatred of Fife police?



EXHIBIT 8

Page 1

```
 1        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 2
   _____
 3
   FREDRICK and ANNALESA THOMAS;)
 4 and JO-HANNA READ, as      )
   Guardian ad Litem of E.T., a )
 5 minor,                     )
                              )
 6         Plaintiffs,  )
                        )
 7    vs.         )  3:15-cv-05346 BJR
                 )
 8 JASON CANNON; BRIAN MARKERT; )
   RYAN MICENKO; MICHAEL WILEY; )
 9 MICHAEL ZARO; CITY OF FIFE;  )
   CITY OF LAKEWOOD; and PIERCE )
10 COUNTY METRO SWAT TEAM,    )
                              )
11         Defendants.  )
12 _____
13      DEPOSITION UPON ORAL EXAMINATION OF
14              MICHAEL WILEY
15 _____
16
                 1:37 P.M.
17
               APRIL 29, 2016
18
           6000 MAIN STREET SOUTHWEST
19
            LAKEWOOD, WASHINGTON
20
21
22
23
24 REPORTED BY:  CINDI ULLMAN, CCR 2687
```

Page 2

```
 1      A P P E A R A N C E S
 2
 3 FOR THE PLAINTIFFS:
 4     DAVID J. WHEDBEE
       TIMOTHY K. FORD
 5     MacDonald Hoague & Bayless
       705 Second Avenue, Suite 1500
 6     Seattle, WA 98104
       206.622.1604
 7     davidw@mhb.com
       timf@mhb.com
 8
 9
10 FOR THE DEFENDANTS:
11     RICHARD B. JOLLEY
       Keating, Bucklin & McCormack, Inc., P.S.
12     800 Fifth Avenue, Suite 4141
       Seattle, WA 98104
13     206.623.8861
       rjolley@kbmlawyers.com
14
15
16 FOR THE CITY OF FIFE:
17     F. HUNTER MacDONALD
       VSI Law Group PLLC
18     225 Tacoma Avenue South
       Tacoma, WA 98402
19     253.922.5464
       hunter@vsilawgroup.com
20
21
22 ALSO PRESENT:
23     BRIAN MARKERT
24     JASON BARNEY,
       Washington Cities Insurance Authority
25
```

Page 3

```
 1              I N D E X
 2
 3 EXAMINATION BY:             PAGE(S)
 4 MR. WHEDBEE                   4
 5
 6
 7
 8
 9
10
11
12 EXHIBITS FOR IDENTIFICATION        PAGE
13 Exhibit 17  Co-Op Cities Metro Crime Response  72
14      Unit:  Interview transcript
15 Exhibit 18  Drawing              135
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      LAKEWOOD, WASHINGTON; APRIL 29, 2016
 2              1:37 P.M.
 3              --oOo--
 4
 5      MICHAEL WILEY,
 6 sworn as a witness by the Certified Court Reporter,
 7      testified as follows:
 8
 9           EXAMINATION
10 BY MR. WHEDBEE:
11    Q.  Good afternoon, Officer Wiley.  We met before
12 the deposition started.  My name is David Whedbee.  I
13 represent Fred and Annalesa Thomas, along with my
14 colleague here, Tim Ford.
15      I'm just going to ask you a few preliminary
16 questions about the deposition process to make sure you
17 understand.  First of all, is this the first deposition
18 that you have ever given?
19    A.  Yes.
20    Q.  So there's a few ground rules.  I'll go over
21 them real quick.
22      As you can imagine, I'm going to ask you a
23 series of questions.  If you could let me finish my
24 question before you respond, that's good; and likewise,
25 I'll try to let you complete your answer before I ask
```

Page 57

1    A. That one, I don't remember, as in exactly
2 which, because I know I was looking through both
3 throughout the night.
4    Q. Okay. And then when you approached, you went
5 around the back of the BearCat; is that correct? And
6 then went towards the porch?
7    A. Yes.
8    Q. Okay. Do you know whether you went around the
9 front of the car or the back of the car that's in the
10 middle distance?
11    A. Well, that, I don't remember.
12    Q. Okay. And then -- and then you had to leap
13 this -- this picket fence?
14    A. Yes.
15    Q. Did Leonard reach for his child before or
16 after the explosive breach was detonated?
17    A. It was after.
18    Q. Was it immediately after, or...?
19    A. Yeah.
20    Q. And as you approached the way we were
21 describing before, sort of coming around the rear end
22 of the BearCat and then up, when you were making that
23 approach, did you see Leonard get shot?
24    A. Did I see him get shot?
25    Q. Yeah.

Page 58

1    A. No.
2    Q. During that approach, when did you hear the
3 sniper shot?
4    A. That, I don't recall. It was -- it was close.
5 It was somewhere there, but I don't remember if the
6 shot went out before we turned or while we --
7    Q. When you say "turned," turned --
8    A. Just turned around the corner of the BearCat
9 where I turned around.
10    Q. Okay.
11    A. I don't remember.
12    Q. When you got to the front door, was Leonard
13 down?
14    A. Yes -- well, when I got to the front door, I
15 mean, he was inside, if that's what you mean.
16    Q. Did he fall sort of right -- right on the
17 inside of the door?
18    A. Oh, I don't know.
19    Q. Okay. Well, when you got to him, where was
20 he?
21    A. When I got -- when I got -- when I got there,
22 he was a few feet into the -- into the living room or
23 by the front door, but -- that's where he was.
24    Q. Okay. Were there other officers on top of him
25 when you got there?

Page 59

1    A. We were -- there was one by him, but...
2 Because I know another officer was grabbing the child,
3 Elijah, out of the way. But I don't -- I don't know
4 what you mean, "on top of him."
5    Q. Well, were there other officers near him, by
6 him, touching him?
7    A. Yes. Well, there --
8    Q. You weren't the first one to get there, in
9 other words.
10    A. Nah, I wasn't the first one to get there.
11    Q. Okay. So how many officers were there when
12 you arrived?
13    A. There was at least two.
14    Q. And when you got there, was the child still
15 within Leonard's grasp, or had it been taken away from
16 Leonard?
17    A. Elijah had been removed from Leonard, yeah.
18    Q. And was there any blood on Elijah?
19    A. I don't know.
20    Q. Was Elijah crying?
21    A. I don't remember.
22    Q. Did Elijah say anything?
23    A. I don't remember.
24    Q. And what kind of condition was Leonard in?
25    A. He was on the ground. He had a -- a gunshot

Page 60

1 wound. I know somebody was working on him, trying to
2 give medical attention. But guys were still moving,
3 going upstairs, and all that, so...
4    Q. And what did you do in particular when you got
5 into the house?
6    A. I just stayed by the front for a second, moved
7 past Leonard towards the -- so if you're looking -- if
8 you're -- if you're standing at the front door and
9 you're looking into the house, there was a staircase on
10 your left-hand side that would go up. And then if you
11 looked towards your right, there was a -- kind of an
12 opening that like would go to a kitchen and I guess a
13 mudroom or a laundry room, or something like that.
14         Just kind of seeing, okay, well, who needed
15 help with anything. Everyone was good. They were
16 still working, so I came back to the -- the front of
17 the house to make sure, Hey, let's get fire rolling
18 this way right away; you know, have them respond
19 immediately.
20    Q. And is that when the medics came in or --
21    A. No. We had -- we had two medics with us, so
22 they -- they were doing the initial treatment. And
23 just because of the -- how tight everything was, he got
24 escorted to a kind of a bigger location where they
25 could kind of properly treat.

Page 61

1    Q.  Under the carport?
2    A.  Yes.  So that way they're not -- nobody's
3  getting in their way or vice versa.  So that way the --
4  the fire rig could get closer and take him to the
5  hospital.
6    Q.  Do you know about how much time passed between
7  when you first got into the -- inside the house and saw
8  Leonard -- between that time and when he was
9  transported on the livery out to the carport?
10   A.  No.  It might be in the transcripts.  I don't
11  know.
12   Q.  Okay.  I mean, was it like 15 minutes or was
13  it --
14   A.  No.
15   Q.  -- three minutes?
16   A.  Nah.  It was just a couple minutes.  I
17  couldn't give you exact.
18   Q.  Okay.  We're going to kind of go back into the
19  incident a little bit and ask if you could describe for
20  me the different rescue plans that were developed
21  throughout the course of the incident before there was
22  the decision to use the explosive breach.
23   A.  Okay.
24   Q.  What were they?
25   A.  The first was have a rescue team on side 3 and

Page 62

1  a rescue team on side 1, because that's where the --
2  the doors were.  But because Mr. Leonard was upstairs a
3  lot, we tried to come up with a way of ladders or
4  something to try to -- try to get up there and kind of
5  shrink the problem a little bit, as opposed to -- so if
6  we can try to get guys upstairs, but trying to figure
7  out how to do that with the equipment that we had.
8        His dog was just a factor, as in, "Okay,
9  there's a dog in here; just be aware of that" type of
10  deal.  But for the side 1, side 3, and then try to
11  figure out how we could get guys up to the top floor,
12  level 1, through side 1, because I didn't see any
13  openings.  I don't know the type of -- upstairs looked
14  like.
15   Q.  So one plan was to use a ladder to get into
16  the upstairs, but that was rejected because it wasn't
17  practical?
18   A.  It was more of timing:  How do we get the
19  ladder up there fast enough, a tall enough ladder?  Do
20  we use maybe the BearCat to bring the ladder in closer
21  and have guys on the -- on the roof?  We kind of
22  war-gamed a few, you know -- "If we had to do it, you
23  know, you know, how could we do it" type of deal.
24        We talked about a possible port and covers on
25  the windows.

Page 63

1    Q.  Say that again?  Port and cover?
2    A.  Port and covers.
3    Q.  What's that mean?
4    A.  Just break out a window.  "Gain visibility
5  inside the house" type of stuff.  Those were kind of
6  the factors that we had.
7    Q.  Were you receiving intelligence from the two
8  snipers, Markert and Kenyon, about what was going on in
9  the house through -- because they were looking through
10  their scopes?
11   A.  Yes.
12   Q.  And how frequent was the update from the
13  snipers?
14   A.  When they saw something, they reported it --
15  movement, stuff like that.
16   Q.  Did either of the snipers ever report that
17  they saw Leonard with a gun in any of the windows?
18   A.  Not that I recall.
19   Q.  Did either of the snipers ever report that
20  they saw Leonard somehow physically threatening his
21  child?
22   A.  I don't remember.
23   Q.  Okay.  And so -- and you said "port," as in
24  p-o-r-t?
25   A.  Yes.

Page 64

1    Q.  And the object of that, the objective of that
2  would be to see into the house better?
3    A.  Yes.
4    Q.  Is that when there's a curtain or something
5  like that?
6    A.  Yeah.
7    Q.  And what happened with this plan?
8    A.  We -- a little bit the height of the windows
9  requires somebody bringing ladders for them.  The
10  amount of bodies we have on the team, it just didn't
11  seem like a viable option.  And then we didn't know
12  where -- if we ported a certain window, it would just
13  go into a closet or like a small room or something.
14   Q.  Okay.  Was there another plan, a rescue plan?
15   A.  No.
16   Q.  Was there a rescue plan by which Annalesa
17  Thomas would ask Leonard to release the child?
18   A.  Oh.  Yeah.  Sorry.  Yeah, there was.  Yeah.
19   Q.  Can you describe how that was going to work?
20   A.  The goal was for her to convince her son to
21  allow Elijah to go free.  The...  Whatever that road
22  is; I forget the street name.
23   Q.  55th; is that right?
24   A.  (Witness indicating.)  I think.
25   Q.  Okay.  The Fife guys knew?

1 to move.  That would require people to get a little bit
2 closer.  With the dog every now and then going in and
3 out, it compromises them as well.
4    Q.  So the reason that you didn't attempt to bring
5 somebody up side 4 and maybe use a less-lethal
6 projectile was because you had too few people?
7    A.  No.  I think he, at that point, had already
8 gone back in the house.  It was too late for them to
9 get from where they were to there, unseen by
10 Mr. Leonard.
11    Q.  And I guess what I'm trying to ask is, Why
12 could you not wait until Leonard reappeared on the
13 porch and then try to do the less lethal from the 1-4
14 corner?
15    A.  I didn't know when he was coming back.
16    Q.  I understand, but...
17    A.  You asked a question.  I answered it.
18    Q.  Okay.  If you go to -- so you said that
19 Leonard went back into the house at some point?
20    A.  Yes.
21    Q.  With the child?
22    A.  Yes.
23    Q.  Okay.  If you flip to page 33.
24    A.  Which one?
25    Q.  I'm sorry.  Of your interview transcript.

1 Sorry about that.
2    A.  It's okay.  I'll just put it back here then
3 (indicating).
4    Q.  That's fine.
5    A.  Thirty-three?
6    Q.  Yeah.  So it looks like around 1449, 1450, you
7 say --
8    A.  Okay.
9    Q.  You say (as read):  "But grabbed the kid and
10 they darted back inside."  Okay.
11       And then you say (as read):  "I'm like, quote,
12 Oh, Kannen[sic], hold, hold, hold.  Get back to Side 3.
13 He's back in the house.  So they pulled back and I
14 said, Hey, Kannen just take your team, the detached
15 garage.  Stay over there.  Let's stop fucking around
16 with this, because going all the way back to the
17 original" -- and this doesn't make sense to me --
18 "case is not going to do any good"?
19       What is it -- do you have any idea what's --
20 what you're trying to say there or what --
21    A.  I have no idea what that is.
22    Q.  Okay.  Was there some original plan that you
23 were going to go back to, or...?
24    A.  Yeah.  Jason was responsible for side 3, and
25 so having him on side 4 doesn't make sense with his

1 element.
2    Q.  When you're talking at this point, had the
3 explosive breach been set?
4    A.  Sorry?
5    Q.  Had the charge been set for the explosive --
6    A.  Has it been hung from the door?
7    Q.  Yeah.
8    A.  I don't know.  I -- I -- the sequence?  Yes,
9 it got set.  I don't know where in the sequence it got
10 set.
11    Q.  Okay.  But at least in this point, looking at
12 the narrative in your interview, by this point in the
13 narrative, the charge has been hung; is that right?
14    A.  I don't know.
15    Q.  Okay.  So if you go down in that same page,
16 page 33, you say on 1472 or so:  "Oh fuck.  Okay we're
17 definitely doing an explosive breach on this thing
18 because we have to have positive..."  And then the
19 questioner cuts you off.
20       What -- what are you saying there?
21    A.  The -- if -- if we're going to make an
22 emergency rescue, we have to have a positive breach.
23    Q.  Okay.
24    A.  It's like a firefighter.  I mean, you try and
25 get somebody out of the house.  You want that door to

1 go the first time so you can get the kids out and the
2 family members out.  We just have to have a positive
3 breach on the first time.
4    Q.  And so that's why you were going to choose the
5 explosive breach as opposed to something else?  Is that
6 what you're saying, or...?
7    A.  Yes.
8    Q.  Was there any reason -- was there any other
9 reason for an explosive breach?  Were you using it as a
10 diversion?
11    A.  No, we're actually deployed and have to
12 [indistinct] --
13       (Reporter interruption/clarification.)
14    Q.  (BY MR. WHEDBEE)  Huh?
15    A.  I'm sorry.  I could have used NFDDs as a
16 diversion.  It was more just we want to make sure that
17 we have a positive way to get inside the house.  It's
18 just benefit that when the breach, explosive breach
19 happens we get that -- we also get an effect of
20 surprise or distraction.
21    Q.  Was that a desired effect?
22    A.  It's always a desired effect to disorient the
23 persons.
24    Q.  On the next page, you say, "It looked like a
25 big 2x4 or something."  Was that what you referred to

Page 141

1 BearCat; is that where you are when the shot goes off?
2    A. I think so.
3    Q. Okay.
4    A. A shot goes out. I know the breach is going.
5 Somebody up front of me -- I think it was -- it was
6 Waller -- ends up pushing down side 4 toward the --
7 toward the back side. Somebody was in front of Vance,
8 but I don't remember who it was, getting to the front
9 door.
10       At this point, the dog comes out pretty
11 aggressively. Vance shot the dog. The dog goes down
12 for a second. Because I'm just climbing over that
13 fence, I told Vance keep going, because we only have
14 one guy up at that door. The dog gets -- so Vance
15 moves away from the dog, or just kind of makes a --
16 going straight towards the -- the front door.
17       The dog starts getting up. I didn't know if
18 he was going to attack him or go inside the house and
19 attack team members or -- or what. I ended up shooting
20 the dog three times. That part, I didn't get a chance
21 to relay the information, "Hey, we shot the dog."
22       Once I get to the -- the threshold, I see the
23 -- the team in the back kind of starting to -- you
24 know, we talked about that opening. They're coming
25 from the back towards the front, as in the middle of

Page 142

1 the house and then starting to move their way upstairs.
2       My guys on side 1 are starting to push -- at
3 this point, the child's already been removed, because
4 it took -- like I said, it took me a little bit to get
5 over the fence. When the dog came up, I put three in
6 the dog. Then I -- then I'm catching back up with the
7 guy, so there was already a little bit of space and
8 time inside the -- inside the house.
9       Somebody was with -- with Leonard. I couldn't
10 tell you who it was, kind of checking him out. Once we
11 had separation, the jackpo- -- or the command or the
12 code word of, Hey, we've -- we have separated. The
13 host- -- was taken from the hostage, or we have the
14 child safely with us. That came out.
15    Q. What's that?
16    A. What?
17    Q. The code word you said?
18    A. Oh, "jackpot."
19    Q. Okay.
20    A. It's just a term. It's a term.
21       Call for medics. So we have two team medics.
22 One's with Central Pierce, and then Sergeant Rodriguez
23 at that time was also one of our team medics. So they
24 started working on Leonard. Like because of the
25 cramped space and all that, moved him over to -- I

Page 143

1 don't know if it was the next house or the one after
2 that. It was just -- it was one of those two. If
3 you're looking at the front of the house, it's to the
4 left. I called for the ambulances to respond
5 immediately to the -- to the corner so we can get him
6 to a trauma center.
7       Somewhere in there, somebody said somebody had
8 the kid, Elijah. But I -- I didn't physically see him
9 for a second; at least I don't think I did, you know,
10 like right now.
11    Q. If you look into your interview real quick.
12    A. Sure. Is this it?
13    Q. Yep. Exhibit 17, page 43.
14    A. Forty-three?
15    Q. Yeah. Tell me, what was -- what was Leonard's
16 reaction to the -- to the explosive breach.
17       MR. JOLLEY: Object to the form.
18    Q. (BY MR. WHEDBEE) That you saw.
19    A. What I saw?
20    Q. Mm-hm.
21    A. Mr. Leonard?
22    Q. Mm-hm.
23    A. Thought it was going to kill him.
24    Q. At line 1915 -- oh, you thought -- line 1915,
25 you said, "He just freaking panicked and grabbed the

Page 144

1 kid."
2    A. Right.
3    Q. Is that accurate?
4    A. Yeah. He -- he grabbed that kid.
5    Q. Was he panicked?
6    A. His actual mental state? I -- I can't testify
7 to that.
8    Q. You said it here. I'm just wondering --
9    A. Sure. He -- he appeared panicked.
10    Q. Okay. And he was panicked because of the
11 breach; is that right?
12    A. That could have been.
13    Q. Is that what you say there on line 1922?
14       MR. JOLLEY: Object to the form.
15    A. Yes. It says, "It was -- it was because of
16 the breach."
17    Q. (BY MR. WHEDBEE) So from your perception, you
18 believed that Leonard was panicked because of the
19 breach?
20       MR. JOLLEY: Object to the form.
21       MR. WHEDBEE: What's wrong with the
22 form?
23       MR. JOLLEY: Well, you're quoting him
24 from the transcript about, It was because of the
25 breach? The question above doesn't indicate it was



EXHIBIT 9

Page 1

1    UNITED STATES DISTRICT COURT
2    WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

FREDRICK and ANNALESA THOMAS;)
4    and JO-HANNA READ, as        )
     Guardian ad Litem of E.T., a )
5    minor,                       )
                                  )
6              Plaintiffs,  )
                            )
7        vs.            ) 3:15-cv-05346 BJR
                            )
8    JASON CANNON; BRIAN MARKERT; )
     RYAN MICENKO; MICHAEL WILEY; )
9    MICHAEL ZARO; CITY OF FIFE;  )
     CITY OF LAKEWOOD; and PIERCE )
10   COUNTY METRO SWAT TEAM,     )
                                  )
11             Defendants.  )
12   _____
13        DEPOSITION UPON ORAL EXAMINATION OF
14                 ZACHARY KENYON
15   _____
16
                     8:53 A.M.
17
                  JULY 22, 2016
18
19      18421 VETERANS MEMORIAL DRIVE EAST

           BONNEY LAKE, WASHINGTON
20
21
22
23
24   REPORTED BY:  CINDI ULLMAN, CCR 2687
25

Page 2

1          A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS THOMAS:
4        TIMOTHY K. FORD
         MacDonald Hoague & Bayless
5        705 Second Avenue, Suite 1500
         Seattle, WA 98104
6        206.622.1604
         timf@mhb.com
7
8
9    FOR THE DEFENDANTS:
10       JEREMY W. CULUMBER
         Keating, Bucklin & McCormack, Inc., P.S.
11       800 Fifth Avenue, Suite 4141
         Seattle, WA 98104
12       206.623.8861
         jculumber@kbmlawyers.com
13
14
15
16   ALSO PRESENT:  NONE
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
3    EXAMINATION BY:              PAGE(S)
4    MR. FORD                        4
5
6
7
8
9
10
11
12
13   EXHIBITS FOR IDENTIFICATION         PAGE
14   Exhibit 37   Co-Op Cities Metro Crime Response   4
15        Unit:  Interview transcript
16        (Draft)
17
18
19
20
21
22
23
24
25

Page 4

1        BONNEY LAKE, WASHINGTON; JULY 22, 2016
2              8:53 A.M.
3              --oOo--
4
5        (Deposition Exhibit 37 was marked for
6         identification.)
7
8        ZACHARY KENYON,
9    sworn as a witness by the Certified Court Reporter,
10        testified as follows:
11
12            EXAMINATION
13   BY MR. FORD:
14     Q.  Can you state your name and spell it for the
15   record, please.
16     A.  Zachary Kenyon, Z-a-c-h-a-r-y, K-e-n-y-o-n.
17     Q.  And where do you work, sir?
18     A.  Bonney Lake Police Department.
19     Q.  How long have you worked here?
20     A.  Two and a half years.
21     Q.  And before that?
22     A.  Milton Police Department.
23     Q.  And how long were you there?
24     A.  Ten years.
25     Q.  Any police experience prior to that?

Page 21

1    Q.  And you were on side 1; is that right?
2    A.  Correct.
3    Q.  And was it the window on side 1 that you're
4  referring to that he hung his child out?
5    A.  Correct.
6    Q.  And do you mean that the child actually went
7  out the window; his body was outside the window?
8    A.  He was outside the window.
9    Q.  Do you know what he was doing while he was
10  doing that?
11    A.  From what I saw?
12    Q.  Yeah.
13    A.  He was holding him out and showing everybody,
14  saying, "See, he's okay."
15    Q.  He wasn't threatening to drop him or throw him
16  down or anything like that?  Harm him?
17    A.  Well, I -- I guess in my eyes, I would take
18  that as a threat.  I mean, any reasonable parent
19  wouldn't hang the kid out a window in a second-story
20  residence.
21    Q.  Okay.  But -- so it appeared to you to be a --
22    A.  A threat.
23    Q.  A threat or a danger?  I mean, a threat
24  meaning that he's going to do something worse to the
25  child or just a danger that he -- what he's doing to

Page 22

1  the child?
2    A.  I -- I'd -- I'd say it's -- I guess, you could
3  consider it both a threat and danger.
4    Q.  Okay.  But the one thing he was doing at
5  least, from your perception, was showing the officers
6  that the child was okay.
7    A.  Yes.
8    Q.  When he was doing that, what was the child
9  doing?
10    A.  I -- after looking back in my notes, I recall
11  the child was talking to him, smiling at him.
12    Q.  Did the child appear to be frightened?
13    A.  No.
14    Q.  Did the child appear to be in pain?
15    A.  No.
16    Q.  Let's listen a little bit longer.
17    A.  Okay.
18    Q.  Ready?
19    A.  Mm-hm.
20       [Audio recording played.]
21    Q.  (BY MR. FORD)  Did you hear that last
22  question?
23    A.  Yes.
24    Q.  Could you tell from your knowledge of these
25  different officers' voices who that was?

