# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

FREDRICK and ANNALESA THOMAS; and
JO-HANNA READ, as Guardian ad Litem of
E.T., a minor,

        Plaintiffs,

    v.

JASON CANNON; BRIAN MARKERT;
RYAN MICENKO; MICHAEL WILEY;
MICHAEL ZARO; CITY OF FIFE; CITY OF
LAKEWOOD; and PIERCE COUNTY
METRO SWAT TEAM,

        Defendants.

_____

FREDRICK THOMAS and ANNALESA
THOMAS, as Co-Administrators of the Estate
of Leonard Thomas, and its statutory
beneficiaries,

        Plaintiffs,

    v.

BRIAN MARKERT; MICHAEL WILEY;
NATHAN VANCE; MICHAEL ZARO;
SCOTT GREEN; JEFF RACKLEY; CITY OF
FIFE; CITY OF LAKEWOOD; PIERCE
COUNTY METRO SWAT TEAM; and JOHN
DOES 1 through 10,

        Defendants.

Nos. 3:15-05346 BJR
     3:16-cv-05392
CONSOLIDATED CASES

ORDER GRANTING IN
PART AND DENYING IN
PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

# I.     INTRODUCTION

In the early hours of May 24, 2013, Leonard Thomas was shot and killed by a Pierce County Metro SWAT Team member while clutching his four year old son, E.T. The shooting occurred after a four hour standoff at the home where Leonard lived with his parents, Fredrick and Annalesa Thomas.[1] The Thomas family has brought two complaints related to these events, and the cases have been consolidated. In one, Fredrick and Annalesa Thomas, as co-administrators of the Estate of Leonard Thomas (hereinafter the "Estate"), bring suit under 42 U.S.C. § 1983 for the unreasonable search and seizure of Leonard's home, in violation of the Fourth Amendment; the unreasonable seizure of Leonard's person, in violation of the Fourth Amendment; and the deprivation of Leonard's interest in a familial relationship with his son without due process of law, in violation of the Fourteenth Amendment. The Estate also brings state law claims for outrage and negligence.

Additionally, Fredrick and Annalesa Thomas, and Jo-Hanna Read, as Guardian ad Litem of E.T. (hereinafter the "Family" or "Individual" Plaintiffs], bring suit under § 1983 for the unreasonable search and seizure of the home of Fredrick, Annalesa, and E.T., in violation of the Fourth Amendment; the unreasonable seizure of E.T., in violation of the Fourth Amendment; the unreasonable seizure of Fredrick, in violation of the Fourth Amendment; and the deprivation of E.T.'s interest in a familial relationship with his father, and Fredrick and Annalesa's interest in a familial relationship with their son, in violation of the Fourteenth Amendment. These Plaintiffs also bring state law claims for outrage, the false arrest of Fredrick, negligence, and the prompt production of public records.

---

[1] Because the Thomas family members share the last name, the Court, like the parties, will refer to them by their first names.

Currently before the Court is Defendants' Motion for Summary Judgment (Doc. No. 57).[2] Having reviewed the parties' submissions, the record of the case, and the relevant legal authority, the Court will GRANT in part and DENY in part Defendants' Motion for Summary Judgment.

## II. FACTUAL BACKGROUND[3]

Leonard lived with his four-year-old son, E.T, in a home in Fife owned by his parents, Fred and Annalesa. Leonard had full custody of E.T. Kim Thomas, E.T.'s mother and Leonard's estranged wife, lived in a nearby town. In the evening of May 23, 2013, Leonard called Annalesa, said he was depressed over the death of a friend, and asked her to come take E.T. for the night. (Doc. No. 58 Ex. 1 at 72.) Annalesa was concerned that Leonard had been drinking that night, after a year of sobriety, and worried that Leonard would fall asleep and not be able to attend to E.T. (*Id.* at 127.) Leonard also called Kim and asked her to spend the night with him. (Doc. No. 58 Ex. 2 at 115.) Kim declined to spend the night, but said she would come pick up E.T. (*Id.* at 117.)

Kim arrived at approximately 9:00 pm, and recognized that Leonard was intoxicated. (*Id.* at 124.) Annalesa arrived thereafter, and determined that both Leonard and E.T. should spend the night at her and Fred's home. (Doc. No. 77 Ex. 2 at 75.) Annalesa did not feel like E.T. was in danger from Leonard's intoxication, but she was concerned that E.T. would be unattended should Leonard fall asleep. (*Id.* at 90.) Leonard did not want to go home with Annalesa, and became upset as Annalesa prepared to leave with E.T. (*Id.* at 78-79.) Annalesa became "exasperated" when Leonard stopped cooperating, and threatened to call the police if Leonard did not let E.T. go

[2] Plaintiffs have requested oral argument on this Motion. Because the Plaintiffs have fully presented their arguments in their briefs, the Court finds that oral argument is not necessary.

[3] The Court devotes significant space to recounting the facts because they are so important to the resolution of this case. The following facts are drawn primarily from the deposition testimony of the various individuals involved. Material disputes are noted where accounts of the incident diverge.

with her.  (*Id.* at 79-80.)  The argument between Leonard and Annalesa escalated, and Annalesa slapped Leonard with an open hand twice on his face, drawing blood.  (*Id.* at 86.)  Annalesa called 911 at 10:18 pm, and told the dispatcher she needed the police.  (*Id.* at 83.)  Leonard grabbed the phone from Annalesa, and told the dispatcher that his mother had hit him and that he needed help. (Doc. No. 58 Ex. 6 at 1.)

Fife Police Officers Pat Gilbert and Angelito Quinto responded to the Thomas house. (Doc. No. 58 Ex. 7 at 1.)  Annalesa and Kim told Officer Quinto that Leonard was distraught over the death of a close friend, that Leonard was highly intoxicated, and the Leonard had resisted their efforts to take E.T. for the night.  (*Id.*)  As other officers arrived at the scene, Officer Quinto advised Lieutenant Scott Green that there was probable cause to arrest Leonard for "Assault 4 DV [domestic violence] and Interfering with the reporting of DV."  (*Id.* at 2.)  Lt. Green was aware that Leonard had mental health issues.  (Doc. No. 58 Ex. 9 at 1.)

