1

Honorable Barbara J. Rothstein

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

8

9
FREDRICK and ANNALESA THOMAS; and
JO-HANNA READ, as Guardian ad Litem of
E.T., a minor,

10
Nos. 3:15-cv-05346 BJR
          3:16-cv-05392
CONSOLIDATED CASES

Plaintiffs,

11

v.

12

13
JASON CANNON; BRIAN MARKERT; RYAN
MICENKO; MICHAEL WILEY; MICHAEL
ZARO; CITY OF FIFE; CITY OF LAKEWOOD;
and PIERCE COUNTY METRO SWAT TEAM,

**DECLARATION OF MEAGHAN M.
DRISCOLL IN SUPPORT OF
PETITION FOR FEES**

14

15
Defendants.

16

17
FREDRICK THOMAS and ANNALESA
THOMAS, as Co-Administrators of the Estate of
Leonard Thomas, and its statutory beneficiaries,

18
Plaintiffs,

19
v.

20

21
BRIAN MARKERT; MICHAEL WILEY;
NATHAN VANCE; MICHAEL ZARO; SCOTT
GREEN; JEFF RACKLEY; CITY OF FIFE;
CITY OF LAKEWOOD; PIERCE COUNTY
METRO SWAT TEAM; and JOHN DOES 1
through 10,

22

23

24
Defendants.

25

26

27

CONNELLY LAW OFFICES, PLLC
2301 North 30th Street
Tacoma, WA 98403
(253) 593-5100 Phone - (253) 593-0380 Fax

Meaghan M. Driscoll declares and states as follows:

1.     I am an attorney of record for the Estate of Leonard Thomas, Plaintiff in this matter. I make this declaration in support of Plaintiffs' Motion for Attorneys' Fees & Costs, pursuant to 42 U.S.C. § 1988. I am over the age of eighteen and am competent to testify to the matters set forth herein.

2.     I have compiled time records for the hours expended on this case based on my review of the files, including the pleadings, correspondence, court file, discovery materials, electronic mail records, electronic and paper calendars, combined with my own recollection.

3.     The number of hours listed is conservative, as countless hours were spent on phone calls, informal conferences, and other miscellaneous matters and tasks. A true and correct copy of my time record is attached hereto as Exhibit A.

4.     My time is being billed at the rate of $350 per hour. This represents the midrange of the average hourly rates being charged by other mid-level associate attorneys within the Western District of Washington, as confirmed by The National Law Journal's 2013 sampling of nation-wide billing rates. A true and correct copy of an excerpt from that survey is attached hereto as Exhibit B.

5.      By way of background, I graduated *magna cum laude* from Gonzaga University School of Law in 2015 and was admitted to practice shortly thereafter. In my role as an associate attorney at Connelly Law Offices, I routinely assume primary or secondary responsibility for the litigation and trial of complex personal injury, wrongful death, and civil rights cases. I have previously tried a civil case to verdict in the Washington State Superior Court for King County as second chair trial counsel in a wrongful death motor vehicle collision case, resulting in a $9.5 million verdict.

**CONNELLY LAW OFFICES, PLLC**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

6.      Prior to joining Connelly Law offices, I served as a judicial extern to Judge Rosanna Peterson at the United States District Court for the Western District of Washington and later as a judicial extern to Justice Mary Fairhurst of the Washington State Supreme Court.

7.      This matter was accepted on a contingent basis, meaning that none of the lawyers who worked on the matter would have been paid a penny had we not succeeded at trial. My research indicates that the odds of succeeding at a jury trial on a civil rights case are roughly one-in-three. A true and correct copy of the Bureau of Justice Statistics survey to that effect is attached hereto as Exhibit C.

8.      Attached as Exhibit D is a true and accurate copy of the Order Granting Attorneys' Fees and Costs in *Ostling v. City of Bainbridge*, 872 F.Supp.2d 1117 (W.D. Wash. 2012) (Dkt. #181).

9.      I believe that the total of the hours included in Exhibit A, my hours log, comes to 710.4.  At $350 per hour the total amount of attorneys' fees requested before any type of additur or lodestar comes to $248,640.

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

Signed this 1st day of August, 2017, at Tacoma, Washington.

_____
Meaghan M. Driscoll, WSBA No. 49863

DECLARATION OF MEAGHAN M. DRISCOLL- 3

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August, 2017, I electronically filed the forgoing

with the Clerk of the U.S. District Court for the Western District of Washington using the

CM/ECF system, which will send notification of such filing to all counsel of record:

| KEATING BUCKLIN McCormack<br>Richard B. Jolley<br>Jeremy W. Culumber<br>rjolley@kbmlawyers.com<br>jculumber@kbmlawyers.com<br>800 Fifth Ave., Ste. 4141<br>Seattle, WA 98104<br>**Attorneys for Defendant** | MacDonald Hoague & Bayless<br>Timothy K. Ford<br>David J. Whedbee<br>Tiffany M. Cartwright<br>705 2nd Avenue, Suite 1500<br>Seattle, WA 98104<br>timf@mhb.com<br>davidw@mhb.com<br>tiffanyc@mhb.com<br>**Attorneys for Plaintiffs** |

DATED this 1st day of August, 2017.

CONNELLY LAW OFFICES, PLLC

By_____

Brooke E. Marvin, Paralegal

EXHIBIT A



EXHIBIT A

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| Date | Time | Description |
|------|------|-------------|
| 5/16/16 | 1.9 | Review of file, Cw JCJ re: working on case |
| 5/20/17 | 6.5 | Review email correspondence re: case, review complaint, research case law re: estate's claim in section 1983 case, discuss complaint and strategize case with co-counsel, research case law |
| 5/23/16 | 2.4 | Review and revise complaint |
| 5/23/16 | .7 | Cw Ford re: filing of complaint, cw JCJ re: adding parties |
| 5/26/16 | 3.5 | Deposition of Jon Waller, travel to Bonney Lake |
| 5/31/16 | .5 | TC Whedbee re: deadlines, motion for extended deadlines |
| 6/1/16 | 1.7 | Review and sign stipulated motion for extension of deadlines (Dkt. 17-0). TC co-counsel Whedbee |
| 6/3/16 | 2.1 | Client meeting with Fred and Annalesa Thomas |
| 6/6/16 | 9.5 | Review case file materials from co-counsel; pleadings and discovery, prepare for deposition of Waller |
| 6/7/16 | 6.7 | Review case file materials from co-counsel; pleadings and discovery, TC co-counsel re: materials |
| 6/8/16 | 7.3 | Review case file materials from co-counsel, discovery |
| 6/10/17 | .3 | Correspond with co-counsel re: discovery materials, additional materials noted |
| 6/12/17 | .1 | Correspond w/ Ford re: discovery materials |
| 6/13/17 | .1 | Email re: deps and discovery |
| 6/22/16 | 4.3 | Write memo to JCJ re: claims summary |
| 6/23/16 | 1.6 | Deposition of Larry Wageman, appeared telephonically |
| 6/29/16 | .3 | Confer w/ co-counsel re: discovery, scene photos |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| | | |
|---|---|---|
| 6/30/16 | 8.5 | Review case file materials from co-counsel; depositions of Rodriguez, Wyrwitzke, Micenko, Eakes, Vradenburg, Thompson, Wiley, Green |
| 7/1/16 | 5.6 | Review case file materials from co-counsel; depositions of Derig, Malave, Gilbert, Quinto, |
| 7/15/16 | 1.3 | Prepare for deposition of Blackburn, review case file, read police reports, Blackburn statements |
| 7/19/16 | 5.1 | Deposition of Brad Blackburn |
| 7/19/16 | 2.1 | Travel to deposition of Brad Blackburn |
| 7/19/16 | 1.3 | Prepare for deposition of Zaro |
| 7/20/16 | 2.1 | Deposition of Michael Zaro |
| 7/20/16 | 2.5 | Travel to deposition of Michael Zaro |
| 7/22/16 | 1.7 | Read discovery requests to the Estate, contact co-plaintiffs re: filling out information, contacts clients |
| 8/1/16 | 6.4 | Meet with Annalesa and Fred Thomas, prepare for deposition |
| 8/3/16 | 3.7 | Draft motion to consolidate (Dkt. 11), work on file, email re: armed officers, discovery dispute procedures |
| 8/8/16 | 3.5 | Defend deposition of Annalesa Thomas |
| 8/8/16 | 1 | Defend deposition of Fred Thomas |
| 8/11/16 | .5 | Conference w/ co-counsel Ford, Whedbee, and JCJ re: discovery, trial plans |
| 8/12/16 | 3.5 | Prepare Kim Thomas deposition |
| 8/12/16 | 4.6 | Defend Kim Thomas deposition |
| 8/17/16 | 1.6 | Discuss discovery responses with client Annalesa Thomas, Kim Thomas |
| 8/19/16 | 2.7 | Write responses to Defendant's 1st discovery |
| 9/1/16 | .2 | Draft and file notice of unavailability (Dkt. 25) |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| 9/9/16 | .1 | Email co-counsel Whedbee re: scheduling TC b/w parties |
|---|---|---|
| 9/14/16 | 1.3 | Strategy meeting with JCJ re: depositions, claims, discovery |
| 9/19/16 | 1.5 | Research privilege issues re: SWAT meeting, TC w/ co-counsel Cartwright and Whedbee, TC Ford re: Estates' discovery responses |
| 9/20/16 | 3.7 | Write and finalize responses to Defendant's 1st discovery, compile and organize responsive documents, review materials sent by Ford |
| 9/22/16 | .1 | Send discovery responses and documents to opposing counsel |
| 10/12/16 | .7 | Review materials sent by co-counsel, DVD, client documents |
| 10/17/16 | .3 | TC Whedbee re: discovery, affirmative SJM re: SWAT |
| 10/24/16 | 1.5 | Draft responses to Defendant's 2nd set of written discovery |
| 10/25/16 | 8.8 | Research damages available to Estate, write memo to JCJ, review email correspondence w/ OC re: phone record subpoenas |
| 11/2/16 | 4.7 | Inspect and photograph SWAT vehicles and equipment |
| 11/4/16 | 4.9 | Prep for deps of Reiber, Wilson, Temple, review file, read post-incident statements |
| 11/7/16 | 1.6 | Deposition of Greg Reiber |
| 11/7/16 | 2 | Deposition of Micah Wilson |
| 11/7/16 | .7 | Deposition of Dave Temple |
| 11/7/16 | .7 | Travel to Puyallup for depositions |
| 11/9/16 | 2.3 | Write objections and responses to Defendant's RFA's |
| 11/9/16 | .5 | Conversation with attorney for Comprehensive Life Resources, Joan Mell, re: healthcare records of Leonard Thomas, review Mell objections to SDT |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| | | |
|---|---|---|
| 11/9/16 | .3 | Review correspondence and SDT to Michael Sabo, cw JCJ re: objections and stipulations |
| 11/10/16 | .2 | Email opposing counsel re: releases for records of Leonard Thomas |
| 11/10/16 | 2.8 | Deposition of Charles Porche |
| 11/10/16 | 2 | Deposition of Matthew Watson |
| 11/10/16 | 2.3 | Travel to depositions |
| 11/15/16 | 4.9 | Prepare for and attend deposition of Brad Blackburn, travel to and from Seattle |
| 11/15/16 | .4 | CR 26 conference with Culumber, Ford |
| 11/15/16 | 2.9 | Outline deposition questions for law partner Micah Lebank to cover deposition of Nils Luckman, cw Lebank |
| 11/16/16 | .2 | Review and sign stipulated motion for protective order (Dkt. 28) |
| 11/18/16 | 1.7 | Deposition of Greg Massey |
| 11/18/16 | 1.3 | 30(b)(6) deposition of Tom Thompson |
| 11/18/16 | .7 | Travel to Puyallup for depositions |
| 12/1/16 | 1.9 | Write supplemental responses to Defendants written discovery |
| 12/5/17 | .4 | Finalize and send supplemental discovery responses |
| 12/05/16 | 2.5 | Write public records requests to SWAT entities re: mental health policies, email OC Culumber re: policies and discovery requests |
| 12/5/16 | 2.3 | Review witness statements prepared by co-counsel |
| 12/13/16 | 1 | Conference call with co-counsel re: experts, expert depositions, depositions, potential of expert Barb Stone |
| 12/13/16 | 4.6 | Write retainer letter to expert Scott Defoe, compile materials sent for his review, discuss w/ Marvin, JCJ re: materials |
| 12/15/16 | .9 | Consult with expert Scott Defoe, discuss materials sent |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| | | |
|---|---|---|
| 12/16/16 | .1 | TC Ford re: plaintiff's experts |
| 12/20/16 | .4 | Make public records records to CJTC re: mentally ill training |
| 12/21/16 | .3 | Telephone call with Pierce County Medical Examiner Dr. Clarke re: pre-death pain and suffering |
| 12/21/16 | .7 | Review proposed expert questions from Ford, TC Ford re: expert reports |
| 12/22/16 | .4 | Phone consult with potential ballistics expert Matt Noedel re: bullet trajectory, angle of Leonard at moment of impact |
| 12/28/16 | 7.3 | Review and discuss expert report of Scott Defoe, cw JCJ, work on file re: experts, compare Defoe with invid. P's experts, Review and discuss expert report of Matt Noedel |
| 12/29/16 | .3 | Phone consult with expert Matt Noedel re: ballistics |
| 12/29/16 | 3.7 | Write, compile, finalize expert disclosures, corresp. Ford re: damages witnesses |
| 12/29/16 | 5 | Write and compile initial disclosures, send to opposing counsel |
| 1/3/17 | 2.4 | Draft motion to strike Defendant's motion to compel (Dkt. 34) and declaration (Dkt. 35) |
| 1/9/17 | 1.2 | Conference call with co-counsel re: expert depositions, Rule 26 conference |
| 1/10/17 | 2.7 | Review police department polices re: mentally ill acquired through publics records requests |
| 1/11/17 | 1.3 | Write memo to JCJ re: experts, prep for conference w/ Court |
| 1/12/17 | 1.9 | Prepare for and attend telephonic hearing with Court re: experts and expert depositions |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| | | |
|---|---|---|
| 1/12/17 | 3.5 | Draft statement re: expert witnesses (Dkt. 42), research case law, similar cases where plaintiffs allowed own experts |
| 1/13/17 | 1.3 | Draft statement re: expert witnesses (Dkt. 42) |
| 1/17/17 | 3 | Draft reply on statement re: expert witnesses (Dkt. 46) and declaration (Dkt. 47) |
| 1/23/17 | 2.3 | Cw co-counsel re: expert witnesses, disclosure of opinions, research Plaintiff's experts backgrounds/history |
| 1/26/17 | .6 | Email expert Scott Defoe re: deposition scheduling and preparation |
| 1/26/17 | .9 | Review response by defendants to motion for partial SJ, work on file, review other potential affirmative SJM's to bring |
| 1/30/17 | .7 | Review Brill animations, cw JCJ |
| 2/2/17 | .3 | Draft notice of joinder to co-plaintiffs motion for extension of time (Dkt. 67) |
| 2/2/17 | 1.5 | Email correspondence with opposing counsel, co-counsel re: deposition scheduling, TC Whedbee re: SJM |
| 2/3/17 | 2.3 | Prepare for deposition of Jeffrey Selleg, review Selleg report, review policies |
| 2/14/17 | 1.5 | Phone call to expert Scott Defoe re: declaration for response to SJM, review CJTC materials from PRR |
| 2/10/17 | 5.1 | Outline and research response in opposition to defendant's motion for summary judgment (Dkt. 80), review Ostling case response to SJM and Court's Order |
| 2/11/17 | .6 | Phone call with Kim Thomas re: observations of E.T. after shooting |
| 2/12/17 | .7 | Draft declaration of Kim Thomas re: observations of E.T. after |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

