# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

FREDRICK and ANNALESA THOMAS; and
JO-HANNA READ, as Guardian ad Litem of
E.T., a minor,

        Plaintiffs,

     v.

JASON CANNON; BRIAN MARKERT;
RYAN MICENKO; MICHAEL WILEY;
MICHAEL ZARO; CITY OF FIFE; CITY OF
LAKEWOOD; and PIERCE COUNTY
METRO SWAT TEAM,

        Defendants.

_____

FREDRICK THOMAS and ANNALESA
THOMAS, as Co-Administrators of the Estate
of Leonard Thomas, and its statutory
beneficiaries,

        Plaintiffs,

     v.

BRIAN MARKERT; MICHAEL WILEY;
NATHAN VANCE; MICHAEL ZARO;
SCOTT GREEN; JEFF RACKLEY; CITY OF
FIFE; CITY OF LAKEWOOD; PIERCE
COUNTY METRO SWAT TEAM; and JOHN
DOES 1 through 10,

        Defendants.

Nos. 3:15-05346 BJR
     3:16-cv-05392
CONSOLIDATED CASES

FINAL ORDER DENYING
DEFENDANTS' POST-
TRIAL MOTIONS

1

# Table of Contents

I. INTRODUCTION ................................................................................................ 3

II. FACTUAL BACKGROUND ............................................................................. 3

    A.   Shooting of Leonard Thomas ............................................................... 3

    B.   Jury Trial ................................................................................................. 7

III. DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ................... 8

    A.   E.T.'s Unreasonable Seizure Claim (Verdict Question One) ............................. 9

    B.   Estate's Unreasonable Seizure Claim (Verdict Question One) ....................... 10

    C.   Estate's Excessive Force Claim Against Wiley (Verdict Question Two) ....................... 11

    D.   Fourteenth Amendment Deprivation of Familial Relationship (Verdict Question Three) 14

    E.   Unreasonable Search and Seizure: Explosive Breach (Verdict Question Four)............... 17

    F.   Unreasonable Seizure of the Dog (Verdict Question Five) ............................. 20

    G.   Fred's Fourth Amendment Seizure Claim (Verdict Question Six)................... 21

    H.   State Law False Arrest (Verdict Question Seven) ............................. 23

    I.   E.T. and Annalesa's Outrage Claims (Verdict Question Eight) ....................... 24

    J.   Negligent Child Abuse Investigation (Verdict Question Nine) ....................... 26

    K.   Punitive Damages (Verdict Question Eleven) ............................. 27

IV. DEFENDANTS' MOTION FOR REMITTITUR ............................................................. 28

    A.   Compensatory Damages ............................................................... 31

        1.   Jury's Awards to E.T. ............................................................... 31

        2.   Jury's Awards to the Estate of Leonard Thomas. ....................... 34

        3.   Jury's Awards to Annalesa Thomas. ....................... 35

        4.   Jury's Awards to Fredrick Thomas. ....................... 37

    B.   Punitive Damages ............................................................... 38

V. DEFENDANTS' MOTION FOR QUALIFIED IMMUNITY ....................... 43

    A.   Waiver ............................................................... 44

        1.   Markert, Wiley, Cannon ....................... 44

        2.   Zaro ............................................................... 46

    B.   Constitutional Violation ............................................................... 47

    C.   Clearly Established Law ............................................................... 51

        1.   Excessive force against Leonard. ....................... 52

        2.   Explosive breach. ....................... 54

        3.   Shooting of the dog. ....................... 56

        4.   Unlawful arrest. ....................... 59

VI. DEFENDANTS' MOTION FOR A NEW TRIAL ....................... 59

    A.   Exclusion of Weapons ............................................................... 60

    B.   Duplicative Case Presentations ............................................................... 61

    C.   Race-Based Arguments ............................................................... 62

    D.   Excluding Reference to the Josh Powell Incident ....................... 63

    E.   Excluding the 3D Animations ............................................................... 66

    F.   Discussion of Markert's Legal Representation ....................... 66

    G.   Answering Jury's Question Regarding Cannon's Employment ....................... 67

    H.   Cumulative Error ............................................................... 68

    I.   Inconsistent Verdicts............................................................... 68

    J.   Evidentiary Deficiencies ............................................................... 69

VII. CONCLUSION ............................................................... 69

# I.  INTRODUCTION

Defendants have brought four post-trial motions for the Court's review: a Motion for Judgment as a Matter of Law (ECF 282); a Motion for Remittitur (ECF 284); a Motion for Qualified Immunity (ECF 280); a Motion for New Trial (ECF 283).  Having reviewed the parties' submissions, the relevant legal authority, and all other relevant material properly before the Court, the Court will DENY Defendants' Motions.

# II.  FACTUAL BACKGROUND

On the night of May 23, 2013, a confrontation with tragic results occurred between police from the Cities of Fife and Lakewood and Leonard Thomas at his home in Fife.  The events that unfolded resulted in the lethal shooting of Thomas, who was unarmed, by a police sniper.  Plaintiffs, which include Leonard's Estate as well as his parents and son, brought this civil rights action, which resulted in a substantial jury verdict in their favor.  While the full scope of the evidence required a lengthy trial, the essential facts are summarized here.

## A.  Shooting of Leonard Thomas

Leonard Thomas lived with his four-year-old son, E.T, in a home in Fife owned by his parents, Fred and Annalesa Thomas.  In the evening of May 23, 2013, Leonard called Annalesa, explained he was depressed over the death of a friend, and asked her to come take E.T. for the night.  Annalesa agreed.  She was concerned that Leonard, after a year of sobriety, had been drinking, and she was worried that Leonard would fall asleep and not be able to attend to E.T. that night.  When Annalesa arrived sometime after 9:00 p.m., Leonard changed his mind and became upset as Annalesa prepared to leave with E.T.  The argument between Leonard and Annalesa escalated when Annalesa slapped Leonard's face with an open hand.  Annalesa called 911 at 10:18

3

p.m., and told the dispatcher that she needed the police. Leonard grabbed the phone from Annalesa, and told the dispatcher that his mother had hit him and that he needed help.

Fife Police Officers responded to the Thomas house and contacted Leonard via cell phone. During their initial 24 minute conversation, Leonard told the Fife officer that he was upset about the recent loss of a personal friend and had requested his mother come to pick up his son; that he had subsequently been assaulted by his mother and was bleeding from the face; that he had locked all the doors and would not be coming out of the house or allowing officers inside the house; and that the police were scaring his four-year-old son and should leave his property. Approximately an hour later, after Leonard continued to refuse to emerge from the house, the Fife police chief called for the Pierce County Metro SWAT Team to respond to the scene.

The SWAT Team arrived at approximately 12:20 a.m. with two tank-like armored vehicles. The "AT" ("armored transport") was driven across the neighbor's yard, through a fence separating the neighbor's yard from the Thomas home, and parked just off the back patio of the Thomas residence. The "Bearcat" was parked on the street in front of the house. Two snipers, including Defendant Brian Markert, took up positions in front of the house. Defendant Mike Wiley was Team Leader of the SWAT Team's tactical side, while Defendant Mike Zaro, the Assistant Chief of Police for Lakewood, oversaw field operations. Officer Wiley informed the SWAT Team that they were "responding to basically assault 4 DV [domestic violence]" due to Leonard's grab of Annalesa's wrist when he snatched the phone during the initial 911 call. Wiley told the Team, "Barricaded male suspect has his four year old son maybe pseudo hostage. The wife is outside. Made no threats towards the son." As negotiations with Leonard proceeded through the night, Leonard repeated that he did not have any weapons, and warned officers not to use flash-bang grenades to enter the house. No officer heard Leonard make any threats to harm himself, his child,

4

or any officer. During the course of negotiations Leonard repeatedly asked the officers to stop harassing him and to leave him alone.

At approximate 1:08 a.m., Fred Thomas (Leonard's father) arrived at the police staging area a few blocks from the house in response to a call from Annalesa. Fred explained to the officers that he needed to go to his house to speak to his son, but was told that the road was closed to traffic. Fred walked to the back of the property and climbed the six foot chain link fence surrounding the backyard. Officer Ryan Micenko, who was behind the house at the time, stopped Fred, ordered him to the ground, and placed him in handcuffs. Fred explained to the officers that he lived at the residence and that he was there to talk to his son. Defendant Jason Cannon, the entry team leader stationed at the back of the house, radioed Zaro to say, "We've got the property owner and the father of the suspect detained. Where would you like [him]?" Zaro asked, "Other than him generally inserting himself onto the scene, does any of his activity warrant him going to jail?" Cannon responded, "I guess that depends on how cooperative he is with you guys but you have at least obstructing on him if you want to." Zaro said, "That's what I need, thanks." Fred was then taken to jail where he was kept until the following morning, when he was released without being charged.

As negotiations with Leonard continued unsuccessfully, officers internally discussed the possibility that if Leonard let E.T. go, they could simply leave for the night and come back to arrest Leonard another time. Zaro agreed with this approach, and asked Fife Police Chief Blackburn "if we get the son tonight, are you good with us leaving here?" Chief Blackburn agreed that "Yeah, if we have the son, then you can – we can walk away from this thing tonight and we'll get him at another time when it's not so volatile." Leonard initially resisted this proposal, but eventually

5

responded, "Okay, we'll do that." Zaro radioed his team, "If, uh, the suspect comes out with the child and you can separate the child, let dad go back in."

Leonard brought E.T., who had been sleeping, out to the front porch, but insisted that E.T. leave with Annalesa, not with the police officers. The officers refused this request, and the stalemate continued.

Based on Leonard's continued demands to have Annalesa come up to the house, his continued refusal to release E.T. to the police, and the fact that he was now on the front porch with E.T., Chief Zaro radioed the entire SWAT Team, ordering them "Do not let him back in the house with that kid." Despite this order, which was never communicated to Leonard, Leonard continued to go in and out of the house with E.T. While Annalesa was not allowed to go up to the house, officers escorted her to the Bearcat, where Leonard could see and hear her.

At 2:00 a.m. a warrant was signed for the arrest of Leonard for domestic violence assault in the fourth degree, a misdemeanor. SWAT officers began working to set an explosive breaching charge on the back door of the house. At approximately 2:45 a.m., Leonard returned to the porch again with E.T., E.T.'s car seat, and an overnight bag. Leonard was in the doorway and E.T. was sitting on the steps of the porch when, with Wiley's encouragement, Zaro gave permission to breach the back door with the explosive charge. The explosion was designed to sever the hinges of the door and create a deafening bang that would overwhelm a subject's senses so that he freezes in place. Trial testimony also suggested that it was foreseeable that the charge would cause Leonard to reach for E.T. in fear. Indeed, that's what happened.

When the breaching charge detonated, Leonard ran to E.T., picked him up, and started retreating into the residence. While Leonard was holding E.T., Markert fired his rifle, striking Leonard just above the belt line on the right side of his abdomen. Leonard fell backward into the

house. Wiley and Defendant Officer Nathan Vance ran toward the house through the front yard, where they encountered Leonard's dog, Baxter. Vance shot the dog twice, and then Wiley fired additional shots, killing it.

Officers entering through the rear door encountered Leonard sitting on the floor, dying, clutching E.T.'s back against his chest. As the officers struggled to pry E.T. from Leonard's arms, one officer started punching Leonard in the face. Another officer recalled Leonard's last words, "Don't hurt my boy." Later that morning, two detectives and a chaplain arrived at the jail where Fred was being held to inform him that his son was dead.

## B. Jury Trial

The jury trial commenced on June 21, 2017 and lasted twelve days. After five days of deliberation, and the jury returned its verdict on July 14, 2017. The jury found Fourth and Fourteenth Amendment violations were committed by Defendants Zaro, Wiley, Markert, and the City of Lakewood due to the excessive force used against Leonard and the unreasonable method of seizing E.T. The jury further found that Zaro and Lakewood violated the Fourteenth Amendment rights of E.T., Fred, and Annalesa by illegally depriving them of their familial relationship with Leonard.

The jury found Zaro, Wiley, and the City of Lakewood liable for Fourth Amendment violations related to the use of the explosive breach. The jury found Wiley, but not Vance, liable for Fourth Amendment violations related to the shooting of Leonard's dog. The jury found Zaro and Cannon, but not Micenko, liable for Fourth Amendment violations related to the arrest of Fred. And the jury found the City of Lakewood liable under state law claims for the false arrest of Fred, the outrage suffered by Annalesa and E.T., and the negligence in the investigation that separated E.T. from his father. The City of Fife was also found liable for the negligent investigation, but

was found not liable for the false arrest of Fred. The jury awarded a total of $8,635,000 in compensatory damages. The jury also awarded a total of $6,500,000 in punitive damages against Zaro, Wiley, and Markert. Defendants subsequently filed four post-trial motions, which the Court will now address.

### III. <u>DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

Federal Rule of Civil Procedure 50 provides that the Court may direct the entry of judgment as a matter of law where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." A directed verdict must be entered where "there is no substantial evidence to support the claim." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 677 (9th Cir. 1975) (quoting *Cleary v. Nat'l Distillers & Chem. Corp.*, 505 F.2d 695, 696 (9th Cir. 1974)). A court may only grant a Rule 50(b) motion "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) (internal punctuation omitted). The court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. The court may only give credence to evidence favoring the moving party if that evidence is "uncontradicted," "unimpeached," and "comes from disinterested witnesses." *Id.*

The Ninth Circuit has noted that some of the prudential reluctance to grant summary judgment – a complete deprivation of a trial – may be relaxed in this context because the parties have had their day in court. *See Santa Clara Valley Distrib. Co. Inc. v. Pabst Brewing Co.*, 556 F.2d 942, 944 n.1 (9th Cir. 1977). Like summary judgment, however, the mere existence of some alleged

factual dispute between the parties or a "scintilla of evidence" will not defeat a properly supported motion for a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 251 (1986); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986).

