UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

FREDRICK and ANNALESA THOMAS;   )
and JO-HANNA READ, as Guardian  )
ad Litem of E.T., a minor,     ) CASE NO. C15-05346-BJR
 )
            Plaintiffs,   ) SEATTLE, WASHINGTON
 ) June 22, 2017
v.                   )
 ) JURY TRIAL, Vol. 2
JASON CANNON; BRIAN MARKERT;   )
RYAN MICENKO; MICHAEL WILEY;   )
MICHAEL ZARO; CITY OF FIFE;    )
CITY OF LAKEWOOD; and PIERCE   )
COUNTY METRO SWAT TEAM,       )
 )
            Defendants.   )
 )

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiffs:    JOHN R. CONNELLY, JR.
                    MEAGHAN M. DRISCOLL
                    Connelly Law Offices
                    2301 N 30th Street
                    Tacoma, WA 98403

                    TIMOTHY K. FORD
                    DAVID J. WHEDBEE
                    MacDonald Hoague & Bayless
                    705 Second Avenue, Suite 1500
                    Seattle, WA 98104-1745

For the Defendants:    BRIAN CHRISTOPHER AUGENTHALER
                    JEREMY W. CULUMBER
                    RICHARD B. JOLLEY
                    Keating Bucklin & McCormack
                    800 Fifth Avenue, Suite 4141
                    Seattle, WA 98104-3175

EXAMINATION INDEX

| EXAMINATION OF | | PAGE |
|---|---|---|
| THOMAS THOMPSON | DIRECT EXAMINATION BY MR. FORD | 4 |
| | DIRECT EXAMINATION BY MR. CONNELLY | 81 |
| | CROSS-EXAMINATION BY MR. CULUMBER | 94 |
| | REDIRECT EXAMINATION BY MR. FORD | 149 |
| | REDIRECT EXAMINATION BY MR. CONNELLY | 169 |
| | RECROSS-EXAMINATION BY MR. CULUMBER | 174 |
| | REDIRECT EXAMINATION BY MR. FORD | 176 |
| MICHAEL MALAVE | DIRECT EXAMINATION BY MR. WHEDBEE | 182 |
| | DIRECT EXAMINATION BY MR. CONNELLY | 215 |
| | CROSS-EXAMINATION BY MR. CULUMBER | 223 |
| | REDIRECT EXAMINATION BY MR. WHEDBEE | 239 |
| | REDIRECT EXAMINATION BY MR. CONNELLY | 245 |
| | RECROSS-EXAMINATION BY MR. CULUMBER | 246 |

EXHIBIT INDEX

| EXHIBITS ADMITTED | PAGE |
|---|---|
| 1018A | 106 |
| 1020 | 107 |
| 504 | 174 |

```
 1    JUNE 22, 2017                              9:00 A.M.
                           PROCEEDINGS
 2    _____

 3              THE FOLLOWING PROCEEDINGS WERE HELD
                   OUTSIDE THE PRESENCE OF THE JURY
 4

 5         THE COURT:  Please be seated.  Are we ready to bring

 6    in the jury?

 7         MR. FORD:  Yes, Your Honor.

 8      Just one thing.  I took the liberty of telling Ms. Read

 9    that I thought it would be okay with the court if she weren't

10    present, so she's not here today.  Is that okay?

11         THE COURT:  It certainly is.  It's going to be a long

12    trial.  She certainly doesn't need to feel she has to be

13    here.

14         MR. FORD:  Thank you.

15              THE FOLLOWING PROCEEDINGS WERE HELD
                    IN THE PRESENCE OF THE JURY:
16

17         THE COURT:  Good morning, ladies and gentlemen.

18    Please be seated.

19      Are you ready to call your first witness?

20         MR. FORD:  We are, Your Honor.  We call Sergeant Tom

21    Thompson of the Fife Police Department.

22         THE COURT:  If you'll step forward to be sworn by the

23    deputy.

24    THOMAS THOMPSON,            HAVING BEEN FIRST DULY SWORN,
                                  TESTIFIED AS FOLLOWS:
25
```

```
 1            THE CLERK:  Please state your full name for the
 2   record.
 3            THE WITNESS:  My name is Thomas Thompson.
 4                       DIRECT EXAMINATION
 5   BY MR. FORD:
 6   Q    Where do you work, sir?
 7   A    City of Fife Police Department.
 8   Q    How long have you worked there?
 9   A    Twenty years.
10   Q    What is your rank there, or position?
11   A    I'm the detective sergeant.
12   Q    And how long have you held that position?
13   A    I've been in that position just over ten years.
14   Q    And can you tell the jury where the city of Fife is, just
15   in case any of them don't know?
16   A    It's in Pierce County, just south of Federal Way, just
17   before you get to Tacoma.  I-5 runs right through the center
18   of town.
19   Q    And where is it in relation to Lakewood, Washington?
20   A    It is -- if you're on the freeway, it's going north,
21   Lakewood is on the south side of Tacoma, we're on the north
22   side of Tacoma.
23   Q    What was your assignment in the City of Fife in May of
24   2013?
25   A    At that time, I was titled a detective lieutenant.  We've
```

1    since reclassified that to sergeant.

2    Q    And who was the police chief at the time of the City of

3    Fife?

4    A    Brad Blackburn.

5    Q    Has that changed since?

6    A    Yes, sir.

7    Q    Who is the police chief now?

8    A    The police chief is Pete Fisher.

9    Q    Are you also involved in Metro SWAT?

10   A    Yes, sir.

11   Q    What is your role there?

12   A    I'm a crisis negotiator.

13   Q    How long have you performed that role?

14   A    Since 2005.

15   Q    Can you tell us what is Metro SWAT?

16   A    Metro SWAT is a SWAT team that's made up of agencies

17   throughout Pierce County.  Smaller agencies.  It doesn't

18   include the Pierce County Sheriff's Department or the Tacoma

19   Police Department.  They have their own teams, and so the

20   other agencies in the county have formed their own team.

21   Q    And what units is the SWAT team composed of?

22   A    What units, sir?

23   Q    Are there different functions within the SWAT team?  You

24   said you were a negotiator.  What are the others?

25   A    The negotiator team, the tactical team, and then the

1    command team.

2    Q    Are there other parts of the command team, or is it all

3    just one unit?

4    A    It is just one.

5    Q    Sorry.  What did you say the second group was?

6    A    The tactical team.

7    Q    The tactical team.  Excuse me.

8    A    There are operators and, also, snipers on that group.

9    Q    What do you mean by "operators"?

10   A    They are the -- I guess the tactical would be the folks

11   that do the -- the work that the SWAT commander gives them to

12   do.

13   Q    And are they armed, generally?

14   A    Yes, sir.

15   Q    What kind of weapons are they armed with?

16   A    They usually have handguns, rifles.

17   Q    So how does your work as a negotiator interface with the

18   operators and the other elements of the SWAT team?

19   A    How do they interface?

20   Q    How do you interface?  How do you relate to them, or how

21   does your function relate to their function?

22   A    Generally, for the negotiator team, we attempt to make

23   contact with the people that we're dealing with.  And we'll

24   do that either on the telephone, or sometimes we use a piece

25   of equipment called a hailer, and we'll negotiate with them

1    that way.

2    Q    What kind of negotiations?  What are you trying to

3    negotiate, usually?  What is your goal of those negotiations?

4    A    To get people to surrender.

5    Q    And are you able to do that in some cases?

6    A    Yes, sir.

7    Q    Are you able to do that in most cases?

8    A    Yes, sir.

9    Q    Is there just a single negotiator, or how do the

10   negotiators work?

11   A    Currently there are six people on our team.  At the time

12   of this incident, there were four of us.

13   Q    And do all the negotiators participate in the negotiation,

14   or just one?

15   A    Oh, in the actual talking to the person?

16   Q    Well, in the whole process of negotiating, do you just

17   need one negotiator at the time, or is there a team?

18   A    No.  Our team responds.

19   Q    And how does the team work if the idea is to talk somebody

20   out of the situation?

21   A    Okay.  We have a team leader that makes assignments, and

22   generally we have a lead negotiator who is the person that

23   does the talking on the telephone or whatever the piece of

24   equipment is.  Then they are assigned what's called a second,

25   and their job is to listen to what's going on and try to

1    coach the lead negotiator on different things that they might

2    try.

3        We also have what's called an intelligence gatherer, or

4    it's -- that function was kind of intelligence.  They scribed

5    and they got the equipment ready and did everything else

6    there was left to do.

7    Q   Where is this done physically?  Do you actually go talk to

8    the person face to face, or is there a place where you

9    negotiate from?

10   A   We have a negotiator rig that we use.  It is a large

11   van/truck that we use that we operate out of.

12   Q   And what do you do in that rig?  What instruments are

13   there, and what functions can be performed there?

14   A   So inside that rig we have our equipment that we use.

15   We're able to use -- sometimes we use cell phones.  We also

16   have a throw phone, so if a person doesn't have a phone

17   available to them, we can introduce a phone into their home,

18   they can talk to us.  We have our hailer that we use, and we

19   also have equipment, like, white boards and stuff that we use

20   to scribe on.

21   Q   And do all the members of the negotiating team stay there

22   in that rig, or how does that work?

23   A   It just depends on what's required of you at the time.

24   Q   I take it it's usually one negotiator that's actually

25   speaking to the person you're conducting negotiations with?

1    A    Yes, sir.

2    Q    And you said there was another one that took notes?

3    A    We have a secondary negotiator who sits right there with

4    the primary negotiator, and they will take notes and write

5    down ideas, different tactics to try.

6    Q    How does that work during the course of the negotiation?

7    How is that communicated to the command?

8    A    To command?

9    Q    Yes.

10   A    Generally by the team lead.

11   Q    So the team leader is not usually the person who is

12   actually speaking to the subject of the negotiation?

13   A    Not always, but that does happen sometimes.

14   Q    Okay.  So I think I'm following that the general situation

15   would be that there would be three negotiators, at least.

16   One would be involved in actually talking with the person,

17   the other would be involved in taking notes and writing down

18   different things, and the third would be the team leader who

19   is relaying the information to the command; is that right?

20   A    Yes.

21   Q    Is the command officer usually inside the negotiation rig,

22   or are they usually someplace else?

23   A    They're usually somewhere else.

24   Q    And is there another rig of some kind that they use, or

25   where do they usually station?

1  A   It just depends on what jurisdiction we're in.  Sometimes

2  they are just in their -- in their car that they show up in.

3  Q   And do the operators, do they ever go into the negotiation

4  rig, or do they have vehicles of their own?

5  A   Occasionally they'll come in, but they have their own

6  vehicles.

7  Q   What kind of vehicles are those?

8  A   They have a BearCat that they use, and that is a large

9  armor-plated piece of equipment, I guess.  They have an AT,

10 which is another armored vehicle, and they have a pickup

11 truck that they use.

12 Q   Where you present when Leonard Thomas was shot?

13 A   Yes, sir, I was.

14 Q   And where were you in relation to where Mr. Thomas was

15 when he was shot?

16 A   I was across the street, behind the BearCat.

17 Q   Can we please look at Exhibit No. 1096?  It's been

18 admitted.

19     Have you happened to see this before?

20 A   No, sir, I've never seen it.

21 Q   Can you take a second, and take a look and see if you can

22 recognize the layout of what it's depicting.

23 A   Yes, sir.

24 Q   Okay.  And can you show me where you were?  You can

25 actually point to the screen and make a little mark on there

1   like that, if you want, with your finger.

2   A   Okay.

3   Q   And let me just clear what I just did.  And could you show

4   the jury where you were at the time that Mr. Thomas was shot?

5   A   (Witness complies.)

6       I don't know if that went through, but back in here,

7   close to the rig.

8   Q   Okay.  I'm going to try and make a circle around what you

9   just did.

10  A   Okay.

11  Q   Because it's a little too small.

12  A   Sorry.

13  Q   Is that right?

14  A   Yes.

15  Q   And where was Mr. Thomas at the time he was shot, or, at

16  least, where was he the last time you saw him before he was

17  shot?

18          MR. CULUMBER:  Objection; foundation.

19  Q   (By Mr. Ford)  Where was Mr. Thomas the last time you saw

20  him before he was shot?

21  A   He was over on the -- in the doorway over here.

22  Q   Okay.  And is this Mr. Thomas's house, do you believe?

23  A   Yes, sir.

24  Q   And what -- let me just clear these off.

25          And can you tell me -- this vehicle here, do you know

1   what that is?

2   A    That is the BearCat, sir.

3   Q    Okay.  And do you know where in relation to this picture

4   the negotiation rig was at the time Mr. Thomas was shot?

5   A    It was farther back up the street, farther back up 55th.

6   Q    Maybe we should back up a bit and take a look at

7   Exhibit No. 238, please.

8         Do you recognize what that is?

9   A    Yes, sir.

10  Q    And what is that?

11  A    That is the BearCat.

12  Q    Is that -- do you know -- can you tell from looking at

13  this picture whether the BearCat was in the same position as

14  it was when you were there at the time of the shooting?

15  A    Yes, sir.

16  Q    And can you show us on that picture where Mr. Thomas's

17  house is?

18  A    It's back here.

19  Q    Okay.

20        Could we also look, then, at Exhibit 239, which has

21  been pre-admitted?

22        And, again, is this -- can you tell where this is shot

23  from in relation to Mr. Thomas's house and the BearCat?

24  A    I'm sorry.  I don't understand the question.

25  Q    Can you tell where this is shot and -- where the BearCat

1   is in this picture?

2   A   Yes.  It's over here, all the way to the left.  It's kind

3   of the black deal there.

4   Q   This thing here?

5   A   Yes, sir.

6   Q   And Mr. Thomas's house, please?

7   A   Actually, this is Mr. Thomas's house here.  This was a

8   garage that was behind it.

9   Q   And can you -- do you know -- again, show us on this

10  picture where Mr. Thomas was the last time you saw him before

11  he was shot.

12  A   He was in this doorway right here.

13  Q   All right.  Let me clear those off, and if we could look,

14  please, at Exhibit No. 203, which has been pre-admitted.

15        Same -- or different perspective, same house?

16  A   Yes, sir.

17  Q   And could we look, please, at Exhibit No. 176 that's been

18  pre-admitted?

19        Can you tell what we're looking at there?

20  A   Yes.  It appears to be looking back at the BearCat from

21  maybe the porch.

22  Q   Okay.

23        And how did it come to pass that you were behind the

24  BearCat as a negotiator, since you were the negotiator?

25  A   The command told me to take Mr. Thomas's mother forward so

1    that -- the hope was that Mr. Thomas would release his son to

2    her.

3    Q   Okay.

4         Could we look, please, at Exhibit No. 1023, which has

5    been pre-admitted?

6         Can you -- have you seen this particular view before?

7    A   No, sir, I have not.

8    Q   Can you take a second and see if you can orient -- do you

9    see here where this says this is 54th Avenue East?

10   A   Okay.

11   Q   And looks like, right here, we have -- does that say 55th

12   Avenue East?

13   A   Okay.

14        MR. CULUMBER:  Your Honor, this isn't exactly 1023.

15   It is a portion of 1023.  I want to make that clear.

16        MR. FORD:  Okay.

17        THE COURT:  Okay.

18        MR. FORD:  Perhaps is it possible to show the whole

19   of 1023, and then we'll zoom back in?  Okay.  Maybe that will

20   help us recognize what we're looking at.

21        THE COURT:  Is that helpful?

22        THE WITNESS:  Yes.

23   Q   (By Mr. Ford)  Okay.  So looking at this larger version of

24   1023, can you show us where the Thomas house is, please?

25   A   I believe it's, like, right in here, one of these.

1  Q    Okay.  And do you know what this is?

2  A    That's a smoke shop, the Outpost Smoke Shop.

3  Q    And what kind of smoke shop -- what kind of business do

4  they do there?

5  A    It's like a convenience store.

6  Q    Okay.

7       And where on this picture was the negotiation rig

8  parked at the time Mr. Thomas was shot, if you know?

9  A    It was back in here somewhere.

10 Q    Okay.

11      Was it possible to see the house from the negotiation

12 rig when you were there?

13 A    Not that I recall.

14 Q    So you said that you were asked to go to the location with

15 Mrs. Thomas, Annalesa Thomas, by command, correct?

16 A    Yes, sir.

17 Q    Can you describe how that happened?

18 A    Initially, Chief Zaro came out of the negotiator rig and

19 said that Mr. Thomas had agreed -- or was talking about

20 letting E⬛⬛⬛ go with his mother if we brought her forward.

21 So initially Ms. Thomas was at the smoke shop with Officer

22 Wyrwitzke.  So I had him bring her up to the negotiator rig,

23 in case that was a possibility.

24      Shortly after he brought her up, Chief Zaro came back out

25 and said that Mr. Thomas was willing to let E⬛⬛⬛ go if we

1  brought his grandmother forward.

2  Q   Okay.

3      So Ms. Thomas was at the smoke shop here at some point;

4  is that right?

5  A   Yes, sir.

6  Q   And then you had her brought here.  Do you know how you

7  got there, whether it was in a vehicle or on foot?

8  A   It was in a patrol vehicle.

9  Q   And then how did you and see travel from there to the

10 front of the Thomas house?

11 A   We walked forward.

12 Q   What exact- -- do you remember what exactly Chief Zaro

13 said to you?  Was it Chief Zaro who said that Ms. Thomas was

14 to be taken up there?

15 A   Yes, sir.

16 Q   And do you remember what it was he said?

17 A   Something to the effect of he's willing to let E▮▮▮ go

18 if he can see his grandma, and so he told me to get her up

19 there right away.

20 Q   And did you ask any questions?

21 A   No, sir.

22 Q   Did you have any questions in your mind?

23 A   I knew that it seemed like he was anxious to get her up

24 there, so I just wanted to get her up front.

25 Q   Did you know what you were supposed to do when you got up

1   to the front of the house?

2   A   I didn't exactly have a plan, but it seemed to me that if

3   I could get her up close enough that Mr. Thomas could see

4   her, he was going to let the child go to her.

5   Q   Did Chief Zaro tell you that that was what you were

6   supposed to do?

7   A   He said to take her forward.

8   Q   But did you ask any questions about and-then-what?

9   A   No, sir, I did not.

10   Q   Did you kind of wonder and-then-what?

11   A   Yeah.  It wasn't normal for us to bring somebody forward

12   into a situation like that.

13   Q   And so did you have any plan as to what you would do if

14   Mr. Thomas did or did not send the child out to his

15   grandmother?

16   A   No, sir.

17   Q   Okay.

18       So after you -- Chief Zaro gave you this order, and

19   Officer Wyrwitzke brought Ms. Thomas up to area outside the

20   negotiation -- by the way, where was Chief Zaro when he gave

21   you this order to take Ms. Thomas forward?

22   A   He had just come out of the negotiator rig.

23   Q   So had he been in the negotiator rig prior to that?

24   A   Yes, sir.

25   Q   Was he in the negotiator rig for most of the night, that

1   you knew of?

2   A    For part of the night, yes, sir.

3   Q    And do you know who else was in the negotiator rig, if

4   anybody, other than negotiators?

5   A    Other than negotiators?

6   Q    Yes.

7   A    Chief Blackburn was in there.

8   Q    How big is a negotiation rig?

9   A    It's hard to say.  It's, like, an old, big truck that's

10  been converted.

11  Q    Had it been raining that night?

12  A    Off and on.

13  Q    Do you know why Chief Zaro and Chief Blackburn were in the

14  negotiation rig that night?

15  A    I found out that they wanted to hear exactly what the

16  negotiations were between Sergeant Eakes and Mr. Thomas.

17  They wanted to hear it directly.

18  Q    So it was different than the usual protocol of having that

19  information conveyed to them outside the rig by the lead

20  negotiator?

21  A    Yes, sir.

22  Q    So when you walked down with Ms. Thomas to the front of

23  the Thomas house, what happened?

24  A    When we got down closer to the house and stopped, she told

25  me that he wouldn't be able to see her from where we stopped

1  because there was, like, a large hedge around the porch, like

2  a really big rhododendron, and she said he wouldn't be able

3  to see us.  So two tactical officers came over and escorted

4  us from our position to the BearCat.

5  Q   What were you wearing at that time when you took

6  Mrs. Thomas before the house?

7  A   Before we started walking forward, I was aware that during

8  the negotiations, Mr. Thomas had emphasized that he did not

9  like the Fife Police Department.  So I had a Fife Police

10 Department coat on, so I took that off and switched out coats

11 with Officer Porsche, who was from Lakewood PD.  So I wore

12 his jacket out there.

13 Q   So you actually had a jacket that said "Lakewood" on it?

14 A   I used his jacket, yes.

15 Q   And it was a Lakewood jacket?

16 A   Yes.

17 Q   And you weren't affiliated with Lakewood?

18 A   No.

19 Q   But that was in order to have Mr. Thomas believe you were

20 not associated with Fife; is that right?

21 A   Yes.  He -- he had shown some anger toward Fife Police

22 Department, so I was worried that if I walked up there

23 wearing a Fife PD coat, that that would just set him off

24 again, and it might keep him from releasing the child.

25 Q   Was that something that Chief Zaro told you to do, change

1   your jacket, or was that something you thought of yourself?

2   A   I don't recall Chief Zaro telling me to do that.  I think

3   it might have been Porsche who suggested it.

4   Q   But at the time Chief Zaro gave you the order to take

5   Ms. Thomas forward, did you have a jacket on that said "Fife

6   Police Department"?

7   A   Yes, sir.

8   Q   Do you know if Chief Zaro had heard the conversation where

9   Mr. Thomas had indicated that he did not trust the Fife

10  Police Department?

11          MR. CULUMBER:  Objection; foundation.

12          THE COURT:  Overruled.

13  A   I don't know that for certain, sir.

14  Q   (By Mr. Ford)  Do you know if he was in the rig at the

15  time that the conversations that you mentioned earlier

16  occurred?

17  A   I believe he was.

18  Q   Is it sometimes necessary, when you're negotiating with a

19  person who is -- has an issue of some sort, to used some

20  slightly deceptive tactics like that to keep them from making

21  them more upset?

22  A   It's not something we do all the time, but I could see it

23  happening.  It seemed like it was a good idea at the time.

24  Q   Do you remember Mr. Thomas being in touch with a Sergeant

25  Eakes of the Lakewood Police Department?

1  A    Yes.  Sergeant Eakes is our team leader, and he ended up

2  becoming the prime negotiator.

3  Q    Did you hear Sergeant Eakes tell Mr. Thomas that he was

4  actually speaking to him from Lakewood and was not able to

5  come to the scene in response to some request from Mr. Thomas

6  for assistance?

7  A    I didn't hear that, no, sir.

8  Q    So did you see Mr. Thomas at any point when you were

9  walking with Mrs. Thomas from the rig to the house?

10 A    No, sir.

11 Q    So you said that you and Mrs. Thomas got to a point where

12 there was a hedge that was blocking, and then some of the

13 operators came and assisted you or escorted you; is that

14 right?

15 A    Yes, sir.

16 Q    And were you alone with Mrs. Thomas, or was there someone

17 else?

18 A    Sergeant Malave was with me at the time.

19 Q    And what department does Sergeant Malave work for?

20 A    He is with the Fife Police Department.

21 Q    Was he wearing a jacket or any identifying uniform that

22 identified him as a Fife police officer?

23 A    Not that I recall.

24 Q    Did you have any conversation with the operators at the

25 time you encountered them at the point where you and

1    Ms. Thomas had stopped?

2    A    Yes, sir.

3              MR. CULUMBER:  Objection; calls for hearsay.

4              THE COURT:  Overruled.

5    A    Yes, I did.

6    Q    (By Mr. Ford)  And what was that?

7    A    Two of the operators came across, and one of the

8    operators, Officer Waller, when he walked up to us, he asked

9    me what we were doing.

10   Q    And what did you answer?

11   A    My answer to him was, "How could you not know what we're

12   doing.  You just walked over here to get us.  How do you not

13   know what we're doing?"

14   Q    Did you have any conversations at all with team leader

15   Wiley?

16   A    Not much of a conversation, but when we walked back over

17   behind the BearCat, he was there.

18   Q    Let's back up a little bit.

19        What is a team leader?  I want to make sure we cover

20   that.  Were Officers Waller and Wiley members of the operator

21   segment of the SWAT team?

22   A    Yes, sir.

23   Q    And Wiley was a team leader?

24   A    Yes, sir.

25   Q    And what is the team leader?

 1  A    He is -- much like Sergeant Eakes is the team leader for

 2  the negotiation side, Officer Wiley was the team leader for

 3  the operator side.

 4  Q    Did you have any conversation with Officer Wiley, team

 5  leader Wiley, regarding what was going on, what you were

 6  doing there with Ms. Thomas?

 7  A    Not much of it.  He just said to have her call out to

 8  E██████.

 9  Q    He did?  Did he know, when you arrived there, what you

10  were doing there?

11  A    I -- yeah, I had the impression he knew exactly what we

12  were doing.

13  Q    Do you remember giving a deposition in this case a while

14  back?

15  A    Yes.

16  Q    And do you remember being asked if Wiley knew why you were

17  there?

18  A    Yes, sir.

19  Q    And what do you recall your answer to that?

20  A    That, yeah, he knew what we were doing.

21  Q    Was there a plan that you learned of that -- what was

22  going to happen with Ms. Thomas?

23  A    The plan, as far as I understood, was that as soon as

24  Mrs. Thomas got up there and Mr. Thomas could see his mother,

25  he would allow his son to go to her, to his grandmother.

1    Q    And did somebody tell you that was the plan, or did you

2    just kind of figure that out?

3    A    When Chief Zaro told us that he was willing to release the

4    child to his grandmother and he said get her up there right

5    away, I pretty much figured out that's what we were there to

6    do.

7    Q    Okay.

8         So after this encounter with the operators and the

9    discussion with Officer Waller of "what are you doing," what

10   happened then?

11   A    We walked her across to the BearCat.

12   Q    And in the course of doing that, did you see Mr. Thomas?

13   A    When we got to the BearCat?

14   Q    Or at any point between -- I guess the time you left the

15   rig to the time you got to the BearCat, did you see

16   Mr. Thomas?

17   A    I saw him when we were at the BearCat, yes, sir.

18   Q    And what was he doing when you saw him at the BearCat?

19   A    So when we initially got to the BearCat, we stood toward

20   the front of it, and Ms. Thomas was calling out to E█████.

21   But it is a large rig, it is high off the ground, and she's a

22   smaller lady, so she wasn't able to -- it seemed like he

23   couldn't see her.  So we moved her around to the back of the

24   BearCat, to the other side, toward the back, and she was able

25   to stand there, and we could see the front door, and

1    Mr. Thomas and E███ were there at the porch, and so she

2    started calling out to E███ to come to grandma.

3    Q    Did you see Mr. Thomas doing any of that?  That was,

4    actually, my question.  Did you see Mr. Thomas do any of

5    that?

6    A    Did I see --

7    Q    Him do anything.

8    A    He walked out on the porch, and I think he kind of put his

9    hands up, kind of like to let us know he didn't have anything

10   in his hands.

11   Q    Now, you said that Ms. Thomas called out.  Right away?

12   A    Initially, when we got her around -- when we got her to

13   the front of the BearCat, I believe she was calling out to

14   him.  But it was clear that he couldn't see her, so we moved

15   her around to the back of the rig where she could be seen by

16   both E███ and Mr. Thomas, so he knew she was there.

17   Q    And did she call out then?

18   A    Yes, sir.

19   Q    Just one time; is that right?

20   A    I think -- yeah, at least once.  Maybe -- maybe more.

21   Q    And what happened when Ms. Thomas called out to Leonard?

22   A    Mr. Thomas started yelling back at us, "No, Mom.  You come

23   up here and get him, you come up here and get him."

24   Q    And then what happened?

25   A    Team leader Wiley said that she's not going forward,

1    "We're not going to let her go up in there," so...

2    Q    And then what happened?

3    A    He went back in the house for a short time, and then

4    shortly after, they came back out onto the porch -- well,

5    E█████ came back out onto the porch.  Mr. Thomas stayed in

6    the doorway.

7    Q    And what happened then?

8    A    So she's calling out to him, you know, "Come to Grandma,

9    come to Grandma," and at that time, as she's calling out to

10   him, the operators started -- there was a lot of them around

11   the rig where we were at.  They started to move and group up

12   together, and I heard a countdown start.

13   Q    What is a countdown?

14   A    So before the tactical team will make an approach to a

15   residence or a house or a location, they'll start a countdown

16   so that they all are moving at the same time.

17   Q    And what did you think when you heard the countdown start?

18   A    Initially, when we were standing there and she was calling

19   out to him, I heard the countdown start.  It was surprising

20   to me that it was happening.  So I knew what was about to

21   happen, and so I put my arm around her and kind of steered

22   her around, back -- on the back side of the BearCat.

23   Q    Why was it surprising to you?

24   A    We -- we hadn't -- we hadn't been there very long, maybe

25   ten minutes, tops, and so it was surprising that it happened

1    that quickly.

2    Q    Ten minutes, tops?

3    A    It felt like it was about ten minutes or so.

4    Q    That's not what you -- do you remember giving an interview

5    the very night that this occurred?

6    A    Yes, sir.

7    Q    And at the time, was your memory maybe a little better

8    than it is now, four years later?

9    A    Yes, sir.

10   Q    In terms of the exact sequence of things?

11   A    Yes, sir.

12            MR. FORD:  Can we take a look, please, at exhibits

13   that have been marked 483 through 484, and play the clip that

14   begins on page 10 of -- and line 446 of the transcript of

15   that interview.

16       This has not been pre-admitted, but I'm offering it for

17   impeachment, Your Honor, to refresh recollection, and it's

18   No. 4019.  It's Clip No. 4019.

19            THE COURT:  It will be admitted for refreshing

20   recollection.

21            MR. FORD:  Thank you, Your Honor.

22            THE COURT:  Thank you.

23                    (Video is played.)

24            MR. CULUMBER:  Objection.  This isn't proper

25   impeachment.

```
 1              THE COURT:  I'm going to sustain.  If you want to
 2    impeach the witness, he is on the stand.
 3              MR. FORD:  Well, he said it would refresh his
 4    recollection.  His recollection was better then.
 5              THE COURT:  What part of it are you getting at?
 6              MR. FORD:  The whole sequence.  He said she calls out
 7    once and the countdown began, and it will show it's not ten
 8    minutes.  It goes on to show the entire event.  It's only a
 9    bit longer.
10              THE COURT:  Okay.  You can go ahead.
11                        (Video is played.)
12              MR. CULUMBER:  Your Honor, now we're past that.
13              THE COURT:  Sustained.  That's enough, counsel.  You
14    can ask him.  He's right here.
15              MR. FORD:  All right.
16    Q   (By Mr. Ford)  So your interview at that time indicated
17    she called out once, and then you heard the countdown; is
18    that correct?
19    A   Yes, sir.
20    Q   And you were surprised because you'd just been there a
21    short time; is that right?
22    A   Yeah.  Initially, she had called out to him, and
23    Mr. Thomas and E████ went back into the house.  And then
24    they came back out, and E████ was on the porch and
25    Mr. Thomas was in the doorway.  And she started calling out
```

 1    to him again, and that's when I heard the countdown start.

 2    Q   And did you see, by the way, Mr. Thomas bring a car seat

 3    out onto the porch for E░░░░░░?

 4    A   I don't recall that.  I know that he did -- he did crouch

 5    down in the doorway, so I wasn't clear on what he was doing

 6    at that time.

 7    Q   And what did you think when you heard the shot?

 8    A   When the shot went off, it startled me because I wasn't

 9    aware that -- where the sniper was, and he was just over my

10    left shoulder, and it was -- yeah, it startled me, so...

11    Q   Just over your left shoulder, and also you were, at that

12    time, in contact with Ms. Thomas, were you not, holding her

13    against the BearCat?

14    A   Yeah.  She was at the back wheel of the BearCat, and her

15    back was to the BearCat and I was facing her, and the shot

16    rang out somewhere behind me over my left shoulder.

17    Q   Did you hear Chief Zaro say to have her call out to him

18    just before the shot -- the explosion?

19    A   I don't recall that, sir.

20          MR. FORD:  Can we please listen to the clip from

21    Exhibit No. 1040, which has been pre-admitted, beginning at

22    page 18 of the transcript that is at Exhibit 1041?

23          MR. CULUMBER:  Objection; foundation.

24          MR. FORD:  It is pre-admitted, Your Honor.

25          THE COURT:  Overruled.

```
 1              MR. CULUMBER:  What is it being used for?

 2              MR. FORD:  It is pre-admitted.

 3              THE COURT:  What are you using it for?

 4              MR. FORD:  I'm asking him to listen to it and see if

 5      that's what he heard.

 6              THE COURT:  Okay.

 7              MR. CULUMBER:  Is this the radio traffic?

 8              MR. FORD:  Yes, this is the radio traffic, SWAT team.

 9              MR. CULUMBER:  He's already testified he didn't have

10      a radio with him.

11              MR. FORD:  He said he heard the countdown, Your

12      Honor.  I want to ask him if this is what he heard.

13              THE COURT:  Is this on his screen?

14              THE WITNESS:  It was.

15              THE COURT:  Why don't you just ask him "did he hear,"

16      and say what it was.

17              MR. FORD:  Well, he said what he heard.  I want to

18      have the jury know that's what's on this exhibit, which is in

19      evidence, is what he heard.

20              THE COURT:  Okay.  Go ahead.

21                      (Audio is played.)

22      Q   (By Mr. Ford)  Is that what you heard, or how much of that

23      did you hear that night?

24      A   I know I heard the countdown.  I seem to recall hearing

25      them say, "Launch on the back door," or something like that.
```

1    Q    Did you have a radio with you that was tuned to SWAT 2?

2    A    Did not have a radio with me, sir.

3    Q    And by the way, I didn't ask you this:  Team leader Wiley,

4    do you know what department he works for?

5    A    He works for the Lakewood Police Department.

6    Q    So can you describe the explosion that you heard at first,

7    the initial explosion?

8    A    It was a very loud bang.

9    Q    Was there any warning given to people outside who were not

10   on the radio that there was going to be an explosion or an

11   action of that type?

12   A    Not that I knew.

13   Q    Have you ever seen a video of the incident that was taken

14   by an amateur reporter who was in the back area of the house?

15   A    The YouTube video?

16   Q    Yes.

17   A    I've seen part of that, yeah.

18   Q    Can we please take a look at the clip of Exhibit 362 that

19   begins at 2:33?

20                         (Video is played.)

21             MR. FORD:  Can we stop for a second, please?

22   Q    (By Mr. Ford)  Did you hear loud music playing in Leonard

23   Thomas's house when you were in front of the house?

24   A    I don't recall that.

25   Q    Okay.

 1          Do you remember -- is that a frog or a cricket

 2     chirping, or can you tell?

 3     A    I don't have any idea what that is.

 4     Q    Can you tell what the people that are in the spotlight

 5     show?