Page 23

1    A.  It sounded like Derig.
2    Q.  You were designated Sierra 2 that night; is
3  that right?
4    A.  I don't remember.
5    Q.  Is -- did you have a regular call handle, or
6  whatever you call it, for SWAT operations?  It was
7  always the same, or did it depend on the operation?
8    A.  It -- well, it depended on the operation, but
9  normally, yeah, we were Sierra units.
10    Q.  So I'm noticing just right below where we're
11  talking, I'm getting a little ahead of us here.
12  Markert is saying he's Sierra -- well, he says the word
13  "Sierra 1."
14    A.  Mm-hm.
15    Q.  Is he identifying himself there?
16    A.  I believe Markert and I were together on the 1
17  side initially, so...
18    Q.  Okay.
19    A.  We were together as Sierra 1, I believe.
20    Q.  Okay.  If two of you are in the same spot,
21  then you both have the same --
22    A.  Yes.
23    Q.  -- call?  How is it determined whether you're
24  1 or 2, or does that have any significance to the other
25  officers?

Page 24

1    A.  It's -- it depends on who shows up on scene
2  first, what sniper shows up on scene first.
3    Q.  Okay.  Let's listen; maybe we can hear it.
4       [Audio recording played.]
5    Q.  (BY MR. FORD)  When you -- do you remember the
6  AT moving around at the back side of the house?  Were
7  you able to see that?
8    A.  I don't remember.
9    Q.  Do you remember if you were able to hear the
10  AT move into the backyard and go across the fence?
11    A.  Yes.
12    Q.  Did that make a noise and the fence go down?
13    A.  Yes.
14    Q.  About how far in front of the side 1 of the
15  house were you?  What was your distance?
16    A.  I'd have to say probably -- maybe 40, 50
17  yards.  I was across the street under a carport.
18    Q.  So there was a front yard of the house --
19    A.  Mm-hm.
20    Q.  -- of Leonard Thomas and then the street and
21  then there was a carport off the street on the other
22  side?
23    A.  Correct.  There was a driveway up where the
24  carport.
25    Q.  And I think we've got pictures at the back of

Page 53

1 I didn't want my barrel down range at them.

2     Q.   Did you see any of the officers enter through
3 the front door?

4     A.   No, I don't -- I don't remember.

5     Q.   So did you see whether Leonard was actually in
6 physical contact with Elijah at the time Officer
7 Markert took his shot?

8     A.   No, I did not.

9     Q.   When Leonard moved toward Elijah, could you
10 see his facial expressions?

11     A.   He looked startled when -- obviously, when the
12 breach went.  That's about it.

13     Q.   Did you ever talk to Markert about what had
14 led him to make the decision to take the shot?

15     A.   No, I didn't.

16     Q.   Down on the bottom of page -362 of your
17 statement, pages 8 -- or lines 848 through -9...  Well,
18 actually, let's move up a little bit.  You say at line
19 843, He got up -- that's Leonard got up, right?

20     A.   Mm-hm.

21     Q.   -- ran straight for the kid.  Grabbed him,
22 started -- basically guarded him in, into the
23 residence.

24        What do you mean by basically guarded him into
25 the residence?

Page 54

1     A.   Well, I don't -- I don't -- I don't
2 remember -- like I said, I don't remember seeing him
3 because that bush was in the way.

4     Q.   Was it your impression that when Leonard was
5 moving toward Elijah one of the things he was trying to
6 do was to guard him from the explosion or what was
7 happening around him?

8     A.   No.

9        MR. FORD:  Let's see if I can...  Why
10 don't we take a break for a couple of minutes while I
11 try and set this up.

12        THE WITNESS:  Okay.

13        MR. FORD:  Okay.  Thanks.

14     (Recess taken.)

15        MR. FORD:  Back on.

16     Q.   (BY MR. FORD)  Exhibit 37, again, is your
17 interview transcript.  Can you take a look at the first
18 page of the actual interview, -344.  Down at the
19 bottom, it says this is being audio/video recorded with
20 your permission.

21     A.   Yep.

22     Q.   Do you remember -- did they have video where
23 you were?  Do you remember that?

24     A.   I don't remember it.

25     Q.   Do you remember where this occurred?

Page 55

1     A.   No, I don't.

2     Q.   Do you know these individuals that are named
3 at the top, Tom Yalbee, Shelby Wilcox?  Do you know
4 either one of those?

5     A.   No.

6     Q.   And do you recall anyone being present for the
7 interview that you did know?

8     A.   I can't recall.

9     Q.   Is this the only time you've had an
10 after-action interview with the SWAT team?

11     A.   No.

12     Q.   There have been other -- other times even when
13 there are not shots fired?

14     A.   Well, no.  Not with the -- I mean, I had --
15 the one I had was with the officer-involved shooting
16 that I had.

17     Q.   Right.  I'm sorry.  Of course, other than that
18 one.  But that was a little different because you were
19 the shooter and so it was --

20     A.   Right.

21     Q.   -- with the prosecutor and whoever.

22     A.   Right.

23     Q.   Right.  But --

24     A.   But this one, yes.

25     Q.   This is the only time this happened?

Page 56

1     A.   Yes.

2     Q.   Okay.  And they -- they don't conduct these
3 kind of interviews unless there's shots fired, I
4 assume, or somebody injured?

5     A.   Correct.

6     Q.   Okay.  So let's just go back to the place
7 where we were here, which was...  Okay, page -362.  And
8 I just want to play the recording here, and let me just
9 ask you to -- to tell me if the transcript is accurate
10 at this portion.  I think it's going to start at line
11 827.

12     A.   Okay.

13        [Audio recording played.]

14     Q.   (BY MR. FORD)  Okay.  Did you see anything
15 there that was not transcribed accurately?

16     A.   No.

17     Q.   And that's down through lines 854?

18     A.   Correct.

19     Q.   On page -362.  Is that right?

20     A.   Yes.

21     Q.   So do you know if this interview occurred
22 after the tactical debrief that you described, or would
23 have the tactical debrief occurred after this
24 interview?

25     A.   I believe the interview was after the debrief.

EXHIBIT 10

EXHIBIT 10

Page 1

1          UNITED STATES DISTRICT COURT
2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE
3
4   _____
                                )
5   FREDRICK and ANNALESA THOMAS;  )
    and JO-HANNA READ, as Guardian )
6   ad Litem of E.T., a minor,     )
                                )
7       Plaintiffs,             )
                                )
8   vs.                         )   3:15-cv-05346 BJR
                                )
9   JASON CANNON; BRIAN MARKERT;   )
    RYAN MICENKO; MICHAEL WILEY;   )
10  MICHAEL ZARO; CITY OF FIFE;    )
    CITY OF LAKEWOOD; and PIERCE   )
11  COUNTY METRO SWAT TEAM,        )
                                )
12      Defendants.             )
13  _____
14       DEPOSITION UPON ORAL EXAMINATION OF
15                  MARK EAKES
16  _____
17
18               1:56 P.M.
19            MARCH 29, 2016
20        3737 PACIFIC HIGHWAY EAST
21            FIFE, WASHINGTON
22
23
24
25  REPORTED BY:  SHARI L. WHEELER, CCR NO. 2396

Page 2

1          A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS:
4     DAVID J. WHEDBEE
      TIMOTHY K. FORD
5     MacDonald Hoague & Bayless
      705 Second Avenue, Suite 1500
6     Seattle, Washington 98104
      206.622.1604
7     davidw@mhb.com
      timf@mhb.com
8
9   FOR THE DEPONENT:
10    JEREMY W. CULUMBER
      Keating, Bucklin & McCormack, Inc. P.S.
11    800 Fifth Avenue, Suite 4141
      Seattle, Washington 98104
12    206.623.8861
      jculumber@kbmlawyers.com
13
14  FOR DEFENDANT CITY OF FIFE:
15    F. HUNTER MACDONALD
      VSI Law Group, PLLC
16    225 Tacoma Avenue South
      Tacoma, Washington 98402
17    253.922.5464
      hunter@vsilawgroup.com
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
3   EXAMINATION BY:              PAGE
4     MR. WHEDBEE                  4
5
6
7   EXHIBITS FOR IDENTIFICATION         PAGE
8   (Exhibits 1 through 9 were previously marked.)
9   Exhibit 10  Photograph of the white board used      32
10       during the incident with Mr. Thomas
11  Exhibit 11  Transcript of interview          41
12
13  EXHIBITS PREVIOUSLY MARKED AND REFERRED TO
14  Exhibit 6  Hand-drawn map              20
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        FIFE, WASHINGTON; MARCH 29, 2016
2                 1:56 P.M.
3                 --oOo--
4
5             MARK EAKES,
6   sworn as a witness by the Certified Court Reporter,
7          testified as follows:
8
9             EXAMINATION
10  BY MR. WHEDBEE:
11     Q. Sergeant Eakes, thank you for coming this
12  afternoon.  My name is David Whedbee.  I'm here with
13  Tim Ford.  We both represent Fred and Annalesa Thomas
14  in this matter.
15         Have you ever been deposed before?
16     A. I have.
17     Q. In which case?
18     A. The last one was an employment dispute with the
19  Lakewood Police Department.
20     Q. Were you deposed in another case, besides that?
21     A. Yes.
22     Q. What was that?
23     A. It was a criminal case involving a suspect that
24  went to prison.
25     Q. Was it a civil suit or just a --

Page 21

1    MR. WHEDBEE: Do you know, Jeremy? Sorry.
2    MR. CULUMBER: 55th is the house --
3    THE WITNESS: Yeah.
4    MR. CULUMBER: 54th? Is that the --
5    THE WITNESS: Yeah. 54th.
6    Q. (BY MR. WHEDBEE) Do you mind writing that in?
7    A. That is a map on paper and somebody's freehand
8    sketch, so --
9    Q. We won't hold you to it.
10   A. Okay. I appreciate it. It would be six to
11   seven houses, I believe, to the -- this would be south,
12   I believe, here.
13   Q. Okay.
14   A. So I don't know. I'm just going to take a stab
15   in the dark.
16   Q. And maybe put "NR" for negotiation rig.
17   A. Sure.
18   Q. From that position, do you have any visual
19   perspective on the house?
20   A. No.
21   Q. Was Chief Zaro ever in the negotiation rig with
22   you?
23   A. Yes.
24   Q. Was he there a lot? Was he there occasionally?
25   Did he come back and forth?

Page 22

1    A. Back and forth.
2    Q. Was he there during -- when you were on the
3    phone with Mr. Thomas, was it on a speakerphone?
4    A. There were times it was and maybe times it
5    wasn't.
6    Q. Was Chief Zaro present when Mr. Thomas was on
7    speakerphone in the negotiation rig?
8    A. I believe towards the end, he was. But I don't
9    have specific times.
10   Q. Okay. Do you know where Chief Zaro would go
11   when he wasn't in the negotiation rig?
12   A. No.
13   Q. There was no particular place that you knew him
14   to be? I know he may have moved around somewhat. But
15   was he positioned in someplace that you knew?
16   A. He would be -- I don't know exactly where he
17   went. He would be relatively close to the command post
18   or at the command post, which was that general area.
19   Q. And where was the command post?
20   A. That was it. We'd all park in that same area.
21   Q. I got it. Okay.
22   Q. When you first arrived there, who debriefed you
23   on what had happened before you arrived?
24   A. I'm sorry. Before I arrived?
25   Q. Uh-huh.

Page 23

1    A. Again, I don't recall anybody talking to me
2    before I arrived on the scene.
3    Q. I'm sorry. My question was unclear.
4    When you arrived at the scene, who debriefed
5    you on what had been going on at the scene before you
6    arrived?
7    A. Sure. It would've been -- I met with Officer
8    Luckman, or Sergeant Luckman, with Milton, and
9    Lieutenant Thompson with Fife.
10   Q. And what did you understand from Sergeant
11   Luckman, as far as what you were dealing with? Very
12   generally, tell me everything that he was telling you.
13   A. Sergeant Luckman had already been talking to
14   him. Again, he was a trained prior negotiator, and he
15   had a -- I think a significant or extended conversation
16   with him before we arrived. And he was -- the
17   information I was given was that he was hostile, upset.
18   He might have been intoxicated. There was a mention
19   that he might possibly have a gun; that he had, at one
20   point, put his child out the window -- or "hung him out
21   the window," I think is the way it was stated.
22   Q. Anything else?
23   A. I'm sorry?
24   Q. Anything else?
25   A. Oh, I'm sorry. I don't recall at this point.

Page 24

1    Q. Did Sergeant Luckman mention anything about
2    Leonard's mental illness or bipolar disorder?
3    A. Thank you. Yes. There was a mention that he
4    might possibly be bipolar.
5    Q. Anything about being on or off meds?
6    A. I don't recall.
7    Q. What did you do to prepare for today's
8    deposition?
9    A. What did I prepare for today?
10   Q. How did you prepare for today's deposition?
11   A. I read my statement that I gave to detectives
12   the night in question here one time.
13   Q. Did you read any other statements?
14   A. No.
15   Q. During your course of conversation with
16   Mr. Thomas, what did you conclude about whether or not
17   he had a gun?
18   A. I did not know. I asked him that, and he said
19   no.
20   Q. Did you ask him that once or many times?
21   A. I asked him more than once. I don't know how
22   many times.
23   Q. Did he always say that he did not have a gun?
24   A. Yes.
25   Q. Did you hear information from any other source

Page 25

1 about family members and whether they believed he had a
2 gun?
3    A. No.
4    Q. Did you ask?
5    A. I was negotiating. I didn't ask other family
6 members.
7    Q. So in your communications with Chief Zaro, he
8 was not providing you with information that he was
9 learning from either other police officers or family
10 members?
11    A. No. That's not -- he doesn't interview family
12 members. He's running a command and SWAT team at the
13 time.
14    Q. I understand that he might not interview them
15 himself. But he's the conduit of information, isn't
16 he, between his subordinate officers and you?
17    A. He's in charge of the scene.
18    Q. Is he the conduit of information between his
19 subordinate officers and you?
20    A. You'd have to clarify or be more specific.
21    Q. Okay. If something is going on outside the
22 negotiation rig that Chief Zaro thinks you need to
23 know, is he the one that communicates that?
24    A. He could be one of the people that will give us
25 information.

Page 26

1    Q. Well, how else does it happen?
2    A. Tom Thompson was the intel person. So he might
3 have interviewed people, too, and any other sources
4 that we could get information from.
5    Q. Describe what an intel person does.
6    A. They're generally going to try to get exactly
7 that, intelligence, and the history and what had
8 happened, you know, during that incident. He may have
9 interviewed family members and gathered that intel. He
10 will decipher it and pass it on.
11    Q. Okay. Did you hear from Lieutenant Thompson
12 that there had been any discussion with family members
13 about whether or not Leonard Thomas had a gun?
14    A. I am sure he talked to somebody. I don't
15 recall the conversation and what was passed on at this
16 point.
17    Q. With respect to Leonard's interactions with his
18 child, what did you understand about any potential
19 threats that Leonard made to his child?
20    A. Other than hanging him out the window?
21    Q. Is that the only one?
22    A. The fact that he wouldn't let the child go. He
23 was hostile. He showed a propensity for violence.
24    Q. So he showed a propensity for violence. What
25 kind of --

Page 27

1    A. Well, he did act out in violence, I should say.
2    Q. When?
3    A. When he struck his mother.
4    Q. How did he strike his mother?
5    A. I don't have that information in front of me.
6 But she's the one that made the first initial 911 call
7 of being assaulted.
8    Q. Did you find out exactly what was alleged that
9 he had done?
10    A. That she was struck. I established that there
11 was probable cause for his arrest for assault.
12    Q. Did you find out where she was struck?
13    A. No.
14    Q. Did you ask?
15    A. No.
16    Q. Did you believe that it was important to find
17 out whether Mr. Thomas had a propensity for violence?
18    A. He did show a propensity for violence and
19 through his criminal history, too, I found out.
20    Q. But you didn't do anything to determine the
21 particulars of the criminal history or the alleged
22 assault with his mother?
23    A. Say that again, please.
24    Q. Did you do anything to find out the particular
25 information about the alleged assault with his mother?

Page 28

1    A. No. Probable cause had been established
2 already. And so that's what I was finding out: if he
3 was going to be arrested and what it would be for.
4    Q. If you're dealing with a subject in this kind
5 of situation, once you figure out that there's probable
6 cause to believe that he, in this case, made an
7 assault, you don't inquire anymore about the nature of
8 that assault?
9    A. It was a misdemeanor, Assault 4, domestic
10 violence, which would tell me that there was not a
11 weapon involved in that particular assault at that
12 time.
13    Q. Did you ever learn that Annalesa Thomas had
14 struck Leonard?
15    A. I did not hear that.
16    Q. And what did you find out about Mr. Thomas'
17 criminal background, as you put it, that led you to
18 believe that he had a propensity for violence?
19    A. A drive-by shooting in 2008 and a conviction.
20    Q. Did you find out any particulars about that?
21    A. No. There was a conviction.
22    Q. I had originally asked what Leonard displayed
23 as far as a threat to his child. And you said, his
24 criminal history. How does that correlate?
25    A. I might have misspoke. I thought I said that

Page 29

1 he hung his child out the window of the house.
2     Q. Then you said he had a propensity for violence,
3 and he had a criminal history. So I was trying to
4 figure out how those two ideas correlate with the
5 idea --
6     A. The assault on his mother was a violent
7 assault. Anytime you strike somebody, that's
8 considered violence. And then his criminal history,
9 which I've already stated, was a drive-by shooting that
10 he had a conviction for.
11     Q. And I'm trying to figure out, how does that
12 correlate with there being a threat to the child?
13     A. Because he's -- it shows a propensity for
14 violence, and he's not letting -- we've asked him to
15 let the child go, and he's refusing to do so.
16     Q. Were there any particular threats to the child,
17 aside from this background information that you --
18     A. Besides hanging the child out the window?
19     Q. Besides that, yeah.
20     A. None that he directly gave me.
21     Q. And how did you know that he had hung the child
22 out the window?
23     A. That was part of my initial briefing when I got
24 there.
25     Q. Who briefed you on that issue?

Page 30

1     A. It would've been either Officer -- sorry --
2 Lieutenant Thompson or Sergeant Luckman.
3     Q. Did Sergeant Luckman tell you anything about
4 the context of that episode at the window?
5     A. As far as how he was hung out the window?
6     Q. Just, generally, the context of that incident?
7     A. That's the general context, as I understood it.
8 A small child was hung out the window by his father.
9     Q. Did Sergeant Luckman tell you that he had asked
10 Leonard -- that he needed to see the child. And then
11 Leonard raised up the child to show that he was okay?
12     A. I don't recall that.
13     Q. Is that something that you would have wanted to
14 know?
15     A. It may or may not have happened. I don't
16 recall it sitting here today.
17     Q. Let's assume that it happened. Is that some
18 information that you would want to know?
19     A. Assuming -- I'm sorry. We're going on
20 assumptions? Go ahead.
21     Q. Let's assume that the context that I just
22 articulated -- let's assume that that occurred. Is
23 that some information that you would want to know from
24 Sergeant Luckman?
25     A. That he asked him to show the child?

Page 31

1     Q. Yes. And that Leonard then raised the child to
2 show Sergeant Luckman --
3     A. It's hard to answer without knowing the
4 correlation and the time frame between when he hung the
5 child out the window and when he asked that question.
6 So it's all on assumptions, and I'm only theorizing at
7 that point.
8     Q. Okay. When you say that probable cause had
9 been established, do you mean that he had committed
10 Assault 4? Is that what you were describing?
11     A. Yes.
12     Q. Was there anything that you personally observed
13 that led you to believe that there was probable cause
14 that Leonard committed a crime?
15     A. I was there after the fact of the crime.
16     Q. I know that.
17     A. So did I -- I couldn't have personally observed
18 it, then, if I wasn't there.
19     Q. I'm asking you, from the time that you arrived,
20 did you observe anything with Leonard that gave you
21 probable cause to believe that a crime had been
22 committed? Not the Assault 4. Any other crime?
23     A. An additional crime?
24     Q. Yes.
25     A. No.

Page 32

1     Q. When you were talking on the phone with
2 Leonard, did he ever make any threats to the child?
3     A. No.
4     Q. When you were talking on the phone with
5 Leonard, did he make any threats to any of the
6 officers?
7     A. I did not hear that. No.
8     Q. When you were on the phone with Mr. Thomas, did
9 he make any threats to himself?
10     A. No.
11     Q. Or that he would harm himself in some way?
12     A. No.
13     Q. When you were speaking with Leonard, did he
14 give you any indication that he had a weapon?
15     A. No.
16     Q. Did you communicate everything that I just
17 asked you about what you personally observed -- did you
18 communicate that to Chief Zaro?
19     A. I couldn't sit there and go bullet by bullet,
20 that we discussed every one of those. But we did
21 communicate the general context of what we're talking
22 about.
23         (Deposition Exhibit 10 was marked for
24           identification.)
25     Q. (BY MR. WHEDBEE) A few minutes ago, you

Page 69

1  review meeting, but you can't remember attending the
2  other debrief?
3      A. Sitting in front of you right now, no.  But
4  I've attended a lot of debriefs and different things
5  like that.
6      Q. Apart from the debrief, did you hear, among
7  your fellow SWAT members, any criticisms about how the
8  incident was handled?
9      A. No.  There was confusion on, I think, a couple
10  of -- you know, specifics, I don't know what they were
11  exactly disputing, if there was a dispute, or just a
12  misunderstanding.  You would have to ask them.
13      Q. So you never heard any criticisms raised by
14  Officers Waller or Kiplinger{phonetic} -- I'm not sure
15  how to pronounce his name.
16      A. Specifically, I don't remember them or their
17  statements about what they would have said.
18      Q. During your conversations with Leonard before
19  the shooting, did you ever hear him interact with
20  Elijah?
21      A. Did I ever hear him do what with Elijah?
22      Q. Interact with Elijah while you were on the
23  phone with Leonard?
24      A. Yes.  He woke him up at one point, and then I
25  spoke to Elijah.

Page 70

1      Q. How did Elijah sound to you?
2      A. He sounded okay, fine.
3      Q. Any signs of distress?
4      A. I could not detect any.  No.
5      Q. Did he seem happy?
6      A. Yeah.  I mean, it's a four-year-old boy.  So I
7  think his knowledge and understanding of events is
8  probably somewhat limited at four.
9      Q. Well, you can still be happy at four, can't
10  you?
11      A. Sure.  And you can still not understand what's
12  happening around you.
13      Q. That's fine.  But I didn't ask that question.
14  I asked whether --
15      A. Yeah.  I was just answering it, though.
16      Q. Okay.  So was he laughing?  Was he joking?
17      A. No.  He was just talking, as we're talking now.
18      Q. What did Elijah tell you?
19      A. Excuse me?
20      Q. What did Elijah say to you?
21      A. I'd have to look at the statement.  I think he
22  said he -- I asked him how he was doing, and he said he
23  was fine.  I think there was some mention of getting
24  him ready or pajamas or something like that.
25      Q. What did he say?  So you asked him if he was

Page 71

1  getting in as pajamas, and he --
2      A. There was some mention of that.  I don't
3  remember.  If you want me to look at that part -- I
4  know it's in the statement here somewhere -- I can
5  refresh my memory with it.
6      Q. Did you hear Leonard say anything to Elijah?
7      A. Did I hear Leonard say anything to Elijah?
8      Q. Yes.
9      A. I want to say yes, but I can't recall.  I think
10  it was about getting ready, or get your pajamas on, or
11  something to that effect.  It would be easier if I just
12  looked at my statement.  I could probably help you
13  better.
14      Q. Get your pajamas on because he was going to go
15  to bed or because he was going to be --
16      A. Well, he might have already had his pajamas on.
17  There was some talk about pajamas.  I just can't
18  remember without looking at my statement.
19      Q. Was Leonard telling Elijah to get ready to go,
20  to leave the house?
21      A. He was saying he was going to get him up to get
22  ready.
23      Q. For what?
24      A. To surrender.  He was going to take him outside
25  or let him come to us.

Page 72

1      Q. And this conversation occurred roughly how long
2  before Leonard was shot?
3      A. Again, it would just be a guess, for the
4  record.  But I'm thinking probably within 20 to 30
5  minutes before, you know, he came out -- or started to
6  come out and went back -- back and forth.
7      Q. What was Leonard's tone with his child?
8      A. He was still upset.  He would go from being
9  monotone and calm to being volatile and upset.
10      Q. And my question was, what was Leonard's tone
11  when he was speaking to Elijah?
12      A. Oh, Elijah.  Okay.  I apologize.  I think he
13  was very calm.
14      Q. In the negotiation rig, did you have the
15  capacity to record calls with the person that you're
16  talking to on the other side?
17      A. No.  I was missing, I believe, a piece of
18  equipment at the time.  We had a throw phone, but we
19  didn't use that.  It was through a cell phone.
20      Q. What's a throw phone?
21      A. Good question.  It's basically a -- what we
22  call a "throw phone."  It's connected to a cable, and
23  it's kind of like the old fashion way of having two
24  cans and a string.  I've got a phone on my end.  You've
25  got a phone.  And one line is connected in between.