At approximately 10:30 pm, Lt. Green contacted Leonard via cell phone.  (Doc. No. 58 Ex. 10 at 1.)  During their initial 24 minute conversation, Leonard told Lt. Green that he was upset about the recent loss of a personal friend and had requested his mother come to pick up his son; that he had subsequently been assaulted by his mother and was bleeding from the face; that he had locked all the doors and would not be coming out of the house or allowing officers inside the house; and that the police were scaring his four-year-old son and should leave his property.  (*Id.*) Lt. Green informed Fife Police Chief Brad Blackburn that Leonard was a suspect in at least two crimes, drunk, irrational, and barricaded inside with a four-year-old child.  At approximately 11:21 pm, Chief Blackburn advised that he would activate the Pierce Metro SWAT team to respond to the scene.  (*Id.*; *id.* at Ex. 6.)

At about the same time, Sergeant Nils Luckman, a certified hostage negotiator in a neighboring city who had been monitoring the situation via radio, arrived to assist. From 11:20 pm to 12:24 am, Sgt. Luckman had 10 separate phone calls with Leonard, which consisted of "hang ups, [Leonard] screaming and yelling, hang ups, call backs," and so on. (Doc. 58 Ex. 11 at 7.) At one point, Luckman asked Leonard whether E.T. was ok. (*Id.* at 10.) Witnesses dispute the manner in which Leonard exhibited E.T. at the window, with accounts ranging from Leonard holding E.T. in front of him at the window to Leonard dangling E.T.'s entire body outside the window. (*See id.* Ex. 6 at 1; Ex. 7 at 2; Ex. 13 at 15; *id.* Ex. 14; Doc. No. 77 Ex. 7 at 56; Ex. 33 at 18-19.)

Leonard warned officers "not to use 'flash bang' grenades to enter the house." (Doc. No. 58 Ex. 6.) Officer Johnson heard Leonard "yelling, 'I don't have any weapons, I don't have any weapons.' Then in a lower voice, 'Except a pistol.'" (Doc. No. 58 Ex. 14.) It is undisputed that no officer heard Leonard make any threats to harm himself, his child, or any officer, and no officer saw Leonard with a weapon. (Doc. No. 77 Ex. 4 at 14; Ex. 10 at 45-46; Ex. 11 at 30, 35-38; Ex. 12 at 17; Ex. 13 at 40, 42, 53-55; Ex. 12 at 17.) Kim informed officers that Leonard was unarmed but was ignored because, as Officer Wiley described, "Baby's momma, 'No he ain't got no gun,' blah blah blah. I don't know how many times I've heard that and found weapons." (Doc. No. 81 Ex. 12 at 53.) Annalesa also told Sgt. Luckman that there were no guns in the house. (Doc. No. 77 Ex. 15 at 79.)

Sgt. Luckman states that Leonard repeatedly told him he was unarmed:

> I had heard from somebody that he said he had a pistol at some point. But he never said anything to me on the phone. And I kept repeating to him on the phone also, "Do you have any weapons at all?" He goes, "No, I'm unarmed. I have nothing. I'm" and he used the word "I'm unarmed" probably four to five times in the conversation.

(Doc. No. 77 Ex. 16 at 10.)

At approximately 11:55 pm, Lt. Green called Fife Detective Jeff Rackley and instructed him to prepare a search warrant for the residence in order to arrest Leonard for domestic violence assault in the fourth degree, a misdemeanor. (Doc. No. 58 Ex. 16.) The warrant was signed at 2:00 am on May 24. (*Id.* Ex. 17.)

At approximately 12:20 am, the Pierce Metro SWAT Team arrived on the scene. (Doc. No. 58 Ex. 6 at 2.) The Team brought two armored vehicles with them, an "AT" ("armored transport") and a "Bearcat." The AT was driven across the neighbor's yard, through a fence separating the neighbor's yard from the Thomas home, and parked just off the back patio of the Thomas residence. (Doc. No. 58 Ex. 52.) The Bearcat was parked on the street in front of the house. (Doc. No. 58 Ex. 53.) Officer Wiley informed the SWAT team that they were "responding to basically assault 4 DV, barricaded male suspect has his four year old son maybe pseudo hostage. The wife is outside. Made no threats towards the son." (Doc. No. 77 Ex. 12 at 1-2.)

The SWAT team consists of a tactical side, with Mike Wiley as Team Leader, and a team of negotiators, which included Sgt. Mark Eakes of Lakewood and Mike Malave of Fife. (Doc. No. 77 Ex. 7 at 21; Ex. 27 at 1.) Overseeing field operations was Defendant Mike Zaro, the Assistant Chief of Police for Lakewood. (Doc. No. 77 Ex. 23 at 30.) Malave made contact with Leonard and had a brief conversation, as reported by Malave:

> I spoke to him for maybe about ten minutes. Um, and he was - he was up and down and he was angry, um, telling us that -- he was telling me that he wanted -- he wanted nothing to do with the Fife Police Department, um, that he didn't want to talk to any Fife officers and he was also saying that he wanted to, um, to have all the officers leave his property. Um, he told me that, um, he wasn't gonna talk about why he was angry, he wasn't gonna talk to me about why he was bleeding or why he, um, um, he said something to the effect of why his mother had assaulted him.

(Doc. No. 58 Ex. 24 at 3.)

After four to five minutes, Leonard "became angry and hung up." (*Id.* at 3.) Thereafter phone calls to Leonard went straight to voicemail. (*Id.*) Leonard then called 911, which connected him to the Fife Police Dispatch Center. (Doc. No. 58 Ex. 26 at 6.) Leonard told the dispatcher, "I do not wish to speak to you guys. I need to be transferred back to 9-1-1 Dispatch and I would like to have someone from a State Patrol or from a Pierce County Sheriff to come out." (*Id.*) Leonard explained, "Ma'am, I am sheltered in my house trying to stay away from the Fife Police Department who are harassing me. I need to have a Sheriff out here." (*Id.* at 8.) He further explained, "The problem is that they are here surrounding my house and I'm asking them to leave. . . . I'm on private property and I've had several occasions to tell them to leave." (*Id.*)

The state patrol patched Leonard's call to the cell phone of Sgt. Eakes, the SWAT team leader and senior negotiator. Eakes recalled that Leonard told him, "I'm bipolar and I've got some mental issues and am really upset about some things right now, [but] I don't need you cops here. Just get out of here." (Doc. No. 58 Ex. 24 at 13.) Throughout the evening, Sgt. Eakes asked Leonard more than once whether he had a gun, and every time Leonard said he did not. (Doc. No. 77 Ex. 32 at 24.)