|  |  |  |
|---|---|---|
|  |  | shooting; acquired signature of K. Thomas |
| 2/13/17 | 7.3 | Draft response in opposition to defendant's motion for summary judgment (Dkt. 80), research 1983 excessive force cases involving mentally ill |
| 2/14/17 | .7 | Meet with Kim Thomas re: declaration |
| 2/14/17 | 7.2 | Draft response in opposition to defendant's motion for summary judgment (Dkt. 80), review depositions, write facts sections |
| 2/15/17 | 8.9 | Draft response in opposition to defendant's motion for summary judgment and declaration (Dkt. 80, 81), research ratification theory under Monell |
| 2/20/17 | 7.1 | Draft response in opposition to defendant's motion for summary judgment (Dkt. 80), add citations to all records and pincites to cases. |
| 2/20/17 | .4 | Phone call with expert Matt Noedel re: ballistics |
| 3/6/17 | 7.7 | Deposition of defense expert Jeffrey Selleg, travel to and from Seattle, conference with co-counsel re: expert depositions |
| 3/7/17 | .4 | Call with expert Scott Defoe re: deposition, report |
| 3/7/17 | 3.3 | Prepare for deposition of Richard Stripp, review autopsy report, outline questions |
| 3/7/17 | 1.7 | Prepare deposition of defense expert Brian Brill, cw JCJ re: animations |
| 3/8/18 | 1.3 | Deposition of defense expert Richard Stripp |
| 3/8/17 | 2.3 | Deposition of defense expert Brian Brill |
| 3/8/17 | 1.7 | Prepare deposition of Melanie English, review CPS records of |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

|  |  |  |
|---|---|---|
|  |  | E.T., medical and schools records of E.T. |
| 3/8/17 | 1.3 | Review expert report of Peter Sarna |
| 3/9/17 | 3.1 | Deposition of Melanie English |
| 3/9/17 | 3.6 | Deposition of Peter Sarna |
| 3/9/17 | 2 | Travel to Seattle for depositions |
| 3/10/17 | 1.8 | Meet with expert Defoe, prepare for deposition |
| 3/10/17 | 3.1 | Defend deposition of Scott Defoe |
| 3/10/17 | 11.5 | Travel to/from Irvine, CA for expert deposition of Scott Defoe, confer with JCJ and Whedbee re: deposition |
| 3/12/17 | 2.7 | Prepare for deposition of defense expert Tom Ovens, read Ovens testimony in Washburn trial |
| 3/13/17 | 2.8 | Deposition of defense expert Tom Ovens |
| 3/13/17 | 1.7 | Travel to/from Seattle for deposition of Ovens |
| 3/13/17 | .7 | Prepare for deposition of K. Miller |
| 3/14/17 | 3.3 | Deposition of Kenneth Miller |
| 3/14/17 | 1.8 | Travel to/from deposition of Kenneth Miller |
| 3/28/17 | 1.3 | Deposition of Heather MacDonad, appeared telephonically |
| 4/3/17 | 2.7 | Review mental health records of Leonard Thomas, disability applications records, medical records |
| 4/11/17 | 1.1 | Cw JCJ re: mediation date, mediation goals, exclusion of defense expert MacDonald, coordinate location for mediation |
| 4/13/17 | .1 | Draft and sign joinder to co-plaintiff's motion for exclusion of defense expert Heather MacDonald (Dkt. 94) |
| 4/19/17 | .5 | VM to Joan Mell re: potential witnesses treating provides |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

|  |  | Trisime Close and Michael Sabo, TC Mell |
|---|---|---|
| 4/21/17 | 7.2 | Draft mediation submission, discuss with Micah Lebank |
| 4/27/17 | 1.3 | cw JCJ re: mediation,  starting demand, mediation strategy |
| 4/28/17 | 3.6 | Revise mediation submissions, incorporate JCJ feedback and changes, proofread and finalize |
| 5/8/17 | .4 | Conference call with co-counsel re: pretrial filings |
| 5/12/17 | 7.8 | Mediation with parties, mediator Keith Kubik, review mediation memorandum, discuss with co-counsel, JCJ |
| 5/16/17 | .7 | Discuss pre-trial filings with JCJ, including jury instructions, exhibit list, witness list |
| 5/17/17 | .5 | Email correspondence with parties re: joint pretrial statement, joint witness list, joint exhibit list (Dkt. 111, 112, 113), review exhibit lists |
| 5/17/17 | 1 | Draft proposed voir dire questions, email to co-counsel |
| 5/17/17 | 2.3 | Review and revise joint pretrial statement, write objections |
| 5/18/17 | 1.7 | Review and revise joint and disputed jury instructions, write objections |
| 5/18/17 | .3 | Cw JCJ re: testimony designations of Micenko, Markert, Wiley, Zaro, Cannon, proposed voir dire questions |
| 5/31/17 | 1.4 | Conference call with co-counsel re: pre-trial conference strategy, goals, review Court's Order on SJM |
| 6/1/17 | 5 | Represented Estate at pre-trial conference, arguments re: exhibits, trial schedule and details |
| 6/1/17 | 2.5 | Travel to and from Seattle for pre-trial conference |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| 6/2/17 | .9 | Discuss focus group with MHB, schedule focus group, discuss trial preparation and themes |
|--------|-----|------|
| 6/6/17 | .6 | Drafted argument re: exclusion of Kim Thomas statements as exhibits, emailed to Cartwright (Dkt. 138) |
| 6/7/17 | .6 | Confer w/ co-counsel re: trial subpoenas, witnesses |
| 6/9/17 | 7.7 | Write deposition summaries of Defoe, Blackburn, Zaro, Eakes, Luckman |
| 6/9/17 | .3 | Review and outsource deposition summaries |
| 6/9/17 | .4 | Read and analyze Mendez decision, S. Court re: provocation theory |
| 6/11/17 | 7.3 | Prepare materials and itinerary for focus group, develop defense opening statements, discuss with Cartwright, Ford |
| 6/12/17 | .8 | Training re: federal courtroom technology |
| 6/12/17 | 1.7 | Meet with co-counsel, train re: Trial Director, discuss exhibits, how to present exhibits at trial |
| 6/12/17 | 5.2 | Focus group case, travel to and from focus group |
| 6/13/17 | 2.2 | Review and revise joint list of pre-admitted exhibits (Dkt. 147), review Court's Order on SJM, prepare summary of MIL's and relevant rulings for trial, experts JCJ |
| 6/13/17 | 1.4 | TC with Annalesa Thomas re: Leonard childhood, stories, future plans, parenting |
| 6/14/17 | .1 | Review and revise joint list of pre-admitted exhibits (Dkt. 149-1) |
| 6/14/17 | .1 | Review revised joint list of witnesses (Dkt. 150) |
| 6/14/17 | 5.2 | Design and compile opening statements, develop powerpoint presentation slides |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| | | |
|---|---|---|
| 6/15/17 | 4.7 | Design and compile opening statements powerpoint presentation, discuss opening with Cartwright |
| 6/16/17 | 2.3 | Draft confidential settlement brief |
| 6/16/17 | .9 | Prepare voir dire questions and strategy |
| 6/16/17 | 3.6 | Outline direct examination of Sgt. Eakes |
| 6/17/17 | 5.7 | Review opening statements of T. Cartwright, modify JCJ opening statements, create powerpoint slides for opening, organize trial schedule, organize witness folders, review "hot docs" of file, write outline of direct of Eakes, Malave |
| 6/18/17 | 10.1 | Pack up trial materials from Tacoma office, travel to Seattle, set up off-site office, trial preparation, confer with co-counsel re: goals and strategy for conference, review co-counsel settlement brief |
| 6/19/17 | 4.7 | Settlement conference with Chief Judge Martinez and parties |
| 6/19/17 | 9.3 | Trial prep: including outline direct examination of Charles Porche, organize exhibits and files, prep. argument re pretrial motions, cw JCJ re: settlement conference |
| 6/20/17 | 13.7 | Trial prep: including outline direct examination of Malave, assist with opening statements, outline Tom Thompson direct, attend pre-trial conference with Judge Rothstein, cw JCJ re opening statements |
| 6/21/17 | 9 | Trial |
| 6/21/17 | 7.2 | Trial Prep: discuss and strategize next day examinations, outline direct examination of Charles Porche, |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