Defendants argue they are entitled to judgment as a matter of law on ten of Plaintiffs' claims. The Court will address each in turn.

### A. E.T.'s Unreasonable Seizure Claim (Verdict Question One)

Question One of the verdict form read:

Plaintiffs E.T. and the Estate of Leonard Thomas bring a Fourth and Fourteenth Amendment constitutional claim for the unreasonable seizure of E.T. from Leonard Thomas. Did any of the Defendants seize E.T. from his father Leonard Thomas in an unreasonable manner, or cause E.T. to be unreasonably seized?

(ECF 237 at 2.)

The jury found Defendants Zaro, Wiley, Markert, and the City of Lakewood liable to E.T. and Leonard's Estate on this claim. (*Id.*) Defendants argue that this verdict was improper because E.T. could not bring a Fourteenth Amendment claim for his seizure and the Estate could not bring a Fourth Amendment claim for E.T.'s seizure. This objection misreads the verdict form. The Fourth Amendment claim was brought by E.T. and the Fourteenth Amendment claim was brought by the Estate. Those claims were combined in this question because they concern the same injury – the seizure of E.T. – and they turn on the same legal test – whether a reasonable person in the position of Leonard Thomas would have felt free to leave the scene with E.T. or to withhold consent to the officers taking E.T., and whether the scope of the intrusion used to seize E.T. was reasonably necessary to alleviate the threat posed to him. (*See* ECF 220 at 20; *see also Jones v. Cty. of Los Angeles*, 802 F.3d 990, 1000 (9th Cir. 2015) ("While the constitutional source of the parent's and the child's rights differ, the tests under the Fourteenth Amendment and the Fourth

Amendment for when a child may be seized without a warrant are the same.").) Thus, the verdict form was correct and there was no likelihood that the jury mistakenly applied an incorrect standard for the claims brought by E.T. and the Estate for E.T.'s seizure.

Defendants further argue that Markert should not have been found liable because the Fourth Amendment does not apply to officers who make "every effort to deliver [hostages] from unlawful abduction." (*See* ECF 282 at 24 (quoting *Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000).) But E.T. was not a hostage, and Markert and the other officers here were not attempting to separate him from a kidnapper. Rather, they were attempting to remove a child from his parent without the parent's consent. In such a situation, "[t]he Constitution requires an official separating a child from its parents to obtain a court order unless the official has reasonable cause to believe the child is in 'imminent danger of serious bodily injury.'" *Jones*, 802 F.3d at 1000. Here the officers did not have a warrant to remove E.T. and the jury reasonably determined that E.T. was not in imminent danger at the time Markert shot Leonard. Further, the jury was not unreasonable in determining that shooting Leonard was an unreasonable way to remove E.T. from his father. Because this removal-by-shooting was precipitated by actions taken and orders given by Wiley and Zaro, the jury reasonably found them liable on this claim as well. Defendants acknowledge that a liability finding against Zaro also supports liability against the City of Lakewood. (ECF 282 at 25.)

## B. Estate's Unreasonable Seizure Claim (Verdict Question One)

Defendants repeat their misreading of the verdict form and argue that the Estate cannot bring a Fourth Amendment claim for the seizure of E.T. As explained *supra* – and as apparent from the verdict from – the Estate's claim on this question is pursuant to the Fourteenth Amendment. Defendants further object that the Estate's Fourteenth Amendment claim was

dismissed on summary judgment. In its summary judgment order, the Court said the Estate had abandoned its claim for deprivation of Leonard's familial relationship with E.T. (ECF 128 at 20 n.4.) The standard for the Fourteenth Amendment familial deprivation claim – whether excessive force shocked the conscience – is different from the standard for Fourteenth Amendment seizure of a child – whether the child was removed without reasonable cause. The Estate's familial deprivation claim did not go to the jury, pursuant to the summary judgment order, but the unreasonable seizure claim survived, and the jury's decision on that claim was supported by evidence presented at trial.

### C. Estate's Excessive Force Claim Against Wiley (Verdict Question Two)

Question Two of the verdict form read:

> Plaintiff the Estate of Leonard Thomas brings a Fourth Amendment constitutional claim for excessive force. Did any of the Defendants use excessive force against Leonard Thomas, or cause excessive force to be used against him?

(ECF 237 at 3.)

The jury found Defendants Zaro, Wiley, Markert, and the City of Lakewood liable on this claim. (ECF 237 at 3.) Defendants argue that Wiley is entitled to judgment as a matter of law on this claim because he did not order or engage in any use of force. According to Defendants, the jury wrongfully held Wiley liable for the shooting of Leonard based on Wiley's role in the explosive breach, under the theory that the explosive breach provoked the shooting. Defendants argue that this liability finding was necessarily based on a "provocation theory" that was rejected by the Supreme Court in *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017).

In *Mendez*, police officers entered a shack on residential property without a search warrant. 137 S. Ct. at 1545. Mendez, who had been sleeping in the shack, responded by picking up a BB gun, which prompted the officers to immediately open fire on him. *Id.* at 1544-45. The district

11

court determined that the officers' use of force was reasonable due to Mendez's possession of the gun, but, applying the Ninth Circuit's "provocation rule," nonetheless found the officers liable for excessive force because the illegal warrantless entry provoked the shooting. *Id.* at 1545. The Supreme Court reversed, explaining that once a use of force was judged to be reasonable, it cannot be recharacterized as excessive force due to a separate constitutional violation (such as warrantless entry, or in this case, the explosive breach). *Id.* at 1547. The Court recognized that the provocation rule would only "come[] into play after a forceful seizure has been judged to be reasonable." *Id.* at 146. The Court went on to hold that the rule is improper because "[w]hen an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." *Id.* at 1547.

Thus, *Mendez* is not analogous to the situation present in this case. Plaintiffs did not argue that Defendants' reasonable use of force should be punished because of some distinct constitutional violation. Rather, they argued that the force exercised by Defendants was unreasonable at every stage. It was unreasonable for Zaro to order his team, including snipers, not to let Leonard back into his house with E.T. when there was no threat of harm to anybody. It was unreasonable for Wiley to cause an explosive breach that foreseeably led Leonard to panic and retreat with E.T. into the cover of his home while Zaro's order remained outstanding. And it was independently unreasonable for Markert to respond to the chaos Wiley created by firing a lethal shot at Leonard. Each of these Defendants proximately caused Leonard's death through unreasonable conduct.

Next, Defendants cite *Medrano v. City of Los Angeles*, 973 F.2d 1499 (9th Cir. 1992), for the principle that "[w]ithout some evidence that the on-scene supervisors authorized use of excessive force, the decision to enter the [residence] cannot reasonably support a judgment in favor

12

of the [Plaintiffs]" for an excessive force claim against the supervisors. 973 F.2d at 1504. *Medrano* concerned the death of Ruben Medrano, who had left a suicide note, locked himself in his bathroom with a loaded .357 magnum revolver, injected himself with a lethal dosage of heroin, and threatened to kill anyone who tried to enter the bathroom to prevent his suicide. *Id.* at 1501. Police officers negotiated with Medrano to come out of the bathroom, without success. *Id.* Once the officers could hear Medrano snoring, they determined that he was in a drug-induced state of unconsciousness and decided to enter the bathroom. *Id.* Two officers entered the bathroom and, according to their testimony, shot Medrano to death after Medrano awoke and fired his own gun. *Id.* at 1501-02. Medrano's family brought suit for excessive force, but the district court either dismissed or directed verdicts in favor of all the defendants except for the two officers who shot Medrano. *Id.* at 1502. On review, the Ninth Circuit held that directed verdicts in favor of the on-scene supervisors and team leaders was appropriate because the decision to enter the bathroom was reasonable. *Id.* at 1504. Defendants argue Wiley was entitled to judgment because, like the supervisors in *Medrano*, his entry order was not unreasonable.

However, the facts of this case are easily distinguishable from *Medrano*. In *Medrano*, the supervising officers merely authorized entry into a bathroom where the suspect was believed to be unconscious, negotiations had failed, and the suspect was likely to die if he was not provided immediate medical attention for a drug overdose. Here, in contrast, Wiley was responsible for a deafening explosive breach while negotiations were still ongoing and after Zaro had instructed snipers not to allow Thomas to return inside his house with E.T., despite the fact that the breach could foreseeably cause Thomas to do exactly that. (*See* ECF 270 at 212.) These two entry orders are not comparable. Instead of reasonably attempting to mitigate the likelihood of death as in *Medrano*, Wiley's actions exacerbated that risk.

13

D. <u>Fourteenth Amendment Deprivation of Familial Relationship (Verdict Question Three)</u>

Question Three of the verdict form read:

Plaintiffs E.T., Fred Thomas, and Annalesa Thomas bring a Fourteenth Amendment claim for deprivation of their familial relationship with Leonard Thomas. Did Michael Zaro cause E.T., Fred Thomas, or Annalesa Thomas to be deprived of their familial relationship with Leonard Thomas by acting with deliberate indifference to the consequences of his (Zaro's) actions and decisions?

(ECF 237 at 4.)

The jury found Zaro and Lakewood liable to E.T., Fred, and Annalesa on this claim. (ECF 237 at 4.) Parents and children may assert Fourteenth Amendment claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *See Lemire v. Cal. Dept. of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (parents and children); *Smith v. City of Fontana*, 818 F.2d at 1418–19; *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (parent); *Crumpton v. Gates*, 947 F.2d 1418, 1421–24 (9th Cir. 1991) (child). However, "the Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–47 (1998). The cognizable level of abuse of power is that which "shocks the conscience" or "violates the decencies of civilized conduct." *Id.* at 846. Mere negligence or liability grounded in tort does not meet the standard for substantive due process liability. *Id.* at 849.

In determining whether an action "shocks the conscience," the court must first ask "whether the circumstances are such that 'actual deliberation [by the officer] is practical.'" *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the

14

conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (*citing Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)); *see also Porter v. Osborn*, 546 F. 3d 1131, 1137-40 (9th Cir. 2008).

Zaro argues the "purpose to harm" standard should apply because he testified that he was operating in a time-pressured environment when he ordered officers to keep Leonard from taking E.T. back inside the house and when he issued the order to breach the door. However, these orders were made after several hours of negotiations and after Leonard had brought E.T. out to the porch with a car seat and overnight bag with the intent that E.T. be turned over to Annalesa. The jury could reasonably have determined that E.T. was at no risk of imminent harm when Zaro gave his orders, and that the situation was not "escalat[ing] so quickly that the officer must make a snap judgment." *See Porter*, 546 F.3d at 1137 (9th Cir. 2008). Indeed, Defendants conceded in their summary judgment motion that "Chief Zaro's decision to breach the door and enter the home was admittedly made after actual deliberation, and the 'deliberate indifference' standard therefore applies." (ECF 57 at 49.)

"Deliberate indifference occurs when 'the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Solis v. Cty. of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). Accordingly, the jury was instructed to find for Plaintiffs if actual deliberation was practical and Zaro exhibited conscious or reckless disregard for the consequence of his actions. (*See* ECF 220 at 25.) The jury heard testimony that it was foreseeable that Leonard would react to the loud, unexpected explosion of the breach by reaching for his child. (*See* ECF 270 at 212.) Because Zaro had instructed his

15

team, including snipers, not to let Leonard back into the house with E.T., it was also foreseeable that should Leonard respond to the explosion by grabbing E.T. and retreating to the cover of his house, he would be shot and killed despite posing no threat of harm. The jury reasonably concluded that Zaro recklessly disregarded these consequences, and that disregarding the consequences that an unarmed man might be shot and killed shocks the conscience.

A jury finding that Zaro's order not to let Leonard return inside his house with E.T. was deliberately indifferent to the likely consequence that Leonard would be shot and killed for doing so is sufficient to support liability on this claim, without reference to Zaro's order to breach the back door. But even if the Court agreed with Defendants that the sole support for this claim rests on the argument that Zaro's order to breach the back door provoked the shooting, a directed verdict for Defendants still would not be appropriate. Defendants contend that such a finding would necessarily be based on a "provocation theory" that was rejected by the Supreme Court in *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). This contention is mistaken, as explained above. Unlike in *Mendez*, where the Supreme Court said a reasonable use of force could not be deemed unconstitutional due to another distinct constitutional violation, here the jury found that Defendants' use of force – including Zaro's authorization of that force – was itself unreasonable, and was unconstitutional as such. There is no reason to believe the jury applied a "provocation rule" that they were never instructed on and that did not fit the facts or arguments presented to them at trial.

Because liability was properly found against Zaro, the jury's verdict on this claim against Zaro's employer, the City of Lakewood, was appropriate as well.

16

### E. Unreasonable Search and Seizure: Explosive Breach (Verdict Question Four)

Question Four of the verdict form read:

Plaintiffs the Estate of Leonard Thomas, E.T., Fred Thomas, and Annalesa Thomas bring a Fourth Amendment constitutional claim for unreasonable seizure of their house through use of the explosive breach. Did any of the Defendants seize Plaintiffs' property through use of the explosive breach in an unreasonable manner, or cause their property to be unreasonably seized?

(ECF 237 at 5.)

The jury found Zaro, Wiley, and the City of Lakewood liable to E.T., Annalesa, Fred, and Leonard's Estate, and awarded $125,000 to E.T., $500,000 to Annalesa, $125,000 to Fred, and $125,000 to the Estate for this claim. Defendants argue that this award was improperly inflated because "[c]learly, the jury was awarding damages for the shooting of Leonard Thomas that occurred after the breach." (ECF 282 at 13.) Defendants maintain this was impermissible (once more) because the jury improperly relied on the Ninth Circuit's "provocation theory," and because these Plaintiffs were already compensated for the shooting of Leonard under other claims.