 6               MR. CULUMBER:  Objection; foundation.

 7               THE COURT:  Sustained.

 8               MR. FORD:  Thought that was the foundation, Your

 9     Honor, "Can you tell?"

10               THE COURT:  Can you tell what they're doing?

11               THE WITNESS:  No.

12               MR. FORD:  Okay.  Go ahead and play, please.

13                         (Video is played.)

14     Q    (By Mr. Ford)  Can you tell, from your memory and what you

15     see there, what that noise was?

16     A    It sounds like the bang that went off.

17     Q    Do you notice where the operators are at that point where

18     that "bang" goes off?

19     A    Yes, sir.

20     Q    So let's go ahead and play.

21                         (Video is played.)

22     Q    (By Mr. Ford)  Do you hear somebody yell "sniper"?

23     A    No, I didn't catch that.

24     Q    Did you hear somebody -- that night, did you hear somebody

25     yell "sniper" after the sniper shot?

1    A    No, sir.

2    Q    Let's go on.

3         You were in the process of holding Ms. Thomas, at that

4    point, behind the BearCat; is that right?

5    A    Yes, sir.

6         MR. FORD:  Go ahead, please.  Oh, that's the end of

7    that clip.

8    Q    (By Mr. Ford)  Was Ms. Thomas, at any point, told there

9    was going to be a breach of the house or an entry -- a forced

10   entry like that at any time when you were around her?

11   A    No, sir.

12   Q    Was there any time, from the time that she was brought to

13   the negotiator rig by Officer Wyrwitzke, that you were not in

14   her presence?

15   A    I'm sorry.  Can you say that again?

16   Q    Was there any time that she wasn't with you after she was

17   brought to the negotiating rig where she might have been

18   briefed on what was going to happen?

19   A    No, sir.

20   Q    So you were around her all the time?

21   A    Yes, sir.

22   Q    And she was never told this was going to happen?

23   A    No, sir.

24   Q    Did you hear the child after the shot?

25   A    After the shot, and then -- I didn't hear him initially,

1   right when it happened.

2   Q   What did you hear?

3   A   I don't -- I mean, I don't recall.  Everybody started

4   moving forward, and then the shot rang out.  And then shortly

5   after that, there were more gunshots that rang out.  And so I

6   didn't know what that was.  And so Malave and I decided we

7   were just going to get her out of there, and so we started

8   moving back toward the negotiator rig.

9        As we came across the front of the BearCat, I looked over,

10  and I could see that the operators were in the doorway, and

11  then I saw that one of them was holding the child, and so I

12  just yelled for Malave to run and get the kid.  And so -- do

13  you want me to continue?  I'm sorry.

14  Q   Sure.  I was wondering if you ever heard the child say

15  anything.

16  A   Yeah.

17       When Malave ran over and took the child, he ran back

18  toward us, and as he ran past us, I could hear him saying,

19  "My daddy, my daddy."

20  Q   And what did you do then?

21  A   I just moved Ms. Thomas to the negotiator rig as quickly

22  as I could.  She was walking with a limp, so it was somewhat

23  slow getting her back to the rig.  But he had taken -- Malave

24  had taken E███████ straight to the patrol car, where his mother

25  was, and then I brought Ms. Thomas to them at the patrol car.

 1   Q    You said that Ms. Thomas was walking with a limp.  Had she

 2   been walking with a limp prior to when you went to the house

 3   rather than when you went away from it?

 4   A    She was walking with a limp the whole time.

 5   Q    That didn't have anything do with any injuries she

 6   received or anything like that, as far as you know?

 7   A    Not that I know of, sir.

 8   Q    What was the last thing you saw Leonard Thomas do before

 9   the explosion?

10   A    I saw him crouch down in the doorway of the home.

11   Q    And what was -- where was E█████ T█████ at the time of the

12   explosion?

13   A    He was on -- on the porch that -- like, I don't recall if

14   it was two or three steps, but he was in the middle on one of

15   the steps.

16   Q    So let's go to Exhibit 203.  This has been pre-admitted

17   and already discussed.

18        So can you show us where --

19           MR. FORD:  Is it possible to blow this area up,

20   Ms. Caldwell?

21   Q    (By Mr. Ford)  I'll clear that off and ask you if you can

22   tell me where the --

23   A    I believe he was on this stair here.

24   Q    That would be E█████?

25   A    Yes.

1    Q    And Leonard?

2    A    He was back here in the doorway.

3    Q    And do you see that, by any chance?  Do you know what that

4    is?

5    A    No, sir.

6    Q    We'll talk about that later, then.

7         Did you ever talk to Leonard Thomas that night?

8    A    No, sir.

9    Q    Did you see what Leonard Thomas did after the explosion

10   occurred?

11   A    No, sir.

12   Q    Did you know -- had you had any contact with Leonard

13   Thomas prior to this evening?

14   A    I had never -- well, I had contacted him on a case that he

15   had several years earlier, where he was the victim of an

16   arson fire.

17   Q    And did you have any problem talking to him or dealing

18   with him?  Did he do anything untoward?

19   A    Untoward?  What was the last thing?

20   Q    Did he do anything untoward, other than just tell you what

21   his problem was, that he had been a victim of -- did you say

22   an arson?

23   A    Yeah.  Someone had firebombed his car.

24        I didn't have any issues talking to him.

25   Q    And what about prior to the evening of the 23rd and 24th

1   of May, earlier that day?  Had you had any contact regarding

2   Mr. Thomas?

3   A   Yes, sir.  I had returned from a couple of days of

4   training, and when I got to my office, I checked my voice

5   mails, and there was a voice mail from Mr. Thomas that had

6   been left for Chief Blackburn and forwarded to me.

7   Q   And what was the purpose of forwarding it to you?  Were

8   you told why it was forwarded to you?

9   A   So in this voice mail, I could tell Mr. Thomas was angry

10  and he was upset about something, but he never really said

11  what it was that he was upset about.  And so that was the

12  first thing I listened to, and so I went in and asked the

13  chief about it, and he told me to just give him a call back

14  and find out what the problem is.

15      So I placed a phone call back to Mr. Thomas, and I

16  received his voice mail, and I left a message for him saying

17  who I was and that I was calling to try and figure out, you

18  know, what the problem was, and I asked him to give me a call

19  back.

20  Q   And had you learned when it was that Mr. Thomas made the

21  call to Chief Blackburn that Chief Blackburn had asked you to

22  return?

23  A   No, sir, I never found out.

24  Q   Did you talk to Chief Blackburn about whether he had

25  promptly returned Mr. Thomas's call or not?

1    A    I had been away from the office for three days for

2    training, so I wasn't exactly sure when this message had come

3    in.  So I went and talked to Chief Blackburn to find out, "Do

4    you know this guy," and why he was calling.  And he said he

5    hadn't returned his call, and he told me to call him back to

6    find out what the issue was.

7    Q    Did you express any surprise to Chief Blackburn about the

8    fact that he hadn't called this person back, for the period

9    of time that he hadn't?

10   A    I wasn't sure how long the message had been on my voice

11   mail, and so I was concerned that maybe he had waited a

12   couple of days.  But I never found out how long it had been

13   there.

14   Q    Would you recognize Mr. Thomas's voice, do you think, if

15   you heard it?

16   A    I think so.

17   Q    Okay.  Could we please play Exhibit No. 350, which has

18   been previously admitted, and see if you recognize his voice.

19                      (Audio is played.)

20   Q    (By Mr. Ford)  Do you recognize whether that was the voice

21   of Leonard Thomas?

22   A    It sounds like him, sir.

23   Q    Do you know if that was the voice mail that Chief

24   Blackburn forwarded to you to respond to?

25   A    That was not the voice mail I got.

1  Q    So it was a different voice mail?  Do you know where that

2  voice mail is now, or where it went?

3  A    I have no idea.

4  Q    Do you remember what it said?

5  A    Yeah.  He basically told me that he didn't want to talk to

6  anyone but Chief Blackburn; that he -- I think the term he

7  used was "underling."  He wasn't going to talk to any of the

8  chief's underlings, and he told me never to call him again.

9  Q    That was the voice mail that he left for you?

10 A    Yes, sir.

11 Q    What about the voice mail that he left for Chief Blackburn

12 that Chief Blackburn forwarded to you?  Do you remember what

13 he said on that?

14 A    Yeah.  It was similar to what you heard, and telling him

15 to call him immediately, and he needed to speak with him.

16 Q    And did you learn thereafter that Mr. Thomas had, about a

17 week and a half before, reported that he was a victim of a

18 malicious mischief and an assault by a woman named Mary

19 Eddington?

20 A    Yes, sir.

21 Q    And he made that report to someone, an Officer Pomeroy; is

22 that right?

23 A    I believe so, yes, sir.

24 Q    And do you know if Ms. Eddington had been arrested or

25 charged as a result of that malicious mischief and assault

1  allegation?

2  A    Charges were forwarded up to -- or the case itself was

3  forwarded to the prosecutor for charging.

4  Q    Do you know if Ms. Eddington was arrested?

5  A    She was not.

6  Q    Do you know if Ms. Eddington was ultimately charged?

7  A    She was, yes, sir.

8  Q    Do you know if Mr. Thomas's concerns that he wanted to

9  talk to Chief Blackburn about had to do with the Fife police

10 response to his complaints about Ms. Eddington?

11 A    Mr. Thomas never said what his issue was.

12 Q    Now, did you do any further research to find out who

13 Mr. Thomas was?

14 A    Yes.  After I got the message from him telling me not to

15 call him, Chief Blackburn called him back.  And his office

16 was right across the hall from my office, and so I could hear

17 part of the conversation.  I could hear Chief Blackburn's

18 half of the conversation, and he was trying to explain to

19 Mr. Thomas kind of how the process works.  And I could tell

20 from what was going on that he was being interrupted, because

21 he was saying, you know, "Hold on, let me explain," you know,

22 like that, and then the conversation abruptly ended, and so

23 I'm not sure how that happened.

24     So it was clear that Mr. Thomas had some kind of issue

25 with our department.  I looked into our record system to see

1    if we had had any recent contacts with him, and that's when I

2    found that -- the case number that you were referring to.

3         In that case, officers -- Mr. Thomas had telephoned and

4    said that he had been assaulted by his ex-girlfriend, who had

5    come back to his home and she had -- they had got into an

6    argument, and she tried to assault him.  And he said that he

7    had been able to run out of the house, and then when she

8    followed him out of the house, he got back in and was able to

9    lock her out.  I think he said that she -- she started to

10   kick at his door, to try and get in, and she damaged the door

11   frame, and then ultimately he was able to get inside, and he

12   said she had pushed him around.

13   Q   Mr. Thomas had made that call to the Fife police to report

14   that?

15   A   He called, and they responded to assist him.

16   Q   And when they responded, they spoke to him in person?

17   A   Yes, sir.  They did a full case.  They took photographs of

18   the damage to the door, and they gave him some domestic

19   violence resources, and then they forwarded the case to the

20   prosecutor for charges.

21   Q   Did you find anything else in terms of the prior Fife

22   contacts with Mr. Thomas?

23   A   Yes, there were -- there were some.

24        About a month prior to this issue on the 23rd, police

25   had been called to the Thomas residence for a domestic

1  violence situation there, where Mr. Thomas and his

2  girlfriend -- she was reporting that he had been -- that he

3  had assaulted her.

4      And so when officers arrived, they found her outside with

5  her mother, and she reported that she had come to the home to

6  remove some of her belongings and that she and Mr. Thomas had

7  been in an argument over -- over her dog, I believe it was,

8  and that he had assaulted her.  She said that she had gone

9  into her room and that throughout the night he had held her

10  there with a knife and wouldn't let her go out.  She said

11  that at some point he told her that the police were at the

12  front door and that if they knocked on the door, that he was

13  going to stab her with a knife.

14  Q   This was all according to Ms. Eddington?

15  A   Yes, that's what she reported, sir.

16  Q   And Officer Quinto, did he make any observations regarding

17  whether Ms. Eddington had any injuries that corresponded to

18  the claims that she made?

19  A   He took photographs of her face because she had a black

20  eye.

21  Q   And did he comment in his report that the black eye

22  appeared to be old rather than something that was caused the

23  previous night?

24  A   Yeah.  I believe she had said that Mr. Thomas had

25  assaulted her a couple of days prior, and so the bruising had

1    already -- it looked like the bruising had been there for a

2    couple of days, I think is what the report said.

3    Q    But she claimed it had happened the night before, didn't

4    she?

5    A    I don't know if it was the night before or two nights

6    before.

7    Q    And Officer Quinto noted that the bruise appeared to be

8    old rather than the way she described it?

9    A    Yes, sir.

10   Q    And Officer Quinto also reported that she did not appear

11   to have any scratch marks on her throat that would correspond

12   to what she claimed happened with this knife; isn't that

13   right?

14   A    Yes.

15   Q    And Officer Quinto also commented that her stories about

16   what had happened were inconsistent and she changed them in

17   the course of talking to him, did she not?

18   A    Yes, sir.

19   Q    And Mr. Thomas was not arrested for that allegation by

20   Ms. Eddington, was he?

21   A    No, sir.  They were unable to locate him.

22   Q    Did you do any background checks on Ms. Eddington and her

23   record, police or criminal record?

24   A    No, sir.

25   Q    Did you also see if there were any kind of officer safety

1    warnings that had to do with either Ms. Eddington or

2    Mr. Thomas?

3    A    When I read Mr. Thomas's name, he came back with two

4    officer-safety alerts, one out of the City of Tacoma, or the

5    Tacoma Police Department, and one out of the Fife Police

6    Department.

7    Q    What is an officer-safety alert?

8    A    It goes into what's called WCIC, which is the Washington

9    Crime Information Center, and it's an alert to officers that

10   might have contact with an individual, to let them know of

11   prior history that is believed to be a danger to the

12   officers.

13   Q    And could we take a look, please, at, I believe,

14   previously admitted Exhibit 1014?

15        Do you recognize what this is?

16   A    Yes, sir.

17   Q    And what is this?

18   A    This is a request for an officer-safety entry into WCIC

19   that was completed by Lieutenant Farris.

20   Q    And the date on this?

21   A    September 16th of 2011.

22   Q    And the date we're talking about now is May 23rd, I guess

23   you're doing this check, of 2013, so approximately 20 months

24   later; is that right?

25   A    Yes, sir.

1   Q    And this is based on the call from Leonard Thomas's

2   mother; is that right?

3   A    Yes, sir.

4   Q    And the concern is that Leonard might try and kill himself

5   or have a police officer kill him; is that right?

6   A    That's correct.

7   Q    And, again, he said he did not -- he said he planned on

8   killing himself or having a police officer shoot him, and she

9   believed him to be suicidal, and that was the reason for this

10  officer-safety request; is that right?

11  A    Yes, sir.

12        MR. FORD:  And is there another page to this?  I

13  believe there is.  I hope there is.  Is it 1015?  Do we have

14  1015?

15  Q    (By Mr. Ford)  And you mentioned that there was also

16  something out of the WCIC.  What is WCIC?

17  A    The Washington Crime Information Center.

18  Q    And this also is from September of 2011; is that right?

19  A    It appears to be, yes.

20  Q    And this also indicates that Mr. Thomas -- the concern was

21  that Mr. Thomas had made several suicide-by-cop statements;

22  is that right?

23  A    Yes, sir.

24  Q    And this one indicates that -- something about a, quote,

25  trains with tasers.  Do you see that?

1  A    Yes, sir.

2  Q    Can you tell what the source of this is in terms of who

3  made this report?

4  A    It appears to be a Tacoma report.  I'm not sure exactly.

5  Bayer, R. Bayer, maybe.

6  Q    And is there any indication of where this information came

7  from that Officer Bayer entered?

8  A    Not on this one.

9  Q    And, again, we have the date of 9/6/2011; is that correct?

10 A    Yes.

11 Q    Okay.  And there is an entry here, I notice, for "gang

12 association," it's left blank; is that right?

13 A    Yes, it's blank.

14 Q    So what did you do after finding out this information

15 about Mr. Thomas and the fact that this was in the system?

16 A    So based on the voice mail that I heard, it sounded like

17 Mr. Thomas was pretty upset with the Fife Police Department

18 for some reason, and when I saw these officer-safety alerts,

19 I was concerned that if officers had to respond to this

20 address, there might be an issue with Mr. Thomas.

21     And so when Lieutenant Gardener, he was our swing shift

22 supervisor, when he came on duty, I talked to him about the

23 phone calls and about the officer-safety alerts, and I let

24 him know what had happened.

25     My suggestion was that if -- if we had to respond to that

1    address for some reason, that it would probably be a good

2    idea to take more than one officer, just for safety reasons.

3    Q    Okay.  And did you later learn that there had been a

4    contact with Mr. Thomas that very night?

5    A    Yeah, later that evening, after I had gone home, I got a

6    call from our dispatch center, and she said that Sergeant

7    Green was asking to have me call him, and she told me that

8    they were out with a subject who had -- it was a domestic

9    violence situation and that the subject had two

10   officer-safety alerts, and I asked her, "Is it Leonard

11   Thomas?"  And she said yes, it was.

12   Q    And did you ultimately hear the call that was made on that

13   domestic violence call the officers were responding to that

14   night?

15   A    I'm not sure I understand.

16   Q    Did you hear a recording of it at some point?

17   A    Have I heard a recording of it?

18   Q    Yes.

19   A    I don't know for sure.

20   Q    Do you remember being deposed as the person who was

21   identifying the various recordings in this case for the City

22   of Fife at one point?

23   A    I believe during my deposition I was shown transcripts of

24   those radio calls, but I don't recall if I ever actually

25   heard them.

1   Q    Okay.  Maybe since the exhibit has been admitted, if we

2   could please listen to the 911 call that is recorded at

3   transcript 20 -- I believe this is Exhibit 19.  Both 19 and

4   20 have been admitted -- and see if you recognize it or if

5   you recognize the voices on it.

6                        (Audio is played.)

7   Q    (By Mr. Ford)  Do you recognize the voice on there?

8   A    Yes, I believe it is Mr. Thomas.

9   Q    Did you also recognize Annalesa Thomas's voice on there?

10  A    I can't say for certain that I recognize that, sir.

11  Q    Okay.  Let's listen to the transcript, the same exhibit

12  transcript, beginning at Exhibit 20, page 2 of the

13  transcript, and this is clip 610.

14                        (Audio is played.)

15  Q    (By Mr. Ford)  Was that Leonard Thomas's voice?

16  A    I believe so.

17  Q    And can we listen, please, to the transcript -- the

18  portion from Exhibit 19 that appears at page 3 of Exhibit 20,

19  which we call clip 603?

20                        (Audio is played.)

21  Q    (By Mr. Ford)  Do you recognize your voice on there?

22  A    Yeah, that's me.

23  Q    And that's the call you were talking about?

24  A    Yes.

25  Q    Maybe we could back up for a second and talk about these

 1    tapes for a little bit.

 2         Can we please take a look at Exhibit 1039?  And let's

 3    take a look at the next page, please.

 4         Do you know what this is?

 5    A    It is a transcript of the radio traffic between the

 6    dispatcher and the officers.

 7    Q    Okay.  And would this be the same -- the transcript of the

 8    same radio traffic from the City of Fife that we just heard

 9    portions of?

10    A    It appears to be.

11    Q    Okay.  And do you know these two columns that are here,

12    the one that has -- says "radio/phone" and the other that

13    says "radio"?  Do you know what those signatures indicate?

14    A    I'm not sure.

15    Q    Do you know if Fife dispatch radio is recorded in real

16    time?

17    A    Yes, sir.

18    Q    So there would be a real-time recording that would show

19    the actual times for all these different calls?

20    A    There should be, yes.

21    Q    Okay.  And let's see how we can -- if we can look at these

22    and -- can you see here where the dispatcher says "22:20"?

23    A    Yes, sir.

24    Q    And what does that indicate?

25    A    That would indicate the time, and it's in military time,

1    so it would be 10:20 p.m.

2    Q    Okay.  And that corresponds on this particular chart to

3    4:03; is that right?  That's what that says, same line?

4    A    Yeah.

5    Q    Okay.  And maybe we -- could we go back to the whole

6    document, please?

7         So assuming that that's real-time recording, then that

8    would mean that this recording begins right around 22:20,

9    minus four minutes, or about 22:16; is that right?

10   A    Yeah.  Above there, like, the third line down, it says

11   22:18, so, yeah, two minutes before that would be...

12   Q    So when the -- when the dispatchers call out the time,

13   they don't say the seconds or anything like that; they're

14   just going off a clock?

15   A    Yes, sir.  There is a clock in front of them.

16   Q    Okay.  Let's take a look way down the line at -- well,

17   here.  Let's take a look at page 17, please, of this

18   document.  And we'll blow up this area here.

19        So here the dispatcher says "0:20," and what does that

20   mean?

21   A    That would be 20 minutes after midnight.

22   Q    Okay.  And here we have a time signature of 2:04:53.  So

23   doing the math, assuming that this is a real-time transcript,

24   subtracting two hours and four minutes from 20 minutes after

25   12:00, we get back to 10:16 or so; is that right?

1    A    Okay.

2    Q    Okay.

3         So this column that I just -- where the 2:04 -- can we

4    go to the full page?

5         This column here, the "radio/phone" column appears to

6    be in real time.  Comparing the dispatcher's call-out to the

7    time signatures there, it seems to correspond, does it not?

8    A    Okay.

9    Q    Thank you.  So we'll understand what we're looking at

10   there.

11        Now, did you hear Leonard Thomas at any point speaking

12   to any of the negotiators who came out later in the night

13   when SWAT responded?

14   A    No, sir.

15   Q    Did you hear that he had made a call that caused him to be

16   connected to Sergeant Eakes in the negotiation rig?

17   A    Yes, sir, I was aware of that.  He had called in to 911

18   and told them that -- I believe he said the Fife Police

19   Department was harassing him, or something like that, and he

20   was demanding to be transferred to either the State Patrol

21   or, I think it was, the Pierce County Sheriff's Department.

22   Q    And what was done when he made that request to talk to the

23   State Patrol or the Pierce County Sheriff's Department?

24   A    That call was forwarded to Sergeant Eakes.

25   Q    Initially, it was forwarded to a different negotiator; is

 1    that right?

 2    A    I think it was actually Malave, and somehow Eakes ended up

 3    on the phone.

 4    Q    And Malave is a Fife officer; is that right?

 5    A    Yes.

 6    Q    So in response to Mr. Thomas's 911 call asking for help

 7    from the Pierce County Sheriff's Office or the Washington

 8    State Patrol, he was transferred back to a Fife officer; is

 9    that right?

10    A    Yes.

11    Q    And ultimately transferred to Sergeant Eakes, who is a

12    Lakewood officer?

13    A    Correct.

14    Q    Let me play Exhibit 23, please, which has been previously

15    admitted.

16                        (Audio is played.)

17    Q    (By Mr. Ford)  Do you know why the phone goes dead there?

18    A    No, sir.

19    Q    If the Fife dispatcher hangs up at that time, does that

20    stop the recording of the communication that's going on

21    between the two individuals that are on the other side of it?

22    A    Yes, sir.

23            MR. FORD:  Would this be a good time for a break,

24    Your Honor?

25            THE COURT:  Yes, it is a perfect time for our morning

```
 1   recess.

 2       Ladies and gentlemen, if you'll retire to the jury room,

 3   we will be in recess for 15 minutes.

 4                     (Court in recess.)

 5          THE COURT:  Whenever you're ready, counsel.  Just

 6   resume where you left off.

 7   Q   (By Mr. Ford)  Sergeant Thompson, where did you go during

 8   the break we just had?

 9   A   I used the restroom, and then I went into the witness

10   room.

11   Q   And who was in the witness room with you?

12   A   Markert and Zaro and the two attorneys.

13   Q   And was Officer Wiley there, too?

14   A   I don't believe so.

15   Q   Is this Officer Wiley?

16   A   Yeah.  He might have been in there.  I don't know for

17   sure.  I think Malave might have been in there, too, or he

18   might have stepped out.

19   Q   You're still on the SWAT team with these officers; is that

20   right?

21   A   Right.

22   Q   Is Wiley still active on the SWAT team?

23   A   No, sir.

24   Q   What happened with him?

25          MR. CULUMBER:  Objection; relevance; foundation.
```

```
 1                THE COURT:  What is the relevance?

 2                MR. FORD:  The relevance is Officer Wiley and his

 3     participation in the SWAT team and his discontinued

 4     participation on the SWAT team.

 5                THE COURT:  Okay.  Overruled.  You may answer.

 6     A   I'm not sure what the circumstances were, but he's no

 7     longer on the team.

 8     Q   (By Mr. Ford)  Can we take a look, please, going back to

 9     where we are about that last call from Mr. Thomas to 911?

10     Can you take a look at Exhibit 1039 again, please, at page

11     1021?  And we'll blow up this section here, please.

12          So let's start with -- do you see this entry that says,

13     "I'm not sure who we have on the line, but we have male on

14     line who's saying that he is at 218-55th Avenue East.  He

15     does not want to speak to Fife, and he's calling from

16     223-1321."  Do you recognize that address and that phone

17     number as Mr. Thomas's?

18     A   I recognize the address, but I don't recognize the phone

19     number.

20     Q   You just don't know his phone number offhand; is that

21     right?

22     A   Right.

23     Q   And is this dispatcher calling for information about what

24     to do in response to Mr. Thomas's call?

25     A   It appears to be.
```

1    Q    Now, is this a transcript of what goes out over the radio

2    to the officers of the City of Fife?

3    A    Yes, sir.

4    Q    And there other transcripts that transcribe or record what

5    comes in to the dispatchers on 911 calls?

6    A    I believe so.

7    Q    So the timing here, the operator says 1:15; is that right?

8    A    Yeah.

9    Q    And that's the same military time or regular time, 1:15 in

10   the morning?

11   A    Correct.

12   Q    Is that about 15 minutes after you arrived on the scene?

13   A    It appears to be, yes.

14   Q    And that also corresponds to what we were talking about

15   earlier.  We have the real-time recording at 2:57, so we're

16   just a little under three hours before.  1:15 would be 10:18,

17   seems like it's real-time again; is that right?

18   A    Seems to be.

19   Q    And let's -- who is Green?

20   A    That's -- at the time it was Lieutenant Green, but it's

21   Sergeant Green now.

22   Q    Let's look at that document, larger now, and let me see.

23   Right here.  We'll blow that up.

24        This is the Fife dispatcher saying, "We're gonna -- I'm

25   gonna to try to transfer him, but I'm going to tell him it's

1  actually a Pierce County deputy, because that's who he wants

2  to talk to," and Green says, "Received"; is that right?

3  A   Yes.

4  Q   And that's another one of these well-intentioned

5  deceptions, like you changing your jacket, to have Mr. Thomas

6  not get upset when he's connected to Fife again when he

7  wanted to be connected to someone else?

8  A   I believe so.

9  Q   And let's go back up just for a second to the top of this

10 page.

11      Do you see that where an Officer Johnson says, "Be en

12 route to your jail with one"?

13 A   Yes.

14 Q   And do you know what that's about?

15 A   No, sir.

16 Q   Do you know if anybody was taken to jail there from the

17 incident that night?

18 A   Yes.  Mr. Thomas's father was arrested that night.

19 Q   And maybe we could back up a page to page 20 of the

20 dispatch log and see if we see any information to help

21 clarify if that is the same event.

22      Do you see this?  Let's take a look at this section.

23 A   Yes, sir.

24 Q   And there's conversation with Officer Green, Officer

25 Wyrwitzke.  I think you mentioned before that the father was

1   going to go try to talk to Leonard Thomas; is that right?

2   A    That who mentioned it?

3   Q    It looks like Green and Wyrwitzke are talking about this;

4   is that right?

5   A    Yes, sir.

6   Q    And all the officers and all the people on this are Fife

7   officers; is that right?

8   A    There are some Milton officers and dispatchers also on

9   there as well.

10  Q    That's right.  Johnson is Milton, right?

11  A    Yes.

12       MR. FORD:  And can we go to the full page, again,

13  please?

14       Well, I guess -- then can we go to the next page, then?

15  We'll just put that together.  Actually, sorry.  Let's go

16  back to 20, please.

17  Q    (By Mr. Ford)  So right here, do you see Officer Green

18  saying -- it says, "252, 220, I got him down here by the van

19  if you wanna head back here with your car."

20       What does he mean when he says "252, 220"?

21  A    252 is Sergeant Green, and he is calling to Officer

22  Gilbert who is number 220.

23  Q    Okay.  And then Officer Johnson, it looks like -- here it

24  says, "720 traffic 252."  What does that mean?

25  A    He 's calling for Sergeant Green on the radio.

1    Q    And then this is Officer Johnson of Milton.  He says -- he

2    agrees to take him to the station; is that right?

3    A    Yes, sir.

4    Q    Now, were you there when Frederick Thomas was brought back

5    from the house and taken away to jail?

6    A    No, sir.

7    Q    Do you know if anybody ever asked Fred Thomas or talked to

8    Fred Thomas about whether he might play a part in trying to

9    resolve the situation with his son?

10         MR. CULUMBER:  Objection; foundation.

11         MR. FORD:  I'm asking if he knew.

12         THE COURT:  Do you know?

13   A    Not that I know, sir.

14   Q    (By Mr. Ford)  So now let's turn the page, please.  So

15   just a minute or so after -- or, actually, a few seconds, it

16   looks like -- so I guess it is a couple of minutes -- after

17   Officer Johnson takes Fred Thomas to jail, Leonard Thomas

18   calls 911, asking for help from another department; is that

19   right?

20   A    It appears to be so, yeah.

21   Q    When you arrived on this scene, where did you receive

22   notice -- well, how did you come to be out there, then, that

23   night when this was all happening?

24   A    How did I show up --

25   Q    Can you tell us how you got there?  I don't think we

1   talked about that.

2   A    There was a SWAT page that was put out, and I responded to

3   assist.

4   Q    And were you there before other officers or after, or

5   where were you in relation to other officers who responded to

6   that page?

7   A    There were others there when I arrived.

8   Q    And were you assigned a role to play?

9   A    I was a negotiator, yes, sir.

10  Q    Did you perform one of the specific functions of the

11  different negotiators that we talked about earlier?

12  A    Yeah.  When -- when I initially arrived, I contacted my

13  chief because he was on scene, and I asked him if he wanted

14  me to work as, you know, Fife PD or if I could go help the

15  negotiation team, and so he told me to go work with the

16  negotiators.  So I went and found Sergeant Eakes, who is our

17  team leader, and I briefly told him about the voice mails

18  from earlier in the day and that that had been an issue.  And

19  so Sergeant Eakes assigned me to be the intel, slash, scribe,

20  slash, equipment guy.

21  Q    And what did you do in response to that assignment?

22  A    Initially, he told me that Sergeant Luckman from the

23  Milton Police Department had actually been on the phone with

24  Mr. Thomas for some time, and Sergeant Luckman was a former

25  negotiator on our team.  In fact, when I came on the team, he

1    was the senior negotiator at the time, so he was one of the

2    guys that trained me, and he actually encouraged me to apply

3    for the team.

4        And so he -- Sergeant Eakes told me that I should try and

5    get ahold of Luckman and try to talk to him about what his

6    conversation was with Mr. Thomas and what he had learned when

7    he was speaking with him on the phone.

8    Q    And what did you do in response to that order?

9    A    I found Sergeant Luckman.  At the time he was standing at

10   a patrol car and he was -- it was one where Ms. Thomas was in

11   the backseat of the car, and he was speaking to her at the

12   backseat of the car.

13   Q    And did you learn anything from Sergeant Luckman about

14   whether Leonard Thomas had been the victim of or the

15   perpetrator of an assault involving his mother?

16   A    Sergeant Luckman had told me that Ms. Thomas had come to

17   the home to take the four-year-old, E███████, with her, and

18   there was a struggle over her phone with Mr. Thomas, and that

19   Mr. Thomas had taken the four-year-old and gone into the

20   house, and so officers arrived, and that's why they arrived.

21   Q    In describing what occurred, did Officer Luckman use the

22   word "barricaded"?

23   A    Yeah, I believe he did.

24   Q    What is barricaded?

25   A    A barricade would be a subject who has gone inside some

1  type of structure, and they're not coming out, and sometimes

2  it means that they've done something to secure their doors or

3  windows.

4  Q  Does it necessarily mean anything like that, or just the

5  fact that they're not coming out, is that sufficient to be

6  considered barricaded?

7  A  Well, you know, a barricaded subject could be someone

8  that, yeah, is just refusing to come out.

9  Q  And when Lieutenant Green called you earlier that evening,

10  the initial call, did he refer to the situation as Mr. Thomas

11  being barricaded?

12  A  I don't recall if he used that term or if he just said he

13  had taken the child inside and was refusing to come out.

14  Q  Okay.

15      Did Officer Luckman tell you that Mr. Thomas had made

16  any statements that indicated he wanted to commit suicide by

17  cop?

18  A  No, sir, he didn't say anything about that.

19  Q  How long did you understand Officer Luckman to have spoken

20  with Mr. Thomas before you debriefed with Officer Luckman?

21  Is it Officer Luckman, or Sergeant Luckman?

22  A  Sergeant.

23  Q  Sorry about that.

24  A  There was some confusion about that, because Sergeant

25  Green had been on the phone with Mr. Thomas for some time,

 1    and then it was transferred to Luckman because he had prior

 2    negotiator experience.  So I believe that Green was on the

 3    phone with him for about 40 minutes or so, and then when

 4    Luckman got on the phone, maybe 20 minutes or so.

 5    Q    And during that time, no comments about suicide by cop?

 6    A    Not that he told me, sir.

 7    Q    And did Mr. Thomas ever say to Officer Luckman or did

 8    Officer Luckman say whether Mr. Thomas said anything to him

 9    about whether he was armed?

10    A    He -- he told me that he said the opposite; that he was

11    unarmed.

12    Q    Did he say how many times he had said that?

13    A    I don't recall specifically how many times.

14    Q    And did he report any other reports that some other

15    officers thought they had heard something different from

16    Mr. Thomas on that subject?

17    A    Yeah.  There was -- there was an officer that had put out

18    over the radio that Mr. Thomas had said that -- that he had

19    yelled out the window that he didn't have any weapons but

20    that he had a pistol.

21    Q    And were you ever able to figure out what that would mean

22    or what that meant?

23    A    I would assume that he had a pistol.

24    Q    Okay.  Well, you didn't find out that night if it was true

25    that Mr. Thomas had said that, did you?

1    A    No, sir.

2    Q    You didn't speak to the officer who claimed to have heard

3    that, did you?

4    A    No, I did not.

5    Q    Do you know who that was?

6    A    I believe it was Officer Johnson.

7    Q    So of all the officers there, one officer claimed to hear

8    Mr. Thomas say, "I don't have any guns but I have a pistol"?

9    A    Yes, sir.

10   Q    "I don't have any guns but I have a pistol"?

11   A    I don't know if it was "guns" or "weapons."

12   Q    And you never got any clarification of that?

13   A    No.

14   Q    Was that one of the reasons that Officer Luckman, or

15   Sergeant Luckman, had asked Mr. Thomas several times about

16   whether he had any weapons?