EXHIBIT 11

right/rear on the other side of the parked car. I used a picnic table and chairs to build a hide location, allowing me to stabilize my rifle so that I could provide constant observation and intelligence updates on the front upstairs window and the suspect's movement up/down the stairs. I used my laser rangefinder to determine that Officer Kenyon was approximately 50 yards from the front of the house and I was approximately 57 yards from the suspect's residence. ATL J. Cannon was coordinating the officers on the back, or "three side" of the house. I conferred with him by radio and told him that I was going to remain with Officer Kenyon to assist him in covering the front of the house unless there was a distinct need for sniper coverage for the rear of the house.

Officer Kenyon and I were designated as "Sierra-1" during radio communications, as we were covering the "one side" of the house. As I observed the front side of the house, there was constant activity from inside the home. The front/upstairs window's blinds were raised, allowing me to see inside that room. The suspect came to the window numerous times, yelling out the open window towards entry officers at the Bearcat. I could clearly hear most of his yelling as he cursed at officers. He sounded agitated and impaired, telling officers that he had done nothing wrong and that we were not allowed to "trespass" on his property and that we needed to leave.

The only adult I saw in the house during the entire callout was a perfect match for the physical description of the suspect, as provided by A/C Zaro and negotiators.

Initially, entry officers in the vicinity of the Bearcat were speaking directly to the suspect. He was yelling and cursing at them, and they were asking him to release the hostage and to surrender. A/C Zaro or the negotiators radioed the team, asking that they not communicate directly with the suspect as negotiators were trying to get him to answer the phone.

Over the next several hours, the suspect appeared at the upstairs window intermittently, waving his arms and gesturing wildly as he yelled about his hatred of the Fife Police, cursing at officers and demanding that we should just leave as he insisted he had not committed a felony. The suspect warned officers 'I have a four year old in here. Don't be smashing in my door, using your stun grenades and tear gas or blowing my door off the hinges.' He warned officers that if they attempted to force entry into his home, the four year old hostage was going to get hurt. These warnings from the suspect indicated to me that he had a working knowledge of SWAT tactics and that he may be willing to sacrifice the safety - and possibly the life - of his son to delay or evade arrest if police entered his home.

At one point, the suspect brought the hostage to the front/upstairs window, shielding himself behind the child as he pushed the hostage up to the open window frame. I could

Statement of Officer B. Markert

D-DISCL 000893

son.  As officers called to the hostage, asking him to come to them, the suspect yelled back at officers, telling them that he wasn't going to let his son leave. He said that he was the boy's father and that the child would only listen to him.  Moments later, I could see the dog's feet and partial view of the dog as the dog came into view.  The suspect was goading the dog to attack officers, I could hear the suspect saying "Go get 'em!  Get 'em!' and as the dog stepped toward the yard and in the direction of officers near the Bearcat, in an aggressive manner the suspect said 'Good dog!'

Suddenly, the suspect grabbed the hostage and pulled him back inside the house and closed the door.  TL Wiley radioed that we had lost the opportunity to secure the hostage.  I went over to Officer Kenyon and asked him what kind of view/exposure of the suspect he had while the suspect was out on the front stoop, crouched behind the hostage.  Officer Kenyon said he could see the suspect and had a clear view of his head at one point before the suspect pulled the hostage back inside.

My location did not allow me to cover the front door if the suspect returned to the entrance with the hostage.  I told Officer Kenyon I was going around the corner to the alternate position and I ran around the barn.  I raised the stabilizing bars on the RV and mounted my rifle on the field rest.  I called out to officers at the Bearcat, to notify them that I was behind them, so that they would know not to cross into my observation lane without warning me.

During the callout, TL Wiley had established a tactical plan in case an emergency or deliberate entry was necessary to rescue the hostage.  This plan was relayed to team members over the SWAT-2 radio channel by TL Wiley.  Team breachers had built an explosive breaching charge to defeat the rear door of the house.  ATL Cannon's entry team would be staged on the "Four Side" of the house, prepared to enter the rear door once the explosive breach was initiated.  Officers staged at the Bearcat or near the front of the house would be responsible for breaching the front door and entering the house through that entrance.  If the hostage was outside the front door to the home, the intent was for the explosive breach to be enough of a distraction to the suspect that officers from the Bearcat would be able to snatch the hostage off the front stoop before the suspect had a chance to react.  ATL Cannon's team would enter the house through the rear door and contact the suspect inside to prevent him from bringing the hostage back inside if officers from the Bearcat had not already done so.

As I continued to cover the front door, I heard someone say that the suspect had now agreed to release the hostage, but only to his mother (the child's grandmother).  I heard a commotion from the direction of the command post.  Two negotiators were walking the mother northbound towards the suspect's residence.  The suspect suddenly opened the door again, guiding the hostage onto the stoop, where the child sat down.  The suspect

Statement of Officer B. Markert

D-DISCL 000895

exposed, right side of the suspect's torso that would not endanger the hostage.  I discharged one round from my rifle in an effort to incapacitate the suspect before he was able to retreat inside the residence with the hostage. I immediately cycled the action of my rifle, chambering a fresh cartridge as the rifle recoiled, in case a follow-up shot was required.  When my scope settled back on the doorway, I could no longer see the suspect or the hostage nor could I see inside the house.

I heard an officer yell "Shots fired!" and 'That was the snipers!' The plan called for officers to be nearing both doors/breach points and entering the home, so I pointed the barrel of my rifle away from the front door of the house and raised the bolt handle, unlocking the action to render the rifle "safe" as I continued to observe the front of the house. I saw officers in the area of the front door and then I heard several gunshots that sounded like they came from the area of the front door, or possibly inside the home.

I heard a female voice screaming from the area of the rear of the Bearcat.  Several moments after my shot, I saw a negotiator, Officer Malave from Fife PD, crossing the lawn with the juvenile hostage in his arms.  The negotiator made his way to the street and jogged southbound, towards the negotiator van and command post, carrying the child.

TL Wiley radioed that there had been shots fired, that the suspect was injured and that they had rescued the hostage. TL Wiley requested medics to respond to the home and for an ambulance to stage forward. As the hostage had been removed from the home and the suspect had been contacted inside, I decided to secure my firing location for investigators. I put the rifle on the ground with the bipod legs extended. I opened the action to my rifle, removed the magazine from the magazine well and the live cartridge from the chamber. I unloaded the magazine to confirm that there were three additional rounds loaded in the magazine. I reloaded all four rounds into in the magazine and inserted the magazine back into the magazine well; I left the action open so that chamber remained empty. I used a flashlight to look in the bushes and found the expended brass casing under the shrubs, adjacent to where I was standing; I never touched or moved the expended brass casing.

Several minutes later, I saw several officers exit the front door to the house, carrying a fabric stretcher holding the suspect; they moved down the block to a waiting ambulance. TL Wiley came outside and called out to me, asking if I was all right.  I responded that I was and that I would remain at my firing location until relieved. Officer Kenyon came to my location and checked on me.  I showed him where my expended brass casing was located and then asked him to retrieve my backpack from the carport.

Several other entry team members stopped by, staying outside the shrubs, to check on my welfare.  They notified me that my shot had seriously wounded the suspect and that the

Statement of Officer B. Markert

D-DISCL 000900

EXHIBIT 12

EXHIBIT 12

# Co-Op Cities
# Metro Crime Response Unit

This transcript was prepared by a third party that did not participate in the interview.  It is a draft only as it has not been verified for complete accuracy. Only the audio/video file should be considered a true, complete and accurate record of the interview.

Subject of Interview:  Ofc. Mike Wiley

Interviewer(s):  Det. Ray Punzalan, Det. Tamera Pihl and Investigator Keith Barnes



EXHIBIT  17
M. Wiley
DATE: 4-29-16
Cindi L. Ullman, CCR

1612

1613    Q:          Okay. Ih so, do - (Zorro) directs you not to bring the kid...

1614

1615    A:          He's not allowed to bring the kid inside, unfortunately that was the first time,
1616                he was - he snatched that kid real quick and got inside and we said, "Fuck we
1617                missed our opportunity."  You know it was a gutsy call, um, but again like I
1618                said, I don't know what triggered this guy, he didn't - there was actually no
1619                sound.  There was no - we didn't do anything.  We didn't move.  The Side 3
1620                team moved but...

1621

1622    Q:          But something hinked him up.

1623

1624    A:          Something, I don't know what it was but he just grabbed the kid and said fuck
1625                this, and went back inside, and we went dammit.

1626

1627    Q1:         So, I'm sorry, was that the first - the first time he went back inside or was
1628                this...

1629

1630    A:          I don't remember if it was the first time or the second time.

1631

1632    Q1:         So it wasn't this time.

1633

1634    A:          I - I...

1635

1636    Q1:         Did he bring him back inside when the kid's out on the sidewalk and (Zorro)
1637                made that decision?

1638

1639    A:          He made it on the - so that would have been the first time.

1640

1641    Q1:         Okay.

1642

1643    A:          That would have been on the first time, hey he's not going back in there or
1644                something like that.

1645

1646    Q1:         Okay, okay.

1647

1648    A:          So something is going on.  They're hearing something that we're not hearing
1649                on the - on negotiations.

1650

1651    Q1:         Mm-hm.

1652

1653    A:          So now it's like, okay check out real - real quick, because that's you know,
1654                every SWAT guy likes to hear, "Hey, he's not free to move," or "He's not...

1655

1656    Q:          Right.

| | | |
|---|---|---|
| 1657 | | |
| 1658 | A: | He's not referred to (unintelligible).  But th-that's pretty clear guidance for us. |
| 1659 | | |
| 1660 | Q1: | Right. |
| 1661 | | |
| 1662 | A: | Um, he's, he's a lethal threat.  But like anything else, you know, if we can take |
| 1663 | | him peacefully, fuck yeah.  Uh because, you know, none of our guys, I don't |
| 1664 | | want to put any of my guys through this stuff.  So we missed that opportunity |
| 1665 | | and now I'm like, "Okay I'm not going to miss another opportunity."  He got, |
| 1666 | | you know, like I said, like that far apart and I'm like, "Mm-mm, this is gonna |
| 1667 | | happen here.  We're gonna be able to move him forward." But then the kid |
| 1668 | | starts - because at this time he had already taken the car seat out and put it on |
| 1669 | | the porch. |
| 1670 | | |
| 1671 | Q: | Okay. |
| 1672 | | |
| 1673 | A: | Before the kid got all the way that far.  I'm like, "Oh, sweet, this might have a |
| 1674 | | great ending."  And then he threw I don't know maybe it was a Laker bag, I |
| 1675 | | don't know what it was.  It was something else, besides the car seat there was |
| 1676 | | something else that came out.  So like, "Hey grandma is going to pick it up." |
| 1677 | | Or I guess he was going to leave it because he was whacked out, he was |
| 1678 | | weird. |
| 1679 | | |
| 1680 | Q: | (Unintelligible) attitude? |
| 1681 | | |
| 1682 | A: | Yeah I mean he was just, it just - there was no rhyme or reason what he was |
| 1683 | | doing.  So we're constantly adjusting on him. |
| 1684 | | |
| 1685 | Q: | And those - and those advisories, any indication that mental health stuff was |
| 1686 | | articulated in the (unintelligible)? |
| 1687 | | |
| 1688 | A: | There was something um, but I - I couldn't tell you for word for word. |
| 1689 | | |
| 1690 | Q: | That you recall? |
| 1691 | | |
| 1692 | A: | Yeah, I know that did come out, they had some issues uh, and like I said I |
| 1693 | | mean there was so much stuff coming out. |
| 1694 | | |
| 1695 | Q: | Okay, sure. |
| 1696 | | |
| 1697 | A: | At that time, at that point, it was yeah okay whoop. |
| 1698 | | |
| 1699 | Q: | I'm just asking if you specifically recall something along those lines. |
| 1700 | | |
| 1701 | A: | Yeah. |

| 2330 | | |
|---|---|---|
| 2331 | A: | Yep it was uh, 'cause like I said (Vance) was to my right. I spun down and |
| 2332 | | told him to go, I got it. 'Cause again they're doing something at the door and |
| 2333 | | this thing is trying to get back up and I'm like click click click and then |
| 2334 | | climbed over the fence and by that time the door was open. Um so I never |
| 2335 | | want to have just two guys going in. Um, hell there could have been five, but |
| 2336 | | at that moment I looked and I only saw two, 'cause I definitely know... |
| 2337 | | |
| 2338 | Q1: | Mm-hm. |
| 2339 | | |
| 2340 | A: | ...somebody went to Side 3, I come to find out it was (Waller) um because |
| 2341 | | there was an open breach point. |
| 2342 | | |
| 2343 | Q1: | Have you ever heard anything - did you know if this guy had uh, any weapons |
| 2344 | | associated with him? |
| 2345 | | |
| 2346 | A: | Yeah, drive-by. |
| 2347 | | |
| 2348 | Q1: | Right. |
| 2349 | | |
| 2350 | A: | Uh, he was guilty of a drive by um, there was - there was conflicting reports |
| 2351 | | where he had a weapon or didn't have a weapon. Baby's momma, "No he ain't |
| 2352 | | got no gun," blah blah blah. I don't know how many times I've heard that and |
| 2353 | | found weapons. |
| 2354 | | |
| 2355 | Q1: | Mm-hm. |
| 2356 | | |
| 2357 | A: | And I've been trying to get all kinds of intel from uh, from command, "Hey |
| 2358 | | somebody talk to me. Tell me about these windows, tell me what's on the |
| 2359 | | other side of them. Can I potentially go up there, breach it, hit him with some |
| 2360 | | less lethal? Or maybe he's separated with the kid. If I can just snatch the kid |
| 2361 | | out the window type deal on Side 4?" Because I asked a couple of times. Uh, |
| 2362 | | but never got a response. And again, like I said this time now, he's - he's - he's |
| 2363 | | constantly coming downstairs and he's always coming on Side 1. |
| 2364 | | |
| 2365 | Q1: | Mm-hm. |
| 2366 | | |
| 2367 | A: | He had made some, uh, movement toward Side 3 without the kid from what I |
| 2368 | | could tell. That's what it sounded like over the radio. So again, I don't know |
| 2369 | | what - where the kid was, but I do know there's a lot of screaming and yelling. |
| 2370 | | Uh, so I'm like, "Man this guy's amped up." Um, there was a lot of - you |
| 2371 | | know, typically through these things, "Hey, what are we," you know, on a |
| 2372 | | barricade it's real simple, you know, the guy's by himself, you know, we'll |
| 2373 | | deploy a couple bangs, we'll set up a charge on a door, let him know, "Hey, |
| 2374 | | you're not free to leave, there's - the best way for you - for this to end is you |

EXHIBIT 13

EXHIBIT 13

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 3  _____
 4  FREDRICK and ANNALESA THOMAS; )
    and JO-HANNA READ, as Guardian)
 5  ad Litem of E.T., a minor,   )
                                 )
 6      Plaintiffs,     )
                        )
 7      vs.             ) No. 3:15-cv-05346 BJR
                        )
 8  JASON CANNON; BRIAN MARKERT; )
    RYAN MICENKO; MICHAEL WILEY;  )
 9  MICHAEL ZARO; CITY OF FIFE;   )
    CITY OF LAKEWOOD; and PIERCE  )
10  COUNTY METRO SWAT TEAM,       )
                                 )
11      Defendants.     )
12  _____
13        DEPOSITION UPON ORAL EXAMINATION
14                    OF
15                NILS LUCKMAN
16  _____
17              10:50 A.M.
18          NOVEMBER 17, 2016
19          9401 LAKEWOOD DRIVE SW
20          LAKEWOOD, WASHINGTON
21
22
23
24  REPORTED BY: CHERYL O. SPRY, CCR No. 2226
25
```

Page 2

```
 1       A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
 4       DAVID J. WHEDBEE
 5       MacDonald Hoague & Bayless
 6       705 Second Avenue, Suite 1500
 7       Seattle, Washington 98104-1741
 8       206.622.1604
 9       davidw@mhb.com
10
11       MICAH R. LeBANK
12       Connelly Law Offices
13       2301 North 30th Street
14       Tacoma, Washington 98403
15       253.593.5100
16       mlebank@connelly-law.com
17
18  FOR THE DEFENDANTS:
19       JEREMY W. CULUMBER
20       Keating Bucklin & McCormack
21       800 Fifth Avenue, Suite 4141
22       Seattle, Washington 98104-3189
23       206.623.8861
24       jculumber@kbmlawyers.com
25
```

Page 3