The police had established a staging area in a convenience store parking lot a couple blocks away. Kim and Annalesa had been brought to the staging area. At approximate 1:08 am, Fred arrived at the staging area, in response to a call from Annalesa that Fred needed to come speak with his son. (Doc. No. 77 Ex. 37 at 17.) Fred told an officer that he needed to go down the road to a house he owned to talk to his son. (*Id.* at 18.) The officer responded, "You're not going anywhere." (*Id.*). According to Officer Wyrwitzke, Fred "attempted to drive around the police barricade and was advised he could not pass." (Doc. No. 58 Ex. 18 at 2.) Fred agreed he "tried to drive down the road" when a uniformed patrol officer "approached me and told me I can't." (Doc.

No. 58 Ex. 19 at 19.)  Officer Wyrwitzke advised Fred "that his wife was seated in the back of my patrol car and that it would probably be beneficial for him to stay and talk to her."  (*Id.* Ex. 18 at 2.)  A short time later, Officer Wyrwitzke "looked up . . . and noticed that [Fred] was nowhere to be found."  (*Id.* Ex. 16 at 2.)  Annalesa told officers that Fred "was probably going to attempt to gain access to their property via the backyard."  (*Id.*)  Kim reported seeing Fred "run past the [convenience store] to go to the back, 'cause there's a back way to get there."  (*Id.* Ex. 2 at 153)  She concluded Fred did this "so the cops won't see him," because "the police wouldn't let anybody just walk up to the house."  (*Id.* at 154.)

Fred reports walking to the back of his property, which was not marked with crime scene tape and where he did not see any officers or vehicles.  (Doc. No. 77 Ex. 31 at 67; Ex. 37 at 22-23.)  Fred climbed the six foot chain link fence surrounding the backyard, and says police "yelled, Put your hands up, and shined lights in my face and just started screaming at me and basically made me get on my knees and threw me to the ground and handcuffed me."  (Doc. No. 77 Ex. 37 at 23.)  Fred recalls:

> They throw me on the ground.  Well, they push – I'm on my knees, they push me to the ground, one puts his knee in my back, and I don't know whether it's him or another person because there were two there and one's zip tying me.  And I tell them I can't breathe because I have COPD, and he says, You sure did hop that fence fine.  And I asked him to let me catch my breath and instead they say no, they yank me up to a sitting position, drag me over to the tree and that's when I see the SWAT vehicle or whatever vehicle that was.

(*Id.* at 26-27.)

Officer Ryan Micenko, who was behind the house at the time, remembers "kind of hearing, like rustling and looking back and seeing Fredrick jumping over the fence and coming – basically sprinting towards us, towards the house."  (Doc. No. 58 Ex. 20 at 79.)  Officer Micenko further recalls "putting my flashlight on [Fred], identifying myself, telling him to stop several times.  And

when he got pretty close to us – there were several of us there. We were kind of like a wall. He lowered down to prone, like we eventually directed him to, and I placed him in handcuffs." (*Id.*) Micenko told Fred he was under arrest for obstructing "[b]ecause he attempted to get through our cordon unlawfully. He made a physical step to get through the cordon and did not comply initially with directives to stop all the way at the back of the property." (*Id.* at 84.)

As negotiations with Leonard increasingly appeared unlikely to lead to a resolution, Eakes suggested to the scene commanders that perhaps if Leonard let E.T. go, they could simply leave for the night and come back to arrest Leonard another time. Chief Zaro agreed with the approach, and asked Fife Police Chief Blackburn "if we get the son tonight, are you good with us leaving here[?]" (Doc. No. 58 Ex. 24 at 14). Chief Blackburn agreed that "Yeah, if we have the son, then you can – we can walk away from this thing tonight and we'll get him at another time when it's not so volatile." (*Id.*)

When Eakes first proposed to Leonard that the police would leave if Leonard gave up E.T., Leonard responded, "I'm not giving him up." (*Id.* at 17.) Eakes reassured Leonard that "[E.T.] could come out and we can give him to whoever you approve of. And then you can talk to that person on the phone to know that they have [E.T.] and you can talk to [E.T.] and we're gone. We're out of here." (*Id.* at 18.) Eventually, Leonard responded, "Okay, we'll do that." (*Id.*) However, when Eakes told Leonard that an officer would meet E.T. out front, Leonard got "real intense that I inserted an officer, you know, coming up to him," and told Eakes "he's not going to come to no officers. No officers are going to touch my son. You're screwing with me again." (*Id.*)

Rather than handing off E.T. to a waiting police officer, Leonard demanded that "I want my mom to come up here." (*Id.*) Eakes told Leonard "we can't let your mom come up to the door

. . . you guys already had one confrontation today and we can't let that happen again." (*Id.*) Eakes continued pleading with Leonard to let E.T. leave the house, and Leonard continued demanding that "mom come up and take him." (*Id.*) Eventually, Eakes suggested that Annalesa "meet [E.T.] around the corner and it'd be like 20 seconds from the time you let him go to she's in – or he was in mom's arms and then you – I'll make sure that you get to talk to make sure." (*Id.*) At that point, Leonard stated "Okay. That sounds good . . . I gotta get him up." (*Id.*)

Approximately ten minutes later, SWAT Officers reported that Leonard had come out onto the front porch, made E.T. sit down on the top step, then stood there behind him "an arm's length" away. (*Id.* Ex. 27 at 13-14.) Leonard told Eakes he was outside with E.T., but again started demanding that Annalesa "comes up to – bring her up to the porch now." (*Id.* Ex. 24 at 19.) Eakes again explained to Leonard, "You don't have to go to jail, anything like that, but you've got to start doing something for me and for yourself here. And, um – and your son . . . He doesn't need to be involved in this kind of drama tonight, he needs to be with grandma." (*Id.* at 19.) Leonard responded "Well, no, she's only – only if she comes up here," and he "kept saying I want to see her." (*Id.*) Eventually, Leonard again said he was outside on the porch, and demanded that Eakes "Tell her to come on up." (*Id.* at 19.) Again, Eakes told Leonard "Well, we can't. Just let him go, you can watch him walk down to the – watch your son walk down a path and you can step back in the door, shut the door, lock it and look out the window if you'd like." (*Id.*) Leonard responded, "No. I'm not doing that." (*Id.*)

Based on Leonard's continued demands to have Annalesa come up to the house, his continued refusal to let E.T. go, and the fact that he was now outside the house with E.T., Chief Zaro radioed the entire SWAT Team, ordering them "Do not let that kid back in the house. If we

are able to separate the kid from the dad, do not let him go back in the house."  (*Id.* at 14.)  Zaro explained that he gave this order

> because of how agitated he was and because of all the background we have on him and, um, just his – his irrational behavior throughout the night, I was very, very concerned for that kid's safety, and if we – if he, you know, within those four walls of the house, we can't see the kid, we don't know where he's at, we don't know what the dad's got or where – where he's at, so, um, our best chance of effecting a safe separation is when they're outside.