|  |  | outline direct examination of Micah Wilson |
|---|---|---|
| 6/22/17 | 9 | Trial |
| 6/22/17 | 5.7 | Trial Prep: strategize and discuss witness order and goals, prepare direct examination of Porche, Wilson, review depositions of Zaro, discuss trial themes w/ JCJ |
| 6/23/17 | 9 | Trial |
| 6/24/17 | 7.3 | Trial Prep: including communicate with expert Defoe, email with co-counsel re strategy and witnesses to call, prepare for examinations of Defoe, read depositions relating to Defoe testimony |
| 6/25/17 | 9.2 | Trial Prep: review expert reports, meet with Scott Defoe, prepare Scott Defoe and exhibits for direct |
| 6/26/17 | 9 | Trial |
| 6/26/17 | 5.3 | Trial Prep: including outline direct examinations of Catherine Winkle, Kerry Todd |
| 6/27/17 | 9 | Trial |
| 6/27/17 | 6.3 | Trial Prep: including review witness files, outline direct examination of Pringle, Cardins, meet with Annalesa Thomas re: direct examination |
| 6/28/17 | 9 | Trial |
| 6/28/17 | 7.4 | Trial prep: outline direct examination of Annalesa Thomas, coordinate exhibits, outline direct examination of Kevin Williams, meet with Kim Thomas |
| 6/29/17 | 9 | Trial |
| 6/29/17 | 7.1 | Trial Prep: including reviewed and revised proposed jury instructions, email correspondence with counsel for co-plaintiffs, outline direct of Gilbert, outline direct of Quinto |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| 6/30/17 | 9 | Trial |
|---------|---|-------|
| 7/2/17 | 4.5 | Compile testimony and make chart re: "delta order" for direct examination of Selleg and Ovens |
| 7/2/17 | 4.3 | Write brief re: loss of life damages (Dkt. 187) |
| 7/2/17 | 3.6 | Outline direct examination of Nathan Vance |
| 7/3/17 | .2 | Draft objection to defendants proposed jury instruction 24B, email co-plaintiff (Dkt. 183) |
| 7/3/17 | 2.7 | Draft brief re: objection to defense exhibits 1018 and 1018A and declaration (Dkt. 188, 189) |
| 7/3/17 | 3.2 | Draft brief re: instruction on mandatory arrest and declaration (Dkt. 190, 191) |
| 7/3/17 | 5.3 | Compile testimony and make chart re: "choke" for direct examination of Selleg and Ovens |
| 7/4/17 | 14.2 | Pack up trial materials, travel to Seattle, draft brief re: additional time for closing argument (Dkt. 192), Email correspondence and conversation with co-counsel re: plaintiffs proposed additional jury instructions, verdict form (Dkt. 194), Review and revise proposed jury instructions (Dkt. 205), Outline direct examination of Richard Stripp, Prepare oral argument re: jury instructions, extra time for closing, exhibit 1018 |
| 7/5/17 | 2.8 | Drafted portions of response to defendants JMOL, email to co-counsel Cartwright (Dkt. 197) |
| 7/5/17 | 6.2 | Trial |
| 7/5/17 | 6.3 | Trial Prep: outline talking points for oral argument re: trial briefs, jury instructions, outline closing talking points, discuss closing with co-counsel |
| 7/6/17 | 5.7 | Trial |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| 7/6/17 | 6.2 | Trial Prep: meet with defense and co-counsel re: jury instructions, create "roadmap" instruction, determine which JI's the parties agree/disagree about, draft jury verdict form, discuss jury verdict form with co-counsel, (Dkt. 208) discuss jury instruction exceptions with co-counsel |
|---|---|---|
| 7/7/17 | .6 | Hearing re: jury instructions, verdict form, argument re: loss of life damages |
| 7/7/17 | 6.5 | Prepare for hearing, discuss closing with co-counsel, make powerpoint slides for closing |
| 7/8/17 | 3.3 | Research and draft motion re: exceptions to court's jury instructions (Dkt. 210) |
| 7/8/17 | 8.7 | Create powerpoint slides for closing statements |
| 7/9/17 | 5.7 | Create closing powerpoint slides |
| 7/10/17 | 7 | Trial |
| 7/11/17 | 2.7 | Respond to juror questions, including research law re: Allen instruction; proofread and revise JCJ's draft of motion (Dkt. 222) |
| 7/12/17 | 3.1 | Respond to juror questions, including draft motion re: excuse juror (Dkt. 224) |
| 7/12/17 | 3.2 | Compiled email correspondence between court and parties re: jury deliberations |
| 7/13/17 | 1.5 | Respond to juror questions |
| 7/14/17 | 1.7 | Travel to court for verdict, verdict read by Chief Judge Martinez |
| 7/17/17 | 2.1 | Compiled email correspondence between court and parties re: jury deliberations |
| 7/24/17 | 3.9 | Draft petition for attorneys fees |
| 7/28/17 | 8.5 | Draft declarations in support of petition for attorneys fees |
| 7/31/17 | 7.3 | Cw JCJ re: petition, revise, research hourly rate |

**Exhibit A**
**Thomas et al v. Cannon et al. Driscoll Time**

| 8/1/17 | 3.5 | Compile petition documents, revise, proofread, discuss with JCJ |
|---|---|---|
| Total Hours | 710.4 $350=$248,640 | |

Meaghan M. Driscoll Hours Log, Thomas Case- 15 of 15

EXHIBIT B



EXHIBIT B 

# NLJ'S BILLING SURVEY



Select a Firm
- ● Adams and Reese
- ○ Akerman Senterfitt
- ○ Akin Gump
- ○ Allen Matkins
- ○ Alston & Bird
- ○ Andrews Kurth
- ○ Archer & Greiner
- ○ Arent Fox
- ○ Arnall Golden
- ○ Arnold & Porter
- ○ Arnstein & Lehr
- ○ Baker & Hostetler
- ○ Baker & McKenzie
- ○ Baker Donelson
- ○ Ballard Spahr
- ○ Barnes & Thornburg
- ○ Benesch Friedlander

## Adams and Reese

**Largest U.S. Office: New Orleans**, 277 total full-time equivalent attorneys



Of all firms surveyed, billing rates for partners averaged **$604**.

Associate rates averaged **$370**.

## By the Numbers: The Firms Report Their Billing Rates

| Firm | Largest U.S. Office | Total FTE Attorneys | Partner High | Partner Average | Partner Low | Associate High | Associate Average | Associate Low |
|---|---|---|---|---|---|---|---|---|
| Debevoise & Plimpton | New York | 615 | $1,075 | $1,055 | $955 | $760 | $490 | $120 |
| Paul Weiss | New York | 803 | $1,120 | $1,040 | $760 | $760 | $600 | $250 |
| Skadden, Arps | New York | 1,735 | $1,150 | $1,035 | $845 | $845 | $620 | $340 |
| Fried Frank | New York | 476 | $1,100 | $1,000 | $930 | $760 | $595 | $375 |
| Latham & Watkins | New York | 2,033 | $1,110 | $990 | $895 | $725 | $605 | $465 |
| Gibson Dunn | New York | 1,086 | $1,800 | $980 | $765 | $930 | $590 | $175 |
| Davis Polk | New York | 787 | $985 | $975 | $850 | $975 | $615 | $130 |
| Willkie Farr | New York | 540 | $1,090 | $950 | $790 | $790 | $580 | $350 |
| Cadwalader | New York | 435 | $1,050 | $930 | $800 | $750 | $605 | $395 |
| Weil Gotshal | New York | 1,201 | $1,075 | $930 | $625 | $790 | $600 | $300 |
| Quinn Emanuel | New York | 697 | $1,075 | $915 | $810 | $675 | $410 | $320 |
| Wilmer | Washington | 961 | $1,250 | $905 | $735 | $695 | $290 | $75 |
| Dechert | New York | 803 | $1,095 | $900 | $670 | $735 | $530 | $395 |
| Andrews Kurth | Houston | 348 | $1,090 | $890 | $745 | $1,090 | $670 | $265 |

Full-time equivalent attorney numbers and the largest U.S. office are from the NLJ 350 published in April 2013. N/A** Data not available due to merger in 2013.

## Billing at the Top of the Market ...



## ... And the Bottom

Purchase the complete NLJ Law Firm Billing Survey from www.almlegalintel.com.