The Court disagrees. As discussed above, the Supreme Court held that reasonable use of force may not be deemed unreasonable due to a separate constitutional violation, such as warrantless entry. *See Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). Here, in contrast, the officers did have a valid warrant, but the jury found that the officers' entry was not executed in a reasonable manner. Even when a warrant is validly issued, the warrant may be "unreasonably executed." *See Dalia v. United States*, 441 U.S. 238, 258 (1979). Given the state of negotiations with Leonard – he was on the front porch with E.T., a car seat, and an overnight bag, requesting Annalesa come to escort E.T. (*see* ECF 264 at 185) – the jury found that the use of an explosive charge was inherently dangerous and unreasonably destructive. That finding was supported by the evidence.

17

Because the jury found in favor of Plaintiffs on several of their claims, the verdict form provided space for the jury to award damages under Question Ten. (ECF 237 at 11.) For each Plaintiff, the verdict form listed each claim brought by that Plaintiff and a line for the jury to assign damages for that claim. Thus, for example, Question 10a, as completed by the jury, read as follows:

**10a. E.T.:** For the claims you found in favor of E.T., what damages do you find for E.T. for each claim:

- Unreaonable seizure from his father (Question 1): $  500,000
- Deprivation of his familial relationship with Leonard (Question 3): $  2,750,000
- Unreasonable seizure of his house (Question 4): $  125,000
- Unreasonable seizure of his dog (Question 5): $  N/A
- Outrage (Question 8)    : $  125,000
- Negligent Investigation (Question 9): $  500,000

(ECF 237 at 11.)

Defendants contend that the jury mistakenly included damages for the shooting of Leonard in their award for unreasonable seizure of the house. However, the verdict form clearly delineated these claims, so that when the jury came to the third line for damages related to the unreasonable seizure of the house, *i.e.* the explosive breach, it had already awarded $3.25 million to E.T. for damages related to the shooting of Leonard. There is no reason to assume the jury believed that damages awarded for the explosive breach should include compensation to E.T. (or the other Plaintiffs) for a separate injury on which the jury had already ordered compensation.

Moreover, the jury awarded substantially more on this claim to Annalesa ($500,000) than to E.T., Fred, or the Estate ($125,000) each. If the jury understood this claim to concern the

shooting that followed the breach, this differentiation would make no sense because the jury did not find that the shooting caused substantially more harm to Annalesa than to the other Plaintiffs. (*See* ECF 237 at 11-12 (awarding Leonard and E.T. greater damages than Annalesa on claims related to the shooting, and awarding Fred equal damages to Annalesa on claims related to the shooting).) Rather, it is more likely the jury concluded that Annalesa suffered greater emotional distress from the unreasonable seizure of the house because, unlike Leonard and E.T., she owned the house, and unlike Fred, she was present when the explosive breach occurred. This greater emotional distress would properly produce a greater damages award. Thus, there is no reason to believe that the jury intended damages awarded for the explosive breach to compensate Plaintiffs for the shooting of Leonard.

At a hearing held regarding remittitur and qualified immunity on December 5, 2017, five months after the close of trial, Defendants for the first time offered an estimate of the value of the Thomas home to argue that the damages awarded for the explosive breach were excessive. The Court will not consider evidence that was not before the jury when it rendered its verdict. *See Young ex rel. Lowman v. Olds*, 168 F. App'x 140, 140-41 (8th Cir. 2006). Moreover, despite receiving an opportunity to question the jury after the verdict was rendered regarding any inconsistencies or duplication, Defendants declined to do so. (*See* ECF 295-1.) Because the evidence introduced at trial supported a finding that the explosive breach was unreasonable and that it was the source of destruction and mental anguish totaling the sums awarded by the jury, Defendants' claim is without merit.

Defendants additionally argue that Wiley's only involvement in the explosive breach was to relay the order from Zaro to the entry team at the back of the house, which they argue is insufficient to support liability. (ECF 282 at 14.) But the jury heard testimony from Zaro that

"Officer Wiley was asking repeatedly whether he could go ahead and breach." (ECF 263 at 198.)

And in his post-incident interview, Wiley recalled his role in the breach:

> I'm like, 'All right, all right. Hey sir this is not working. I need to set a charge now.' . . . I'm not getting anything, not getting anything like fuck it. 'Side 3, set that charge.' Um, then I got the hold. . . . And then finally it was just like, 'Hey screw this.' Um, I can't miss another opportunity where he separates from the kid, um. 'Hey [Cannon] set the charge.' [Zaro's] like, 'yeah, good with that.' . . . 'Hey charge is set.' 'Hey sir, if I get an opportunity you know, I'm going to have [Cannon's] team go through Side 3, we're going to punch through Side 1.' . . . So this time I get authorization to make the breach.

(Trial Ex. 41 at 35, 40, 42.)

Based on the evidence presented at trial, the jury reasonably determined that Wiley was a but-for cause of the explosive breach.[1]

## F.  Unreasonable Seizure of the Dog (Verdict Question Five)

Question Five of the verdict form read:

> Plaintiffs the Estate of Leonard Thomas and E.T. bring a Fourth Amendment claim for unreasonable seizure of their dog. Did any of the Defendants unreasonably seize the dog when they killed him, or cause an unreasonable seizure of the dog?

(ECF 237 at 6.)

The jury found Wiley liable to Leonard's Estate on this claim. (*Id.*) Defendants argue this verdict is legally and logically inconsistent because the jury did not find liability against Vance even though Vance also shot the dog Baxter. Defendants explain, "the verdict form did not ask the jury whether Vance and Wiley acted unreasonably when they 'shot' Baxter, but whether they acted unreasonably when they 'killed' him. Consequently, the verdict would have to be either

---

[1] The Court did not previously dismiss Plaintiffs' Fourth Amendment claims against Wiley, as Defendants suggest. To the extent Defendants interpret the Court's previous orders differently, the Court reconsiders those orders in light of the evidence presented at trial. *See Moses H. Cone Me. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 (1983) ("Every order short of a final decree is subject to reopening at the discretion of the district judge.").

'yes' or 'no' for both officers." (ECF 282 at 16 n.6.) On the contrary, the jury's verdict can be reconciled by the fact that Baxter was still alive after Vance shot it and before Wiley shot it. The jury could have found that Vance's use of force was reasonably calibrated to eliminate the threat from the dog, but that Wiley's subsequent decision to kill the dog was unreasonably gratuitous. Even if Defendants did not waive this claim by failing to ask the jury for clarification when given the opportunity, their argument fails on the merits.

### G. Fred's Fourth Amendment Seizure Claim (Verdict Question Six)

Question Six of the verdict form read:

Plaintiff Fred Thomas brings a Fourth Amendment constitutional claim for unreasonable seizure of his person. Did any of the Defendants seizue Fred Thomas, or cause his person to be seized, without legal cause or with excessive force?

(ECF 237 at 7.)

The jury found Zaro and Cannon, but not Micenko (the officer who initially detained Fred) liable on this claim. (*Id.*) First, Defendants challenge whether Zaro and Cannon participated in Fred's arrest. Evidence presented at trial revealed that Cannon, the entry team leader, was at the back of house where Fred was arrested. (ECF 263 at 175.) After Micenko stopped Fred, Cannon radioed Zaro and said, "We've got the property owner and the father of the suspect detained. Where would you like [him]?" Zaro asked, "Other than him generally inserting himself onto the scene, does any of his activity warrant going to jail?" Cannon responded, "I guess that depends on how cooperative he is with you guys but you have at least obstructing on him if you want to." Zaro said, "That's what I need, thanks." (Trial Ex. 1041 at 10-11.) Fred was then taken to jail, where he was kept until two detectives and a chaplain arrived to inform him that Leonard had died. (ECF 266 at 133-34, 159.) Based on this evidence, the jury reasonably concluded that Cannon and Zaro jointly made the decision to take Fred into custody for obstruction of justice.

Next, Defendants argue that even if Cannon and Zaro were responsible for Fred's arrest, the arrest was supported by probable cause, and holding Cannon and Zaro liable would be inconsistent with the jury's finding that Micenko was not liable. Fred testified that after his wife called him to request that he leave work and come help with Leonard, Fred drove within a few blocks of the house, where police informed him that the roads were closed. (ECF 266 at 124-25.) Fred decided to walk around to the back of the house, climb the fence, and attempt to walk over to talk to Leonard. (*Id.* at 126.) Fred testified that as soon as he climbed over the fence, officers yelled at him to put his hands up and to get on the ground. (*Id.* at 128.) Fred further testified that he complied with the order and explained that he was Leonard's father and simply wanted to talk to his son in order to help de-escalate the conflict, and that he was worried his son would be killed. Nonetheless, he was arrested and escorted to jail. (*Id.* at 128-30.)

Based on this evidence, the jury could have concluded that Micenko's initial seizure of Fred was justified in order to prevent any interference with the ongoing operation. However, the jury may also have reasonably concluded that Zaro's and Cannon's decision to transform that initial, temporary investigative stop into a full custodial arrest was not supported by probable cause. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 9 (1968); *United States v. Cortez,* 449 U.S. 411, 417 (1981)). During an investigatory stop, a police officer may briefly stop and detain an individual for investigation without a warrant if the officer reasonably suspects that the person is engaged or about to be engaged in criminal conduct. *See United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002). This "reasonable suspicion" standard requires less than probable cause. *See Arvizu*, 534 U.S. at 274-

76. Thus, the jury may have reasonably concluded that Micenko was not liable for briefly detaining Fred after Fred crossed the police perimeter, but that Zaro's and Cannon's decision to transform that brief detention into a custodial arrest lacked probable cause.

Alternatively, the jury may have recognized that when Zaro and Cannon made the decision to take Fred into custody, they had more information about Fred's legitimate intentions than Micenko possessed during the initial detention. By the time Zaro and Cannon decided to have Fred transported to jail, they knew that Fred was the property owner and father of Leonard. Fred had the opportunity to explain that he merely sought to help resolve the standoff with Leonard peacefully by talking to his son. Thus, the jury could have concluded that by the time Zaro and Cannon decided to formalize Fred's arrest, there was no longer a fair probability that Fred had willfully hindered, delayed, or obstructed law enforcement, and therefore there was no rational reason for his arrest. As the Ninth Circuit has held, probable cause for obstruction is not present where an individual complies with a police order slowly or fails to comply for only a few seconds. *See Mackinney v. Nielson*, 69 F.3d 1002, 1005-06 (9th Cir. 1995). Viewing the evidence in the light most favorable to Fred, he did no worse than comply with the officers' orders slowly. Because his actions did not supply probable cause for a custodial arrest, and the evidence supports a finding that Fred's custodial arrest was ordered by Zaro and Cannon, liability on this claim against those two Defendants was not inappropriate.

### H. State Law False Arrest (Verdict Question Seven)

Question Seven of the verdict form read:

Plaintiff Fred Thomas brings a claim under Washington state law for false arrest. Did the Cities of either Fife or Lakewood, through the actions of their employees, cause Fred Thomas to be falsely arrested on May 24, 2013?

(ECF 237 at 8.)

The jury found the City of Lakewood liable to Fred on this claim. (*Id.*) Because Zaro and Cannon were agents of Lakewood, and liability against them for Fred's unreasonable seizure claim was supported by the evidence, the jury did not err by finding Lakewood liable as well. Defendants note that the Court previously granted their Rule 50(a) motion for a directed verdict against Lakewood on this claim. (ECF 219 at 3.) This ruling was a typographical error. While Defendants were free to object to the verdict form on the grounds that it was inconsistent with the Rule 50(a) order, they failed to do so. This claim was properly before the jury, and liability against Lakewood was supported by the evidence.

I.  E.T. and Annalesa's Outrage Claims (Verdict Question Eight)

Question Eight of the verdict form read:

> Plaintiffs E.T. and Annalesa Thomas bring a claim under Washington state law for outrage against the City of Lakewood. Did the City of Lakewood, through the actions of its employees, intentionally or recklessly cause severe emotional distress to E.T. or Annalesa Thomas by outrageous conduct on May 24, 2013?

(ECF 237 at 9.)

The jury found the City of Lakewood liable to E.T. and Annalesa on this claim. (*Id.*) The tort of outrage requires the proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress. *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wa. 2003). Claims for outrage must be predicated on behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby v. Sampson*, 530 P.2d 291, 295 (Wa. 1975) (internal citations omitted). As Defendants cite, "This cause of action is reserved for the most extreme of circumstances, such as forcing a plaintiff to witness the pain and suffering of his spouse while she

24

died." *McCourt v. Ocwen Loan Servicing, LLC*, 2012 WL 681787 (W.D. Wash. 2012) (citing *Grimsby*, 530 P.2d at 295).

Yet Defendants maintain that no facts in this case rise to the level of outrage. The jury had good reason to disagree. Zaro and Wiley orchestrated an operation, executed in critical part by Markert, whereby an unarmed man who was negotiating the temporary release of his four year old son to the boy's grandmother was subject to an explosive breach of his back door, shot in his abdomen, and then repeatedly punched in the face while he died, despite having never threatened violence to anyone that night. The cases cited by Defendants recognize the emotional distress inherent in the experience of a close family member's death. *See, e.g.*, *Grimsby*, 530 P.2d at 295. E.T. was being held in his father's arms when Leonard was shot and could be heard crying "Daddy, Daddy!" (ECF 264 at 186.) Annalesa was on the street in front of the house when she heard an explosion and gunfire, and said, "Oh my God, they've shot my son." (ECF 267 at 158-59.) An officer had to drag her down the street away from the scene. (*Id.* at 159.) Defendants consistently represent the facts in the light most favorable to themselves and consistently fail to recognize the scope of Plaintiffs' loss, and the traumatic nature of the way in which the loss took place. The jury resoundingly found otherwise. Its finding stands.