17        MR. CULUMBER:  Objection; foundation.

18   Q    (By Mr. Ford)  Did he tell you why he had asked several

19   times on that subject?

20   A    I don't recall if he told me why he asked that, but that

21   would be a normal question that we would ask.

22   Q    Okay.  And the answer was always to him, no, he doesn't

23   have --

24   A    "No, I don't have any weapons."

25   Q    And did Officer Luckman tell you that, in the course of

1   his conversations with Mr. Thomas, that he, Mr. Thomas, had

2   ever threatened his child?

3   A   He did not say that, sir.

4   Q   Did he say that Mr. Thomas had threatened a police

5   officer?

6   A   No, sir.

7   Q   Did he say that Mr. Thomas had threatened his mother?

8   A   No, sir.

9   Q   Did you hear any information or did Sergeant Luckman

10  report to you any information about Mr. Thomas taking some

11  action with the child in an upstairs window in the house?

12  A   Yes, sir.

13  Q   What did he tell you about that?

14  A   Initially he said that Mr. Thomas -- I believe the term he

15  used was "had dangled the child out the window," and that was

16  certainly alarming to me, because when he said "dangled," I

17  was kind of envisioning him holding him by a leg or an arm or

18  something and hanging him out the window, so I asked for

19  clarification, and he said he believed that he had actually

20  held the child up to the window, and maybe outside the

21  window, but that he had ahold of him, that he wasn't actually

22  dangling him out the window.

23  Q   And did you report that to -- did he say anything about

24  whether the child was in distress at any point?

25  A   No, he did not.

1    Q    And did you report the information that you got from

2    Sergeant Luckman to Chief Zaro?

3    A    I don't know if it was Chief Zaro.  I believe it was

4    Sergeant Eakes.

5    Q    That was back in the negotiation rig?

6    A    Yes.

7    Q    Where Chief Zaro was?

8    A    Yeah.  I don't know if I was in the rig when I told Eakes

9    or outside the rig, but Eakes would have been the person I

10   would have relayed that information to.

11   Q    And that is the normal chain of providing information;

12   that the investigative negotiator reports back to the

13   negotiation team leader, and that person reports to the chief

14   or the commander; is that right?

15   A    Yes, sir.

16   Q    Did you also speak to Annalesa Thomas in the course of

17   that intel gathering?

18   A    No.  Initially Sergeant Luckman was asking her the

19   questions, and he was asking her good questions.  I didn't

20   want to overwhelm her, you know, by introducing myself in

21   there, so just kind of let him finish up.

22       And I did have an opportunity to speak with her later in

23   the evening, but, initially, no, I didn't get a chance to

24   talk to her.

25   Q    Did Sergeant Luckman report to you whether Annalesa Thomas

1   had said anything about Mr. Thomas having guns or weapons in

2   the house?

3   A   No, he did not.

4   Q   Did you ultimately learn about what Ms. Thomas had to say

5   about whether there were guns in the house as far as she

6   knew?

7   A   Yeah.  Later, when I had an opportunity to speak to her,

8   she told me she didn't believe Leonard had any weapons.

9   Q   Did you pass that on to the negotiation rig?

10  A   Yes, sir.

11  Q   Was that before the decision to take Ms. Thomas forward

12  and the events that we've heard about that resulted in the

13  shooting?

14  A   Yes, sir.

15  Q   So you reported to the -- up the chain of command, either

16  to Eakes or to Chief Zaro, that both Leonard had told Luckman

17  that he didn't have any weapons and that Annalesa said she

18  wasn't aware of any weapons; is that right?

19  A   Correct.

20  Q   So it was a little bit later, then, that you were asked --

21  you were told to bring Annalesa Thomas forward and take her

22  up to the house; is that right?

23  A   Yes, sir.

24  Q   And were either you or she told that there was a sniper

25  behind -- that you would be walking down the street between

1    two snipers and the house that they were aiming at?

2    A   No, sir.

3    Q   Were you surprised that the launch and the countdown

4    happened so quickly after you arrived?

5    A   Yeah, it took me by surprise.

6    Q   Did you think the decision to stop negotiations with the

7    forcible entry like that was premature?

8        MR. CULUMBER:  Objection; foundation; relevance;

9    asked and answered.

10       THE COURT:  Overruled.

11   A   No, I didn't think it was premature.  I didn't have -- I

12   didn't have a lot of the info from what Mr. Thomas was saying

13   on the phone.  I didn't realize that, at the time, that he

14   had told him that all we had to do is bring her forward, and

15   he would release the child to his mother.

16   Q   (By Mr. Ford)  Do you remember being asked about this at

17   the deposition that you gave in this case on April 28, 2016?

18   A   Yes, sir.

19   Q   Okay.  And could you take a look, please, at that

20   deposition, page 88?

21       MR. FORD:  Do I need to move to publish, Your Honor,

22   the deposition?  Is that --

23       THE COURT:  Well, if you're going to use it, yes.

24       MR. FORD:  Okay.  I move to publish the deposition of

25   Sergeant Thompson taken on April 28th, 2016.  Can I?

 1          THE COURT:  Yes, go ahead.

 2    Q    (By Mr. Ford)  Can you see on the screen page 88 of that

 3    deposition transcript?

 4    A    Yes, sir.

 5          JUROR:  We can't see it.

 6          MR. FORD:  I'm glad to publish it, Your Honor.

 7          THE COURT:  Well, it is published, but it's not on

 8    the jury screens.

 9          MR. FORD:  Should I put it on the jury screen?

10          THE COURT:  Yes.

11          THE CLERK:  And if I could have the original

12    deposition.

13    Q    (By Mr. Ford)  So you were asked at that time, "But Chief

14    Zaro did not tell you or Malave that he was contemplating an

15    explosive breach when he sent you, Malave, and Annalesa out

16    to the BearCat?"

17       And you answered, "No, he did not."

18       And you said -- then you were asked, "Okay.  So you were

19    describing that you figured out what was going to happen

20    based on the countdown, right?"

21       And you answered, "Well, we started hearing the countdown,

22    and -- and Mike and I looked at each other like, 'Are they

23    going to launch?'  You know, it's like, 'Really?  We just got

24    her up here.'  And then -- then the explosion went off.  So

25    as we're hearing the countdown, we move her behind the rig,

1   and then the explosion went off, and they all -- they all

2   went forward to the house, all the tactical guys, everybody

3   just takes off.

4       "So then we're standing there with her, and then the shot

5   rang out, which was the first we even knew where the sniper

6   was."

7           Is that the answer you gave to that question at that

8   time?

9   A   Yes, sir.

10  Q   And that was your feeling when you heard that countdown,

11  when you and Malave looked at each other and thought,

12  "Really?  We just got her up here."  Was that your thought

13  then?

14  A   Yes, sir.

15  Q   So after the shooting, and you, I think, described earlier

16  telling Ms. Thomas it is only a diversion, moving her down

17  the street, E█████ moving down the street, you described

18  that.  Did you see where E█████ was taken?

19  A   He was taken to his mother.

20  Q   And did anyone say that E█████ needed to be checked for

21  injuries or damage that he might have incurred in the course

22  of this at any time?

23  A   I don't know.

24  Q   Did anyone -- did you hear anyone --

25  A   I did not hear that, no.

```
 1   Q    Did you see any medics examine E█████ to see if he was
 2   hurt?
 3   A    I did not see that.
 4   Q    Did you hear at any point in the evening that his father
 5   had tried to strangle him or hurt him in some way prior to
 6   the shooting?
 7   A    No, sir.
 8   Q    Now, sometimes police officers actually use choke holds,
 9   where they have to choke people in order to obtain compliance
10   or overcome resistance; is that right?
11   A    Yes, sir.
12   Q    And when you do use a choke hold, if it is necessary, that
13   is a serious use of force, is it not?
14   A    Yes, sir.
15   Q    And there's rules that if you use a choke hold, there has
16   to be an examination of the person to determine whether there
17   was a serious injury from that choke hold; isn't that right?
18   A    Yes, sir.
19   Q    Was there any blood on E█████ T█████?
20   A    Not that I saw.
21   Q    So what happened after you got Annalesa Thomas back to the
22   area you took her to?
23   A    So when I -- after I reunited her with E█████ and his
24   mother, I just wanted to know -- from the other shots that
25   rang out, I didn't know what happened or if one of our
```

1    officers had been shot, so I was asking, you know, what

2    happened, and, you know, where were the other shots coming

3    from, and I was told that a dog had been shot.

4    Q   And what did you do then?

5    A   I made a telephone call.  I'm a member of the Pierce Metro

6    Crime Response Unit, and that unit is similar to the SWAT

7    team.  It's a detective unit that's made up of investigators

8    and detectives from across Pierce County.  Again, we have a

9    member from every jurisdiction in the county except for

10   Tacoma, Pierce County, and then State Patrol.  We have State

11   Patrol members now on our team, but at that time we didn't.

12        So because I knew this was an officer-involved shooting, I

13   made a phone call to Detective Ryan Byerley, who is a

14   detective with the Bonney Lake Police Department, and he is

15   one of the team leaders on that team.  I told him that we had

16   had an officer-involved shooting and I needed him to activate

17   the team and come to the scene to investigate.

18   Q   So the crime response unit, you said, is made up of

19   various cities within Pierce County; not the county, not the

20   city.

21        Lakewood?

22   A   Yes, Lakewood is a member.

23   Q   Fife?  Obviously, you were a member.

24   A   Yes, sir.

25   Q   And Bonney Lake, you said, was a member?

1    A    Yes.

2    Q    Puyallup?

3    A    Yes.

4    Q    Basically, the same jurisdictions that are involved in

5    Metro SWAT; isn't that right?

6    A    Yes, sir.

7    Q    And didn't a crime response officer respond to your call?

8    A    Many of them did.

9    Q    And who was the first one to respond?

10   A    The forensic services manager, Brian Johnson.

11   Q    And Brian Johnson is from what department?

12   A    Lakewood.

13   Q    And Officer Markert is from what department?

14   A    Lakewood.

15   Q    And Chief Zaro is from what department?

16   A    Lakewood.

17   Q    And did you learn who shot the dog?

18   A    Later.  That day, I -- I don't know if I knew that day,

19   but I believe it was Wiley and Officer Vance.

20   Q    And Officer Wiley is from what department?

21   A    Lakewood.

22   Q    And Vance is from what department?

23   A    Bonney Lake.

24   Q    What did Officer Johnson, or Detective Johnson from

25   Lakewood, do when he arrived on the scene?

1  A   I'm not sure I understand.

2  Q   Well, let me ask you this:  What is the standard protocol

3  if officers fire shots and there are injuries, or even if

4  there are not, and there is an investigation of an

5  officer-involved shooting?  Is one of the things that's done

6  is the weapons of the officers who fired are confiscated?

7  A   Yes, sir.

8  Q   And taken into evidence?

9  A   Yes, sir.

10 Q   And that would be the officers we just described who fired

11 shots that night?

12 A   Yes, sir.

13 Q   Did you actually initiate that process of securing those

14 weapons?

15 A   Initially, when I walked back out to the scene, I was

16 telling the officers that everybody needed to kind of leave

17 everything where it was, not to move the BearCat.  And

18 Officer Markert was standing there, and I said, "Hey, just

19 stand right there," and he said, "Sure, whatever you need."

20 And so I think it was Detective Rackley that initially came

21 up and contacted Markert.

22 Q   And did you have any other involvement in the evidence

23 gathering and the securing of the scene?

24 A   I helped to put up crime scene tape, to make sure it

25 was -- you know, that people knew not to go in there.  And

1   then I stayed at the scene.  Assistant Chief Mears, from

2   Fife, he was notified of what had happened, and he responded

3   to the scene and took control of the scene.  And then from

4   Fife, I assigned Detective Rackley, who was already on scene.

5   And then Detective Gow, who is a member of the crime response

6   unit, he showed up from Fife.  They were assigned as the lead

7   detectives for that.

8   Q   Did any of the -- were any of the vehicles or other

9   physical objects, cars or anything like that involved in the

10  scene, moved that night while you were there?

11  A   Not that I know.

12  Q   Was there any attempt to move them?

13  A   No, sir.

14  Q   Did you speak to Lakewood officers who were starting to

15  move the BearCat and told them not to move it?

16  A   They weren't starting to move it.  They were all starting

17  to head back to the BearCat.  And so, generally, what happens

18  on an operation is, once everything is done, they'll collect

19  all their gear and load it back into the rig, and then leave.

20  I think out of habit they all started to put their gear back

21  into the BearCat, and I told them they needed to stop and

22  just leave everything the way it was.

23  Q   And who were the officers who were doing that?

24  A   I don't recall precisely which ones.  There were a number

25  of them standing around.

1    Q    From the SWAT team?

2    A    Yes, sir, from the SWAT team.  I'm sorry.

3    Q    And were the officers involved or present at the scene

4    then interviewed that night?

5    A    Yes, sir.

6    Q    And where did those interviews take place?

7    A    The Lakewood Police Department.

8    Q    And who decided that the interviews of the Lakewood

9    officers would occur at the Lakewood Police Department rather

10   than somewhere else?

11   A    I'm not sure who exactly made that decision.  I know that

12   Lakewood has multiple interview rooms, and at Fife PD we have

13   one.  And so there were multiple officers involved, and so

14   I'm not exactly sure who made the final decision, but it was

15   decided that if everyone went to Lakewood, it would help

16   speed up the process of getting the officers through their

17   interviews.

18   Q    Do you know how many interview rooms Tacoma Police

19   Department have?

20   A    I have no idea.

21   Q    Do you know how many interview rooms the Pierce County

22   Sheriff's Office have?

23   A    I have no idea.

24   Q    To drive from Fife to Lakewood, you have to go through

25   Tacoma, don't you?

1    A    Correct.

2    Q    And the Pierce County Sheriff's Office have a headquarters

3    in downtown Tacoma; is that right?

4    A    Yes.

5    Q    And, of course, Tacoma Police Department does as well; is

6    that right?

7    A    Yes.

8    Q    No Tacoma police or Pierce County sheriffs or Washington

9    State Patrol officers were involved in the investigation of

10   this shooting, were they?

11   A    No, sir.

12   Q    Just the crime response unit from these same cities that

13   are involved in the SWAT team; is that correct?

14   A    Well, actually, the Pierce County Prosecutor's Office

15   sends investigators out.  And I know that Keith Barnes is the

16   lead investigator for the prosecutor's office, and I know he

17   responded to the scene.

18   Q    Is he a detective, or do you know what his rank, position

19   is there?

20   A    I believe he's titled "investigator."  He's a former

21   Pierce County detective sergeant.

22   Q    So during the time that you were -- however long it was

23   that you -- between the time you got there with Annalesa

24   Thomas and the time that the countdown began, did you see or

25   hear any action by Leonard Thomas that made you believe that

 1    E████ T████ was at risk of serious injury or death?

 2    A    No, sir.

 3    Q    Based on everything you knew, including the officer-safety

 4    alerts and the intel you gathered, did you see anything that

 5    evening that made you believe or that you thought would have

 6    justified the use of deadly force against Leonard Thomas?

 7    A    No, I didn't see anything.

 8    Q    Did you go to -- you said when you went back to the rig,

 9    you asked, "What just happened?"  Is that right?

10    A    Yes, sir.

11    Q    Did anybody ever answer you?

12    A    I don't recall who it was.  But my concern was about the

13    additional shots that had been fired, and I was concerned

14    that one of our officers had been shot, and I wanted to know

15    who it was.  And I don't remember who told me, but somebody

16    told me that the dog had been shot that was in the yard.

17    Q    Was it a natural assumption that if explosive entries are

18    used and shots are fired, that's the kind of situation where

19    you might expect an officer might be shot at also, right,

20    because that's what sometimes would justify that kind of a

21    response; is that right?

22    A    Yes, sir.

23    Q    But you learned there weren't any shots fired at the

24    officers, were there?

25    A    No, sir.

1    Q    Just Leonard Thomas and his dog?

2    A    Correct.

3    Q    And E█████'s dog.

4         Did you learn whose dog it was?

5    A    I don't have any idea whose dog it was.

6    Q    Did you go to any after-action debriefing kind of meetings

7    about this after that evening?

8    A    I went to a peer-support meeting.

9    Q    And that is a confidential kind of a meeting?

10   A    That's my understanding, yes, sir.

11   Q    So you're not inclined to talk about that?

12   A    I don't recall much about what happened at that meeting

13   anyway.

14   Q    Did you go to the SWAT team debrief, the tactical debrief

15   that occurred in June of that month -- of that year?

16   A    No, sir, I did not attend that meeting.

17   Q    So you don't know what happened there?

18   A    No, sir.

19   Q    Did you ever go back and have a conversation with Chief

20   Blackburn about the events on the day before May 24th, where

21   he had not returned Mr. Thomas's call and you received these

22   callbacks from Mr. Thomas.  Did you have a conversation with

23   him about that?

24   A    I did.

25   Q    And what did you say?

A    Well, when I went to talk to the chief, I was still

concerned about the fact that I never actually got an

opportunity to speak with Mr. Thomas or to find out what his

issue was with the Fife Police Department.  So when I went in

and I talked to Chief Blackburn about that, and I asked him,

you know, why -- there was -- I didn't know for sure how long

that message had been sitting there on my voice mail, and so

my concern is maybe it sat there for three days, and I didn't

know for sure.  So I asked him, "Why didn't you just call

this guy back?"  And, you know, the chief -- he took that

almost like I was challenging him or suggesting that maybe

that phone call had something to do with the results of what

happened that night.  And that wasn't my intention.  My

intention was just to -- I really wanted to know what his

issue was with the Fife Police Department and why he was so

angry with us.  And so that kind of came out in that

conversation.

Q    And you asked the chief, "Why did you let it sit for three

days without calling him back?"  Isn't that right?

A    Yeah.  Again, I don't know that it actually sat there for

three days, but I had been away for three days, and so that

was kind of my assumption.

Q    And you told him, "It shouldn't have happened," didn't

you?

A    What was that?

1    Q    You told the chief, "It shouldn't have happened," for

2    Mr. Thomas to be hanging that long and to get angry like he

3    did?

4    A    Yes.  Well, he was angry when he called, but he didn't get

5    called back right away, so it seemed to me like that angered

6    him even further.

7    Q    Do you know when his first call was?

8    A    Pardon me?

9    Q    You don't know when his first call was?

10   A    No, sir.

11   Q    You've never seen a record that indicated he first called

12   on May 15th, 2013?

13        MR. CULUMBER:  Objection; foundation.

14   Q    (By Mr. Ford)  Can we take a look at Exhibit 1021, please?

15   This has been admitted.

16        Have you seen this email before?

17   A    Yes, sir.

18   Q    May 15th, 2013?

19   A    Yes, sir.

20   Q    Eight days before the callbacks that you received from

21   Mr. Thomas?

22   A    Yes, sir.

23   Q    He left two phone numbers, is that right, Mr. Thomas did?

24   A    Yes, sir.

25   Q    And he was concerned about this contact with Officer

 1  Pomeroy and the call he had made, where he was the victim of

 2  assault and malicious mischief by Ms. Eddington?

 3          MR. CULUMBER:  Objection.  That's not what the

 4  exhibit says.

 5  A   Actually, it says that he wouldn't discuss the issue or

 6  whatever his issue was with the dispatcher and that she

 7  looked it up and saw this case, and she is assuming that's

 8  what it might have been about.

 9  Q   (By Mr. Ford)  I'm sorry.  That's right.

10          MR. FORD:  All right.  That's all the questions I

11  have.  Thank you very much.

12          MR. CONNELLY:  Your Honor, I have a few.

13                        DIRECT EXAMINATION

14  BY MR. CONNELLY:

15  Q   Good morning, Sergeant Thompson.  I'm Jack Connelly.  I

16  represent the estate of Leonard Thomas.  I've got a few

17  follow-up questions.

18          That discussion you had with Chief Blackburn, you

19  characterized it as a very heated conversation, correct?

20  A   Yes, sir.

21  Q   And you were upset with him, correct?

22  A   You know, I was upset with the situation.  And then when I

23  went in and asked him about it, I think he felt like I was

24  somehow challenging him, and so it did get somewhat heated,

25  yes, sir.

1   Q   And when you were at the scene and you were speaking with

2   Sergeant Eakes, did you talk to him about the fact that these

3   conversations had taken place earlier that day?

4   A   Yes, sir.  When I initially got there, I told him about

5   that.

6   Q   So Sergeant Eakes works for Lakewood, correct?

7   A   Correct.

8   Q   And you told him that Leonard Thomas had a pretty serious

9   issue at that point with the Fife Police Department?

10  A   Yes.  I told him he was angry with the Fife Police

11  Department but I didn't know why.

12  Q   All right.  Now, as far as during the time -- and do you

13  remember what time you got there?

14  A   I believe I got there sometime after midnight.  I'm not

15  exactly sure when.

16  Q   All right.

17      And when you got there, did you learn that Leonard was

18  bipolar, had some mental health issues?

19  A   Not initially, but later, when I had an opportunity to

20  speak with his mother, she told me that Leonard had been

21  prescribed some new medications and that he hadn't been

22  taking them.

23      She said that he -- he was upset because he had found out

24  that a friend of his had recently died, and so he started

25  drinking, like, really heavily, and she was concerned about

1    the fact that he wasn't taking his medications and that he

2    had been drinking, and so that's why she came to get E████.

3    Q    So at the time that you were at the scene, you had been

4    given the information that he had mental health issues and

5    was not taking his medications, that he had been drinking,

6    and he just lost a good friend, correct?

7    A    Yes, sir.

8    Q    Did you pass that information on to the negotiation team?

9    A    Yes, sir.

10   Q    And as far as -- as far as the mental health issues that

11   Leonard was experiencing, did you or did anyone on the team

12   consider bringing in any type of mental health professional

13   or somebody that could speak with him?

14   A    Not that I know of, sir.

15   Q    All right.

16        And from your training as a negotiator, are you aware

17   that mental health issues, and particularly bipolar, can

18   cause agitation, mood swings, fear, confusion?

19   A    Yes, sir.

20   Q    And during the time that you were there, were you seeing

21   agitation, mood swings?

22   A    I wasn't seeing it, but my understanding was that, yes,

23   there was some of that going on on the telephone.

24   Q    All right.

25        And bipolar and mental illness can cause fear of

1  uniformed people and police officers; is that something

2  you've been trained in?

3  A    I don't know if I've been trained in that specifically,

4  but it seems reasonable.

5  Q    All right.

6       You mention that you had gotten to the scene and

7  there's some discussion.

8       The negotiation team didn't follow its normal protocol,

9  correct?

10  A    Initially, we did.  But when there was transition from

11  Eakes -- or from Malave to Eakes, normally Eakes, because he

12  is our team leader, he would not have been the primary

13  negotiator, so that was where it turned a little bit.

14  Q    All right.

15       And that was something that you were concerned about,

16  correct, that the negotiation team wasn't able to do what we

17  normally do?

18  A    Yeah.

19       What happened was, normally we would be in the rig --

20  or in the negotiation rig with the negotiator, listening to

21  what's going on, and occasionally you would add something to

22  what was going on or some ideas or whatever.

23       Chief Zaro -- once Eakes got on the phone, Chief Zaro

24  wanted to go into the negotiator rig so he could hear

25  directly what was going on or so he could hear what

1    Mr. Thomas was saying.

2    Q    And in fairness, Sergeant, the way the negotiation team

3    works is that you have a specific protocol you follow in

4    order to deescalate situations, correct?

5    A    I don't know that we have a specific protocol, but that is

6    something that we try to do, yeah.

7    Q    All right.

8         And the goal is to deescalate the situation?

9    A    Correct.

10   Q    And you have a way that you have one person who is the

11   primary, the secondary is sitting there in the rig with him,

12   correct?

13   A    That's correct.

14   Q    One person is gathering intelligence?

15   A    Yes, sir.

16   Q    And the other person is the lead for the negotiation team?

17   A    Correct.

18   Q    And that procedure wasn't followed that evening, correct?

19   A    Initially it was, and then when Eakes transitioned to the

20   primary negotiator and Zaro was in the rig with him --

21   normally the lead -- the negotiator lead would be the person

22   that would be relaying to Zaro, or to command, but Zaro was

23   right there so that wasn't necessary at that time.

24   Q    And there was a point where this call came in.  Initially,

25   was it Sergeant Malave had been talking to him?

1   A   That's correct, yes, sir.

2   Q   And he was actually the primary negotiator, correct?

3   A   Yes.

4   Q   And at some point there was a call -- and I think we've

5   heard it -- from Leonard, and he wanted to speak with

6   somebody from the sheriff's or from the Washington State

7   Patrol, and that was patched in and went to Sergeant Eakes,

8   correct?

9   A   My understanding is it initially went to Malave, but

10  somehow it ended up at Eakes, yes.

11  Q   Okay.

12      And from that point forward, it was Sergeant Eakes that

13  was doing the conversing, correct?

14  A   That's correct.

15  Q   And then you and Sergeant Malave were outside the vehicle

16  at that point?

17  A   Yes, sir.

18  Q   And at some point somebody told you, well, bring Leonard's

19  mom, Annalesa, forward, correct?

20  A   Chief Zaro came out and told us that there was discussion

21  that if we were to bring Leonard's mother forward, that he

22  would release E         to her when he saw her.

23  Q   All right.

24      And they told you to walk her up towards the house?

25  A   Correct.

1  Q  And that's where you changed the jackets and so forth so

2  that Leonard wouldn't see the Fife Police Department?

3  A  Yes.

4  Q  And your radio was left in your old jacket?

5  A  Yeah.  I had a radio in my jacket, and when I got forward,

6  I didn't have a radio, so that wasn't a good feeling.

7  Q  All right.

8      As you walked forward, the tactical team came up and

9  said, "What are you guys doing here," correct?

10  A  Yes.

11      MR. CULUMBER:  Your Honor, we're getting repetitive.

12  This has been asked and answered.

13      MR. CONNELLY:  It hasn't been, Your Honor.

14      THE COURT:  We'll see.  I'll allow it.

15  Q  (By Mr. Connelly)  They asked, "What are you doing here,"

16  correct?

17  A  Right.

18  Q  At that point, you had no knowledge there were snipers

19  posted, right?

20  A  I didn't know where the snipers were, but it wouldn't be

21  uncommon for there to be snipers.

22  Q  You didn't know there were snipers posted?

23  A  No, sir, I didn't.

24  Q  And as you approached the vehicle, you mentioned earlier,

25  in response to the questions, that there was a plan in place.

1   But the truth is, there was no plan that you were aware of,

2   correct?

3   A   No, that I was aware, no, sir.

4   Q   And, in fact, you were critical afterwards that there

5   really wasn't a plan?

6   A   What I was critical of is that when Officer Waller came up

7   to me when I was standing there with Ms. Thomas and his

8   question to me was, "What are you guys doing," the confusion

9   for me was, first of all, how would he not know what we're

10  doing, and second of all, if he doesn't know what we're

11  doing, why is he walking over here?

12       So there was a bit of confusion there on my part, and I

13  didn't know exactly what the plan was between command and

14  then-team lead Wiley.  All I knew is that when Chief Zaro

15  came out of the rig and said, "Get her up there," there

16  seemed to be, like, some urgency in it, like, get her up

17  there right away because he will release the child if he sees

18  her.

19  Q   Sergeant, you didn't know what the plan was at that point,

20  and the technical team didn't seem to know of any plan,

21  correct?

22            MR. CULUMBER:  Objection; asked and answered.

23            THE COURT:  Sustained.

24  Q   (By Mr. Connelly)  I'd like you to turn to page 92 in your

25  deposition, and at line 13.

1   A    Okay.

2   Q    You were asked a question:  "Was it your understanding

3   Annalesa would be able to approach the porch and collect

4   E█████ as a possibility?"

5        Your answer was:  "There was no understanding on my

6   part."

7        MR. CULUMBER:  Objection; asked and answered.  We

8   went over this.

9        THE COURT:  Overruled.

10  Q    (By Mr. Connelly)  "I was told to bring her forward, and

11  that's all I was told to do.  I didn't know what the plan

12  was.  And, in fact, when I got her forward, the tactical guys

13  didn't seem to know what the plan was either, and so that's

14  all I knew."

15  A    Correct.

16  Q    All right.

17       So at that point, your concern, and you had been up

18  there and you'd been up there for a fairly short period of

19  time, but the tactical guys didn't seem to know the plan, and

20  you weren't really sure what the plan was other than to bring

21  her forward, correct?

22       MR. CULUMBER:  Objection; asked and answered.

23       THE COURT:  Sustained.

24  Q    (By Mr. Connelly)  When you were up there, Annalesa

25  started talking to the -- to E█████, correct?

1           MR. CULUMBER:  Objection; asked and answered.

2           THE COURT:  Overruled.

3    A    Yes, she started telling him to come to Grandma.

4    Q    (By Mr. Connelly)  And at that point, Leonard was saying

5    no, he wanted Annalesa to come forward, correct?

6    A    Yes, sir.

7    Q    And it was about at that point, as that's going on, E█████

8    is sitting on the steps, correct?

9    A    Yes, sir.

10   Q    And not -- Leonard is not even touching him at that point,

11   right?

12   A    No.  No, not that I recall.

13   Q    Leonard's back in the doorway, right?

14   A    Yeah.  Initially, he was standing there in the door.  I'm

15   not sure if he stepped out, but he was -- he was there, and

16   we could see him.

17   Q    Okay.

18        But the scene is that E█████ is sitting down on the

19   steps, and we've got Annalesa, who can't be seen, saying,

20   "Come down here," and Leonard is saying, "Bring people up" --

21   "bring Annalesa up, and I'll release him," correct?

22   A    He was telling her, "Just you come up here, Mom, come up

23   here.  You come get him."

24   Q    All right.

25        And then Sergeant Wiley said, "No, we're not going to

1    do that," right?

2    A    Yes.

3    Q    And it is at that point that you started hearing the

4    countdown, correct?

5    A    No, not initially.  He went back in the house, and E█████

6    went back in the house.  They came back out, and then we

7    started to call out to -- or she started to call out to

8    E█████ again, "Just come to Grandma, come to Grandma," and

9    that's when I heard the countdown start.

10   Q    All right.  And at that point, E█████ is on the steps?

11   A    That's correct.

12   Q    And Leonard is back up standing by the doorway?

13   A    Leonard is in the doorway, crouched down.

14   Q    All right.

15        So at that point you'd been there around ten minutes or

16   less, correct?

17   A    It seemed like ten minutes or so, yes, sir.

18   Q    All right.

19        And that's when you hear the countdown, you know that

20   there is going to be an explosion?

21   A    Yes.

22   Q    Because they're going to blow out the back door?

23   A    Yes.

24   Q    And no one prior to that had announced, in any manner, to

25   Leonard that, "Hey, we're going to do this, we're going to

```
 1  come forward."  No one said anything of that nature at all?

 2  A   No, sir.

 3  Q   And at that particular point in time, there is no one

 4  harming E▆▆▆▆▆, correct?

 5  A   Correct.

 6  Q   All right.

 7       At the point that -- you mentioned in response to

 8  Mr. Ford's question that it was a surprise to you and Malave.

 9  Do you remember that?

10  A   Yes, sir.

11  Q   And it was a surprise because you had just gotten up there

12  and you didn't know why they were suddenly blowing up the

13  back door, correct?

14  A   No.

15           MR. CULUMBER:  Objection; asked and answered.

16           THE COURT:  Overruled.

17  A   Yeah.  We didn't -- we didn't know why they were doing

18  that.

19  Q   (By Mr. Connelly)  All right.

20       And then you've talked about what happened then.  They

21  blew up the back door, E▆▆▆▆ ran down, one of the police

22  officers got him, and you told Malave to grab him, correct?

23  A   Correct.

24  Q   And when he was saying, "Daddy, Daddy," was there anything

25  else that you recall him saying at that time?
```

```
 1   A    No, sir.
 2   Q    Now, during that time -- and we've talked about -- you
 3   were asked some questions about different points during the
 4   evening, but from the time you got there and spoke with
 5   Lieutenant Green, was there ever any statement that E█████
 6   was being harmed in any manner?
 7   A    No.
 8   Q    And I want to ask you a question about -- there was some
 9   discussion about the reference with Sergeant Luckman about
10   the window.  Do you recall that?
11   A    Yes, sir.
12   Q    If we can turn to page 56 in the deposition.
13             MR. CULUMBER:  Is this impeachment, Your Honor?  It's
14   up on the screen here.
15             MR. CONNELLY:  It's different than what he testified
16   earlier.
17             THE COURT:  Well, what is the question that you're --
18   Q    (By Mr. Connelly)  The question is:  You were told and the
19   information that you got was that E█████ was being held up to
20   the window, not held up outside the window, correct?
21        If we look at line 13, "It was not him dangling out of
22   the window, it was holding him up to the window."
23   A    Okay.
24   Q    "Kind of so that officers could see the child."
25   A    Yes, sir.
```

1  Q   "I don't know if it was to see if the child was okay or

2  what he was holding him up to," but the testimony you gave

3  previously was that he was holding him up to the window,

4  correct?

5  A   I believe so, yes, sir.

6  Q   All right.

7      And then as far as the -- the entire time that you had

8  been there, there were never any threats by Leonard towards

9  law enforcement, correct?

10 A   Not that I knew of, sir.

11 Q   And there were never any threats where he was going to

12 harm himself, correct?

13 A   No, sir.

14 Q   No threats to harm the child?

15 A   Not that I know of.

16     MR. CONNELLY:  All right.  That's all I have.  Thank

17 you, Your Honor.

18     THE COURT:  You may cross-examine whenever you're

19 ready.

20     MR. CULUMBER:  Can I have just a minute to get set

21 up?

22     THE COURT:  Sure, sure.

23                    CROSS-EXAMINATION

24 BY MR. CULUMBER:

25 Q   Good morning, Sergeant.

1   A    Good morning.

2   Q    Are we still morning?

3   A    Ten more minutes.

4   Q    Can you give the jury a little background about your law

5   enforcement resumé, your experience, your training?

6   A    I started with the Fife Police Department in 1996 as a

7   reserve police officer.  It was a volunteer position.

8   Shortly after that, I was hired full-time, and I attended the

9   Washington State Basic Law Enforcement Academy.  I was a

10  patrol officer for some time, and then I was promoted to

11  detective.  I did that for a few years and was promoted to

12  sergeant, and I was in charge of a graveyard patrol squad

13  before I was promoted to detective sergeant, and I've been

14  doing that since.

15      I've been on the Metro SWAT team since 2005, and I'm also

16  a member or a team leader for the Metro Crime Response Unit,

17  which I told you guys about a little bit earlier.

18      Other than that, I'm a member of what's called WSHNA, or

19  the Washington State Hostage Negotiators Association, and

20  I've been a member of that organization since I got on this

21  team.