```
 1              I N D E X
 2
 3  EXAMINATION BY:                    PAGE
 4      MR. WHEDBEE                      4
 5      MR. LeBANK                     109
 6  EXHIBITS FOR IDENTIFICATION        PAGE
 7  Exhibit 53 5/24/2013 transcript of interview    4
 8      between Sgt. Nils Luckman and Det. Todd
 9      Jordan; D-DISCL 000370 - 000396
10  Exhibit 53A 5/25/2013 Incident Detail Report   36
11  Exhibit 53B Handwritten diagram of Sergeant    44
12      Luckman's
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      LAKEWOOD, WASHINGTON; NOVEMBER 17, 2016
 2              10:50 A.M.
 3              --oOo--
 4      (Deposition Exhibit 53 was marked for
 5      identification.)
 6              NILS LUCKMAN,
 7  sworn as a witness by the Certified Court Reporter,
 8          testified as follows:
 9              EXAMINATION
10  BY MR. WHEDBEE:
11      Q.  Sergeant Luckman, my name is David Whedbee.  I
12  represent Annalesa Frederick and Elijah Thomas in this
13  matter.
14      A.  Okay.
15      Q.  And also with me is Micha LeBank from the
16  Connelly Law Firm.  And they represent the Estate of
17  Leonard Thomas.
18      A.  Okay.
19      Q.  First of all, if you could just state your
20  name and spell it for the record, please.
21      A.  My name is Nils, N-I-L-S, as in Sam.  And my
22  last name is Luckman, L-U-C-K-M-A-N.
23      Q.  And Sergeant Luckman, have you ever been
24  deposed before?
25      A.  I believe twice before.
```

1     A.  Because when somebody is in a hostage
2  negotiation and they're in a situation and they're
3  there, just talking to them that way, that's a
4  communication method, but that's -- ensuring the safety
5  of him and everyone involved, we need to physically
6  contact him and speak to him so we made sure that was --
7  and it wasn't through the window.
8        But also, I couldn't verify whether he was in
9  the window or not.  The only time I can recall is when
10  he held his son up to the window.
11     Q.  And I understand that ultimately that might
12  not be the goal, but what I'm talking about, in your
13  view, is his coming to the window when you say we need
14  to physically speak to you, is that a form of
15  cooperation, in your view?
16     A.  Yes.
17     Q.  Did you ever say to Mr. Thomas that you also
18  needed to see his son to make sure that he was okay?
19     A.  Yes.
20     Q.  When you were -- when you quote yourself here
21  on page eight, the last line, "'We can't leave until we
22  physically speak with you,'" is that the same time that
23  you think you would have said we need to see your son to
24  make sure that he's okay?
25     A.  I can't recall if -- yeah, I can't recall.

1     Q.  And on line 369 you say -- well, first of all,
2  the question was, "did he ever talk about his son being
3  in the house?"  And you said, "Yes.  Multiple times he
4  said his son was in the house.  At one point I said,
5  'Well, is your son okay?'  'Yeah, my son's okay.'"
6        At this point, do you think that you would
7  have told him that you, the police officers, needed to
8  see his son to make sure that he was okay?
9     A.  Yeah, that's probably why I asked the question
10  there, I was trying to ensure both their safety.
11     Q.  And then you say, "And that's when he brought
12  the son to the window."
13        Do you think that that was a form of
14  cooperation?
15     A.  I don't know, because is he complying with
16  part of what I'm saying?  Sure, but there is -- but
17  we're still not there.
18     Q.  I understand you're not at the ultimate goal,
19  but if we're just taking baby steps, would you agree
20  that he was complying with your directive that you
21  needed to see his son?
22     A.  And I would say no, because for me I can't see
23  him at that point.
24     Q.  Okay, understand.  But I mean, you the
25  collective officers need to see his son.  So he's

1  showing you the son at the window.  Do you think he's
2  complying with that directive?
3     A.  Probably not the way I would want it to
4  happen, though, but that's --
5     Q.  Understood.  But do you agree that in some
6  form he's complying with what you're asking him to do?
7     A.  Yes.
8     Q.  And then when he says, "'Look, I'll hold him
9  out the window for you,'" and you say, "No, no, no,'"
10  you would agree that he is -- the reason he's holding
11  him out of the window, as you quote him here, is because
12  he's trying to show the officers that his son is okay,
13  because, in some way, he's trying to comply with your
14  orders?
15     A.  No.
16     Q.  No?
17     A.  No.
18     Q.  Why not?
19     A.  Because I don't believe -- I don't believe
20  that was the -- I never asked him to do that, I never
21  asked him to hold him out the window.  I don't believe
22  that is correct, no.  I believe that was -- that was
23  Mr. Thomas's decision of how he chose to do that.  And
24  that wasn't something I encouraged.
25     Q.  But when he did hold, according to you, when

1  he said, "Look, I'll hold him out the window," it was in
2  the context of you asking that the officers needed to
3  see the son; right?
4     A.  And what I said was -- I said, "We need to
5  ensure the safety -- we need to talk to you and make
6  sure both of you are okay."
7        And then he initiated the window part.  That
8  was all -- I didn't say come up to the window, I didn't
9  say bring him to the window.  That was all initiated by
10  him.
11     Q.  But when he did that, that was all in the
12  context of you saying, as you said a minute ago, that we
13  need to see the son?
14     A.  Yes.
15     Q.  Okay.  And from your perspective, though, you
16  don't know whether he, in fact, held the son out the
17  window or not; correct?
18     A.  I couldn't see it, no.
19     Q.  And when you said, look -- sorry, in response
20  to him allegedly saying, "Look, I'll hold him out of the
21  window for you," and you saying, "No, no, no," how did
22  Mr. Thomas respond?
23     A.  It was real tense, because I think he's trying
24  to hold him out the window.  He's talking to me on the
25  phone.  I'm trying to say, "No, no, no," because my

Page 73

1  first thought was with everything he told me about his
2  current -- what I believed, he was intoxicated and
3  things like that, I was concerned about the kid's
4  safety. So this is when the track gets really fast.
5  And I started saying, "No, no, no, no, no. Bring the
6  kid back in. No, no, no, don't do that."
7      Q.  Did Mr. Thomas ever say, "Oh, he's back in,"
8  or did he ever --
9      A.  I can't recall. I'd have to read it. But at
10  a point I guess he did, but I know it was -- he was out
11  the window from what they were communicating over the
12  radio. And I heard, "Hey, he's got the kid up to the
13  window" at the time. But I don't know how long.
14      Q.  And unfortunately, the questioner never asked
15  you this question, whether Mr. Thomas brought the child
16  back in through the window or said anything about that.
17  So that's why I'm asking whether he said something to
18  you.
19      A.  I don't recall.
20      Q.  And do you have any idea how he responded to
21  you saying, "No, no, no"?
22      A.  He just at the time, he just kept taking the
23  kid to the window and just kept going. He seemed to be
24  completely ignoring me when I said, "Don't do that,
25  don't do that," because I didn't want him to put him at

Page 74

1  risk by even partially hanging him out or whatever he
2  planned to do at that point. I was just concerned with
3  him not doing it.
4      Q.  Understood. Do you have any idea from talking
5  to your fellow officers whether he in fact held the
6  child outside of the window?
7      A.  They said over the air that he's got the kid
8  at the window. And I don't recall if they said he was
9  actually out the window, how far he was out. I don't
10  know. And then at some point they probably
11  communicated, it wasn't asked, but I don't know.
12      Q.  Okay. So your testimony is you can't remember
13  whether any of the fellow officers said that Leonard
14  Thomas was holding the child outside of the window; is
15  that right?
16      A.  I recall my -- I recall them saying he was --
17  that he's got the child at the window. I can't remember
18  if it was out or at, I can't recall that part, the
19  specific, what that was, how they said it.
20      Q.  Okay.
21      A.  Because it was over the radio and, you know --
22      Q.  Okay. But whatever they said, it was captured
23  on the radio, the transcript; right?
24      A.  I would -- yes.
25      Q.  When he took his -- when you were talking to

Page 75

1  him and Mr. Thomas said that -- he said, "Look, I'll
2  take him to the window," or whatever he said, did he --
3  did he threaten the child at all when he was talking to
4  you?
5      A.  No, not that I recall.
6      Q.  Up until this point in your interactions with
7  Mr. Thomas, had he ever threatened to harm the child
8  verbally?
9      A.  No, not that I recall.
10      Q.  Did he take any action, aside from coming to
11  the window, that you believed threatened the safety of
12  the child?
13      A.  No, not that -- no.
14      Q.  Did he ever mention whether he had any weapons
15  in the house?
16      A.  No.
17      Q.  And you asked him many times, didn't you?
18      A.  Yeah, I repeated it quite a few times, yeah,
19  yes.
20      Q.  At the bottom of page ten, line 443, you said,
21  "I had heard from somebody that he said he had a pistol
22  at some point."
23          Do you know who that somebody is?
24      A.  I believe it was Officer Johnson. But he
25  never said anything to me in talking about Mr. Thomas,

Page 76

1  and then I never heard anything yelled from the house.
2  So he never said anything to me. I never -- yeah.
3      Q.  Okay. So as far as you're concerned from
4  23 -- from 11:38 p.m. to 12:24 p.m., you did not hear
5  Mr. Thomas yell anything about having a pistol or any
6  kind of weapon?
7      A.  No.
8      Q.  Did you and Officer Johnson have any
9  discussion at any point about him hearing that
10  Mr. Thomas -- or him hearing Mr. Thomas say that he had
11  a pistol?
12      A.  Yes.
13      Q.  And what was that conversation about?
14      A.  I believe it was after the incident was over,
15  or it may have been after Paul cleared, after Metro
16  arrived and they took up the positions, that the
17  officers that were there, and then Paul ended up
18  contacting me. Because Paul was the one who contacted
19  me, notified me of what happened, because I had already
20  cleared after I gave the information to Metro and left
21  the scene.
22      Q.  And what did Paul say?
23      A.  Well, I heard him say that he had a pistol
24  or -- and I don't know the exact word, pistol or gun at
25  that point, but Paul had told me that. And I said,

1  "Well, I never heard him say anything, he never said
2  anything to me."
3      Q.   And did Paul tell you when he heard this, like
4  when in the course of the incident?
5      A.   I don't recall.  I don't know when he told me
6  that.  Like I said, I don't know.
7      Q.   When you say here, "I had heard from somebody
8  that he said he had a pistol at some point," you did not
9  have that information when you were talking to him on
10 the phone it sounds like."
11     A.   I don't believe I did.  When I was speaking to
12 him on the phone, I don't believe -- I don't believe --
13 yeah, no, I don't recall having that information when I
14 was on the phone with him ever.
15     Q.   Is that some information you would have wanted
16 to know?
17     A.   Probably, but I'd asked him so many times if
18 he did, and he told me no.  And maybe he yells to
19 somebody else he does.  I don't know if it would have
20 made much of a difference in my negotiation.  Maybe it
21 would have.  I don't know.
22     Q.   Why would it have?
23     A.   I can't speak to whether it would or wouldn't.
24     Q.   Then you carry on, so you -- so line 444, you
25 say, "And I kept repeating to him on the phone also, 'Do

1  you have any weapons at all?'  He goes, 'No, I'm
2  unarmed.  I have nothing.  I'm' -- and he used the word
3  I'm unarmed probably four or five times in the
4  conversation."
5          Did this convince you that he didn't have a
6  weapon?  Did you believe him?
7      A.   Based upon what he's telling me, I mean
8  your -- how much he -- I don't know.  No, I couldn't
9  really speak to that.
10     Q.   You know, I know in general you're always
11 assuming that he has a weapon and you're preparing for
12 that eventuality, but you spent 45 minutes on the phone
13 with him.  And I'm curious about whether you yourself
14 believed he had a weapon or not.
15     A.   I don't know, because I would -- there is
16 nothing that told me he did, but there was nothing that
17 told me he didn't.  So I would --
18     Q.   He told you five times he didn't have a
19 weapon.
20     A.   But there was nothing that I know of
21 concretely other than his -- people have lied to me
22 many, many times in my career.  And that's not something
23 I would assume, just because he told me five times as
24 opposed to one or two, that that's the truth.
25     Q.   Was one of your goals to determine whether or

1  not Mr. Thomas was armed?
2      A.   That's always one of the goals, yeah.
3      Q.   And --
4      A.   You're trying to get as much information as
5  you can.
6      Q.   And if you flip to the next page, page eleven,
7  it sounds like you said, then I did go and ask -- "then
8  I did also ask mom and wife.  I said, 'Does he have
9  anything in the house that's gonna -- other than normal
10 kitchen utensils, things like that, does he have any
11 guns?'  She said, 'No.'"
12         So were you trying to confirm information that
13 Mr. Thomas had given you that he didn't have a weapon
14 with his wife and mother?
15     A.   Yes.
16     Q.   And so when they say "No," does that further
17 convince you that he doesn't have a weapon?
18     A.   Yes, but -- and let me clarify.  That
19 conversation with them, that was after I had left and I
20 was back.  I spoke to them back by the negotiator rig.
21 And I was asked to speak to them, and I did.
22     Q.   Okay.
23     A.   I wasn't on scene.  That had nothing to do
24 with my negotiation at the time.
25     Q.   The conversation that you had with mom and

1  wife occurred before the shooting, though; right?
2      A.   Yes.
3      Q.   You alluded a moment ago to a mini debrief
4  that you had with the SWAT team once they came in.
5      A.   Just the negotiator.
6      Q.   Okay.  And would that be with Sergeant Eakes?
7      A.   Yes.
8      Q.   So in your mini debrief with Sergeant Eakes,
9  did you mention that you had asked Mr. Thomas whether he
10 had any guns and he said five times that he did not?
11     A.   I probably didn't mention how many times.  I
12 probably said he told me, and I don't -- but I know I --
13 that's information that I normally would communicate,
14 that he told me he was unarmed.
15     Q.   Okay.  And did you mention to Sergeant Eakes
16 that -- did you mention to Sergeant Eakes that you had
17 had this conversation with mom, Annalesa Thomas, and
18 wife Kim Thomas about whether he had any guns in the
19 house, and that they said, "No"?
20     A.   I -- I don't know.  I don't know if I
21 specifically phrased it like that or if I phrased it
22 that Mr. Thomas himself told me that he wasn't armed.  I
23 don't know if I said in the -- I don't know.
24     Q.   So you're not sure whether you added the other
25 information that you had gotten from the family members,

EXHIBIT 14

EXHIBIT 14

# Co-Op Cities
# Metro Crime Response Unit

This transcript was prepared by a third party that did not participate in the interview.  It is a draft only as it has not been verified for complete accuracy. Only the audio/video file should be considered a true, complete and accurate record of the interview.

Subject of Interview:  Ofc. Mark Eakes

Interviewer(s): Det. Todd Jordan, Det. Jeff Hall, and Investigator Keith
          Barns



EXHIBIT 11
M. Eakes
DATE: 3-29-16
Shari L. Wheeler, CCR

| | | |
|---|---|---|
| 224<br>225<br>226<br>227 | Q: | Did, uh - why was the 4-year-old requested to come out of the house, I mean, what was the - do you know - did they give you a briefing on why the 4-year-old needed to come out, what his issue was... |
| 228<br>229<br>230<br>231<br>232 | A: | Yeah, the other information I was given that he, um, is bipolar.  Um, that he's off his medications and, um, possibly intoxicated or he was intoxicated, believed to be.  And then, um, also that he had made some, uh, statements about having a - a weapon, a gun.  And... |
| 233<br>234 | Q: | Uh, tonight? |
| 235<br>236 | A: | Yes. |
| 237<br>238<br>239<br>240 | Q: | Yeah.  And then did he make any, uh - were you aware of any threats that he had a gun, did he threaten himself, the police or the children with the gun or just that he... |
| 241<br>242<br>243 | A: | No, I wasn't given any statements that - that I recall right now anyway about that, so... |
| 244<br>.45 | Q1: | Who - who provided you the information about the gun? |
| 246<br>247 | A: | Um, I - I think - oh, I'm sorry, that was, uh, Sergeant Luckman from Milton. |
| 248<br>249 | Q1: | From Milton, Luckman? |
| 250<br>251 | A: | Yeah. |
| 252<br>253<br>254 | Q: | So, uh, that was your initial briefing and then you - I would assume that you got closer to the scene with your negotiation rig or did you stay there? |
| 255<br>256<br>257<br>258<br>259<br>260<br>261<br>262<br>263<br>264<br>265 | A: | Yeah, initially what I do is I assign everybody a position.  Uh, so I assigned (Charles Porsche) as a primary negotiator.  And then, uh, a- assigned, uh, Detective (Molave) as a secondary.  I assigned, um, Lieutenant Thompson as a scribe the scribe and intel person.  And then I would be the team leader that kinda oversaw everything and work with, uh, command.  Um, so we started setting up that way.  We got, uh, permission or, you know, we were asked if we, uh - Detective - I'm sorry, Assistant Chief Zaro asked if we were calling in.  Um, just as he was asking that we had gotten a phone number.  I had written everything, all the intel that I had, um, and his past history and everything up on the whiteboard that's inside the negotiator rig.  Um... |
| 266<br>267 | Q: | What past history did you have on him? |
| 268 | A: | Uh... |

| | | |
|---|---|---|
| 628 | | |
| 629 | A: | ...I'm sorry? |
| 630 | | |
| 631 | Q: | I said that's all right, take your time (unintelligible)... |
| 632 | | |
| 633 | A: | Yeah. |
| 634 | | |
| 635 | Q: | ...more details the better. |
| 636 | | |
| 637 | A: | Yeah.  Um, I have to refresh my memory and it's not coming to me right now, |
| 638 | | but, uh, that's the one we ended up going with. |
| 639 | | |
| 640 | Q: | Okay. |
| 641 | | |
| 642 | A: | And that's the only one we... |
| 643 | | |
| 644 | Q: | So you got some other... |
| 645 | | |
| 646 | A: | ...ever really... |
| 647 | | |
| 648 | Q: | ...possible options... |
| 49 | | |
| 650 | A: | Yeah, and it was just basically... |
| 651 | | |
| 652 | ((Crosstalk)) | |
| 653 | | |
| 654 | A: | ...just getting to him to - to try to free himself just to - just to walk out, you |
| 655 | | know, let's take care of this tonight, so that we don't have to go any further.  I |
| 656 | | kept trying to minimize it, saying look, we're just talking about a simple |
| 657 | | assault here, you know, we - it doesn't have to be bigger than this kind of |
| 658 | | thing, let's just go ahead and not make it a bigger issue than this. |
| 659 | | |
| 660 | Q: | During that, uh, first 40 - 30 to 40-minute conversation, did he ever, uh, |
| 661 | | threaten, um, to harm the child? |
| 662 | | |
| 663 | A: | No. |
| 664 | | |
| 665 | Q: | Did he ever indicate he had a gun or a knife or anything like that, weapons in |
| 666 | | the house? |
| 667 | | |
| 668 | A: | No, I actually did ask him if he had any weapons and he told me no.  You |
| 669 | | know, obviously I've had many people say that and... |
| 70 | | |
| J71 | Q: | And then they had a weapon. |
| 672 | | |

| 673 | A: | ...and they have a weapon, but... |
| 674 | | |
| 675 | Q: | Sure.  Sure. |
| 676 | | |
| 677 | A: | ...um... |
| 678 | | |
| 679 | Q: | But no - no direct threats like if you don't leave I'm going to hurt my kid or |
| 680 | | anything like that? |
| 681 | | |
| 682 | A: | No. |
| 683 | | |
| 684 | Q: | That you know... |
| 685 | | |

686  A:  No, he - he never said anything like that.  I asked him where his son was
687      'cause I was trying to ascertain where he was related to his son, if he was with
688      his son, what bedroom, those kind of things.  And, uh, he said he's with me.
689      And I said, okay.  And he goes - well, I said, "What are you doing," and he
690      said, "Well, we're just - we're just laying here and he's sleeping right now."
691      And, uh - and he goes, "And you guys woke him up earlier," and those kind of
692      things.  And, you know - and I think that was prior to us even getting there
693      and now he's back asleep and that kind of thing and so he kept trying to shift
94      the blame back to us for anything that happened in there.  And so, I, uh - um -
695      I lost my train of thought again.  The - oh, his son, yeah.  I asked him where -
696      where he was and he just said they were in a - in a room.  I go, "Oh, so, it's
697      your room," and, um - and he goes, "It's a bedroom."  And I said - and he
698      goes, "And I'm watching you guys."  And I said, "Well, how are you
699      watching us."  He goes, "I have cameras here and I'm watching you on a 36 -
700      I'm watching you on my 36" TV."  I go, "Oh, the one that's in your bedroom,
701      then."  And he went - go with that, you know, he just said...
702

703  Q:  Mm-hm.
704

705  A:  ...it's in a room.  You know, and - and I said, "Oh, wow."  I said, "I - what do
706      you got cameras for," and he just never really responded to that.  So he said he
707      - he said he had sur- surveillance cameras all around outside.
708

709  Q:  Okay.  Then, um, at that point, so wh- that was all within the first 30, 40-
710      minute conversation?
711

712  A:  Uh, some of it might have been on an- in the second, but most of that was the
713      first conversation...
714

'5   Q:  Okay.  So, on the second call, though, when you - and you called back in, how
,16      long do you think you spoke to him then?
717

EXHIBIT 15

EXHIBIT 15

# Co-Op Cities
# Metro Crime Response Unit

This transcript was prepared by a third party that did not participate in the interview. It is a draft only as it has not been verified for complete accuracy. Only the audio/video file should be considered a true, complete and accurate record of the interview.

Subject of Interview: Ofc. Kenyon

Interviewer(s): Det. Wilcox and Det. T. Yabe

EXHIBIT __37__
Kenyon
DATE: __7-22-16__
Cindi L. Ullman, CCR

| 405<br>406<br>407<br>408 | A: | As things were progressing, um, you could see the male's, uh, shadow through the - the light here, so every time that he walked by, I knew he was going upstairs. |
|---|---|---|
| 409<br>410 | Q: | Okay. |
| 411<br>412<br>413 | A: | Uh, when I first initially got on-scene, he went upstairs, uh, opened the blinds in the window and left it open for quite some time. |
| 414<br>415 | Q: | Okay. |
| 416<br>417<br>418 | A: | So - and we - we had a good view of him, um, just looking through the scope... |
| 419<br>420 | Q: | So you saw him through the window... |
| 421<br>422 | A: | Through the window... |
| 423<br>424 | Q: | ...that's up there? |
| 425<br>426<br>427 | A: | ...yeah, and he was sticking out, talking to I believe it was (Rodriguez) at the time. |
| 428<br>429 | Q: | Okay. |
| 430<br>431 | A: | Um... |
| 432<br>433 | Q: | Did you see anybody else in the window there with him? |
| 434<br>435 | A: | A little bit later, yeah, he ended up bringing his son up - back upstairs. |
| 436<br>437 | Q: | Okay. |
| 438<br>439 | A: | Um, and then, uh, the dog was upstairs with him, too. |
| 440<br>441 | Q: | Okay. |
| 442<br>443 | A: | Who was hanging out the window. |
| 444<br>445 | Q: | How did the, uh - how did the child look to you? |
| 446<br>447 | A: | Uh, the child didn't look like he was - he was laughing with his dad. |
| 448<br>449 | Q: | Mm-hm. |

| | | |
|---|---|---|
| 450 | A: | Smiling, um… |
| 451 | | |
| 452 | Q: | Okay. |
| 453 | | |
| 454 | A: | …I could tell that it's dad was talking to him. |
| 455 | | |
| 456 | Q: | Mm-hm. |
| 457 | | |
| 458 | A: | It seemed like he was trying to tell him to say stuff to the police like bye… |
| 459 | | |
| 460 | Q: | Mm-hm. |
| 461 | | |
| 462 | A: | …you know leave… |
| 463 | | |
| 464 | Q: | Mm-hm. |
| 465 | | |
| 466 | A: | Um… |
| 467 | | |
| 468 | Q: | Okay. |
| 469 | | |
| 470 | A: | …and then he took his son back downstairs. |
| 471 | | |
| 472 | Q: | Um… |
| 473 | | |
| 474 | Q1: | The child was out the window? |
| 475 | | |
| 476 | A: | No - well, he had his - you know, his head was out, he was looking out the |
| 477 | | window. |
| 478 | | |
| 479 | Q: | Okay.  Um, how about the dog, how did the dog look? |
| 480 | | |
| 481 | A: | The dog just propped his, uh, feet up on the window and was just looking out |
| 482 | | the window. |
| 483 | | |
| 484 | Q: | Okay.  Um, any - anything that you noticed about the dog's demeanor |
| 485 | | throughout, uh - uh, kinda throughout the night? |
| 486 | | |
| 487 | A: | Um, initially at first when he was looking out the window he was just looking |
| 488 | | around.  Uh, throughout the night when the dog came outside, uh, he started - |
| 489 | | uh, was getting more aggressive.  There was people around, he started |
| 490 | | barking… |
| 491 | | |
| 492 | Q: | Mm-hm. |
| 493 | | |
| 494 | A: | …um, and then the male half was provoking him saying… |

D-DISCL 000354

| | | |
|---|---|---|
| 810 | | |
| 811 | A: | Yeah, they were sitting, uh… |
| 812 | | |
| 813 | Q: | Okay. |
| 814 | | |
| 815 | A: | …a strip for an explosive breach on the back… |
| 816 | | |
| 817 | Q: | Okay.  Did that happen? |
| 818 | | |
| 819 | A: | It eventually happened, yes. |
| 820 | | |
| 821 | Q: | Okay. |
| 822 | | |
| 823 | A: | Yeah. |
| 824 | | |
| 825 | Q: | What happened at, uh - at the point that they made the breach? |
| 826 | | |
| 827 | A: | Um, at the point they made the breach, uh, the - the child was out on the porch |
| 828 | | again.  Um, dad was again, kneeling down in the doorway from what I saw |
| 829 | | through - through my glass.  Um, they were advised to go ahead and breach |
| 830 | | the - the back door. |
| 31 | | |
| 832 | Q: | Mm-hm. |
| 833 | | |
| 834 | A: | Um, breach went, um, just by looking at the guy's face through - through my |
| 835 | | scope, he knew something - obviously it was loud, loud bang… |
| 836 | | |
| 837 | Q: | Mm-hm. |
| 838 | | |
| 839 | A: | …um, his eyes kinda got big. |
| 840 | | |
| 841 | Q: | Mm-hm. |
| 842 | | |
| 843 | A: | He got up, ran straight for the kid.  Grabbed him, started - basically guarded |
| 844 | | him in- into the residence. |
| 845 | | |
| 846 | Q: | Okay. |
| 847 | | |
| 848 | A: | Um, at that point as far as him standing up running, I just got T-shirt and legs. |
| 849 | | That was it.  Um, after the breach went and he started to go back in, I heard a |
| 850 | | gunshot. |
| 851 | | |
| 52 | Q: | Okay.  Um, how many gunshots did you hear? |
| 53 | | |
| 854 | A: | I heard one initially. |

EXHIBIT 16

EXHIBIT 16

Page 1

```
1        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2

3   _____

    FREDRICK and ANNALESA THOMAS;)
4   and JO-HANNA READ, as      )
    Guardian ad Litem of E.T., a )
5   minor,              )
                    )
6       Plaintiffs,  )
                    )
7   vs.         )  3:15-cv-05346 BJR
                    )
8   JASON CANNON; BRIAN MARKERT; )
    RYAN MICENKO; MICHAEL WILEY; )
9   MICHAEL ZARO; CITY OF FIFE;  )
    CITY OF LAKEWOOD; and PIERCE )
10  COUNTY METRO SWAT TEAM,    )
                    )
11      Defendants.  )
12  _____
13    DEPOSITION UPON ORAL EXAMINATION OF
14            CHARLES PORCHE
15  _____
16
              10:05 A.M.
17
          NOVEMBER 10, 2016
18
        800 FIFTH AVENUE, SUITE 4141
19
          SEATTLE, WASHINGTON
20
21
22
23
24  REPORTED BY:  CINDI ULLMAN, CCR 2687
25
```

Page 2

```
1        A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS:
4      DAVID J. WHEDBEE
       MacDonald Hoague & Bayless
5      705 Second Avenue, Suite 1500
       Seattle, WA 98104
6      206.622.1604
       davidw@mhb.com
7
8
9   FOR THE PLAINTIFF ESTATE OF LEONARD THOMAS:
10     MEAGHAN M. DRISCOLL
       Connelly Law Offices
11     2301 North 30th Street
       Tacoma, WA 98403
12     253.593.5100
       mdriscoll@connelly-law.com
13
14
15  FOR THE DEFENDANTS:
16     JEREMY W. CULUMBER
       Keating, Bucklin & McCormack, Inc., P.S.
17     800 Fifth Avenue, Suite 4141
       Seattle, WA 98104
18     206.623.8861
       jculumber@kbmlawyers.com
19
20
21
    ALSO PRESENT:  NONE
22
23
24
25
```

Page 3