(*Id.* at 15.)  The two SWAT Team snipers, Kenyon and Brian Markert, said they were initially unsure whether Zaro's order was a "delta order" to use deadly force.  (Doc. No. 77 Ex. 28 at 24; Ex. 29 at 62-63; Ex. 41 at 48.)  Several other members of the SWAT team understood Zaro's order to authorize deadly force.  (Doc. No. 77 Ex. 39 at 93; Ex. 31 at 82-83; Ex. 44 at 17-18; Ex. 51 at 92-93.)

Shortly after Zaro gave that order, Leonard took E.T. back inside the residence.  (Doc. No. 58 Ex. 30 at 18.)  A few minutes later, Leonard brought ET onto the porch, and then quickly returned inside.  As Eakes describes, "we kept going back and forth, back and forth . . . and he kept going in and out of the house . . . he's back in and out, you know, he's back in, he's back out."  (*Id.* Ex. 24 at 20.)  While Annalesa was not allowed to go up to the house, officers escorted her up to the Bearcat, where Leonard could see and hear her.  (*Id.* Ex. 28 at 129.)

Leonard sent E.T. out to sit on the top step again, but instead of coming out with him, Leonard kneeled down inside the doorway, using a wooden two-by-four to prop the door open.  SWAT Team sniper Brian Markert, watching through his rifle scope from across the street, describes how "the door was basically partially open.  The 2-by-4 was placed in a way that would block the door from completely closing.  And then Mr. Thomas was just inside the door, crouched down . . . keeping an eye on [E.T.] who was sitting on the stoop."  (Doc. No. 58 Ex. 32 at 113,

116.) The other sniper, Officer Kenyon, confirms that Leonard was "kneeling inside the doorway," watching E.T. on the steps a few feet away. (*Id.* Ex. 30 at 19.)

Meanwhile, during the entire time Leonard was going in and out of the house, SWAT officers had been trying to set a breaching charge on the back door. When Leonard would come to the front door, the Team would approach the back door and attempt to set the charge. When Leonard would go back inside, the Team would retreat from the back door to avoid detection, and take up positions at the back of the house. (*Id.* Ex. 33 at 9-10.) By the time Annalesa arrived at the Bearcat, the entry team had finished hanging the charge, and was prepared to breach the back door if necessary.

Sergeant Thompson and Annalesa, standing at the rear corner of the Bearcat, could now clearly see E.T. sitting on the porch. Annalesa began calling out to E.T., "Hey, come to Grandma. Come to Grandma." (*Id.* at 83-84.) Once again, though, Leonard refused to let E.T. go, and began yelling directly to Annalesa, "No. Come up and get him. Just come get him," and "Hey, Mom, you come up here." (*Id.* at 85.) Team Leader Mike Wiley, standing nearby, warned Thompson, "No, she's not going up there. We're not going to introduce her. You know, we don't know what he's going to do, so we're not going to let her move forward." (*Id.* at 84.) On the phone, Leonard continued to get angrier at Eakes for refusing to let Annalesa come up to the house. (*Id.* Ex. 27 at 16.)

At approximately 2:45 am, Leonard and E.T. returned to the porch again. Leonard had brought a car seat and a bag onto the porch. (Doc. No. 77 Ex. 18 at 34.) According to Officer Malave, E.T. was on the third or fourth step down, and Leonard was in the doorway. (*Id.* Ex. 36 at 5.) Leonard said to the officers that "the only way he was letting E.T. go is if [Annalesa] walked

in front of the car all the way to the steps and . . . picked him up." (*Id.* Ex. 22 at 34.) Annalesa volunteered to walk up and get E.T., but the officers would not let her. (*Id.* Ex. 2 at 102.)

Chief Zaro perceived that "Leonard's emotional state was devolving. I felt he was hallucinating. He had already endangered the child and assaulted the child, and he [wasn't doing much more than] toying with us as far as saying he would release the child." (Doc. No. 58 Ex. 28 at 134.) Chief Zaro gave permission to breach the back door with an explosive charge that was designed to sever the hinges of the door and, due to its loud sound, overwhelm a subject's senses so that the subject freezes in place. (*Id.* Ex. 35 at 14; Ex. 36 at 30.)

When the breaching charge detonated, however, Leonard did not freeze. Instead, he ran to E.T., grabbed him, and started retreating into the residence. The nature of Leonard's action is in dispute. Officer Markert describes Leonard holding E.T. with his "arms wrapped around his son's neck in a chokehold-like fashion." (Doc. No. 58 Ex. 32 at 45-46.) Officer Wiley also thought Leonard was going to hurt the child (*Id.* Ex. 37 at 48-49), and Officer Vance described Leonard's movement "like an angry snatch" (*Id.* Ex. 39 at 65-66). Officer Malave recalled that Leonard was not holding E.T. by the throat. (Doc. No. 77 Ex. 35 at 36-37.)

While Leonard was holding E.T., Officer Markert fired his rifle, striking Leonard just above the belt line on the right side of his abdomen. (Doc. No. 58 Ex. 32 at 277-78.) Leonard fell backward into the house. (*Id.*) Officers entering through the rear door encountered Leonard sitting on the floor, clutching E.T.'s back against his chest. (*Id.* Ex. 41 at 61-62.) As the officers struggled to pry E.T. from Leonard's arms, Officer Derig "started punching [Leonard] in the face to get him distracted and some pain compliance so he'd let go of the kid." (*Id.* Ex. 42 at 47.) Officer Wilson recalls Leonard's last words were, "Don't hurt my boy." (Doc. No. 77 Ex. 53 at 32, 47.) Kim

examined E.T., and found that "he was not hurt and did not have any bruises or other marks around his neck or anywhere else." (Doc. No. 71 ¶ 6.)