**By the Numbers: The Firms Report Their Billing Rates**

| Firm | Largest U.S. Office | Total FTE Attorneys | Partner High | Partner Average | Partner Low | Associate High | Associate Average | Associate Low |
|---|---|---|---|---|---|---|---|---|
| Buchalter Nemer | Los Angeles | 134 | $695 | $605 | $475 | $375 | $365 | $350 |
| Carlton Fields | Tampa, Fla. | 276 | $840 | $600 | $455 | | | |
| Foley & Lardner | Milwaukee | 872 | $860 | $600 | $405 | $470 | $335 | $210 |
| Perkins Coie | Seattle | 823 | $940 | $600 | $320 | $595 | $405 | $215 |
| Vinson & Elkins | Houston | 677 | $770 | $600 | $475 | $565 | $390 | $275 |
| Holland & Knight | Washington | 926 | $1,035 | $595 | $335 | $575 | $325 | $210 |
| McGuireWoods | Richmond, Va. | 941 | $725 | $595 | $450 | $525 | $360 | $285 |
| Bryan Cave | St. Louis | 990 | $860 | $590 | $405 | $570 | $405 | $210 |
| Nutter McClennen | Boston | 135 | $715 | $575 | $470 | $460 | $375 | $295 |
| Gibbons | Newark, N.J. | 210 | $865 | $560 | $440 | $475 | $360 | $295 |
| Cozen O'Connor | Philadelphia | 509 | $1,050 | $555 | $300 | $590 | $345 | $235 |
| Knobbe Martens | Irvine, Calif. | 268 | $785 | $555 | $440 | $535 | $345 | $295 |
| Kilpatrick Townsend | Atlanta | 552 | $775 | $550 | $400 | $475 | $385 | $315 |
| Littler Mendelson | San Francisco | 909 | $615 | $550 | $395 | $420 | $290 | $245 |

Full-time equivalent attorney numbers and the largest U.S. office are from the NLJ 350 published in April 2013. N/A** Data not available due to merger in 2013.



EXHIBIT C

**U.S. Department of Justice**
Office of Justice Programs



## Bureau of Justice Statistics
# Special Report

August 2008, NCJ 222989

# Civil Rights Complaints in U.S. District Courts, 1990-2006

Tracey Kyckelhahn and Thomas H. Cohen, Ph.D.
*BJS Statisticians*

After the expansion of civil rights laws in the early 1990s, the number of civil rights cases filed in U.S. district courts increased from 18,922 in 1990 to 43,278 in 1997. Civil rights filings stabilized in the late 1990s and early 2000s and subsequently declined. From 2003 through 2006, civil rights filings in federal district courts decreased by almost 20%. During this period of growth and stabilization in civil rights litigation, the percent of civil rights claims concluded by trial declined from 8% in 1990 to 3% in 2006.

Other major findings in this report include—

- Civil rights cases in U.S. district courts declined from a high of 17% of all federal civil cases in 1998 to 13% in 2006.

- From 1990 through 2006, about 9 out of 10 civil rights filings involved disputes between private parties.

- Jury trials became more common than bench trials during the 17-year period covered in this report (figure 1).

- The percent of plaintiffs who won at trial between 1990 and 2006 remained steady at about a third.

- From 2000 through 2006, the median damage award for plaintiffs who won in civil rights trials ranged from $114,000 to $154,500.

- The combined 2000 through 2006 median jury award was $146,125; the median bench award was $71,500.

This report addresses trends in civil rights litigation in federal district courts and the outcomes of civil rights disputes. Information is presented on civil rights complaints filed and terminated in U.S. district courts concerning employment, housing and accommodations, welfare, voting rights, and other types of discrimination. The report also focuses on

**Civil rights jury trials increasingly more common than bench trials in U.S. district courts, 1990-2006**

Number of civil rights cases concluded by jury or bench trial



Note: Directed verdicts not included.

*Figure 1*

civil rights cases concluded by trial and examines who wins in civil rights trials and the damages awarded to plaintiff winners.

A civil rights claim arises when an individual or group asserts they have been discriminated against on the basis of their race, sex, religion, age, physical limitation, or previous condition of servitude. Most litigants in civil rights disputes are required to seek administrative remedies involving federal agencies such as the Equal Employment Opportunity Commission (EEOC), in the case of employment discrimination, or the U.S. Department of Housing and Urban Development (HUD), in the case of housing discrimination. Litigants not satisfied with these administrative outcomes can file a civil rights lawsuit in the federal courts to seek monetary or injunctive relief.

This study does not cover civil rights grievances filed, investigated, and resolved through administrative channels and agencies that enforce various federal civil rights discrimination laws such as the EEOC or HUD. This report also does not examine civil rights litigation in state courts. Because of limited data this study does not report the number of cases filed or terminated under specific titles and sections of the U.S. code. (See *Methodology*).

### Civil rights laws underwent a major expansion during the early 1990s

Civil rights laws underwent a major expansion during the early 1990s with the passage of the Americans for Disabilities Act of 1990 and the Civil Rights Act of 1991. The Civil Rights Act of 1991 amended several federal employment discrimination laws including Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1871, the Age Discrimination in Employment Act of 1973, the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990. It also made available compensatory and punitive damages in certain discrimination claims, permitted jury trials for plaintiffs seeking monetary damages, and overturned several U.S. Supreme Court decisions, effectively broadening the scope of employment practices considered discriminatory.[*]

---

[*]*Wards Cove Packing Co. v. Atonio*, 109 S. Ct. 2115 (1989); *Patterson v. McLean Credit Union*, 109 S. Ct. 2363 (1989); *Martin v. Wilks*, 109 S. Ct. 2180 (1989); *Price Waterhouse v. Hopkins*, 109 S. Ct. 1775 (1989); *Lorance v. At&T Technologies*, 109 S. Ct. 2261 (1989); *Equal Employment Opportunity Commission v. Aramco*, 111 S. Ct. 1227 (1991); *West Virginia University Hospitals v. Casey*, 111 S. Ct. 1138 (1991).

### Civil rights cases represent declining proportion of federal civil caseloads

Throughout the 1990s, civil rights claims accounted for an increasing proportion of federal civil caseloads in U.S. district courts. As a percent of all federal civil filings, civil rights filings increased from 9% in 1990 to nearly 17% in 1998 (figure 2). Civil rights filings stabilized at about 16% of federal civil caseloads from 1999 through 2003 and subsequently declined. By 2006, 13% of federal civil cases involved civil rights issues.

### Employment discrimination accounted for about half of all civil rights filings in U.S. district courts from 1990 to 2006

*Employment discrimination*

Civil rights in an employment setting are violated when employers discriminate with regard to hiring, promotion or discharge practices, compensation, conditions and privileges of employment, or denial of employment opportunities (42 USC § 2000E-2; 29 USC §§ 621-634).

Throughout the 17-year period covered by this report, employment discrimination accounted for about half of all civil rights filings in U.S. district courts (figure 3). Civil rights cases involving employment discrimination demonstrated the same trend as overall civil rights filings with substantial increases in the 1990s. In 1990, 8,413 cases were filed with the number peaking at 23,796 in 1997. Employment discrimination filings stabilized between 1997 and 2004, and declined to 14,353 in 2006.



**Since 2003, civil rights cases have represented a declining proportion of federal civil caseloads**

Civil rights complaints as percentage of federal civil caseloads

*Figure 2*



**Civil rights cases involving employment discrimination demonstrated the same trend as civil rights cases overall, 1990-2006**

Number of civil rights cases filed in U.S. district courts

*Figure 3*

### Housing and accommodations

Pursuant to the Fair Housing Act of 1972 and amendments in 1988, discrimination is prohibited in the rental or lease of apartments, the sale of housing, and the financing of housing because of an individual's race, color, religion, sex, national origin, disability, or families with children. Complaints may also include discrimination in public accommodations such as restaurants or hotels (42 USC §§ 3601-3619; 15 USC § 1691).

Housing and accommodation civil rights claims represented 2% of all civil rights filings in 2006. These cases followed the same general trend as employment discrimination cases. There were 341 housing and accommodations related filings in 1990, a high of 1,315 filings in 2003, and a decline to 643 filings in 2006 (figure 4).

### Welfare and voting

A person's civil rights regarding welfare issues are violated when social security entitlements are denied based on an individual's race, color, religion, sex, or national origin. Violations of a person's civil rights related to welfare issues also include the denial of benefit income (e.g., annuity, pension, retirement, or disability benefit including veterans' compensation), the denial of rehabilitation and other services for families with dependent children, and the denial of benefits for individuals who are elderly, blind, or disabled, or whose income and resources are insufficient to meet the costs of necessary medical services.

Voting rights are violated when redistricting plans or election methods prevent minority voters from electing candidates of their choice. Situations related to voting rights violations include preventing voters from casting their ballots by denying them assistance or preventing voters from receiving assistance from a person of their choice. Failure to provide voting information and assistance in the language used by a substantial number of voters in a jurisdiction or failure to provide access to polling places for handicapped or elderly individuals are also situations related to voting rights violations (42 USC §§ 1973-1973e).

Civil rights cases involving welfare and voting issues did not follow the same general trend as housing and employment discrimination cases. Lawsuits involving welfare discrimination steadily declined from 129 to 56 cases between 1990 and 2006. In comparison, complaints alleging viola-

tions of voting rights peaked in 1992 and rose again in 2002. The increase in voting rights cases for these specific years was most likely the result of redistricting challenges following the 1990 and 2000 censuses. By 2006, the number of voting rights lawsuits had declined to about 150 cases.

### Other civil rights complaints

Available data on the statutory provisions litigated suggest that filings in the other civil rights complaints category dealt with diverse issues such as the civil rights of handicapped children, education of children and adults with disabilities, as well as vocational disabilities and rehabilitation discrimination.

Civil rights filings that were either unidentifiable or were in a category other than housing and accommodations, welfare, voting, and employment comprised about the same percentage of filings as those in the employment discrimination category. In 1990, 9,909 civil rights complaints listed as "other civil rights" were filed in U.S. district courts. From the mid-1990s through 2006, "other" filings remained constant at about 18,000 per year.



**Housing, voting rights, and welfare claims filed in U.S. district courts, 1990-2006**

Number of housing, voting, and welfare claims filed in U.S. district courts

*Figure 4*

## Most civil rights complaints involved private parties

From 1990 to 2006, around 9 in 10 civil rights filings involved disputes between private parties (table 1). The majority of private cases involved questions over interpretation and application of the U.S. Constitution, acts of Congress, or treaties ("federal question" jurisdiction) from parties in the same state.

"Diversity of citizenship" cases, which consisted of private parties from different states or parties of a state and citizens, corporations, or subjects of a foreign country, were a small percentage (under four percent) of private civil rights lawsuits filed during this period.

## Number of private civil rights lawsuits declined between 2004 and 2006

The number of civil rights lawsuits filed in U.S. district courts increased from 16,310 in 1990 to a peak of 40,361 in 1997 (not shown in table). Between 2004 and 2006 the number of filings declined 19%, from 37,374 to 30,405 (table 2). All categories of civil rights filings exhibited a decline over this two-year period.

## U.S. government more likely to be a defendant than a plaintiff

U.S. district courts exercise jurisdiction in civil actions that are either initiated by the U.S. government (U.S. plaintiff), or are brought against the U.S. government (U.S. defendant) for alleged civil rights violations. (28 USC § 1345; 28 USC § 1346).

Of the approximately 10% of civil rights filings that involved the U.S. government, cases in which the government was the defendant accounted for around 70% to 80% of civil rights filings from 1990 to 2006 (table 3). In 2006, 1,961 civil rights complaints were filed against the U.S. government, representing a 17% decline in the number of filings since 2000. As with overall case filings, about an equal percentage of employment discrimination and "other" cases involving civil rights violations were filed from 1990 to 2006, representing the majority of cases overall.