Finally, Defendants argue that the award for outrage is duplicative of the recovery E.T. and Annalesa won for their Fourteenth Amendment deprivation of familial relationship claims. In fact, however, these claims represent distinct injuries. The Fourteenth Amendment claim represents the permanent loss of E.T.'s father and Annalesa's son; the outrage claim represents the emotional trauma of being present when Leonard was killed. Each claim exists independently of the other.

### J. Negligent Child Abuse Investigation (Verdict Question Nine)

Question Nine of the verdict form reads:

> Plaintiff E.T. brings a claim against the Cities of Fife and Lakewood under Washington state law for negligence in the investigation which separated him from his father. Did a negligent investigation by employees of the Cities of Fife or Lakewood cause the wrongful permanent removal of E.T. from his father Leonard Thomas?

(ECF 237 at 10.)

The jury found the Cities of Fife and Lakewood liable to E.T. on this claim. (*Id.*) The relevant statute provides that "A law enforcement officer may take, or cause to be taken, a child into custody without a court order if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order." RCW 26.44.050. The Supreme Court of Washington has recognized that this statutory duty implies a cause of action for children and parents for negligent investigation where authorities remove a child from a nonabusive home. *See M.W. v. Dep't of Soc. & Health Servs.*, 70 P.3d 954, 957 (Wa. 2003).

Defendants argue that the statute cannot be implicated because Defendants were executing a valid warrant for Leonard's arrest, and Defendants did not take E.T. "into custody" due to the fact that E.T. was turned over to his family. However, trial testimony indicated that Defendants decided not to arrest Leonard the night of the incident because the mission of their operation became "get[ting] custody of [E.T.]." (ECF 263 at 82; ECF 264 at 156.) The jury could reasonably have concluded that the force used by Defendants was intended to remove E.T. from the custody of Leonard and bring him into the custody of law enforcement. The jury could have further concluded that Defendants failed to exercise reasonable care in their investigation of the need to remove E.T. from Leonard's custody, which caused E.T. to be removed from a non-abusive home

26

by force. The fact that Defendants returned E.T. to his family after they secured custody of him does not excuse the manner in which E.T. was removed from his father's custody. Defendants also argue that they were improperly denied the opportunity to argue that Leonard was a superseding cause of any harm suffered by E.T. However, the jury was instructed in the context of the negligent investigation instructions on the principle of a superseding cause. (ECF 220 at 44.) The fact that the jury found liability despite this instruction indicates that it determined Defendants to be the proximate cause of the damages found.

### K. Punitive Damages (Verdict Question Eleven)

Question Eleven of the verdict form asked whether punitive damages should be assessed against Zaro, Wiley, and/or Markert. (ECF 237 at 13.) Defendants briefly argue there was no evidence that they engaged in the type of conduct that would properly allow the issue of punitive damages to be placed before the jury. To the contrary, once the jury found that Defendants' actions were unreasonable and violated Plaintiffs' constitutional rights, it was reasonable and appropriate for the jury to consider the issue of punitive damages. The jury's conclusion that the Defendants' escalation and use of force resulting in the death of Leoanrd exhibited malice, recklessness, or callous indifference to Plaintiffs' rights was a reasonable conclusion based on the evidence presented to them.

## IV. **DEFENDANTS' MOTION FOR REMITTITUR**

Defendants move for remittitur of the compensatory and punitive damages awarded against them. (ECF 284.) The jury awarded the following compensatory damages:

To E.T.:

- $500,000 for unreasonable seizure from his father;

- $2,750,000 for deprivation of his familial relationship with Leonard;

- $125,000 for unreasonable seizure of his house;

- $125,000 for outrage; and

- $500,000 for negligent investigation.

To the Estate of Leonard Thomas:

- $750,000 for unreasonable seizure of his son;

- $1,000,000 for excessive force;

- $125,000 for unreasonable seizure of his house; and

- $10,000 for unreasonable seizure of his dog.

To Annalesa Thomas:

- $750,000 for deprivation of her familial relationship with Leonard;

- $500,000 for unreasonable seizure of her house; and

- $125,000 for outrage.

To Fredrick Thomas:

- $750,000 for deprivation of his familial relationship with Leonard;

- $125,000 for unreasonable seizure of his house; and

- $500,000 for false arrest.

28

Additionally, the jury imposed the following punitive damages:

- $3,000,000 against Michael Zaro;

- $1,500,000 against Michael Wiley; and

- $2,000,000 against Brian Markert.

(ECF 237 at 12-13.)

In considering a motion for remittitur, the Court views the evidence concerning damages in a light most favorable to the prevailing party. *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987), *amended on other grounds by* 817 F.2d 609 (9th Cir. 1997). "Generally, a jury's award of damages is entitled to great deference, and should be upheld unless it is 'clearly not supported by the evidence' or 'only based on speculation or guesswork.'" *In re First All. Mortg. Co.*, 471 F.3d 977, 1001, 1003 (9th Cir. 2006) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986)). "An otherwise supportable verdict must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking the conscience.'" *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988) (quoting *Fauntila v. Carter*, 571 F.2d 487, 492 (9th Cir. 1978)). That is, the Court will not substitute its own judgment for the judgment of the collective conclusion of the jury unless the jury's award is "clearly unsupported by the evidence." *Id.* "[C]ompensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1086 (9th Cir. 2009).

Defendants argue that before analyzing the governing legal factors, the Court should address the fact that it is "clear" the jury's decision-making was improperly influenced by "sentiment in the community about police excessive force against African-Americans." (ECF 284

29

at 2.) The jury's findings should be discounted, Defendants' counsel repeated to the Court during the December 5, 2017 hearing on qualified immunity and remittitur, because "what the jury found here is that they weren't going to go back to their individual communities and tell the people that they associate with, we found in favor of white cops that shot an unarmed black man." The Court could not more strongly reject Defendants' argument. Without any evidence – without any factual foundation whatsoever – Defendants have chosen to malign one of this country's most sacred civic institutions, the impartially selected petit jury. Eight individuals interrupted their lives for three and a half weeks of solemn attention to this case. These eight individuals swore to try the matter at issue according to the evidence and the instructions of this Court. They listened, they watched, and for five days they deliberated.

The suggestion that this jury flouted its charge and colluded to hold government officials liable merely to advance the jurors' individual reputations is not simply frivolous; it is insulting to our constitutional order. And the notion that the American justice system can be characterized by an illegitimate solicitude for black victims of alleged police misconduct is so painfully ahistorical that one wonders whether Defendants advance this argument seriously. Apparently, Defendants would have the Court declare a mistrial at this late stage on the basis of juror prejudice notwithstanding the fact that Defendants successfully moved to preclude the venire from viewing a video on unconscious bias (*see* ECF 146, 163); notwithstanding the fact that Defendants only used two of their three peremptory challenges (*see* ECF 168); notwithstanding the fact that Defendants represented to the Court that they accepted the jury as constituted (*see* ECF 261 at 169); notwithstanding the fact that Defendants never requested a continuance or change of venue; notwithstanding the fact, should it even matter, that none of the jurors were African American; and

notwithstanding the fact that all available evidence suggests each juror conducted himself or herself with integrity and impartiality.  The Court declines Defendants' request.

Perhaps Defendants intend to argue that the damages awarded in this case were inflated because of passions and prejudices that clouded the jury's logical reasoning.[2]  If Defendants are, in fact, concerned that the jury's response to the facts of this case may have been colored by emotion, they fail to show that those emotions were somehow inappropriate.  This jury was empaneled to hear a case about a misuse of police power that left a young man dead, a child fatherless, two parents devastated with grief.  The law is not so cold and callous as to forbid an emotional reckoning with this suffering.  The jury need not have – and could not have – avoided the manner and magnitude of the Thomas family's loss.  Indeed, the jury was instructed to access its collective emotional register to consider whether the officials' conduct here "shocks the conscience." (ECF 220 at 25)  It found in the affirmative, and rationally calculated that the sound and fury unleashed by Defendants in May 2013 signified something very specific: $15,135,000 in damages.

## A.  Compensatory Damages

Defendants move for remittitur on every claim for which the jury awarded damages.  The Court will address each in turn.

### 1.  Jury's Awards to E.T.
#### a.  Unreasonable seizure.

Defendants request that the $500,000 awarded to E.T. for being unreasonably seized from his father be reduced to $25,000 because E.T. has only a vague memory of what occurred that

---

[2] In Part VI, below, the Court addresses – and rejects – Defendants' argument that Plaintiffs improperly exploited racial considerations.

night. Plaintiffs, however, submitted evidence that E.T. does appear to remember the relevant events. (*See* ECF 266 at 12.) Defendants seized E.T. from his father by shooting Leonard while he was holding E.T., and then pulling E.T. from Leonard's arms while he lie dying. Viewing the evidence in a light favorable to Plaintiffs, as the Court must, *Seymour*, 809 F.3d at 1387, this was all done even though E.T. was not in any danger from his father. Plaintiffs correctly note that the evaluation of the magnitude of a child's trauma is a quintessentially jury question. The Court finds that the jury's award is a reasonable reflection of the kind of trauma evidenced at trial.

    b. <u>Deprivation of his familial relationship with Leonard.</u>

    Defendants request that the $2,750,000 awarded to E.T. for the deprivation of his familial relationship with Leonard be reduced to $500,000 because the jury disregarded, among other factors, that Leonard's chronic substance abuse problems frequently interfered with his ability to parent E.T. Defendants, however, ignore substantial evidence of Leonard's devotion and care for E.T. (*See* ECF 265 at 182-93; ECF 266 at 66-68, 72-75, 93, 119-21, 137-38, 148-54; ECF 267 at 37-39, 172-77.) Leonard was described by those who knew him as a father who loved his child and lived for his child, serving as E.T.'s primary caregiver and custodian. When Defendants ended Leonard's life they also severed one of the most important relationships in E.T.'s life. The jury's verdict will stand.

    c. <u>Unreasonable seizure of his house.</u>

    Defendants request that the $125,000 awarded to E.T. for the unreasonable seizure of his house be reduced to $1 because E.T. did not remember the explosive breach and was not injured by it. Defendants ignore E.T.'s right not to have the home where he lived seized in an unconstitutional manner. An unreasonable violation of the personal home is not simply a nominal harm. The jury heard testimony that E.T., who rarely cried, sobbed when reminded of his old

home and wanted to return even though he knew his father was no longer there. (ECF 267 at 177-78.) The damages awarded by the jury for the unreasonable seizure of his home will not be adjusted by the Court.

d. Outrage.

Defendants request that the $125,000 awarded to E.T. for outrage be reduced to $1 because the damages are duplicative of those awarded on his civil rights causes of action. Outrage, however, recognizes damages for personal presence during the injury of an immediate family member, *see Reid v. Pierce Cty.*, 961 P.2d 333, 337 (Wa. 1998), which is an injury distinct from the other claims brought by E.T. E.T. was present in the worst way when his father was killed – embraced by Leonard when the bullet hit, and pried from Leonard's arms as his father bled to death. Defendants further argue, "This is an example of the jury seeing a dollar-sign with a blank next to it and feeling obligated to fill in a number." (ECF 284 at 18.) This contention, however, is impossible to square with the jury's decision not to award any damages to Fred for excessive force during his arrest despite finding Zaro and Cannon liable on that claim. (*See* ECF 237 at 12.) The verdict reveals that the jury only awarded damages where it deemed an award to be appropriate. Given E.T.'s physical presence when his father was killed, the Court will not disturb the amount of the jury's verdict on this claim.

e. Negligent investigation.

Defendants request that the $500,000 awarded to E.T. for negligence in the investigation that precipitated the entire episode and separated him from his father be reduced to $1 because the award was duplicative. Moreover, this was the only claim on which the jury found liability against the City of Fife, which again suggests that the jury was considering independent actions or consequences unique to each claim. Defendants rejected Plaintiffs' proposed verdict form, which

33

carefully avoided any possibility of duplication (*see* ECF 208), and declined to raise any inconsistencies in the completed verdict form – despite receiving the opportunity to do so – before the jury was dismissed (*see* ECF 295-1).  Defendants have otherwise failed to carry their burden of demonstrating duplication, and accordingly the jury's verdict will not be disturbed.