22      I'm also a member of what's called WHIA, the Washington

23  Homicide Investigators Association, and I also serve on the

24  advisory board for that association.  We have probably 1,100

25  members right now, so...

1    Q    When did you first become a hostage negotiator?

2    A    In 2005.

3    Q    What sort of training did you have to undergo in order to

4    become certified as a hostage negotiator?

5    A    I attended the basic hostage negotiators course or school

6    with the FBI.

7    Q    When you finish the FBI school, do you get a certification

8    that you're able to be a hostage negotiator?

9    A    Yeah, that's correct.  You're awarded a certification

10   through the Washington State Criminal Justice Center.

11   Q    Following your initial certification, are you required to

12   undergo any continuous training to maintain that

13   certification as a hostage negotiator?

14   A    On our team, you are required to join the Washington State

15   Hostage Negotiators Association, and they have a yearly

16   conference where they present training courses and case

17   studies, and so we attend that every year in the spring.  And

18   then in the fall, we actually do practical training with the

19   tactical side of our team.

20   Q    How many hours of hostage negotiator training do you think

21   you've received in your career?

22   A    Hundreds.

23   Q    In addition to the hundreds of hours of training, do you

24   actually have experience doing negotiations in crisis

25   situations?

Thomas Thompson - Cross

1    A    Yes, sir.

2    Q    How many times have you done that?

3    A    Numerous times.  I don't know an exact number.

4    Q    Is it rare for crisis negotiations to be done with

5    mentally ill subjects, based on your training and experience?

6    A    No.  It happens all the time, every day.  If you're on

7    patrol, you deal with people like that all the time.

8    Q    So based on your training and experience, both as a, I'll

9    say, a normal police officer -- if you'll forgive that

10   term -- but based on your training and experience as just a

11   police officer in addition to your hostage negotiation

12   training and experience, are you familiar with negotiating

13   with people who are suffering from some sort of mental

14   illness?

15   A    Yeah.  We deal with people that are in crisis all the

16   time, whether it be mental illness or some drug or alcohol

17   addiction, something like that.  It's pretty much a daily

18   occurrence.  It's part of the job.

19   Q    When you're negotiating with someone who may be exhibiting

20   symptoms of mental illness in a barricaded, standoff, hostage

21   situation, would you ever be trained to bring in a mental

22   health professional to be involved in that negotiation?

23   A    I haven't been trained to do that.  I don't know if other

24   teams do that or not, but I've never been trained to do that.

25   Q    Have you had occasions in your career as a police officer

1    to sometimes seek mental health help for people after you've

2    taken them into custody?

3    A    Yes, we do that all the time.

4    Q    Normally do you have to actually get the person into

5    custody before you can address mental health issues, or try

6    to get them that sort of help?

7    A    Sometimes, yeah.

8    Q    I want to talk about the morning and afternoon of May

9    23rd, the day before this initial call-out.

10          So you arrived back to work, and you had been away at

11   training, you said?

12   A    Yes.  I had been gone for three days.

13   Q    What sort of training?

14   A    I was actually at the negotiator conference.

15   Q    And when you came back, you got a voice mail that Chief

16   Blackburn had forwarded you, correct?

17   A    That's correct.

18   Q    Did you have any idea whether the chief had already, in

19   fact, talked to Leonard on the phone before that?

20   A    No, sir.

21   Q    Did you have any idea about how many times Leonard had

22   called Chief Blackburn before that?

23   A    No, sir.

24   Q    Did you have any idea about any of Chief Blackburn's

25   attempts to address the situation before you had come back

1    from training?

2    A    No.

3    Q    When you got the voice mail and asked Chief Blackburn

4    about it, what did he tell you?

5    A    He told me to call him and figure out what the problem

6    was.

7    Q    Did he -- when he forwarded you the voice mail, did he

8    say, "Get this guy off my back, make him stop calling me"?

9    A    No, it was nothing like that.

10   Q    If Chief Blackburn had spoken to Leonard and actually been

11   able to determine what his issue was, based on your training

12   and experience, what would Chief Blackburn had done with that

13   information?

14   A    He would have forwarded that to a sergeant to follow up

15   on.

16   Q    And that would be someone in your position?

17   A    Yes, sir.

18   Q    Was that uncommon for you as a detective sergeant to be

19   tasked with talking to citizens who are upset somehow, and

20   trying to figure out what the problem was?

21   A    No, I did that all the time.

22   Q    When you got that voice mail forwarded from Chief

23   Blackburn, did you conclude that it was somehow inappropriate

24   that he would ask you to follow up on that?

25   A    No.

1    Q   When you listened to the voice mail, could you decipher

2    what Leonard's issue was with the Fife Police Department?

3    A   Other than he was very angry at something, no, I couldn't

4    make it out.  I couldn't tell what it was.

5    Q   And the voice mail that we heard earlier today, that

6    wasn't the voice mail that Chief Blackburn forwarded you,

7    correct?

8    A   No.  That sounded like a voice mail he must have got after

9    I made my call, because he said, "Don't have your lieutenants

10   call me."

11   Q   So when you -- well, what did you -- did you call Leonard

12   right then that day?

13   A   Yes, sir.

14   Q   So when you got the voice mail, you called Leonard right

15   away.  Did you get ahold of him?

16   A   No, I reached his voice mail.

17   Q   Did you leave a voice mail?

18   A   Yeah.  I introduced myself and told him that the chief had

19   asked me to call him and try to help him.

20   Q   And then did you hear back from Leonard that day?

21   A   Yeah.  Later in the day, I got a return call from him.  It

22   was a voice mail, and he was angry that I was the one who

23   called.  He demanded to have Chief Blackburn call him, and he

24   told me never to call him again.

25   Q   Did it sound, basically, the same sort of subject matter

1   as the voice mail we heard?

2   A    Yeah, yeah, it sounded quite a bit like it.

3   Q    So when Leonard called you back and left you a voice mail

4   saying, "Don't call me back, I don't want to talk to you,"

5   what did you do?  Did you ignore that or forget about it?

6   What did you do?

7   A    No.  My office was right across the hallway from the

8   chief's, and so I cranked the volume up and I played it, and

9   he said, "What was the phone number again?"  And he called

10  him back.

11  Q    So when you played the voice mail that you got from

12  Leonard, did the chief tell you, "Forget about it.  I don't

13  want to hear about it.  Ignore him"?

14  A    No.  He asked me for the phone number, and then he called

15  him.  I could hear him make the call.

16  Q    So after you said, "Chief" -- after you played the voice

17  mail Leonard had left for you -- or for Chief Blackburn, he

18  actually called him back right then, correct?

19  A    Yeah.  I was in my office, but I could hear him make the

20  call.

21  Q    From what you heard, was Chief Blackburn able to address

22  what Leonard was concerned about?

23  A    No.  From what I heard, the chief was trying to explain to

24  him why he hadn't called him back, and he was telling him

25  that there is a process to follow.

1      What I could hear, though -- I couldn't hear Mr. Thomas.

2   I could only hear the chief's side of the conversation, but

3   it sounded like he was being interrupted, because he kept

4   saying, "Well, hold on, let me explain, let me explain," and

5   that went on for a little bit, and then all of a sudden the

6   call stopped, the call was over.

7           THE COURT:  Counsel, is this a good place to stop for

8   lunch?

9           MR. CULUMBER:  Yes.

10          THE COURT:  Ladies and gentlemen, we're going to take

11  our lunch break now.  Retire to the jury room, and I'll see

12  you back here at one o'clock.

13      Remember, you're not to be discussing the case amongst

14  yourselves or with anyone else, nor are you to hear anything

15  connected to the case.

16      We'll see you back here at 1:00.  The court is in recess.

17                    (Court in recess.)

18      (The following occurred in the presence of the jury.)

19          THE COURT:  Please be seated.  Welcome back, ladies

20  and gentlemen.  Whenever you are ready, counsel.

21          MR. CULUMBER:  Thank you.

22  Q   Sergeant Thompson, after you had heard Chief Blackburn

23  talk to Leonard on the phone -- and then that conversation

24  seemed to end poorly, correct?

25  A   Correct.

1  Q    After you heard that, did you do anything else that day to

2  try to investigate what Leonard might possibly have been

3  upset about?

4  A    Yes, sir.  I went to our inhouse record system, and I

5  brought up current cases that Mr. Thomas had been involved

6  in.

7  Q    And you talked about those cases and what was in those

8  reports, excuse me, earlier this morning, correct?

9  A    Yes, sir.

10  Q    You were asked questions about what was in those reports?

11  A    That's correct.

12  Q    I want you to look at Exhibit 1018.  Is this the

13  April 21st, 2013, report that you testified about earlier?

14  A    Yes, sir.

15  Q    And this incident happened just about a month before?

16  A    Yes, sir.

17  Q    And just to clarify, you were looking at these reports the

18  day of the eventual SWAT callout, that afternoon, correct?

19  A    That's correct.

20  Q    Is this a standard Fife police report?

21  A    Yes, sir.

22  Q    Is this the police report that you were asked about

23  earlier today?

24  A    Yes, sir.

25  Q    Did you locate this in the Fife Police Department's

```
 1    computer system?

 2    A    I did.

 3              UNIDENTIFIED JUROR:  Your Honor, we can't see the

 4    report.

 5              THE CLERK:  Your Honor, it's not admitted yet.

 6              MR. CULUMBER:  It hasn't been admitted yet.

 7              THE CLERK:  They can't see it.

 8              THE COURT:  Let's continue questioning about it.

 9        It's not admitted, so you can't see it yet.

10    Q    (By Mr. Culumber:)  Did the facts in this report inform

11    your thinking on the night of the incident with Leonard

12    Thomas?

13    A    Yes, sir.

14    Q    And you found out from this report that Mary Eddington

15    reported that Leonard had held her hostage with a knife to

16    her throat and threatened to kill her?

17    A    That's correct.

18    Q    And you were asked questions about the injuries to his

19    girlfriend that day, correct?

20    A    Yes.

21    Q    Did Officer Quinto, who responded to that incident,

22    actually take colored photographs of those injuries?

23    A    He did.

24    Q    Are those color photographs part of the report that you

25    reviewed?
```

Thomas Thompson - Cross

1    A    Yes, sir.

2             MR. CULUMBER:  Your Honor, I offer 1018.

3             MR. FORD:  We don't have any objection to the first

4    page, Your Honor.  The second page, the photographs, we have

5    not heard any identification about how they were taken, what

6    kind of instrumentation was used, how accurate they are in

7    portraying what was there.  I don't have any objection to the

8    first page.

9             THE COURT:  Without additional foundation, I would at

10   this time not admit the photographs, but the rest of it can

11   come in.

12   Q    Do you have -- based on the report that you reviewed here,

13   did you find -- had officers ever actually spoken to Leonard

14   on this occasion?

15   A    No, sir.

16   Q    When they arrived and took the report, was he still there?

17   A    No, he was not.

18   Q    Based on your review, did you find any evidence that

19   Leonard had subsequently been arrested on this incident?

20   A    No, sir.

21   Q    Did you find any evidence that officers had ever spoken to

22   him at all about this incident?

23   A    No.

24   Q    Did you find any reason to believe that Leonard even knew

25   the police had been to his house that day?

```
 1   A    No, sir.

 2   Q    Based on your review of this report from just a month

 3   before, did it give you any more indication as to why Leonard

 4   could possibly be upset with the Fife Police Department?

 5   A    No, sir.

 6             MR. CULUMBER:  Your Honor, I have Exhibit 1020

 7   with -- I'm sorry, 1018 with the pictures removed.

 8             THE COURT:  Okay.

 9             MR. CULUMBER:  I would offer.  Could we rename that

10   1018A, or --

11             THE COURT:  Sure, why don't we do that.

12             MR. CULUMBER:  Okay.

13             THE COURT:  It will be admitted.

14                  (Exhibit No. 1018A admitted.)

15             MR. CULUMBER:  Okay.

16   Q    So what you are looking at here, Detective -- I'm sorry,

17   Sergeant -- you are a detective and a sergeant, correct?

18   A    That's correct.

19   Q    So either one works?

20   A    Either one works, sir.

21   Q    Okay.  What we're looking at on the screen here is the

22   incident report taken by Officer Quinto April 21st, 2013,

23   just about a month before Leonard was shot, correct?

24   A    Yes, sir.

25             MR. CULUMBER:  May I publish, Your Honor?
```

```
 1   Q    I would like you to look at 1020, Sergeant.  Is this the
 2   second report that you had reviewed that day?
 3   A    It is.
 4   Q    And this report was from April 12th?
 5   A    Yes, sir.
 6   Q    And so that would have been just about ten days before the
 7   incident with Leonard Thomas, correct?
 8   A    Correct.
 9   Q    Or ten days before you were actually reviewing the report?
10   A    Yes.
11   Q    Okay.  Is this a standard Fife police report?
12   A    It is.
13   Q    Did you find this in the Fife Police Department computer
14   system?
15   A    Yes, sir.
16   Q    Is this the report that informed your thinking when you
17   responded to Leonard's house later that night?
18   A    Yes, sir.
19             MR. CULUMBER:  Your Honor, I would offer 1020.
20             MR. FORD:  No objection, Your Honor, except for
21   clarification, I think the date is May 12th, not April 12th.
22             MR. CULUMBER:  Fair enough.
23             THE COURT:  With that correction, it will be
24   admitted.
25                      (Exhibit No. 1020 admitted.)
```

1    Q    And so I believe you said that the allegation on that day

2    was -- well, Leonard had actually called 911 that day,

3    correct?

4    A    That's correct.

5    Q    And the police responded to his address?

6    A    Yes, they did.

7    Q    And they took a report from him, correct?

8    A    They did.

9    Q    Anything about the report that you reviewed that indicated

10   Leonard was upset or didn't want to speak to the Fife police

11   that day?

12   A    No.  He was the one that called us for help, and they went

13   and took the report.

14   Q    And what he had alleged that day was his girlfriend had

15   kicked in the door, right?

16   A    That's correct.

17   Q    And the officers actually took pictures of the damaged

18   door that did look like it had been kicked in, right?

19   A    Yes, they did.

20   Q    Did the officers treat Leonard as a suspect that day?

21   A    No.  He was the victim of that crime.  They actually gave

22   him some domestic violence resource paperwork that we include

23   with all domestic violence cases.

24   Q    And then did this report, because you were the detective

25   sergeant, actually cross your desk at some point?

1    A    It did.

2    Q    And did you forward it to the prosecutor, recommending

3    that Leonard's girlfriend be charged in this incident?

4    A    Yes, sir.

5    Q    Based on the fact that Leonard was actually the one that

6    called Fife police that day, did that give you any indication

7    as to why he would have been upset?

8    A    No, sir.

9    Q    Based on what you reviewed in this report about the

10   actions that the officers actually took, was there anything

11   about this incident at all that would lead you to believe

12   Leonard was upset with the Fife Police Department for

13   something?

14   A    No.

15   Q    He wasn't arrested, right?

16   A    No.

17   Q    After you reviewed the police reports, you also found some

18   officer safety alerts, correct?

19   A    Yes, sir.

20   Q    Let's look at 1015 again.  This is the officer-safety

21   alert issued by the Tacoma Police Department about Leonard

22   Thomas, correct?

23   A    Yes, sir.

24   Q    What information did this officer-safety alert provide to

25   you that day?

1    A    That Mr. Thomas had made some threats to commit suicide,

2    statements about suicide-by-cop, and that he had also trained

3    in how to overcome the effects of a Taser.

4    Q    I'm going to have you look at 1014.  Is this the Fife

5    officer-safety alert issued on Leonard Thomas?

6    A    Yes, sir.

7    Q    And the chief of police, Brad Blackburn, signed this also?

8    A    He did.

9    Q    What information did this officer-safety alert provide you

10   about Leonard?

11   A    That Leonard's mother had called the police and said that

12   he was suicidal, that he had a history of alcohol abuse, and

13   that he -- she believed he either wanted to kill himself or

14   have an officer kill him.  She said that there were roommates

15   present that said that they thought he may have been able to

16   obtain a handgun.

17   Q    Both of these officer-safety alerts mentioned

18   suicide-by-cop.  Explain to the jury what suicide-by-cop

19   means to you as a police officer?

20   A    If someone is suicidal, they intend to kill themselves,

21   but they don't actually intend to do it themselves, sometimes

22   they will force an action that would make an officer respond

23   to that and use deadly force against them.

24   Q    What sort of actions do suspects normally take in order to

25   force a police officer to shoot them?

```
 1              MR. FORD:  Objection, foundation.  "Normally."

 2              THE COURT:  He can lay a foundation.

 3              MR. FORD:  Thank you.

 4   Q   Do you receive training as a police officer on

 5   suicide-by-cop and what that means?

 6   A   Yes, sir.

 7   Q   Based on your training and experience, do you have a

 8   general understanding of situations in which people will

 9   commit suicide-by-cop?

10   A   Yes, sir.

11   Q   Is suicide-by-cop something that's common enough that the

12   law enforcement community has come up with this sort of code

13   name for it, "suicide-by-cop"?

14   A   Yes, it is.

15   Q   What sort of actions do suspects normally take, based on

16   your training and experience, in order to force an officer to

17   shoot them?

18              MR. FORD:  Still no foundation.  He hasn't said any

19   experience and he hasn't said what the training is that would

20   deal with this question of what actions are taken.

21              THE COURT:  Have you had any training along these

22   lines?

23              THE WITNESS:  This is something, Your Honor, that

24   every officer talks about and is trained during their field

25   training.
```

1          THE COURT:  Overruled.

2          MR. FORD:  So just for training, Your Honor?  No

3    experience foundation, experience.

4          THE COURT:  You can ask him on redirect.

5          MR. FORD:  Thank you.

6    Q   (By Mr. Culumber:)  Based on your training and experience,

7    what sort of actions does a suspect have to take in order to

8    force an officer to shoot them?  For example, can a suspect

9    just say, "Hey, please shoot me," and an officer will shoot

10   them?

11   A   No, sir.  They have to pose a threat to either the officer

12   or someone else in order for the officer to use deadly force

13   against them.

14   Q   So why is it that suicide-by-cop is an officer-safety

15   alert?

16   A   This would indicate to me that the subject or the person

17   might try to either do something to me or to someone else

18   that would basically force my hand and force me to kill them.

19   Q   The alerts mention that Leonard claims to have trained

20   with Tasers; in the event he gets tased, he's able to pull

21   one of the probes out.  What concerns does that particular

22   statement raise for you as a police officer?  Why would that

23   be an officer-safety alert?

24   A   Generally we use Tasers when people are non-compliant or

25   if they are attacking an officer.  This would be concerning

1    because someone that would go out of their way to actually

2    train on how to overcome the effects of a Taser, that might

3    indicate to you that they are planning on attacking an

4    officer and that they want to be able to overcome that Taser

5    if it were to be used.

6    Q    The alerts mention that Leonard may have acquired a pistol

7    based on information from his family and his roommates.  What

8    concerns does that raise for you as an officer in a situation

9    like this?

10   A    I think the alert actually says a weapon.  But during this

11   case, one of the roommates said that Leonard had talked about

12   obtaining a pistol, and she didn't know for sure if he had

13   done so or not, but, of course, anyone that's threatening to

14   commit suicide-by-cop, if they are able to obtain a pistol or

15   a weapon, that would just make it that much easier to go

16   through with the act.

17   Q    And then once you had reviewed these prior police reports

18   and reviewed the officer-safety alerts about Leonard, why did

19   you go and speak to Sergeant Gardner?

20   A    Well, my concern was that Leonard was obviously upset with

21   our department for some reason, and so these officer-safety

22   alerts concern me, that if one of our officers were to be

23   dispatched to that address, that there might be some type of

24   situation that they found themselves in.

25        What I told Sergeant Gardner was that he should maybe

1    think about, if they're dispatched to this address, having

2    more than one officer respond.

3    Q    After you had given that information to Sergeant Gardner,

4    did you go off shift and just go home?

5    A    Yes, sir.

6    Q    And then what time did you next hear about this situation?

7    A    I believe I got the call from dispatch just before eleven

8    o'clock or so.

9    Q    And the call from dispatch, was that the audio recording

10   that we heard earlier?

11   A    Yes, sir.

12   Q    That said, "We're out with someone," and you say, "Is it

13   Leonard Thomas?" and they said, "Yes"?

14   A    Yes, sir.

15   Q    From the recording, they ask you to call Officer Quinto's

16   cell phone.  Do you know why that is?

17   A    My understanding was that, at that time, Sergeant Green

18   was actually talking to Mr. Thomas on his cell phone, and

19   Quinto was standing there with Green.

20   Q    Did you actually call Officer Quinto there at the scene?

21   A    Yes, sir.

22   Q    Did he then give his phone to Sergeant Green so you could

23   talk to him?

24   A    Yes, he did.

25   Q    And maybe back up a little bit.  Explain who was Sergeant

1   Green in terms of the Fife Police Department that night?

2   Just so the jury understands who is who.  There's been a lot

3   of names thrown around.

4   A   Okay.  Sergeant Green was the patrol sergeant, or at the

5   time, was lieutenant, so the patrol lieutenant that was in

6   charge of the nightshift, and so he had come -- he and his

7   crew had come on duty, and he was in charge of that group.

8   Q   When you spoke to Sergeant Gardner earlier in the evening,

9   Sergeant Gardner was in charge of all the patrol officers on

10  duty at that time?

11  A   Yes, on the swing shift.

12  Q   And then by the time you got the call later, the shift had

13  changed, and it was Sergeant Green who was now in charge of

14  the patrol officers?

15  A   That's correct.

16  Q   Okay.  From your understanding, about how many officers

17  were at Leonard's house, Fife patrol officers, were at

18  Leonard's house as of the time you got the call?

19  A   They were all there.  I think maybe four or five.  And

20  there were at least two Milton officers there.

21  Q   If there were four or five -- well, how many patrol

22  officers would generally be on duty in the entire City of

23  Fife at that time?

24  A   At that time, four or five.

25  Q   Okay.  So if there were five Fife police officers at

1    Leonard's house, that would mean the entire Fife Police

2    Department on duty at that time was there?

3    A    Yes, sir.

4    Q    And was it your understanding there were also officers

5    from adjoining jurisdictions who had come to assist?

6    A    Yes.  Initially there were officers from the Milton Police

7    Department and then the Puyallup Tribal Police also sent some

8    officers to help.

9    Q    And you're not talking about the SWAT team now; you are

10   just talking about the patrol officers that had arrived to

11   help with the initial callout?

12   A    Yes, sir.

13   Q    So Sergeant Green, the patrol supervisor, was there at the

14   scene overseeing the patrol response.  What did he tell you

15   when he talked to you on the phone?

16   A    They told me that they had responded to Mr. Thomas's

17   address for a domestic violence issue.  He said that

18   Mr. Thomas had taken his four-year-old and gone into the

19   house and was refusing to come out.

20   Q    Did Sergeant Green tell you that they had probable cause

21   to arrest him for domestic violence that day?

22   A    I don't recall him specifically saying that.

23   Q    What did you tell Sergeant Green in response?

24   A    Based on the situation and that he had pretty much used up

25   all of his resources, I suggested that he call the command

1   duty officer.  In our department, we have an administration

2   person that's always on call, 24-7, and so we call that our

3   command duty officer.  So I suggested that he call the

4   command duty officer.

5   Q   Do you know who happened to be the command duty officer

6   that night?

7   A   It was Chief Blackburn.

8   Q   If Chief Blackburn had not been the command duty officer,

9   would you still have wanted Green to let Chief Blackburn know

10  what was going on based on the fact that Chief Blackburn had

11  spoken to Leonard earlier that day?

12  A   Yes, probably.

13  Q   So after you -- when you spoke to Sergeant Green and you

14  recommended that he call the command duty officer, did you do

15  anything else right at that point, or did you just go back to

16  your --

17  A   No.  I was done with it at that point.

18  Q   Why were you done with it at that point?

19  A   They didn't need me for anything, and he didn't ask me to

20  respond at that time.

21  Q   What was the next thing that you heard, after you hung up

22  with Sergeant Green?

23  A   There was a SWAT page that goes out.  It's kind of like a

24  text message that goes out.  And they were requesting SWAT

25  and negotiators to respond to Fife for a barricaded subject.

1   Q   And you understood that to be the same incident that you

2   had just spoke to Green about a little while earlier?

3   A   Yes, sir.  Where they told us to respond for the command

4   post.  I believe it was in the same area.  So I knew that

5   that was probably what it was.

6   Q   Based on what you had read about Leonard earlier that day

7   and the background you understood and the information that

8   you got from Sergeant Green when he talked to you, did it

9   surprise you that this SWAT team was called out?

10  A   No, sir.

11  Q   Based on your training and experience as a patrol officer

12  and a negotiator, is that the type of call that you would

13  expect the SWAT team to get called out on?

14  A   Yes, it is.

15  Q   You testified earlier that there's normally roles that are

16  assigned in the negotiators:  a lead negotiator, a secondary,

17  an intelligence, and scribe?

18  A   Yes, sir.

19  Q   Based on your experience, are SWAT callouts always a real

20  organized sequential operation?

21  A   No, sir.  Sometimes they're fluid and you just have to

22  adapt and change as different things are happening.

23  Q   Have you found in your experience that oftentimes the

24  roles that you initially are assigned at the beginning will

25  change and develop as the call goes on and you adapt to

1    what's required?

2    A    Yes.  Sometimes.

3    Q    You mentioned the negotiators' rig.  Is this the

4    negotiators' rig?

5    A    Yes, sir, it is.

6         MR. CULUMBER:  It's Exhibit 411.  It's been admitted.

7    Q    So when you arrived and talked to Sergeant Eakes, he

8    instructed you to talk to Sergeant Luckman, right?

9    A    Yes, sir.

10   Q    So let's back up a little bit and explain to the jury who

11   was Sergeant Luckman and what was your understanding of why

12   he was at the scene?

13   A    Sergeant Luckman was a Milton patrol sergeant who had come

14   down to assist with this call.  Sergeant Luckman was also a

15   former SWAT negotiator on our team.  And he had an

16   opportunity to speak with Mr. Thomas for, I think it was,

17   about 20 minutes or so before we arrived on scene.

18   Q    Is Sergeant Luckman -- how long have you worked with

19   Sergeant Luckman?

20   A    I have worked with Sergeant Luckman for many years.

21   Milton and Fife, our cities abut up against each other.  And

22   we're both fairly small agencies, and so when we're on duty,

23   we rely on each other quite often.

24   Q    If Sergeant Luckman was the patrol sergeant for Milton, he

25   essentially would have been in the same role as Sergeant

1    Green for Fife that night, correct?

2    A    Yes, sir.

3    Q    They would have been peers in those roles?

4    A    Yes, sir.

5    Q    When you spoke to Sergeant Green earlier, he had told you

6    that he had been on the phone for quite a while with Leonard,

7    correct?

8    A    Correct.

9    Q    And he hasn't had any success in getting him to calm down

10   or release E█████ or anything, right?

11   A    No, sir.

12   Q    And then when you arrived, you understood that Sergeant

13   Luckman, who had been a prior negotiator, had also been on

14   the phone with Leonard for quite a while, correct?

15   A    Correct.

16   Q    Had Sergeant Luckman -- did he communicate to you that he

17   had any success at all in getting Leonard to comply with

18   anything or to cooperate?

19   A    No, he did not.

20   Q    What did Sergeant Luckman tell you about his phone call

21   with Leonard that night?

22   A    He said -- he talked about Ms. Thomas showing up there to

23   pick up E█████ and that Leonard had gone inside the house

24   with him and was refusing to let him come out.  He talked

25   about how Leonard was angry with the Fife Police Department,

1  but, again, he never told him what the issue was or what the

2  problem was.  He said that Mr. Thomas had been telling them

3  to just go away.  He just wanted them to go away and get out

4  of his yard.

5  Q   Sergeant Luckman told you, I think you said earlier, that

6  a patrol officer had reported something about hearing Leonard

7  say he had a pistol?

8  A   Yeah.  He said that -- he told me that Officer Johnson had

9  overheard Mr. Thomas say that he didn't have any weapons, but

10 he had a pistol.

11 Q   Where is Officer Johnson from?

12 A   He's also from Milton Police Department.

13 Q   So at least Luckman and Johnson had come from the next

14 city over, Milton, to help assist?

15 A   Yes, sir.

16 Q   Okay.  Have you also worked with Officer Johnson before?

17 A   Yes, sir.

18 Q   For how long?

19 A   Many years.

20 Q   Did Sergeant Luckman tell you that Leonard had told him --

21 Leonard had told Sergeant Luckman several times he was

22 unarmed?

23 A   He said that he had told him that, yes, sir.

24 Q   When you are dealing with a suspect in a violent crime who

25 has officer safety alerts issued on them, is inside a house

1  with a small child, refusing to come out, are you trained to

2  make any assumptions about the potential presence of weapons?

3  A   I would -- I would always assume that there are weapons

4  present if you are inside a house.  There could be any number

5  of things in the house:  knives, bats, clubs, anything.  It's

6  hard to say.  It doesn't necessarily just have to be a gun.

7  Q   If a suspect in this sort of situation tells you they're

8  unarmed, are you trained to just take their word for it?

9  A   No, we're not.

10  Q   If a suspect in this situation tells you they're unarmed,

11  are you trained to let your guard down somehow?

12  A   No, sir.

13  Q   In your experience as a police officer, have suspects told

14  you many times they're unarmed only for you to find out that

15  that wasn't true?

16  A   Yes.  That's happened to me in the past.

17  Q   In a situation like you had with Leonard that night, would

18  you ever assume he was unarmed, regardless of what he told

19  you?

20  A   No, I would not assume that.

21  Q   As a police officer -- and I think you sort of alluded to

22  it -- do you receive actual training on the types of items

23  that most people have access to in their own home?

24  A   Yeah.  There's any number of things that you could have in

25  your home that you could use as a weapon.

1    Q   When you were on the scene that night, did Chief Zaro --

2    so Chief Blackburn was your chief at the City of Fife, right?

3    A   Yes, sir.

4    Q   Chief Zaro, sitting here at the table, he was the tactical

5    commander of the SWAT team, correct?

6    A   He was.

7    Q   Okay.  After the SWAT team had arrived, did Chief Zaro

8    ever broadcast any information about Leonard's criminal

9    history?

10   A   There was a broadcast about a prior arrest that he had

11   for -- that he had been arrested for a drive-by shooting and

12   I believe it was a possession of stolen property.

13   Q   I will show you Exhibit 1041 at the 28 minute, 48 second

14   mark.

15        This is the transcript of the SWAT radio channel.  So

16   what we looked at earlier -- maybe we should explain this a

17   little bit -- what we looked at earlier, that was the Fife

18   dispatch radio transcript, correct?

19   A   Yes.

20   Q   That would have been the radio transcript that all Fife

21   officers would have heard just as they're out in their patrol

22   cars with dispatch?

23   A   Yes.

24   Q   When SWAT arrives at a scene, SWAT uses a separate radio

25   channel for them to communicate amongst themselves; is that

1    correct?

2    A    That's correct.

3    Q    And is it your understanding that Exhibit 1041 is a

4    transcript of the SWAT radio traffic?

5    A    Yes, it appears to be.

6    Q    And at 28:48, Chief Zaro says, "Command.  All units follow

7    up on suspect's criminal history received.  Convicted of a

8    drive-by shooting in 2008 and other burglary and PSP property

9    crimes."  What is PSP?

10   A    Possession of stolen property.

11   Q    Based on your training and experience, does the fact that

12   Leonard had been convicted of a drive-by shooting and sent to

13   prison for it, did that have any impact on your level of

14   concern that evening?

15   A    Yes, sir.

16   Q    Why?

17   A    Well, someone that would commit a drive-by shooting has

18   already shown that they would use a gun against another

19   person.  So that was definitely a concern for me.

20   Q    Now, you understand -- as of this point, you understand

21   that the year written on there, 2008, it was a different year

22   that he had been convicted.  Does that make any difference

23   for your concerns as a police officer whether a drive-by

24   conviction had happened five years ago or ten years ago?

25   A    No, it wouldn't have any difference -- or it wouldn't mean

1   anything different to me.

2   Q    Now, you didn't immediately speak to Annalesa because

3   Sergeant Luckman was already talking to her, correct?

4   A    Yes, sir.

5   Q    Do you recall at some point the team moved the negotiator

6   rig from the Outpost up closer to Leonard's house?

7   A    That's correct.

8   Q    Okay.  I want to show you 1023.  We looked at that

9   earlier.  Is this the actual north-south orientation?

10  A    Yes, sir.

11  Q    Okay.  Is this the Outpost that you were talking about?

12  A    Yes, sir.

13  Q    And is that generally where everyone gathered first?

14  A    Yes, it is.

15  Q    And then is this Leonard's house right here?

16  A    Yes, sir.

17  Q    Okay.  So when you arrived, was the negotiator rig here in

18  the Outpost?

19  A    Yes, sir.

20  Q    Then at some point was the negotiator rig moved around the

21  corner, partway up Leonard's block?

22  A    Yes, it was.

23  Q    So that was -- so you could be close enough to use a throw

24  phone or a hailer?

25  A    Yeah.  We have a couple of pieces of equipment in our rig

 1  that require, when it's used, it has a cable that we have to

 2  use to get power to it.  And so we have a limited amount of

 3  cable for each of those pieces of equipment, and so we had to

 4  get close enough that we could deploy them and not run out of

 5  the cords.

 6  Q   When the negotiator rig was moved up to Leonard's block,

 7  who had been given the task of being the primary negotiator

 8  that day -- or that night?  I'm sorry.

 9  A   Sergeant Malave.

10  Q   That's Mike Malave of the Fife Police Department where you

11  work?

12  A   Yes, sir.

13  Q   And you have worked with him for a lot of years?

14  A   Yes, sir.

15  Q   At some point did Detective Malave actually make contact

16  with Leonard on the phone?

17  A   I think he was on the phone with him several different

18  times.

19  Q   So that would have been the third person that he had

20  talked to on the phone, after Sergeant Green and Sergeant

21  Luckman, the prior negotiator, right?

22  A   Yes, sir.

23  Q   So now Detective Malave -- who's a negotiator with the

24  SWAT team, right?

25  A   Yes.

1  Q    -- when Sergeant Malave got on phone with him, what was

2  your understanding of how that conversation between Sergeant

3  Malave and Leonard went?

4  A    My understanding was that it didn't go very well and that

5  he hung up on Malave several times.

6  Q    Was it your understanding that at some point Leonard just

7  stopped answering the phone again?

8  A    Yes.  They were calling him back, but he was refusing to

9  answer.

10  Q    When Leonard stopped answering the phone, what was the

11  plan?  What plan was put into effect at that point?

12  A    There was some of the officers that were up by the house,

13  he was yelling at them through the windows and stuff, and so

14  it was decided that Malave and Officer Porche move forward

15  and try to have a dialogue with him up close by the house.

16  Q    Well, did Detective Malave and Officer Porche -- as they

17  were getting ready to go walk up to the house to try to have

18  a face-to-face dialogue with Leonard, what did you do?