```
1              I N D E X
2
3   EXAMINATION BY:              PAGE(S)
4   MR. WHEDBEE                    4
5
6
7
8
9
10
11
12
13  EXHIBITS FOR IDENTIFICATION           PAGE
14  Exhibit 47  Co-Op Cities Metro Crime Response  16
15      Unit:  Interview transcript
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1       SEATTLE, WASHINGTON; NOVEMBER 10, 2016
2              10:05 A.M.
3              --oOo--
4
5           CHARLES PORCHE,
6   sworn as a witness by the Certified Court Reporter,
7         testified as follows:
8
9           EXAMINATION
10  BY MR. WHEDBEE:
11      Q.  Officer Porche, my name is David Whedbee.  We
12  met just before the deposition started.  I represent
13  Fred and Annalesa Thomas, in addition to Elijah Thomas.
14  And also here is Meaghan Driscoll, who represents the
15  Estate of Leonard Thomas as a different plaintiff.
16      If you could just state your full name for the
17  record and tell me where you work, please.
18      A.  Charles Porche, and I work for the City of
19  Lakewood Police Department.
20      Q.  And can you spell "Porche," please.
21      A.  P, as in "Paul," o-r-c-h-e.
22      Q.  And which police force do you work with?
23      A.  Lakewood.
24      Q.  How long have you worked for the Lakewood PD?
25      A.  Since 2004, since initiation.
```

1 cops are still there.  I don't want this going on?

2        And then you say, That's when he kept --
3 that's when -- sorry.  Then he started again with the
4 back and forth where Elijah would be on the porch and
5 he'd pull him off -- where he'd pull him inside and
6 shut the door.

7        Did that start happening after Annalesa Thomas
8 was pulled back?

9    A.  Pulled?

10    Q.  I don't know.  I mean, I'm trying to -- so the
11 decision was not to let her go up to get the kid
12 herself, right?

13    A.  Right.  She wasn't going to go all the way to
14 the house.

15    Q.  Okay.  And then the question at 928 was:  So
16 at that point, what did you hear on the phone once he
17 said, There's still cops out there.  I don't want this
18 going on?

19        And then you say:  That's when he started
20 again with the back and forth where Elijah would be out
21 on the porch, and then he'd pull him inside and shut
22 the door.

23        So what I'm trying to figure out is did he
24 start to do that with Annalesa up front, or had she
25 been taken out of the situation when he started to do

1 the in and out again?

2    A.  That part, I don't recall how long she was out
3 basically at the -- out there.

4    Q.  Okay.

5    A.  I know she never went all the way up to the
6 house, but I don't know how long she was out there as
7 to exactly what point it started with Elijah coming in
8 and out and how long she was there during that.

9    Q.  Okay.  Did Malave or Thompson come back and
10 tell you guys in the negotiation -- negotiator rig what
11 had happened out there with Annalesa?

12    A.  I don't remember that conversation, because I
13 think -- yeah, I don't remember that conversation.

14    Q.  Assuming that Leonard Thomas was shot at 2:45
15 a.m., when did -- when did this happen with grandma
16 going up towards the door and then coming back?  About
17 how much time before the shot?

18    A.  I don't know.  I really don't know that time
19 line.

20    Q.  Do you have any idea whether it was no more
21 than a half-hour before?

22    A.  No, I don't.

23    Q.  Okay.  Then on page 22, I just want to
24 confirm, so that's the two first paragraphs.  Is it
25 your understanding that -- or is it your testimony that

1 Leonard never threatened the police when he was talking
2 to Sergeant Eakes during this phase of the
3 conversation; is that right?

4    A.  Correct.  This looks like just conversation
5 about Mr. Thomas not wanting the police there still.

6    Q.  So he never said anything like, "If the police
7 don't leave, you know, I'm going to come out shooting
8 or" -- never said anything like that?

9    A.  Not -- no.

10    Q.  And he never said, "If the police don't leave,
11 I'm going to harm my son" or anything like that?

12    A.  No.

13    Q.  And then on 956, you say:  It was -- no.  I
14 don't recall any of that -- meaning the threats.  It
15 was pretty much, "Then we'll just stay here" kind of
16 thing instead.  He doesn't have to leave.  We'll just
17 stay here.

18        What are you talking about right there?

19    A.  To go back to what we've talked about earlier
20 that, if Elijah were staying there, we were staying
21 there.

22    Q.  Okay.  So at this point, it's just a waiting
23 game?

24    A.  Waiting and attempting to negotiate, yes.

25    Q.  And this...  And it sounds like during the

1 whole course of the incident there's been no change in
2 the threat level to either Elijah or to the police
3 around the house; is that right?

4    A.  Correct.

5    Q.  Okay.  Which is essentially there is no threat
6 to the police or to Elijah that Leonard Thomas
7 specifically made, right?

8    A.  Not specifically.

9    Q.  And then generally are there any threats to
10 the police or to Elijah?

11    A.  We don't know.

12    Q.  Could be, but just nothing specific that you
13 know of.

14    A.  Correct.

15    Q.  And then if you go down below, 973, the
16 questioner says:  Was there a decision somewhere along
17 the line what the tactical team was going to do?

18        And then he asked again:  Is it decided that
19 the tactical team is going to enter the residence?
20 That's the last question on page 22.

21        And then you say:  I would say that it was the
22 fourth or fifth time, somewhere toward the end.

23        Is that your understanding about when the
24 decision was made that the tactical team would enter
25 the residence?

EXHIBIT 17

EXHIBIT 17

Page 1

1        UNITED STATES DISTRICT COURT
2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3     _____

   FREDRICK and ANNALESA THOMAS;)
4  and JO-HANNA READ, as        )
   Guardian ad Litem of E.T., a )
5  minor,                       )
                                )
6           Plaintiffs,  )
                         )
7     vs.           )  3:15-cv-05346 BJR
                    )
8  JASON CANNON; BRIAN MARKERT; )
   RYAN MICENKO; MICHAEL WILEY; )
9  MICHAEL ZARO; CITY OF FIFE;  )
   CITY OF LAKEWOOD; and PIERCE )
10 COUNTY METRO SWAT TEAM,      )
                                )
11          Defendants.  )
12 _____

13     DEPOSITION UPON ORAL EXAMINATION OF
14             THOMAS THOMPSON

15 _____

16

             9:58 A.M.
17

           APRIL 28, 2016
18

        3737 PACIFIC HIGHWAY EAST
19

           FIFE, WASHINGTON
20
21
22
23
24 REPORTED BY:  CINDI ULLMAN, CCR 2687
25

Page 2

1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
4      DAVID J. WHEDBEE
       MacDonald Hoague & Bayless
5      705 Second Avenue, Suite 1500
       Seattle, WA 98104
6      206.622.1604
       davidw@mhb.com
7
8
9  FOR THE DEFENDANTS:
10     JEREMY W. CULUMBER
       Keating, Bucklin & McCormack, Inc., P.S.
11     800 Fifth Avenue, Suite 4141
       Seattle, WA 98104
12     206.623.8861
       jculumber@kbmlawyers.com
13
14
15 FOR THE CITY OF FIFE:
16     F. HUNTER MacDONALD
       VSI Law Group PLLC
17     225 Tacoma Avenue South
       Tacoma, WA 98402
18     253.922.5464
       hunter@vsilawgroup.com
19
20
21 ALSO PRESENT:  NONE
22
23
24
25

Page 3

1                 I N D E X
2
3  EXAMINATION BY:              PAGE(S)
4  MR. WHEDBEE                     4
5
6
7
8
9
10
11
12 EXHIBITS FOR IDENTIFICATION         PAGE
13 Exhibit 14  Radio Calls (52 pages)      29
14 Exhibit 15  Co-Op Cities Metro Crime Response  61
15     Unit:  Interview of Lt. Thompson
16
17
18
19
20
21
22
23
24
25

Page 4

1      FIFE, WASHINGTON; APRIL 28, 2016
2              9:58 A.M.
3              --oOo--
4
5          THOMAS THOMPSON,
6  sworn as a witness by the Certified Court Reporter,
7          testified as follows:
8
9              EXAMINATION
10 BY MR. WHEDBEE:
11     Q.  Good morning.  My name is David Whedbee.
12 Formally, for the record, I represent Annalesa and
13 Fredrick Thomas.  I believe you used to be a lieutenant
14 and now you are a sergeant.
15     A.  Correct.  They had a -- a title change is what
16 it was.
17     Q.  Sure.  And can you identify yourself for the
18 record?
19     A.  Sergeant Tom Thompson, with the Fife Police
20 Department.
21     Q.  And have you ever been deposed before?
22     A.  I have.
23     Q.  And what was the -- what was the occasion for
24 that?
25     A.  It was many years ago.  There was a lawsuit

1 you bringing her up here?  And I'm like, Well, the
2 commander told me to bring her here.  What -- you know,
3 and I'm like why -- Why do you not know this, you know.
4 So that was -- there was confusion right there.
5        And then -- so I don't know how they worked
6 that out, but we brought her around.  She started
7 trying to bring Elijah -- you know, convince him to
8 just come to her.  And then that's when Leonard was
9 telling her, "Hey, Mom, you come up here," and she's
10 like -- or Wiley wouldn't let her walk up there.
11     Q.  There were two SWAT channels that were used,
12 right?
13     A.  I believe so.
14     Q.  Were you -- how is it; was it an earpiece?
15 Was it --
16     A.  I didn't have a radio with me.
17     Q.  Oh, you didn't have a radio?
18     A.  Yeah.  When Porche and I changed, changed
19 coats out, my coat was in my -- or my radio was in my
20 coat.  When we walked up there, I didn't have a radio,
21 so I didn't -- I didn't hear what was going on.
22     Q.  Did Malave have a radio?
23     A.  No.  No.
24     Q.  Before you swapped your coat out and I guess
25 left your radio behind, did -- well, let me ask you

1 this.  Did you ever hear Chief Zaro say, "If he tries
2 to go back inside with the kid, don't let that happen,"
3 or something like that?
4     A.  I didn't hear that, no, sir.
5     Q.  Do you have any idea, even just on what you
6 learned after the fact, when Zaro gave that order?
7     A.  I don't know.
8     Q.  Okay.  You were describing Annalesa asking
9 Elijah to come, and Leonard saying, No, you come and
10 get her.  And then Wiley saying, She's not going up
11 there, right?
12     A.  Mm-hm.
13     Q.  Then what happened?
14     A.  So she's -- she's standing there at the back
15 of the rig, and there's -- there's tactical guys
16 all over.  They have the radio in the -- in the -- in
17 the BearCat on.  And we start hearing them.  We start
18 hearing them doing a countdown.
19     Q.  Okay.
20     A.  All right.  And I -- and I know what that --
21 that is, and -- and it -- it was surprise to me and
22 Malave both, and I knew what was about to happen.  They
23 didn't tell me, "Hey, Tom, we're going to do this."  I
24 just knew what was about to happen.  So I pulled her
25 back behind that last back wheel because I know they're

1 going to make entry.  And so we pull her back, and then
2 they go.
3        And we stayed there for a minute.  And by "a
4 minute," I mean, I don't know exactly how long it was,
5 but as they start moving forward, it's like we just
6 tried to keep her behind cover.
7        And then -- and then the shot rang out, which,
8 really, that was the first we even knew that there was
9 a sniper there.  I didn't know where the sniper was,
10 and it was quite startling.  I mean, it was startling
11 to me, so I got to imagine it was startling to her.
12 Well, the flashbang went -- went off first.
13     Q.  And when you say "flashbang," do you mean the
14 explosive breach?
15     A.  On the -- I understand now that it was on the
16 back.
17     Q.  Uh-huh.
18     A.  So that happened first, which really startled
19 her.  That, that didn't shock me as much because I kind
20 of knew what they were going to do.  And then --
21     Q.  And again, just for clarity, you knew what
22 they were going to do because you inferred it from the
23 countdown?
24     A.  Yes, sir.  When the -- once the -- yeah,
25 sorry.

1     Q.  So, yes.  And -- but Chief Zaro did not tell
2 you or Malave that he was contemplating an explosive
3 breach when he sent you, Malave, and Annalesa out to
4 the BearCat?
5     A.  No, he did not.
6     Q.  Okay.  So you were describing that you figured
7 out what was going to happen based on the countdown,
8 right?
9     A.  Well, we started hearing the countdown and --
10 and Mike and I looked at each other like, Are they
11 going to launch?  You know, it's like, Really?  We just
12 got her up here.  And then -- then the explosion went
13 off.  So as we're hearing the countdown, we move her
14 behind the rig, and then the explosion went off.  And
15 they all -- they all went forward to the house, all the
16 tactical guys.  Everybody just takes off.
17        So then we're standing there with her, and
18 then the shot rang out, which was the first we even
19 knew where the sniper was.
20     Q.  About how long passed between the explosion
21 from the breach and the shot ringing out?
22     A.  I don't know for sure.  It was not very long,
23 though.  I don't -- I don't know.  It -- it was not
24 very long, though.
25     Q.  Two seconds or five?

Page 93

1  him up?
2     A.  Not that I recall.
3     Q.  Was he crying?
4     A.  I don't recall.
5     Q.  Was he happy to see his grandmother?
6     A.  I don't know.  I -- I don't know.  Mike, or
7  Malave, pretty much put them together.  We put them in
8  a car, and then I went back over to the rig and was
9  like, What's just happened?  You know.
10    Q.  And what did they tell you?
11    A.  Well, I wanted to know, you know, Is he down?
12 What -- I mean, we heard multiple shots.  I didn't know
13 that they shot a dog.  I didn't know if one of our
14 officers had been shot.  I didn't -- yeah, I didn't
15 know anything.  I just knew to get her out of there;
16 that's all I knew.
17    Q.  And so when you went back and said, What just
18 happened, did you --
19    A.  Well --
20    Q.  -- address that question to Zaro or to
21 somebody --
22    A.  No.  It was just kind of a -- Hey, what --
23 what just happened here?  And then I saw them bringing
24 Mr. Thomas forward to where the medics could -- could
25 work on him.

Page 94

1     Q.  And you saw -- you saw him, actually?
2     A.  I didn't get up close, but I saw them move him
3  forward, and I think they -- I think they moved him
4  into a carport or something, and then the medics
5  started working on him.
6     Q.  Could you tell whether he was alive or not?
7     A.  I couldn't tell.
8     Q.  Was he screaming or anything like that?
9     A.  I don't recall.
10    Q.  Did anybody answer your question about what
11 just happened?
12    A.  I don't know.  I don't think so.
13    Q.  During your time with Annalesa and Malave
14 around the BearCat, from what you could either see or
15 hear, did Leonard do anything that gave you the
16 impression that Elijah was in risk of serious injury or
17 death?
18    A.  No.
19    Q.  Apart from what you saw and heard, did you
20 have any information that convinced you that lethal
21 force was justified?
22    A.  I did not.
23    Q.  And that was based on everything you knew of
24 the officer safety alerts and the intelligence that you
25 had gathered and passed on to Zaro, all the information

Page 95

1  you had; you didn't believe that lethal force was
2  justified.
3     A.  I didn't say that.
4        MR. CULUMBER:  Object to the form.
5     A.  I said I didn't -- I didn't think there was
6  anything that I saw that would justify that.  I didn't
7  say I didn't think that they were justified in what
8  they were doing.
9     Q.  (BY MR. WHEDBEE)  Well, so my question was
10 two-part.  Your testimony was that there was nothing
11 that you saw or heard when you were up around the
12 BearCat with Annalesa that, in your view, justified
13 lethal force, right?
14    A.  Correct.
15    Q.  Was there anything else that you learned
16 during your collection of intelligence and whatever
17 else you would have heard that justified the use of
18 lethal force?
19        MR. CULUMBER:  Object to the form.
20    A.  I -- I did not see anything that would have
21 justified that.
22    Q.  (BY MR. WHEDBEE)  Now, Mr. Thomas also showed
23 up, right?  Fredrick Thomas?
24    A.  That's my understanding.
25    Q.  Did you see --

Page 96

1     A.  I never saw him.  No.  I -- I didn't know he
2  was there until after apparently he -- he entered the
3  backyard, I think it was.  I -- I never talked to him.
4     Q.  In your communications with Chief Zaro or
5  Sergeant Eakes or anybody else, did you -- did anybody
6  suggest trying to have Fred Thomas talk to his son on
7  the phone in order to resolve this situation?
8     A.  Not to me.
9     Q.  Did you attend after -- after the shooting
10 incident and after the CRU came on the morning of the
11 24th, did you attend any meetings with the SWAT team
12 where the shooting incident was discussed?
13    A.  I did.
14    Q.  And what was discussed there?
15    A.  It was a critical incident debrief.
16    Q.  And what was discussed there?
17    A.  The shooting itself.
18    Q.  And can you describe in detail what was talked
19 about?
20    A.  Well, I was told when I went to that meeting
21 that it was confidential and that anything that was
22 said in that room was confidential to the people in the
23 room.
24    Q.  Was this a peer-support meeting, or was this a
25 critical incident...?

EXHIBIT 18

EXHIBIT 18

| Wiley | Suspect is also on side one. |
|---|---|
| Wiley | Wiley Command. |
| Zaro | Go ahead. |
| Wiley | Child is sitting on a porch waiting (Inaudible) grandmother was going to (Inaudible) other kids? |
| Zaro | (audio of background talking) grandma (Inaudible) ah, walking out. (Inaudible) grandma come down so we're ah going over that now. Do not let him back in the house with that kid. |
| Wiley | Copy. |
| Wiley | Wiley Cannon |
| Cannon | Go ahead. |
| Wiley | Move to side three going now. |
|  | (Inaudible) |
| Massey | Massey Wiley you want us to hook up with Cannon? |
| Wiley | Affirm we will move to side one. |
| Cannon | We're at the door. Operator is talking to the kid or the dad but negotiator talked to the dad. Door is locked, we're at side three. |
|  | Copy that. |
| Wiley | Wiley Command. |
| Cannon | Cannon Wiley. Making sure you don't want us to go in yet? |
| Wiley | Wiley Command. |
| Zaro | Negative not yet, standby. |

| Wiley | Negative we lost the opportunity. The kid is back in the house. |
| Cannon | Cannon to Micenko, you still at the AT? |
| Micenko | Yah. (Inaudible) here to |
| Cannon | Good man, stay there. |
| | Kid's coming back outside. We have a car seat. He's just holding at the front door. |
| Wiley | Cannon move to side three again. |
| Cannon | Copy. |
| Zaro | Hey we're bringing grandma up so she is visible from the front door. Because he'll release the kid when he sees the grandmother. So were just going to bring him up close enough to be visible on the one side. |
| Wiley | Copy. I want to have Vance and Waller cover grandma. |
| Zaro | Copy that. |
| Wiley | Sir can you standby for a second and meet me on SWAT one. |
| Waller | He's still out front. |
| | Yah they're standing in the front door. Dad's got kid and dog right there at the front door. The breach one. |
| Zaro | Grandma's moving up right now. |
| | Upstairs in the window. |
| Wiley | Wiley Cannon. Hang the charge on side three. |
| Cannon | Okay. We got the charge. |
| Wiley | Coming to ya. |

EXHIBIT 19

EXHIBIT 19

| | |
|---|---|
| | a delta orders supposed to be given. |
| Sgt. Rich Hall | And, when you, ah, discussed that with him, ah, were you, were you talking them in trying to identify if that's what that was, or how you, how did you take that? |
| Ofcr. Brian Markert | Um, Yes. We were basically trying to...Well, I mean, we basically said to one another, um, that's, if he's trying to give us delta order, that's not a delta order. Um, we felt that, ah, it lacked the specific wordin', um, to fulfill that requirement, so, I did not feel at that point that I had a, that I was operating under delta order protocols. |
| Sgt. Rich Hall | Okay. |
| Ofcr. Brian Markert | But, it did concern me when he said that. It did, ah, heighten my sense of concern for the hostage because why would he say that... |
| Sgt. Rich Hall | Right. |
| Ofcr. Brian Markert | Ah, Chief Zaro. Why would he say, we, he can't, he can not go back inside the house, or we were not al-us-you know, we were not allo—ah, to allow that to happen. |
| Sgt. Rich Hall | So in, the totality of the circumstances and the, and the things that you were taking in at that point, that heightened your sense of what was going on? |
| Ofcr. Brian Markert | Yes. I, I felt that there was information available to Assistant Chief Zaro that made him concerned that the, if this hostage went back into the house, that basically something bad was gonna happen. That, you know, physical injury or death, or, or, ah, you know he felt the need to say, okay guys we can't let the hostage go back inside with the suspect. So that definitely, ah, raised my concern that the hostage was facing some sort of, you know, threat of, or physical harm or, or death at the hands of the suspect. |
| | |
| Sgt. Rich Hall | Okay. We're gonna skip over page eight. On page nine, ah, last paragraph, um, you said the suspect stood up holding his arms |

D-DISCL 000426

EXHIBIT 20

EXHIBIT 20

# Co-Op Cities
# Metro Crime Response Unit

This transcript was prepared by a third party that did not participate in the interview.  It is a draft only as it has not been verified for complete accuracy.  Only the audio/video file should be considered a true, complete and accurate record of the interview.

Subject of Interview:  Det. Malave

Interviewer(s):  Det. Nikoloa and Ofc. Scott



EXHIBIT __21__
M. Malave
DATE: __5-2-16__
Cindi L. Ullman, CCR

| | | |
|---|---|---|
| 136 | Q: | So how much longer after that, um, did you respond to his residence? |
| 137 | | |
| 138 | A: | Um... |
| 139 | | |
| 140 | Q: | Was it immediately or... |
| 141 | | |
| 142 | A: | No. The decision was made with command and, uh, Sergeant Eakes, uh, |
| 143 | | negotiator team leader, that, um, we were gonna try to use a hailer, so we |
| 144 | | started getting the hailer set up. As we were doing so, um, we were advised |
| 145 | | by, uh, by officers on the perimeter that he was actually talking to them, um, |
| 146 | | uh, I believe from a window. So the decision was made for, um, myself and, |
| 147 | | um, uh, Officer Porsche from Lakewood to go forward and - and speak to |
| 148 | | him. As we were, uh, preparing our gear to go forward, um, he actually called |
| 149 | | 911. And I don't know if he got in touch with state patrol or what, but I |
| 150 | | believe he was transferred from them, um, to Fife and Fife reached out to our, |
| 151 | | uh, command center. And at that point he started speaking to Charles Porsche |
| 152 | | from Lakewood. Um, I stayed outside and then, um, they spoke for - I'm |
| 153 | | sorry. He didn't speak to Charles Porsche. He spoke to, uh, Sergeant Eakes. |
| 154 | | Um, they spoke for anywhere from 45 minutes to an hour, I believe. Um, and |
| 155 | | I waited outside the, uh, outside of the negotiator rig. Um, and then the |
| 156 | | decision was made that, um, Leonard Thomas wanted to let his son, Elijah, go, |
| 157 | | but only to his mother, so Elijah's grandmother. So the decision was made for |
| 158 | | Lieutenant (Thompson) and I to - to, um, escort, uh, the subject's grandmother |
| 159 | | up to the front towards the armored, uh, vehicle. Uh, we - we met with her |
| 160 | | briefly, told her what - what had, you know, what was transpiring and what |
| 161 | | Leonard was requesting. She was, um, more than willing to go up there. Um, |
| 162 | | she said she wanted to come with us. We told her how it was gonna happen. |
| 163 | | Um, two operators came and met us and escorted, um, myself, Lieutenant |
| 164 | | (Thompson) and the, uh, subject's grandmother. And I - I apologize. I don't |
| 165 | | remember her name at the moment. Uh, and we walked her towards, um, the |
| 166 | | armored vehicle. Then we set up behind the... |
| 167 | | |
| 168 | Q: | I'm sorry. I'm just (unintelligible) interrupt you. And when you say s- it was |
| 169 | | Leonard's grandmother that you understood it as or was it the (unintelligible)? |
| 170 | | |
| 171 | A: | No, I understood it as... |
| 172 | | |
| 173 | Q: | Elijah's grandmother? |
| 174 | | |
| 175 | A: | It was Elijah's grandmother. |
| 176 | | |
| 177 | Q: | Okay. So... |
| 78 | | |
| 179 | A: | The four-year-old's grandmother. |
| 180 | | |

EXHIBIT 21

EXHIBIT 21



EXHIBIT ___24___
___Zaro___
DATE: ___6-30-16___
Cindi L. Ullman, CCR

# Co-Op Cities
# Metro Crime Response Unit

This transcript was prepared by a third party that did not participate in the interview.  It is a draft only as it has not been verified for complete accuracy.  Only the audio/video file should be considered a true, complete and accurate record of the interview.

Subject of Interview:  Assistant Chief M. Zarro

Interviewer(s):  Det. Ray Pumzalan and Sgt. Andy Suver

| | | |
|---|---|---|
| 226 | | |
| 227 | Q: | You remember anything specific that he says, any threatening things or |
| 228 | | anything that's indicating weapons or threats to the child, or? |
| 229 | | |
| 230 | A: | No, they don't say any of that. |
| 231 | | |
| 232 | Q: | Okay. |
| 233 | | |
| 234 | A: | They just say he's yelling out the window.  I believe at the time he was talking |
| 235 | | to T.J. |
| 236 | | |
| 237 | Q: | Okay. |
| 238 | | |
| 239 | A: | Ah, but I don't know… |
| 240 | | |
| 241 | Q: | (Unintelligible). |
| 242 | | |
| 243 | A: | …yeah, I don't know exactly what was said. |
| 244 | | |
| 245 | Q: | Okay. |
| 246 | | |
| 247 | Q1: | But the judge says he's agitated and… |
| 248 | | |
| 249 | A: | Very. |
| 250 | | |
| 251 | Q1: | …irrational? Okay. |
| 252 | | |
| 253 | A: | Yeah, yeah, and we're actually close, and when they would key up the radio I |
| 254 | | could hear him yelling. So, that goes on for a little bit and um, you know, |
| 255 | | Charles and - and Mark try to re - you know, phone contact again, but it's - |
| 256 | | it's not working and we start setting up a plan to send Charles forward, a |
| 257 | | negotiator forward, to take over attempts to negotiate from T.J. |
| 258 | | |
| 259 | Q1: | Okay. |
| 260 | | |
| 261 | A: | Ah, as we're doing that, we're told that the suspect calls 911 from his cell |
| 262 | | phone. |
| 263 | | |
| 264 | Q1: | Okay. |
| 265 | | |
| 266 | A: | Ah, when he does that, the dispatcher calls us, or one of the Fife guys, ah, the |
| 267 | | Fife guy has them patch that call through to (Eakes') cell phone. So the guy |
| '68 | | ends up talking - and goes through - and the guy ends up talking to Mark. |
| 269 | | |

| | | |
|---|---|---|
| 718 | | had set up an explosive charge on the door to make an emergency entry. So, I, |
| 719 | | ah, am listening to Mark talk to this guy and he's getting more and more |
| 720 | | agitated, um, the guy is not sending his, ah, kid, out to, um, grandma; she's |
| 721 | | there, she's just standing next to police and he doesn't like that. So, we have - |
| 722 | | we have really. |
| 723 | | |
| 724 | Q1: | He's seen her now at this point, he acknowledges that it's (unintelligible). |
| 725 | | |
| 726 | A: | Oh, yeah, he knows she's out there, and it's, the problem is that's there's |
| 727 | | police standing wither. |
| 728 | | |
| 729 | Q: | Does he take the kid back inside at that point and time? |
| 730 | | |
| 731 | A: | Almost. |
| 732 | | |
| 733 | Q: | Okay. |
| 734 | | |
| 735 | A: | Um, so he's yelling and getting more and more agitated with Mark, ah, about |
| 736 | | that fact, and he wants his mother to walk up to the porch, take the kid and go |
| 737 | | back, and now his mom is calling, at our direction, calling for the kid, and |
| 738 | | he's saying, "He's not going anywhere until I tell him to." Ah, and I can hear |
| 39 | | some of this over the radio when the guys key up, I can hear some of it on the |
| 740 | | phone, as Mark's having his negotiations, um, but I - I'm getting most of what |
| 741 | | - what the guy is saying directly because of that. So, ah, this is going on and |
| 742 | | on and the guy is getting more and more agitated and I knew that our team |
| 743 | | was set up in back; we had the entry team, and we had - now had the kid on |
| 744 | | the front porch again, ah, we had the front door open, so we had, um, the |
| 745 | | opportunity that we missed the first time to - to try and save this kid. So, I got |
| 746 | | on the air and I said, "Launch, entry team launch into the back, um, breach on |
| 747 | | door command," which, for that - for explosive breaching - there's a |
| 748 | | countdown that's done. Ah, and it's not - it would be, um, ridiculous and |
| 749 | | inappropriate for me sitting in the command post to do the countdown. |
| 750 | | |
| 751 | Q1: | (Unintelligible). |
| 752 | | |
| 753 | A: | Right, so what I do is I authorize the breach but give the, um, the countdown |
| 754 | | and the command to do it to whoever's on scene in this case; the team leader. |
| 755 | | So Wiley initiates the countdown and it is... |
| 756 | | |
| 757 | Q1: | And he's got eyes on the back at that point? |
| 758 | | |
| 759 | A: | No, he's got eyes on the front. |
| '60 | | |
| /61 | Q1: | Okay, all right, I, ah, I'm sorry, I thought the point was so that you could see |
| 762 | | if something was going sideways if you needed to abort the countdown. |

EXHIBIT 22

EXHIBIT 22

Page 1

1      UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2

3   _____

    FREDRICK and ANNALESA THOMAS;)
4   and JO-HANNA READ, as        )
    Guardian ad Litem of E.T., a )
5   minor,                       )
                                 )
6         Plaintiffs,  )
                                 )
7    vs.         ) 3:15-cv-05346 BJR
                                 )
8   JASON CANNON; BRIAN MARKERT; )
    RYAN MICENKO; MICHAEL WILEY; )
9   MICHAEL ZARO; CITY OF FIFE;  )
    CITY OF LAKEWOOD; and PIERCE )
10  COUNTY METRO SWAT TEAM,      )

11        Defendants.  )
12  _____
13   VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
14             JOHN DERIG
15  _____
16

17             1:39 P.M.

18             MAY 2, 2016

19        3737 PACIFIC HIGHWAY EAST

       FIFE, WASHINGTON
20
21
22
23
24  REPORTED BY:  CINDI ULLMAN, CCR 2687
25

---

Page 2

1        A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS THOMAS:
4      TIMOTHY K. FORD
       MacDonald Hoague & Bayless
5      705 Second Avenue, Suite 1500
       Seattle, WA 98104
6      206.622.1604
       timf@mhb.com
7
8
9   FOR THE DEFENDANTS:
10     JEREMY W. CULUMBER
       Keating, Bucklin & McCormack, Inc., P.S.
11     800 Fifth Avenue, Suite 4141
       Seattle, WA 98104
12     206.623.8861
       jculumber@kbmlawyers.com
13
14
15  FOR THE CITY OF FIFE:
16     F. HUNTER MacDONALD
       VSI Law Group PLLC
17     225 Tacoma Avenue South
       Tacoma, WA 98402
18     253.922.5464
       hunter@vsilawgroup.com
19
20
21  ALSO PRESENT:
22     LORI TALBOTT, Legal Videographer, CLVS
       YOM: Full Service Court Reporting
23
24
25

---

Page 3

1             I N D E X
2
3   EXAMINATION BY:              PAGE(S)
4   MR. FORD                  5
5
6
7
8
9
10
11
12
13  EXHIBITS FOR IDENTIFICATION       PAGE
14  Exhibit 20  Co-Op Cities Metro Crime Response   14
15      Unit:  Interview transcript
16      (Draft)
17
18
19
20
21
22
23
24
25

---

Page 4

1        FIFE, WASHINGTON; MAY 2, 2016
2             1:39 P.M.
3             --oOo--
4
5        THE VIDEOGRAPHER:  We are on the record.
6   Here begins Media Number 1 in the deposition
7   of John Derig, in the matter of Fredrick and Annalesa
8   Thomas vs. Jason Cannon in the United States District
9   Court, Western District of Washington at Seattle; Case
10  number 3:15-cv-05346 BJR.  Today's date is May 2nd,
11  2016.  The time is 1:39 p.m.
12       The video operator today is Lori Talbott, with
13  YOM Reporting & Video of Seattle, Washington.  This
14  video deposition is taking place at 3737 Pacific
15  Highway East, Fife, Washington, and was noticed by
16  MacDonald Hoague & Bayless.
17       Counsel, please voice identify yourselves and
18  state whom you represent.
19       MR. FORD:  I'm Tim Ford, representing
20  the plaintiffs, Fred and Annalesa Thomas and E.J.
21  [verbatim].
22       MR. CULUMBER:  I'm Jeremy Culumber, for
23  the defense.
24       THE VIDEOGRAPHER:  The court reporter
25  today is Cindi Ullman, with YOM Reporting & Video.

Page 45

1    A. I don't remember.

2    Q. Was there gunfire after you were inside the

3 house?

4    A. I don't remember. There was gunfire.

5    Q. Did you ever see a dog?

6    A. Yes.

7    Q. When did you see a dog?

8    A. While we were on the 3 side.

9    Q. Did you see --

10    A. Prior to going inside.

11    Q. Okay. Did you ever see a dog inside?

12    A. No.

13    Q. So where were you when you first saw

14 Mr. Thomas? Were you in the same room with him, or did

15 you see him through a door or what?

16    A. When we're inside?

17    Q. Yes.

18    A. Yes. I was in the same room with him -- or

19 entering the same room.

20    Q. Was he in front of the door such that someone

21 coming through the door would have to step over him or

22 anything? Was he that close to it?

23    A. I don't remember. I know he was inside the

24 house.

25    Q. Do you remember if the front door was closed

Page 46

1 or open?

2    A. I don't remember. I believe it was open.

3    Q. Did officers at some point come through that

4 front door?

5    A. Eventually, yes.

6    Q. And at the time the officers came through the

7 front door, were any -- was anyone in the room other

8 than yourself and the man and the child? In other

9 words, had other officers arrived from the back or from

10 anywhere else?

11    A. I don't know.

12    Q. So what did you do when you saw the man and

13 the child?

14    A. I approached him and was looking at the man

15 for any weapons.

16    Q. And were you able to see any?

17    A. No.

18    Q. Did you say anything to him?

19    A. I don't remember.

20    Q. Is there some protocol or some standard thing

21 you might say to someone in that situation?

22    A. Usually "Please get down."

23    Q. And what happened then?

24    A. I approached him, and he was still holding the

25 child. So I grabbed his hair and pulled his head back

Page 47

1 as another officer was coming in. Officer Watson was

2 grabbing the child, and he was grabbing onto the kid,

3 where Officer Watson had to struggle to get the child

4 loose from him. That's when I started punching him in

5 the face to get him distracted and some pain complaints

6 so he'd let go of the kid.

7    Q. And why did you feel that was necessary?

8    A. Because at that time I believed he -- the

9 child was in danger.

10    Q. What danger would the child be in?

11    A. From him. He is unstable, at best.

12    Q. Did you have any particular thing you thought

13 he might be doing to the child or he could do to the

14 child in the -- in the situation he was in at that

15 point?

16    A. Nothing particular, no.

17    Q. And during the course of these things that you

18 just described, did either he or the child say

19 anything?

20    A. I don't remember.

21    Q. Do you remember him saying anything the entire

22 time you saw him before he expired?

23    A. I don't remember.

24    Q. And what about the child?

25    A. I don't remember.

Page 48

1    Q. And what happened with the child after you hit

2 Mr. Thomas in the face?

3    A. Officer Watson was able to pull the child

4 free.

5    Q. What happened then?

6    A. And then observed that he was bleeding.

7    Q. Who was bleeding?

8    A. Mr. Thomas.

9    Q. Was the child hurt at all as you could tell?

10    A. No.

11    Q. And where did you see that Mr. Thomas was

12 bleeding; what part of his body?

13    A. I believed it was the lower -- his abdomen

14 area. I don't know the exact area.

15    Q. And was the body -- was the blood around him,

16 or was it coming out of him? Was it in his clothing?

17 Where -- where did you see the blood?

18    A. It was in his clothing.

19    Q. In the front or back?

20    A. Front. He was still sitting up.

21    Q. How much blood? Lots of blood?

22    A. It didn't look -- there was not a lot of

23 blood.

24    Q. Was it immediately apparent to you that that

25 was a gunshot wound?

EXHIBIT 23

EXHIBIT 23

Page 1