Meanwhile, as Officer Vance ran toward the house after the breach, Leonard's dog came around the house and charged him. (Doc. No. 58 Ex. 39 at 60-62.) Vance tried to hit the dog with his rifle, but the dog came at him again. Vance shot the dog one time, then proceeded past it toward the porch. Officer Wiley, following behind Vance, saw the dog start getting back up, and fired three more rounds, killing the dog in the front yard. (*Id.* Ex. 37.) Leonard was transported to St. Joseph's Medical Center in Tacoma, and pronounced dead at 3:16 am. (*Id.* Ex. 48.)

The City of Lakewood conducted a review of the Thomas shooting. Chief Zaro was the ranking member of the shooting review board. (Doc. No. 77 Ex. 55 at 7.) The Lakewood Board found that Officer Markert's use of deadly force "was legal and within policy . . . of the City of Lakewood." (*Id.* Ex. 29 at 243; Ex. 55 at 1.)

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if there is no genuine issue of material fact. Fed. R. Civ. P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and demonstrating the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before a shooting has died, our precedent permits the decedent's version of events to be constructed circumstantially from competent expert and

14

physical evidence, as well as from inconsistencies in the testimony of law enforcement." <u>George v. Morris</u>, 736 F.3d 829, 834 (9th Cir. 2013).

## IV. DISCUSSION

Defendants move for summary judgment on several groups of claims. The Court will address each in turn.

### A. Fred's Claim for Unreasonable Seizure

First, Fred claims Officers Micenko and Cannon violated his Fourth Amendment rights when they arrested him for trying to break through the SWAT perimeter. The Fourth Amendment prohibits arrests without probable cause. *Beck v. Ohio,* 379 U.S. 89, 90–91 (1964). Probable cause exists where the arresting officer is aware of facts and circumstances "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Id.* at 91. "[I]n a § 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).

Under Washington law, "[a] person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020. Officer Micenko told Fred he was under arrest for obstructing "[b]ecause he attempted to get through our cordon unlawfully. He made a physical step to get through the cordon and did not comply initially with directives to stop all the way at the back of the property." (Doc. No. 58 Ex. 20 at 84.) Fred disputes Officer Micenko's account, and recalls halting and complying with police orders as soon as they were communicated to him. (Doc. No. 77 Ex. 37 at 23.) The jury must determine whose story is more credible.

15

An arrest may also violate the Fourth Amendment if it is executed with excessive force. The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner,* 471 U.S. 1, 7–8 (1985). Determining whether a specific use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). Relevant factors to this inquiry include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "[B]ecause the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004).

Fred claims that he immediately submitted to the officers' compliance orders, and while on his knees the officers pushed him to the ground, put a knee in his back while he was being handcuffed, yanked him to a sitting position, and dragged him to a nearby tree, all while behaving rudely. (Doc. No. 77 Ex. 37 at 26-27.) If the jury credits Fred's account of immediate submission, then the jury may also determine whether his rough handling by police was disproportionate and unreasonable. Such questions are quintessentially for the finder of fact.

Defendants' Motion for Summary Judgment is DENIED as to Fred's claims for arrest without probable cause and for excessive force.

### B. Claim for Unreasonable Search/Entry into the House

The Estate alleges that Defendants unreasonable searched and seized Leonard's home in violation of the Fourth Amendment by entering and remaining on Leonard's property without a

16

warrant or legal cause; obtaining a search warrant without probable cause and with false information; and executing the warrant in an unreasonable and violence manner. Fred, Annalesa, and E.T. bring a parallel claim.

First, Plaintiffs allege Defendants Wiley and Zaro improperly ordered entry onto their property without exigent circumstances before the warrant was issued. This complaint ignores the fact that Annalesa summoned police to the residence by dialing 911 and explained to the officers that Leonard had grabbed her wrist and took her phone. (Doc. No. 58 Ex. 1 at 113.) Once Annalesa invited the police onto her property, she never asked them to leave. Officers do not violate the Fourth Amendment when they enter property at the homeowner's request to investigate a reported domestic assault.

Plaintiffs next allege Defendants obtained a search warrant without probable cause and with false information. Plaintiffs do not attempt to rebut Defendants' argument on this issue, and therefore the Court deems this claim to have been abandoned by Plaintiffs.

Next, Plaintiffs allege Defendants executed the warrant unreasonably by using explosives on the back door of the house without justification and without warning, and by shooting Leonard and his dog. Even when a warrant is validly issued, a Plaintiff may nevertheless claim the warrant was "unreasonably executed." *Dalia v. United States*, 441 U.S. 238, 258 (1979). A § 1983 claim for unreasonable execution of a warrant "requires a precise determination of which specific acts amounted to unreasonable conduct, which actors engaged in that conduct, and what damage each unreasonable act caused. The Ninth Circuit has repeatedly stressed that such findings are reserved for the trier of fact." *Torre v. City of Renton*, 164 F. Supp. 3d 1275, 1284 (W.D. Wash. 2016). Given the state of negotiations with Leonard – he was on the front porch with E.T., a car seat, and a bag, requesting Annalesa come to escort E.T. – a reasonable jury could find that the use of an

explosive charge was inherently dangerous and predictably spurred Leonard to grab his son and retreat into the cover of his home, which dramatically increased the risk of injury and death.

As for the shooting of the dog, "The killing of a dog is a destruction recognized as a seizure under the Fourth Amendment and can constitute a cognizable claim under § 1983." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) (alteration adopted, quotations omitted). In *Hells Angels*, law enforcement entry teams were given approximately one-week advance notice to prepare searches of residences for evidence of gang activity. *Id.* at 967. Two of the residences entered and searched had large, aggressive dogs, which police officers shot and killed. *Id.* at 967-68. In determining whether the shooting of the dogs violated the owners' Fourth Amendment rights, the Ninth Circuit balanced "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* The Court recognized that the intrusion inherent in killing a family pet is severe. *Id.* at 975. The purported government interests – namely, the need to ensure stealth, speed, and safety of the officers – were deemed insufficient to justify the intrusion for purposes of determining whether the defendant officers were entitled to qualified immunity. *Id.* at 976. The Court considered that the officers developed no realistic plan other than shooting the dogs while serving the search warrants, despite having a week's advance notice to prepare; none of the plaintiffs were potential suspects; and silencing the dogs to ensure stealth was not advanced by discharging four loud shotgun blasts at the dogs. *Id.* at 976-77.