In comparison to filings involving two private parties or the U.S. government as the defendant, complaints filed by the U.S. government as the plaintiff did not show a clear trend between 1990 and 2006. Filings ranged from a high of 816

in 1991 to a low of 486 in 1996 (not shown in table). Since 2000, the number of civil rights cases filed by the U.S. government has declined by 21%. Cases in the "other" category accounted for a much smaller percentage of cases filed by the U.S. government, compared to private party and U.S. as defendant filings.

### Table 1. Federal subject matter jurisdiction of civil rights complaints filed in U.S. district courts, 1990-2006

| | | | Federal subject matter jurisdiction | | | |
| | | | Cases involving the U.S. government as— | | Private cases | |
| Year | Total cases filed | Total percent | Plaintiff | Defendant | Federal question | Diversity of citizenship |
|---|---|---|---|---|---|---|
| 1990 | 18,793 | 100% | 4.0 | 9.2 | 86.8 | -- |
| 1995 | 36,600 | 100% | 1.8 | 6.4 | 91.7 | -- |
| 2000 | 40,908 | 100% | 1.5 | 5.8 | 89.6 | 3.1 |
| 2001 | 40,910 | 100% | 1.7 | 5.7 | 89.7 | 2.9 |
| 2002 | 40,420 | 100% | 1.6 | 5.9 | 89.5 | 3.0 |
| 2003 | 40,516 | 100% | 1.5 | 5.7 | 90.1 | 2.7 |
| 2004 | 40,239 | 100% | 1.5 | 5.6 | 91.6 | 1.3 |
| 2005 | 36,096 | 100% | 1.5 | 6.0 | 91.8 | 0.7 |
| 2006 | 32,865 | 100% | 1.5 | 6.0 | 92.1 | 0.3 |

Note: Does not include prisoner petitions.
-- No cases recorded.
Source: Annual Report of the Director. Washington, D.C.: Administrative Office of the U.S. Courts (table C-2).

### Table 2. Civil rights complaints involving a private suit filed in U.S. district courts, by type, 1990-2006

| | | Type of civil rights complaints involving private suits | | | | |
| Year | Total number | Employment | Voting | Housing | Welfare | Other* |
|---|---|---|---|---|---|---|
| 1990 | 16,310 | 6,936 | 114 | 284 | 107 | 8,869 |
| 1995 | 33,574 | 17,374 | 188 | 582 | 103 | 15,327 |
| 2000 | 37,888 | 19,245 | 141 | 1,202 | 73 | 17,227 |
| 2001 | 37,878 | 19,371 | 173 | 1,151 | 53 | 17,130 |
| 2002 | 37,391 | 19,225 | 209 | 1,231 | 61 | 16,665 |
| 2003 | 37,602 | 18,768 | 139 | 1,261 | 63 | 17,371 |
| 2004 | 37,374 | 18,040 | 152 | 1,169 | 54 | 17,959 |
| 2005 | 33,390 | 15,344 | 143 | 821 | 48 | 17,034 |
| 2006 | 30,405 | 13,042 | 122 | 593 | 49 | 16,599 |

*Types of civil rights cases within the "other" category cannot be distinguished.
Source: Annual Report of the Director. Washington, D.C.: Administrative Office of the U.S. Courts (table C-2).

## Percent of civil rights cases concluded by trial declined from 8% in 1990 to 3% in 2006

Of the 17,985 civil rights complaints disposed in 1990, 8% were terminated by trial, while in 2006, 3% of the 33,108 civil rights claims concluded in federal courts ended in a trial (table 4). Other cases concluded by a judgment remained steady during this period at about a quarter of terminations. This category of terminations included judgment by defaults, consent, motions before trial, and judgments through formal arbitration procedures adopted by the court.

The percentage of civil rights cases dismissed from U.S. district courts increased from 66% in 1990 to 75% in 2003, and decreased slightly to 72% in 2006. Civil rights dismissals followed the same trend as out of court settlements and voluntary dismissals. Out of court settlements rose from 31% to 39% of all civil rights dispositions between 1990 and 2003. Voluntary dismissals increased from 8% to 13% of all civil rights dispositions between 1990 to 2003. Since 2003, both the settlement and voluntary disposition categories have declined slightly. Settlements accounted for 37% and voluntary dismissals accounted for 11% of civil rights dispositions by 2006.

The proportion of civil rights dismissals which occurred due to lack of jurisdiction declined from 8% in 1990 to 2% in 2006. From 1990 to 2006, civil rights cases dismissed because of want of prosecution remained at about 4%.

In 1990, welfare civil rights cases (3%) were the least likely to go to trial while employment discrimination cases (9%) were the most likely to reach trial (table 5). In 2006 the percent of civil rights cases ending in trial exhibited a smaller range across all categories, varying between two and three percent.

### Table 3. Civil rights complaints with the U.S. government involved as plaintiff or defendant filed in U.S. district courts, by type, 1990-2006

| Year | | U.S. government as plaintiff | | | | | | U.S. government as defendant | | | | |
|------|-------|------------|-------|---------|---------|--------|-------|------------|-------|---------|---------|--------|
| | Total | Employment | Voting | Housing | Welfare | Other* | Total | Employment | Voting | Housing | Welfare | Other* |
| 1990 | 747 | 601 | 10 | 37 | 5 | 94 | 1,736 | 876 | 6 | 20 | 17 | 817 |
| 1995 | 668 | 410 | 8 | 115 | -- | 135 | 2,358 | 1,275 | 12 | 38 | 13 | 1,020 |
| 2000 | 633 | 425 | 16 | 50 | -- | 142 | 2,387 | 1,362 | 10 | 32 | 7 | 976 |
| 2001 | 710 | 516 | 7 | 55 | 1 | 131 | 2,322 | 1,270 | 15 | 43 | 7 | 987 |
| 2002 | 649 | 464 | 8 | 55 | 1 | 121 | 2,380 | 1,266 | 17 | 27 | 9 | 1,061 |
| 2003 | 599 | 445 | 3 | 34 | -- | 117 | 2,315 | 1,294 | 5 | 20 | 2 | 994 |
| 2004 | 603 | 435 | 12 | 35 | 1 | 120 | 2,262 | 1,271 | 9 | 18 | 6 | 958 |
| 2005 | 534 | 420 | 8 | 42 | -- | 64 | 2,172 | 1,166 | 15 | 22 | 6 | 963 |
| 2006 | 499 | 373 | 16 | 32 | -- | 78 | 1,961 | 938 | 12 | 18 | 7 | 986 |

*Types of civil rights cases within the "other" category cannot be distinguished.
-- No cases recorded.
Source: Annual Report of the Director. Washington, D.C.: Administrative Office of the U.S. Courts (table C-2).

### Table 4. Civil rights cases concluded in U.S. district courts, by disposition, 1990-2006

| Year | Number of complaints disposed[a] | Percent of cases disposed | | | | | | | | |
|------|---------------------|-------|---------|-----------|---------------------|---------------------|-------|-------|--------|--------|
| | | Dismissed | | | | | | Judgment | | |
| | | Total | Settled | Voluntary | Lack of jurisdiction | Want of prosecution | Other | Total | Trial[b] | Other[c] |
| 1990 | 17,985 | 66.2% | 30.7% | 8.1% | 8.3% | 5.0% | 14.1% | 33.8% | 7.6% | 26.2% |
| 1995 | 30,175 | 69.4 | 33.4 | 11.8 | 2.0 | 4.1 | 18.1 | 30.6 | 6.0 | 24.6 |
| 2000 | 39,941 | 72.3 | 37.6 | 11.9 | 1.7 | 4.1 | 17.0 | 27.7 | 4.1 | 23.6 |
| 2001 | 38,612 | 73.9 | 38.9 | 12.2 | 1.8 | 4.0 | 17.0 | 26.1 | 3.8 | 22.3 |
| 2002 | 38,551 | 74.2 | 37.8 | 12.7 | 1.8 | 4.0 | 17.8 | 25.8 | 3.6 | 22.3 |
| 2003 | 37,624 | 74.7 | 38.5 | 12.8 | 1.9 | 4.0 | 17.5 | 25.3 | 3.4 | 22.0 |
| 2004 | 37,407 | 73.8 | 37.6 | 12.0 | 1.8 | 4.0 | 18.5 | 26.2 | 2.9 | 23.3 |
| 2005 | 36,929 | 73.6 | 38.1 | 11.8 | 1.7 | 4.1 | 17.9 | 26.4 | 3.0 | 23.5 |
| 2006 | 33,108 | 72.0 | 37.0 | 11.4 | 1.7 | 4.4 | 17.6 | 28.0 | 3.0 | 25.0 |

Note: Does not include prisoner petitions. Percentages may not sum to total due to rounding.
[a] Excludes transfers, remands, and statistical closures.
[b] Trial includes cases disposed of by jury trial, bench trial, and directed verdict. In some cases, the parties may have settled before the completion of the trial.
[c] Includes judgments by default, consent, a motion before trial, judgment of arbitrator or by some other final judgment method.
Source: Administrative Office of the U.S. Courts, Civil Master File.

**Jury trials increased as a percent of all trials**

A jury trial is held before a jury—a selected body of persons sworn to give their verdict according to the evidence—and presided over by a judge. A bench trial is held in the absence of a jury and decided by a judge.

Jury and bench trials each accounted for about half of all civil rights trials concluded in federal district courts in 1990 (figure 1). By 2006, jury trials accounted for 87% of civil rights trials. The growth of jury trials can be partially attributed to Title VII of the Civil Rights Act of 1991, which allowed jury trials when a plaintiff sought punitive or compensatory damages in employment discrimination cases.

The percentage of employment discrimination trials involving a jury increased from 40% in 1990 to 86% in 2006 (not shown in a table). The percentage of other civil rights cases disposed of by jury trial increased from 66% in 1990 to 86% in 2006.

**On average, plaintiffs won a third of civil rights cases from 1990 to 2006; median damage awards ranged from $114,000 to $154,500**

While the percent of civil rights cases terminated by trial declined, about a third of plaintiffs won their case at trial from 1990 to 2006 (table 6). The percent of plaintiff winners who received monetary damages declined from 83% in 1990 to 79% in 2006.

The estimated median damages awarded to plaintiffs showed no discernible pattern during the period covered by this report. Since 1990 the median damage awards have ranged from $114,000 in 2001 to $154,500 in 2005. In 2006 the median damages awarded to plaintiffs prevailing in civil rights trials was $150,000.

Civil rights complaints brought under Title VII of the Civil Rights Act of 1964 or the Americans with Disabilities Act of 1990 typically involve a compensatory award for economic damages. Damages may include losses associated with back pay, interest on back pay, lost benefits, attorney fees, some litigation costs, or other financial losses that the court deems appropriate as a result of the defendant's conduct.