2. <u>Jury's Awards to the Estate of Leonard Thomas.</u>
   a. <u>Unreasonable seizure of E.T.</u>

Defendants request that the $750,000 awarded to the Estate for the unreasonable seizure of E.T. be reduced to $50,000 because Leonard could have expected that he was not going to be allowed to keep E.T. that night.  Defendants ignore that Plaintiff's claim was not simply that E.T. was seized, but that E.T. was seized in a horrific manner.  Police seized E.T. from Leonard by shooting Leonard in the stomach and then punching him in the face as they forcibly pulled his son from his arms.  The anguish and distress that Leonard experienced due to this separation supports the jury's full award.

   b. <u>Excessive force.</u>

Defendants request that the $1,000,000 awarded to the Estate for the excessive force used against Leonard be reduced to $500,000 because Leonard was rendered unconscious within minutes of the shooting.  Notwithstanding Defendants' unseemly efforts to diminish the physical pain and anguish suffered by a dying man, Defendants also ignore the fact that the jury was instructed to consider in its award of any damages, "The loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future," and "Deprivation of life." (ECF 220 at 46.)  These categories go beyond the agony that Leonard experienced in the final moments of his life to encompass the total sum of his loss.  The Court will not disturb the jury's award.

c.    <u>Unreasonable seizure of his house.</u>

Defendants request that the $125,000 awarded to the Estate for the unreasonable seizure of Leonard's house be reduced to $5,000 because it could come as no surprise that his home would become occupied by the police given the circumstances.  As with their arguments against the Estate's award for unreasonable seizure of E.T., Defendants ignore the unconstitutional manner in which the seizure of the house occurred.  Even though Defendants had a warrant to enter Leonard's home, the Constitution nonetheless applied to their method of entry.  The method Defendants chose – an explosive breach ignited when Leonard was unarmed and negotiating the surrender of E.T. to Annalesa – was a dangerous, escalatory, destructive intrusion.  The damages awarded fairly reflect the jury's view of the magnitude of that violation.

d.    <u>Unreasonable seizure of his dog.</u>

Defendants request that the $10,000 awarded to the Estate for the unreasonable killing of Leonard's dog Baxter be reduced to $1 because the dog was in poor health and may not have survived the first volley of shots fired by Nathan Vance, who was found not liable.  Dogs do not lose all of their value, however, when they become ill, and Defendants cannot point to unrefuted evidence in the record that this dog would not have survived but for Wiley's gratuitous gunshots.  Leonard's emotional attachment to Baxter was apparent from the manner in which he mourned the dog's illness, and that loss supports an award of $10,000.

3.    <u>Jury's Awards to Annalesa Thomas.</u>

a.    <u>Deprivation of familial relationship with Leonard.</u>

Defendants request that the $750,000 awarded to Annalesa for the deprivation of her familial relationship with Leonard be reduced to $250,000 because Annalesa had a troubled relationship with Leonard and was a domestic violence victim of Leonard on the night he was

35

killed. The domestic violence in question involved Leonard grabbing Annalesa's wrist during the scuffle over a phone. As an example of Annalesa's troubled relationship with Leonard, Defendants point out that "She wrote a letter to a court in one of Leonard's criminal cases, begging for something short of a jail sentence because Leonard was an end-stage alcoholic who could die during alcohol withdrawals." (ECF 284 at 21.) A mother's begging the court for leniency on behalf of her son, however, seems to be more an example of parental love for her child than an example of antagonism or estrangement. That love was well documented during trial, and the jury witnessed firsthand the grief that Annalesa continues to endure. (*See, e.g.*, ECF 267 at 141-42.) The jury's award was an appropriate calculation of the damages suffered by a mother's loss of her child.

  b.     Unreasonable seizure of her house.

  Defendants request that the $500,000 awarded to Annalesa for the unreasonable seizure of her house be reduced to $5,000 because the evidence does not support the jury's decision to award Annalesa a greater sum on this claim than was awarded to the other Plaintiffs. The jury's decision to award a greater sum to Annalesa than to the other Plaintiffs may be explained by the fact that unlike Leonard and E.T., Annalesa owned title to the house. And unlike Fred, she was present when the explosive breach was detonated. The jury could reasonably have concluded that these variables resulted in greater damages to Annalesa. The fact that Annalesa summoned the police to help deescalate a minor conflict with her son was not a license for an unconstitutional entry that damaged her house and exacerbated the standoff.

  c.     Outrage.

  Defendants request that the $125,000 awarded to Annalesa for outrage be reduced to $1 because she did not see Markert's bullet strike Leonard. Defendants provide no citation, however,

36

for a requirement that Annalesa physically witness the shooting. Annalesa was present at the scene, heard the explosion and gunfire that killed her child, and exclaimed, "Oh my God, they've shot my son." (ECF 267 at 158-59.) This is precisely the type of emotional trauma for which outrage damages are intended to compensate. *See Grimsby v. Sampson*, 530 P.2d 291, 295 (Wa. 1975)

### 4. Jury's Awards to Fredrick Thomas.

#### a. Deprivation of his familial relationship with Leonard.

Defendants ask that the $750,000 awarded to Fred for the deprivation of his familial relationship with Leonard be reduced to $300,000 because "Fred's relationship with Leonard was a troubled one." (ECF 284 at 22.) On the contrary, the jury heard extensive testimony about the enduring, loving, father-son bond between Fred and Leonard. (*See, e.g.*, ECF 266 at 112-13, 139-41; ECF 267 at 38-39, 170-71.) The jury was entitled to credit this testimony and award Fred $750,000 for the loss of his son.

#### b. Unreasonable seizure of his house.

Defendants ask that the $125,000 awarded to Fred for the unreasonable seizure of his house be reduced to $1 because Fred did not suffer any harm as a result of his house being seized. The jury found that the police caused unreasonable destruction to a home Fred owned, and that finding is supported by the evidence. The violation of residential property is not a trivial matter. The Court cannot say that the jury's award was "grossly excessive."

#### c. False arrest.

Defendants ask that the $500,000 awarded to Fred for false arrest be reduced to $50,000 because the jury "essentially awarded Fred damages for the lost opportunity to bring the standoff

37

to a peaceful resolution." (ECF 284 at 23.) Defendants have not provided any citation, however, for why the jury was not permitted to consider the circumstances of the arrest and the emotional toll that Fred endured during his wrongful confinement. The jury found that Zaro and Cannon ordered Fred to be removed from the scene even though Fred had explained that he was the property owner and simply wanted to speak with his son. Regardless of whether Fred could have successfully contributed to resolving the standoff had he been permitted to remain, the consequences of removing him were severe. He wrongfully spent the night in a cell, unable to speak to his wife or son during this critical moment in their lives. He testified, "I sat in that cage all night long, knowing my son was dead." (ECF 266 at 134.) The following morning two officers and a chaplain arrived to inform Fred that Leonard had indeed been killed. When police returned Fred's cellphone he saw a missed call and voicemail from Leonard where, Fred testified, "He begs me, 'Please help me, Dad. Please help me, Dad,' and I never heard it till the next day." (ECF 266 at 168.) The jury had an opportunity to observe Fred testify and view his still-palpable grief. Its award for the false arrest of Fred is supported by the evidence presented to the jury.

## B. Punitive Damages

The jury imposed punitive damages against Zaro in the amount of $3 million, against Markert in the amount of $2 million, and against Wiley in the amount of $1.5 million. Defendants argue that the punitive damages award was unreasonable and violated the Constitution's Due Process Clause. The Court assesses reasonableness through analysis of the "*Hammond* factors":

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred;

(b) the degree of reprehensibility of the defendant's conduct, duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct;

. . .

(d) the "financial position" of the defendant;

(e) all the costs of litigation;

(f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and

(g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

*Morgan v. Woessner*, 997 F.2d 1244, 1257 n.14 (9th Cir. 1993) (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21-22 (1991)). The Court may also look to "other general elements of reasonableness to determine whether a punitive damage award should be upheld. The broader picture must not be lost." *Id.* at 1257. "The task of the court is a comparison between the amount of punitive damages actually assessed and a figure derived from the facts of the case at hand. To arrive at this figure, the court should look to awards in similar cases and to its own experience." *Id.*

The *Hammond* factors support a finding that the jury's award was reasonable. The harm caused and reprehensibility exhibited by the Defendants warrants significant condemnation. The Defendants have not been subject to any other civil or criminal sanction, and they have not borne the costs of litigation. Indeed, this jury verdict is the only form of accountability Defendants face for their conduct.

The sole factor that might raise a question about the amount of the award is the Defendants' financial position. Defendants argue that the punitive damages amount to "the financial equivalent of a death sentence" because they failed to "take into account the financial realities of being a career police officer." (ECF 284 at 6.) There are two problems with this argument. First, "There is no constitutional prohibition of awards in excess of a party's net worth." *Dawe v. Corr. USA*,

39

506 F. App'x 657, 660 (9th Cir. 2013); *see also Kemezy v. Peters*, 79 F.3d 33, 36 (7th Cir. 1996)

("The reprehensibility of a person's conduct is not mitigated by his not being a rich person, and

plaintiffs are never required to apologize for seeking damages that if awarded will precipitate the

defendant into bankruptcy.").   While this factor may weigh in Defendants' favor, it is not

dispositive.

Second, Defendants may not argue that the jury unreasonably failed to consider the

Defendants' financial position when Defendants made the strategic choice not to present evidence

of their finances to the jury.  The Ninth Circuit has refrained from interfering with a punitive

damages award when defendants offered no evidence of their financial ability to pay.  *See Tri-*

*Tron Int'l v. Velto*, 525 F.2d 432, 438 (9th Cir. 1975); *El Ranco, Inc. v. First Nat'l Bank of Nev.*,

406 F.2d 1205 (9th Cir. 1968), *cert. denied,* 396 U.S. 875 (1969).  This is a common rule across

the country.  *See, e.g.*, *Schaub v. VonWald*, 638 F.3d 905, 926 & n.14 (8th Cir. 2011) ("as a matter

of federal law, it is a defendant's burden to introduce evidence of net worth for purposes of

minimizing a punitive damages award"); *Provost v. City of Newburgh*, 262 F.3d 146, 163-64 (2d

Cir. 2001) ("The duty then is on the defendant to present evidence, before the jury renders its

verdict . . . of his limited resources if he wishes that factor to be weighed in the calculation of

punitive damages."); *Mason v. Okla. Turnpike Auth.*, 182 F.3d 1212, 1214 (10th Cir. 1999)

("plaintiff does not bear the burden of demonstrating defendant's financial condition"); *Kemezy*,

79 F.3d at 36 (same); *Hutchinson v. Stuckey*, 952 F.2d 1418, 1422 n.4 (D.C. Cir. 1992) ("the weight

of authority places on *the defendant* the burden of producing evidence of his own financial

condition if he wishes it considered by the jury.); *Fishman v. Clancy,* 763 F.2d 485, 490 (1st Cir.

1985) (declining to overturn a jury verdict where the defendants "failed to create a record of their

financial capabilities").  Defendants cannot argue their inability to pay at this stage when no

40

evidence on the matter was introduced during trial. The Court will not second guess the jury by considering evidence that the jury did not have before it.

An award of punitive damages must also be consonant with the Due Process Clause of the Fourteenth Amendment. The Supreme Court has identified three "guideposts" for courts to consider when reviewing the constitutionality of a punitive damages award:

> (1) the degree of reprehensibility of the defendant's misconduct;
>
> (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and
>
> (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The jury obviously found that the type of harm and reprehensible conduct revealed at trial were unusually severe, even for a wrongful death case. At every step of the evening after Annalesa and Thomas first asked the police for help resolving where E.T. should spend the night, Defendants escalated the probability that someone would die. They responded to a minor domestic dispute with a full SWAT Team including two armored trucks and two snipers. When Leonard brought E.T. onto the porch in preparation to hand him off, Zaro ordered his team – including the snipers – not to let Leonard back inside with his son. Wiley orchestrated an explosive breach that destabilized any hope for a peaceful resolution. Markert shot and killed an unarmed man who was holding his son in his arms. Unlike civilians, police officers are trained to respond to tense conflicts with equipoise and empathy. Instead, taking the facts in the light most favorable to the verdict, these three defendants exhibited conduct that was reckless and destined

41

to cause harm. The Supreme Court has recognized that conduct causing physical harm is more reprehensible than conduct causing merely economic harm, and conduct that evinces indifference or reckless disregard for the health or safety of others is more likely to be reprehensible than a mere accident. *Id.* at 575-76. The intentional acts here resulted in the most tragic of physical harms: death.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at 580. This can be measured by calculating the ratio between punitive damages and compensatory damages. *Id.* The Supreme Court has recognized a punitive damages award of more than four times the amount of compensatory damages might be close to the constitutional line. *Id.* at 581. Here, the punitive damages imposed against each defendant are less than the compensatory damages assessed against them. The jury's award does not exceed the bounds of reasonability and due process.

Finally, the Court may assess the constitutionality of a punitive damages award by comparing the verdict to damages imposed in comparable cases. Defendants have compiled a spreadsheet of 64 appellate cases reviewing the jury's assessment of punitive damages to show that the mean award, adjusted to present value, is $370,479. (ECF 295 at 96-97.) This spreadsheet suffers an obvious deficiency: it includes all cases where the jury awarded punitive damages, for any claim. That a jury assessed $5,000 in a Fair Housing Act action (*see Fountila v. Carter*, 571 F.2d 487, 488 (9th Cir. 1978)) or $10,000 for a First Amendment violation (*see Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9, 13 (1st Cir. 1989)) is singularly unhelpful when determining the appropriate range of damages for Fourth and Fourteenth Amendment violations that resulted in the loss of life. Of further concern, Defendants omit the most analogous case, *Estate of*

42

*Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005). In *Moreland*, the jury awarded a combined $27.5 million in punitive damages against two sheriff's deputies after finding them liable for wrongfully causing the death of an individual by the use of unnecessary and excessive force. 395 F.3d at 751. The much smaller award here was properly calibrated to punish and deter.

Given the evidence presented at trial, the compensatory and punitive damages awards were well within the jury's prerogative and the Court will not disturb them. Defendants' Motion for Remittitur (ECF 284) is DENIED.

## V. <u>DEFENDANTS' MOTION FOR QUALIFIED IMMUNITY</u>

Defendants move for qualified immunity pursuant to Rule 50(b) for the following individuals:

- Mike Zaro (for the Fourth Amendment and Fourteenth Amendment claims resulting from his orders that led to the shooting of Leonard and the explosive breach);

- Brian Markert (for the Fourth Amendment claims resulting from his shooting of Leonard);

- Mike Wiley (for the Fourth Amendment and Fourteenth Amendment claims resulting from his participation in the explosive breach and for shooting the dog); and

- Jason Cannon (for the Fourth Amendment claims resulting from his participation in the arrest of Fred).