19  A    That was the point where I -- there had been -- some of

20  the officers that were up close had said that there were some

21  cameras around the house, and so they asked me to go back and

22  talk to  Ms. Thomas and try to find out what those cameras

23  were and if they were actually operational.

24  Q    And then I think you described earlier you went and spoke

25  to Ms. Thomas?

1    A    Yes, sir.

2    Q    When you got back to the negotiator rig, had things

3    changed from when you left?

4    A    Yes.  Sergeant Eakes was now on the phone with Mr. Thomas.

5    Q    Okay.  So was it your understanding that when Detective

6    Malave and Officer Porche put on their gear and walked up to

7    talk to Leonard, that that's actually when Leonard called and

8    was transferred to Sergeant Eakes?

9    A    Yes, sir.  I believe that's when that happened, yes.

10   Q    Because Sergeant Eakes was still there in the negotiator

11   rig?

12   A    Yes.

13   Q    Malave and Porche were on foot walking up to the house,

14   correct?

15   A    That's correct.

16   Q    Was it odd in any way for Sergeant Eakes to be negotiating

17   himself?

18   A    Odd?

19   Q    He was initially the team leader, correct?

20   A    Correct.

21   Q    And he wasn't planning on doing the negotiation; that had

22   been assigned to Malave, right?

23   A    Right.

24   Q    Was it odd that that changed and now Sergeant Eakes was

25   doing the negotiation?

1    A    No.  That happens sometimes.  Sergeant Eakes is our senior

2    negotiator, so he's got a lot of experience negotiating.

3    Q    Would that be the fourth person that Leonard has now

4    talked to on the phone?

5    A    Yes, sir.

6    Q    What was your understanding how that discussion was going

7    between Leonard and Eakes?

8              MR. FORD:  Objection.  No foundation.

9              THE COURT:  Try to lay one.

10             MR. CULUMBER:  I'm sorry?

11             THE COURT:  You can try to lay a foundation.

12   Q    Were you getting periodic updates on the status of

13   negotiations between Sergeant Eakes and Leonard Thomas?

14   A    Yes.  And my understanding was that it was not going very

15   well.

16   Q    Normally, when you are assigned to the intelligence

17   role -- that is the role that you were initially assigned,

18   correct?

19   A    Yes, sir.

20   Q    Normally, when you're assigned to that role, would part of

21   your job be to communicate information about the negotiations

22   between the person actually negotiating and the tactical

23   commander, Chief Zaro?

24   A    Generally that would be the team leader that does that.

25   But, occasionally, especially in an instance like this where

1    the team leader had suddenly become the primary negotiator,

2    then yes, that would be a function.

3    Q   So if the team leader is actually doing the negotiations

4    or doing something else, that would fall to you as the

5    intelligence officer to communicate between the negotiator

6    and tactical command?

7    A   It could, yes, sir.

8    Q   In this incident here, based on the location and the

9    setup, did you actually have to do that, communicate -- run

10   back and forth and communicate information that way?

11   A   No.  Chief Zaro was right there in the rig listening to

12   the negotiations as they were going on.

13   Q   As an experienced hostage negotiator, are there advantages

14   to having the tactical commander sitting next to the

15   negotiator, hearing firsthand what's going on?

16   A   He knows exactly what's being said by both parties, and so

17   there wouldn't be any miscommunication, because he's hearing

18   it directly.

19   Q   Did you personally have any objection to the tactical

20   commander sitting in the negotiator rig actually listening to

21   the negotiations themself?

22   A   No.

23   Q   Based on your training and experience, would you think it

24   was somehow inappropriate for the tactical commander to be

25   getting firsthand information from the negotiators?

 1  A    I didn't think it was inappropriate.

 2  Q    At some point are you standing -- just sort of standing

 3  outside the negotiator rig?

 4  A    Yes, I'm right outside the door.

 5  Q    And then Chief Zaro comes out at some point and opens the

 6  door and tells you what initially?

 7  A    He said that Sergeant Eakes and Mr. Thomas were talking

 8  about whether or not he would be willing to let E█████ go to

 9  his grandmother if we brought her up closer where he could

10  see her.

11  Q    And what was your understanding of where grandma was --

12  well, when you say "grandma," we're talking about Annalesa

13  Thomas, correct?

14  A    Yes, sir.  Sorry.

15  Q    No.  That's okay.

16        What was your understanding of where she was at that

17  point?

18  A    She was still back at the Outpost with Officer Wyrwitzke,

19  and I just asked him, I radioed for him to bring her up

20  closer, so that if this actually were a possibility, we could

21  get her up close.

22  Q    Now, I'm going to have you look at 1039.  This is the

23  radio transcript that you were looking at before.

24  A    Okay.

25  Q    On the first page, is this a list of last names, full

1    names, their jurisdiction, and their unit number, just for

2    clarification when we're reading through this?

3    A    Yes, sir.

4    Q    Okay.  And I want to try to take another shot at what I

5    think Mr. Ford was doing.

6         When you start at 2:05 and this continues down, this

7    first column of times, is it your understanding that that is

8    total elapsed time from the initial 911 call?

9    A    Yes, sir.

10   Q    And so 2:05, essentially, the clock starts running when

11   Annalesa called 911, correct?

12   A    Yes.

13   Q    And so this dispatch, this first entry here, would have

14   occurred two minutes after the initial 911 call, and then you

15   continue going down; is that your understanding?

16   A    Yes.

17   Q    So, for example, this entry here at 4:55, that would be

18   four minutes and 55 seconds into the incident?

19   A    I believe so, yes, sir.

20   Q    And if we keep going down, this first column is the

21   elapsed time of the incident, essentially?

22   A    Yes.

23   Q    Okay.  Let's go to about the four-hour mark.  Okay.  This

24   entry here, "Thompson," is that you?

25   A    Yes, sir.

1    Q    Explain to the jury what's happening in these couple

2    interactions there.

3    A    This is where I called back to Sergeant -- or he's a

4    sergeant now, but he was an officer -- Wyrwitzke and asked

5    him to bring Ms. Thomas forward.

6    Q    So when you call "Hey Ryan," that's Officer --

7    A    His name is Ryan Wyrwitzke.

8    Q    Okay.  And then you indicate, "Just come up to 55th, you

9    will see my car, and we can keep it corralled," right?

10   A    Yes, sir.

11   Q    Can you point to -- if Leonard's house is here, your

12   understanding was that Officer Wyrwitzke was parked in the

13   Outpost parking lot here?

14   A    Yes, sir.

15   Q    Can you draw where Officer Wyrwitzke brought her to meet

16   you?

17   A    Best guess, it was like somewhere back in here.

18   Q    Okay.  So half a block or so from Leonard's house?

19   A    Yes, sir.

20   Q    So when you meet Officer Wyrwitzke, does Annalesa get out

21   of the car?

22   A    I don't recall if she initially got out or not.

23   Q    Okay.  At some point did she get out of the car?

24   A    Yes, she did.

25   Q    Then you walked with her up to the negotiator rig?

1    A    Yeah.  She was right there at the back of it.

2    Q    Okay.  I apologize.  Did Officer Wyrwitzke basically bring

3    her up to the negotiator rig?

4    A    When he brought her up in her car -- or in his car, she --

5    my recollection is that she stayed there for a little bit

6    because we weren't sure if this was actually going to be

7    something that Mr. Thomas was going to be willing to do.

8    Q    And then almost as soon as you got her out of the car, did

9    Chief Zaro come out again and tell you to get her up there?

10   A    I think that's backwards.  I think Chief Zaro came out of

11   the rig and said, "Hey, he's willing to do this.  Let's get

12   her up there."  So then we got her out and brought her up.

13   Q    Did it seem like it was something that he wanted you to do

14   immediately?

15   A    Yes.  There was some urgency in his voice.

16   Q    He didn't sit you down and explain everything that had

17   gone on and exactly what was going to happen, correct?

18   A    No, sir.

19   Q    Based on your experience, did it surprise you that there

20   might be a time-pressure element in a situation like this?

21   A    No, sir.

22   Q    During SWAT callouts, sometimes are you asked to go

23   interview someone or do a task without having the commander

24   explain exactly why he wants you to do it?

25   A    Yes.

1   Q   Prior to escorting Annalesa from the negotiator rig up to

2   the house, you said you took your jacket off?

3   A   Yes.

4   Q   Okay.  Would that be, in hostage negotiator terms, a

5   "deescalation" tactic, switching out from a Fife jacket to a

6   Lakewood jacket so as not to agitate someone who doesn't like

7   Fife?

8   A   Correct.  Yes.

9   Q   On Exhibit 1024, can you -- so this is Leonard's -- this

10   is just a closer version.  Is this Leonard's house there?

11   A   Yes, sir.

12   Q   Can you show the jury where you walked initially with

13   Annalesa?

14   A   So we brought her like somewhere up in here.

15   Q   And did a member of the tactical team actually come up and

16   meet you?

17   A   Two of them did.

18   Q   When Officer Waller asks you, "What is she doing here," or

19   "What are you guys doing," did you have any idea specifically

20   what his concern was?

21   A   No.

22   Q   And from the time you had taken off your jacket and walked

23   away from the negotiators rig, did you have your radio with

24   you?

25   A   No.  When I handed off my jacket to Porche, left my radio

1  in my jacket.

2  Q   So at the time that you arrived at this location and the

3  tactical officer came up to meet you, you hadn't heard any of

4  what was communicated to the tactical officers over the

5  radio?

6  A   No, sir.

7  Q   Did it appear to you initially like Officer Waller didn't

8  know you were coming to that spot?

9  A   I don't know that it appeared that.  He came over to us,

10  but when he asked me what I was doing, it was -- it was a bit

11  of a concern because I didn't understand why -- first of all,

12  why he was asking it, and it didn't make sense why he would

13  be asking it, if he was coming over to meet us.

14      So my concern was, why are you asking this question when

15  you clearly know why we're here, because you are the one that

16  is coming over to pick us up.  So that was -- it really

17  didn't make any sense to me.

18  Q   I am going to have you look at Exhibit 1041.  This is,

19  again, the SWAT radio traffic.  At the 1 hour, 1 minute, 32

20  second mark, Chief Zaro clearly tells the team, "Hey, we're

21  bringing grandma up just so she is visible from the front

22  door, because he'll release the kid when he sees the

23  grandmother.  So we're just going to bring him -- her -- up

24  close enough to be visible on the one side."  But you didn't

25  hear this because you didn't have your radio, right?

1  A    No, sir.

2  Q    And then what is the very next entry from the tactical

3  team leader?

4  A    He says he wants to have Vance and Waller cover the

5  grandma.

6  Q    Okay.  Having read the actual transcript, does that

7  alleviate your concerns as to whether or not Vance and Waller

8  knew you were coming?

9  A    It seemed clear they knew I was coming.

10 Q    And then a couple of minutes later, did Officer Waller

11 actually broadcast "Mike" -- that's Mike Wylie, correct?

12 A    Yes.

13 Q    -- "Mike, I have grandma with me.  Are you prepared to

14 receive us at the BearCat?"  And then Wylie says, Wylie to

15 Waller, "Go ahead and move the package."

16 A    Yes, sir.

17 Q    Based on this, there really isn't any concern that the

18 tactical team didn't know you were coming or didn't know what

19 the plan is?

20 A    It seemed like they knew exactly what was happening.

21 Q    Once you arrived at the BearCat, was it clear to you that

22 Officer Wylie clearly knew what the plan was?

23 A    Yes.  He seemed to know exactly what was going on.

24 Q    I want you to look at Exhibit 238.  This is where the

25 BearCat was parked that night, correct?

1   A    Yes, sir.

2   Q    Point out for the jury where you said, when you initially

3   arrived at the BearCat, you were standing with Annalesa where

4   you thought maybe she couldn't see the porch, or someone on

5   the porch couldn't see her?

6   A    So we initially brought her right up in here, and it's --

7   like I said, it's a large vehicle, and we didn't think they

8   could see her there.  So we moved her over to here, and she

9   could see the porch, and they can see her.

10  Q    I'm going to go forward to 239.  Is that the backside of

11  the BearCat generally where you and Annalesa would have been

12  standing while you are looking at the porch?

13  A    Yeah.  We were back in this area here.

14  Q    Was it clear to you that Leonard could see you and

15  Annalesa standing out there?

16  A    Yes, sir.

17  Q    And then when Annalesa starts saying, "Come here, E▓▓▓,

18  come to grandma," Leonard says, "No, you come up here and get

19  him," right?

20  A    Yes, sir.

21  Q    Officer Wylie, who is the tactical team leader, was

22  standing right beside you?

23  A    He was there, yeah, somewhere beside me.

24  Q    And he said, "No way is she going up there"?

25  A    Yeah, "That's not going to happen."

1  Q   As an experienced negotiator yourself, would you ever

2  allow Annalesa in that situation to walk up to the house

3  where Leonard is standing?

4  A   Not in a hostage situation.  I wouldn't want to make her a

5  potential -- another hostage.

6  Q   In hostage situations, based on your training and

7  experience, is it common for people who are holed up in a

8  house like this to demand that their family come to the

9  house?

10  A   Sometimes, yes, sir.

11  Q   Do you receive training on common reasons hostage takers

12  ask that, to have their family come to the scene?

13  A   Sometimes it's just to maybe try and take them as a

14  hostage also.  If they're going to commit some kind of act,

15  they may want their family member to see them do this.  If

16  they're suicidal, they may want to either have their family

17  member see this happen, if they blame them for the situation

18  they're in.  Sometimes they just want to say good-bye.  So

19  that's a concern.

20  Q   Based on your training and experience as a negotiator,

21  when a suspect in a hostage situation like this is calling

22  Annalesa up to the house, does that raise concerns for you

23  that he's trying to lure her closer?

24  A   Yes, sir.

25  Q   After that back-and-forth there for a few minutes, did

1   Leonard actually take E███████ and go back in the house?

2   A   Yes, he went back in.

3   Q   When he went back in, what did you -- well, I guess to

4   back up.  Was Sergeant Malave also with you and Annalesa

5   there at the BearCat?

6   A   He was in that area, yes, sir.

7   Q   When Leonard -- after there was this back-and-forth

8   between Annalesa and E███████ and Leonard, and then Leonard

9   goes inside, what did you and Detective Malave do?

10  A   Well, we weren't sure if that was the end of this or not,

11  if he was just going to go back in and this was over.  But he

12  came right back out a short time later.

13  Q   Was it a couple of minutes later that he came back out?

14  A   Maybe.

15  Q   When E███████ came back out -- and you said Leonard was

16  crouched down in the doorway?

17  A   Yes, sir.

18  Q   Did he have the door shut?

19  A   I don't think it was shut all the way.

20  Q   Was it your impression that he was crouched down, sort of

21  peeking out?

22  A   I saw him crouch down.  I don't know if -- yeah, he was

23  watching E███████, was kind of my impression.

24  Q   And then there was some more calling out to E███████, and

25  E███████ looking back and forth between grandma and --

```
 1   A    Yeah.  Grandma was saying, "Just come to grandma, just
 2   come to grandma."  Some of the officers that were up closer
 3   were yelling out to him, "Hey, just let him go.  Grandma is
 4   right here, just let him go."  E█████ was looking at her, but
 5   then he was also kind of looking back over his shoulder at
 6   his dad.
 7   Q    When you were standing there watching this, did you have
 8   any impression as to why E█████ wasn't just running out to
 9   grandma?
10   A    Just he was -- it appeared that he was looking at Dad, not
11   sure what to do.
12   Q    So at some point while this is going on, you hear the
13   countdown start?
14   A    Yes, sir.
15   Q    And based on your experience, you know what the countdown
16   means, correct?
17   A    That's correct.
18   Q    Prior to beginning the countdown, did any of the tactical
19   officers tell you, "Hey, Sergeant Thompson, we're about to
20   breach"?
21   A    No, they didn't.
22   Q    Does it surprise you that they didn't tell you?
23   A    No, sir.
24   Q    Do the tactical team members normally tell the negotiators
25   when they're about to breach?
```

1   A    No, they don't.

2   Q    Are there good reasons, based on your training and

3   experience, why you don't tell the negotiators when you are

4   about to breach, specifically?

5   A    Yes.  If we're negotiating with someone, you don't want to

6   give anything away.  You don't want to, with your voice, or

7   the way you are speaking to them, you don't -- you just don't

8   want to give anything away.  It's an element of surprise, and

9   you don't want anything to happen where they might know

10  something is changing.

11  Q    And you're standing right there with Annalesa, correct?

12  A    Yes.  I'm right at the back of the BearCat with her.

13  Q    Based on your training and experience, is there a reason

14  why tactical officers wouldn't tell you, while you are

15  standing there with Annalesa, that, "Hey, we're about to

16  breach the house"?

17  A    If they're about to go forward, they wouldn't want her to

18  know because she might yell out for them and warn them that

19  we're coming or that they're coming.

20  Q    So when you say, "I was surprised by the countdown," maybe

21  the question is, were you surprised that you were surprised?

22  Did that make sense?

23          THE COURT:  What?  I think you better rephrase that.

24  Q    In a situation like this, would you expect to be surprised

25  by the breach?

 1  A    Yeah.

 2  Q    Okay.  I'm sorry.  Maybe that was a terrible question.

 3  A    Yeah.  No, I get it.

 4  Q    You were asked some questions about if you heard anyone

 5  tell Leonard they were about to breach.  In your years on the

 6  hostage team, has the tactical team ever told the subject,

 7  "Hey, we're about to breach your house"?

 8  A    That would never happen.

 9  Q    Okay.  At the time you heard the countdown begin, how long

10  had you been up at the BearCat with Annalesa?

11  A    It wasn't very long.  Maybe ten minutes.

12  Q    Is it fair to say that time for a negotiator who's used to

13  negotiating for hours and hours may be different than time

14  for other people?

15  A    I'm not sure I understand the question.

16  Q    When you say -- forget that.

17       You had been at the BearCat for about ten minutes at

18  the time of the breach, right?

19  A    Correct.

20  Q    I'm going to direct your attention back to 1039,

21  Exhibit 1039.  So at about the 4:02 mark, fours hours and two

22  minutes, is you asking Officer Wyrwitzke to bring her up,

23  correct?

24  A    Correct.

25  Q    And then about two minutes later, this is Officer

 1    Wyrwitzke saying, "I'm en route to 253's location."  You're
 2    253, correct?
 3    A    That's correct.
 4    Q    Is this Officer Wyrwitzke, "I'm bringing Annalesa to
 5    Detective Thompson"?
 6    A    Correct.
 7    Q    And then if you go down 20 minutes later, "239 to Fife
 8    units on scene.  Stand by for noise," what's that?
 9    A    That's Chief Blackburn telling the Fife and Milton units
10    that are on our air that there's going to be some noise, that
11    something is about to happen.
12    Q    Okay.  Is it your understanding that that noise was the
13    breach?
14    A    Yes, sir.
15    Q    So you let patrol officers know there's going be a big
16    loud boom, sort of be expecting it?
17    A    Correct.
18    Q    Is that consistent with your memory, that from the time
19    Officer Wyrwitzke brought Annalesa to you until the time of
20    the breach was about 20 minutes?
21    A    That seems about right.
22    Q    And so some of that time would have been taken up from
23    Officer Wyrwitzke actually driving her around the corner,
24    correct?
25    A    Uh-huh.

1  Q   And then some of that time would be taken up from you

2  walking her up to the BearCat, correct?

3  A   Correct.

4  Q   And all of that is consistent with your memory that you

5  were at the BearCat for about ten minutes?

6  A   Ten minutes seems about right.

7  Q   When you heard the countdown begin, what did you do with

8  Annalesa?

9  A   I put my arm around her and escorted her back around

10 behind the BearCat.

11 Q   At the time of the breach, can you show the jury on here

12 where Annalesa was actually standing?

13 A   So I brought her back around, and I stood her right here

14 in front of this wheel.  The reason for that is I knew they

15 were going to be going up to the house, and I wanted her to

16 have the best cover that she could have.  Standing her behind

17 this wheel and behind the BearCat, there was no way, if there

18 were rounds fired our way, that she could be struck.

19 Q   And which direction was she facing?

20 A   She was facing with her back to the vehicle, and then I

21 was facing her.  I was right there facing her.

22 Q   At the time the breach actually occurred until after all

23 the shots had been fired, was there any way that Annalesa

24 could have seen anything that was going on at the house?

25 A   No.

1   Q   Was there any way that you could have seen anything that

2   was going on at the house?

3   A   No, sir.

4   Q   You saw the YouTube video that we played earlier today?

5   A   Yeah.

6   Q   And that was the back of the house -- that was a view from

7   the back of the house, correct?

8   A   Correct.

9   Q   Had you ever been to the back of the house that night?

10  A   No, sir.

11  Q   Had you seen any of that that happened back there?

12  A   No.

13  Q   Do you have training and experience in the purpose and use

14  of breaching charges by the tactical team?

15  A   Yes, sir.

16  Q   Have you been on various calls where breaching charges

17  like this were used before?

18  A   Yes.

19  Q   When a breaching charge is used, what's normally the

20  effect on the suspect inside the house?

21  A   The loud noise that it puts off is intended to kind of

22  stun people or scare them into giving up or just kind of

23  freezing them in place.

24  Q   Based on your training and experience, is that what the

25  SWAT team and the negotiators usually expect will happen when

1  a breaching charge is used?

2  A   Yes, sir.

3  Q   Is that similar to a flash-bang?

4  A   Yes.

5  Q   At the time of the breach, Sergeant Green had talked to

6  Leonard for quite a while, correct?

7  A   Yes, sir.

8  Q   Did he have any success that you were aware of?

9  A   No.

10  Q   Sergeant Luckman had talked to him for quite a while,

11  right?

12  A   Correct.

13  Q   Did he have any success?

14  A   No, sir.

15  Q   Detective Malave had talked to him for quite a while; did

16  he have any success?

17  A   No, sir.

18  Q   And then your senior negotiator, Sergeant Eakes, had

19  talked to him for quite a while.  Did he have any success?

20  A   Other than he agreed to release E███████ if we brought his

21  grandmother forward.

22  Q   Did Leonard actually do that when you brought her, the

23  grandmother, forward?

24  A   No, he did not.

25  Q   At the time of the breach, based on your training and

1    experience and what you were actually watching, did it appear

2    to you like he was just about ready to release E████?

3    A    No, sir.

4    Q    Based on your training and experience and what you

5    observed that night, did you ever see any indication that

6    Leonard actually planned to let E████ go that night?

7    A    No.

8    Q    Of all the jurisdictions that make up the Metro SWAT and

9    the Crime Response Unit, which jurisdiction is far and away

10   the biggest one?

11   A    Lakewood.

12   Q    Do they provide the most officers because of their size?

13   A    Yes, sir.

14   Q    And which jurisdiction has the newest and biggest police

15   department?

16   A    Lakewood.

17   Q    And would that be the natural place to go when you were

18   trying to do interviews of 30 people?

19   A    They had the most rooms.

20   Q    Was there anything inappropriate, based on your training

21   and experience, that the interviews took place at Lakewood

22   the next morning?

23   A    No, sir.

24   Q    One second.

25           MR. CULUMBER:  I don't have anything else.

```
 1          Thank you, sir.

 2                    REDIRECT EXAMINATION

 3     BY MR. FORD:

 4     Q    Sergeant Thompson, if you are a negotiator and someone has

 5     been -- you have been asking someone to let another person do

 6     something and then they agree to let another person do

 7     something; is that progress?

 8     A    Yes, sir.

 9     Q    And if you then continue to talk to them and then they

10     actually take steps toward doing what you have asked them to

11     do, is that progress?

12     A    Yes, sir.

13     Q    So prior to talking to Sergeant Eakes, who represented

14     himself as not being a part of Fife and not being the people

15     that Leonard was concerned about, Leonard hadn't brought

16     E▇▇▇▇ outside, had he?

17     A    No.

18     Q    And after talking to Sergeant Eakes -- he was actually

19     talking to Sergeant Eakes when the explosion went off, wasn't

20     he?  He was still on the phone, wasn't he?

21     A    I don't know that for sure.

22     Q    You don't know that for sure.

23          But after talking to Sergeant Eakes, he brought E▇▇▇▇

24     back out on the porch, didn't he?

25     A    Yes.
```

1  Q   Or out on the porch.  He hadn't done that before, had he?

2  A   No, sir.

3  Q   That's progress, isn't it?

4  A   Yes, sir.

5  Q   And then -- well, let's take a look at that SWAT

6  transcript.  I think it's 1041 that Mr. Culumber was asking

7  about.  And let's take a look, please, at page 16.  And on

8  the top there -- let's look right at here.  I guess I will

9  look at it this way.  I will get rid of this here, if I can.

10      Okay.  All right.  Let's take a look right -- let's

11  move back one page, please.  Here, can you take a look at

12  this?  If we can blow that up, please.

13      So here is Markert at 5620, on the time signature of

14  SWAT 2, saying, "It looks like they're going back upstairs.

15  It looks like he's back down now."

16          MR. FORD:  I'm sorry.  Is that published?  It should

17  be published.  Excuse me.

18          THE COURT:  I think it is.

19      Isn't it?

20          MR. FORD:  Yeah.  It is.

21          THE JURY:  No, it isn't.

22          MR. FORD:  Now it is.

23  Q   Is that right?

24  A   Yes, sir.

25  Q   So if a negotiator talked to a person and says, "Hey,

1   please send somebody out who's upstairs sleeping," and they

2   go upstairs, and then they come back down, that's progress,

3   isn't it?

4           MR. CULUMBER:  Objection.  Speculation, foundation.

5           THE COURT:  Overruled.

6   A   Yeah, it sounds like it would be.

7   Q   Okay.  And then if we can go to the next page, please.

8   Could we blow this up here?

9           "Child is sitting on the porch waiting."  That hadn't

10  happened when he was talking to Sergeant Malave of the Fife

11  Police Department, had it?

12  A   No.

13  Q   And that hadn't happened when he was talking to Sergeant

14  Green of the Fife Police Department, who was not a

15  negotiator, had it?

16  A   No, sir.

17  Q   And it hadn't happened when he talked to Sergeant Luckman

18  either, had it?

19  A   No.

20  Q   But he made progress when he was talking to Sergeant

21  Eakes.  And the child was on the porch for the first time;

22  isn't that right?

23  A   Yes.

24  Q   Now, at this point, at 5725, Zaro says, "Grandma is around

25  the corner."  There's only one corner there, isn't there?

1   It's the corner that goes down the street to the smoke shop?

2   A   Yes, sir.

3   Q   And then, of course, we can see here where Zaro says, "Do

4   not let him back in the house with that kid"; is that right?

5   A   Yes.

6   Q   And he said, "He's insisting that grandma come down, so

7   we're, ah, going over that now."

8        Now, you had your radio on when this was happening,

9   didn't you?

10  A   Yes, sir.

11  Q   It was before you changed your jacket?

12  A   Yes, sir.

13  Q   Now, now let's keep -- take that down, please.

14       And here we go.  Let's look at the bottom here.  This

15  says, "Wiley:  Okay.  You have the side of the house.  As

16  soon as you turn the corner, the kid is about five feet from

17  that corner.  The dog is right in between the kid and the

18  suspect."

19       The kid is about five feet from the corner.  That's

20  progress, isn't it?

21  A   Okay.

22  Q   Okay.  And let's move to the next page, please.  Back up.

23  Blow that up.

24       Now Wiley says, "He's back inside."  And then it says,

25  "The kid is out front.  Negative.  We lost the opportunity.

```
 1   The kid is back in the house."  Okay.  That's at 100, right?
 2   Do you see that?
 3   A    Yeah.
 4   Q    Okay.  So that may be a little bit of a step backwards
 5   maybe.  We're back in the house.  Sometimes things go that
 6   way.  Sometimes they go up and down a little bit in terms of
 7   whether you make progress?
 8   A    Yes.
 9   Q    When you are negotiating?
10   A    Yes, sir.
11   Q    It doesn't all happen all at once often; isn't that right?
12   A    Correct.
13   Q    And there's different reasons for that, aren't there, that
14   sometimes people back off a little bit and then go forward a
15   little bit, for different reasons, because of whatever is
16   going on with them at the time and whatever is going on in
17   the situation at the time; is that right?
18   A    Yes.
19   Q    Okay.  So let's look and see what happens when the kid
20   goes back inside.  And we can go right here, please.
21        "Kid is coming back outside.  We have a car seat.  He's
22   just holding the front door."
23        E███ was a four-year-old child.  He used a car seat,
24   if he was going to drive, wasn't he?
25   A    Say that again.
```

1   Q    E█████ was a four-year-old child who would use a car seat

2   to travel, wouldn't he?

3   A    Okay.

4   Q    And the car seat was for his grandma's car, to drive

5   E█████ home, wasn't it?

6            MR. CULUMBER:  Objection.  Foundation.

7            THE COURT:  Overruled.  He can answer if he knows.

8   Q    Do you know any other reason that there was a car seat

9   brought out there?

10  A    I don't know of any reason.

11  Q    And here, at this point, we're still bringing grandma up,

12  so she's just visible from the front door.  That's the

13  passage that Mr. Culumber just asked you about; isn't that

14  right?

15  A    Yes, sir.

16  Q    Okay.  And let's go down.  If we could get rid of that,

17  please.

18       Now, what's happening?  Here, let's blow this one up.

19  Grandma is moving up right now, and Wylie says, "Hang the

20  charge on Side 3."  What does that mean?

21  A    I'm not 100 percent sure, but I'm guessing that that would

22  be the charge for the back door.

23  Q    And Side 3, that's the way that the officers refer to the

24  different sides of the house, right?

25  A    Yes, sir.

1    Q    Side 1 would be the front, and then would 2 be one of the

2    sides, or would it be the back?  How does it go?

3    A    I'm not sure.

4    Q    Okay.  But, anyway, Side 3, that would be a way of

5    referring to a door, not the front --

6    A    Correct.

7    Q    -- hanging a charge?  While grandma is just moving up.

8         Okay.  Let's look at what happens next.  By the way,

9    just assuming he's bringing a car seat out to have the child

10   driven away, that's progress, isn't it?

11   A    Yes, sir.

12   Q    Is that a suicide-by-cop indication?

13   A    No, sir.

14   Q    He's planning -- have you ever seen anybody who was

15   planning on suicide-by-cop who brought a car seat out to help

16   a child go away that the police were asking him to let go

17   away?

18   A    Not that I have seen, no.

19   Q    Have you ever actually had any experience with somebody

20   being suicide-by-cop?

21   A    I have not.

22   Q    Okay.  Have you ever heard about cases where people have

23   committed suicide-by-cop?

24   A    Yes, sir.

25   Q    It was another metro SWAT case where a man came out with a

1    gun and pointed it at the SWAT officers, and he got shot.

2    That would be a good way to commit suicide-by-cop, wouldn't

3    it?

4    A    Yes, sir.

5    Q    So let's move down here a little bit.  Wylie says here --

6    do you see this part here -- to Cannon, "Move your team back

7    to garage.  We're going to have the explosive breach element

8    come to you so you guys can set the charge next time we get

9    an opportunity."  Then Waller says, "Mike, I have grandma

10   with me.  Are you prepared to receive us at the BearCat?"

11        So they're hanging the charge, preparing the breach, at

12   the same time Annalesa is being brought forward; isn't that

13   what that shows?

14   A    Yes, sir.

15   Q    There's a reference here, Wylie to Waller, "Go ahead and

16   move the package."  What's the package?

17   A    That would be Ms. Thomas.

18   Q    Then down here we have Wylie to Cannon, "Go ahead and set

19   the charge."  They're setting the charge while Annalesa is

20   being brought forward; isn't that right?

21   A    That's what it says, yes, sir.

22   Q    And they're setting the charge while the suspect at the

23   door is coming out; isn't that right?

24   A    (No audible response.)

25   Q    Do you see where I'm --

1    A    Yeah.  It looks like, right after that, they say, "He's

2    coming out."

3    Q    Well, then right under that, after it says, "Suspect at

4    the door, coming out," "Wylie:  Cannon, go ahead and set the

5    charge"?

6    A    Yes, sir.

7    Q    Okay.  And we will -- well, let's see.  Is that the end of

8    the page?  That is.

9           Let me go to the next.  Okay.  Can we go right here?

10          Here it says, "Command to Wylie:  How far away is the

11   child from the suspect?"  "He's in his arms right now."

12   Zaro -- that's Zaro -- he says, "Copy."

13          "Copy" means I hear you, I understand you; isn't that

14   right?

15   A    Yes, sir.

16   Q    And Wylie says, "So let's just work on the charge for

17   right now.  Cannon, I will let you know when the kid is

18   clear."  Cannon says.  "Okay."

19          Who is Cannon?

20   A    He's one of the SWAT officers.

21   Q    Okay.  And then Cannon says, "All right.  We're moving up

22   to set the charge"; isn't that right?

23   A    Yes.

24   Q    Annalesa hasn't even spoken to him yet, has she?

25   A    I'm not sure.

 1    Q    And down here at the bottom, Wiley to Cannon, "The child

 2    is sitting on the porch on Side 1, right in the middle.

 3    Suspect is in the doorway leaning down."  That's at 1:05:56.

 4    Do you see that?

 5    A    Yes, sir, I do.

 6    Q    Okay.  Okay.  And then -- here we are.  We move to the

 7    next one then.

 8         Wylie says, "Door is open.  Just looks like he moved

 9    some kind of pole or something behind the door."  And Zaro

10    says, "Can somebody have grandma call E▇▇▇▇?"  Isn't that

11    what that said?

12    A    Yes, sir.

13    Q    Wylie said, "Doing it right now."  And then the next thing

14    is, "Command to Wylie:  Launch on the back door on your

15    command"; isn't that correct?

16    A    Yes, sir.

17    Q    Now, Mr. Culumber asked you about this 20 minutes that's

18    on the Fife dispatch recording that we talked about, between

19    the time that you called Officer Wyrwitzke and the time that

20    the breach occurred; is that right?

21    A    Yes, sir.

22    Q    And in that twenty minutes, he mentioned that Officer

23    Wyrwitzke would have gotten her in his car, I guess, and

24    driven her around the corner to the rig; isn't that right?

25    A    Yes, sir.

1    Q    And then you said earlier that she sat and waited for a

2    little while, while it was determined whether this was

3    actually going to happen; isn't that right?

4    A    Yes, sir.

5    Q    And then it was determined it was actually going to

6    happen, and you changed your jacket, didn't you?

7    A    Yes.

8    Q    And then you and Mrs. Thomas walked down the way, the

9    street there, to the point where, you showed us earlier, you

10   first stopped; isn't that right?

11   A    Correct.

12   Q    And when you walk -- she walks with a limp all the time,

13   doesn't she?

14   A    Yes, sir.

15   Q    And then you got to that point and you stopped, and then

16   the SWAT operators came across the house and encountered you;

17   is that right?

18   A    Correct.

19   Q    And then after some discussion, during which you said, in

20   your deposition, "Wylie didn't seem to know what was going

21   on," didn't you?