```
 1        UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 2

 3   _____
     FREDRICK and ANNALESA THOMAS;)
 4   and JO-HANNA READ, as       )
     Guardian ad Litem of E.T., a )
 5   minor,                       )
                                  )
 6        Plaintiffs,  )
                                  )
 7   vs.              ) 3:15-cv-05346 BJR
                                  )
 8   JASON CANNON; BRIAN MARKERT; )
     RYAN MICENKO; MICHAEL WILEY; )
 9   MICHAEL ZARO; CITY OF FIFE;  )
     CITY OF LAKEWOOD; and PIERCE )
10   COUNTY METRO SWAT TEAM,      )
                                  )
11        Defendants.  )
12   _____
13     DEPOSITION UPON ORAL EXAMINATION OF
14              MATTHEW WATSON
15   _____
16
               1:33 P.M.
17
          NOVEMBER 10, 2016
18
       800 FIFTH AVENUE, SUITE 4141
19
          SEATTLE, WASHINGTON
20
21
22
23
24   REPORTED BY:  CINDI ULLMAN, CCR 2687
25
```

Page 2

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4        DAVID J. WHEDBEE
          TIFFANY M. CARTWRIGHT
 5        MacDonald Hoague & Bayless
          705 Second Avenue, Suite 1500
 6        Seattle, WA 98104
          206.622.1604
 7        davidw@mhb.com
          tiffanyc@mhb.com
 8
 9
10   FOR THE PLAINTIFF ESTATE OF LEONARD THOMAS:
11        MEAGHAN M. DRISCOLL
          Connelly Law Offices
12        2301 North 30th Street
          Tacoma, WA 98403
13        253.593.5100
          mdriscoll@connelly-law.com
14
15
16   FOR THE DEFENDANTS:
17        JEREMY W. CULUMBER
          Keating, Bucklin & McCormack, Inc., P.S.
18        800 Fifth Avenue, Suite 4141
          Seattle, WA 98104
19        206.623.8861
          jculumber@kbmlawyers.com
20
21
22
     ALSO PRESENT:  NONE
23
24
25
```

Page 3

```
 1               I N D E X
 2
 3   EXAMINATION BY:              PAGE(S)
 4   MR. WHEDBEE                     4
 5
 6
 7
 8
 9
10
11
12
13
14   EXHIBITS FOR IDENTIFICATION      PAGE
15   Exhibit 48  Co-Op Cities Metro Crime Response  11
16        Unit: Interview transcript
17   Exhibit 49  Photograph              52
18
19
20
21
22
23
24
25
```

Page 4

```
 1        SEATTLE, WASHINGTON; NOVEMBER 10, 2016
 2                  1:33 P.M.
 3                  --oOo--
 4
 5             MATTHEW WATSON,
 6   sworn as a witness by the Certified Court Reporter,
 7        testified as follows:
 8
 9             EXAMINATION
10   BY MR. WHEDBEE:
11        Q.  Good afternoon, Officer Watson.  My name is
12   David Whedbee.  I represent the Estate of Leonard
13   Thomas -- sorry, I don't.  Meaghan Driscoll here, my
14   co-counsel, represents the Estate of Leonard Thomas.  I
15   represent Annalesa, Fredrick, and Elijah Thomas.  Okay?
16        A.  Okay.
17        Q.  -- in this action.  Can you state your name
18   and spell it for the record, please.
19        A.  Matthew Watson, M-a-t-t-h-e-w, W-a-t-s-o-n.
20        Q.  Have you ever been deposed before?
21        A.  Once, yeah.
22        Q.  What was that related to?
23        A.  It was for a fatality, a semitruck versus a
24   bicyclist.
25        Q.  Were you a witness or were you --
```

Page 61

1  Q.  Did he do anything that convinced you that he
2  was going to use a weapon against any of the officers
3  in the last ten minutes before the breach?
4  A.  No.
5  Q.  Okay.  So tell me what happened when the
6  breach went off.
7  A.  So obviously, the 3 side had the explosive
8  charge.  They did what they were doing on the 3 side.
9  I wasn't involved in that.  And then we launched on the
10  1 side from the 1-4 corner angle; went over the fence
11  on -- on the 1-4 corner here (indicating) on the other
12  side of the blue car.  As I was going over the fence,
13  unbeknownst to me, the dog was charging at me.  I
14  believe it was Wiley and Vance that shot the dog.
15  I went immediately for the front door because
16  Leonard was dragging the kid back in.  Obviously, the
17  shot went, and I got to the front door.  It was
18  partially open, I believe, and I just pushed it open.
19  And Leonard was sitting on his butt, if you will,
20  holding his kid like this (indicating).
21  Q.  When you say "like this," you have your arms
22  crossed?
23  A.  He had his arms wrapped around him in a death
24  clutch, the child's back against his chest.  Derig was
25  the first guy from the 3 side to get to him.  He was

Page 62

1  hitting and punching him.  And I was more or less
2  playing tug of war with Leonard, trying to rip the kid
3  out of his arms.  I eventually got the kid broke free
4  and rushed him outside and passed him off to a
5  negotiator, which I believe was Malave, but I don't
6  recall.  I think it was Malave.
7  Q.  When you use the word "death clutch," what do
8  you mean?
9  A.  A death clutch, I mean a tight grip.  He
10  wasn't letting go of that kid.  It was a -- as tight as
11  you could hold somebody.
12  Q.  Is that because he was actually dying or --
13  A.  I don't know why he was.
14  Q.  Okay.  But he was just holding on to his kid.
15  A.  Extremely tight.  Screaming, the kid was
16  screaming.
17  Q.  Where was he holding Elijah?
18  A.  Like I said, he was on his butt, the best I
19  recall, and against his chest, with Elijah's back
20  against his chest.
21  Q.  And arms on Elijah's chest?
22  A.  Wrapped around him.  I don't remember exactly
23  in what manner, but nonetheless, he was -- he was
24  holding him with his arms wrapped around him.
25  Q.  Right.  And I'm trying to figure out where.

Page 63

1  Was his arms around his waist?
2  A.  Don't remember.
3  Q.  Was his arms around his neck?
4  A.  Don't remember.  I do remember him having his
5  arms wrapped around him in a manner he wasn't going to
6  let go.
7  Q.  Okay.  And was he saying anything?
8  A.  I believe, "Don't take my kid."  "Don't take
9  my son," something to that effect.
10  Q.  Okay.  And what was the -- was there a
11  particular tone in his voice when he was saying this?
12  A.  He's screaming.  I mean, as you can imagine.
13  I don't remember how -- you know, but it was -- it
14  wasn't in a calm-like manner.
15  Q.  I mean, was he -- was he angry?  Was he
16  panicked?  Was he...?
17  A.  I would say more screaming, panic, crying,
18  emotional type of way.
19  Q.  Leonard was.
20  A.  Yes.
21  Q.  And I think that you used the term that he was
22  "dragging" -- or after the explosive breach went, then
23  I think you said that he was dragging his kid?
24  A.  He came out and picked the kid up and went
25  back into the house.

Page 64

1  Q.  So -- and how did he pick the kid up?
2  A.  I believe he was just more in a -- about -- if
3  I come up behind you and wrap my hands around you and
4  pick you up.
5  Q.  Okay.  So again --
6  A.  The kid's back to his chest, I believe that's
7  how it was.
8  Q.  And again, was his arms around his waist or
9  around his chest?
10  A.  I don't recall exactly.  It wasn't in a manner
11  that you come out and pick your four-year-old up, chest
12  to chest.
13  Q.  Okay.  I mean, did you think that he was
14  strangling his kid?
15  A.  I didn't know what he was doing with the kid.
16  Q.  No, I know.  But at the moment that you saw
17  him, was he strangling --
18  A.  No, I don't remember.  I don't remember ever
19  thinking that he was strangling the kid, no.  But I
20  remember thinking, Oh, shit.  What's -- that's not --
21  you've go a SWAT team that just blew your back door,
22  and you're going to take the kid back into that
23  environment?  I remember thinking, This is not good.
24  Q.  Okay.  If you look at your -- or go ahead and
25  look at your statement on page 14?

EXHIBIT 24

EXHIBIT 24

Page 1

```
 1        UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 2
    _____
 3
    FREDRICK and ANNALESA THOMAS;)
 4  and JO-HANNA READ, as        )
    Guardian ad Litem of E.T., a )
 5  minor,                       )
                                 )
 6          Plaintiffs,  )
                         )
 7     vs.        ) 3:15-cv-05346 BJR
                  )
 8  JASON CANNON; BRIAN MARKERT; )
    RYAN MICENKO; MICHAEL WILEY; )
 9  MICHAEL ZARO; CITY OF FIFE;  )
    CITY OF LAKEWOOD; and PIERCE )
10  COUNTY METRO SWAT TEAM,    )
                               )
11          Defendants.  )
12  _____
13      DEPOSITION UPON ORAL EXAMINATION OF
14              MICAH WILSON
15  _____
16
             11:03 A.M.
17
         NOVEMBER 7, 2016
18
          311 W. PIONEER
19
        PUYALLUP, WASHINGTON
20
21
22
23
24  REPORTED BY:  CINDI ULLMAN, CCR 2687
25
```

Page 2

```
 1       A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
 4     TIFFANY M. CARTWRIGHT
        MacDonald Hoague & Bayless
 5     705 Second Avenue, Suite 1500
        Seattle, WA 98104
 6     206.622.1604
        tiffanyc@mhb.com
 7
 8
 9  FOR THE ESTATE OF LEONARD THOMAS:
10     MEAGHAN M. DRISCOLL
        Connelly Law Offices
11     2301 North 30th Street
        Tacoma, WA 98403
12     253.593.5100
        mdriscoll@connelly-law.com
13
14
15  FOR THE DEFENDANTS:
16     JEREMY W. CULUMBER
        Keating, Bucklin & McCormack, Inc., P.S.
17     800 Fifth Avenue, Suite 4141
        Seattle, WA 98104
18     206.623.8861
        jculumber@kbmlawyers.com
19
20
21  ALSO PRESENT:  NONE
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3  EXAMINATION BY:             PAGE(S)
 4  MS. CARTWRIGHT               4, 53
 5  MS. DRISCOLL                46
 6
 7
 8
 9
10
11
12
13  EXHIBITS FOR IDENTIFICATION         PAGE
14  Exhibit 44  Hand-drawn diagram          13
15  Exhibit 45  Co-Op Cities Metro Crime Response  55
16       Unit:  Interview transcript
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1     PUYALLUP, WASHINGTON; NOVEMBER 7, 2016
 2           11:03 A.M.
 3            --oOo--
 4
 5         MICAH WILSON,
 6  sworn as a witness by the Certified Court Reporter,
 7       testified as follows:
 8
 9          EXAMINATION
10  BY MS. CARTWRIGHT:
11     Q.  Good morning, Officer Wilson.  Is that -- that
12  still the right title?
13     A.  Detective now, but --
14     Q.  Detective.
15     A.  -- either way.
16     Q.  My name is Tiffany Cartwright.  I represent
17  the parents of Leonard Thomas in this matter.  And I
18  would like to start by asking you if you have ever been
19  deposed before.
20     A.  I have not.
21     Q.  So it's a little different than a normal
22  conversation.  Even if you know what my question is
23  going to be, try to wait until I finish asking it, and
24  I'll wait for you to finish your answer so that the
25  court reporter can take down our conversation easily.
```

Page 29

1 knowing that that wasn't a command that was meant for
2 me, and so I didn't seek clarification.
3    Q.   Now, at some point you received permission to
4 set explosive breach charges on the back door; is that
5 right?
6    A.   Our element was, yes.
7    Q.   And what was your understanding of the plan at
8 that point as to how to use the explosive breach?
9    A.   If I remember correctly, the plan was that if
10 he came -- because he had gone in and out several
11 times, even after the instruction not to let him go
12 back in.  Almost very shortly after that, he went back
13 in, and I believe he may have come out and gone back in
14 another time after that.
15        And so we were -- like I said, if I recall
16 right, we were told when he comes back out again, we
17 were going to breach the back door and make entry into
18 the house, essentially, so that we occupied the house
19 at that point to prevent him from coming back in.
20    Q.   Was there any concern about how Mr. Thomas
21 might react to the sound of the explosive breach?
22    A.   The plan was to execute it when he was on the
23 front porch where there were more knowns and fewer
24 unknowns.  He's there.  The elements in the front can
25 see that he and the child are both there.  And so I

Page 30

1 don't recall any discussions specifically about what
2 effect is the noise going to have on him other than the
3 typical effects of the noise are to cause people to
4 freeze if it's very surprising, unexpected.  And so a
5 normal response is to freeze while trying to figure out
6 what was that.  And by the time, you know, he has
7 figured out what it is, we would now be in his living
8 room and he could no longer come back inside the house.
9    Q.   Have you ever been involved in any other
10 operations where an explosive breach has been used with
11 children in the building?
12    A.   Well, the plan here was that the child wasn't
13 in the building when the breach went, but yes.
14    Q.   And maybe that wasn't a very good question,
15 but in terms of where there have been --
16    A.   Children present?
17    Q.   -- children present with their -- with their
18 parents.
19    A.   Yes.
20    Q.   Do you think it would be a foreseeable
21 response to the sound of the explosion for a parent to
22 reach for their child?
23    A.   Sure.
24    Q.   So who made the decision to initiate the
25 breach?

Page 31

1    A.   Command would make that decision.
2    Q.   And how is that communicated to you?
3    A.   By radio.
4    Q.   And once the breach was initiated, what
5 happened?
6    A.   The rear element made entry into the house
7 through the back door.  The door didn't fall completely
8 inside the room due to the amount of stuff in the room,
9 so I recall having to kind of climb up over the door.
10 It was sort of -- sort of a wedge shape (indicating),
11 having to climb over the door and fit through that
12 wedge to get into that first room and then moving into
13 the -- first the living room and then eventually up the
14 stairs.
15    Q.   And was it just a crowded, messy room, or was
16 it that stuff had been stacked in an attempt to block
17 the door?
18    A.   I don't know.  That room was dark.  I remember
19 as I went through it, I remember being in a dark area
20 in the living room.  Ahead was where the light was, and
21 so I was focused that way.  I remember just climbing
22 over the door and heading towards the living room.  I
23 don't recall what the obstruction was.
24    Q.   And where were you when you heard the
25 gunshots?

Page 32

1    A.   Again, having read my transcript, I indicated
2 that that, the sound of the gunshots was pretty close
3 to the time as I was crawling over the rear door.  And
4 that seems to make sense with my memory.
5    Q.   And what did you see when you got into the
6 living room?
7    A.   When I got into the living room, I saw two
8 team members holding Mr. Thomas, and I saw a third team
9 member wrestling Mr. Thomas over the child briefly and
10 getting the child and turning around, taking the child
11 out the front door.  I recall that.
12        During my interview, I had also described
13 seeing a fourth team member striking Mr. Thomas.  I
14 vaguely recall that.  And it seemed that that was an
15 attempt to essentially get him to let go of the child.
16    Q.   And how long was the struggle to take the
17 child out of his arms?
18    A.   It was very brief.  Seconds.  Not long.
19    Q.   Was the child saying anything?
20    A.   I don't recall the child saying anything.
21    Q.   Was Mr. Thomas saying anything?
22    A.   I recall hearing Mr. Thomas say something to
23 the effect of "Don't hurt my boy" or something like
24 that.
25    Q.   Do you remember what his voice sounded like?

Page 49

1  moment?
2     A.  Yes.
3     Q.  When was the next time you saw him?
4     A.  Outside.  After I left the house and I was
5  walking back to somewhere, the medics were treating
6  him.
7     Q.  Was he on a stretcher at that point?
8     A.  I don't recall.
9     Q.  Okay.  Could you tell if he was breathing or
10  moving at that point?
11     A.  I think he was.
12     Q.  What would be your best estimate of how much
13  time transpired between when you first saw him standing
14  with the officers holding him and later when you saw
15  him with the medics?
16     A.  I can't estimate.  I don't recall how much
17  took place in between.
18     Q.  And I think you said earlier that time just
19  moves strangely as you'd expect in a situation like
20  this; is that right?
21     A.  Not exactly that.  There's the perception of
22  time passing during the thing which may be different
23  than the actual passage of time, but also the fact that
24  it was three and a half years ago and I don't recall
25  the gaps.