Here, officers had several hours to develop a non-lethal strategy for addressing Leonard's dog. As Defendants recount, "Throughout the standoff, Leonard's large dog was running around the front and back yards, and in and out of the house. Various officers testified how Leonard would yell 'Get em – get em, that's right, boy, good boy' and the dog would then 'bark and be

18

aggressive.'" (Def. Motion, Doc. No 57 at 26, quoting Doc. No. 58 Ex. 42 at 58-59.) Thus, Defendants were clearly aware of the dog's presence and potential danger over the course of the evening and night, and a jury could find that it was unreasonable for Officers Vance and Wiley to charge the house without any contingency for controlling the dog. Thus, the Court finds that there are multitudinous questions as to whether Defendants' execution of the warrant was reasonable, and summary judgment, therefor, is denied.

### C. The Estate's Claim for Excessive Force

Excessive force is examined under the Fourth Amendment's prohibition of unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Whether the officers' use of explosives followed by deadly force was reasonable in these circumstances is a question fraught with factual issues. Under *Graham*, three specific factors must be considered in assessing the reasonableness of the force used: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Smith v. City of Hemet*, 394 F.3d at 701 (*citing Graham*, 490 U.S. at 396). Whether the suspect poses a threat to the safety of officers or others is "the most important single element of the three specified factors." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

Officer Markert defends his decision to shoot Leonard on the basis of the chokehold Leonard allegedly applied to E.T. after the explosive charge was detonated at the rear of the house. However, according to Officer Malave, Leonard was not holding E.T. by the throat. (Doc. No. 77 Ex. 35 at 36-37.) And circumstantial evidence undermines the objective reasonableness of Markert's belief that E.T. was in serious danger. Over the course of the standoff, Leonard repeatedly stated he was unarmed. There is no testimony that he ever threatened officers or E.T.

Instead, Leonard consistently sought to ensure E.T.'s wellbeing. For example, Leonard asked the police to leave his property because they were scaring his son (Doc. No. 58 Ex. 10 at 1), and, according to Markert's statement, warned officers, "I have a four year old in here. Don't be smashing in my door, using your stun grenades or blowing my door off the hinges" (Doc. No. 81 Ex. 11 at 6). Shortly before the shooting, Leonard had brought E.T. to the front porch with a car seat. (*Id.* Ex. 12 at 38.) A reasonable factfinder could find incredible Markert's suggestion that the explosive breach suddenly caused Leonard to treat his son in a way that risked serious, immediate harm.

The other *Graham* factors – the severity of the crime at issue, and the suspect's attempts to actively resist arrest or evade by flight – also present factual questions. Officers sought to arrest Leonard for assault based on the reporting of domestic violence because he grabbed Annalesa's wrist and took the phone from her while she was calling 911. Such misdemeanors do not generally necessitate a lethal response. Additionally, Leonard was not attempting to evade by flight; in fact, at the time of the shooting, the officers planned to not arrest Leonard that night. (Doc. No. 58 Ex. 24 at 14.) A jury could find that it was unreasonable for an officer to conclude that deadly force was warranted in this situation.

### D. Claim for Deprivation of Familial Relationship

Fred, Annalesa, and E.T. bring a claim for the deprivation of their familial relationship with Leonard.[4] Under the Due Process Clause of the Fourteenth Amendment, a decedent's parents and child have an interest in their familial relationship with the decedent. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168-69 (9th Cir. 2013) (parents); *Hayes v. Cty. of San Diego*,

---

[4] While the Estate's complaint also includes a claim for deprivation of Leonard's familial relationship with E.T, the Estate does not attempt to rebut Defendants' argument on this issue, and therefore the Court deems this claim to have been abandoned by Plaintiffs.

736 F.3d 1223, 1229-30 (9th Cir. 2013) (child).  To establish a violation of due process, a plaintiff must prove that the officer's action "shocks the conscience."  *Hayes*, 736 F.3d at 1230.

The "shocks the conscience" standard differs from the excessive force standard under the Fourth Amendment.  "In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'"  *Id.* (quoting *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir.2008)).  "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience.  On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."  *Id.*  "Whether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious."  *Farmer v. Brennan*, 511 U.S. 825, 826 (1994).

Plaintiffs argue the deliberate indifference standard applies to Chief Zaro's order authorizing lethal force to prevent Leonard from reentering the home with E.T, and to Chief Zaro's order to breach the back door.[5]  While Leonard was on his front porch with E.T., Chief Zaro radioed the entire SWAT Team, ordering them "Do not let him back in the house with that kid." (Doc. No. 89 Ex. B at 30.)  Zaro explained that he gave this order

> because of how agitated he was and because of all the background we have on him and, um, just his – his irrational behavior throughout the night, I was very, very concerned for that kid's safety, and if we – if he, you know, within those four walls of the house, we can't see the kid, we don't know where he's at, we don't know what the dad's got or where – where he's at, so, um, our best chance of effecting a safe separation is when they're outside.

---

[5] Plaintiffs also bring a deliberate indifference claim based on Officer Wiley's alleged decision to request authorization to breach the back door.  However,Plaintiffs do not provide any evidence that Wiley requested authorization to breach.

(Doc. No. 58 Ex. 27 at 15.)

The Metro SWAT Manual contains five explicit requirements for issuance of a delta order. (Doc. No. 89 at Ex. C.)  The word "delta" must be used; only the Incident Commander – here, Chief Blackburn – may authorize a delta order; team members must acknowledge receipt of the delta order; the delta order must identify the incident commander authorizing the order; and the person issuing the order must identify the affected team member(s) receiving the order.  (*Id.*)  Chief Zaro's statement did not comply with these five protocols.

Officer Markert explained that initially it was not clear to him whether Chief Zaro's order was a delta order, and that he spoke with Officer Kenyon, a fellow sniper, to decipher what Zaro meant.  (Doc. No. 77 Ex. 28 at 14.)  He recognized that the order did not contain the specific language required by the protocol, but nonetheless concluded that Chief Zaro was communicating that E.T. was at the risk of physical injury or death if he returned inside the house.  (*Id.* at 15.)  The order "heighten[ed his] sense of concern" "that the hostage was facing some sort of, you know, threat of, or physical harm or, or death at the hands of the suspect."  (*Id.*)  Officer Kenyon testified that Chief Zaro's order was ambiguous, and "I think the whole team probably was unclear about that order."  (Doc. No. 77 Ex. 41 at 48; *see also* Doc. No. 77 Ex. 39 at 93; Ex. 31 at 82-83; Ex. 44 at 17-18; Ex. 51 at 92-93.)  Clearly, the situation was one that must be presented to a jury to examine.