The Civil Rights Act of 1991 extended the type of damages that could be sought by plaintiffs by allowing claims for non-economic compensatory damages and punitive damages. Non-economic compensatory damages reimburse the plaintiff for losses such as emotional pain, suffering, inconvenience, mental anguish, future monetary losses, as well as loss of enjoyment of life. Punitive damages are intended to punish a defendant who acted with recklessness, malice, or deceit, and can be awarded in addition to compensatory damages.

The Civil Rights Act of 1991 placed a cap on the total amount of compensatory and punitive damages that can be awarded, based on the size of the employer. The cap on awards does not apply to complaints of ethnic or racial discrimination.

Award amounts include both compensatory and punitive damages. For this report, the types of award amounts cannot be distinguished in the data. Monetary information presented in this report is for civil rights cases in which damages were awarded. Excluded from this analysis were civil rights complaints in which only court costs and/or attorneys fees were awarded.

**Table 5. Disposition of civil rights complaints concluded by trial by case type, in U.S. district courts, 1990 and 2006**

| | 1990 | | 2006 | |
|---|---|---|---|---|
| Case type | Number of complaints disposed | Percent concluded by trial* | Number of complaints disposed | Percent concluded by trial* |
| Employment | 8,206 | 8.7% | 15,950 | 3.2% |
| Housing | 290 | 6.6 | 718 | 2.2 |
| Voting | 125 | 5.6 | 118 | 2.5 |
| Welfare | 120 | 3.3 | 41 | 2.4 |
| Other | 9,244 | 6.8 | 16,281 | 2.8 |

Source: Administrative Office of the U.S. Courts, Civil Master File.
*Includes jury trials, bench trials, and directed verdicts.

**Table 6. Plaintiff winners and award amounts in civil rights complaints concluded by trial in U.S. district courts, 1990-2006**

| | | | Monetary awards | |
|---|---|---|---|---|
| Year | Number of cases terminated by trial[a] | Percent plaintiff winners[b] | Percent of plaintiff winners receiving monetary awards | Estimated median awards[b] |
| 1990 | 1,321 | 29.0% | 82.8% | ... |
| 1995 | 1,727 | 27.2 | 81.5 | $128,000 |
| 2000 | 1,600 | 34.1 | 76.3 | 152,100 |
| 2001 | 1,411 | 35.4 | 79.2 | 114,000 |
| 2002 | 1,314 | 32.3 | 76.7 | 120,400 |
| 2003 | 1,183 | 31.0 | 76.0 | 129,250 |
| 2004 | 951 | 30.8 | 76.8 | 128,400 |
| 2005 | 830 | 31.9 | 73.6 | 154,500 |
| 2006 | 717 | 30.8 | 78.7 | 150,000 |

... Not reported for the year 1990.
[a]Includes jury trials, bench trials, and directed verdicts.
[b]Civil rights trials in which both the plaintiff and the defendant won were excluded from the plaintiff winner and award calculation. Awards adjusted for inflation to 2006 dollars.
Source: Administrative Office of the U.S. Courts, Civil Master File.

**Jury awards higher than bench awards**

A comparison of civil rights bench and jury trials necessitated combining trial data for the years 2000 through 2006 because of the limited number of bench trials concluded during this time period. The rate in which plaintiffs prevailed at trial did not differ appreciably between jury and bench trials. Plaintiffs won in about a third of trials litigated before either a jury or judge (table 7). Bench trials awarded monetary damages to 59% of plaintiff winners and jury trials awarded monetary damages to 81% of plaintiff winners from 2000 to 2006.

Cases disposed of by jury trial had a median award of $146,125. In comparison, cases disposed of by bench trial had a median award of $71,500. The 25th percentile for jury trials was $39,925 and the 75th percentile was $380,188. For bench trials, the 25th percentile was $17,880 and the 75th percentile was $292,500 (percentile data not shown in table).

**Employment discrimination plaintiff winners more likely to receive a monetary award**

In all civil rights trials concluded between 2000 and 2006, employment discrimination plaintiff winners (81%) were most likely to receive a monetary award, followed by housing cases (74%), and other civil rights cases (72%).

Employment discrimination cases received a median award of $158,460 for cases concluded by trial between 2000 and 2006. The 25th percentile for employment discrimination cases was $52,065 and the 75th percentile was $374,265 (percentile data not shown in table). The median damage award for civil rights trials in the "other civil rights" category was $100,000. For other civil rights cases, the 25th percentile was $21,400 and the 75th percentile was $351,000.

**Case processing time constant between 1990 and 2006**

The median number of months from filing to disposition for civil rights cases terminated in federal district courts varied slightly between 9 and 11 months from 1990 to 2006 (table 8). Employment discrimination cases generally had the longest median case processing time, varying between 11 and 13 months (not shown in table).

---

**Table 7. Plaintiff winners and median awards for civil rights cases concluded by trial or case type in U.S. district courts, 2000-2006**

| Trial or case type | Number of cases terminated by trial[a] | Percent plaintiff winners[b] | Monetary awards | |
|---|---|---|---|---|
| | | | Percent of plaintiff winners receiving monetary awards | Median awards[b] |
| **Trial type** | | | | |
| Jury | 5,760 | 33.9% | 80.7% | $146,125 |
| Bench | 1,218 | 33.3 | 59.0 | 71,500 |
| **Case type[c]** | | | | |
| Employment | 3,809 | 36.7% | 80.9% | $158,460 |
| Housing | 115 | 42.6 | 73.5 | ... |
| Other | 3,013 | 29.7 | 71.6 | 100,000 |

Note: Civil rights trial data combine the years 2000 through 2006.

[a]Includes jury trials, bench trials, and directed verdicts.

[b]Civil rights trials in which both the plaintiff and the defendant won were excluded from the plaintiff winner and award calculation. Awards adjusted for inflation to 2006 dollars.

[c]Voting rights and welfare cases were too few to provide reliable data.

...Too few cases to calculate median award.

Source: Administrative Office of the U.S. Courts, Civil Master File.

---

**Table 8. Number of months from filing of complaint to disposition among civil rights cases concluded in U.S. district courts, 1990-2006**

| Year | Number disposed | Months | |
|---|---|---|---|
| | | Median | Mean |
| 1990 | 17,985 | 11.0 | 15.1 |
| 1995 | 30,175 | 9.8 | 12.6 |
| 2000 | 39,941 | 10.9 | 13.4 |
| 2001 | 38,612 | 10.6 | 13.0 |
| 2002 | 38,551 | 10.6 | 13.0 |
| 2003 | 37,624 | 10.6 | 13.3 |
| 2004 | 37,407 | 10.5 | 13.1 |
| 2005 | 36,929 | 10.7 | 13.2 |
| 2006 | 33,108 | 11.0 | 13.6 |

Source: Administrative Office of the U.S. Courts, Civil Master File.

**Prisoner petitions in state and federal courts, 1990-2006**

Various legislation and U.S. Supreme Court cases have allowed state and federal inmates to sue for violations of certain constitutional rights.

• In 1941, prisoners were permitted to file claims against state officials for violations of constitutional rights, including the right to religious freedom, freedom of speech and association, due process, racial discrimination, and cruel and unusual punishment. (*Ex parte Hull*, 312 U.S. 546 (1941))

• The U.S. Supreme Court granted inmates the right to bring lawsuits against federal officials who violate their constitutional rights in 1963. (*United States v. Muniz*, 374 U.S. 150 (1963))

From 1990 to 1996, prisoner petitions by federal inmates varied from about 900 to 1,200, with a high of 1,219 in 1996. Petitions from state inmates increased from 24,843 to 39,996. Total filings showed a steady increase from 25,992 in 1990 to 41,215 in 1996.

Following the passage of the Prison Litigation Reform Act of 1996, which restricted the rights of inmates to sue in federal court, complaints filed by federal (20%) and state (31%) inmates declined in 1997.

From 1999 to 2006, the number of civil rights prison petitions filed in U.S. district courts stabilized at about 24,500 cases filed on average per year. Prison petitions involving state inmates declined by 7% from 24,732 filings in 1999 to 23,122 filings in 2006. In comparison, federal inmate prison petitions increased from 962 filings in 1999 to 1,334 filings in 2004 and declined to 1,116 filings by 2006.

**State prison petitions declined after the Prison Litigation Reform Act of 1996**

Number of prisoner petitions filed in U.S. district courts

Note: Includes prisoner petitions involving civil rights and prison condition claims.

*Figure 5*

**Federal prisoner petitions filed in U.S. district courts ranged from a low of 910 in 1992 to a high of 1,334 in 2004**

Number of federal prisoner petitions filed in U.S. district courts

Note: Includes prisoner petitions involving civil rights and prison condition claims.

*Figure 6*

## Methodology

The primary source of data presented in this report is the Administrative Office of the U.S. Courts (AOUSC) Civil Master File. Data tabulations were prepared from the BJS staff analysis of source agency data sets. The federal civil rights categories used in this report were based on the codes established by the Administrative Office of the United States Courts. Case level information was provided by individual U.S. district courts that submitted data to the AOUSC. No detailed information was available on civil rights cases coded as "other". For civil rights cases that involved filing more than one action, the AOUSC instructed the plaintiff's attorney to select the most definitive code if the cause fit more than one nature of the lawsuit. It was the first nature of suit code that was used in the analysis for this report.

For civil rights complaints where more than one basis of jurisdiction applied, the case was coded according to the highest priority jurisdiction. Cases in which the U.S. government as plaintiff have the highest priority, followed by the U.S. government as defendant, and federal questions.

Calculations pertaining to trial winners and their award amounts were based on cases in which the winner and award amount were known and did not include instances where both parties won the case in part. Differences between known amounts and unknown amounts were not quantifiable.

The percent of cases concluded by jury trial, bench trial, and directed verdict was calculated using the disposition variable available in the AOUSC data (per the recommendation of the AOUSC). Because a previous BJS report used the procedural progress variable, the percents and number of cases may vary slightly between reports.

Although the courts record the title and section of the U.S. code for each case, this data field is not required by the AOUSC Statistics Division. It is not recommended for statistical analysis. For a more detailed explanation of the difficulties associated with the title and section fields of the AOUSC civil file, see the Report to the Subcommittee on Judicial Statistics on "Increase in Civil Rights Filings", prepared by the Analytical Services Office of AOUSC.

### Fiscal years

The AOUSC reports on federal caseloads by fiscal year rather than calendar year. The period covered by a fiscal year changed in 1992. Prior to 1992 the fiscal year started on July 1 and ended on June 30 of the next year. The change in 1992 resulted in the fiscal year beginning on October 1 and ending on September 30.

Earlier BJS reports on civil rights cases terminated in U.S. district courts were not modified to reflect the current definition. This report modifies slightly the findings of those earlier BJS reports. Data for fiscal years 1990 to 1992 use October 1 through September 30 as the fiscal year.

For a discussion of findings from earlier BJS studies on Civil Rights litigation in U.S. district courts, see *Civil Rights Complaints in U.S. District Courts, 1990-98* (NCJ 173427) at <http://www.ojp.usdoj.gov/bjs/abstract/crcusdc.htm> and *Civil Rights Complaints in U.S. District Courts, 2000* (NCJ 193979) at <http://www.ojp.usdoj.gov/bjs/abstract/crcus00.htm>.