(ECF 280.)

Three questions must be addressed to resolve this motion. First, did Defendants waive their qualified immunity claims? Second, did Defendants commit a constitutional violation? And third, if a constitutional violation was committed, would a reasonable officer have known that the conduct was unconstitutional? The Court will address each in turn.

43

## A. Waiver

### 1.  Markert, Wiley, Cannon

The Supreme Court has formulated the doctrine of qualified immunity to dispose of "insubstantial claims" at the earliest stage of litigation possible.  *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.").  Thus, defendants typically assert qualified immunity in a motion to dismiss or motion for summary judgment.  At those stages, a court may grant qualified immunity if the plaintiffs have not made out a constitutional violation, based on the facts alleged or "shown."  *See Pearson v. Callahan,* 555 U.S. 223, 232 (2009).

Markert, Wiley, and Cannon raised qualified immunity in a motion to the Court for the first time in their Rule 50(a) motion for a directed verdict on July 3, 2017.  (ECF 184.)  Plaintiffs argue that by failing to raise qualified immunity in a motion to dismiss or motion for summary judgment, and by failing to request special verdicts relevant to a qualified immunity defense to the jury, the defense has been waived.  Where the jury's verdict "necessarily rel[ies] on factual findings which are determinative of the immunity issue[,] district courts may be required to solicit special verdicts on the factual issues needed to determine entitlement to qualified immunity."  *Sloman v. Tadlock*, 21 F.3d 1462, 1469 n.9 (9th Cir. 1994).  The Second Circuit has also held that, "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. . . . If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the factual finding."  *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)  Moreover, Plaintiffs note, the Ninth Circuit has held that a district court may only

44

submit qualified immunity to the jury where "historical facts material to the qualified immunity determination are in dispute." *Connor v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012).

None of these cases support a finding of complete waiver, however. *Connor* simply prohibits juries from resolving the legal elements of qualified immunity, which is why the Court denied Defendants' requested jury instruction that would have had the jury do so here. (*See* ECF 119.) *Sloman* and *Zellner*, meanwhile, prohibit judges from resolving the factual elements of qualified immunity. Because the jury found Defendants liable, and because none of the Defendants requested special verdicts on any factual issues, all factual disputes shall be resolved in favor of Plaintiffs. As discussed below, however, that factual deference does not completely resolve the qualified immunity inquiry because the legal element – whether the constitutional prohibition was "clearly established" – remains for the Court's determination. That determination can be made at any time, even after trial.

In *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), the Eighth Circuit addressed the district court's post-trial denial of qualified immunity where the defendant did not submit any special verdicts to the jury. The Court explained:

> The defendants raised the qualified immunity defense in their answer to Hill's third amended and substituted complaint, but did not file a motion for summary judgment, as is the usual practice. Although the defendants did not receive the benefit of an early resolution to their claim of qualified immunity, the defense is not waived by failure to assert it by motion prior to trial. On appeal from a post-trial rejection of a qualified immunity defense, we consider the evidence in a light favorable to the prevailing party."

311 F.3d at 902 (citations omitted).

In an unpublished decision, the District of Arizona construed Ninth Circuit precedent to permit qualified immunity to be raised for the first time on the fourth day of trial. *See Thompson v. City of Tucson Water Dep't*, No. CIV 01-53-TUC-FRZ, 2006 WL 3063500, at *6 n.14 (D. Ariz.

45

Oct. 27, 2006) ("[A]s the Ninth Circuit has generally found that qualified immunity can be raised in a Rule 50 motion, the Court will err on the side of caution and find that the qualified immunity defense has not been waived.").

Thus, the Court concludes that Markert, Wiley, and Cannon did not waive their qualified immunity claims by waiting until their Rule 50(a) motion to formally raise the issue for the Court's resolution.

   2.   Zaro

While Defendants' Rule 50(a) motion for judgment as a matter of law argued that Micenko, Cannon, Markert, and Wiley were entitled to qualified immunity, it did not assert qualified immunity for Zaro. (ECF 184.) "When a qualified immunity claim cannot be resolved before trial due to a factual conflict, it is a litigant's responsibility to preserve the legal issue for determination after the jury resolves the factual conflict. A Rule 50(a) motion meets this requirement." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009). The "failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law." *Id.*

Thus, Plaintiffs argue, Zaro's claim has been waived and may not be entertained now. Defendants respond that they did argue against liability for Zaro in their Rule 50(a) motion on the grounds of insufficient evidence, and that this was adequate to preserve the claim for qualified immunity because the insufficient evidence arguments overlap substantially with the qualified immunity arguments. The First Circuit has confronted this exact situation, and held otherwise. In *Parker v. Gerrish*, 547 F.3d 1 (1st Cir. 2008), the Court considered a case where the defendant argued insufficiency of the evidence in a Rule 50(a) motion without mentioning qualified immunity, and subsequently moved for qualified immunity under a Rule 50(b) motion. The Court held this was too late:

46

[The] Rule 50(a) motion only argued that the evidence was insufficient to support a finding of a constitutional violation. Though Gerrish stated that there were two issues, he only argued the excessive force issue. Gerrish did not specify qualified immunity as the legal basis for his motion or give the district court judge adequate notice that he was renewing that claim in this context. *See United States v. Samboy,* 433 F.3d 154, 161 (1st Cir. 2005) ("To raise an argument on appeal, a party must 'spell out its arguments squarely and distinctly . . . or else forever hold its peace.'" (quoting *Rivera–Gómez v. de Castro,* 843 F.2d 631, 635 (1st Cir. 1988))). Accordingly, his qualified immunity defense is waived.

Though we have discretion "to relieve a party from the normal consequences of failure to proffer a defense" in a timely manner, we do so only to prevent a "miscarriage of justice" where "error is plain" and the equities heavily favor correcting that error. *Correa,* 69 F.3d at 1196. We need not conduct a detailed examination of the waived qualified immunity arguments to conclude that no such circumstances are presented here.

547 F.3d at 12; *see also Isom v. Town of Warren*, 360 F.3d 7, 9 (1st Cir. 2004) ("[D]efendants did not raise immunity as an issue at the time of their Rule 50 motion, and so they have waived that defense as a grounds for the motion."); *Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001) ("Because [the defendant officer] did not specifically include a qualified immunity argument in his pre-verdict request for judgment as a matter of law, he could not have included such an argument in his post-verdict motion even had he attempted to do so.").

Accordingly, Zaro has waived his qualified immunity defense. In the alternative, he would not be entitled to qualified immunity on the merits, as discussed below.

## B. Constitutional Violation

"A defendant will receive qualified immunity if one of two conditions are met. First, immunity will be applied if the plaintiff has not 'alleged' or 'shown' facts that would make out a constitutional violation. Second, even if the Plaintiff has shown such a violation, the defendant is entitled to qualified immunity if the constitutional right allegedly violated was not 'clearly

47

established' at the time of defendant's alleged misconduct." *A.D. v. California Highway Patrol*, 712 F.3d 446, 453-54 (9th Cir. 2013) (citations omitted).

*A.D.* provides an analogous situation where qualified immunity was requested after trial. The Ninth Circuit emphasized the importance of deferring to the jury's verdict in determining the first prong of qualified immunity analysis, whether Plaintiff has "shown facts that would make out a constitutional violation." 712 F.3 at 453. The Court said that Markgraf, the defendant officer, was not entitled to qualified immunity because "Plaintiffs have done more than 'show' that Markgraf violated their due process rights – they proved it to a jury." *Id.* at 456. The Court explained that "the verdict precludes us from hypothesizing about whether Markgraf could have believed that a legitimate law enforcement objective existed" because "deference to the jury's view of the facts persists throughout each prong of the qualified immunity inquiry." *Id.* (quoting *Guillemard–Ginorio v. Contreras–Gomez,* 585 F.3d 508, 528 (1st Cir. 2009)). "According to the jury's view of the facts, Markgraf shot Eklund without a legitimate law enforcement objectives. We would not be deferring to that view if we now held that Markgraf was entitled to qualified immunity, because he *could have* believed a legitimate law enforcement objective existed under the circumstances. Although such an inquiry might be appropriate when a defendant asserts qualified immunity in a motion for summary judgment or a pre-verdict JMOL motion, the jury's view of the facts must govern our analysis once litigation has ended with a jury's verdict." *Id.* at 456-57 (emphasis in original). "[P]ost-verdict, a court must apply the qualified immunity framework to the facts that the jury found (including the defendant's subjective intent)." *Id.* at 459. The Ninth Circuit recognized that the jury's factual findings could be logically inferred by viewing the jury's verdict in light of the jury instructions. *Id.* at 456 n.5.

The importance of deferring to a jury's fact finding when deciding a motion for qualified immunity was also discussed in *Corcoran v. Fletcher*, 160 F. Supp. 2d 1085 (C.D. Cal. 2001). The court explained, "[D]espite the difficulty in applying qualified immunity, one thing is certain and, for the purposes of this case, dispositive. That is, where essential historical facts concerning what an official knew or did are in dispute, 'it is clear that these are questions of fact for the jury to determine.'" 160 F. Supp. 2d at 1090 (quoting *Headwaters Forest Defense v. Cty. of Humboldt*, 240 F.3d 1185, 1207 (9th Cir. 2000)). "Put simply, 'the jury, not the judge, must decide the disputed 'foundational' or 'historical' facts that underlie the determination.'" *Id.* (quoting *Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1147 (9th Cir.1996)). The *Corcoran* court also recognized that a jury award of punitive damages renders qualified immunity particularly unlikely:

> Furthermore, the special verdicts (i.e., the Punitive Damages Special Verdict Form) indicate that the jury not only found there was no probable cause for Corcoran's arrest, but that Fletcher was either "malicious or in reckless disregard of Corcoran's constitutional rights" and so merited punitive damages. *See Larez v. Holcomb,* 16 F.3d 1513, 1518 (9th Cir. 1994) (observing in context of faulty jury instruction that the jury's award of punitive damages "provides a strong indication that the jury did not find the [officer's] account persuasive," and citing *Benigni v. City of Hemet,* 879 F.2d 473, 480 (9th Cir. 1988), for the proposition that "the jury's award of punitive damages indicated that the jury found the police officer's conduct unreasonable"). Indeed, it would be entirely inconsistent with the jury's clearly supportable finding that Fletcher was either malicious or reckless in the denial of Corcoran's rights to then conclude that his conduct is entitled to immunity. *See Hamilton v. Endell,* 981 F.2d 1062, 1066 (9th Cir. 1992) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity.").

> Therefore, because the jury instructions demonstrate that the jury must have determined that Officer Fletcher not only lacked probable cause to arrest Corcoran but did so unreasonably, and because this Court holds that the jury's determination was sufficiently supported by the record, this Court hereby denies Fletcher's assertion of qualified immunity.

*Id.* at 1090-91.

When a jury has rendered a verdict against a defendant claiming qualified immunity, the defendant is not without recourse. The *A.D.* Court suggested that the defendant could directly attack the sufficiency of the evidence to support the jury's verdict, or attack the jury instructions as inadequate statements of clearly established law. 712 F.3d at 459.

The jury verdict here is sufficient to recognize that each of the Defendants committed a constitutional violation. Zaro argues that his command "don't let him go back into the house with that kid" was not an order to kill. Wiley argues that he was not directly responsible for the explosive breach and was justified in shooting Leonard's dog because the dog was trying to get back up after it had been shot. Markert argues he was justified in shooting Leonard because Leonard was holding E.T. in a threatening manner. Cannon argues he was not involved in Fred's arrest and that the arrest was justified by probable cause for obstruction of justice. The jury's verdict refutes all of these claims.

The jury found that Zaro caused excessive force to be used against Leonard and caused Plaintiffs' property to be unreasonably seized, and found Zaro's actions so reprehensible that it imposed $3 million in punitive damages against him. The jury found that Wiley caused Plaintiffs' property to be unreasonably seized, caused excessive force to be used against Leonard, and unreasonably seized the dog, and found his behavior so reckless and malicious that it assessed $1.5 million in punitive damages. The jury found that Markert used excessive force against Leonard, which means it must not have believed his account of the way Leonard was holding E.T., and assessed $2 million in punitive damages. Finally, after being instructed on the definition of obstruction and probable cause, the jury found Cannon guilty of causing Fred to be seized without legal cause.

Defendants counter that a number of undisputed facts weigh in their favor. They argue that the officers were told that Leonard had a pistol and that he had hung his son out of a second-story window, that the officers knew Leonard was agitated, and that the officers knew that Leonard never released E.T. during the course of the four and a half hour standoff. Defendants would have the Court focus on these facts in isolation, without reference to the evidence submitted by Plaintiffs, to find that Defendants' use of force was constitutional. But even if the Court were to give credence to Defendants' novel form of "deference" to the jury's findings, they would not prevail. That an agitated man may have a pistol, and may have held his son dangerously hours earlier, does not supply constitutional authorization for his killing. The shooting of Leonard could only be justified if Leonard posed an immediate threat to the safety of officers or to others. This disputed fact required a jury trial, and the jury supplied a unanimous answer: No he did not. To the extent Defendants have challenged the sufficiency of the evidence to support the liability findings (*see* ECF 282), the Court has rejected these arguments in Part III above.