22   A    No.  I said Waller didn't --

23   Q    I will go back to that in a minute.

24   A    Waller didn't seem to know what was going on.

25   Q    Okay.  Well, we will go back to that in a minute, because

```
 1   I just want to talk about the timing.
 2          Then you crossed with her over to the BearCat; isn't
 3   that right?
 4   A    Yes, sir.
 5   Q    And at first you went to a point in the BearCat where you
 6   didn't think Mr. Thomas could actually see her; isn't that
 7   right?
 8   A    Yes, sir.
 9   Q    And then you moved to the back of the BearCat, and then
10   she called out to Mr. Thomas; is that right?
11   A    To E▮▮▮▮, yes, sir.
12   Q    Or to E▮▮▮▮.
13          And that's when Leonard said, "No.  Mom, you have to
14   come here"?
15   A    Correct.
16   Q    Okay.  That happened, according to your interview
17   statement you gave that night, one time, isn't that right?
18   Annalesa called out one time before the breach occurred.
19   Isn't that what you said when you were interviewed by the CRU
20   on the night of May 24th?
21   A    I don't recall that, sir.
22   Q    Can we look at Exhibit Number --
23          MR. CULUMBER:  Your Honor, we went over this three
24   times now.  He's already shown him the exact same exhibit on
25   direct.  At a certain point, we have to stop.
```

```
 1            THE COURT:  He doesn't seem to remember, from
 2    whatever time he went over it.  So go ahead.
 3            MR. FORD:  Okay.
 4       Can we see the transcript of Officer -- or Sergeant
 5    Thompson's interview of May 24th?  And -- oh, boy.  I'm going
 6    to have to get to the right page.
 7       Let's take a look at page 8, please.  And let's go up.  Is
 8    that page 8?  I think -- yeah.  That is page 8.
 9            MR. CULUMBER:  Your Honor, this is Mike Malave's
10    interview.
11            MR. FORD:  Yeah.  That's the wrong interview.  Sorry.
12    Okay.  I was wondering.  Thank you for the help.
13    Q   Okay.  Now, do you remember -- can we blow this up right
14    now, even though it's not published, so I can see it?  No.
15    The whole bottom part, please.
16            UNIDENTIFIED JUROR:  We can't see it.
17            MR. FORD:  The whole bottom part, please.
18            THE COURT:  It's not on the jury's screen.
19            MR. FORD:  May I publish it on the jury screen?  This
20    will be a new exhibit.  I don't think this has already been
21    marked.
22            MS. CARTWRIGHT:  It's marked but not admitted.
23            MR. FORD:  Marked, but not admitted, and it's Exhibit
24    No. 500.
25            MR. CULUMBER:  Is it being offered as substantive
```

```
 1   evidence?

 2          THE COURT:  They are not going to offer it as

 3   substantive evidence.  He's going to mark it, but it's not

 4   going to be offered, it's not going to be admitted, it's just

 5   being used to refresh his recollection.

 6   Q   Oops.  And I'm on the wrong page.  Excuse me.  I'm sorry.

 7   I -- page 10.  Sorry.  Page 10, please.  And let's do the

 8   bottom of that one.

 9          You're talking -- and I think we saw this in the video

10   clip -- you said, "'Hey, he's coming back out.  He's coming

11   back out.'  I could hear them talking, and I look over and,

12   sure enough, you know, little boy, little -- you know,

13   it's -- I'm assuming it's E█████, is walking out on the

14   porch, and she and I walked to the very end of the BearCat,

15   where we still had cover and where he could -- he could see

16   her good.  And so I said, 'Hey, just call him to and say:

17   E████, come to grandma.'  And so she did that.  And so she

18   started, you know -- and I could see he's looking right

19   at" -- if we could go to the next page, please:  -- "us.

20   And, um, she's trying to get him to come, but I could tell

21   that, um, Mr. Thomas was kind of in the doorway crouched

22   down.  You could see he's talking to him, and I didn't  know

23   what he was saying.  Talking to E█████?  Yeah.  Yeah.  But --

24   okay.  I don't know what he was saying, but it was clear

25   because he was looking at grandma.  Okay."
```

1          I'm sorry.  We need a little bit more of that page,

2     please.

3          "And I heard -- and kind of looking back at Dad, but he

4     wasn't coming, right, and so he was, you know, doing this.

5     And, uh, I -- I -- because I had -- there was the SWAT

6     operators over there and other radios on and I can hear

7     what's going on and I hear them say, 'We're going to launch

8     through the rear door.'  All right.  And I know what that

9     means.  And I saw -- I started hearing the countdown.  All

10    right.  And the SWAT guys all started grouping up where we

11    were.  And so I put my arm around her shoulder and said,

12    'Hey, let's get back over here.'"

13         That's what you told the interviewers that night, isn't

14    it?

15    A    Yes, sir.

16    Q    So Mrs. Thompson did not call to Leonard before he went

17    back in that house the last time; she called right before the

18    breach, did she not?  Isn't that what you said that night?

19    A    She called out to him, and Leonard told her, "No.  Mom,

20    you come up and get him."  She didn't go up to get him.  They

21    went back inside.  He came back out, and E███████ was on the

22    porch.  He crouched down in the doorway, and she called out

23    to him again, and that's when this happened.

24    Q    Okay.  That's not what you described, though, the first --

25    that night.  You didn't tell them that Leonard went back in

1   the house after Annalesa called to E█████ the first time.

2   You told them the first time that Annalesa called was right

3   before the breach; isn't that right?

4   A   I don't believe so.  If you can go back, maybe I could --

5          THE COURT:  The jury will have to figure it out.

6   Mr. Ford, let's go on.

7          MR. FORD:  All right.  Thank you.

8   Q   Could we bring up the SWAT 2 transcript please, 1041?  We

9   just saw that.  Let's -- actually, let's bring up the radio

10  itself.  We already played that, so we won't need to do that

11  again.

12         Now, I think Mr. Culumber asked you if you were

13  surprised because you were surprised.  But what you said in

14  your deposition was, when you looked -- when you heard the

15  countdown was happening, you looked at Malave, and you

16  thought, "Really, we just got here"; isn't that right?

17  A   That's correct.

18  Q   And are you changing that testimony?

19  A   No, sir.

20  Q   That's what you thought, isn't it?

21  A   I'm not sure.  I'm --

22  Q   That was what you thought at that moment.  You thought,

23  really, we just got here?

24  A   Yes, sir.

25  Q   All right.  No one ever told Leonard Thomas not to take

1    E████ back in the house or he would be shot, did they?

2    A    No, sir.

3    Q    No one ever told Leonard Thomas not to take E████ back in

4    the house, did they?

5    A    No, sir.

6    Q    Can we go back -- well, we talked a little bit about the

7    officer-safety warnings.  I think Mr. Culumber asked you a

8    question.  Exhibits 1014 and 1015.  Those are the things from

9    September of 2011 that I was talking to you about earlier;

10   isn't that right?

11   A    Yes, sir.

12   Q    And the only mention of a gun in those officer-safety

13   warnings is that Mrs. Thomas said that one of Leonard's

14   roommates said that, in September of 2011, they thought he

15   might have a gun; isn't that right?

16        MR. CULUMBER:  Objection.  Misstates the evidence.

17   Q    All right.  Let's take a look at it then.  Could we take a

18   look, please, at 1014, I believe it is.  1015.

19        "Leonard Thomas's mother has reported that her son" --

20   this is the basis -- she is the reporting person here, isn't

21   she?  There's no indication that they talked to anybody else,

22   is there?

23   A    Not in this officer-safety entry request, but there was a

24   corresponding police report.

25   Q    And did you look at that?

1   A   I did.

2   Q   When?

3   A   I have seen it since.  I'm not sure.

4   Q   You didn't see it at the time?

5   A   I don't believe I looked at it at that time, no, sir.

6   Q   Okay.  Now, let me ask you about this drive-by shooting.

7   You acknowledge, I guess, when Mr. Culumber asked you, that

8   on the radio, when Chief Zaro said that that happened in

9   2008, that was wrong, wasn't it?  It happened in 2000, didn't

10  it?

11  A   I'm not sure when it happened.

12  Q   Okay.  Let's take a look, if we could, please, at Exhibit

13  No. 490.

14          THE COURT:  Well, there's no question, is there?

15          MR. CULUMBER:  No.

16          THE COURT:  You can stipulate to that, right?

17          MR. CULUMBER:  Right.

18          MR. FORD:  Well, there's other aspects of this I

19  would like to bring out, Your Honor.

20  Q   Have you seen this Statement of Defendant on Plea of

21  Guilty?

22  A   Have I seen this?

23  Q   Yes.

24  A   No.  This is the first time I have seen this.

25  Q   Do you know what this is?

```
 1   A    Yes, sir.

 2   Q    You have seen these before?

 3   A    I have seen these before.

 4   Q    And Mr. Thomas apparently pled guilty to this drive-by

 5   shooting crime; isn't that right?

 6   A    Yes, sir.

 7   Q    And he was 17 years old at the time he entered that plea,

 8   wasn't he?

 9   A    That's what it says, yes, sir.

10   Q    Now, that would make sense, if it was 2000, and he was 29

11   years old in 2013, wouldn't it?

12   A    Okay.

13   Q    Okay.

14             UNIDENTIFIED JUROR:  Are we supposed to be looking at

15   that?

16             MR. FORD:  Sorry.  I should publish it.  Sorry.

17             UNIDENTIFIED JUROR:  And I think it's a new exhibit,

18   that's the other thing.

19             THE COURT:  Yes.

20             MR. FORD:  Yeah.  Thank you.

21             THE COURT:  Is it on now?

22             UNIDENTIFIED JUROR:  Yes.

23             THE COURT:  You are going to have to keep us

24   informed.

25             MR. FORD:  Excuse me.
```

1   Q   So he was 17.

2           And can we take a look at page 8 of this document,

3   please?

4               THE COURT:  This is page 8 of 490?

5               MR. FORD:  Yes.

6   Q   And this is what -- oop.  Did we lose it?  Yeah.  Can we

7   go back to the previous page, where we were looking at,

8   because that was what I wanted, right here?  Can you blow

9   that up a little bit, please?

10          And this says that, at age -- on March 7, 2000, he

11  admitted to acting as "an accomplice to Chris Wilmer in a

12  drive-by shooting where a firearm was recklessly discharged

13  from a motor vehicle I was driving.  This act occurred in

14  Pierce County Washington."

15          Did you look at that when you were looking at

16  Mr. Thomas's background?

17  A   No, sir.

18  Q   What's an accomplice?

19  A   That means he assisted with the crime.

20  Q   Did you know -- there was mention of a

21  possession-of-stolen-property crime by Mr. Thomas.  Did you

22  look into that?

23  A   No, sir.

24  Q   Do you know if that occurred when he was 14?

25  A   I don't know, sir.

1          MR. FORD:  Give me one second, Your Honor.

2          THE COURT:  Sure.

3    Q    You indicated that the rig was moved in part because of

4    the desire to use -- the possible need of using a throw phone

5    of some kind, is that right, and the cable length that goes

6    along with the throw phone?

7    A    Yes, sir.

8    Q    In fact, all the conversations that occurred between

9    Mr. Thomas and the various negotiators that night occurred on

10   the negotiators' cell phones; isn't that right?

11   A    That's correct.

12   Q    And that's one of the reasons why we don't have any

13   recordings of those except for the brief period when

14   Mr. Thomas called in to 911 asking for help from Pierce

15   County; is that right?

16   A    Yes, sir.

17   Q    And I guess just on -- just one last point we were talking

18   about earlier, if I can find it.

19          Well, I'm not finding anything regarding the sergeants.

20          I will end it there then.  Thank you very much.

21          MR. CONNELLY:  Your Honor, I do have a couple of

22   questions.

23                        REDIRECT EXAMINATION

24   BY MR. CONNELLY:

25   Q    Sergeant Thompson, you mentioned, in response to

Thomas Thompson - Redirect (Ford)

1    Mr. Culumber's question, that you didn't feel it was at all

2    inappropriate for Chief Zaro to get in the negotiation rig

3    and sort of change the way you guys normally do things,

4    correct?

5    A    No, sir, I didn't think that was inappropriate.

6    Q    Pardon me?

7    A    That was okay with me, I thought.

8    Q    Okay.  But that wasn't your prior testimony, correct?

9    A    Are you talking about --

10   Q    If we can go to page 102 of your deposition.  Do you have

11   it there in front of you, at line 15?

12   A    Yes, sir.

13   Q    And this was taken back in September of -- or April of

14   2016.  "There was some question about the fact that our

15   crisis negotiation team -- we're a team.  There's four of us.

16   We felt we got splintered because command kind of took over

17   our rig.  I was probably the most critical of that.  I didn't

18   like the fact that we didn't -- we weren't able to do what we

19   normally do because they were in there taking up our space."

20        That was your testimony back in April of 2016?

21   A    Yes, sir.

22   Q    And you have made some statements in response to

23   Mr. Culumber's question, again, about this plan and that

24   Waller and Wylie knew what was going on.  Your concern back

25   at this time was that communication had broken down, correct?

A    Yeah.  It seemed to me, when Waller came up, that when --

the questioning that he had for me made it sound like he

didn't know what was going on.

Q    And the same thing with Wylie, correct, Officer Wylie?

A    With Wylie?

     When we got over to the BearCat, it was -- my

understanding was, it was just we were going to call out to

him, so ...

Q    Let me show you page 100 and 101.  Let's start with 100.

          MR. CULUMBER:  Your Honor, it's cumulative.  It's

asked and answered.

          THE COURT:  Overruled.

Q    Now, if we look down at the bottom of the page, down at

line 22, "There was some criticism about the communications

and the way that it wasn't working right, and, clearly, if we

walked Mrs. Thomas up there, and they don't know we're

coming, communication broke down somewhere."

     And that was your testimony back in April of 2016,

correct?

A    Yes, sir.

Q    And if we go back to page 91, that was a statement that,

at line 15, "And, in fact, when I got her forward, the

tactical guys didn't seem to know what the plan was either,"

correct?

A    Yes, sir.

1    Q    All right.  With regard to the -- you made some statements

2    that you had been trained and never received training

3    regarding mental health professionals, correct?

4    A    That I have never received that training?

5    Q    Bringing into a situation such as this.

6    A    Okay.

7    Q    All right.

8                    MR. CONNELLY:  Your Honor, I have an

9    impeachment exhibit I would like to admit, 504.

10   Q    I'm handing you what's been marked as 504.  Can you

11   identify that document?

12   A    Yes, sir.  It's a Fife Police Policy Manual, Policy 417.

13   Q    Okay.  And if we go over to the second page of that

14   document, do you see the second page where it has

15   Section 417.4?

16   A    Yes, sir.

17   Q    And -- by the way, the Fife policy, that's the department

18   that you work for, correct?

19   A    Yes, sir.

20              MR. CONNELLY:  Your Honor, may I publish?

21              THE COURT:  Sure.

22   Q    In the Fife policy actually that -- you were trained on

23   the Fife policies, correct?

24   A    Yes, sir.

25   Q    That indicates, "In any case" -- we're talking about

1  response to calls with people of mental illness, correct?

2  A    Yes, sir.

3  Q    "In any case, an officer should routinely try to bring in

4  the services of a community mental health professional or a

5  crisis intervention team to engage the subject and attempt to

6  deescalate the situation," correct?

7  A    Yes, sir.

8  Q    And then if you go to the following page, and I won't go

9  through all of them, but there's a number of things about how

10 you deal with people that have a mental health illness, such

11 as bipolar.  One is to speak calmly, correct?

12 A    Yes.

13 Q    Use non-threatening body language, eliminate commotion,

14 correct?

15 A    Yes, sir.

16 Q    And then prepare for a lengthy interaction.  There's some

17 others, too.  But then prepare for lengthy interaction

18 because, with somebody who's mentally ill, they can be up and

19 down, correct?

20 A    Yes, sir.

21 Q    And somebody who's bipolar goes through episodes of what

22 are called manic and depression, correct?

23 A    Yes, sir.

24 Q    And that's something that you had been trained on and you

25 were aware of, correct?

1   A    I would have had to read this policy, yes, sir.

2   Q    All right.  Thank you.

3            MR. CONNELLY:  Your Honor, we would offer

4   Exhibit 504.

5            THE COURT:  Hearing no objection --

6            MR. FORD:  No objection.

7            MR. CULUMBER:  It's already been published and shown

8   before we were able to address it, so ...

9            THE COURT:  Do you have an objection?

10           MR. CULUMBER:  I do, based on there's no date on it.

11  It's unclear when it was a policy.

12           THE COURT:  Have you seen this before?

13           THE WITNESS:  Yes, ma'am, I have.

14           THE COURT:  And you're familiar with it and trained

15  on it?

16           THE WITNESS:  Yes, ma'am.

17           THE COURT:  Overruled.  It will be admitted.

18                 (Exhibit No. 504 admitted.)

19           THE COURT:  Any questions, counsel?

20           MR. CULUMBER:  Yes.

21                      RECROSS-EXAMINATION

22  BY MR. CULUMBER:

23  Q    This policy to consider contacting a potential mental

24  health provider is if you are at a private residence where

25  there's no immediate threat to the public or law enforcement,

1    correct?

2    A    Correct.

3    Q    As you were at Leonard's house with a barricaded subject,

4    a man with a four-year-old child hostage, a suspect in a

5    violent crime, screaming at police officers, refusing to come

6    out, did you perceive that there was a threat to the public

7    and law enforcement officers posed by Leonard Thomas that

8    night?

9    A    Yes, sir.

10   Q    It also says you should try to bring in the services of a

11   community mental health professional or a crisis intervention

12   team.

13        Is there -- is "crisis intervention team" something

14   that the hostage negotiators are also referred to?

15   A    We're the crisis negotiation team.

16   Q    So the hostage negotiators that were actually brought in

17   that night, that's the crisis intervention team, correct?

18   A    It could be, yes, sir.

19   Q    The SWAT 2 radio traffic, I just want to clarify.  The

20   times that are on the side here, it's not your understanding

21   that this is actual realtime, start to finish, correct?

22   A    Correct.

23   Q    Okay.  So the last entry is 1:7 -- sorry, 1:17:09.  The

24   SWAT team was out there for several hours, correct?

25   A    Yes, sir.

Thomas Thompson - Redirect (Ford)

```
 1              MR. CULUMBER:  That's all I have.
 2                       REDIRECT EXAMINATION
 3   BY MR. FORD:
 4   Q    I just want to know, are you changing your testimony from
 5   the direct when you said that during your time around the
 6   BearCat, you never saw or heard anything that gave the
 7   impression that E█████ was at risk of serious injury or
 8   death?  Are you changing that?  Are you changing that?
 9   A    No.  I never saw anything.
10   Q    And are you changing your testimony --
11              THE COURT:  Where are you reading from, counsel?
12              MR. FORD:  I'm reading from the questions that I
13   asked him earlier, and he said he didn't see any risk to
14   E█████ and he didn't see any basis for --
15              THE COURT:  Are you reading from his deposition; is
16   that what you are doing?
17              MR. FORD:  I am -- the questions were from his
18   deposition, but then he answered them on direct, so I'm going
19   back to the direct, because this morning he said --
20              THE COURT REPORTER:  Mr. Ford, I need you to speak up
21   and slow down, please.
22              MR. FORD:  Okay.  I'm sorry.
23              THE COURT:  And a little slower.
24              MR. FORD:  Okay.
25              MR. CULUMBER:  Your Honor, he is literally just
```

1    reading the same questions he read earlier.

2         THE COURT:  He's trying to impeach the person.

3         MR. CULUMBER:  Well, I understand, but -- okay.

4    Q   I am just wondering if you are changing the last question

5    {sic} when you said yes to his thing about the danger to the

6    public and all of that, when you said, this morning, based on

7    everything you knew of officer-safety alerts and Leonard

8    Thomas and all the intel you passed on and what you saw at

9    the BearCat, did you think that deadly force was justified?

10   A   I said I didn't see anything.  But the totality of

11   everything that was going on, it could lead you to believe

12   that there is a threat to the child or to the officers that

13   were up there at the house.  You asked me if I saw anything

14   specifically, and no, sir, I did not.

15   Q   But, actually, I had asked you, based on everything you

16   knew of the safety alerts for Leonard Thomas and the intel

17   you  gathered and passed on to Chief Zaro and what you

18   observed at the BearCat, did you think that deadly force was

19   justified.  You said no this morning and you said no in your

20   deposition --

21        MR. CULUMBER:  Objection.  It's argumentative at this

22   point.

23        THE COURT:  Overruled.  Let him finish.

24   Q   You said no this morning, you said no in your deposition,

25   didn't you?

1   A    I said I didn't see anything.

2   Q    Well, let's take a look at your deposition, at page 94.

3           MR. FORD:   And publish it.

4   Q    And you said during your time with Annalesa and Malave

5   around the BearCat, from what you could either see or hear,

6   did Leonard do anything that gave you the impression that

7   E███ was in risk of serious injury or death?  You said no.

8   And then it says, "Apart from what you saw and heard, did you

9   have any information that convinced you that lethal force was

10  justified?"  And the answer is, "I did not."  And then the

11  question was, "And that was based on everything you knew of

12  the officer-safety alerts and the intelligence that you had

13  gathered and passed on to Zaro, all the information" -- and I

14  guess we need to turn the page -- "you had, you didn't

15  believe that lethal force was justified?"  You said, "I

16  didn't see that."

17          THE COURT:   No.  "I didn't say that."

18  Q    "I didn't say that."  And then there was another

19  objection.  And then, down at the bottom, it says, "Was there

20  anything else you learned during your collection of

21  intelligence and whatever else you would have heard that

22  justified the use of deadly force?"  You said, "I didn't see

23  anything that would have justified that."

24          Was that your testimony now?

25  A    I said, "I didn't see anything that would have justified

1    that."  Yes, I just said that.

2    Q    Okay.  And on the previous page, it's everything -- okay.

3         And you said -- did you say there was a threat to the

4    officers?

5    A    Say that again.

6    Q    There was a threat to the officers?  That Leonard Thomas

7    was a threat to the officers who were surrounding this house

8    with their weapons?

9    A    No, I didn't say he was.  I said he could be.

10   Q    Could be.

11        And you can't shoot somebody because they could be a

12   threat; isn't that right?

13   A    Yes, sir.

14   Q    Okay.

15            MR. FORD:  That's all.

16            THE COURT:  Anything?

17            MR. CONNELLY:  Nothing further.

18            THE COURT:  We are finished with this witness.  May

19   he step down?

20            MR. FORD:  He may, Your Honor.

21            MR. CONNELLY:  Yes.  Thank you.

22            THE COURT:  You may step down.

23       This seems like a good place to take our afternoon recess.

24   We will be in recess for 15 minutes.

25       Ladies and gentlemen, if you would retire to the jury

1    room, please.

2                    (Proceedings recessed.)

3              THE COURT:  Okay.  Counsel, what's the problem?

4              MS. CARTWRIGHT:  Yes, Your Honor.  We filed a motion

5    in limine to exclude animations that were created by Brian

6    Brill.  The Court granted that motion in limine in Docket

7    No. 139.  The defense has informed us that they want to use

8    one of those animations with the next witness.

9              THE COURT:  Well, I have excluded them.

10             MS. CARTWRIGHT:  Yes.

11             THE COURT:  So how can you use them?

12             MR. CULUMBER:  Our understanding was that, when we

13   had the pretrial conference, we went through all of the

14   exhibits and you pre-admitted some and didn't pre-admit

15   others.  We would like the opportunity to lay a foundation

16   with the witness.  And if foundation is laid, then it comes

17   in, just like any other  exhibit.  But until a witness is

18   actually able to testify about it and lay a foundation, we

19   would think it would be premature to say that they would be

20   excluded until we actually get to ask questions about it.

21             MS. CARTWRIGHT:  And, Your Honor, we filed a separate

22   motion in limine about the animations, and I'm reading from

23   the Court's order.  "Plaintiffs motion in limine to exclude

24   animations created by Brian Brill is granted.  Given the

25   concerns raised about the accuracy of the animations, the

1    Court finds there's an undue risk that the animations will

2    mislead the jury.

3          THE COURT:  I think that's what I said.

4          MR. CULUMBER:  We would like to do an offer of proof

5    at some point on this.

6          THE COURT:  Okay.  Then my suggestion is this:  That

7    we do an offer.  I understand an offer of proof.  That, I do

8    understand.

9          MR. CULUMBER:  Okay.

10          THE COURT:  And why don't we do the offer of proof

11    later and just go ahead with the witness now, okay?  Because

12    I have already ruled, and I think what you are saying is, you

13    disagree with my ruling, which I thought you might.  So we

14    will give you an opportunity to do an offer of proof.

15       My question is, do you need -- we want to get this witness

16    on and off before five, is what I hear.  So I think we should

17    go ahead with that, do that, and then we will figure -- the

18    problem with the offer of proof today is that I have a

19    hearing.

20          MR. CULUMBER:  We can do it later.

21          THE COURT:  Good.  Thank you very much.

22       Okay.  Let's bring in the jury.

23       (The following occurred in the presence of the jury.)

24          THE COURT:  Please be seated, ladies and gentlemen.

25       Are we ready to call your next witness?

```
 1          MR. FORD:  Yes, Your Honor.

 2          MR. WHEDBEE:  The plaintiffs call Detective Sergeant

 3   Mike Malave.

 4          THE COURT:  If you will step forward please and be

 5   sworn by the clerk.

 6          THE CLERK:  If you will just stand right here and

 7   raise your right hand.

 8                    MICHAEL MALAVE,

 9     having been sworn under oath, testified as follows:

10          THE CLERK:  Please take a seat here at the witness

11   stand.

12      And then please state your name for the record.

13          SERGEANT MALAVE:  My name is Michael Malave.

14                    DIRECT EXAMINATION

15   BY MR. WHEDBEE:

16   Q   Good afternoon, Sergeant Malave.  It is sergeant still,

17   right?

18   A   Yes, sir.

19   Q   Okay.  Which police department do you work for?

20   A   I work for the Fife Police Department in Pierce County,

21   Washington.

22   Q   And how long have you worked for the Fife Police

23   Department?

24   A   I have worked for the Fife Police Department since

25   November of 2000.
```

1   Q    Are you also a member of the Pierce Metro SWAT team?

2   A    Yes, sir, I am.

3   Q    And on that team, do you fulfill the function of a

4   negotiator?

5   A    Yes, I do.

6   Q    How long have you been a negotiator for the Pierce Metro

7   SWAT team?

8   A    I have been a negotiator since 2006.

9   Q    On the evening of May 23rd, 2013, were you called to the

10  residence of Leonard Thomas on a SWAT page-out?

11  A    Yes, I was.

12  Q    What time did you arrive approximately?

13  A    I believe the page was probably about 11:20, 11:30, and I

14  may have responded like 20 minutes later.  So roughly about

15  11:40 or so.

16  Q    Okay.  And of the SWAT team, who was there when you

17  arrived?

18  A    Of the SWAT team, Chief Mike Zaro was there, and I spoke

19  to Chief Mike Zaro, and then Nils Luckman from -- he's a

20  sergeant with the Milton Police Department.  He was also

21  there.  He was a former member of the SWAT team.

22  Q    Was it your understanding that Sergeant Luckman had been

23  on the phone to some extent with Leonard Thomas about the

24  incident that was unfolding at that location?

25  A    Yes.

1  Q    And what information did you receive from Sergeant Luckman

2  about what was going on there?

3  A    Basically, he told me that he had been on the phone with

4  Mr. Thomas.  He said the conversations really weren't getting

5  anywhere.  He told me that basically the call started as like

6  a 911 call, a domestic between a male and a female.  At some

7  point the male took the phone from the female and hung up.

8  He also told me that there was a four-year-old in the house.

9  He told me that the male in the house was uncooperative, and

10  there was a report that the male stated he might have been

11  armed.

12  Q    Anything else?

13  A    That's all I can remember now.

14  Q    Did Sergeant Luckman explain to you the source of the

15  claim that Leonard Thomas might have been armed?

16  A    Yes.  He said that it came from one of the -- one of the

17  officers around the scene.

18  Q    One of the officers that had previously responded?

19  A    Yes.

20  Q    Did he identify who that officer was?

21  A    I don't -- I don't remember if he did.

22  Q    Did you find out anything more about the officer who

23  claimed to have heard Leonard Thomas say this about

24  potentially being armed?

25  A    No.

1    Q    Did you also learn from Sergeant Luckman that Leonard

2    Thomas was upset because a friend of his had died recently?

3    A    I did hear that.  I don't know if I heard that from

4    Sergeant Luckman.

5    Q    But from Sergeant Luckman or some other officer you heard

6    that?

7    A    Yes, I did hear that.

8    Q    When you were talking to Sergeant Luckman, was he giving

9    you what officers refer to as an intel dump?

10   A    What do you mean by that?

11   Q    What is an intel dump in common police parlance?

12   A    Well, we don't -- we don't really use that term "intel

13   dump."  He was briefing me as to what he had learned.

14   Q    Okay.  And was Chief Zaro present with you when Sergeant

15   Luckman was debriefing you on what he had learned?

16   A    I don't know where he was.  I don't remember where he was,

17   I should say.

18   Q    Okay.  Now, what was your role in the negotiator response

19   initially?

20   A    Initially, I was the primary, or the lead negotiator.

21   Q    Can you just briefly describe for the jury what that role

22   would entail?

23   A    The primary negotiator, or the lead negotiator, is the

24   negotiator who actually speaks on the phone to the subject in

25   crisis.  The primary negotiator has a coach with him, and

1    that coach is also monitoring the call with a headphone, and

2    he also feeds ideas to the primary negotiator, basically to

3    keep the primary negotiator, which is myself at the time,

4    speaking to the subject in crisis.

5    Q    And when you were functioning as the primary negotiator,

6    where were you actually speaking on the phone to Leonard

7    Thomas?

8    A    We were in our negotiator rig.

9    Q    And was the negotiator rig at that time at what we have

10   been referring to as the smoke shop?

11   A    Yes.

12       So as I arrived, the negotiator rig hadn't -- hadn't

13   arrived yet.  But my conversations with Mr. Thomas started on

14   a cell phone, and it may have been outside of the negotiator

15   rig.  And as the team arrived with the negotiator rig, then I

16   would have gone into the negotiator rig at some point with

17   the secondary.

18   Q    And on whose cell phone were you speaking to Mr. Thomas?

19   A    On my work phone.

20   Q    Okay.  And at this time who was playing the role of

21   secondary negotiator?

22   A    The secondary negotiator, who would have been officer

23   Charles Porche.

24   Q    Okay.  So Officer Porche's role did not change as the

25   evening unfolded.  He remained secondary negotiator; is that

1  right?

2  A   I don't know.  I wasn't with him the whole night.

3  Q   Okay.  But he was functioning as secondary negotiator with

4  you?

5  A   Yes.

6  Q   Okay.  About how many calls did you have with Mr. Thomas?

7  A   I would estimate maybe around ten phone calls.  We didn't

8  speak every time, but there was -- I probably made about ten

9  phone calls to him and left a voicemail for him to call me

10  back and speak to me.

11  Q   About how many phone calls did you have where you actually

12  spoke to one another?

13  A   I would say -- I estimate at that time I may have spoke to

14  him maybe five to ten minutes total.

15  Q   Okay.  Among more than one phone call?

16  A   Yes.

17  Q   Okay.  And what did Mr. Thomas tell you during those phone

18  calls?

19  A   What he told me -- basically, he told me he was angry.  He

20  was mad at the Fife Police Department.  He was irate.  He

21  cursed at me numerous times.  He really -- really didn't let

22  me get too many words in.  He was just yelling.  I remember

23  he was saying that at some point officers needed to get off

24  his property, they were trespassing.  It really was kind of a

25  one-sided conversation.

1  Q    Now, you stated that he was angry with the Fife police.

2  Did he ever threaten any of the Fife police with any sort of

3  harm?

4  A    I never heard him make any threats to the Fife police.

5  Q    He never said, "If you don't get off my property, I'm

6  going to start taking out cops" or anything like that, right?

7  A    No, he never said that.

8  Q    Did he ever --

9  A    He never said that to me.

10  Q    And I'm just talking about the times when you were on the

11  phone with him right now.

12       During the times when he was on the phone with you, did

13  he say that he had a weapon?

14  A    No.  He never told me he had a weapon.

15  Q    Did he take any action that you could observe that led you

16  to believe that he was going to harm one of the officers?

17  A    I'm sorry.  Can you say that again?

18  Q    Did he articulate any kind of threat to the officers

19  during your phone calls?

20  A    No.  No.

21  Q    Did he articulate any kind of threat to his son, E█████,

22  during your phone calls with him?

23  A    If you could allow me to back up?

24       What was passed on to me also from Sergeant Luckman was

25  that at one point during -- or prior to my arrival was that

1  he said he was using his son as a shield, and then at another

2  point he said that he -- and this was per Sergeant Luckman,

3  passed on to me -- that he dangled the child from a

4  second-story window.  But I did not actually see that.  So he

5  gave me that information.  So when I did speak to him, I had

6  that also in mind.

7  Q   Did Sergeant Luckman actually use the term "dangle"?

8  A   I don't remember if he said "dangle."  I know that he was

9  saying something to the effect that he placed the child out

10 the window.

11 Q   Did he say he placed the child outside the window, or did

12 he say that he put the child up to the window?

13 A   He told me he placed him outside the window.

14 Q   And this -- the idea that Leonard Thomas had placed his

15 child outside the window, that's something that you heard

16 from Sergeant Luckman, correct?

17 A   Yes.

18 Q   From nobody else who directly observed this?

19 A   I don't know who observed it.

20 Q   Okay.  But the source of your impression that Leonard

21 Thomas held E██████ T██████ outside of the window, that came

22 from Sergeant Luckman, correct?

23 A   Yes.

24 Q   Besides the claim from Sergeant Luckman about putting

25 E██████ outside of the window, did Leonard Thomas threaten

1   E███████ while he was on the phone with you?

2   A   No.

3   Q   When you were talking to Mr. Thomas, did he appear

4   intoxicated to you?

5   A   I couldn't tell at the time.  I didn't speak to him long

6   enough to tell if he was having mental health issues or if he

7   was intoxicated.

8   Q   So is that a yes or a no?  Did he appear intoxicated to

9   you?

10  A   I don't know.  I don't know.

11  Q   Was he slurring his speech?

12  A   Not that I noticed.

13  Q   You also didn't get the sense from Leonard that he was

14  psychotic; is that correct?

15  A   That, I don't know.  He was yelling at me.  He was very

16  irate.  It was hard for me to diagnose what his issue was.

17  Q   And you also didn't -- did you get the impression that he

18  was delusional?

19  A   I did not get that impression that he was delusional.

20  Q   The overall impression you had, though, was that

21  Mr. Thomas did not like the Fife Police Department, correct?

22  A   Yes.

23  Q   And he was telling the Fife police to get off his

24  property, correct?