Page 50

1     Q.  Based on what you remember and reviewing the
2  transcript, do you think it would have been more than
3  five minutes that had transpired?
4     A.  It could have been.
5     Q.  Would it be somewhere between five and ten
6  minutes?
7     A.  It could have been.  Like I said, it was after
8  I left the house.  I don't recall how long I was in the
9  house after searching.
10     Q.  Is it your understanding that the last words
11  Leonard said were something to the effect of "Don't
12  hurt my boy"?
13     A.  That was the -- that was all I heard him say.
14  I don't know what else he may have said after that.
15     Q.  Okay.  When Leonard was then moved onto the
16  floor, did you -- you saw that happen, when other
17  officers pushed him down?
18     A.  Right; as he was set down on the floor.
19     Q.  Okay.  And was he struggling at all at that
20  point, or was he pretty compliant; could you tell?
21     A.  I couldn't tell.  I couldn't tell.
22     Q.  Was there any sort of thud or noise as he
23  struck the ground?
24     A.  I don't recall hearing one.  I -- my
25  impression was that he was sort of maybe escorted down

Page 51

1  or not thrown down hard.
2     Q.  I want to go back to pretty early on in your
3  testimony.  You talked about kind of the two elements
4  that make up a hostage situation.  The first element
5  was whether the hostage is free to leave; is that
6  accurate?
7     A.  (Witness nodding.)
8     Q.  Is that a "yes"?
9     A.  Yes.  Sorry.
10     Q.  Does that element, meaning whether a hostage
11  is free to leave or not, change or get distinguished at
12  all if you're talking about a small child hostage?
13     A.  Not substantially.
14     Q.  Does it, the analysis change at all if it's a
15  small child of, say, under five years old?
16     A.  In the sense that we will accommodate the
17  release of a five-year-old differently than we would
18  accommodate the release of a full-grown adult.  But...
19     Q.  Wouldn't it be fair to say that any small
20  child isn't really free to come and go as they please,
21  but they're subject to what their parents tell them to
22  do?
23     A.  In this context?
24     Q.  Just generally.
25     A.  In general, a parent is going to dictate

Page 52

1  whether or not a four-year-old comes or goes.
2     Q.  So a four-year-old isn't free to leave
3  normally and walk out of the door and go get themselves
4  an ice cream cone at McDonald's.
5     A.  Correct.
6     Q.  Okay.  So with that in mind, does that change
7  element one at all when you're dealing with children
8  who are young in age in a supposed hostage situation?
9     A.  We are asking him to release the child to the
10  police and with other -- with the child's other family
11  members present, so he's still -- that's what he's
12  expected to do.  We're not asking him to let the child
13  go to McDonald's and get an ice cream.
14     Q.  Okay.  When you arrived on scene, you had
15  expressed that you were told that Leonard was involved
16  in a DV assault situation; is that correct?
17     A.  Correct.
18     Q.  Were you told that Leonard had been hit by his
19  mother in that DV situation?
20     A.  I don't recall being told that.
21     Q.  If you had been told, do you think it's
22  something you would have said in one of your interviews
23  that happened after the incident?
24     A.  Possibly.
25     Q.  Did you take any notes or write anything down

EXHIBIT 25

EXHIBIT 25

# Co-Op Cities
# Metro Crime Response Unit

This transcript was prepared by a third party that did not participate in the interview. It is a draft only as it has not been verified for complete accuracy. Only the audio/video file should be considered a true, complete and accurate record of the interview.

Subject of Interview:  Sgt. Nils Luckman

Interviewer(s): Det. Todd Jordan



EXHIBIT 53
WIT: Luckman
DATE: 11-17-16
Cheryl O'Haleck, CCR

D-DISCL 000370

| | | |
|---|---|---|
| 581 | | |
| 582 | A: | Right. |
| 583 | | |
| 584 | Q: | ...ah, he - did he ever ah, tell you that he was going to harm ah, any of the |
| 585 | | policemen?  Or is it just I hate the fucking cops? |
| 586 | | |
| 587 | A: | No, no.  It was I hate the fucking cops.  He never made any direct threats... |
| 588 | | |
| 589 | Q: | Mm-hm. |
| 590 | | |
| 591 | A: | ...that I recall at all.  Because even when he was saying get those fucking |
| 592 | | guys back off my property he was never saying, he goes, "I want you fucking |
| 593 | | guys off my property.  I have posted no trespassing signs.  Get off my fucking |
| 594 | | property."  Yeah, never made any, you know, you fucking guys.  What he |
| 595 | | brought up at one point was it sounded like the - the - the root of his anger |
| 596 | | toward the Fife cops was he said, "You fucking guys came here one time and I |
| 597 | | was the one that called the police and you came and you arrested me and you |
| 598 | | asked me if I used a closed fist or whatever."  And he goes, "I would never hit |
| 599 | | a woman."  He insisted he never hit a woman.  He said at one point his mom |
| 600 | | hit him twice in the face.  He said he was bleeding.  So then I said to him, |
| 601 | | "Hey, can we get you some medical aid?"  "I don't need medical aid."  Um... |
| 602 | | |
| 603 | Q: | Did he say where he was bleeding from? |
| 604 | | |
| 605 | A: | He said he was bleeding from the face. |
| 606 | | |
| 607 | Q: | From the face? |
| 608 | | |
| 609 | A: | Yeah. |
| 610 | | |
| 611 | Q: | Did he say what he was doing with the - I mean did he have some kind of ca- |
| 612 | | ah, tissue or? |
| 613 | | |
| 614 | A: | No. |
| 615 | | |
| 616 | Q: | He didn't say any of that stuff? |
| 617 | | |
| 618 | A: | No, he didn't say anything.  And when he said that about bleeding from the |
| 619 | | face, you know, I said to him, "You know, well how did you get cut?  Or how |
| 620 | | did you get cut or why are you bleeding?"  And that's when he said, "Well, |
| 621 | | you know."  I said, "Is that when your mom hit you?"  And he goes, "No, no. |
| 622 | | My mom didn't do anything."  But he had told me earlier in the conversation... |
| 623 | | |
| 624 | Q: | That mom... |
| 625 | | |

D-DISCL 000384

| | | |
|---|---|---|
| 626 | A: | ...that his mom had hit him. |
| 627 | | |
| 628 | Q: | Yeah.  Try not to get her in trouble with the police probably. |
| 629 | | |
| 630 | A: | And he -and multiple times.  And I said to him why we were there.  We were |
| 631 | | there to investigate this assault that occurred between you and your mom.  We |
| 632 | | don't know who's at fault.  Well I'm not telling you anything.  I'm not saying |
| 633 | | anything to send my mom to jail.  Okay. |
| 634 | | |
| 635 | Q: | Okay.  And then ah, but still at no time did he threaten ah, he didn't want to |
| 636 | | like kill me, didn't say just fucking kill me or anything like that? |
| 637 | | |
| 638 | A: | No.  Didn't say anything like that to me. |
| 639 | | |
| 640 | Q: | Okay.  And then ah, and didn't threaten his son. |
| 641 | | |
| 642 | A: | No. |
| 643 | | |
| 644 | Q: | The only threat or the only danger that you know of is when ah, he reportedly |
| 645 | | hung the kid out the window. |
| 646 | | |
| 647 | A: | Yeah.  Yeah. |
| 648 | | |
| 649 | Q: | And you're assuming that was on the second floor but you don't know because |
| 650 | | you couldn't see it from your position? |
| 651 | | |
| 652 | A: | No. |
| 653 | | |
| 654 | Q: | Okay. |
| 655 | | |
| 656 | A: | So I - the only reason I'm - even at the time I would say I was pretty sure it |
| 657 | | was the second floor is because you could hear him - where initially I could |
| 658 | | hear him when he was yelling, because he was yelling and talking to me at the |
| 659 | | phone on the same time. |
| 660 | | |
| 661 | Q: | Right. |
| 662 | | |
| 663 | A: | When he was doing that, you could hear it was elevated. |
| 664 | | |
| 665 | Q: | Okay. |
| 666 | | |
| 667 | A: | You could hear the noise coming from up. |
| 68 | | |
| 669 | Q: | Up, right. |
| 670 | | |

EXHIBIT 26

EXHIBIT 26

3    Officers shall exercise arrest powers when appropriate.

4    Officers shall provide information that explains their rights as well as resources available to them.

5    If a crime occurred, and the parties meet the definition of a family or household member, a report shall be written, regardless of an arrest or not.

6    In addition to a general report, officers shall complete a Domestic Violence Supplemental form, obtain handwritten statements from victims and witnesses, obtain a medical release waiver, and should take photographs of any visible injuries or damaged property.

7    If officers are not able to establish probable cause that a crime occurred, the incident may be documented via MDC notes.

B    Follow Up

1    The Special Assault Section (SAU) generally conducts all follow up investigations on reports of domestic violence. The SAU supervisor is responsible for reviewing cases to establish if they should be assigned for follow up or forwarded to the appropriate prosecutor's office.

## 41.2.7    Responding To Persons with Mental Illness

**Principle**: People with mental illnesses function in day-to-day life, often going without being noticed. The continued development of psychotropic medications has allowed many to be freed from some or all of the symptoms of mental illnesses. However, when a mental illness has gone undiagnosed or untreated, often law enforcement professionals become the first responder to people suffering a mental crisis or episode. This standard is intended to provide officers with guidelines to allow them to recognize and give appropriate service to individuals in these situations.

**Practices**

A    Mental Illness Recognition: Listed below are some of the symptoms for the mental illnesses that law enforcement officer most frequently confront in a first responder role. This information was gathered from the National Institute of Mental Health.

1    Panic Disorder: People with panic disorder have feelings of terror that strike suddenly and repeatedly with no warning. Common physical symptoms are feeling sweaty, weak, faint, dizzy, tingling or numbness in the hands, feeling flushed or chilled, nausea, chest pains, or a smothering sensation. Panic attacks generally peak within 10 minutes, but may last much longer.

2    Obsessive-Compulsive Disorder (OCD): People with OCD experience anxious thoughts or rituals that feel that they can't control. The disturbing thoughts or images are called obsessions, and the rituals that are performed to try to prevent or get rid of them are called compulsions. There is no pleasure in carrying out the rituals, people are only trying to get temporary relief from the anxiety that grows if they don't perform them.

3    Post-Traumatic Stress Disorder (PTSD): PTSD is a debilitating condition that can develop following a terrifying event. People with PTSD often experience nightmares and disturbing recollections during the day. They may also experience sleep problems, feel numb or detached, be easily startled, or feel irritable.

4    Bipolar Disorder: People with Bipolar Disorder experience dramatic mood swings called episodes of mania and depression.

5    Symptoms of Mania: Increased energy, activity and restlessness, Excessively euphoric mood, Extreme irritability, Racing thoughts, Little sleep needed, Poor judgment, Spending sprees, Provocative, intrusive, or aggressive behavior, and Abuse of drugs and/or alcohol.

6    Symptoms of Depression: Lasting sad, anxious, or empty mood, Feelings of hopelessness or pessimism,

139

Decreased energy, a feeling of fatigue. Difficulty concentrating, remembering, or making decision. Sleeping too much or unable to sleep. Unintended weight loss or gain, Chronic pain or other persistent bodily symptoms that are not caused by physical illness or injury, and Thoughts of suicide

7   Schizophrenia. People with schizophrenia often suffer symptoms that include, distorted perceptions of reality, hallucinations and illusions, delusions, disordered thinking, neglect of basic hygiene, and a "blunted" emotional expression

8   Psychosis. This is a severe or acute psychotic condition that leads to hallucinations and/or delusions. Psychosis may be a symptom of Bipolar Disorder or Schizophrenia

9   Excited Delirium. This condition is most often associated with substance abuse or mental illness. In almost every case, police are called because a subject is behaving in a bizarre fashion and is unresponsive to verbal direction. As police move to take custody of the individual a violent struggle ensues and police use some form of restraint to try and maintain control. Individual's struggle against the restraints and then lapse into tranquility. When checked, they have been found not to be breathing and efforts at resuscitation are futile. Common behaviors related to Excited Delirium include:

   • Unbelievable strength and endurance
   • Imperviousness to pain
   • Ability to offer effective resistance against multiple officers
   • Removal of clothing, or subject presents partially clothed or naked
   • Bizarre and violent behavior
   • Aggression
   • Hyperactivity
   • Extreme Paranoia
   • Incoherent shouting
   • Grunting or animal-like sounds while struggling with officers

   The following characteristics may also be present

   • Perspiration, victims are often described as drenched in sweat. (Occasionally the subject will not be sweating at all. This is usually due to a documented side-effect with certain prescribed mental health medications.)
   • Foaming at the mouth
   • Drooling
   • Dilated pupils

B   Available Community Mental Health Resources. Officers receive information about available community mental health resources during the mandated refresher training discussed in Section E of this section

C   Dealing with the Mentally Ill. The Police Executive Research Forum provided the information below.

   1   General Approach and Interaction. In general officer should use the following practices when interacting with people who have a mental illness

      • Remain calm and avoid overreacting
      • Be helpful and professional
      • Follow procedures indicated on medical alert bracelets or necklaces
      • Indicate a willingness to understand and help
      • Speak simply and briefly, and move slowly
      • Remove distractions, upsetting influences and disruptive people
      • Be aware that the uniform and equipment may frighten the person
      • Recognize that the a delusional or hallucinatory experience is real to the person
      • Announce actions before initiating them (exception may be when taking combative person into custody)

140

- Do not force discussion
- Do not maintain direct, continuous eye contact
- Do not touch the person unless necessary for safety
- Do not express anger, impatience or irritation
- Assume the person that does not respond cannot hear
- Do not mislead the person to believe that officers on scene think or feel the way the person does

2  Involuntary Custody Evaluation  RCW 71.05.150(4) allows a peace officer to cause a person to be taken into custody and immediately delivered to an evaluation and treatment center or the emergency department of a local hospital

    a  When  Whenever an officer receives information that as a result of a mental disorder a person presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled

    b  Use of Force  RCW 9A.16.020 states that any person may use force to prevent a mentally ill person from committing and act dangerous to any person, or in enforcing necessary restraint for the protection or restoration to health of the person, during such period only as is necessary to obtain legal authority for the restraint or custody of the person

    c  Documentation  Mental health professionals must have "specific facts" presented in the police report in order for them to proceed in the mental health evaluation process. Officers will be sure to include all facts to indicate why the person was an imminent danger and will include any information regarding repeated and escalating patterns of behavior

        1  If all the necessary information cannot be included on the Mental Hold form, the officer will complete a typed narrative as soon as practical after clearing the call and FAX the additional information to the mental health professional

    d  Notification Requirement  Whenever an officer places a combative into custody for a mental evaluation the officer shall check the box on the Mental Hold form requesting the written results of the mental health professional's investigation

3  Excited Delirium  If an officer is responding to a suspected case of Excited Delirium one of the most important steps they must take is to immediately request medics respond and stand-by until the individual is restrained  Once in custody and deemed a safe situation for medical personnel, then the subject should be checked out by the medics

4  Practices for Interrogations  The Constitution requires that the Miranda warnings be comprehended, not simply administered  If an officer doubts a person's capacity to understand his or her rights, in order to make an informed decision about whether to initiate questioning  the officer should ask the person to explain each of the Miranda warnings in his or her own words  and make a record of the person's explanations

D  Entry Level Training  All new employees receive training in dealing with persons that have mental illnesses as part of their orientation

E  Refresher Training  The Lakewood Police Department provides refresher training to all employees at least every three years  This training includes the identification of available community mental health resources

## 41.3   EQUIPMENT

PHILOSOPHY  The Lakewood Police Department recognizes that our dedication to high standards creates the need to provide equipment that supports the efforts of our members  It is also important to ensure efficiency and cost control through the care and maintenance of the equipment

PDR-000193

EXHIBIT 27



EXHIBIT 27

address (although these may also be signs of an injury or Alzheimer's disease).

2.   Delusions (i.e., the belief in thoughts or ideas that are false), such as delusions of grandeur ("I am Christ") or paranoid delusions ("Everyone is out to get me").

3.   Hallucinations of any of the five senses (e.g. hearing voices commanding the person to act, feeling one's skin crawl, smelling strange odors, etc.).

4.   The belief that one suffers from extraordinary physical maladies that are not possible, such as a person who is convinced that his heart has stopped beating for extended periods of time.

5.   Extreme fright or depression.

## 417.3 COMMON ENCOUNTERS WITH PERSONS WITH MENTAL ILLNESS

Officers should be prepared to encounter a person with a mental illness at any time. Employees should ensure that people with a mental illness receive the necessary assistance to access available services. This may require time and patience beyond what is normally provided.

Common situations in which such individuals may be encountered include, but are not limited to, the following:

(a)   Wandering: Individuals with mental challenges may be found wandering aimlessly or engaged in repetitive or bizarre behaviors in a public place.

(b)   Seizures: Mentally ill persons are more subject to seizures and may be found in medical emergency situations.

(c)   Disturbances: Disturbances may develop when caregivers are unable to maintain control over mentally ill persons engaging in self-destructive behaviors.

(d)   Strange and bizarre behaviors: Repetitive and seemingly nonsensical motions and actions in public places, inappropriate laughing or crying, and personal endangerment.

(e)   Offensive, aggressive or suspicious persons: Socially inappropriate or unacceptable acts such as ignorance of personal space, annoyance of others, or inappropriate touching of oneself or others are sometimes associated with mentally ill persons who are not conscious of acceptable social behaviors.

## 417.4 INITIAL RESPONSE TO CALLS INVOLVING PERSONS WITH MENTAL ILLNESS

Upon initial response to potential mental-health related calls, officers must assess the scene and determine whether the situation is active or static. Information can be sought from family members, friends, or others at the scene who know the individual or his/her history. At a private residence where there is no immediate threat to the public or law enforcement, it is advisable to confer with the on-duty supervisor before deciding to contact the subject or place the subject into custody. In any case, an officer should routinely try to bring in the services of a community mental health professional or a crisis intervention team to engage the subject; attempt to deescalate the situation; and make a recommendation regarding any need to transport the subject to a triage facility, crisis stabilization unit, evaluation and treatment facility, or the emergency department of a local hospital. Consideration should be toward protecting the public and law enforcement officers.

(a)   Active Situation: A situation in which an active threat is present. Officers must consider factors that affect the safety of everyone involved. Does the subject pose an imminent threat and do they have the ability, means, and opportunity to carry out the threat? Officers may need to use reasonable force consistent with the departments Use of Force Policy (300) as necessary to neutralize the threat, secure subjects(s), make the scene safe, and continue an assessment of the people involved.

(b)   Static Situation: A situation in which there is no immediate threat or immediate need to take action. Officers should continually assess the people involved and monitor the situation for factors that may compromise safety. This type of condition may be conducive to using crisis intervention techniques.

## 417.5 COMMUNICATION WITH THE MENTALLY ILL

Officers should, when possible, establish a dialogue with the subject to develop trust and rapport. The following guidelines detail how to approach and interact with people who may have a mental illness, and who may be a crime victim, a witness or a suspect. These guidelines should be followed in all contacts, whether on the street or during more formal interviews and interrogations:

(a)   Speak calmly: Loud, stern tones will likely have either no effect or a negative effect on the individual.

(b)   Use non-threatening body language: Keep your hands by your sides if possible.

(c)   Eliminate commotion: Eliminate, to the degree possible, loud sounds, bright lights, sirens, and crowds. Move the individual to a calm environment if possible.

(d)   Keep animals away: Individuals with mental Illness are often afraid of dogs or other large animals.

(e)   Look for personal identification: Medical tags or cards often indicate mental illness and will supply a contact name and telephone number.

(f)   If the person has a caregiver, the caregiver is often the best resource for specific advice on calming the person and ensuring both the officer's safety and the person's safety until the contact person arrives.

(g)   Prepare for a lengthy interaction: Unless there is an emergency, situations involving mentally ill individuals should not be rushed.

(h)   Use short, direct phrases: Too much talking can distract the mentally ill individual and confuse the situation.

(i)   Be attentive to sensory impairments: Many mentally ill individuals have sensory impairments that make it difficult to process information. Officers should not touch the person unless absolutely necessary. Use soft tones and gestures. Avoid quick movements. Use simple and direct language. Do not automatically interpret odd behavior as belligerence.

(j)   In many situations, and particularly when dealing with someone who is lost or has wandered away, the officer may gain improved response by accompanying the person through a building or neighborhood to seek visual clues.

(k)   Be aware of different forms of communication. Mentally ill individuals often use signals or gestures instead of words, or demonstrate limited speaking capabilities.

(l)   Do not get angry or frustrated.

(m)   Maintain a safe distance.

## 417.5.1 INTERVIEW AND INTERROGATION FOR PERSONS WITH MENTAL ILLNESS

Officers attempting to conduct an interview or interrogation with a mentally ill individual should consider the following:

(a)   Lack of eye contact or strange actions should not be interpreted as indications of deceit.

(b)   Use simple and straightforward language.

(c)   Do not suggest answers, attempt to complete thoughts of persons slow to respond, or pose hypothetical conclusions.

(d)   Recognize that the individual might be easily manipulated and highly suggestible

## 417.6 DISPOSITION OF CALLS INVOLVING MENTALLY ILL PERSONS

Once sufficient information has been collected about the nature of the situation, and the situation has been stabilized, there are a range of options officers should consider when selecting an appropriate resolution. These options include the following:

(a)   Refer, or arrange transport for, the person for medical attention.

(b)   Outright release.

(c)   Release to care of family, caregiver or mental health provider.

(d)   Refer, or arrange transport to, a substance abuse facility.

(e)   Assist in arranging voluntary admission to a mental health facility.

(f)   Arrange transport for involuntary emergency mental health evaluation if the person's behavior meets the criteria for this action.

(g)   Arrest if a crime has been committed.

## 417.7 SAFETY

Given the unpredictable and sometimes violent nature of the mentally ill, officers should never compromise or jeopardize their safety or the safety of others when dealing with individuals displaying symptoms of mental illness.

Not all mentally ill persons are dangerous. Some may represent danger only under certain circumstances or conditions. Officers may use several indicators to determine whether an apparently mentally ill person represents an immediate or potential danger to himself/herself, the officer, or others. These include the following:

(a)   The availability of any weapons to the suspect.

(b)   Statements by the person that suggest to the officer that the individual is prepared to commit a violent or dangerous act. Such comments may range from subtle innuendos to direct threats that, when taken in conjunction with other information, paint a more complete picture of the potential for violence.

(c)   A personal history that reflects prior violence under similar or related circumstances. The disturbed person's history may be known to the officer, family, friends, or neighbors who may be able to provide helpful information.

(d)   Lack of physical control over emotions of rage, anger, fright, or agitation. Signs of a lack of control include extreme agitation, inability to sit still or communicate effectively, wide eyes, and rambling thoughts and speech. Clutching one's self or other objects to maintain control; begging to be left alone; or offering frantic assurances that one is all right may also suggest the individual is close to losing control.

(e)   Officers must evaluate the volatility of the environment. Agitators that may affect the person or a particular combustible environment that may incite violence should be taken into account.

**Buckley Police Department**
Policy Manual

# Crisis Intervention Incidents

## 426.1   PURPOSE AND SCOPE
This policy provides guidelines for interacting with those who may be experiencing a mental health or emotional crisis. Interaction with such individuals has the potential for miscommunication and violence. It often requires an officer to make difficult judgments about a person's mental state and intent in order to effectively and legally interact with the individual.

### 426.1.1   DEFINITIONS
Definitions related to this policy include:

**Person in crisis** - A person whose level of distress or mental health symptoms have exceeded the person's internal ability to manage his/her behavior or emotions. A crisis can be precipitated by any number of things, including an increase in the symptoms of mental illness despite treatment compliance; non-compliance with treatment, including a failure to take prescribed medications appropriately; or any other circumstance or event that causes the person to engage in erratic, disruptive or dangerous behavior that may be accompanied by impaired judgment.

## 426.2   POLICY
The Buckley Police Department is committed to providing a consistently high level of service to all members of the community and recognizes that persons in crisis may benefit from intervention. The Department will collaborate, where feasible, with mental health professionals to develop an overall intervention strategy to guide its members' interactions with those experiencing a mental health crisis. This is to ensure equitable and safe treatment of all involved.

## 426.3   SIGNS
Members should be alert to any of the following possible signs of mental health issues or crises:

(a)   A known history of mental illness

(b)   Threats of or attempted suicide

(c)   Loss of memory

(d)   Incoherence, disorientation or slow response

(e)   Delusions, hallucinations, perceptions unrelated to reality or grandiose ideas

(f)   Depression, pronounced feelings of hopelessness or uselessness, extreme sadness or guilt

(g)   Social withdrawal

(h)   Manic or impulsive behavior, extreme agitation, lack of control

(i)   Lack of fear

(j)   Anxiety, aggression, rigidity, inflexibility or paranoia

Members should be aware that this list is not exhaustive. The presence or absence of any of these should not be treated as proof of the presence or absence of a mental health issue or crisis.