Likewise, Chief Zaro explained that when he authorized the explosive breach, he considered the "flight or freeze, you know, response to sudden stress and shock.  And the vast majority of the time that we've done that, it's been freeze."  (Doc. No. 89 Ex. D at 131-32.)  Thus, Chief Zaro was cognizant that "flight" was a potential response to the sudden shock of the rear door breach.  It is for the jury to determine whether Chief Zaro was deliberately indifferent to the

possibility that the breach would trigger in Leonard a reflexive flight response, and that his sudden retreat into the house – in combination with or independent from his order that the SWAT team was not to allow Leonard into his house with E.T. – would result in his fatality. Accordingly, summary judgment is denied as to Plaintiffs' claim for deprivation of a familial relationship.

### E. Plaintiffs' Claim for Unreasonable Seizure of E.T.

The Individual Plaintiffs contend that Defendants Zaro, Wiley, and Markert violated E.T.'s Fourth Amendment rights when they seized him from his father. Because Defendants sought to remove a minor from his custodial parent in order to protect the minor's health and safety, the case law derived from child abuse investigations is more analogous than the hostage cases cited by Defendants. The Ninth Circuit has articulated the governing standards:

> Under the Fourteenth Amendment right to familial association, an official who removes a child from parental custody without a warrant "must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Rogers v. Cnty. of San Joaquin,* 487 F.3d 1288, 1294 (9th Cir. 2007). The child subjected to seizure is also protected by the Fourth Amendment's prohibition against unreasonable searches and seizures. *Kirkpatrick v. Cnty. of Washoe,* 792 F.3d 1184, 1187–89 (9th Cir. 2015); *Wallis,* 202 F.3d at 1137 n.8. While the constitutional source of the parent's and the child's rights differ, the tests under the Fourteenth Amendment and the Fourth Amendment for when a child may be seized without a warrant are the same. *Wallis,* 202 F.3d at 1137 n.8. The Constitution requires an official separating a child from its parents to obtain a court order unless the official has reasonable cause to believe the child is in "imminent danger of serious bodily injury." *Id.* at 1138.

Jones v. Cty. of Los Angeles, 802 F.3d 990, 1000 (9th Cir. 2015)

Defendants articulate three physical threats E.T. faced over the course of night: 1) E.T. was "dangled" out the window by Leonard; 2) Leonard grabbed E.T. in a chokehold after the breach; and 3) Leonard was not equipped to attend to E.T. during the night because of his inebriation and manic temperament. All three are subjects of material disputes of fact. There is direct or circumstantial evidence to support a jury's finding that E.T. was not in imminent danger of serious

bodily injury when the SWAT team determined that their primary goal was to extract E.T. for the night; when Chief Zaro commanded the SWAT team not to allow Leonard to return into the home with E.T.; when Chief Zaro authorized the breach of the rear door; or when Officer Markert took the fatal shot.

### F. Plaintiff's *Monell* Claims

The Supreme Court has held that municipalities may be held liable as "persons" under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694. A plaintiff may establish municipal liability by demonstrating that an official with final policy-making authority "delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City & County of San Francisco,* 308 F.3d 968, 984–85 (9th Cir. 2002). "'If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.'" *Id.* (citation omitted). To establish a ratification claim, Plaintiffs must present evidence of "a 'conscious, affirmative choice' on the part of the authorized policymaker." *Id.* (quoting *Gillette,* 979 F.2d at 1347). "A local government can be held liable under § 1983 only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* (internal quotations omitted). The policymaker must have knowledge of the alleged constitutional violation. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

Plaintiffs argue Lakewood is liable under *Monell* based on a "ratification theory" for the finding of the Shooting Review Board that Markert's actions were lawful and within policy. In support of their argument, Plaintiffs cite <u>*Rosales v. City of Chico*</u>, *No. CV21402152WBSCMK,*

24

*2015 WL 6167740, at \*7–8 (E.D. Cal. Oct. 20, 2015)*, where the court denied the defendant city's

motion for summary judgment on plaintiff's *Monell* claim when the chief of police pronounced

that the allegedly offending officer's conduct was "in compliance with Department policy." The

court explained:

> In this case, it is not a mere ratification, but rather the Chief of Police's
> pronouncement that Officer Bailey's alleged use of force was "in compliance with
> Department policy" that gives rise to a *Monell* claim. This is "tantamount to the
> announcement or confirmation of a policy for purposes of *Monell*." [] The Chief of
> Police's finding that Officer Bailey's use of force was "in compliance" with the
> City of Chico's policies is more than sufficient to raise a genuine issue of material
> fact with respect to whether the City of Chico had a policy of using the force Officer
> Bailey did in this case. Although the finding was made after the incident, it
> constitutes clear evidence from which a rational jury could infer that the policy
> existed before the incident and therefore was the moving force that caused the
> injury. If the jury ultimately concludes that Officer Bailey used excessive force and
> that the use of force comported with the City of Chico's policies, it would be
> entirely consistent with *Monell* to hold the City of Chico liable based on its policy
> promoting that use force.

> Accordingly, because plaintiff has raised a genuine issue of material fact with
> respect to whether the City of Chico had a policy that caused the constitutional
> violation alleged in this case, the court must deny defendants' motion for summary
> judgment on plaintiff's § 1983 *Monell* claim.

*Id.* (footnote omitted).

Defendants respond that *Monell* liability is improper because the Shooting Review Board

adopted Officer Markert's version of the facts, and under his version the shooting was not

unconstitutional. In support, Defendants cite *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D.

Haw. 2003), where the court held:

> The law does not say that every failure to discipline an officer who has shot
> someone is evidence of a "whitewash" policy or some other policy of "sham"
> investigations. The law does not say that, whenever an investigative group accepts
> an officer's version over a victim's differing version, this acceptance establishes a
> policy for which a municipality may be held liable under § 1983. If that were the
> law, counties might as well never conduct internal investigations and might as well
> always admit liability. But that is not the law. The law clearly requires "something

more." As Kanae presents nothing more than the failure to discipline Hodson, the County is entitled to summary judgment on Kanae's § 1983 ratification claim.