### Damage awards

Damage award amounts are presented as estimates limited by data coverage and quality issues. For further information about award variables see the AOUSC codebook at the National Archive of Criminal Justice Data <http://www.icpsr.umich.edu/NACJD/index. html>; the codebook is archived with studies 4026 and 4059.

**Selected federal civil rights statutes**

**Employment**

*The Civil Rights Acts of 1866 and 1871* were established to enforce the 13th, 14th, and 15th amendments to the U.S. Constitution following the U.S. Civil War (1861-1865). The 1866 act prohibits racial discrimination in the making and enforcement of contracts among public and private employers. The 1871 act deals with civil rights violations by government entities. The civil rights acts have been increasingly used in employment discrimination cases.

*The Equal Pay Act of 1963* requires employers to pay men and women equal pay for equal working conditions.

*Title VII of the Civil Rights Act of 1964* prohibits employers with 15 employees or more from discriminating on the basis of race, color, religion, sex, or national origin.

*The Age Discrimination in Employment Act of 1967* prohibits discrimination on the basis of age against persons 40 years of age or older. This act applies to employers with 20 employees or more. This Act was amended by the *Older Workers Benefit Protection Act* in 1990 to ensure that older workers have complete and accurate information about their benefits and are not pressured into waiving their rights under the Age Discrimination in Employment Act (ADEA).

*The Rehabilitation Act of 1973* prohibits government contractors with contracts of $2,500 or more from discriminating against individuals with physical or mental handicaps. Government contracts pursuant to Executive Order 11246 must contain an equal opportunity clause and must develop and maintain an affirmative action plan. Vietnam veterans may benefit from affirmative action plans in government contracts under the *Vietnam Veterans Readjustment Assistance Act of 1974*, and the employment of aliens is dealt with in the *Immigration Reform and Control Act*.

*The Pregnancy Discrimination Act of 1978* amended Title VII to prohibit discrimination against employees or job applicants on the basis of pregnancy and required employers to treat pregnant employees in the same way as employees with medical disabilities.

*The Americans with Disabilities Act of 1990* prohibits discrimination against individuals with disabilities in employment, public services, and public accommodations.

*The Civil Rights Act of 1991* amended several of the federal employment discrimination laws including Title VII of the *Civil Rights Act of 1964, the Civil Rights Act of 1866, the ADEA, the Rehabilitation Act,* and the *Americans with Disabilities Act* (ADA).

The act amended Title VII and the ADA to provide the right to a jury trial and punitive damages (not to exceed $300,000); it amended the *Civil Rights Act of 1866* to prohibit racial harassment in the workplace and in post-hire employment conduct rather than just in hiring and promotions.

**Housing and accommodations**

*The Civil Rights Act of 1866* ensures that all citizens of the U.S. shall have the same right, in every state and territory, as is enjoyed by white citizens to inherit, purchase, lease, sell, hold, and convey real and personal property.

*The Fair Housing Act* prohibits discrimination in various types of housing transactions such as sales, renting, and financing on the basis of race, religion, sex, or national origin. *The Fair Housing Amendments Act of 1988* expanded the *Fair Housing Act* to prohibit discriminatory housing practices based on handicap and familial status and provided for enhanced government enforcement of the act, including the recovery of monetary penalties in cases where discrimination is found.

*The Equal Credit Opportunity Act* prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age, because all or part of the applicant's income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

*Title II of the Civil Rights Act of 1964* prohibits discrimination based on race, color, religion, and national origin in places or public accommodation, such as hotels, restaurants, and certain places of entertainment.

**Voting**

*The Voting Rights Act of 1965* protects racial and language minorities from discrimination in the electoral process and from being denied the fair opportunity to elect candidates of their choice.

*The Voting Accessibility for the Elderly and Handicapped Act of 1984* ensures access for handicapped and elderly individuals to polling places for federal elections.

*The Uniformed and Overseas Citizens Absentee Voting Act of 1986* enables members of the Armed Forces and other U.S. citizens who are abroad to register and vote absentee in presidential congressional elections.

*The National Voter Registration Act of 1993* commonly referred to as *the Motor Voter Law,* improves the access to voter registration by requiring states to provide simultaneous voter registration and driver's license applications, provide a mail-in application, and make registration available at various government agencies.

**BJS**

# For electronic versions of this report, visit the BJS website

### *http://www.ojp.usdoj.gov/bjs*

To order paper copies of this or other BJS reports —

- Visit
  *http://www.ncjrs.gov/app/publications/bjspubs.aspx*

- Call 1-800-851-3420

Download datasets and documentation from
the National Archive of Criminal Justice Data —

*http://www.icpsr.umich.edu/NACJD/index.html*

---

# Keep current on criminal justice issues

**Get notices and newsletters:**

**JUSTSTATS**

E-mail notifications of new statistical materials from BJS, the FBI,
and the Office of Juvenile Justice and Delinquency Prevention.
        To subscribe, see http://www.ojp.usdoj.gov/bjs/juststats.htm

**JUSTINFO**

A biweekly electronic newsletter from the National Criminal Justice Reference
Service (NCJRS) with news from BJS, NCJRS, and the other agencies in the
Office of Justice Programs.

        To subscribe, see http://www.ncjrs.gov/subreg.html

**U.S. Department of Justice**
Office of Justice Programs
Bureau of Justice Statistics

Washington, DC 20531

Official Business
Penalty for Private Use $300

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/BJS
Permit No. G-91

---

This report in portable document format and in ASCII and its related statistical data and tables are available at the BJS World Wide Web Internet site: <http://www.ojp.usdoj.gov/bjs/abstract/crcusdc06.htm>

**Office of Justice Programs**

*Innovation • Partnerships • Safer Neighborhoods*
http://www.ojp.usdoj.gov

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Jeffrey L. Sedgwick is director.

This Special Report was written by Tracey Kyckelhahn and Thomas H. Cohen, Ph.D. Sean P. Rosenmerkel verified the report.

Georgette Walsh edited the report, Tina Dorsey produced the report, and Jayne Robinson prepared the report for final printing under the supervision of Doris J. James.

August 2008, NCJ 222989



EXHIBIT D

HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM OSTLING, individually and as
Personal Representative of the Estate of
DOUGLAS OSTLING, deceased; JOYCE
OSTLING; and TAMARA OSTLING,

　　　　　　　　Plaintiffs,

　　　　v.

CITY OF BAINBRIDGE ISLAND, a
political subdivision of the State of
Washington; JON FEHLMAN; and JEFF
BENKERT,

　　　　　　　　Defendants.

CASE NO. 3:11-cv-05219-RBL

ORDER RE: ATTORNEYS' FEES
AND COSTS

## I.　INTRODUCTION

THIS MATTER is before the Court on Plaintiffs' Motion for Attorneys' Fees and Costs [Dkt. #155]. The case arises out of the death of Douglas Ostling, a mentally ill man who was shot in his home by Bainbridge Island police officers. A jury awarded Plaintiffs one million dollars in damages on a failure-to-train claim and a claim of deprivation of familial companionship. The jury rejected Plaintiffs' unlawful search, excessive force, and failure-to-aid claims.

The parties dispute the amount of the attorneys' fees and costs. Plaintiffs request fees at their hourly rate plus a 1.5 multiplier based on the novelty of the failure-to-train claim, for a total award of $688,535.83. Defendants argue that fees are not warranted, or alternatively, that fees should be reduced by one half, for a total of $137,653.90, because Plaintiffs prevailed on only one of their four claims. For the reasons set forth below, the Court awards Plaintiffs' fees and costs in the amount of $392,401.84.

## II.   DISCUSSION

### A.  Plaintiffs are a Prevailing Party

Absent unusual circumstances, the Court shall award reasonable attorneys' fees and costs under 42 U.S.C. § 1988 to prevailing parties in civil rights cases.  Plaintiffs are "prevailing parties" for attorneys' fees purposes if they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (citations omitted).

The jury awarded Plaintiffs a one million dollar verdict on their failure-to-train claim.  In light of the Court's denial of Defendants' Motion for Judgment as a Matter of Law [Dkt. #148] and Defendants' Motion for a New Trial [Dkt. #151], Plaintiffs' one million dollar verdict is certainly a success on a significant issue.  Plaintiffs are a prevailing party and shall be awarded reasonable fees.  The issue is what fees are reasonable.

### B.  Reasonable Fees

The first step in determining reasonable fees is to calculate the lodestar figure, by taking the number of hours reasonably expended on the litigation and multiplying it by the appropriate hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The Court should exclude overstaffed, redundant, or unnecessary time. *Id.* at 434.  The Court must also consider the extent

1  of Plaintiffs' success, as that is a "crucial factor" in determining an appropriate award. *Id.* at

2  440.

3        After determining the lodestar figure, the Court should then determine whether to adjust

4  the lodestar figure up or down based on any *Kerr* factors that have not been subsumed in the

5  lodestar calculation.[1]  *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975) *cert.*

6  *denied*, 425 U.S. 951 (1976).

7                    **1.  Reasonable Hourly Rate**

8        In determining hourly rates, the Court must look to the "prevailing market rates in the

9  relevant community." *Bell v. Clackamas County*, 341 F.3d 858, 868 (9th Cir. 2003).  The rates

10  of comparable attorneys in the forum district are usually used.  *See Gates v. Deukmejian*, 987

11  F.2d 1392, 1405 (9th Cir. 1992).  In making its calculation, the Court should also consider the

12  experience, skill, and reputation of the attorney requesting fees. *Schwarz v. Sec'y of Health &*

13  *Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995).  The Court is allowed to rely on its own

14  knowledge and familiarity with the legal market in setting a reasonable hourly rate. *Ingram v.*

15  *Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).

16        Plaintiffs propose rates for associates at $325 and $350, and for a partner at $550, based

17  on a survey for attorneys in the greater Seattle area, specifically at law firms Perkins Coie and

18  Lane Powell.  Defendants respond that the rates are not comparable because Perkins Coie and

19  Lane Powell are large, international law firms, not plaintiff-side, contingency-based tort firms.

20  _____

21  [1] The twelve *Kerr* factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions
22  involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the
    attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time
    limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the
23  experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of
    the professional relationship with the client, and (12) awards in similar cases. *Kerr v. Screen Extras Guild, Inc.*, 526
24  F.2d 67, 69-70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976). These considerations are consistent with
    Washington Rule of Professional Conduct 1.5.

1   Even though those firms have a significant litigation practice, the similarities with Plaintiffs'

2   firm are limited.  That said, Defendants do not propose a more appropriate rate.  Instead,

3   Defendants suggest the discrepancies should affect the proposed multiplier.

4          The Court will leave the rate as suggested by Plaintiffs ($325 for first chair associate

5   Nathan Roberts; $350 for second chair associate Julie Kays; $550 for consultant partner John

6   Connelly; and $125 for litigation paralegal Pamela Wells).  The Court notes that it allowed

7   similar rates in a prior case involving local contingency-fee attorneys.  *Cornhusker v. Kachman*,

8   No. 2:09-cv-00273-RBL, 2009 WL 2853119, at *4 (W.D. Wash. Sept. 1, 2009) (rates between

9   $350-$450).  *See also Ryan v. Dreyfus*, 2010 WL 1692057, at *5 (W.D. Wash. Apr. 26, 2010)

10  ($350 rate for civil rights plaintiffs' attorney).  The proposed rates are reasonable.