## C. Clearly Established Law

The final question is whether these constitutional violations found were "clearly established at the time of the challenged conduct." *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 741 (alterations in original) (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

51

The "'clearly established' inquiry is a question of law that only a judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017). An Eighth Circuit case, *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), provides an example of when qualified immunity may be appropriate after a jury returns a guilty verdict. There, the plaintiff had been arrested for public intoxication and brought to jail, where, she testified, she was strapped naked to a restraining board, visible to male guards, for three hours. 311 F.3d at 901-03. Consistent with the jury's verdict against the prison officials, the Court held that plaintiff's "Fourth Amendment rights were violated when the defendants allowed her to remain completely exposed to male guards for a substantial period of time after the threat to security and safety had passed." *Id.* at 903. However, the Court continued, "Although we conclude that the facts establish a constitutional violation, we believe the defendants were entitled to qualified immunity on the ground that their actions did not violate clearly established law" because "we cannot say as a matter of law that it was clearly established in 1996 that a highly intoxicated, loud and violent prisoner could not constitutionally be restrained naked outside the view of all but a small number of guards." *Id.* at 904-05. Accordingly, the Court's task is to resolve all factual disputes in favor of Plaintiffs, and then determine whether Defendants' actions would have been clearly unconstitutional on the night of the shooting, May 24, 2013.

1.  Excessive force against Leonard.

As for the shooting of Leonard, we must resolve the dispute about the way Leonard was holding E.T. in favor of Plaintiffs and ask whether it was clearly established that police may not authorize or use lethal force against a suspect who is not threatening immediate harm. It plainly was. As the Ninth Circuit recently recounted, citing cases pre-dating 2013, "If a jury determines that [a plaintiff] no longer posed an immediate threat, any deadly force . . . used after that time violated long-settled Fourth Amendment law. We have cases holding that the use of deadly force

52

against a non-threatening suspect is unreasonable." *Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (citing *Tennessee* v. *Garner*, 471 U.S. 1, 11–12 (1985); *Harris* v. *Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997)). "While locating the outer contours of the Fourth Amendment may at times be a murky business, few things in our case law are as clearly established as the principle that an officer may not seize an unarmed, nondangerous suspect by shooting him dead in the absence of probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (citations and alterations omitted).

The Ninth Circuit has identified and established constitutional violations in other cases with facts that overlap with this one. For example, the Court denied qualified immunity to the FBI agents involved in the Ruby Ridge siege in *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997). After an initial outdoor firefight between agents and Plaintiff Harris, Weaver, and Weaver's son Sammy left one agent and Sammy dead, Harris and Weaver retreated to Weaver's cabin. 126 F.3d at 1193. An FBI team created rules of engagement providing that any armed adult male observed in the vicinity of the cabin "could and should be killed." *Id.* At approximately 6:00 pm the following day, Harris, Weaver, and Weaver's daughter Sarah exited the cabin and approached a nearby shed, where Sammy had been prepared for burial. *Id.* Defendant Horiuchi, an FBI sniper, shot Weaver in the back, and after Weaver called out for his wife Vickie, Horiuchi fired a second shot that passed through Vickie and hit Harris. *Id.* at 1193-94.

Horiuchi argued that the "shot he fired while Harris was trying to return to the cabin was objectively reasonable because Harris presented a greater danger when he was in the cabin than when he was outside, and it was therefore necessary to prevent him from reentering." *Id.* at 1203. The Court disagreed: "One of the many problems with Horiuchi's argument is that the force he

53

used was designed to kill Harris, not simply to stop him from reentering the cabin. That under all of the circumstances Harris's effort to return to the cabin he had left only minutes before did not justify so extreme a measure should have been apparent to any reasonable law enforcement officer." *Id.* Moreover, the Court noted, "[e]ven though Harris was armed, he made no aggressive move of any kind when Horiuchi started shooting; instead, with the others, he ran back toward the cabin from which they had recently emerged." *Id.* Thus, "[e]xamining Horiuchi's actions from the perspective of a reasonable law enforcement officer faced with the need to make on-the-spot decisions, it is plain to us that his actions were not objectively reasonable." *Id.* The use of deadly force, the Court concluded, is not permitted "to kill a suspect who is running back to a cabin where he is temporarily staying and who makes no threatening movement of any kind, even though the suspect had engaged in a shoot-out with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers." *Id.*

Defendants here offered similar reasoning to justify the order not to allow Leonard to return inside his house, and for firing the shot that effectuated that order. Because such force was found clearly proscribed in *Harris*, where the plaintiff was suspected of killing an FBI agent and was armed at the time he was shot, the violation is all the more obvious here, where Leonard was unarmed and the jury verdict squarely rejected Defendants' alternative theory that Leonard's decision to pick up E.T. after the explosive breach was harmful or threatening. Therefore, qualified immunity is denied as to Zaro, Wiley, and Markert for the excessive force used against Leonard.

2.     Explosive breach.

As for the explosive breach, the Ninth Circuit held the use of a similar flash-bang device to be unconstitutional in *Boyd v. Benton Cty.*, 374 F.3d 773 (9th Cir. 2004). In *Boyd*, police officers secured a search warrant to enter an apartment to recover jewelry and a firearm as part of a robbery

54

investigation. 374 F.3d at 776-77. A SWAT Team was enlisted to secure the apartment before conducting the search due to the fact that an armed robbery suspect was still at large, the firearm had yet to be recovered, another individual connected to the apartment had attempted to purchase an assault rifle, two armed individuals had been seen exiting the apartment a short time beforehand, and the apartment had a loft from which a shooter could target officers as they entered the apartment. *Id.* at 777. The officers were also aware there was a possibility that five to eight people would be sleeping inside the apartment. *Id.* The SWAT Team supervisor determined that a flash-bang device should be used near the door, where individuals were unlikely to be sleeping, in order to gain entry and secure the premises. *Id.* Unfortunately, Plaintiff Boyd was sleeping near the front wall where the flash-bang came to rest, and suffered burns on her forearm when the device ignited. *Id.* at 777-78. The Ninth Circuit affirmed that the district court correctly found a Fourth Amendment violation under the facts presented because the "officers' use of force was constitutionally excessive" under the circumstances. *Id.* at 778-79. The Court held "[t]here are likely circumstances in which a risk to officers' safety would make the use of a flash-bang device appropriate," but "given the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment . . . absent a strong government interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury." *Id.* at 779.

The Court nonetheless affirmed qualified immunity for the officers because it recognized this rule was not clearly established in 1997 when the flash-bang was used. *Id.* at 784. However, the Court noted that the use of the flash-bang would likely have been "so patently violative of the constitutional right" that reasonable officers should have known that their actions were

unconstitutional without guidance from the courts if "there was no reasonable likelihood that the occupants of the apartment would be armed." *Id.* at 783.

Under the holding and reasoning of *Boyd*, the constitutional violation committed by Zaro and Wiley when they orchestrated the explosive breach was clearly established in 2013. The Government's interest in the use of the explosive breach was not strong because – unlike in *Boyd* – the SWAT Team members were under no conceivable threat of danger. There was no indication that Leonard was armed or threatening anyone's safety when the breach was requested, authorized, and executed. Additionally, Defendants devoted insufficient consideration to alternatives – most obviously, continuing peaceful negotiations with Leonard, who had cooperated by bringing E.T. onto the porch with a car seat and overnight bag, and who had indicated his willingness to release E.T. to Annalesa. (*See* ECF 264 at 185; ECF 269 at 95-96; ECF 267 at 151-52.) As expert testimony revealed at trial, "[at] no time in this incident would that explosive breach on Side 3 have been appropriate. . . . There were no threats, there were no issues at all, that necessitated the use of explosives at any time during this incident." (ECF 165 at 17-18.) The use of the explosive breach was "an emergency assault. There was never an emergency that required them ever to make entry into this house. Never. Because negotiations hadn't failed." (*Id.* at 18.)

Zaro and Wiley violated the Fourth Amendment when they caused an explosive breach to be used on the backdoor of a suspect's house when the suspect was unarmed and negotiating peacefully with officers, and when Zaro's order to snipers not to let Leonard back into the house with E.T. remained outstanding. This violation was clearly established.

3.     Shooting of the dog.

Defendants argue that Wiley's decision to shoot Baxter after Vance had already shot the dog twice was justified because the dog remained a threat. Baxter's menacing nature was a

56

disputed fact at trial.  Vance testified that as he and Wiley stormed the house after the explosive breach, he shot Leonard's dog twice, and shortly thereafter Wiley fired additional shots killing the dog.  (*See* ECF 269 at 208-09.)  The jury found that Vance's decision to shoot Baxter was reasonable, but that Wiley's decision to shoot the dog was not.  (*See* ECF 237 at 6; ECF 220 at 26.)  The only fair inference from this verdict is that the jury determined that Baxter could not reasonably have been viewed as dangerous after he was shot twice by Vance.  The Court has no reason to disturb that finding.  The question, then, is whether it was clearly established that the Constitution prohibits officers from shooting a dog that has survived previous gunshots but is no longer threatening.

"In the Ninth Circuit, we begin our inquiry by looking to binding precedent."  *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004).  "If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end.  On the other hand, when there are relatively few cases on point, and none of them are binding, we may inquire whether the Ninth Circuit or Supreme Court, at the time the out-of-circuit opinions were rendered, would have reached the same results."  *Id.* (quotations and citations omitted).  "Thus, in the absence of binding precedent, we look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts."  *Id.* (quotations and citations omitted).

The Ninth Circuit held in *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) that officers may kill a dog only where it is "reasonably necessary to effectuate the performance of the law enforcement officer's duties."  "The killing of a dog is a destruction recognized as a seizure under the Fourth Amendment."  *Id.*  Dogs "are more than just a personal effect," the Court said; "The emotional attachment to a family's dog is not

comparable to a possessory interest in furniture." *Id.* In *Hells Angels*, the Court affirmed the denial of qualified immunity where officers had a week to plan a raid of a suspect's residence and had advance notice of the presence of two guard dogs, and yet made no plan to protect the entry team from dogs other than by shooting them. *Id.* at 976. Defendants argue *Hells Angels* should not apply here, where Wiley was reacting to exigent circumstances. This may be an instance, then, where there are relatively few cases on point within the Circuit, and looking to decisions rendered by other jurisdictions is appropriate.

A Seventh Circuit case decided in 2008 is analogous. In *Viilo v. Eyre*, 547 F.3d 707 (7th Cir. 2008), officers raided a residence in search of a wanted felon. When a dog ran from the backyard of the residence towards the police, an officer fired two shots at the dog, striking it at least once. 547 F.3d at 708-09. The dog retreated to bushes near the front window of the residence, and emerged minutes later when Defendant Sergeant Kevin Eyre arrived on the scene. *Id.* at 709. Officers testified that the dog ran from under the bushes with his teeth and gums exposed; other witnesses testified that the dog was limping slowly and whimpering. *Id.* Eyre, professing to fear for his own safety, shot the dog twice more, killing it. *Id.* The Seventh Court held that qualified immunity was not appropriate, resolving the factual dispute in favor of the plaintiff, and explaining that the Third Circuit and the Ninth Circuit in *Hells Angels* had clearly established that an officer cannot kill a person's pet unnecessarily. *Id.* at 710. "[C]ommon sense," the Court said, "counsel[s] that the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Id.* Here, the jury found that Leonard's dog was no longer dangerous when it was shot by Wiley. It was clearly established in 2013 that officers may not use lethal force against dogs that are no longer dangerous.

4.    Unlawful arrest.

As for Cannon's participation in the arrest of Fred, "It is well established that an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under [42 U.S.C.] § 1983." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (quoting *Borunda v. Richmond*, 885 F.2d 1884, 1391 (9th Cir. 1988)).   There can be no dispute that this rule is long established.   The only question here is a factual one – whether Fred's actions supplied probable cause for his arrest.   The jury answered that question as to Zaro and Cannon in the negative.   (ECF 237 at 7.)   The Court has ruled that the jury's verdict was supported by the evidence.   Accordingly, qualified immunity is denied.

## VI. **DEFENDANTS' MOTION FOR A NEW TRIAL**

Defendants move for a new trial under Rule 59.   Under Federal Rule of Civil Procedure 59(a)(1)(A), the "court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."   A trial court "enjoys broad discretion with regard to a new trial motion."   *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc) (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court.")).   The Court may grant a new trial only "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed."   *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1087–88 (9th Cir. 2009) (internal quotation marks omitted).

Defendants argue that ten errors cumulatively deprived Defendants of their right to a fair trial: (1) exclusion of weapons found on and under the bed where Leonard and E.T. were seen during the standoff; (2) allowing the Estate and the Individual Plaintiffs to deliver duplicative case

presentations to the jury; (3) allowing Plaintiffs to pursue race-based arguments in an already racially charged occurrence; (4) excluding the Josh Powell incident; (5) exclusion of a 3D animation created by Defendants despite permitting Plaintiffs to show their own 3D animation; (6) allowing Plaintiffs to argue adverse inferences from Brian Markert's decision to retain a lawyer post-shooting; (7) answering a jury question regarding Defendant Jason Cannon's employment status; (8) cumulative error; (9) inconsistent verdicts; and (10) evidentiary deficiencies. The Court will address each in turn.

## A. Exclusion of Weapons

Defendants argue it was error for the Court to exclude evidence that a fixed-blade knife and an unloaded pistol crossbow were found in an upstairs room when the police searched the house after Leonard was shot. A Court's evidentiary rulings are reviewed for abuse of discretion and cannot form the basis for reversal or a new trial unless they are "manifestly erroneous." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Navellier v. Sletten*, 262 F.3d 923, 942 (9th Cir. 2001). A court abuses its discretion only when it commits an error of law or when the court's decision is illogical, implausible, or "without support in inferences that may be drawn from the facts in the record." *Perry v. Brown*, 667 F.3d 1078, 1084 (9th Cir. 2012); *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

Defendants contend that the Court's evidentiary ruling unfairly prevented them from challenging Plaintiffs' "central trial theme" that Leonard Thomas was unarmed. (ECF 283 at 6.) Had the Court allowed it, Defendants say that SWAT Officer Micah Wilson "would have testified that he found the knife on the bed immediately after the shooting, during his protective sweep of the Thomas residence." (*Id.* at 6-7.) Defendants complain that the Court's decision to exclude

this evidence left the jury with the misimpression that Leonard was not a threat to E.T. or the police.