25  A   Yes.

1   Q    And he didn't threaten the officers in any way, correct?

2   A    He never threatened them to me, no.

3   Q    During your conversations with Mr. Thomas, he also never

4   displayed any behavior that convinced you that he wanted to

5   commit suicide; is that right?

6   A    While I was speaking to him, I didn't -- he never made any

7   suicidal threat to me.

8   Q    And earlier in the evening, you also received an officer

9   safety or did you -- strike that.

10       Earlier in the evening, you had heard that there were

11  officer-safety alerts about Mr. Thomas?

12  A    That would have -- that would have come from my initial

13  arrival, checking in with Sergeant Luckman.

14  Q    One of the officer-safety alerts was that Mr. Thomas, in

15  the past, had made alleged statements about suicide-by-cop;

16  is that right?

17  A    That was passed on to me, yes.

18  Q    But even though you had heard that, Mr. Thomas did not

19  indicate any sort of intent to commit suicide when you were

20  talking to him with him on the phone, correct?

21  A    When I was talking to him, no.

22  Q    And Mr. Thomas also did not say that he had any sort of

23  gun or other weapon; is that right?

24  A    Not to me, he did not.

25  Q    And when I'm talking right now, I'm talking about when you

1    were on the phone with --

2    A    Yeah.  No, he did not.

3    Q    Now, at some point during the evening, perhaps after

4    the -- well, strike that.

5         At some point during the evening you stopped being the

6    primary negotiator; is that right?

7    A    Yes.

8    Q    And can you tell me how that came to pass?

9    A    At one point during the night, it was reported that

10   Mr. Thomas was speaking to officers that were near the home

11   or on the perimeter, and he was -- he was talking to them.

12   So I was asked to go along with Officer Porche to see if we

13   could contact him.

14        So prior to doing that, we got our helmets, we put on our

15   tactical vests, our ballistic vests.  We did this because we

16   were responding to -- at the time we had a barricaded

17   subject.  It came out that it was now a hostage situation.

18   So we got our gear ready.  And knowing the past alerts, the

19   flags, we took caution in doing that.  We got our gear ready,

20   and then we started to make our way to the home to attempt to

21   speak to him.  However, that actually never really happened.

22   Q    So did you speak with Leonard from outside the home

23   someplace?

24   A    No.

25   Q    And when you went to approach Leonard with your tactical

1    gear and other things, were you wearing your Fife vest still?

2    A    What's that?

3    Q    Were you wearing some vest or other garment that indicated

4    that you were a Fife officer?

5    A    It's a -- a velcro badge that says "Fife" on it, and then

6    it says "Police" on the back.

7    Q    And so in response to my question, how did it come to pass

8    that you were no longer the primary negotiator?

9    A    We were -- we were asked to move forward, to go to the

10   house, to see if we could make a face-to-face contact with

11   him.  Basically, that means we are no longer speaking to him

12   over the phone.  We are having a conversation where we could

13   see each other.  So that was the request.  That was what was

14   asked of us.  However, when we -- as we got closer to the

15   residence, he retreated back into the home, or away from the

16   window, and so we never -- we never got to speak to him

17   face-to-face.

18   Q    And who had sent you up to speak with him?

19   A    That was Chief -- I believe it came from Chief Zaro.

20   Q    Okay.  And who asked you to retreat from that house?

21   A    No one.  No one asked us to retreat, that I can remember.

22   Q    So what did you do after you decided -- or what did you do

23   after Leonard had gone away from the window and you were no

24   longer in visual contact with him?

25   A    What we had found out was, when we got to the residence,

1    he retreated into the residence, and then we were -- we were

2    advised that he had actually placed -- he had placed a call

3    to -- I don't know if it was like state patrol or Pierce

4    County.  He didn't want to speak to Fife.  So he called one

5    of those agencies, and they were able to patch him back to

6    the negotiator rig, or back to us, and we were informed that

7    he was speaking to our now-team-leader, Sergeant Mark Eakes.

8    Q    So Leonard had made -- is this because Leonard made a 911

9    call?

10   A    He made a 911 call, yes, and asked to speak to somebody.

11   Q    Who was not from Fife?

12   A    Yes.

13   Q    And was that because he wanted the Fife police out of

14   there; he was asking for some assistance?

15   A    That was my understanding.

16   Q    And your understanding was that he believed that the Fife

17   police were harassing him; is that correct?

18   A    I don't know if he thought we were harassing him.  I never

19   got to that -- I never got there in our conversation.

20   Q    But, in any event, he went to another jurisdiction to ask

21   police to assist him in some way in dealing with the

22   situation with the Fife police, correct?

23   A    He asked to speak to another agency.

24   Q    And when the 911 dispatcher patched the call back in,

25   that's when Sergeant Mark Eakes picked it up, right?

1    A    That's my understanding.

2    Q    And Sergeant Mark Eakes is the squad -- ordinarily, he's

3    the squad negotiator team leader, correct?

4    A    Yes, he is.

5    Q    And on that night, he took this call from the Fife

6    dispatcher and transitioned into the role of primarily

7    negotiator, correct?

8    A    Yes.

9    Q    And after that, he spoke with Mr. Thomas for about 45

10   minutes in the initial call; is that right?

11   A    I don't know how long he spoke to him.

12        MR. WHEDBEE:  Christy, if we could bring up the

13   transcript of the interview of Sergeant Malave.  If you would

14   go to page 4.

15   Q    Sergeant Malave, after the shooting of Leonard Thomas had

16   occurred, several hours after that, in the morning of the

17   24th, you were interviewed by investigators from the Crime

18   Response Unit; is that correct?

19   A    Yes.

20   Q    And the Crime Response Unit is a multi-jurisdiction team

21   that investigates officer-involved shootings, at least in

22   part -- they have other roles -- but that's what they do,

23   right?

24   A    Yes.

25   Q    And on this particular incident, they arrived at the scene

1    and began to investigate or process the crime scene after

2    Mr. Thomas had been killed, correct?

3    A    Yes.

4    Q    And one of the things they did is interview you and many

5    of the other officers who had been eyewitnesses or

6    participants in the situation that had resulted in the death

7    of Leonard Thomas, right?

8    A    Yes.

9    Q    And during that interview that you gave, you gave an

10   accurate description of what had occurred; is that right?

11   A    I gave -- I gave a statement that was the best of my

12   ability at the time.

13   Q    And it was the best of your ability at the time because

14   you wanted to give the most accurate information you could to

15   the Crime Response Unit because one of their roles is to

16   provide the information by which it will later be determined

17   by another body whether the shooting of Leonard Thomas was

18   justified; is that right?

19   A    Yes.

20   Q    So if you could just look to page 4.  This is just to

21   reflect your -- or to refresh your recollection.  Line 154.

22   Do you see line 54 -- 154?  I'm sorry.

23   A    Just 154?

24   Q    Yeah.  I'm sorry.  I misspoke.

25   A    Yeah, I see line 154.

1   Q    So does that refresh your memory, that you understand that

2   Sergeant Eakes spoke with Leonard Thomas for 45 minutes to an

3   hour during this first call?

4   A    Yes.

5   Q    Okay.

6         MR. WHEDBEE:   I'm just going to publish this to the

7   jury, Your Honor.

8         THE COURT:   Sure.

9   Q    So, as a negotiator, have you been trained that one of the

10  goals you do as negotiator is to try to keep the subject

11  talking; is that right?

12  A    Yes.

13  Q    That's a good development, when you can keep the subject

14  on the phone?

15  A    Yes.

16  Q    So the fact that Sergeant Malave now -- or, excuse me,

17  Sergeant Eakes had now had a phone conversation from 45

18  minutes to an hour with the subject, that was progress,

19  right, compared to what had been happening with you, for

20  instance?

21  A    I can't say it's progress, because I don't know what he

22  was saying.

23  Q    But, in general, it's good to keep a subject on the phone,

24  correct?

25  A    We try our best to keep them on the phone, yes, to try to

1    make some progress.  I mean, we cannot make progress without

2    speaking to them.  So that is -- that is our way that

3    we're -- the only way we can make progress is by speaking, by

4    speaking to him, by having a dialogue.

5    Q   So it was a better arrangement for the negotiators that

6    Leonard Thomas was speaking continuously with Sergeant Eakes

7    at least for 45 minutes to 60 minutes, compared to his

8    calling you and hanging up.  Correct?

9    A   I would say that the -- that the phone call I had, it

10   could have been 45 minutes of what I had.  I don't know.  I

11   didn't hear that phone call.  But there's time.  And the 45

12   minutes, I would prefer to speak to him, to try to get him to

13   come out in 45 minutes as opposed to ten minutes, if that's

14   what you are asking.

15   Q   That's what I'm asking.

16   A   Okay.

17   Q   After the -- after Sergeant Eakes took over as primary

18   investigator, what were you doing after that point?  What was

19   your role?

20   A   As Sergeant Eakes was the primary, we went back to the

21   command post area, to the -- where the negotiator rig was,

22   and then we were there for -- I don't know how long we were

23   there.  But we were then asked to return back, to try to go

24   back to the residence, or near it, to escort his mother back

25   to see if we could get E███████.

1    Q    During the time -- during the time that -- or starting

2    from the time that you stopped being the primary negotiator

3    till you were told to go back up to the residence, did you

4    hear that Mr. Thomas had threatened any of the officers?

5    A    No, I never heard that.

6    Q    Did you hear that Leonard had threatened E████?

7    A    Other than what I was told by Sergeant Luckman, I never

8    heard.

9    Q    And I'm talking specifically about the time after you

10   stopped being the primary negotiator and before you were told

11   to move up to the BearCat with Annalesa Thomas.

12   A    I never heard anything like that.

13   Q    And during that time period that I just referenced, did

14   you hear anything that Leonard wanted to commit suicide?

15   A    No.

16   Q    Did you hear about any actions that convinced any of the

17   officers that Leonard had a weapon?

18   A    No, I did not.

19   Q    Did you hear from any of the officers that someone had

20   seen Leonard with a weapon?

21   A    No, I did not hear that.

22   Q    Okay.  But at some point you learned of a plan where you

23   and then Lieutenant Thompson were going to take Annalesa from

24   where she was, near the negotiator rig, up to the BearCat; is

25   that right?

1    A    Yes.

2    Q    Okay.  And can you explain to me how that plan sort of

3    was -- strike that.

4         Can you explain what the nature of that plan was?

5    A    The plan was to take Leonard's mother, Annalesa, to the

6    armored vehicle, and from there -- it was -- it was supposed

7    to be pretty quick.  It was -- my understanding was that

8    Leonard would be outside with the child, and then the child

9    would go to Annalesa.

10   Q    And who communicated that plan to you?

11   A    It was Sergeant -- or, I'm sorry, Chief Zaro communicated

12   it to Sergeant Thompson.

13   Q    In your presence?

14   A    I was -- I was in the area.  I was standing with Sergeant

15   Thompson, and that was what my understanding of the plan was.

16   And so, therefore, we started -- she was transported from

17   the, I believe, the convenience store, and she was

18   transported to our location, and so we moved.  It was -- my

19   understanding was it was a time-sensitive thing, and so we

20   moved quickly.

21   Q    How -- when you -- where did you start walking with

22   Annalesa and Sergeant Thompson, where were you physically in

23   relation to the house?

24   A    We started from our negotiator rig.

25   Q    And then you walked down 55th; is that correct?

1    A    Yes.

2    Q    And then you walked in front of the house?

3    A    We were -- we were escorted.

4    Q    And who escorted you?

5    A    I believe it was Officer Waller and Officer Vance.

6    Q    Were these escorts, were they part -- were these two

7    officers part of the tactical side?

8    A    They were SWAT officers.

9    Q    Okay.  And were they armed and in their tactical gear?

10   A    Yes.

11   Q    And they accompanied you, Lieutenant Thompson, and

12   Annalesa across the front of the Thompson -- or, excuse me,

13   the Thomas house?

14   A    It was -- so it was on the other side of the street, is

15   what I remember, and we would have had to have walked in

16   front of the house, but it was on the other side of the

17   street.

18   Q    And then you walked to the BearCat; is that right?

19   A    Yes.

20   Q    What time was it, about, when you did this?

21   A    I don't remember the time.  I know it was late.

22   Q    If you take as a reference point when Leonard Thomas was

23   shot, at 2:45 a.m., about what time would you have set off

24   from the negotiator rig to get to the BearCat?

25   A    I would say from the time that -- from the time -- are you

1   asking me how long did it take for her to get from, like, the

2   convenience store to --

3   Q   No.  Once you set off from the negotiator rig.

4   A   Once the plan was in play, once we went to escort her and

5   then we were escorted by those officers, I would say maybe 20

6   minutes.

7        So if you are asking me from 2:45, I would say probably

8   2:20 maybe, 2:20, 2:25.

9   Q   When do you think you got to the BearCat?

10  A   I would estimate we were at the BearCat maybe 10 to 15

11  minutes.

12  Q   Okay.

13          MR. WHEDBEE:  Christy, if you could bring up

14  Exhibit 154, please?  This has been pre-admitted.

15  Q   Sergeant Malave, can you see this all right?

16          THE COURT:  Can the jurors see it?

17          THE JURY:  Yes.

18          THE COURT:  Thank you.

19  Q   Is this the BearCat that you are looking at here?

20  A   Yes.

21  Q   Is that actually a picture of you?

22  A   Yes.

23  Q   When you first got to the BearCat with Annalesa and

24  Lieutenant Thompson, can you explain where exactly you were?

25  A   When we first got there, I would say we were probably

1  where -- we were probably toward the front, front portion of

2  it, the wheel, and then we moved her to the back of the

3  vehicle.  So towards the back wheel.

4  Q    Why did you move her there?

5  A    Well, there was a couple of reasons.  One being we wanted

6  to -- we wanted to have cover.  We didn't really want him to

7  see us.  We didn't want to make him angrier than he was.  And

8  we wanted her to be over towards that side where he could see

9  her and the child could see her.

10        MS. WHEDBEE:  Christy, if you could bring up

11  Exhibit 238, please?

12  Q    Now, before you moved her from the front of the BearCat to

13  the rear of the BearCat, could Leonard see Annalesa from that

14  position?

15  A    Could he see her from the front part?

16  Q    Yes.

17  A    I don't know if he could see her or not.

18  Q    Did you hear anything from Leonard that he said, "I can

19  see mom," or anything like that?

20  A    I know that they had -- that they -- that he spoke to her,

21  and I know that he said something to the effect of "No. Mom,

22  you come up here and get him."  So I don't know if he

23  actually saw her, but he knew she was in that area.

24  Q    Did he say that when you were at the front of the BearCat?

25  A    I don't remember.

MICHAEL MALAVE - Direct (Whedbee)

1  Q   Okay.  If you could just point to where you and -- first

2  point to where you and Lieutenant Thompson were.  Yeah, you

3  can touch the screen and draw.

4  A   So you want to know where we were initially?

5  Q   No.  Where you ended up after you moved to the back of the

6  BearCat.

7  A   So I was in this area here, and Sergeant Thompson and

8  Annalesa were right in here.

9  Q   Is that where you stayed?

10 A   I would go back and forth, but Sergeant Thompson and

11 Annalesa pretty much stayed in that area.

12 Q   And you put Annalesa there to make sure that she was

13 behind the BearCat, correct?

14 A   Yes.

15 Q   So she couldn't -- from that position, she couldn't see

16 Leonard?

17 A   No.

18 Q   And Leonard couldn't see her?

19 A   No.

20 Q   Okay.  From this position behind the BearCat, did you ever

21 hear Leonard call out that he wanted to see his mother?

22 A   I don't -- I don't remember if he actually said, "I want

23 to see you, mom."  I know at one point he said, "No.  You

24 come up here and get him," or something to that effect.

25 Q   But you can't remember whether he said, "I want to see

1    her"?

2    A   I can't remember if he said, "I want to see you, mom," or

3    "I want to see you."  I don't remember that.

4            MR. WHEDBEE:  Christy, if you could just bring up the

5    interview transcript again, please?  If you could go to

6    page 5, line 192.

7    Q   Sergeant Malave, if you could just read that.  Does that

8    refresh your recollection about whether Leonard wanted to see

9    his mother?

10   A   Yes.

11   Q   And they wanted to see her because she was behind the

12   armored vehicle, as you state there, correct?

13   A   Yes.

14   Q   Now, Annalesa, when she was brought up, she wanted to

15   participate in this plan to try to negotiate with Leonard

16   directly and see if he would send E█████ out to you, correct?

17   A   As far as I know.  She came up with us, and I didn't hear

18   any objection from her that she didn't want to come up.

19   Q   Describe what -- what happened when -- when you got up and

20   you were talking to her from the back of the BearCat?

21   A   I'm sorry.  When I was talking to her from the back or --

22   can you rephrase that, please?

23   Q   Yeah.

24           So going back to where you were.  You were at the front

25   of the BearCat, correct?

1   A   Yes.

2   Q   And Lieutenant Thompson and Annalesa Thomas were at the

3   back of the BearCat?

4   A   Towards the rear, yes.

5   Q   Towards the rear.  And Leonard couldn't see her at that

6   point, right?

7   A   Yes.

8   Q   And then at some point, not long before the lieutenant

9   or -- excuse me, Officer Wylie gave the countdown for the

10  breach, you or Lieutenant Thompson told Annalesa to call out,

11  is that correct, to call out for E████?

12  A   Sergeant Thompson had been communicating with her to call

13  to E████.

14  Q   And she called out, and then soon after that, you

15  understood that the countdown was going to occur, and the

16  SWAT operators were going to launch their forced entry; is

17  that right?

18  A   No.  I didn't understand -- I didn't know the breach was

19  going to happen.

20  Q   That's because no one had told you that a breach was going

21  to happen; is that right?

22  A   No.  No.

23  Q   How did you first learn that a breach was going to happen?

24  A   When I heard a countdown.

25  Q   So when you -- so Chief Zaro did not instruct you, when he

1    sent you up, that he was also preparing an explosive breach

2    and a forced entry at the same time that he had sent you up

3    to negotiate with Annalesa; is that right?

4    A    So if I may?

5    Q    If you could answer the question?

6    A    So my understanding from Chief Zaro was that we were to

7    take her to the armored vehicle, and my understanding was

8    that the child would go to her.

9         Now, as far as a breach, or a SWAT team launching, that's

10   something that typically the negotiators don't know ahead of

11   time.  The breach, or a launch, is something that's --

12   there's always a plan that, in case something goes wrong, or

13   if there's an opportunity, we always know that's a

14   possibility, that's something that can happen.  But at that

15   time I did not know that was going to happen until I heard

16   the countdown.

17   Q    Okay.  Just before you heard the countdown, were you

18   looking at the front porch?

19   A    I was -- I don't remember at that time if I was looking at

20   the front porch when the countdown happened.  I know that as

21   it started I made my way to be able to see the front.

22   Q    To see the front porch?

23   A    The front porch.  I had a view of the front door, and then

24   I had a view of like the porch area and there were some

25   stairs.  And that's what I made myself able to see.

1    Q    And can you describe what was going on on the front porch?

2    A    The front porch, Mr. Thomas was -- he was in the doorway

3    area, and then E███████ was on one of the steps to the home.

4    Q    He was about three or four steps down; is that right?

5    A    He was -- I don't know how many steps down he was.

6         MR. WHEDBEE:  Christy, if you can put up page 5 of

7    Sergeant Malave's interview transcript?

8    Q    If you would look at lines 202, 203, Sergeant Malave?

9    A    Okay.

10   Q    Do you see that?

11   A    Yes.

12   Q    Does that refresh your recollection that E███████ was

13   sitting about three or four steps down on the front porch

14   steps?

15   A    Yes.

16   Q    And Leonard had his hands in the air at this point, right?

17   A    Do you mind pulling that up for me again?

18        MR. WHEDBEE:  Christy, if you could get rid of

19   the --. I'm sorry.  Go back to 202.  You don't have to blow

20   it up, though.  You can just go to lines -- line 201 or 202.

21   Q    Can you read that, Sergeant Malave?

22   A    Read 202 or --

23   Q    Tell me if I'm reading this correctly.  You said, "I

24   initially saw him.  He was standing on the front steps.  And

25   he saw us and he raised his hands."

1  A    I'm sorry, sir.  Where are you reading from?

2  Q    I'm sorry.  Page 5, line 202.

3  A    202?

4       What I see on 202 is, "um, and then I noticed that, uh,

5  was sitting on, like, the third or fourth step down."

6  Q    Then 201.  I'm sorry.

7  A    Okay.

8       201, "On the front steps, and he saw us and he raised his

9  hands.  And, um -- and then I noticed --

10 Q    So when he raised his hands, he had no weapons in his

11 hands or anything like that, correct?

12 A    I couldn't see any weapons, no.

13 Q    Okay.  And then what happened next?

14 A    Are you asking me what happened next from here, or are you

15 asking me next from what happened from the countdown?

16 Q    I'm just asking, you were looking at Mr. Thomas, he was in

17 the doorway, kneeling down, E█████ was three or four steps

18 down, Mr. Thomas had his hands up, and then I asked you, what

19 happened next?

20 A    So this -- what we're speaking about here is a -- at one

21 point prior to this, he had taken him back into the house.

22 This was the second time that -- the second, I guess, period

23 of time where E█████ would have been out on the front area.

24 At this point, he was sitting on the steps.

25      From the time that the countdown was given, I made my way

1   to the front, looking over the winch, the bumper area of the

2   armored vehicle.  I heard a long bang towards -- somewhere

3   towards the back of the house, and I assumed that was a

4   flash-bang.

5   Q   Was it in fact a flash-bang?

6   A   At the time I didn't know.

7   Q   Did you later learn that it was the explosive breach?

8   A   Yes.

9   Q   Okay.  Go ahead.  What happened next?

10  A   And at that point, Mr. Thomas quickly got from outside of

11  the doorway, and he essentially ripped him off the ground,

12  off the steps, and pulled him up.

13  Q   Okay.  Now, as you were motioning right there, Leonard

14  grabbed his son across the chest, is that how he did it?

15  A   No.

16  Q   Where did he grab him?

17  A   He -- well, he grabbed him right here.

18  Q   Across E███████'s shoulders?

19  A   He grabbed him like this.

20  Q   And when you say, "like this," what are you referring to?

21  Is that where he was holding him or --

22          THE WITNESS:  Your Honor, may I stand up, please?

23          THE COURT:  Sure.

24  A   If he were to be on the stairs -- and, I'm sorry, I can't

25  bend over as quick as he did -- but he grabbed him and held

 1   him like this.  And so what I remember is, I remember

 2   Mr. Thomas's -- I remember his head being right next to his

 3   boy's head, so like this.  So if his head was here, he would

 4   have been right like this, holding him.

 5       So I don't know if you consider this the neck, the upper

 6   chest.  But this is how he was holding him.

 7   Q   He never grabbed him around the throat; is that right?

 8   A   I never saw him grab him around the throat like this.

 9   Q   Okay.  You never saw him grab him around the throat at

10   all, right?

11   A   I never saw him grab him around the throat like this.

12   Q   Okay.  So you never saw him grab him around the throat at

13   all; is that right?

14           THE COURT:  Do you want to get back on the stand?

15           THE WITNESS:  Oh.  I'm sorry, Your Honor.

16           THE COURT:  Let me try to describe what you are

17   talking about.  He had his arms crossed around E██████'s chest

18   or upper shoulders or what?

19           THE WITNESS:  I would say his upper shoulders.

20           THE COURT:  Upper shoulders.  Okay.

21       So that E██████'s head was next to his head?

22           THE WITNESS:  Mr. Thomas's head was like behind his

23   head.

24           THE COURT:  Okay.

25           THE WITNESS:  But level.

```
 1              THE COURT:  Okay.

 2              MR. CULUMBER:  Your Honor, if I could?  I'm sorry.  I

 3    meant to bring this up before.  Detective Malave just had

 4    back surgery.  So I don't know if maybe he wanted to stand up

 5    because  it would be more comfortable.

 6              THE COURT:  Was that --

 7              THE WITNESS:  That's what I was asking, Your Honor.

 8              THE COURT:  Oh.  I thought you were just standing up

 9    to demonstrate, but --

10              THE WITNESS:  Yeah.  No.

11         If that's okay?

12              THE COURT:  Feel free.  It's certainly okay.

13              THE WITNESS:  Thank you.

14              MR. CULUMBER:  I apologize.  That's my fault.  I told

15    him that I would --

16              THE COURT:  You can step down there.

17              THE WITNESS:  All righty.

18    Q   I want to confirm, Sergeant Malave, that your testimony is

19    that Leonard came to his boy, picked him up, and held him

20    across his upper shoulders; is that right?

21    A   Yes.

22    Q   Okay.  And right after the breach, from what you could

23    see, the breach went off and E█████ looked at his father; is

24    that right?

25    A   I'm sorry.  When the breach went off, did he --
```

1    Q    When the explosive breach detonated creating that loud

2    bang,  from what you could see, E█████ looked at his father

3    when that happened, right?

4    A    I don't know if he looked at his father.

5              MR. WHEDBEE:  Christy, if you could bring up

6    Exhibit 614?  Go ahead.  Play it.

7                        (Video/audio played.)

8              MR. WHEDBEE:  Can you pause it so I can -- could you

9    start from the beginning, please?

10                       (Video/audio played.)

11             MR. WHEDBEE:  Start from the beginning, please.

12                       (Video/audio played.)

13             THE COURT:  If you want anybody to hear it, you are

14   going to have to make it louder.

15             MR. WHEDBEE:  Can I just inquire, can you hear that

16   back there?

17             THE JURY:  Not very well.

18             THE CLERK:  And I have the volume up on our end all

19   the way.

20             MR. WHEDBEE:  My apologies.

21                       (Video/audio played.)

22   Q    Does that refresh your recollection that E█████ did look

23   at his father after the explosion?

24   A    Yeah.

25   Q    Okay.  And you had testified before, that when you were

1    interviewed by the CRU investigators, that you tried to give

2    an accurate account of what happened; is that right?

3    A    Yes.

4    Q    And so your descriptions to them were accurate on that

5    morning several hours after the incident, correct?

6    A    Can you pull up the video again, or can I -- I believe the

7    time on there.

8         I can tell you -- what I can tell you is I gave a

9    statement, as I had been up for, at this point, going over

10   24 hours, and so I gave a statement the best that I could at

11   the time.  I was obviously tired.  And as a detective, I've

12   been taught that when someone goes through a traumatic

13   experience, you want to speak to them twice, you want to

14   interview them twice, and that was the initial interview.

15   That's what I remember at the time.  That's how I saw it at

16   the time.

17   Q    Okay.  So when you did that motion where you said that

18   Leonard was pulling E█████ in, that's what you saw Leonard

19   do, correct?

20   A    I -- at the time, that's what I said.

21   Q    Okay.

22   A    I said that he pulled him in.

23   Q    And the way -- though, you demonstrated it, too, and that

24   was accurate, as far as what you had observed Leonard doing?

25   A    That's what I remembered at the time.

1    Q    Okay.

2         MR. WHEDBEE:  I will defer to Mr. Connelly at this

3    point.

4                        DIRECT EXAMINATION

5    BY MR. CONNELLY:

6    Q    Sergeant, when you got to the scene, it's fair to say that

7    Leonard was agitated, correct?

8    A    Are you talking about when I got to --

9    Q    When you got to his house?

10   A    When I was at the armored vehicle?

11   Q    Correct.

12   A    Yeah.

13   Q    And he was -- he wanted you to leave.  He wanted all the

14   police to leave, correct?

15   A    That's what he told me earlier.

16   Q    He particularly didn't want to speak to the Fife Police

17   Department, correct?

18   A    Yes.

19   Q    All right.  It's fair to say you had had no prior contact

20   with Mr. Thomas, right?

21   A    No.

22   Q    You had never responded to any calls at that address

23   before?

24   A    No.

25   Q    And when you did get there and when you're both -- during

1    the time you are talking, the entire time you are there, he

2    was making it clear he wanted people to leave his property,

3    correct?

4    A    Yes.

5    Q    And at that point he's -- basically, when the SWAT team

6    gets there, he's surrounded by police personnel, correct?

7    A    Yes.

8    Q    And he tried at one point to call Pierce County and the

9    Washington State Patrol because of his concern with Fife,

10   correct?

11   A    Yes.

12   Q    Were you aware that he was bipolar?

13   A    At the time, no.

14   Q    And were you -- did anyone in the negotiation team explain

15   that to people?  We knew that some people knew it.

16   A    I never heard anybody say that.

17   Q    Were you aware that he was not on his meds?

18   A    I can't recall.  I don't know.

19   Q    And you were told that a friend had recently died and he

20   was distraught?

21   A    I did hear that information.

22   Q    As far as the work that you were doing, it was progressing

23   to the point that Annalesa was going to go up to him and get

24   E█████, correct?

25   A    I'm sorry.  What --

1   Q    Annalesa, his mother, was going to go up with you guys,

2   and the idea was that E█████ was going to come to her,

3   correct?

4   A    That was my understanding, E█████ was going to come to

5   her.

6   Q    And she was more than willing to go up there with you,

7   correct?

8   A    Yes.

9   Q    Very cooperative, correct?

10  A    As far as I know, she was cooperative.

11  Q    And Leonard had the concern that he will let -- at that

12  point, it had progressed to the point he will let E█████ go,

13  but only to his mother, right?

14  A    Yes.

15  Q    And so it had -- through all of this time you have been

16  there, it had gotten to the point where E█████ is now four

17  steps down, three to four steps down, correct?

18  A    Uh-huh.

19  Q    And Leonard is back in the doorway, and Leonard is saying,

20  "I want to let him go, but I want my mom to come up and take

21  him, I don't want police officers to come up with her,"

22  correct?

23  A    Yes.

24  Q    All right.  And then you're there for about ten minutes or

25  so when you hear shots being fired, correct, and a loud

1    explosion?

2    A    Yes.

3    Q    And at that point you see Leonard grab E█████, correct?

4    A    Yes.

5    Q    And then fall backward into the house, correct?

6    A    Yes.

7    Q    And Leonard doesn't -- we mentioned that he doesn't have

8    his hands around his throat, correct?

9    A    No.

10   Q    Nor does he have him like -- in any way like a shield,

11   correct?

12   A    I remember him having him up like this.  I remember him

13   being very tall, and I remember his -- E█████'s legs were

14   like probably to here to him.  He was very tall.  And I

15   remember Leonard's head being level with E█████.

16            MR. CONNELLY:  Christy, can you pull up the statement

17   at page 11?

18   Q    And, for the record, you just pointed roughly to your

19   navel area, correct, when you were pointing?  You were

20   gesturing, and the record doesn't show where you are

21   gesturing.

22   A    Oh.  I'm sorry.  So he was a lot taller than me, and his

23   legs were.

24            THE COURT:  E████'s legs.

25   A    -- E█████'s legs were probably above his belly button, or

1    navel area.

2    Q    Okay.  If we look at the statement at page 11, this was in

3    the interview that Mr. Whedbee referred to, correct?  And the

4    questions asked, down at line 484, you are sort of led to say

5    that he's holding him as shield, correct?  So just so I

6    understand --

7          MR. CULUMBER:  Objection, Your Honor, as

8    argumentative.

9          THE COURT:  Where are you going with this?

10         MR. CONNELLY:  Well, I'm reading the portion there

11   about the shield.  But the question -- and I will rephrase

12   the question, Your Honor.

13         THE COURT:  All right.

14   Q    "And just so I understand, when he's using his

15   four-year-old son as a shield, has the SWAT team already set

16   up their perimeter and made their -- made themselves known to

17   him basically?"  Answer:  "I never saw him hold his -- his --

18   E█████ like that."  Correct?

19         THE COURT:  Are you asking him?

20         He's asking you, is that correct?

21   A    Yes.

22   Q    All right.  And after -- oh, by the way, did you ever see

23   the dog before he was shot?

24   A    No, I don't remember seeing the dog.

25   Q    And the dog wasn't running around where you could see him,

 1    correct?

 2    A    I couldn't see the dog.

 3    Q    All right.  And then you did afterwards see the dog was

 4    shot, correct?

 5    A    Yes, after I came back to the house, I did.

 6    Q    All right.  After the shot was fired, you saw Leonard fall

 7    back into the doorway, and then you guys ran up and you

 8    grabbed E▮▮▮▮▮, correct?

 9    A    I did grab E▮▮▮▮▮.

10    Q    And E▮▮▮▮ was startled, correct, very startled?

11    A    I'm assuming he was startled.

12    Q    But not hurt, correct?

13    A    I didn't -- I didn't know if he was hurt or not.

14    Q    And he was given to his mother, or Annalesa?

15    A    I took him -- or I ran him to a patrol car, to a person

16    that I was told was his mother.

17    Q    All right.  There was no need for medics or anything to

18    look at him, correct?

19    A    I don't know if medics looked at him, because I ran back

20    to the house.

21    Q    Okay.  And at any rate you released him to his mother,

22    correct?

23    A    Yes.

24    Q    Then afterwards you went back to the house and Leonard was

25    there, correct?

1    A    Yes.

2    Q    Was he handcuffed at that point?

3    A    I don't remember him being handcuffed.

4    Q    And people were putting Leonard on a kind of a carrier,

5    correct?

6    A    Yes.

7    Q    And you helped carry Leonard down the road two houses to a

8    carport?

9    A    Yes.

10   Q    He was put there on the carrier, and then the medics

11   were -- medics came, correct?

12   A    There was SWAT medics there that were -- I was helping

13   them transport him to that carport area.

14   Q    And as you were transporting him, Leonard is looking at

15   you correct?

16   A    When I looked down at him, he was looking at me.

17   Q    And he was moving, correct?

18   A    Yes.

19   Q    And the medics were frantically working on him and telling

20   him to hang on, correct?

21   A    Yes.

22   Q    And he was bleeding profusely from the stomach area,

23   correct?

24   A    I don't remember the amount of blood.

25   Q    Do you recall it being an arterial bleed?

```
 1   A    I don't know.  I don't know if it was arterial bleed.  I

 2   know it was coming from his stomach area.

 3   Q    He's held there in the carport, the medics are working on

 4   him, and eventually the fire department comes, correct?

 5   A    Yes.

 6   Q    And he's taken to St. Joseph's Hospital?

 7   A    I don't know where he was taken.

 8   Q    All right.  And later that morning he is pronounced dead;

 9   is that your understanding?

10   A    I don't know when he was pronounced dead.

11   Q    During the entire time that -- the entire time, the entire

12   evening, there were no threats to harm you or the police,

13   correct?

14   A    No.

15   Q    And there were no threats to harm E█████ that you ever

16   heard, correct?

17   A    Not that I ever heard.

18   Q    You never saw any weapons, correct?

19   A    No.

20   Q    And Leonard never said he had any weapons, correct?

21   A    He never told me he had any weapons.

22   Q    In fact, Sergeant Luckman had told people that he said he

23   hadn't had any weapons, correct?

24   A    I'm sorry?

25   Q    You had heard from Sergeant Luckman that he didn't have
```

 1    any weapons, correct?