Copyright Lexipol, LLC 2016/12/07, All Rights Reserved.
Published with permission by Buckley Police Department

PDR-000028

## Buckley Police Department
Policy Manual

*Crisis Intervention Incidents*

---

### 426.4  COORDINATION WITH MENTAL HEALTH PROFESSIONALS
The Chief of Police should designate an appropriate Assistant Chief to collaborate with mental health professionals to develop an education and response protocol. It should include a list of community resources, to guide department interaction with those who may be suffering from mental illness or who appear to be in a mental health crisis.

### 426.5  FIRST RESPONDERS
Safety is a priority for first responders. It is important to recognize that individuals under the influence of alcohol, drugs or both may exhibit symptoms that are similar to those of a person in a mental health crisis. These individuals may still present a serious threat to officers; such a threat should be addressed with reasonable tactics. Nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in crisis.

Officers are reminded that mental health issues, mental health crises and unusual behavior alone are not criminal offenses. Individuals may benefit from treatment as opposed to incarceration.

An officer responding to a call involving a person in crisis should:

(a)  Promptly assess the situation independent of reported information and make a preliminary determination regarding whether a mental health crisis may be a factor.

(b)  Request available backup officers and specialized resources as deemed necessary and, if it is reasonably believed that the person is in a crisis situation, use conflict resolution and de-escalation techniques to stabilize the incident as appropriate.

(c)  If feasible, and without compromising safety, turn off flashing lights, bright lights or sirens.

(d)  Attempt to determine if weapons are present or available.

(e)  Take into account the person's mental and emotional state and potential inability to understand commands or to appreciate the consequences of his/her action or inaction, as perceived by the officer.

(f)  Secure the scene and clear the immediate area as necessary.

(g)  Employ tactics to preserve the safety of all participants.

(h)  Determine the nature of any crime.

(i)  Request a supervisor, as warranted.

(j)  Evaluate any available information that might assist in determining cause or motivation for the person's actions or stated intentions.

(k)  If circumstances reasonably permit, consider and employ alternatives to force.

### 426.6  DE-ESCALATION
Officers should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis.

---

Copyright Lexipol, LLC 2016/12/07, All Rights Reserved.
Published with permission by Buckley Police Department

PDR-000029

## Buckley Police Department
Policy Manual

*Crisis Intervention Incidents*

Once it is determined that a situation is a mental health crisis and immediate safety concerns have been addressed, responding members should be aware of the following considerations and should generally:

- Evaluate safety conditions.
- Introduce themselves and attempt to obtain the person's name.
- Be patient, polite, calm, courteous and avoid overreacting.
- Speak and move slowly and in a non-threatening manner.
- Moderate the level of direct eye contact.
- Remove distractions or disruptive people from the area.
- Demonstrate active listening skills (e.g., summarize the person's verbal communication).
- Provide for sufficient avenues of retreat or escape should the situation become volatile.

Responding officers generally should not:

- Use stances or tactics that can be interpreted as aggressive.
- Allow others to interrupt or engage the person.
- Corner a person who is not believed to be armed, violent or suicidal.
- Argue, speak with a raised voice or use threats to obtain compliance.

### 426.7   INCIDENT ORIENTATION
When responding to an incident that may involve mental illness or a mental health crisis, the officer should request that the dispatcher provide critical information as it becomes available. This includes:

(a) Whether the person relies on drugs or medication, or may have failed to take his/her medication.

(b) Whether there have been prior incidents, suicide threats/attempts, and whether there has been previous police response.

(c) Contact information for a treating physician or mental health professional.

Additional resources and a supervisor should be requested as warranted.

### 426.8   SUPERVISOR RESPONSIBILITIES
A supervisor should respond to the scene of any interaction with a person in crisis. Responding supervisors should:

(a) Attempt to secure appropriate and sufficient resources.

(b) Closely monitor any use of force, including the use of restraints, and ensure that those subjected to the use of force are provided with timely access to medical care (see the Handcuffing and Restraints Policy).

Copyright Lexipol, LLC 2016/12/07, All Rights Reserved.
Published with permission by Buckley Police Department

PDR-000030

# Buckley Police Department
Policy Manual

*Crisis Intervention Incidents*

(c)     Consider strategic disengagement. Absent an imminent threat to the public and, as circumstances dictate, this may include removing or reducing law enforcement resources or engaging in passive monitoring.

(d)     Ensure that all reports are completed and that incident documentation uses appropriate terminology and language.

(e)     Conduct an after-action tactical and operational debriefing, and prepare an after-action evaluation of the incident to be forwarded to the Assistant Chief.

(f)     Evaluate whether a critical incident stress management debriefing for involved members is warranted.

## 426.9   INCIDENT REPORTING
Members engaging in any oral or written communication associated with a mental health crisis should be mindful of the sensitive nature of such communications and should exercise appropriate discretion when referring to or describing persons and circumstances.

Members having contact with a person in crisis should keep related information confidential, except to the extent that revealing information is necessary to conform to department reporting procedures or other official mental health or medical proceedings.

### 426.9.1   DIVERSION
Individuals who are not being arrested should be processed in accordance with the Emergent Detentions Policy.

## 426.10   CIVILIAN INTERACTION WITH PEOPLE IN CRISIS
Civilian members may be required to interact with persons in crisis in an administrative capacity, such as dispatching, records request, and animal control issues.

(a)     Members should treat all individuals equally and with dignity and respect.

(b)     If a member believes that he/she is interacting with a person in crisis, he/she should proceed patiently and in a calm manner.

(c)     Members should be aware and understand that the person may make unusual or bizarre claims or requests.

If a person's behavior makes the member feel unsafe, if the person is or becomes disruptive or violent, or if the person acts in such a manner as to cause the member to believe that the person may be harmful to him/herself or others, an officer should be promptly summoned to provide assistance.

## 426.11   EVALUATION
The Assistant Chief designated to coordinate the crisis intervention strategy for this department should ensure that a thorough review and analysis of the department response to these incidents is conducted annually. The report will not include identifying information pertaining to any involved

PDR-000031

**Policy**
**429**

# Crisis Intervention Incidents

### 429.1  PURPOSE AND SCOPE
This policy provides guidelines for interacting with those who may be experiencing a mental health or emotional crisis. Interaction with such individuals has the potential for miscommunication and violence. It often requires an officer to make difficult judgments about a person's mental state and intent in order to effectively and legally interact with the individual.

### 429.1.1  DEFINITIONS
Definitions related to this policy include:

**Person in crisis** - A person whose level of distress or mental health symptoms have exceeded the person's internal ability to manage his/her behavior or emotions. A crisis can be precipitated by any number of things, including an increase in the symptoms of mental illness despite treatment compliance; non-compliance with treatment, including a failure to take prescribed medications appropriately; or any other circumstance or event that causes the person to engage in erratic, disruptive or dangerous behavior that may be accompanied by impaired judgment.

### 429.2  POLICY
The Sumner Police Department is committed to providing a consistently high level of service to all members of the community and recognizes that persons in crisis may benefit from intervention. The Department will collaborate, where feasible, with mental health professionals to develop an overall intervention strategy to guide its members' interactions with those experiencing a mental health crisis. This is to ensure equitable and safe treatment of all involved.

### 429.3  SIGNS
Members should be alert to any of the following possible signs of mental health issues or crises:

(a)     A known history of mental illness

(b)     Threats of or attempted suicide

(c)     Loss of memory

(d)     Incoherence, disorientation or slow response

(e)     Delusions, hallucinations, perceptions unrelated to reality or grandiose ideas

(f)     Depression, pronounced feelings of hopelessness or uselessness, extreme sadness or guilt

(g)     Social withdrawal

(h)     Manic or impulsive behavior, extreme agitation, lack of control

(i)     Lack of fear

(j)     Anxiety, aggression, rigidity, inflexibility or paranoia

Members should be aware that this list is not exhaustive. The presence or absence of any of these should not be treated as proof of the presence or absence of a mental health issue or crisis.

Copyright Lexipol, LLC 2016/12/13, All Rights Reserved.
Published with permission by Sumner Police Department

PDR-000301

## Sumner Police Department
Policy Manual

*Crisis Intervention Incidents*

### 429.4  FIRST RESPONDERS

Safety is a priority for first responders. It is important to recognize that individuals under the influence of alcohol, drugs or both may exhibit symptoms that are similar to those of a person in a mental health crisis. These individuals may still present a serious threat to officers; such a threat should be addressed with reasonable tactics. Nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in crisis.

Officers are reminded that mental health issues, mental health crises and unusual behavior alone are not criminal offenses. Individuals may benefit from treatment as opposed to incarceration.

An officer responding to a call involving a person in crisis should:

(a)  Promptly assess the situation independent of reported information and make a preliminary determination regarding whether a mental health crisis may be a factor.

(b)  Request available backup officers and specialized resources as deemed necessary and, if it is reasonably believed that the person is in a crisis situation, use conflict resolution and de-escalation techniques to stabilize the incident as appropriate.

(c)  If feasible, and without compromising safety, turn off flashing lights, bright lights or sirens.

(d)  Attempt to determine if weapons are present or available.

(e)  Take into account the person's mental and emotional state and potential inability to understand commands or to appreciate the consequences of his/her action or inaction, as perceived by the officer.

(f)  Secure the scene and clear the immediate area as necessary.

(g)  Employ tactics to preserve the safety of all participants.

(h)  Determine the nature of any crime.

(i)  Request a supervisor, as warranted.

(j)  Evaluate any available information that might assist in determining cause or motivation for the person's actions or stated intentions.

(k)  If circumstances reasonably permit, consider and employ alternatives to force.

### 429.5  DE-ESCALATION

Officers should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis.

Once it is determined that a situation is a mental health crisis and immediate safety concerns have been addressed, responding members should be aware of the following considerations and should generally:

- Evaluate safety conditions.

- Introduce themselves and attempt to obtain the person's name.

- Be patient, polite, calm, courteous and avoid overreacting.

- Speak and move slowly and in a non-threatening manner.

Copyright Lexipol, LLC 2016/12/13, All Rights Reserved.
Published with permission by Sumner Police Department

PDR-000302

## Sumner Police Department
Policy Manual

*Crisis Intervention Incidents*

- Moderate the level of direct eye contact.
- Remove distractions or disruptive people from the area.
- Demonstrate active listening skills (e.g., summarize the person's verbal communication).
- Provide for sufficient avenues of retreat or escape should the situation become volatile.

Responding officers generally should not:

- Use stances or tactics that can be interpreted as aggressive.
- Allow others to interrupt or engage the person.
- Corner a person who is not believed to be armed, violent or suicidal.
- Argue, speak with a raised voice or use threats to obtain compliance.

### 429.6  INCIDENT ORIENTATION
When responding to an incident that may involve mental illness or a mental health crisis, the officer should request that the dispatcher provide critical information as it becomes available. This includes:

(a)  Whether the person relies on drugs or medication, or may have failed to take his/her medication.

(b)  Whether there have been prior incidents, suicide threats/attempts, and whether there has been previous police response.

(c)  Contact information for a treating physician or mental health professional.

Additional resources and a supervisor should be requested as warranted.

### 429.7  SUPERVISOR RESPONSIBILITIES
A responding  to a crisis intervention incident should:

(a)  Attempt to secure appropriate and sufficient resources.

(b)  Closely monitor any use of force, including the use of restraints, and ensure that those subjected to the use of force are provided with timely access to medical care (see the Handcuffing and Restraints Policy).

(c)  Consider strategic disengagement. Absent an imminent threat to the public and, as circumstances dictate, this may include removing or reducing law enforcement resources or engaging in passive monitoring.

(d)  Ensure that all reports are completed and that incident documentation uses appropriate terminology and language.

(e)  Conduct any after-action tactical or operational debriefing as may be warranted. .

(f)  Evaluate whether a critical incident stress management debriefing for involved members is warranted.

---

Copyright Lexipol, LLC 2016/12/13, All Rights Reserved.
Published with permission by Sumner Police Department

PDR-000303

## Sumner Police Department
Policy Manual

*Crisis Intervention Incidents*

**429.8  INCIDENT REPORTING**
Members engaging in any oral or written communication associated with a mental health crisis should be mindful of the sensitive nature of such communications and should exercise appropriate discretion when referring to or describing persons and circumstances.

Members having contact with a person in crisis should keep related information confidential, except to the extent that revealing information is necessary to conform to department reporting procedures or other official mental health or medical proceedings.

429.8.1  DIVERSION
Individuals who are not being arrested should be processed in accordance with the Emergent Detentions Policy.

**429.9  CIVILIAN INTERACTION WITH PEOPLE IN CRISIS**
Civilian members may be required to interact with persons in crisis in an administrative capacity, such as dispatching, records request, and animal control issues.

(a)  Members should treat all individuals equally and with dignity and respect.

(b)  If a member believes that he/she is interacting with a person in crisis, he/she should proceed patiently and in a calm manner.

(c)  Members should be aware and understand that the person may make unusual or bizarre claims or requests.

If a person's behavior makes the member feel unsafe, if the person is or becomes disruptive or violent, or if the person acts in such a manner as to cause the member to believe that the person may be harmful to him/herself or others, an officer should be promptly summoned to provide assistance.

**429.10  TRAINING**
In coordination with the mental health community and appropriate stakeholders, the Department will develop and provide comprehensive education and training to all department members to enable them to effectively interact with persons in crisis.

Training shall include mandated training in crisis intervention, certified by the Criminal Justice Training Commission, as required by Washington law (RCW 43.101.427).

Copyright Lexipol, LLC 2016/12/13, All Rights Reserved.
Published with permission by Sumner Police Department

PDR-000304

EXHIBIT 28

EXHIBIT 28 



**Don Anderson**
Mayor

**Jason Whalen**
Deputy Mayor

**Mary Moss**
Councilmember

**Michael D. Brandstetter**
Councilmember

**Helen McGovern-Pilant**
Councilmember

**Marie Barth**
Councilmember

**Paul Bocchi**
Councilmember

**John J. Caulfield**
City Manager

October 18, 2013

Officer Brian Markert
9401 Lakewood Drive SW
Lakewood, WA 98499

RE: 2013SR-002

Dear Officer Markert,

On October 15, 2013, a Professional Standards Shooting Review Board was convened for the purpose of reviewing incident 2013SR-002 in which you fired your weapon during the course of your duty.

After a thorough review of the known facts and circumstances surrounding the incident, the board unanimously ruled your shooting lawful and within LPD Policy, and this matter will be considered closed.

As you know, a thorough review of incidents of this nature is an important component of community trust, and I thank you for your patience and cooperation in this matter.

Sincerely,

Bret Farrar
Chief of Police

cc: Assistant Chief Mike Zaro
Lieutenant Alwine
Sergeant Eakes
Officer Markert's Division File

## LAKEWOOD POLICE DEPARTMENT
## ADMINISTRATIVE LEAVE/RELIEF OF DUTY NOTICE

| Employee Name<br>Brian Markert | Pers. No.<br>109 | Division Assignment<br>NPO & SWAT | Supervisor<br>Eakes |
|---|---|---|---|

| ADMINISTRATIVE LEAVE | RELIEF OF DUTY |
|---|---|
| You are hereby placed on administrative leave effective _4/24/13_ for the following reason:<br>■ Officer involved shooting or other use of force resulting in death or substantial bodily injury.<br>☐ Involvement in a critical incident.<br><br>☐ Active duty status may be detrimental in your current assignment with the department.<br>☐ Required by department policy, procedure or regulation. Cite the applicable policy, procedure or regulation: | You are hereby relieved of duty effective _____ for the following reason(s):<br>☐ Active duty status may be detrimental in your current assignment with the department.<br>☐ Allegations of such a serious nature that termination is the likely outcome if they are found to be true.<br>☐ Presence of employee in the work force may be detrimental.<br>☐ Required by department policy, procedure or regulation Cite the applicable policy, procedure or regulation:<br>_____ |

☐ The Chief/designee has directed administrative leave.

**EQUIPMENT:** Mark the box for any department property/equipment that was <u>REMOVED</u> from the employee when placed on Administrative Leave/Relief of Duty:
☐ Firearm    ☐ Radio    ☐ Badge    ☐ Premise Card(s)    ☐ LPD ID    ☐ Vehicle    ☐ Keys

**RESTRICTIONS:**
☒ Employee is authorized to carry firearms (including concealed weapons, department issued or personally owned).
☐ Employee is **NOT** authorized to carry firearms (including concealed weapons, department issued or personally owned).
☐ Employee is **NOT** authorized to work Off-Duty or Outside Employment for the duration of the Administrative Leave.

### PART I: ADMINISTRATIVE LEAVE/RELIEF OF DUTY *WITH PAY*

**You are to be available for duty or investigative purposes during the following period, unless otherwise directed by the PSS Supervisor. You are now assigned to the PSS Supervisor and will report to him/her for all supervisory needs. You must be accessible by phone and will report to the PSS Supervisor by phone at the beginning of each shift. You must be able to report for duty in order to receive your regular pay.**

☒ During your regularly scheduled shift.
☐ During a new shift effective: _____, Monday through Friday, 0800-1600 hours.
-If you have been receiving Shift Differential and/or Assignment Differential Pay you will continue to do so during this period.
-You are considered off on holidays and will not need to be available unless otherwise instructed by your supervisor or the investigating authority.

| _[signature]_ | _109_ | 4/24/13 | _[signature]_ | _-2_ | 5-24-13 |
|---|---|---|---|---|---|
| Employee Signature | Pers. No. | Date | Relieving Authority Signature | Pers. No. | Date |

**See Distribution Below**

### PART II: RELIEF OF DUTY *WITHOUT PAY*

You have been placed in a relief of duty status without pay effective _____. You are required to inform your Unit commander of where you can be reached by phone at all times in the event you are needed to report for investigative purposes. You will be in a paid status for the period in which you are reporting for investigative purposes.

| _____ | _____ | _____ | _____ | _____ | _____ |
|---|---|---|---|---|---|
| Unit Commander Signature | Pers. No. | Date | Assistant Chief Signature | Pers. No. | Date |

| _____ | _____ | _____ |
|---|---|---|
| Chief Signature | Pers. No. | Date |

**See Distribution Below**

| DISTRIBUTION: |
|---|
| A copy of this document must be given to the employee and Routed immediately to the following **AT EACH STEP:**<br>Chief of Police * Human Resources * Professional Standards * The Appropriate Guild/Association<br>If placed in a Temporary Assignment, copy also to temporary assignment command * The signed original document will be filed in Professional Standards when completed. |

| Employee Name<br>Brian Markert | Pers. No.<br>109 | Bureau of Assignment | Budget # |
|---|---|---|---|

### PART III: TEMPORARY DUTY ASSIGNMENT

You will be placed in a temporary duty assignment until further notice by your supervisor or the investigating authority.
You are to report to your new temporary assignments as follows:

on _____ at _____ hours.

To:                                    At Location

Your work shift is _____ hours to _____ hours, and your RDOs will be: _____.

_____    _____  _____       _____    _____   _____
Employee Signature                Pers. No.   Date          Unit Commander Signature            Pers. No.   Date

_____    _____  _____       _____    _____   _____
Relieving Authority Signature     Pers. No.   Date          Division Chief Signature            Pers. No.   Date

_____    _____  _____
Chief of Police                      Pers. No.   Date

Note any equipment/credentials that may be returned to employee.
**See Distribution Below**

### PART IV: RETURN FROM RELIEF OF DUTY OR TEMPORARY DUTY ASSIGNMENT

#### EMPLOYEE RETURNED TO DUTY: 6/10/13
Date

Your work shift is _____ hours to _____ hours, and your RDOs will be: _____.

Reason:

_____    _____  _____       _____    _____   _____
Employee Signature                Pers. No.   Date          Relieving Authority Signature       Pers. No.   Date

_____    _____  _____
Division Chief Signature          Pers. No.   Date

**See Distribution Below**

#### DISTRIBUTION:
A copy of this document must be given to the employee and Routed immediately to the following **AT EACH STEP:**
Chief of Police * Human Resources * Professional Standards ** The Appropriate Guild/Association
If placed in a Temporary Assignment, fax also to temporary bureau/area command *   The signed original document will be filed in
Professional Standards when completed.



# Lakewood Police Department
## Shooting Review Board



Review #: **2013SR-002**

Reviewer Name: _____PAUL   OSNESS_____

Date of Review: __10/15/13__

1) Agree with the facts as presented:  ☑ YES
   ☐ NO

2) Officer name: __BRIAN   MARKERT__

   Were the Officer's actions within policy?

   ☑ YES            ☐ No

   Officer name: _____

   Were the Officer's actions within policy?

   ☒̶Y̶E̶S̶            ☐ No

3) Recommendations for training or equipment improvements:-

   _____
   _____
   _____
   _____
   _____
   _____

Board Member Signature: _____




# Lakewood Police Department
## Shooting Review Board

Review #: **2013SR-002**

Reviewer Name: _David Guttu_

Date of Review: _10/15/13_

1) Agree with the facts as presented:　☒ YES
　　　　　　　　　　　　　　　　　　　☐ NO

2) Officer name: _Brian Markert_

　Were the Officer's actions within policy?

　　☑ YES　　　　　☐ No

　Officer name: _____

　Were the Officer's actions within policy?

　　☐ YES　　　　　☐ No

3) Recommendations for training or equipment improvements:-

　_____
　_____
　_____
　_____
　_____
　_____

Board Member Signature: _David Guttu_



# Lakewood Police Department
## Shooting Review Board



Review #: **2013SR-002**

Reviewer Name: _Michael Zaro_

Date of Review: _10-15-13_

1) Agree with the facts as presented:  ☒ YES
                                                     ☐ NO

2) Officer name: _B. Markert_

    Were the Officer's actions within policy?

    ☒ YES                    ☐ No

    Officer name: _____

    Were the Officer's actions within policy?

    ☐ YES                     ☐ No

3) Recommendations for training or equipment improvements:-

_____
_____
_____
_____
_____
_____

Board Member Signature: _____

# Lakewood Police Department
# Memo



---

Date:   10/15/13

To:   Chief Farrar

Cc:

From:   Sgt. Unfred

Subject: Shooting Review Board for 2013SR-002

---

Chief Farrar,

On 10/15/13, the Professional Standards Unit convened a Shooting Review Board to review the circumstances regarding an on-duty firearm discharge by Ofc. Markert on 04/24/13.

The board consisted of Assistant Chief Zaro, Lt. Guttu, and Rangemaster Ofc. Osness. Sgt. Hall, Det. B. Johnson, Fife PD Lt. Thompson, Fife PD Det. Gow, and Bonney Lake PD Det. Byerly presented the complete case investigation report. All of the forensic evidence fully supported and coincided with all of the Officer and witness statements from the incident.

The board voted unanimously to accept the facts and circumstances as presented in the case file. The board also unanimously determined that Ofc. Markert acted lawfully and within department policy and procedures when he discharged his firearm during this incident.

There were no reccomendations for training or equipment improvements.  The board hereby reccomends that this Firearm Discharge be ruled Within Policy.


*John Unfred*

Sgt. Unfred
Professional Standards Unit



Advanced Behavioral Medicine
and
Neuropsychology Associates, PLLC

2013 South 19th Street
Tacoma, WA 98405
(253) 383-3355
FAX (253) 383-3627

Edwin L. Hill, Ph.D.
Donna M. Lidren, Ph.D.
Barbara Dahl, Ph.D.
Phillip S. Tate, Ph.D.
Kathryn Sawyer, Ph.D.

August 30, 2013

Chief Bret Farrar
Lakewood Police Department
9401 Lakewood Drive S.W.
Lakewood, WA. 98499

RE: Officer Brian Markert
Last 4 SSN: 8417
D.O.B.: 10/28/1969

Dear Chief Farrar:

This letter is to notify you that I met with Officer Markert today to complete his 3 month follow-up Post-Crisis Education/Advisory meeting following the May 24, 2013 shooting incident in Fife, Washington in which he was involved. Office Markert continues to present and report no stress related issues that might disrupt his ability to perform his duties effectively and safely. He was apprised of possible symptoms that might emerge in the future as part of a delayed stress reaction. We agreed to schedule his required 6 month follow-up meeting in 3 months to review whether he remains free of disruptive symptoms.

Thank you for the opportunity to be of service to the Lakewood Police Department. If you have any questions, please do not hesitate to contact me.

Sincerely,

Edwin L. Hill, Ph.D.
Licensed Psychologist (#984)



# Lakewood Police Department

**Personnel Memo P2013-050**

To:     All Personnel

From:   Professional Standards Section

Date:   June 7, 2013, 2013

Re:     Ofcr. Brian Markert returned to full duty

---

Effective June 10, 2013 Ofcr. Brian Markert has been returned to full duty.

**Authorized by:**

Bret Farrar
Chief of Police