The Court finds the *Rosales* holding closer to the facts of the instant case. Municipalities are required to review police shootings and carefully determine whether the shooting complied with local policy, and then determine whether or not discipline is appropriate. Here, there is a triable issue of fact regarding whether Officer Markert committed a constitutional violation by shooting an unarmed man who had not made threats to police or his son over the course of the evening – or whether the shooting was justified because Markert's belief that E.T. was in imminent danger of serious harm was objectively reasonable. A rational jury could find that Markert's decision to shoot was not constitutionally justified, and that Lakewood ratified that unconstitutional decision by determining it was lawful and within policy. Summary judgment on the *Monell* claim against Lakewood is accordingly denied.[6]

### F. Negligent Investigation Claim

Finally, Defendants move for summary judgment on Plaintiffs' negligence claims. Generally, a claim for negligent investigation is not cognizable under Washington law. *Fondren v. Klickitat Cty.*, 79 Wash. App. 850, 862 (1995); *see also Keates v. City of Vancouver*, 73 Wash. App. 257, 267 (1994) ("As a general rule, law enforcement activities are not reachable in negligence."). The individual plaintiffs argue that their negligent investigation claim arises from an exception provided by RCW 26.44.050, which creates "a general mandatory duty to investigate" reports of child abuse, *Rodriguez v. Perez*, 99 Wn. App. 439, 448 (2000). In

---

[6] The Court has recently received Plaintiffs' request (Doc. No. 100) to supplement their response to Defendants' Motion with evidence and argument along the lines of an alternative theory of *Monell* liability developed in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Because the Court has determined that Plaintiff's ratification theory is sufficient to defeat Defendants' Motion as to this claim, it is unnecessary to determine whether Plaintiffs could also defeat Defendants' Motion with a *Pembaur* claim.

*Rodriguez,* the court held that unlike a "typical criminal investigation" that is "premised on a duty that is owed to the public at large," an investigation into a report of possible child abuse or neglect "concerns a duty that is owed to a specific class of individuals." *Id.* at 445. The rationale in permitting negligent investigation claims in this class of cases is the "statutory duty to investigate child abuse and the protected status of the parents and children bringing the claims." *Id.* "Those considerations apply equally to claims against law enforcement officers when those officers are conducting investigations pursuant to the statutory directives set forth in RCW 26.44." *Id.* This is true even when the law enforcement officers are conducting a "criminal investigation" as well as investigating the possible abuse or neglect. *Id.* at 446.

The individual plaintiffs argue "a reasonable jury could conclude that a negligent investigation by defendants caused the wrongful, permanent separation of E.T. from his non-abusive father," because of such actions including "the breakdown in communications between the negotiating team, the command staff, and the tactical team that culminated in Defendant Zaro's unreasonable orders authorizing the use of an explosive device and lethal force to take E.T. from Leonard, [and] Defendants Wiley and Markert's negligent failure to clarify the deadly force order." (Doc. No. 79 at 50-51.)

The Court has already recognized the apparent fit of the child abuse investigation analogy in its discussion of E.T.'s claim for unreasonable seizure, Section E, *supra*, because police were attempting to separate a child from his parent for the child's safety and well-being without a warrant. Such actions are governable under a reasonableness standard, and there is evidence to

suggest that the efforts made to secure E.T.'s safety were objectively unreasonable.  This question, once more, is properly for the jury.[7]

## V. CONCLUSION

For the foregoing reasons, the Court rules as follows:

1. Defendants' Motion for Summary Judgment as to Fredrick Thomas' claim for unreasonable seizure is DENIED;

2. Defendants' Motion for Summary Judgment as to Plaintiffs' claim regarding the execution of the search warrant is DENIED;

3. Defendants' Motion for Summary Judgment as to the Estate's claim for the unreasonable seizure of Leonard is DENIED;

4. Defendants' Motion for Summary Judgment as to the Family's claim for deprivation of their familial relationship with Leonard is DENIED;

---

[7]     Separately, the Estate argues that Defendants breached a duty of care they owed to Leonard. (Doc. No. 80 at 22.)  The Estate relies on *Coffel v. Clallam Cty.*, 47 Wash. App. 397 (1987), where the owner and tenant of a commercial building brought suit against the county and various county officials for failure of law enforcement officers to prevent destruction of the building.  The court found the "failure to enforce" exception to the public duty doctrine applied as to some of the defendants.  The court explained, "The public duty doctrine recognizes that the duties of public officers normally are owed only to the general public. Generally, the statutory duty of officers to provide police protection, RCW 36.28.010, and the common-law duty of municipalities to provide police protection are owed to the public at large and are unenforceable as to individual members of the public." *Id.* at 402.  "An exception to the public duty doctrine provides that if a 'special relationship' exists between the public officer and the plaintiff, a duty owed to the individual may arise.  []  Specifically, an actionable duty to provide police services will arise if (1) there is some form of privity between the police department and the victim that sets the victim apart from the general public, and (2) there are explicit assurances of protection that give rise to reliance on the part of the victim." *Id.* 403.  The Estate has not identified a relevant exception to the public duty doctrine, or any other legal basis under Washington law for holding Defendants liable for negligence.  Accordingly, summary judgment is granted on this claim.

5. Defendants' Motion for Summary Judgment as to the Family's claim for unreasonable seizure of E.T. is DENIED;

6. Defendants' Motion for Summary Judgment as to Plaintiffs' *Monell* claims is DENIED;

7. Defendants' Motion for Summary Judgment as to the Family's negligence claims is DENIED;

8. Defendants' Motion for Summary Judgment as to Plaintiffs' claim for entering and remaining on their property without a warrant or legal cause is GRANTED;

9. Defendants' Motion for Summary Judgment as to Plaintiffs' claim for obtaining a search warrant without probable cause and with false information is GRANTED;

10. Defendants' Motion for Summary Judgment as to the Estate's claim for deprivation of Leonard's familial relationship with E.T is GRANTED;

11. Defendants' Motion for Summary Judgment as to the Estate's claim for negligence is GRANTED.

**SO ORDERED.**

Dated this 25th day of May, 2017.

Barbara Jacobs Rothstein
U.S. District Court Judge