11                **2.   Reasonable Number of Hours**

12         Defendants argue that Plaintiffs' fee request is unreasonable because Plaintiffs lost on a

13  majority of their claims, and because many hours are redundant or unnecessary.  Plaintiffs argue

14  their request is reasonable because they billed half the hours of Defense counsel and prevailed on

15  the significant failure-to-train claim.

16          "By and large, the court should defer to the winning lawyer's professional judgment as

17  to how much time he was required to spend on the case; after all, he won, and might not have,

18  had he been more of a slacker."  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir.

19  2008).  In determining the reasonable number of hours, the Court may exclude those hours that

20  are excessive, redundant, or otherwise unnecessary.  *Hensley v. Eckerhart*, 461 U.S. 424, 434

21  (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007).

22             *a.   Claim by Claim*

23         Defendants argue that hours billed for successful claims should be separated from hours

24  billed for unsuccessful claims.  When the claims arise from a "common core of facts," however,

1   the Court will not evaluate the hours spent on each claim, as "[m]uch of counsel's time will be

2   devoted generally to the litigation as a whole, making it difficult to divide the hours expended on

3   a claim-by-claim basis." *Hensley,* 461 U.S. at 435. Plaintiffs' claims all arise from the same set

4   of facts—the shooting and death of Douglas Ostling. Thus, the Court will not parse hours claim

5   by claim.

6          *b.  Non-Contemporaneous Billing; Fees on Fees; Paralegal Fees*

7          Defendants argue that the Court should exercise its discretion and deny fees because

8   Plaintiffs' counsel did not maintain contemporaneous billing. But, as Defendants note,

9   contemporaneous billing is not mandatory in the Ninth Circuit. In preparing the fee request,

10  Plaintiffs' counsel reviewed their notes and correspondence. The Court declines to deny fees on

11  those grounds.

12         Defendants also argue that the hours Plaintiffs spent working on their fee request should

13  be denied. As Plaintiffs note, however, "[w]ork performed on a motion for fees under § 1988(b)

14  is compensable." *McGrath v. County of Nevada,* 67 F.3d 248, 253 (9th Cir. 1995). The hours

15  billed working on the fee request is minimal and is awarded.

16         Finally, the Court awards fees for paralegal Pamela Wells. *Missouri v. Jenkins by Agyei,*

17  491 U.S. 274, 288 (1989) (approving award of paralegal fees).

18         *c.  Multiple Attorneys*

19         Defendants' main contention is that Plaintiffs' counsel requests hours where multiple

20  attorneys were not necessary, specifically at depositions and through the participation of a senior

21  partner. Plaintiffs respond that the hours reflect the teamwork needed to pursue this case.

22         Multiple Plaintiffs' attorneys were present at most stages of this litigation. Because Mr.

23  Roberts is billing at the rate of an experienced associate (a rate earned through good, first-chair

24  quality work), the Court strikes the supporting attorneys' hours at depositions, as well as the

senior partner's hours observing trial. This teamwork appears to be redundant and supervisory in nature, and would not normally be billed to a fee paying client. The Court approves the other hours billed by multiple attorneys, including time reviewing briefing, developing strategy, and preparing the case for trial.

The Court eliminates the following fees:

| DATE | ATTORNEY | HOURS | DESCRIPTION |
|------|----------|-------|-------------|
| 12/20/2011 | JAK | 7.0 | Prepare for and attend Deposition of Bill Ostling |
| 12/21/2011 | JAK | 4.0 | Prepare for and attend Deposition of Bill Ostling |
| 1/2/2012 | JAK | 3.5 | Attend deposition of Officer Benkert |
| | | 6.0 | Prepare for and attend deposition of Officer Portrey |
| 1/17/2012 | JAK | 4.5 | Attend deposition of Chief Fehlman |
| | | 1.75 | Prepare for and attend deposition of Carla Sias |
| | | 1.0 | Attend deposition of Ben Sias |
| | | 1.0 | Attend deposition of Chris Jensen |
| | | 1.75 | Prepare for and attend deposition of Officer Berg |
| 1/18/2012 | JAK | 3.5 | Attend deposition of Ellis Amdur |
| 1/19/2012 | JAK | 4.0 | Prepare for and attend deposition of defense expert Bragg |
| 1/19/2012 | JAK | 2.0 | Attend deposition of defense expert Fountain |
| 1/23/2012 | JAK | 3.0 | Attend deposition of Van Blaricom |
| 1/24/2012 | JAK | 3.5 | Attend deposition of Dr. Cummins |
| 1/31/2012 | JAK | 12.0 | Travel to and attend depositions of Drs. Izenberg and Nelson |
| **TOTAL** | **JAK** | **HOURS DEDUCTED: 58.5** | |
| 1/2/2012 | JRC | 7.5 | Attend Depositions of Officer Portrey and Defendant Benkert |
| 1/16/2012 | JRC | 4.5 | Meeting w/ NPR; Deposition Preparation |
| 1/17/2012 | JRC | 4.5 | Deposition of Defendant Chief Fehlman |
| 5/14/2012 | JRC | 3.0 | Observe opening statement, feedback to NPR |

| 5/15/2012 | JRC | 3.5 | Observe trial witnesses; trial strategy conference |
| 5/30/2012 | JRC | 1.5 | Observe first portion of NPR Closing |
| 6/1/2012 | JRC | 1.5 | Courthouse for Jury Verdict |
| **TOTAL** | **JRC** | **HOURS DEDUCTED: 26** | |

The lodestar amount for the work performed by Plaintiffs' attorneys is $363,422.50, calculated by multiplying each attorney's total hours by the hourly rate:

| Individual | Hours Requested | Hours Granted | Rate | Lodestar (pre-multiplier) |
|---|---|---|---|---|
| Nathan P. Roberts | 668.1 | 668.1 | $325 | $217,132.50 |
| Julie A. Kays | 293.5 | 235 | $350 | $82,250 |
| John R. Connelly, Jr. | 79.8 | 53.8 | $550 | $29,590 |
| Pamela S. Wells | 275.6 | 275.6 | $125 | $34,450.00 |
| **TOTAL** | | | | **$363,422.50** |

### d. Further Adjustment is Not Warranted

The final step in fee assessment is evaluating whether to enhance or reduce the presumptively reasonable lodestar figure based on the Court's evaluation of those *Kerr* factors not subsumed in the lodestar calculation. *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006). Plaintiffs argue for a 1.5 multiplier largely based on the novelty of the failure-to-train claim and the risk involved in pursuing it. Defendants argue for a one half reduction based on Plaintiffs' failure to establish a majority of their claims.

In evaluating the factors, the Court notes that there is some novelty in pursuing a claim for failure-to-train officers about mental illness. And Plaintiffs' counsel, although relatively inexperienced, performed skillfully at trial. Still, Plaintiffs' counsel quickly accepted this case, suggesting that it was a desirable one.

1    The most dispositive factors are the results obtained and the time and labor required.

2    Plaintiffs lost three of the four claims they pursued, including the use of force claim, which

3    played a large role at trial and in case preparation.  But, Plaintiffs' counsel billed less than half

4    the hours of the Defense team.  Pl.'s Reply, Dkt. #172 at 1.  These two significant factors

5    counterbalance each other.

6    The original lodestar amount provides an appropriate award.  It provides a balance

7    between encouraging attorneys to take civil rights cases and preventing inappropriate windfalls.

8    After evaluating the *Kerr* factors, no adjustment to the original lodestar is warranted.

9    **C.  Reasonable Costs**

10    Defendants also argue that "[t]he Court should exclude parking, lodging, meals, trial

11    consulting, postage, telephone, travel, and transportation expenses because they constitute

12    overhead and are not generally taxable."  Def.'s Fee Opp., Dkt. #167 at 12.  Plaintiffs argue that

13    the costs are recoverable as expenses normally charged to a fee paying client.  In the Ninth

14    Circuit, "[i]t is well established that attorney's fees under 42 U.S.C. § 1988 include reasonable

15    out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if

16    the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920."  *Trustees of Const. Indus.*

17    *& Laborers Health & Welfare Trust v. Redland Ins. Co.,* 460 F.3d 1253, 1257 (9th Cir. 2006).

18    Thus, expenses recoverable under § 1988 may be greater than taxable costs.

19    Plaintiffs' expenses for meals, shipping, postage, parking, and travel are recoverable, as

20    they are generally charged to fee paying clients.  Plaintiffs' costs associated with deposing

21    Defendants' experts are also recoverable.  *See Harris v. Marhoefer,* 24 F.3d 16, 19-20 (9th Cir.

22    1994) (affirming award of expenses for defense expert's fee at deposition, postage, copying

23    costs, hotel bills, meals*,* messenger service, and employment record reproduction).  Plaintiffs

24    were charged $3,100 by defense experts, and are awarded that amount.

1       Precedent is less clear regarding costs for a party's own experts. The Court joins other

2 district courts in this circuit and denies Plaintiffs' request to recoup fees paid to its own experts.

3       In *West Virginia Univ. Hosp. Inc. v. Casey,* 499 U.S. 83, 102, 111 S.Ct. 1138, 113
      L.Ed.2d 68 (1991), the Supreme Court concluded that 42 U.S.C. § 1988 conveys

4       no authority to shift expert fees in civil rights cases to the losing party. . . . After
      *Casey,* Congress amended § 1988 to specifically provide for the recovery of

5       expert fees in cases brought to enforce a provision of 42 U.S.C. § 1981 or 1981a.
      Congress could have amended § 1988 to allow for expert fees in all cases covered

6       by § 1988(b), but did not. The *Casey* decision therefore stands with regard to §
      1983 cases. . . . Because Plaintiffs pursued § 1983 claims, they cannot shift the

7       burden of their experts' fees to Defendants.

8 *Agster v. Maricopa County*, 486 F. Supp. 2d 1005, 1019 (D. Ariz. 2007) (internal citations

9 omitted); *see also Ruff v. County of Kings*, 700 F. Supp. 2d 1225, 1243 (E.D. Cal. 2010).

10       The Court reduces Plaintiffs' cost request by $61,671.66 for non-compensable expert

11 fees. The Court also reduces costs by $588.58 for non-compensable overhead expenses.

12 Plaintiffs' other expenses, totaling $25,879.34, are approved. In total, the Court awards

13 Plaintiffs $28,979.34 in costs.

14               **III.    CONCLUSION**

15       The Court awards Plaintiffs $363,422.50 in fees and $28,979.34 in costs, for a total

16 award of $392,401.84. The clerk shall prepare a judgment in this amount.

17       IT IS SO ORDERED.

18

19       Dated this 11th day of October, 2012.

20

21                     _____

22                     Ronald B. Leighton
                    United States District Judge

23

24