To the extent Defendants desired to introduce this evidence in order to justify Zaro's command not to let Leonard back into the house or to justify Markert's decision to fire the lethal shot, they ignore the Fourth Amendment rule that the reasonableness of an officer's conduct is determined based on the information available to the officer at the time of the conduct. *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Police did not discover these weapons until after the house was breached and Leonard was shot, and therefore the existence of the weapons cannot retroactively justify those decisions. Besides, absent any other supporting evidence, the existence of a knife and unloaded mini-crossbow inside a home is not probative of any intent Leonard may have harbored to harm E.T. Leonard certainly could not have threatened E.T. or the police with the weapons during the moments between the explosive breach and Markert's shot because, as Plaintiff's proved and Defendants do not contest, Leonard did not have access to any weapons during this period. The Court balanced the danger of unfair prejudice to Plaintiffs from the introduction of this evidence as required by Federal Rule of Evidence 403, and concluded that this danger substantially outweighed any probative value related to liability or damages.

## B. Duplicative Case Presentations

The separate counsel representing the Estate of Leonard Thomas and the Individual Plaintiffs (Fred, Annalesa, and E.T.) were permitted to divide their time at trial as they pleased, so long as their aggregate amount of time did not exceed the amount time that was allotted to Defendants' counsel. Defendants argue that they were nonetheless prejudiced by this arrangement because questions asked of a witness by the Estate's counsel were occasionally repeated to the same witness by counsel for the Individual Plaintiffs.

61

Even if Defendants could show that this sporadic repetition was prejudicial – which they cannot – Defendants waived this argument by failing to object during trial. "A party challenging the admission of evidence must timely object and state the specific grounds for his objection." *United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990) (citing Fed. R. Evid. 103(a)(1)). "This rule serves to ensure that 'the nature of the error [is] called to the attention of the judge, so as to alert [her] to the proper course of action and enable opposing counsel to take corrective measures.'" *Id.* (quoting Advisory Committee's Note to Rule 103(a), 56 F.R.D. 183, 195 (1972)) (first alteration in original). Defendants now argue that raising the objection that a question had been asked and answered would have been "futile (at best) and signaled to the jurors Defendants were hiding something (at worst)." (ECF 283 at 13.) Defendants are free to choose their own trial strategy and devise their own predictions about how jurors will respond to their behavior, but raising an objection would not have been futile in at least one regard: the objection would have preserved this issue for appeal. By failing to do so, Defendants forfeited their opportunity to ask the Court and opposing counsel to take any corrective measures that may have been necessary. If Defendants had raised an objection, the Court would have had an opportunity, outside the presence of the jury, to caution Plaintiffs' counsel against repetitive questioning. In any event, the Court allocated trial time in a fair manner.

C. Race-Based Arguments

Defendants argue that the Court erred by permitting Plaintiffs "to discuss 'racial factors' allegedly influencing Defendants' decision-making on the night in question." (ECF 283 at 14.) Defendants contend that the "most egregious display of Plaintiffs' exploitation" of racial factors occurred when Plaintiffs' counsel told the jury during closing:

62

> Because you need to know who he was so that you do think and you do understand that Leonard's background and his life mattered.

and

> These lives do matter, and these SWAT teams and police officers need to know that you don't use deadly force when it's not justified.

(ECF 283 at 15 (quoting ECF 272 at 179-80 & 183).)

In other words, Defendants suggest that a new trial is required because attorneys in a wrongful death case suggested to a jury that the decedent's life mattered. Viewed in context, these statements represented Plaintiffs' legitimate effort to refute what they perceived as Defendants' attempt to diminish the worth of Leonard's life by highlighting negative aspects of his background. (*See* ECF 272 at 178.) That effort, and Plaintiffs' rare references to Leonard's race during trial, were appropriate in light of the facts of this case. There is simply nothing in the record to support the argument that Plaintiffs prejudiced the jury with racial arguments.

### D. Excluding Reference to the Josh Powell Incident

Defendants next argue that the Court erred by granting Plaintiffs' motion in limine to exclude testimony about Josh Powell, a man who brutally killed himself and his children in his residence in Tacoma, Washington in February 2012. (ECF 283 at 15.) Defendants contend that Zaro and other officers would have testified that the Powell incident was fresh in their minds as they gauged the appropriateness of their response to the Leonard Thomas standoff. (*Id.* at 16.) The Court recognizes that the Defendants' mindset is relevant to punitive damages and admissible

evidence under Federal Rules of Evidence 401[3] and 402[4]. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. The Court determined that testimony regarding the Josh Powell incident risked significant unfair prejudice to Plaintiffs because the jury might have been tempted to conflate two episodes that were quite distinct.

The details of the Powell incident received substantial media coverage.[5] Josh Powell was already suspected of killing his wife on the night of the murder-suicide, and had been denied custody of his two sons pending a psychosexual evaluation related to a voyeurism and child pornography investigation. After donating his boys' toys to Goodwill and emailing his attorney, "I'm sorry, goodbye," Powell executed his deadly plan. As *Time* recounts[6]:

> Josh Powell, father to Charles, 7, and Braden, 5, reportedly blew up his home outside of Tacoma, Wash., just a few miles south of Seattle, within minutes of his sons' running from a caseworker's car to his front door on Sunday, Feb. 5. He pulled the children inside and locked the door. By the time the contract

---

[3] Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Fed. R. Evid. 401.

[4] Relevant evidence is admissible unless any of the following provides otherwise:

- the United States Constitution;
- a federal statute;
- these rules; or
- other rules prescribed by the Supreme Court.

Irrelevant evidence is not admissible.

Fed. R. Evid. 402.

[5] *See* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute.").

[6] Tim Newcomb, *Timeline: The Powell Family's Tragic Two Years*, TIME (Feb. 07, 2012), http://newsfeed.time.com/2012/02/07/timeline-the-powell-familys-tragic-two-years.

64

caseworker reached the door, she smelled gasoline and started pounding on the door and windows. An explosion ripped through the house. Three minutes later, when firefighters arrived on the scene, the residence was fully engulfed in flames. An autopsy revealed the father also actually tried to chop his sons with a hatchet before setting the fire.

When police responded to the Thomas residence, in contrast, Leonard had full custody of his son and was not suspected of anything approaching murder. Moreover, Defendants had the benefit of a four hour standoff to learn that Leonard was unarmed and only wanted the police to leave him alone for the night. While officers may always prepare for the worst when they respond to a disturbance, they are nonetheless obligated to tailor their actions and orders to the facts actually presented before them. *See Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) ("[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment.") The Court ruled that allowing details of the Powell incident to be introduced would be prejudicial to Plaintiffs. Just as Plaintiffs would not have been permitted to introduce the bloody details of police shootings in Ferguson, Missouri and beyond, Defendants could not present their own grisly account from Tacoma. This case was tried based on the facts that occurred in Fife, Washington on the night of May 23, 2013. Defendants explained to the jury their version and interpretation of those facts, which included extensive testimony about their fear that Leonard was a threat to E.T. Nonetheless, Defendants were found liable for acting unreasonably, and the punitive damages reflected the jury's fair determination that Defendants' response to those facts was malicious, oppressive, or in reckless disregard of Plaintiffs' rights. (*See* ECF 220 at 47.) The Court's decision to exclude reference to the Powell murders was necessary to ensure that the facts of *this case* were not obscured by other sensational accounts that may have resulted in unfair prejudice to the parties or confused or misled the jury.

## E. Excluding the 3D Animations

Defendants argue that the Court erred by excluding animations prepared by Defendants showing the final moments leading up to Markert's shooting of Leonard Thomas. After viewing the animation and hearing testimony and argument about the animation's accuracy, the Court ruled:

> The Court is persuaded that there's sufficient differences between this and the actual circumstances. The lighting is totally different, the bush is different. I am not at all persuaded that the heights are accurate.
>
> And, you know, there was a demonstration yesterday – I hope we were all in the same courtroom – when the witness did demonstrate for the jury. And, quite frankly, the demonstration that this Court saw was quite different than this animation or the screenshot. I don't find it's accurate enough to be admitted, and I'm going to exclude them.

(ECF 270 at 30-31.)

Defendants' citations from outside jurisdictions do not convince the Court that its ruling was in error. Defendants also object that an animation prepared by Plaintiffs was admitted. Plaintiffs' animation, however, was admitted only to illustrate the trajectory of the bullet that killed Leonard. Any inaccuracy in Plaintiffs' animation, which was subject to scrutiny before the jury (*see* ECF 168 at 29-37), did not create a risk of unfair prejudice comparable to Defendants' animation, which purported to show the broader scene as it unfolded before Markert fired his rifle.

## F. Discussion of Markert's Legal Representation

Defendants argue that the Court erred by permitting Plaintiffs to reference Markert's decision to retain counsel in the context of arguing to the jury that Markert's written account of the shooting was "a parody of an over-lawyered statement where every possible justification is thrown in and repeated page after page." (ECF 272 at 87.) Plaintiffs stated to the jury several times their belief that Markert's statement was a post-hoc rationalization designed to avoid legal

accountability rather than a frank recollection of the events at issue. (*See* ECF 270 at 82, 88; ECF 272 at 40.) Defendants contend this was impermissible because "[c]ommenting on a criminal suspect's decision to retain counsel is prohibited." (ECF 283 at 19 (citing *United States v. Kallin*, 50 F.3d 689, 693 (9th Cir. 1995).)

First, Defendants ignore the obvious: the constitutional concerns discussed by *Kallin* are not implicated because this was not a criminal trial. Second, Plaintiffs did not argue, or even suggest, that Markert should be found liable due to the fact that he retained counsel. That is, Plaintiffs did not introduce this fact for the truth of the matter. Rather, they argued that Markert's legalistic defense was designed to obscure the truth. Third, any prejudice suffered by Defendants is negated by the fact that Defendants themselves sought to undermine Fred Thomas's credibility on account of his decision to retain an attorney shortly after Leonard's death. (*See* ECF 167 at 11, ECF 172 at 145.) Plaintiffs' occasional references to Markert's attorney do not require a new trial.

## G.  Answering Jury's Question Regarding Cannon's Employment

During deliberations, the jury asked, "Is Jason Cannon (@ time of incident) a Lakewood officer? Is there an org chart in evidence of all SWAT officers at the time of incident with the roles they played? Is there a chart that shows all the officers and their department affiliation?" (ECF 233 at 4.) Over Defendants' objection, the Court answered: "Jason Cannon is a Lakewood police officer. For any further information, you must rely on your collective memory, notes, and the exhibits." (*Id.* at 5.) The jury subsequently found Cannon liable for arresting Fred without probable cause, found the City of Lakewood liable for false arrest, and ordered zero damages against Cannon and $500,000 in damages against the City of Lakewood on the claims. (ECF 237 at 7, 8, 12.) Defendants argue that the jury "would not have found Jason Cannon and the City of

Lakewood liable for $500,000 in false arrest damages had the Court not provided that substantive answer to its question." (ECF 283 at 20.)

A district court's response to a question from the jury is reviewed for abuse of discretion. *United States v. Romero–Avila*, 210 F.3d 1017, 1024 (9th Cir. 2000). Instructions to the jury are reviewed for whether they were "misleading or confusing, inadequately guided the jury's deliberations, or improperly intruded on the fact-finding process." *United States v. Warren*, 25 F.3d 890, 898 (9th Cir. 1994). None of these errors were present in the Court's answer to the jury's question because the answer was a simple admitted fact from the record. (*See* ECF 213 ¶ 2.3; ECF 263 at 145 (During direct examination of Zaro, "Q: Officer Cannon as well is another defendant here with the City of Lakewood?; A: Yes.").) Reminding the jury of an undisputed and admitted fact is not error.

## H. Cumulative Error

Defendants contend that the errors set forth in this motion and all other objections preserved during trial cumulatively require a new trial. Defendants have failed to persuade the Court, however, that a new trial is "necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 845-46 (9th Cir. 2014).

## I. Inconsistent Verdicts

Defendants argue that a new trial is warranted because the jury rendered two inconsistent verdicts. First, Defendants maintain it was inconsistent for the jury to find Wiley but not Vance liable for violating Plaintiffs' rights by killing Leonard's dog. Second, Defendants argue it was inconsistent for the jury to find Cannon but not Micenko liable for arresting Fred Thomas without probable cause. The Court has already rejected these arguments in Part III, *supra*, addressing Defendants' Motion for Judgment as a Matter of Law.

J.    Evidentiary Deficiencies

Finally, Defendants argue that the jury's verdict and damages awards are not supported by the evidence.  The Court rejected these arguments in Parts III and IV, *supra*.  Having weighed the evidence and assessed the credibility of witnesses, the Court determines the liability findings and damages awards were not against the clear weight of the evidence.

## VII.  **CONCLUSION**

For the reasons herein, Defendants' Motion for Judgment as a Matter of Law (ECF 282); Motion for Remittitur (ECF 284); Motion for Qualified Immunity (ECF 280); and Motion for a New Trial (ECF 283) are each hereby DENIED.

**SO ORDERED.**

Dated this 30th day of January, 2018.

Barbara Jacobs Rothstein
U.S. District Court Judge