 2    A    It was reported to me that he had told another officer

 3    that he had -- he had a pistol, but then it was also said

 4    that he didn't have any weapons.

 5    Q    Right.

 6         And there were never any weapons, any guns, found in

 7    that house, correct?

 8    A    I don't know what was found in the house.

 9    Q    All right.

10         MR. CONNELLY:  I think that's all I have.  Thank you,

11    Your Honor.

12                        CROSS-EXAMINATION

13    BY MR. CULUMBER:

14    Q    Are you okay?

15    A    (Indicating a thumbs-up.)

16         Thank you, sir.

17         THE COURT:  Are you all right?

18         THE WITNESS:  Yeah.  My leg falls asleep, so ...

19    Q    Briefly, have you been trained -- in addition to your

20    training and experience as a police officer, you have been

21    trained as a crisis negotiator as well, correct?

22    A    Yes, sir, I have.

23    Q    And did you go to FBI hostage negotiator school?

24    A    I did.

25    Q    When you finished that, you received a certification as a

1  hostage negotiator or a crisis negotiator?

2  A   Yes, I did.

3  Q   In addition to your initial training, have you had to

4  undergo continuous update training to maintain that?

5  A   Yes.

6  Q   Are you a part of any organizations or associations in

7  your role as a crisis negotiator?

8  A   Yes.  I'm part of the Washington -- or the Western State

9  Hostage Negotiators Association.

10 Q   Have you also taken part in a lot of actual negotiations,

11 real-life negotiations?

12 A   Yes.

13 Q   Your understanding is that there was a report that Leonard

14 claimed to have a weapon, and then he told Sergeant Luckman

15 and others that he didn't have a weapon, is that generally

16 the idea?

17 A   Yes.

18 Q   When you are dealing with an assault suspect barricaded in

19 a house like this, are you trained to make any assumptions

20 about whether they may be armed?

21 A   No.

22 Q   In your experience as a police officer, has a suspect ever

23 told you they're unarmed only for you to find out later that

24 they're not telling the truth?

25 A   It's happened a lot.

1   Q    If a suspect in a crime who's uncooperative with the

2   police, yelling and screaming at you, barricaded inside his

3   house with a child, tells you, "I'm unarmed," are you

4   generally trained to take their word for it in that

5   situation?

6   A    No, we wouldn't.  We would never take his word for it.

7   Q    As a police officer, do you receive training on kinds of

8   items that people generally have available in their house

9   when they're inside their house, items that could be used as

10  weapons?

11  A    Yes.  We're taught there could be guns, there could be

12  knives, depending on -- they can be in the kitchen.  There

13  could be knives, there could be baseball bats.  There's many

14  things in a home that can be used as a weapon.

15  Q    Are you generally trained that when a person is inside

16  their own house, they have access to something that can be

17  used as a weapon?

18  A    Yes.

19  Q    Leonard never said, "I'm going to kill a police officer if

20  you don't get off my property," right?

21  A    No, he never said that.

22  Q    And Leonard never said, "I'm going to kill my son if you

23  don't get off my property," right?

24  A    No.

25  Q    Have you been in situations where people have assaulted

1    police officers?

2    A    Yes.

3    Q    Do they generally tell you in advance that they're going

4    to do it before they do it?

5    A    No.

6    Q    Have you been in situations where people have assaulted

7    family members in your presence, including children?

8    A    Yes.

9    Q    Do they generally tell you that they're going to do it

10   before they do it?

11   A    No.

12   Q    Despite the fact that Leonard never said, "I'm going to

13   kill a police officer" or "I'm going to kill my son," are you

14   trained to take into account the totality of the

15   circumstances that you are faced with in assessing whether or

16   not someone presents a potential threat to either you or a

17   family member?

18   A    Yes.

19   Q    Based on the -- what factors did you consider that

20   evening, aside from the fact that he didn't say, "I'm going

21   to kill you," or "I'm going to kill my son," did you conclude

22   that Leonard generally presented a threat to both E█████ and

23   to others in the area?

24   A    Yes.

25   Q    Based on what?

1  A    Based on my initial conversation, which he was irate, he

2  was cursing at me, he was very angry.  I was also given the

3  information from Sergeant Luckman, and I was advised that

4  there were some officer-safety flags, one being a

5  suicide-by-cop flag and then the other one was a

6  drive-by-shooting conviction that he had.

7  Q    Based on your training and experience, are you supposed to

8  take those sorts of things into account, like an officer

9  alert issued by a police department, when determining whether

10 or not someone may present a danger?

11 A    Yes.

12 Q    Does it matter to you, based on your training and

13 experience, that the officer-safety alert had been issued 18

14 months before?

15 A    No, it doesn't matter.

16 Q    For example, if someone had threatened suicide-by-cop or

17 assaulted a police officer, would you ever say, "Well, that

18 happened a year and a half ago, so I'm not going to worry

19 about it now"?

20 A    No.

21 Q    Looking at Exhibit 238, when you first arrived up at the

22 BearCat, you were near the front?

23 A    Yes.

24 Q    And then did Detective Thompson and Annalesa come around

25 the back here?

```
 1   A    At some -- at one point, they -- I remember them going

 2   around there.

 3   Q    Did you generally stay near the front?

 4   A    Yes.

 5   Q    I will have you look at Exhibit 240.  Is this photo the

 6   view that you had as the breach went off, you described

 7   looking over the winch at the front of the BearCat?

 8   A    Yes.

 9   Q    Is this what you would have been watching as the explosion

10   went off that night?

11   A    Yes.

12   Q    When you described how Leonard grabbed the child, this is

13   the view you had?

14   A    Yes.

15   Q    When you indicated that Leonard raised his hands, was that

16   the first time -- as soon as you got up to the BearCat, he

17   came out with E███████ and raised his hands, correct?

18   A    Yes, that I can remember.

19   Q    And at some point, after communication between E███████ and

20   Annalesa and Leonard and Annalesa -- well, back up.  At some

21   point did Annalesa call out to E███████?

22   A    Yes.

23   Q    Did Leonard have any response to that?

24   A    I remember him saying, "Mom, you come get him," or

25   something like that.
```

Q   Were the other SWAT officers in the area doing anything to

try to encourage Leonard to let E████ go to his grandmother?

A   They were -- they were telling him that his mom was or

"She's here, let him go" or something like that.

Q   When Leonard said, "No, mom, you come up and get him," to

you, as an experienced hostage negotiator, would you ever let

that happen?

A   No.

Q   Is it common for hostage takers to ask to see their family

at a scene like this?

A   Yes, it's common.

Q   Is that something that you receive training on as a

hostage negotiator, the fact that hostage-takers will often

demand that their family come up to the house?

A   Yes.

Q   Have you received training on why that usually happens?

A   Yes.  We are taught that a lot of times when someone in

crisis asks to see their family like that, or in a hostage

situation, a lot of times they are trying to cause harm to

that family member, and in this case, it being his mother.

Oftentimes they commit suicide, and that's their final act.

That's sometimes how they say good-bye or sometimes it's how

they hurt the family member.

Q   Based on your training and experience, was it already sort

of outside the normal practice to even bring Annalesa up that

1    far?

2    A    This -- this was not normal.

3    Q    Were you willing to go outside the box a little bit and

4    bring her up if that was going to be enough to secure

5    E█████'s release?

6    A    Yes.

7    Q    But would you ever be willing to let her walk up to the

8    porch in that situation?

9    A    No.  No.

10   Q    And you understood at the time that Annalesa was not only

11   E█████'s grandmother and Leonard's mom, but she was also the

12   person who called 911 to report the assault, correct?

13   A    Yes.

14   Q    Would you ever let the assault victim go up to the house

15   in a situation like this?

16   A    No.

17   Q    After the initial back-and-forth there, did Leonard take

18   E█████ and just go inside?

19   A    Yes.

20   Q    Did he say anything before he did that?

21   A    I can't remember him saying anything.

22   Q    When he took Annalesa -- or, I'm sorry, when he took

23   E█████ and went inside, did you and Detective Thompson, who

24   we heard from earlier today, did you say anything or have any

25   interaction?

```
 1   A    I remember us just kind of looking at each other and just,

 2   you know, wondering if we should -- if we should take her, if

 3   we should take Annalesa back to the command post area, the

 4   negotiator rig.

 5   Q    When you walked up, it was your understanding that Leonard

 6   would see his grandma, and E█████ would come out?

 7   A    Yes.

 8   Q    As you were discussing what should be done, did Leonard

 9   come out a second time with E██████?

10   A    Yes.

11   Q    Okay.  And then at some point did you see Leonard go back

12   in and see him looking out a window?

13   A    Yeah, I saw him looking -- the door had a window at the

14   top of it, and I remember him -- he was so tall -- that he

15   could look, he was looking through that window.

16   Q    The little window just in the top of the door there?

17   A    Yes.

18   Q    And then at some point did you see him crouching down

19   inside the living room, behind the almost-closed door there?

20   A    Yes.

21   Q    And while Leonard was crouched down inside the house and

22   E██████ was sitting out on the porch, that's when you heard

23   the countdown?

24   A    I'm sorry.  Can you say that again?

25   Q    When Leonard was crouched inside the front door and E██████
```

1    is sitting there on the porch, that's when you heard the

2    countdown start?

3    A    Yes.

4    Q    Okay.  And based on your experience, you knew what the

5    countdown meant?

6    A    Yes.

7    Q    Prior to beginning the countdown, nobody told you they

8    were going to start the countdown?

9    A    No.

10   Q    It would have been outside of normal for them to tell you

11   that they were going to start the countdown, correct?

12   A    Yes.

13   Q    At the time you heard the countdown start, how long had

14   you been at the BearCat?

15   A    I would say 10 minutes, 10, maybe 15 minutes.

16   Q    Was that longer than you had expected to be there based on

17   what you thought the plan was?

18   A    I thought it was going to be quick.  I thought we were

19   going to go there and then leave.

20   Q    Based on your training and your experience, at the time

21   the breach occurred, did it appear that Leonard was just

22   about to release E███████?

23   A    From what I could see, it did not appear that he was going

24   to release him.

25   Q    Did you see or hear anything that night that, based on

1    your experience, convinced you that Leonard was planning on

2    letting E████ go at all?

3    A    No.

4    Q    Based on your training and experience and what you were

5    actually seeing that night, did you have any doubt that

6    Leonard was using E████ as a bargaining chip with the police

7    that night?

8    A    That's what I felt like he was doing.  It felt like he was

9    using him as a bargaining chip.

10   Q    At the time the countdown started, based on the

11   interaction between Leonard and Annalesa, did you have any

12   feelings as to whether or not he was trying to lure her up

13   there to the house?

14   A    I thought he wanted her to come up to the house.  That was

15   the impression I was getting.

16   Q    Have you been on calls before where breaching charges were

17   used to sever the hinges on a door?

18   A    Yes.

19   Q    Have you been on trainings before where that's been done?

20   A    Yes.

21   Q    Have you received training on the purpose and use of those

22   breaches?

23   A    Yes.

24   Q    Have you been -- have you received training on what

25   suspects  are generally expected to do in response to a

1   breaching charge like this?

2   A    Yes.

3   Q    What are suspects generally expected to do in reaction to

4   a breaching charge like this?

5   A    Typically, when a flash-bang goes off, or a breach, all

6   the people that I have seen have either just -- it's like

7   they're in shock.  They freeze or they will drop to the

8   ground.  It makes them disoriented.  Even if you are

9   expecting it, or you see it, like as a negotiator, when we

10  see that flash, it also stuns us a little bit.

11  Q    When the breaching charge went off at the backdoor, as you

12  looked at this view, did Leonard react the way all the other

13  suspects had reacted?

14  A    No.

15  Q    Were you surprised that he didn't freeze or seem

16  disoriented at all by the boom at the backdoor?

17  A    Yes.

18  Q    When the breach occurred, or when the breach occurred and

19  Leonard came out of the house towards E_____, the SWAT

20  tactical officers in the front were sprinting across the

21  street towards the porch, correct?

22  A    Yes.

23  Q    And you were just sort of squatting down, looking over,

24  with this view, correct?

25  A    Yes.

 1    Q    You weren't moving or giggling around or anything?

 2    A    No.

 3    Q    When Leonard grabbed E█████, and you described him holding

 4    him up here, was E█████ facing out toward you?

 5    A    Yes.

 6    Q    When Leonard grabbed E█████, did he lean over and lay on

 7    top of him or anything like that?

 8    A    No.

 9    Q    Did he just pick him up -- which direction did he turn?

10    A    So Leonard turned his back towards the door and was

11    walking backwards into the residence.  So it looked like he

12    was backpedaling in.

13    Q    So he didn't grab E█████ and then turn and run into the

14    house?

15    A    No.

16    Q    He picked up E█████, turned towards you, and started

17    backing up into the house like this?

18    A    Yeah.

19    Q    With his head right beside E█████'s, correct?

20    A    Yes.

21    Q    When Leonard picked him up and held him like that and

22    started backing toward the door, did it appear to you as some

23    sort of  fatherly protective action?

24    A    No.  It was -- that's the hard part for me to talk about.

25    I felt like he grabbed him, and it wasn't something a loving

1   father would do.

2   Q   You have seen parents grab their kids to prevent them from

3   running out in front of a car, for example, correct?

4   A   Yes.

5   Q   Did it appear to you that that's the sort of thing that

6   was going on at the time?

7   A   No.

8   Q   The way that Leonard grabbed E███ and started backing

9   into the house as he is holding him up, did it cause you, as

10  you were watching this, to have some concern that E███ was

11  facing a threat of imminent harm at the time?

12  A   Yes.

13  Q   Aside from the way that he held him in front, did the fact

14  that he was taking him back in the house cause you some sort

15  of concern?

16  A   Yes.

17  Q   Why?

18  A   I felt like given, you know, the past information I got

19  about him dangling him out the second-story window.  I

20  thought also that the fact that there's SWAT officers coming

21  in the back, so I felt like he was -- he was going to

22  encounter them with the child.

23  Q   Based on what you were actually watching there at the

24  time, was there any doubt in your mind that Leonard posed a

25  threat of imminent harm to E███'s safety?

 1  A    There was no doubt.

 2  Q    Can you show on the exhibit here where Detective, or if

 3  you know, where were Detective Thompson and Annalesa Thomas

 4  standing at the time of the breach?

 5  A    When I was over here, when I -- I went over here for the

 6  countdown, they were like in this area right here.

 7  Q    Based on where they were at the time of the breach, is

 8  there any way that either one of them could have seen what

 9  happened at the front of the house?

10  A    No.

11  Q    After -- well, pick up the story when Leonard is walking

12  back in.  At some point, before he gets all the way back in

13  the house, you hear a shot, correct?

14  A    Yes.

15  Q    Did you -- where did you feel like it came from?

16  A    I felt like it came over me.

17  Q    And you know now that Sergeant Markert was behind you to

18  your left, correct?

19  A    Yes.

20  Q    And nobody had told you where he was before that?

21  A    I saw him when we first got up there.  I saw him in that

22  area.

23  Q    Would it be -- did the tactical team always tell you

24  exactly where everyone was at the time?

25  A    No.

```
 1   Q    After Leonard was shot and you saw him fall back into the
 2   house, what did you do then?
 3   A    After the first shot, I froze, just -- I didn't want to
 4   get in the way.  There was a shot that just was pretty close
 5   over me, so I froze.  I just stayed where I was.  And then
 6   the officers went for the house, went for the front area, and
 7   then I heard more shots, and at that point, after hearing the
 8   shots, I came out from where I was, I came out from cover.
 9   Q    Did you eventually go up to the house to get E____?
10   A    I did.  I did.
11   Q    Describe how that came about.
12   A    When I saw E____ -- after hearing the shots, I saw
13   E____, and one of the officers was holding him, and I didn't
14   know if someone else had been shot in the house, didn't know
15   if another officer had been shot, and so I made the decision
16   to go grab E____.  I grabbed him, and then I ran around the
17   fence, and I ran as fast as I could to where the command post
18   was set up.
19   Q    What did you do with E____?
20   A    I took him to his mother.
21   Q    And she was still sitting in the back of Officer
22   Wyrwitzke's police car, correct?
23   A    Yes.
24   Q    Did Annalesa come back and be reunited there in the same
25   police car with the two of them?
```

1    A    I think so.

2          MR. CULUMBER:  I don't have anything further.  Thank

3    you.

4          THE COURT:  Any redirect?

5          MR. WHEDBEE:  Yes, Your Honor.

6                     REDIRECT EXAMINATION

7    BY MR. WHEDBEE:

8    Q    Sergeant Malave, when defense counsel asked you about your

9    training -- or do you recall the line of questioning from

10   defense counsel where he asked you whether you were trained

11   to not assume that people aren't armed when they tell you

12   they're not armed; is that right?

13   A    Yes.

14   Q    And he also said that you're trained that there could be

15   any number of objects in a house that could be used as a

16   weapon; is that right?

17   A    Yes.

18   Q    So these are a butter knife, a steak knife, a screwdriver,

19   anything like that could be a weapon; is that right?

20   A    Yes.

21   Q    Just like it is in anybody's home, correct?

22   A    Yes.

23   Q    And you're trained to be skeptical, correct, when somebody

24   says that they're not armed?

25   A    I'm not trained to be skeptical.  I'm trained to be

1    cautious.

2    Q    And not to make assumptions, right?

3    A    Yes.

4    Q    Okay.  But your training doesn't tell you that you can use

5    lethal force based only on a potential threat, based on

6    something that might be in a home; is that right?

7    A    I'm sorry.  Can you say that again?

8    Q    You were not trained that just because somebody might have

9    a weapon or an object that could be a weapon in their house,

10   that you can use deadly force to essentially prevent them

11   from accessing a potential threat, right?

12   A    That's not necessarily true.  That is -- if someone is

13   going to cause harm to somebody, then that's where that

14   statement isn't really accurate.

15   Q    But there must be some particular indication that somebody

16   is actually going to harm another person before you can

17   resort to deadly force to prevent that from happening,

18   correct?

19   A    Correct.

20   Q    You can't just do it because you are speculating that

21   there might be a potential threat in the home?

22   A    Correct.

23   Q    Okay.  Now, you mentioned the threat, quote/unquote, that

24   you were discussing in response to defense counsel's

25   questioning.  And that was that Mr. Thomas was irate,

1    correct?

2    A    Yes.

3    Q    And he was cursing?

4    A    Yes.

5    Q    And that he had been involved in some drive-by shooting at

6    some point in his life, right?  Correct?

7    A    Yes.

8    Q    And that he had made an alleged comment about

9    suicide-by-cop maybe some 20 months before this incident,

10   right?

11   A    Yes.

12   Q    And then you mentioned that he had dangled his child out,

13   correct?

14   A    Yes.

15   Q    But you never heard Sergeant Luckman use the word

16   "dangle."  I think your testimony was you did not hear that?

17   A    I don't remember if it was "dangled," I don't remember if

18   it was "held out the window."  I -- the impression that I got

19   was that he was dangled or held out the window.

20   Q    And this had occurred --

21   A    Prior to my --

22   Q    Regardless of how it actually occurred, it had occurred

23   hours before the five minutes or so before Leonard was shot,

24   correct?

25   A    I don't know the time length of when that happened to when

1    he was shot.

2    Q    So when Mr. Culumber referred to the totality of the

3    circumstances, that was the universe of the circumstances

4    that you were considering, correct, those things that you

5    testified to?

6    A    Yeah.  I was considering that him cursing and being irate,

7    to me meant that he was -- I felt like he was unstable, I

8    felt like he was going up and down, I felt like the drive-by

9    shooting and the suicide-by-cop were not just things that

10   just happened, but the drive-by shooting being something

11   where he actually pointed a gun at somebody and shot at them,

12   the suicide-by-cop was also another definite area of concern.

13   Q    Those last two things, that had occurred in the past,

14   correct?

15   A    Yes.

16   Q    So before the breach went off, do you believe that

17   E█████ -- or, excuse me, that Leonard posed an imminent risk

18   of serious bodily injury or death to his child?

19   A    I believe that something bad was going to happen to the

20   child by him going into the house.

21   Q    Before the breach?  Before the breach occurred and Leonard

22   took E██████ with him back into his house, or at least tried

23   to, do you believe that Leonard Thomas posed an imminent risk

24   of serious bodily injury or death to his child, E██████?

25   A    At that time I didn't.

1   Q    Okay.  Now, you described that Annalesa had been brought

2   forward and that she was behind the BearCat and telling

3   E████ to come, and Leonard was saying --

4           MR. CULUMBER:  Objection.  Asked and answered.

5           THE COURT:  Sustained.

6   Q    Would you characterize the final back-and-forth between

7   Annalesa and Leonard as an impasse in the negotiations about

8   whether he would release E████?

9   A    I characterize it as that he was trying to get her to come

10  to the house.

11  Q    But he had never threatened Annalesa, correct?

12  A    He never verbally said anything to her, but I was aware

13  that they had some sort of altercation prior.

14  Q    Right.

15          But you don't know who struck whom and that and such?

16  A    I don't.

17  Q    But what I'm talking about, the last five minutes or so,

18  Leonard didn't articulate any threat to his mother, did he?

19  A    No.

20  Q    And he never articulated any threat to E████; is that

21  right?

22  A    No.

23  Q    And he never articulated any threat to the officers that

24  were outside?

25  A    No.

1    Q    And the officers that were encouraging E█████ to come in

2    those last moments, these were officers who were dressed in

3    their tactical gear, correct?

4    A    Some of them were.  I couldn't see all of them.  It was

5    dark.

6    Q    And they were armed, correct?

7    A    Yes.

8    Q    With rifles?

9    A    I don't know if they all had rifles.

10   Q    Do you think that some did?

11   A    Some had rifles.

12   Q    Okay.

13        MS. CARTWRIGHT:  Christy, could you bring up the

14   interview transcript, please?  Page 11, line 44.  If you

15   could just highlight those lines, 484 to 494?

16        Thank you.

17   Q    Sergeant Malave, can I just ask you a question?

18   A    Yes.

19        THE COURT:  Haven't we just seen this before,

20   counsel?

21   A    We did earlier.

22   Q    When you were interviewed on that morning several hours

23   after the incident, your accurate account to the CRU

24   investigators was that you never saw him hold his child like

25   a shield; is that right?  Is that what that says on that

```
 1   transcript?
 2            THE COURT:  He has already answered that, counsel.
 3   We've already had this.  He's already answered it.
 4            MR. WHEDBEE:  Okay.
 5   Q   How many times did you meet with defense counsel before
 6   your testimony today?
 7   A   How many times did I meet with them?
 8   Q   Yeah.
 9   A   I think twice.  And today.
10   Q   And how long did you meet with them today?
11   A   Briefly checked in with them.  And at lunch.  They
12   delivered food to us.
13   Q   And how long did you meet with them to prepare for today's
14   testimony?
15   A   I didn't prepare with them today.
16   Q   Did you meet with them sometime recently to prepare for
17   today's testimony?
18   A   I did several weeks ago.
19   Q   Okay.
20            MR. WHEDBEE:  Thank you, Your Honor.
21            MR. CULUMBER:  Do you have anything, John?
22            MR. CONNELLY:  Oh, I may have something.
23                      REDIRECT EXAMINATION
24   BY MR. CONNELLY:
25   Q   Just one clarification question --
```

1   A    Yes, sir.

2   Q    -- from something that was asked.

3        When that breach occurred, or immediately before that

4   breach occurred, E███████ was three steps down and Leonard was

5   in the doorway, correct?

6   A    I can't remember how many steps down it was.

7   Q    Three to four?

8   A    Okay.

9   Q    All right.  Leonard wasn't even touching E███████ at that

10  point; he was discussing things with Annalesa and

11  negotiators, correct?

12  A    Yes.

13  Q    And then the breach went off?

14  A    Yes.

15  Q    All right.

16       MR. CONNELLY:  Thank you.

17                    RECROSS-EXAMINATION

18  BY MR. CULUMBER:

19  Q    Showing you your -- what number is this? -- 501, where you

20  said -- you were asked about, "Did he hold him as a shield?"

21  and you say, "I never saw him hold his child like that."

22       If you go back to the page before, they were asking you

23  about what was reported to you about what he had done before

24  you got here, before you got there, correct?

25  A    Yes.

Q    At one point, Caban was saying, "It appeared he was using
him as a shield," and you say, "I didn't see that.  I'm just
telling you what I heard prior to my speaking with him on the
phone."

A    Yes.

Q    So you weren't talking about at the end; you were talking
about the briefing that you had received when you initially
arrived at the scene?

A    I was trying to explain to them the information that I
received from Sergeant Luckman at the time.

Q    So when you said, "I never saw him hold his child like
that, like a shield," you were talking about the report that
he had done that before you got there?

A    Correct.

          MR. CULUMBER:  That's all I have.

          THE COURT:  You may -- well, I can't tell you to step
down because you have already stepped down.  But you are
excused.

          DETECTIVE MALAVE:  Thank you, Your Honor.  Thank you
for letting me stand.

          THE COURT:  Take care of that back.

          DETECTIVE MALAVE:  Thank you, Your Honor.

          THE COURT:  Counsel, I think we're close enough to
the end of the day.  I don't think we should start with a new
witness at this point.  I think we can start fresh tomorrow

1  morning.

2      So I am going to excuse the jury.  And, yes, I'm going to

3  warn you, you must not be discussing the case amongst

4  yourselves, with your friends, your family, nor are you to

5  look up anything connected with the case, on any media or any

6  electronic device.

7      We will see you back here.  We will start at nine o'clock,

8  our usual time.  If you will retire to the jury room.

9      And, counsel, if you will wait just a moment, please.

10   (The following occurred outside the presence of the jury.)

11          THE COURT:  Counsel, have a seat for a minute.

12      Just a word of caution.  I don't know if you are going

13  over the same questions with the next witnesses that you went

14  over with the ones today, but you are reaching the point

15  where it's getting awfully repetitious, and it takes real

16  talent to take a case as interesting as this one and drag it,

17  you know?  I mean, you really have to work at it.  Because

18  this is a fascinating case and the jury finds it that, until

19  you start repeating it over and over again.  So watch it.

20  That's all, you know.  And be careful that you don't just go

21  over the same thing again and again.

22      Are we where you thought we would be, or are we ahead, or

23  behind?  I'm going to ask you this every day, counsel.

24          MR. FORD:  We are, I think, actually right where we

25  thought we were before things changed and then changed back.

1    So I think we are on schedule.

2         THE COURT:  Great.

3         MR. FORD:  Thank you.

4         MR. JOLLEY:  Your Honor, can we just take one minute

5    now to discuss something?  I think this will be quick.

6         THE COURT:  Sure.

7         MR. JOLLEY:  In the morning, I believe that the

8    plaintiffs are calling Officer Wilson, who was one of the

9    SWAT officers, and Officer Wilson came into the house, and

10   his job was to go clear the upstairs, to make sure that there

11   was nobody else up there, nothing going on that they needed

12   to know about.  And he had, earlier that night, seen Leonard

13   and E█████.  He could see them up in the upstairs window on

14   the front side of the house.  He had seen that repeatedly

15   earlier in the evening.  He goes upstairs into that

16   second-story bedroom, and that's where the big, six-inch

17   fixed-blade knife is on the bed.

18      And given that we have heard repeatedly how Mr. Thomas

19   wasn't armed, and yesterday, even in opening, I believe the

20   exact words from Ms. Cartwright were, "No guns were found in

21   the house," it would seem that, in fairness, given that

22   Officer Wilson can connect the bedroom to what he finds when

23   he goes into -- I say "connect the bedroom."  He can connect

24   Leonard and the boy with that upstairs bedroom and with the

25   knife because he's the one who finds it on the bed.  And so

1    it would seem that --

2        Also, he's the one that finds the Taser cartridge.  I

3    think the Court is now seeing where we were headed with the

4    Taser cartridge that was on the stereo console.

5        So I know the Court had earlier ruled that the photos were

6    not going to be pre-admitted, but given the state of the case

7    thus far and what we have heard from plaintiffs, it would

8    seem like that that door at this point is open, and that

9    would be our intention, to elicit from Officer Wilson what he

10   found, what he saw on the bed, and also what he saw on the

11   stereo console.

12           THE COURT:  Well, the Taser cartridge is not a

13   weapon, so I don't know why that would become relevant.  Even

14   if it's that he -- I realize you're saying that there was

15   some evidence that he was building up to be able to take

16   Tasers, but, you know, that's not even an issue.  No one ever

17   tried a Taser in this  situation, and there's no evidence

18   that anyone was thinking of  using a Taser.

19       But let's hear --

20           MR. JOLLEY:  Other than Mr. Thomas using the Taser.

21   That's the evidence.

22           THE COURT:  Let me hear from plaintiffs.

23           MS. CARTWRIGHT:  So just to give a complete picture

24   of where we're at on this issue, we had the pretrial

25   conference where the defendants showed the photos that they

1    intended to offer, and then both parties submitted briefing

2    on those photos, and the judge put out a minute order that

3    those photos were excluded.  And then yesterday, in opening,

4    I told the jury "No guns were ever found," because I was not

5    going to open that door, I was not going to say, "No weapons

6    were ever found," because we have heard extensive testimony

7    from numerous witnesses that everybody has knives in their

8    house.  And then Mr. Jolley got up here during opening and

9    said, "And I think you are going to hear evidence that there

10   were serious weapons found in other parts of that house,"

11   after he had told me that they were only going to use, in

12   opening, pre-admitted exhibits.  So we can't unring that

13   bell.  The jury has heard it.  And, you know, I'm not exactly

14   sure -- I was planning to bring it up before Officer Wilson's

15   testimony tomorrow.

16       I think the jury has heard people say that everybody has

17   knives in their house.  There was a knife.  I think that the

18   judge excluded the evidence of that particular knife on a

19   different floor from where Leonard was at when he was shot,

20   after much earlier in the evening they had seen E███████ in

21   that room.  And then after that, Leonard put him to bed, and

22   then after he agreed to release him, he went and woke him up

23   and he gathered his things.  And there is no evidence as to

24   how long that particular knife was in that particular room of

25   the house.

1       And so we still maintain that it's more prejudicial than

2   probative.

3       And with respect to the Taser cartridge, you need a Taser

4   to have electricity going into the Taser.

5           THE COURT:  Don't spend time on the Taser cartridge.

6   I'm not admitting the Taser cartridge.

7       I am concerned about the knife.  And I don't know how it

8   hurts anybody, because the testimony by both officers has

9   been whether or not there were weapons, they would have

10  behaved the same way, that it wouldn't have changed their

11  behavior.  But they didn't see the knife.  They didn't know

12  whether there were weapons in there or not.  But they would

13  have behaved the same way they behaved because they assumed

14  that, given their experience as police officers, when people

15  told them they were unarmed, and sometimes they were, and

16  sometimes they were lying about it, and the safest thing to

17  do is to always assume the worst, that people may have said

18  they were unarmed, but they really were armed.  That's been

19  shot through, and I assume everybody else is going to say the

20  same thing.  So I don't -- I'm not sure what the purpose of

21  showing the knife is anyway.

22          MR. JOLLEY:  Well, I think the purpose, Your Honor,

23  just to be frank, the position that they're taking, and what

24  they're actually inserting -- or asserting in front of this

25  jury is misleading.  And I think it's for the jury to

1    determine that if Leonard is backing into the house with the

2    boy the way he's holding him, who knows, if he's going

3    upstairs, that that's going to be his last stand, the Alamo.

4        But a six-inch, fixed-blade knife under Leonard's

5    circumstances has no purpose other than to stick a human.

6    It's not a butter knife, it's a fixed-blade knife, it's not

7    in a sheath.  It's on the bed where Officer Wilson saw E█████

8    earlier that night through the window.  And so I think it's

9    for the jury to determine whether it's factually accurate or

10   not when they're claiming that, well, they shot an unarmed

11   black man.  It wasn't prefaced with, "And he was unarmed

12   right at the threshold."  We're not talking about what's

13   inside.  It's misleading.

14           THE COURT:  Okay.

15           MR. CONNELLY:  And, Your Honor, the only point I

16   would add is what the Court just stated, is this is after the

17   fact that they're trying to bring in.  What's important is

18   what the police officers knew and what they saw at the time

19   that Leonard was shot.

20           THE COURT:  I'm going to take this under advisement.

21   I will give you a ruling -- Oh, you want to say something?

22           MS. CARTWRIGHT:  May I make one more point on this?

23           THE COURT:  Yeah.

24           MS. CARTWRIGHT:  When we briefed this subject before,

25   after the pretrial conference, we did submit law on this

1   issue, on what it means to be armed, and analogous cases that

2   have to do with criminal sentencing under Washington law, and

3   that something in a different part of the house does not make

4   somebody armed.

5       As far as a fixed blade, that just means you can't move

6   the blade.  Most knives are fixed blade unless it's a

7   switchblade or a pocket knife.  So, you know, I don't really

8   know what the significance of that is.

9           THE COURT:  I'm going to take it under advisement.  I

10  will give you a ruling before we put the witness on.

11          MR. FORD:  Your Honor, I have one other, just a

12  logistical question.  We have a lengthy -- not lengthy -- but

13  about a 30-minute interview tape of one of the officers from

14  the night afterwards.  We're going to play it in its

15  entirety.  It's one of the defendants'.  It's been admitted

16  as an exhibit.  And the transcript of that has also been

17  admitted.

18      We do not have the entirety of that closed captioned, so

19  we don't have a technological way to show the transcript with

20  the video.  And so what I would like to do, if the Court

21  would permit me, is to provide the jury with copies of the

22  admitted exhibits so that they can read along if they want.

23          THE COURT:  It's a very old-fashioned way of doing

24  it.  It's what we did for years.

25          MR. FORD:  Yes, Your Honor.

1          THE COURT:  I recollect any time we did play a tape,

2    we used to hand out copies.  So I don't see any problem with

3    that.

4          MR. FORD:  Thank you, Your Honor.

5          THE COURT:  Okay.  Well, counsel, I'm glad we're at a

6    pace where we want to be.  I will see you back here.  I will

7    get you a ruling before nine o'clock so you know what to do.

8    But we will start again at 9:00.

9       See you back.

10          MR. FORD:  Thank you.

11          MR. JOLLEY:  Thank you.

12                    (Proceedings adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4                    We, Nancy L. Bauer, CCR, RPR, and Nickoline

5    Drury, RPR, CRR, Court Reporters for the United States

6    District Court in the Western District of Washington at

7    Seattle, do hereby certify that we were present in court

8    during the foregoing matter and reported said proceedings

9    stenographically.

10                    We further certify that thereafter, we have

11   caused said stenographic notes to be transcribed under our

12   direction and that the foregoing pages are a true and

13   accurate transcription to the best of our ability.

14

15

16                    Dated this 22nd day of June 2017.

17

18                              /S/  Nancy L. Bauer

19                              Nancy L. Bauer, CCR, RPR
                                Official Court Reporter
20
                                /S/ Nickoline Drury
21
                                Nickoline Drury, RPR, CRR
22                              Official Court Reporter

23

24

25